Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,**
**(B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING**
**LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**(D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS,**
**(E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING,**
**AND (G) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477). The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

## <u>Relief Requested</u>

1.     By this motion, the Debtors seek entry of an interim order, substantially in the form

attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>"),[2] and a final order (the "<u>Final Order,</u>" and

together with the Interim Order, collectively, the "<u>DIP Orders</u>"):[3]

a.     authorizing the Debtors to obtain $90 million senior secured postpetition financing on a superpriority basis (the "<u>DIP ABL Credit Facility</u>" and the loans under the DIP ABL Credit Facility, the "<u>DIP ABL Loans</u>") pursuant to the terms and conditions of that certain Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP ABL Credit Agreement</u>"), by and among the DIP ABL Borrowers, Parent, as guarantor, and such other guarantors thereto from time to time (the "<u>DIP ABL Guarantors</u>," together with the DIP ABL Borrowers, the "<u>DIP ABL Loan Parties</u>"), Wells Fargo Bank, National Association, as agent (in such capacity, the "<u>DIP ABL Agent</u>"), for and on behalf of itself and the other lenders party thereto (the "<u>DIP ABL Lenders</u>"), the Issuing Lenders (as therein defined) and the Bank Product Providers (as therein defined) (collectively, the "<u>DIP ABL Parties</u>"), substantially in the form attached hereto as **<u>Exhibit B</u>**;

b.     authorizing the Debtors party thereto to execute and deliver the DIP ABL Credit Agreement and any other agreements and documents related thereto (collectively with the DIP ABL Credit Agreement, the "<u>DIP ABL Documents</u>") and to perform such other acts as may be necessary or desirable in connection with the DIP ABL Documents;

c.     granting the DIP ABL Credit Facility and all obligations owing thereunder and under the DIP ABL Documents to the DIP ABL Agent and DIP ABL Parties (collectively, and including all "Obligations" as described in the DIP ABL Credit Agreement (including the Last Out Obligations), the "<u>DIP ABL Obligations</u>") allowed superpriority administrative expense claim status in each of the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>");

d.     authorizing the Debtors (other than Debtor Hollander Sleep Products Canada Limited) to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to

---

[2]     Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the First Day Declaration (as defined herein) or Interim Order, as applicable.

[3]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

KE 61190851

$28,000,000.00 (the "DIP Term Loan Credit Facility," and the loans thereunder, the "DIP Term Loans," and the DIP Term Loan Credit Facility together with the DIP ABL Credit Facility, the "DIP Facilities") pursuant to the terms and conditions of that certain superpriority secured Debtor-in-Possession Term Loan Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Loan Credit Agreement," and together with the DIP ABL Credit Agreement, the "DIP Agreements"), by and among the DIP Term Loan Borrower, the guarantors party thereto from time to time (the "DIP Term Loan Guarantors," and together with the DIP ABL Guarantors, the "DIP Guarantors") (the DIP Term Loan Guarantors, together with the DIP Term Loan Borrower, the "DIP Term Loan Parties") (the DIP Term Loan Parties, together with the DIP ABL Loan Parties, the "DIP Parties"), the financial institutions party thereto from time to time as lenders (collectively, the "DIP Term Loan Lenders," and together with the DIP Term Loan Agent (defined below), the "DIP Term Loan Secured Parties") (the DIP Term Loan Secured Parties, together with the  DIP ABL Parties, the "DIP Lenders"), and Barings Finance LLC, as administrative agent (in such capacity, the "DIP Term Loan Agent," and, together with the DIP ABL Agent,  collectively, the "DIP Agents") for and on behalf of itself and the DIP Term Loan Lenders, substantially in the form of **Exhibit C**, attached hereto;

e.      authorizing the Debtors party thereto to execute and deliver the DIP Term Loan Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Term Loan Credit Agreement, the "DIP Term Loan Documents," and together with the DIP ABL Documents, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Term Loan Documents;

f.      granting the DIP Term Loan Credit Facility and all obligations owing thereunder and under the DIP Term Loan Documents to the DIP Term Loan Agent and DIP Term Loan Lenders (collectively, and including all "Obligations" as described in the DIP Term Loan Credit Agreement, the "DIP Term Loan Obligations," and together with the DIP ABL Obligations, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases, in each case subject to the Carve Out;

g.      granting the DIP Agents, for the benefit of themselves and the DIP Lenders and the DIP Obligations, automatically perfected security interests in and liens on all of the DIP ABL Collateral (as defined below), or DIP Term Collateral (as defined herein), as applicable, including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the Carve Out and  the priorities set forth herein;

3

    h.      authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' respective attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the applicable DIP Documents, including on the terms set forth in the fee letters attached hereto as **Exhibit D** and **Exhibit E**;

    i.      authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral (each as defined below) of the Prepetition ABL Secured Parties and Prepetition ABL Obligations under the Prepetition ABL Documents and the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents (each as defined below), and providing adequate protection to the Prepetition ABL Secured Parties, Prepetition ABL Obligations and Prepetition Term Loan Secured Parties for any Diminution in Value (as defined below) of their respective interests in the Prepetition Collateral, including the Cash Collateral, as applicable, and subject to the Carve Out;

    j.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

    k.      scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing; and

    l.      granting related relief.

2.     In support of this motion, the Debtors submit the declaration of Saul Burian, a Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan"), the Debtors' proposed investment banker, filed contemporaneously herewith (the "Burian Declaration"), and the *Declaration of Marc Pfefferle, Chief Executive Officer of Hollander Sleep Products, LLC, in Support of Debtors' Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith (the "First Day Declaration").

4

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 361, 362, 363(b), 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

**Background**

6.      Hollander Sleep Products is the largest pillow and mattress pad manufacturer in North America.  The Debtors also manufacture comforters and other basic bedding products.  The Debtors have their own brands, including Great Sleep®, I AM®, LC®, PCF®, and Restful Nights®, and also manufacture and sell licensed brands, including Simmons®, Ralph Lauren®, CHAPS®, Calvin Klein®, Therapedic®, Nautica®, 37.5®, and Dr. Maas®.  The Debtors are headquartered in Boca Raton, Florida, operate a main showroom in New York City, and have thirteen manufacturing facilities throughout the United States and Canada.  In addition to the North American operations, the Debtors also have a sourcing, product development, and quality control

KE 61190851

office in China.  The Debtors generated approximately $527 million in net revenue in fiscal year 2018 and currently employ more than 2,300 people across the United States.  As of the date hereof, the Debtors have approximately $233 million in funded debt.

7.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

**Preliminary Statement**

8.      The Debtors require relief to continue operations which they can accomplish in chapter 11 with a balance sheet restructuring or an asset sale.  Today's filings will enable them to pursue both paths towards a fairly prompt and efficient emergence.  The Debtors urgently need an infusion of new money to continue operations and fund the administrative costs of these chapter 11 cases.  New money will also send an important signal to their stakeholders that the Debtors have a path to emergence and will continue as a going-concern.

9.      To these ends, they have entered into debtor-in-possession ("DIP") financing agreements with their prepetition secured term and asset-based lenders to fund these cases, whether the path is a restructuring or a sale.  The proposed DIP facilities also reflect the lenders' support for the Debtors' proposed plan process in at least two important respects.  First, the term lenders agreed to a restructuring support agreement pursuant to which they will either own the reorganized business or be paid cash from a sale process.  In either event they will support the Debtors' exit through a chapter 11 plan and the payment of administrative expense and priority claims.  Second, the term loan facility will roll into the Debtors' proposed new money exit facility (being provided by certain of the DIP term loan lenders), providing the Debtors a clear path to

6

emergence.  Additionally, the proposed funding is essential to preserving and maximizing the value of the Debtors' assets.

10.     As described below and in the Burian Declaration, the Debtors' proposed DIP Facilities are the product of hard-fought, good-faith negotiations with the Debtors' secured stakeholders.  By this motion, the Debtors seek approval of the $90 million DIP ABL Facility provided by the Prepetition ABL Lenders (as defined herein), consisting of a revolving credit facility of up to $90 million, and the $28 million DIP Term Loan Facility provided by certain Prepetition Term Loan Lenders (as defined herein), which will provide the Debtors with $28 million of new money financing (and an immediate $15 million upon entry of the Interim Order).  If approved, the DIP Facilities will provide the Debtors with ample liquidity to fund the Debtors' business operations and administrative expenses during the contemplated time period of these chapter 11 cases.  Moreover, access to the DIP Facilities will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis, which is critical given concerns raised by certain of the Debtors' vendors prior to the Petition Date.

11.     For these reasons, and for the reasons set forth below, in the Burian Declaration, and in the First Day Declaration, the Debtors firmly believe that authorizing the Debtors to enter into the DIP Documents is vital, will avoid irreparable harm to operations (through immediate access to funding under the Interim Order), will maximize value for the Debtors' stakeholders, and represents an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

KE 61190851

## Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[4]

### I.       Concise Statement Regarding the DIP ABL Facility.

12.       The below chart contains a summary of the material terms of the proposed DIP

ABL Facility, together with references to the applicable sections of the relevant source documents,

as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Hollander Home Fashions Holdings, LLC<br>Hollander Sleep Products, LLC<br>Hollander Sleep Products Kentucky, LLC<br>Hollander Sleep Products Canada Limited<br>Pacific Coast Feather, LLC, and<br>Pacific Coast Feather Cushion, LLC<br><br>*See* DIP ABL Credit Agreement, Intro. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Dream II Holdings, LLC<br>*See* DIP ABL Credit Agreement, Intro. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | A syndicate of banks, financial institutions, and other entities arranged by Wells Fargo Bank, National Association<br><br>*See* DIP ABL Credit Agreement, Intro. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Facilities include standard and customary conditions that require the Borrowers to provide periodic reports to the DIP ABL Lenders and their respective professionals regarding the Approved Budget, the status of these chapter 11 cases, and certain other matters.  The failure of the Borrowers to comply with such reporting obligations will cause an Event of Default that may permit the DIP Agents to exercise remedies against the Borrowers, including terminating the DIP Facilities.<br><br>*See* DIP ABL Credit Agreement § 5.2. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties (the "Prepetition Secured Parties")<br><br>*See* Interim Order, Intro. |

---

[4]    This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

[5]    Capitalized terms used but not otherwise defined in this chart shall have the meanings ascribed to them in the DIP ABL Credit Agreement or Interim Order, as applicable.

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | The earliest of (a) the date that is one hundred fifty (150) days after the Filing Date, (b) the consummation of a sale of all or substantially all of the Debtors' assets, (c) if the Final Financing Order has not been entered, the date that is forty (40) days after the date of the First Day Hearing, (d) the Plan Effective Date of a Plan and (e) the Maturity Date (under and as defined in the Prepetition Term Loan Credit Agreement).<br><br>*See* DIP ABL Credit Agreement, Schedule 1.1. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Adequate Protection Liens.  Subject to the terms of the DIP Intercreditor Agreement and the Carve Out, pursuant to Sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Secured Parties and the Prepetition ABL Obligations in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the DIP ABL Loan Parties hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties and the Prepetition ABL Obligations, continuing valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP ABL Collateral.<br><br>Priority of Adequate Protection Liens.  Subject to the terms of the DIP Intercreditor Agreement:<br><br>(i) The Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out (and the caps and limitations set forth therein).  The Prepetition ABL Adequate Protection Liens shall otherwise be junior only to:  (a) with respect to the DIP ABL Priority Collateral (other than to the extent securing the Last Out Loan Obligations) (1) Permitted Prior Liens; (2) the DIP ABL Liens; and (3) the Prepetition ABL Liens; and (b) with respect to the DIP Term Loan Priority Collateral (1) Permitted Prior Liens; (2) the DIP Term Loan Liens; (3) the Prepetition Term Loan Liens; (4) the Prepetition Term Loan Adequate Protection Liens; (5) the DIP ABL Liens; and (6) the Prepetition ABL Liens. The Prepetition ABL Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP ABL Loan Parties' assets.<br><br>(ii) The Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior only to:  (a) with respect to the DIP ABL Priority Collateral (1) Permitted Prior Liens; (2) the DIP ABL Liens; (3) the Canadian Intercompany Superpriority Administrative Claims (4) the Prepetition ABL Liens; (5) the Prepetition ABL Adequate Protection Liens; (6) the DIP Term Loan Liens; and (7) the Prepetition Term Loan Liens; and (b) with respect to the DIP Term Loan Priority Collateral (1) Permitted Prior Liens; (2) the DIP Term Loan Liens; and (3) the Prepetition Term Loan Liens.  The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Term Loan Parties' assets.  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens<br><br>Adequate Protection Payments and Protections for Prepetition ABL Parties.  As further adequate protection, the Debtors are authorized and directed to provide adequate protection to the (A) Prepetition ABL Secured Parties and Prepetition ABL Obligations in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) interest, at the default rate (other than on account |

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| | of Last Out Loans and Last Out Obligations, provided that the Last Out Loans and Last Out Obligations shall accrue interest at the default rate as part of the Last Out Loans and Last Out Obligations), (ii) principal due under the Prepetition ABL Documents (other than on account of Last Out Loans and Last Out Obligations), subject to the rights preserved in paragraph 42 below, and (iii) immediately upon entry of this Interim Order, payment of fees and expenses as provided in the DIP ABL Credit Agreement; *provided,* that Prepetition ABL Adequate Protection Payments with respect to the subsection (i) above shall be paid monthly and upon entry of the Final Order, all accrued and unpaid Prepetition ABL Adequate Protection Payments for the period prior to the entry of the Final Order shall be paid, in cash, upon entry of the Final Order. <br><br> Adequate Protection Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties and Prepetition Secured Obligations hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties and Prepetition Secured Obligations of the adequate protection provided herein shall not be deemed an admission that the respective interests of the Prepetition Secured Parties and Prepetition Secured Obligations are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties and Prepetition Secured Obligations to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection. <br><br> *See* Interim Order ¶¶ 12–18. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or the Prepetition Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties under the DIP Documents, the DIP Facilities and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order and the DIP Documents. <br><br> *See* Interim Order ¶ 23. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(5) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order. <br><br> *See* Interim Order ¶ 39. |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br>Local Rule 4001-2(a)(i)(C) | Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Agents, DIP Lenders, DIP Obligations, the Prepetition Secured Parties, the Prepetition Secured Obligations, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agents, DIP Lenders, and Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.<br><br>*See* Interim Order ¶ 44. |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B) | Subject to entry of a Final Order, the Prepetition Secured Parties and Prepetition Secured Obligations are each entitled to all of the rights and benefits of section 552(h) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties and Prepetition Secured Obligations, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.<br><br>*See* Interim Order ¶ 46. |
| **Commitments**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP ABL Facility commitments total $90 million.<br><br>*See* DIP ABL Credit Agreement § 1.1; Interim Order ¶ 3. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Loans will bear interest, at the option of the Borrower, at one of the following rates:<br><br>- if a US Revolving Loan or Canadian Obligation is a Base Rate Loan, the Base Rate + 2.00%; or<br><br>- if a US Revolving Loan or Canadian Obligation is a Non-Base Rate Loan, LIBOR + 4.00%<br><br>Default Rate: Upon the occurrence and during the continuation of an Event of Default and at the election of the Agent or Required Lenders (a) all Revolving Loans and all other Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a per annum rate equal to 2 percentage points above the per annum rate otherwise applicable thereunder, and (b) the applicable Letter of Credit Fee shall be increased to 2 percentage points above the per annum rate otherwise applicable hereunder.<br><br>*See* DIP ABL Credit Agreement §§ 2.6; Sch. 1.1. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | - On or before the date that is 2 Business Days following the First Day Hearing in the Bankruptcy Cases, the Bankruptcy Court shall have entered the Interim Financing Order, on the terms and conditions contemplated by Loan Documents and otherwise in form and substance satisfactory to Agent; and on or before the date that is 3 Business Days following the entry of the Interim Financing Order, the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Interim DIP Recognition Order, and the Canadian Supplemental Order, in form and substance satisfactory to Agent;<br><br>- On or before the date that is 7 days following the Filing Date, the Debtors shall have filed a motion requesting an order from the Bankruptcy Court approving bid procedures relating to the solicitations of qualified bids for the sale of substantially |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| | all of the Debtors' assets and business (the "Bidding Procedures"), which motion and Bidding Procedures shall each be in form and substance reasonably satisfactory to Agent (the "Bidding Procedures Order") (it being agreed that the proposed bidding procedures order filed with the Bankruptcy Court on the Closing Date is satisfactory to Agent); and on or before the date that is 3 Business Days following the entry of the Bidding Procedures Order, the Canadian Court shall have issued an order recognizing the Bidding Procedures Order in the Recognition Proceedings;<br><br>• On or before the date that is 40 days following the First Day Hearing in the Bankruptcy Cases, the Bankruptcy Court shall have entered the Final Financing Order, on the terms and conditions contemplated by the Loan Documents and otherwise in form and substance satisfactory to Agent; and on or before the date that is 3 Business Days following the entry of the Final Financing Order, the Canadian Court shall have issued the Canadian Final DIP Recognition Order in the Recognition Proceedings;<br><br>• On or before the date that is 40 days following the Filing Date, but in any event no later than entry of the Final Financing Order, the Loan Parties shall file the Proposed Plan, and a disclosure statement (the "Disclosure Statement") relating to the Proposed Plan, in each case, in form and substance reasonably satisfactory to Agent in respect of the Obligations (other than the Last Out Obligations) being paid in full upon the Plan Effective Date;<br><br>• On or before the date that is 45 days following the Filing Date, the Debtors shall have filed their Schedules and Statement of Financial Affairs pursuant to Section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure with the Bankruptcy Court;<br><br>• On or before the date that is 45 days following the Filing Date, the Bankruptcy Court shall have entered an order setting the date (the "Bar Date") by which proofs of claim for general unsecured creditors must be filed (the "Bar Date Order"); and on or before the date that is 3 Business Days following the entry of the Bar Date Order, the Canadian Court shall have issued an order recognizing the Bar Date Order in the Canadian Proceedings;<br><br>• On or before the date that is 45 days following the Filing Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, in form and substance satisfactory to Agent with respect to the economic treatment of the Obligations (other than Last Out Obligations) and Existing Secured Obligations (other than the Existing Last Out Obligations) (the "Specified Bidding Procedures Order") (it being agreed that the proposed bidding procedures order filed with the Bankruptcy Court on the Closing Date is satisfactory to Agent); and on or before the date that is 3 Business Days following the entry of the Specified Bidding Procedures Order, the Canadian Court shall have issued an order recognizing the Specified Bidding Procedures Order;<br><br>• On or before the date that is 75 days following the Filing Date, the Bar Date shall have occurred;<br><br>• On or before the date that is 75 days following the Filing Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and voting and solicitation procedures for a Plan, in form and substance reasonably satisfactory to |



KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| | Agent (the "Disclosure Statement and Plan Solicitation Procedure Order"); and on or before the date that is 3 Business Days following the entry of the Disclosure Statement and Plan Solicitation Procedure Order, the Canadian Court shall have issued an order recognizing the Disclosure Statement and Plan Solicitation Procedure Order in the Recognition Proceedings;<br><br>• On or before the date that is 110 days following the Filing Date, the Bankruptcy Court shall have entered an order confirming a Plan (the "Plan Confirmation Order"), in form and substance reasonably satisfactory to Agent in respect of the Obligations (other than Last Out Obligations) being paid in full on the Plan Effective Date and otherwise reasonably satisfactory to Agent; and on or before the date that is 3 Business Days following the entry of the Plan Confirmation Order, the Canadian Court shall have issued an order recognizing the Plan Confirmation Order;<br><br>• On or before the date that is 120 days following the Closing Date, Parent and Borrowers shall have delivered to Agent a fully executed Exit Financing Commitment Letter; and<br><br>• On or before the date that is 120 days following the Filing Date, the effective date of a Plan shall have occurred.<br><br>*See* DIP ABL Credit Agreement, Sch. 5.2. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(10) | "Challenge Period" means (i) if the Creditors' Committee is not formed, seventy-five (75) calendar days (or such longer period as the Court orders for cause shown before the expiration of such period) from the entry of the Final Order and (ii) if the Creditors' Committee is formed, sixty (60) days after the entry of the Final Order (or such longer period as the Court orders for cause shown before the expiration of such period).<br><br>*See* Interim Order ¶ 42. |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br>Local Rule 4001-2(a)(ii) | Subject to the terms and conditions contained in the Interim Order and the DIP ABL Credit Agreement, the Debtors shall, in each case only in compliance with the Approved Budget and in compliance with the terms and conditions in this Interim Order and the DIP Documents, use the proceeds of the DIP ABL Facility:<br><br>• to refinance the Prepetition ABL Facility;<br>• for working capital;<br>• for general corporate purposes;<br>• to pay adequate protection to the Prepetition ABL Lenders; and<br>• to pay interest, fees, and expenses in accordance with the Interim Order and DIP ABL Credit Agreement;<br><br>*See* DIP ABL Credit Agreement § 6.11; Interim Order ¶ 9. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(B) | Debtors' Stipulations. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition ABL Lenders,' Put Purchasers,' and Prepetition Term Loan Lenders' claims and liens.<br><br>*See* Interim Order ¶ F. |

13

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | _Modification of Automatic Stay_. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or the Prepetition Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties under the DIP Documents, the DIP Facilities and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Agents, the DIP Lenders and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order and the DIP Documents.

_See_ Interim Order 23. |
| **Repayment Features** Local Rule 4001-2(a)(13) | _Optional Prepayments_. Borrowers may prepay the principal of any Revolving Loan at any time in whole or in part, without premium or penalty.

_Mandatory Prepayments_.

**(i) Borrowing Base**. If, at any time, (A)(x) the US Revolver Usage (excluding Last Out Obligations) on such date exceeds (y) the US Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers to Agent, or (B)(x) the US Revolver Usage (including Last Out Obligations) on such date exceeds (y) the US Maximum Revolver Amount less the Dollar Equivalent of the Canadian Revolver Usage, then, in each case, US Borrowers shall within one Business Day prepay the US Obligations in accordance with Section 2.4(f)(i) in an aggregate amount equal to the amount of such excess. If, at any time, (A) the Dollar Equivalent of the Canadian Revolver Usage on such date exceeds (B) the lesser of the Canadian Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers to Agent and the Canadian Maximum Revolver Amount, then Canadian Borrower shall within one Business Day prepay the Canadian Obligations in accordance with Section 2.4(f)(i) in an aggregate amount equal to the amount of such excess.

**(ii) Disgorgement**. In the event that Existing Agent or any of the Existing Lenders are required to repay or disgorge to Debtors or any representatives of the Debtors' estate (as agents, with derivative standing or otherwise) all or any portion of the Existing Secured Obligations authorized and directed to be repaid pursuant to the Financing Order, or any payment on account of the Existing Secured Obligations made to Existing Agent or any Existing Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or other applicable Insolvency Laws or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law, then, in such event, Borrowers shall prepay the Revolving Loans in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by Debtors or any representative of the Debtors' estate.

**(iii) Dispositions**. Immediately upon receipt by any Loan Party or any of its Subsidiaries of the Net Cash Proceeds of any disposition of any ABL Priority Collateral outside the ordinary course of business (including Net Cash Proceeds of insurance or arising from casualty losses or condemnations and payments in lieu thereof), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such disposition of such ABL Priority Collateral. Nothing contained in |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| | this <u>Section 2.4(e)(iii)</u> shall permit any Loan Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with <u>Section 6.4</u>. |
| | **(iv) Extraordinary Receipts**.  Immediately upon receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(f)</u> in an amount equal to 100% of such Extraordinary Receipts; provided, that any Extraordinary Receipts shall not include items of Term Loan Priority Collateral or proceeds of any assets of the categories in the definition of Term Loan Priority Collateral. <br><br> *See* DIP ABL Credit Agreement § 2.4. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(3) | Specified in the Fee Letter. <br><br> *See* DIP ABL Credit Agreement § 2.6. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br> Local Rule 4001-2(a)(2) | The Approved Budget is attached as **<u>Exhibit A</u>** to the Interim Order.  The Approved Budget is provided for informational purposes only and the provision of the Budget does not imply a budget compliance covenant. <br><br> *See* DIP ABL Credit Agreement §§ 4.12; Interim Order ¶ G(v). |
| **Variance Covenant** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(ii) | <u>Budget Compliance</u>. Except as otherwise provided herein or approved by the Agent (in its sole discretion), the Loan Parties will not, and will not permit any Subsidiary thereof to, directly or indirectly, (i) use any cash, including the proceeds of any Loans, in a manner or for a purpose other than those permitted under this Agreement or contemplated by the Financing Order or the Approved Budget, (ii) permit a disbursement causing any variance from the Approved Budget other than Permitted Variances without the prior written consent of the Agent (in its sole discretion), (iii) make any Pre-Petition Payment or application for authority to make any Pre-Petition Payment, other than those permitted by this Agreement, the Financing Order or the Approved Budget, (iv) make or commit to make payments to critical vendors (other than those critical vendors set forth in the Financing Order or in the Approved Budget, in each case as approved in writing by the Agent in respect of any pre-petition amount in excess of the amount included in the Approved Budget, (v) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash disbursements (in any event excluding disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Filing Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (vi) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder and under the Term Loan Credit Agreement) as reported in the Variance Reports delivered with respect to periods ending after the Closing Date through the end of such Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder and under the Term Loan Credit Agreement) forecast in the Approved Budget for the same such period, and (vii) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual net cash flow (in any event excluding from the calculation thereof disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Filing Date through the end of such Testing Period to exceed, |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| | by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period.<br><br>*See* DIP ABL Credit Agreement § 7(a). |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(4) | <u>DIP Liens</u>.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the applicable DIP Agents, for the benefit of themselves and the DIP Lenders and/or DIP Obligations, are hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of, with respect to the DIP ABL Obligations, each of the DIP ABL Loan Parties  or, with respect to the DIP Term Loan Obligations, each of the DIP Term Loan Parties, including without limitation:<br><br>(a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds,<br><br>(b) all owned real property interests and all proceeds of leased real property,<br><br>(c)  upon entry of a Final Order, proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral and, upon entry of a Final Order, proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code, and<br><br>(d) subject to entry of a Final Order, the Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof and including all DIP Collateral that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date.  DIP Collateral that is of a type that would be ABL Priority Collateral (as defined the DIP Intercreditor Agreement) and the proceeds and products thereof shall in each case, constitute "DIP ABL Priority Collateral," DIP Collateral that is of a type that would be Term Loan Priority Collateral (as defined in the DIP Intercreditor Agreement) and the proceeds and products thereof and shall, in each case, constitute "DIP Term Loan Priority Collateral".<br><br><u>DIP Lien Priority</u>.   The DIP Liens securing the DIP ABL Obligations (are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens shall be subject to the Carve Out, and shall otherwise be junior only to: (i) as to the DIP ABL Priority Collateral, Permitted Prior Liens; and (ii) as to the DIP Term Loan Priority Collateral, (A) Permitted Prior Liens; (B) the DIP Term Loan Liens (as defined below); (C) the Prepetition Term Loan Liens; and (D) the Prepetition Term Loan Adequate Protection Liens. The DIP Liens securing the DIP Term Loan Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[5] |
|---|---|
| | Term Loan Collateral, except that the DIP Term Loan Liens shall be (1) subject to the Carve Out and (2) shall otherwise be junior only to:  (i) as to the DIP Term Loan Priority Collateral, Permitted Prior Liens; and (ii) as to the DIP ABL Priority Collateral, (A) Permitted Prior Liens; (B) the DIP ABL Liens; (C) the Prepetition ABL Liens; (D) the Prepetition ABL Adequate Protection Liens; and (E) the Canadian Intercompany Superpriority Administrative Claims.   Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.  Notwithstanding anything herein to the contrary, none of the Prepetition Term Loan Adequate Protection Liens or DIP Term Loan Liens shall exist with respect to any ABL Canadian Collateral (as defined by the DIP Intercreditor Agreement).<br><br>*See* Interim Order ¶ 5. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(4) | Subject to entry of the Final Order, upon entry of a Final Order, proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral and, upon entry of a Final Order, proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code and subject to entry of a Final Order, the Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof and including all DIP Collateral that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date.<br><br>*See* Interim Order ¶ 5. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(10) | Usual and customary for financings of this type.<br><br>*See* DIP ABL Credit Agreement § 8. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Loan Documents and Interim Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type by each Borrower and each Guarantor (jointly and severally) in favor of the Agent-Related Persons, the Lender-Related Persons, and each Participant, subject to customary carveouts.<br><br>*See* DIP ABL Credit Agreement § 10.3; Interim Order ¶ 38. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | Conditions Precedent to Closing Date.<br><br>The DIP Loan Documents includes conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>Conditions Precedent to Each Revolving Loan and Letter of Credit.<br><br>The DIP Loan Documents includes conditions to all credit extensions that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP ABL Credit Agreement §§ 3.1, 3.2. |

KE 61190851

## II.    Concise Statement Regarding the DIP Term Loan Facility.[6]

13.    The below chart contains a summary of the material terms of the proposed DIP Term Loan Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Hollander Sleep Products, LLC *See* DIP Term Loan Credit Agreement Preamble; Interim Order Preamble. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | All Debtors, excluding Hollander Sleep Products, LLC and Hollander Sleep Products Canada Limited. *See* DIP Term Loan Credit Agreement, Sch. 1.1. |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | Barings Finance LLC, as administrative agent, and the lenders party to the DIP Term Loan Credit Agreement from time to time. *See* DIP Term Loan Credit Agreement Preamble; Interim Order Preamble. |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | Same as DIP ABL Credit Facility. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | Same as DIP ABL Credit Facility. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local Rule 4001-2(a)(2) | Same as DIP ABL Credit Facility. |

---

[6]    This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

[7]    Capitalized terms used but not otherwise defined in this chart shall have the meanings ascribed to them in the DIP Term Loan Credit Agreement or Interim Order, as applicable.

18

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | <u>Prepetition Term Loan Adequate Protection Liens</u>. Subject to the terms of the DIP Intercreditor Agreement and the Carve Out, pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Parties hereby grant to the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties continuing valid, binding, enforceable, and perfected postpetition security interests and liens on the DIP Term Collateral.<br><br><u>Priority of Adequate Protection Liens</u>.  Same as DIP ABL Credit Facility<br><br><u>Adequate Protection Reservation</u>.  Same as DIP ABL Credit Facility<br><br>*See* Interim Order ¶¶ 12–18. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Same as DIP ABL Credit Facility. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(5) | Same as DIP ABL Credit Facility. |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(l)(B)(x) Local Rule 4001-2(a)(i)(C) | Same as DIP ABL Credit Facility. |
| **Section 552(b)** Bankruptcy Rule 4001(c)(l)(B) | Same as DIP ABL Credit Facility. |
| **Commitments** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Commitment</u>.  The aggregate principal amount of $28 million.<br><br><u>Initial Commitment</u>.  $15 million in the aggregate.<br><br><u>Final DIP Loan Commitment</u>:  $7 million in the aggregate.<br><br><u>Budget Advance Date Commitment</u>:  $6 million in the aggregate.<br><br>*See* DIP Term Loan Credit Agreement, Sch. D-1. |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Loans will bear interest, at the option of the Borrower, at one of the following rates:<br><br>• LIBOR Rate Loans:  LIBOR + 7.00%; or<br><br>• Base Rate Loans:  Base Rate + 6.00%.<br><br>Default Rate: Automatically upon the occurrence of an Event of Default described in Section 8.1, (x) all the DIP Loans shall bear interest at a default rate of interest equal to an additional 2.00% per annum over the rate otherwise applicable and (y) all other DIP Facility Obligations under the DIP Loan Documents that are past due shall bear interest at a default rate of interest equal to (I) in the case of past due interest, the default rate applicable to the DIP Loans giving rise to such interest and (II) in the case of all such other DIP Facility Obligations, the default rate applicable to Base Rate Loans whether or not such Base Rate Loans are actually outstanding at such time, and, in each case, all such interest will be payable on demand.<br><br>*See* DIP Term Loan Credit Agreement § 2.6. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | • The Interim DIP Order shall have been entered by the Bankruptcy Court on or before two (2) Business Days following the date of the First Day Hearing;<br><br>• On or before the date that is 7 days following the Petition Date, the Loan Parties shall have filed a motion requesting an order from the Bankruptcy Court approving bid procedures relating to the solicitations of qualified bids for the sale of substantially all of the Loan Parties' assets and business, which motion and Bidding Procedures shall each be in form and substance reasonably satisfactory to Agent (it being agreed that the proposed bidding procedures order filed with the Bankruptcy Court on the Petition Date is satisfactory to the Agent);<br><br>• The Final DIP Order shall have been entered by the Bankruptcy Court on or before forty (40) days following the date of the First Day Hearing;<br><br>• Within forty (40) calendar days of the Petition Date, but in any event no later than entry of the Final DIP Order, the Loan Parties shall file a plan of reorganization, and a disclosure statement relating to such Plan, in each case, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders) (it being agreed that the plan of reorganization in the form attached to the RSA is satisfactory to the Agent and the Lenders);<br><br>• No later than forty-five (45) calendar days after the Petition Date, the Loan Parties shall have filed their Schedules and Statement of Financial Affairs pursuant to Section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure with the Bankruptcy Court;<br><br>• No later than forty-five (45) calendar days after the Petition Date the Bankruptcy Court shall have entered an order setting the date by which proofs of claim for general unsecured creditors must be filed;<br><br>• On or before the date that is 45 days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders) (it being agreed that the proposed bidding procedures order filed |

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| | with the Bankruptcy Court on the Petition Date is satisfactory to the Agent at the direction of the Required Lenders); <br><br> • The Bar Date shall have occurred on or before seventy-five (75) days following the Petition Date; <br><br> • No later than seventy-five (75) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and voting and solicitation procedures for the Proposed Plan in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders); <br><br> • No later than one hundred ten (110) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders) confirming the Proposed Plan; <br><br> • No later than the Confirmation Date, Borrower shall have entered into a commitment letter reasonably acceptable to the Agent with respect to the funding of an exit asset-backed credit facility; and <br><br> • No later than one hundred twenty days (120) calendar days after the Petition Date, the Plan Effective Date shall have occurred. <br><br> *See* DIP Term Loan Credit Agreement § 8.9. |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(10) | Same as DIP ABL Credit Facility. |
| **Use of DIP Financing Facility and Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(ii) <br> Local Rule 4001-2(a)(ii) | The proceeds of DIP Loans shall be used by the Borrower only for the following purposes, in each case in accordance with and subject to compliance with Section 6.19 and the DIP Orders (except as otherwise agreed by the Agent and the Required Lenders): (i) working capital and general corporate purposes of the Loan Parties, (ii) to fund the costs of the administration of the Chapter 11 Cases and the consummation of the Plan under the Bankruptcy Code, (iii) to fund interest, fees, and other payments contemplated in respect of this Agreement and the other DIP Loan Documents, and (iv) to fund allowed administrative expenses incurred during the Chapter 11 Cases. <br><br> *See* DIP Term Loan Credit Agreement § 4.28. |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br> Local Rule 4001-2(a)(i)(B) | Same as DIP ABL Credit Facility. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law** | Same as DIP ABL Credit Facility. |

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| **Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | |
| **Repayment Features** Local Rule 4001-2(a)(13) | Optional Prepayments. Borrower may prepay the principal of the DIP Loans at any time in whole or in part upon written notice, subject to the payment of any fees, premiums or other amounts owed under the Fee Letter and subject to any Funding Losses pursuant to Section 2.12(b)(ii), to Agent prior to 1:00 P.M., New York City time three Business Days prior to the date of prepayment (in the case of LIBOR Rate Loans), or prior to 1:00 P.M., New York City time at least one Business Day prior to the date of prepayment (in the case of Base Rate Loans).  Such notice shall specify, in the case of any prepayment of DIP Loans, the date and amount of prepayment and whether the prepayment is of LIBOR Rate Loans or Base Rate Loans or a combination thereof, and, in each case if a combination thereof, the principal amount allocable to each.  Any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by Borrower (by written notice to Agent on or prior to the specified effective date) if such condition is not satisfied.  Upon the receipt of any such notice Agent shall promptly notify each affected Lender thereof.  If any such notice is given and not revoked, the amount specified in such notice shall be due and payable on the date specified therein, together with (if a LIBOR Rate Loan is prepaid other than at the end of the Interest Period applicable thereto) any accrued and unpaid interest on the DIP Loans being repaid and amounts payable pursuant to Section 2.12(b)(ii).  Any prepayment of LIBOR Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof; and any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Agent shall apply any such optional prepayment to the outstanding amount of DIP Loans.

Mandatory Prepayments.

(A)      Borrower hereby unconditionally promises to pay to Agent for the ratable account of each Lender the then unpaid principal amount of, and unpaid accrued interest on, each DIP Loan of such Lender made to Borrower, on the Maturity Date (or such earlier date on which the DIP Loans become due and payable pursuant to Section 9.1) in cash without further application to or order of the Bankruptcy Court.  Borrower hereby further agrees to pay interest in cash on the unpaid principal amount of such DIP Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth herein.

(B)      Notwithstanding the foregoing Section 2.4(d)(i)(A), in lieu of any applicable portion of the cash payments otherwise owed to the Lenders with respect to the DIP Loans, the Lenders may receive non-cash consideration in the form of senior secured debt and equity in the reorganized Loan Parties on the Plan Effective Date of a confirmed Plan if a Plan as contemplated by the RSA is confirmed

*See* DIP Term Loan Credit Agreement § 2.04. |

22

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(3) | Specified in the Fee Letter. <br><br> *See* DIP Term Loan Credit Agreement § 2.10. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br> Local Rule 4001-2(a)(2) | The the Initial Approved Budget as amended and supplemented by any Weekly Cash Flow Forecast delivered in accordance with <u>Section 5.2(a)</u> and approved by the Agent and the Required Lenders in accordance with <u>Section 5.20</u>. <br><br> *See* DIP Term Loan Credit Agreement, Sch. 1.1. |
| **Variance Covenant** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(ii) | Except as otherwise provided herein or approved by the Agent (at the direction of the Required Lenders, in their sole discretion), the Loan Parties will not, and will not permit any Subsidiary thereof to, directly or indirectly, (a) use any cash, including the proceeds of any DIP Loans, in a manner or for a purpose other than those permitted under this Agreement or contemplated by the DIP Orders or the Approved Budget, (b) permit a disbursement causing any variance from the Approved Budget other than Permitted Variances without the prior written consent of the Agent (at the direction of the Required Lenders, in their sole discretion), (c) make any Pre-Petition Payment or application for authority to make any Pre-Petition Payment, other than those permitted by this Agreement, the DIP Orders or the Approved Budget, (d) make or commit to make payments to critical vendors (other than those critical vendors set forth in the DIP Orders or in the Approved Budget, in each case as approved in writing by the Agent at the direction of the Required Lenders) in respect of any pre-petition amount in excess of the amount included in the Approved Budget, (e) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash disbursements (in any event excluding disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Petition Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (f) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings of DIP Loans) as reported in the Variance Reports delivered with respect to periods ending after the Effective Date through the end of such Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings of DIP Loans) forecast in the Approved Budget for the same such period, and (g) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual net cash flow (in any event excluding from the calculation thereof disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Petition Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period. <br><br> *See* DIP Term Loan Credit Agreement § 6.19. |

KE 61190851

| Bankruptcy Code/Local Rule | Summary of Material Terms[7] |
|---|---|
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(4) | Same as DIP ABL Credit Facility. |
| **Liens on Avoidance Actions** Local Rule 4001-2(a)(4) | Same as DIP ABL Credit Facility. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(10) | Events of Default.  Usual and customary for financings of this type, including failure to obtain entry of the Interim Order. *See* DIP Term Loan Credit Agreement § 8. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Right to Indemnity.  The DIP Loan Documents and Interim Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type by the Borrower and each Guarantor in favor of the Administrative Agent, each DIP Lender, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them, subject to customary carve outs. *See* DIP Term Loan Credit Agreement § 10.3; Interim Order ¶ 38. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(2) | Conditions Precedent to Effective Date. The DIP Loan Documents includes conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type, including entry of the Interim Order. Conditions Precedent to Funding on the Final Order and Each Extension of Credit. The DIP Loan Loan Documents includes conditions to all credit extensions that are customary and appropriate for similar debtor-in-possession financings of this type, including entry of the Final Order. *See* DIP Term Loan Credit Agreement §§ 3.1–3.3. |

## **Background**

## I.    **The Debtors' Prepetition Capital Structure.**

14.    As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $233 million, consisting of prepetition asset-based loans and secured term loans.  Each Debtor is an obligor (either as a borrower or guarantor) under the Prepetition ABL Facility and each Debtor, except for

24

Hollander Sleep Products Canada Limited ("Hollander Canada"), is an obligor (either as a borrower or a guarantor) under the Prepetition Term Loan Facility. The following table summarizes the Debtors' outstanding funded-debt obligations:

| Funded Debt | Maturity | Approximate Principal Amount Outstanding (MM) |
|---|---|---|
| $125 Million Prepetition ABL Facility | June 9, 2022 | $    66.4 |
| Prepetition Term Loan Facility | June 9, 2023 | $   166.5 |
| | Total: | $   232.9 |

### A.    Prepetition ABL Facility.

15.    Each Debtor is party to that certain Third Amended and Restated Credit Agreement, dated as of June 9, 2017 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition ABL Credit Agreement"), by and between Parent, and Hollander Home Fashions Holdings, LLC, Hollander Sleep Products, LLC, Hollander Sleep Products Kentucky, LLC, Hollander Canada, Pacific Coast Feather Company, and Pacific Coast Feather Cushion Co., as borrowers, the lenders party thereto (the "Prepetition ABL Lenders"), and Wells Fargo Bank, National Association, as agent (in such capacity, the "Prepetition ABL Agent"). The Prepetition ABL Credit Agreement provides for a $125 million senior secured revolving credit facility (the "Prepetition ABL Facility"). Parent is not a borrower under the Prepetition ABL Facility but has guaranteed all obligations under the Prepetition ABL Facility.

16.    The Prepetition ABL Facility provides for cash dominion when the excess availability under the Prepetition ABL Facility is less than either (a) 12.5% of the maximum credit available under the Prepetition ABL Facility or (b) $12.5 million for three consecutive business days, at which point the Prepetition ABL Agent can exercise certain controls over the Debtors' bank accounts. The Debtors have triggered cash dominion and the Prepetition ABL Agent currently sweeps the Debtors' accounts that are subject to control agreements daily. Substantially

all of the Debtors' cash is subject to deposit account control agreements in favor of the Prepetition

ABL Agent. The amount outstanding under the Prepetition ABL Facility is subject to fluctuations

based on daily cash sweeps. The Debtors estimate that approximately $61 million in principal will

be outstanding as of the date hereof, not including approximately $5 million in letters of credit

(the "Prepetition ABL Obligations").

17.     These Prepetition ABL Obligations are secured by a first lien on ABL-priority

collateral of the Debtors, including certain accounts and inventory, Canadian assets, and a second

lien on certain collateral on which the prepetition secured term loan lenders (the "Prepetition Term

Loan Lenders") have a first lien. The relative rights and priorities among the Prepetition ABL

Lenders and Prepetition Term Loan Lenders are governed by an intercreditor agreement.

**B.      Prepetition Put Agreement.**

18.     In November 2018, the Debtors entered into forbearances and an amendment to

their credit agreements. In connection with these amendments, Sentinel Capital Partners V, L.P.,

Sentinel Dream Blocker, Inc., and Sentinel Capital Investors V, L.P. (collectively, together with

their permitted successors and assigns, the "Purchasers") entered into a Put Agreement, dated as

of November 27, 2018 (the "Put Agreement"), in favor of the Prepetition ABL Agent and SunTrust

Bank, a prepetition lender under the ABL. Subject to the terms and conditions set forth in the Put

Agreement, upon the occurrence of certain events of default under the Prepetition ABL Credit

Agreement, the Prepetition ABL Agent may cause the Purchasers to execute an agreement to

purchase their pro rata share of a participation interest in a subordinated last-out loan (the "Last-

Out Loans").

19.     If the Purchasers fail to purchase their participation interest in the Last-Out Loans

in accordance with the Put Agreement, the Prepetition ABL Agent is permitted to draw from

certain standby letters of credit that were posted by the Purchasers. The Purchasers share priority

with the Prepetition ABL Lenders with regard to the Debtors' collateral but have agreed to subordinate their right to payment to the Prepetition ABL Lenders until the Prepetition ABL Obligations are paid in full.

**C.    Prepetition Term Loan Facility.**

20.     Each Debtor, except for Hollander Canada, is party to that certain Term Loan Credit Agreement, dated as of June 9, 2017 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), by and between Parent and Hollander Home Fashions Holdings, LLC, as parent guarantors, Hollander Sleep Products, LLC, as borrower, Barings Finance LLC, as administrative agent (in such capacity, the "Prepetition Term Loan Agent"), and the lenders from time to time party thereto.  The Prepetition Term Loan Credit Agreement provided a $190 million secured term loan facility (the "Prepetition Term Loan Facility").  The Parent Guarantors, Hollander Sleep Products Kentucky, LLC, Pacific Coast Feather, LLC, and Pacific Coast Feather Cushion, LLC (collectively, the "Prepetition Term Loan Guarantors") have guaranteed all obligations under the Prepetition Term Loan Facility.  As of the Petition Date, approximately $166.5 million in aggregate principal amount remains outstanding under the Prepetition Term Loan Facility.  The Prepetition Term Loan Facility is secured by a first lien on certain collateral of the Debtors, except for Hollander Canada, and a second lien on certain collateral on which the Prepetition ABL Lenders have a first lien.  Hollander Canada's assets are not encumbered by the Prepetition Term Loan Facility; however, the Prepetition Term Loan Facility is secured by a pledge of 65% of Parent's equity interests in Hollander Canada.

**D.    Prepetition ABL and Term Loan Intercreditor Agreement.**

21.     The relative contractual rights and priorities of the Prepetition ABL Agent and the Prepetition Term Loan Agent with respect to shared collateral are governed by that certain Intercreditor Agreement, dated as of June 9, 2017 (as amended, restated, supplemented, waived,

or otherwise modified from time to time prior to the Petition Date, the "Prepetition Intercreditor Agreement"), by and among the Prepetition ABL Agent and the Prepetition Term Loan Agent. Pursuant to the Prepetition Intercreditor Agreement, obligations under the Prepetition ABL Facility are secured by a first priority lien on, among other things, all assets and interests in assets and proceeds owned or acquired by the Canadian Loan Parties (as defined in the Prepetition Intercreditor Agreement), the Debtors' accounts (other than certain accounts that are identifiable proceeds of collateral of the Prepetition Term Loan Facility), inventory, all instruments and chattel paper (excluding all tangible and electronic chattel paper), deposit accounts and securities accounts into which any proceeds of such collateral are deposited into, cash and cash equivalents, all commercial tort claims and general intangibles, investment property, and receivables (collectively, the "Prepetition ABL Priority Collateral"), and a second priority lien on all other property of the borrowers and the guarantors (collectively, the "Prepetition Term Loan Priority Collateral").  The Prepetition Term Loan Priority Collateral includes all non-excluded collateral that is owned or hereafter acquired that does not constitute Prepetition ABL Priority Collateral.

22.    The Prepetition Term Loan Lenders' relative priorities mirror the Prepetition ABL Lenders; the Prepetition Term Loan Lenders have a first lien in the Prepetition Term Loan Priority Collateral and a second lien in the Prepetition ABL Priority Collateral, with one notable exception. Hollander Sleep Products Canada Limited is a borrower under the Prepetition ABL Facility and the Prepetition ABL Lenders have a first lien on the Canadian ABL collateral, which includes the assets and interests in assets and proceeds of Canadian accounts, inventory and similar property securing the Canadian ABL obligations, along with any equity pledges of Canadian entities that are not required to be pledged under the Prepetition Term Loan Credit Agreement.

KE 61190851

23.      Finally, with regard to the Last Out Loans, the Purchasers share priority with the Prepetition ABL Lenders with regard to the Debtors' collateral but have agreed to subordinate their right to payment to the Prepetition ABL Lenders until the Prepetition ABL Obligations are paid in full.

### E.      Equity Interests.

24.      As of the Petition Date, Parent owns directly or indirectly 100% of the residual interests in each of the Debtors (other than Parent).  Investment funds managed by Sentinel directly or indirectly hold the majority of the outstanding membership interests in Parent.

## II.      The Need to Use Cash Collateral and for Access to Financing.

25.      The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance is insufficient to operate their enterprise and continue paying their debts as they come due.  The Debtors have thus far largely been able to maintain the shipment and distribution of products (and thus the continued trust of their customers) notwithstanding their liquidity challenges, but the Debtors project they will run out of money as early as next week without an immediate infusion of post-petition financing and access to cash collateral, leaving the Debtors unable to pay wages for their employees or the invoices of vendors critical to business operations.  Further, access to ample post-petition financing is necessary to send a strong market signal that these chapter 11 cases are well-funded.  Accordingly, access to committed financing at the outset of these chapter 11 cases is necessary not only to operate, but also to quell uncertainty throughout the Debtors' supply chain that the Debtors will have the liquidity necessary to preserve and maximize the value of their estates and successfully emerge from chapter 11.  *See* First Day Decl. ¶ 56. Otherwise, customers may seek other alternative products and services, and vendors and suppliers

KE 61190851

may refuse to do business with the Debtors if there exists a market perception that these chapter 11 cases are not well-funded, or that the Debtors' chances of reorganization are slim.

26.    In connection with their liquidity situation and the prospect of a chapter 11 filing, the Debtors, with the assistance of Carl Marks Advisory Group LLC ("Carl Marks"), analyzed their projected cash needs and prepared the budget outlining the Debtors' postpetition cash needs in the initial 17 weeks of these chapter 11 cases.  The Debtors believe that the budget and their projections provide an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations—including the administrative expenses of these chapter 11 cases—and are reasonable and appropriate under the circumstances.

27.    The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases.  Each of the DIP Facilities is critical to the Debtors' ability to smoothly operate postpetition, including by providing sufficient liquidity to fund the administrative cost of these chapter 11 cases and, importantly, payments to the Debtors' vendors who are critical to the free flow of the Debtors' inventory.  As a result, the Debtors believe that the DIP Facilities provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement the restructuring contemplated by the RSA, and are therefore essential to the preservation of their assets during the pendency of these cases.  *See* First Day Decl. ¶ 56.

### III.    Alternative Sources of Financing Are Not Readily Available.

28.    The Debtors do not have alternative sources of financing readily available. Substantially all of the Debtors' assets are encumbered under their existing capital structure, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, postpetition financing.

KE 61190851

29.     The Debtors engaged in good faith, arm's length negotiations with the Prepetition ABL Lenders, recognizing that the Debtors would need daily access to liquidity to fund their operations.  The Debtors and their advisors negotiated over a number of weeks regarding the structure and economics of the proposed DIP ABL Credit Facility.  *See* Burian Decl. ¶ 6. Ultimately, the Debtors and the Prepetition ABL Agent agreed to a set of terms that will provide the Debtors with necessary access to liquidity during the pendency of these chapter 11 cases at fees and rates that the Debtors and their advisors consider to be reasonable under the circumstances. *See* Burian Decl. ¶ 6.

30.     At the same time, the Debtors engaged in good faith, arm's length negotiations with their Prepetition Term Loan Lenders regarding a chapter 11 plan and the funding of that plan process.  *See* Burian Decl. ¶ 7.  The Prepetition Term Loan Lenders ultimately committed to support the plan process and to finance these cases through a new money $28 million DIP Term Loan Facility.  The Prepetition Term Loan Lenders also signed a restructuring support agreement documenting their support for the Debtors' proposed plan.  This commitment provides a platform for the Debtors to market test the restructuring transactions contemplated by their chapter 11 plan as well as allows for certainty of emergence from chapter 11 if no sale transaction under that plan materializes.

31.     The Debtors also sought financing from third-party sources before the commencement of these cases.  The Debtors recognized that it would be difficult to secure financing because of limited time and because essentially all of the Debtors' assets are encumbered by existing liens under their prepetition funded debt, and their prepetition lenders indicated that they would not consent to a "priming" DIP financing provided by a third party. *See* Burian Decl. ¶ 8.

31

32.     Nonetheless, at the direction of the Debtors, Houlihan Lokey commenced a marketing process for possible DIP financing alternatives beginning in May 2019.  Specifically, Houlihan Lokey contacted 15 banks and institutions in the business of extending postpetition financing under similar circumstances, six of which have executed non-disclosure agreements and have access to a data room that was set up by Houlihan Lokey.  *See* Burian Decl. ¶ 8.  To date, none of these institutions has proposed competing financing facilities on any terms.  Moreover, to date, none of these institutions is willing to lend on a junior or unsecured basis. *See* Burian Decl. ¶ 8.

33.     The fees to be paid under the proposed DIP facilities were the subject of arm's-length and good faith negotiation between the Debtors and the DIP lenders, and they are an integral component of the overall terms of the proposed DIP facilities.  Also, as a condition to providing postpetition financing, the DIP agents and lenders required the exit financing commitments.  In exchange, the Debtors required that the term lenders sign the restructuring support agreement ("RSA") documenting their commitment to the Debtors' restructuring.  The RSA is important to the Debtors because it will reassure customers and vendors of the business' continued viability and protect on-going operations, thereby maximizing value for creditors. *See* Burian Decl. ¶ 9.  The DIP Term Loan Facility also proved to be the only postpetition term facility available to the Debtors before filing.  *See* Burian Decl. ¶ 9.  Absent this financing, the only alternative course may be liquidation in a very compressed timeline that could gravely injure employees, vendors, and customers, as well as jeopardize recoveries for the Prepetition Secured Parties.  *See* Burian Decl. ¶ 9.

**Basis for Relief**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

    A.    **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

34.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

35.    Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic

KE 61190851

terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at*5 (Bankr. S.D.N.Y. July 6, 2009).

36.    This rationale applies with full force here.  As stated above, the DIP Facilities represents a resolution between the Debtors and their prepetition secured lenders.  Following extensive negotiations, the Debtors were able to come to a resolution not only on economic terms (such as interest rates, fees, and agency fees), but also achieved a resolution regarding case controls that provide the Debtors with flexibility to ensure they maintain a value-maximizing path to emergence.  The Debtors' access to the DIP Facilities therefore will enable the Debtors to preserve their value as a going concern by providing crucial liquidity under terms that allow for the prospect of completing a successful, comprehensive reorganization.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

37.    The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order), which includes substantially all of the Debtors' assets.  The Prepetition Lenders will have similar "criss cross" first and second priority liens on the DIP Collateral as they do on the Prepetition Collateral:

a.    The DIP Liens securing the DIP ABL Obligations (the "DIP ABL Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any

of the DIP Collateral, except that the DIP ABL Liens shall be subject to the Carve Out, and shall otherwise be junior only to:

   i.    as to the DIP ABL Priority Collateral, Permitted Prior Liens; and

   ii.    as to the DIP Term Loan Priority Collateral, (A) Permitted Prior Liens; (B) the DIP Term Loan Liens (as defined below); (C) the Prepetition Term Loan Liens; and (D) the Prepetition Term Loan Adequate Protection Liens.

b.    The DIP Liens securing the DIP Term Loan Obligations (the "DIP Term Loan Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Term Loan Collateral, except that the DIP Term Loan Liens shall be (1) subject to the Carve Out and (2) shall otherwise be junior only to:

   i.    as to the DIP Term Loan Priority Collateral, Permitted Prior Liens; and

   ii.    as to the DIP ABL Priority Collateral, (A) Permitted Prior Liens; (B) the DIP ABL Liens; (C) the Prepetition ABL Liens; (D) the Prepetition ABL Adequate Protection Liens; and (E) the Canadian Intercompany Superpriority Administrative Claims.

38.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 440–41 (Bankr. S.D.N.Y. 2010) (noting that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

   a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

   b.    the credit transaction is necessary to preserve the assets of the estate; and

   c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

KE 61190851

*See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also Norris Square Civic Assoc. v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

39.    As described above and as set forth in the Burian Declaration, due to the Debtors' high level of existing secured debt obligations, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or otherwise junior to the Prepetition Lenders. *See* Burian Decl. ¶ 8. Moreover, substantially all of the Debtors' existing assets, including Cash Collateral are encumbered. *See* Burian Decl. ¶ 8. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders. The Debtors, however, also negotiated with their creditors and surveyed certain potential lending sources for actionable alternative proposals—but there are no other options that are readily available to the Debtors or that will also provide the Debtors with a value-maximizing restructuring support agreement. Thus, the Debtors determined that the DIP Facilities provided the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. *See* Burian Decl. ¶¶ 9–10 & 13.

40.    Absent the DIP Facilities, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Agreements, are reasonable and adequate, given the circumstances, all as more fully set forth below. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

41.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and/or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

42.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit or credit on a junior basis, nor do the Debtors have significant unencumbered assets.  Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

43.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior

or equal lien on property of the estate already subject to a lien, after notice and a hearing, where

the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the

interest of the holder of the lien on the property of the estate on which such senior or equal lien is

proposed to be granted."   11 U.S.C. § 364(d)(1).   Consent by the secured creditors to priming

obviates the need to show adequate protection.   *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99

B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those

[undersecured] creditors relieved the debtor of having to demonstrate that they were adequately

protected.").   Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either

(a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interests in collateral are

adequately protected.

44.     Here, the Prepetition ABL Lenders and the substantial majority of the Prepetition

Term Loan Lenders have affirmatively consented to the DIP Facilities and actively participated in

facilitating the proposed DIP Financing.   Moreover, as set forth more fully in the Interim Order,

the Debtors propose to provide a variety of adequate protection to protect the interests of the

Prepetition Lenders.    Therefore,  the  relief  requested  pursuant  to  section 364(d)(1)  of  the

Bankruptcy Code is appropriate.

## II.     The Debtors' Should Be Authorized to Use the Cash Collateral.

45.     Section 363 of the Bankruptcy Code generally governs the use of estate property.

Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the

secured party.   Here, the substantial majority of the Prepetition Lenders consent to the Debtors'

use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations

set forth in the Interim Order.

46.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore, is determined on a case-by-case basis.") (citation omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

47.    As described more fully above, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

a.    the Prepetition ABL Secured Parties and Prepetition ABL Obligations will receive  adequate protection liens and superpriority claims;

b.    superpriority administrative claims under section 507(b) of the Bankruptcy Code;

c.    the Prepetition Agents' professionals' fees and expenses; and

      d.      with respect to the Prepetition ABL Secured Parties (other than on account of the Last Out Loans and Last Out Obligations) shall receive current payment of interest at the default rate (provided the Last Out Loans and Last Out Obligations shall accrue payment of interest at the default rate as part of the Last Out Loans and Last Out Obligations).

48.      Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Lenders from any diminution in value to the Cash Collateral and Prepetition Collateral. In light of the foregoing, the Debtors further submit, and the substantial majority of the Prepetition Lenders have already agreed, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Lenders are appropriate.[8] Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## III.    The Proposed Roll-Up of Prepetition ABL Obligations is Necessary and Appropriate.

49.      As set forth above, the DIP ABL Credit Agreement contemplates refinancing the Prepetition ABL Obligations upon entry of the Interim Order. Without the incremental liquidity provided by refinancing the Prepetition ABL Obligations and continued access to an asset-based lending facility to fund the administration of these chapter 11 cases and support the Debtors' business operations without interruption, the Debtors could face irreparable harm to their ability to continue their business on a go-forward basis. Maintaining the ability to continue as a going concern during these chapter 11 cases is essential to the preservation of the Debtors' assets and the

---

[8]    Pursuant to the DIP Orders, the Prepetition Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

KE 61190851

Debtors' ability to maximize the value of those assets, either through a sale pursuant to a plan or a reorganization. *See* Burian Decl. ¶ 3.

50.     The Prepetition ABL Lenders are highly unlikely to continue to lend postpetition without the roll-up of the Prepetition ABL Obligations, given the concerns raised by the Prepetition ABL Lenders with respect to the coverage of their loans under the Debtors' borrowing base and tight liquidity.  Absent the Prepetition Lenders' support, the first month of the Debtors' chapter 11 cases would likely devolve into a costly priming fight that would almost certainly result in liquidation of the Debtors' estates, regardless of whether the Debtors ultimately prevailed.  Due to the senior priority of the Prepetition ABL Lenders' loans, they are likely to receive a full recovery on their prepetition claims in any event.  And, importantly, the roll-up proposed here is a gradual refinancing of the Prepetition ABL Obligations until the entry of the Final Order, rather than a complete refinancing at the onset of these cases.

51.     Thus, after careful consideration of all available alternatives, the Debtors have determined that rolling up the Prepetition ABL Obligations under the DIP ABL Facility is necessary to obtain access to the liquidity necessary to preserve the value of their business for the benefit of all stakeholders.  The refinancing of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  Courts in this jurisdiction have approved similar debtor-in-possession features on an interim basis.  *See, e.g.*, *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018) (authorizing an initial draw of an ABL/FILO DIP Facility to refinance all of the ABL/FILO prepetition outstanding obligations); *In re Cenveo*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018) (authorizing repayment of $50 million of outstanding revolving obligations and conversion of all remaining outstanding prepetition revolving obligations on an interim basis); *In re BCBG Max Azria Global*

41

*Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 2, 2017) (approving interim roll-up of $35 million outstanding revolving obligations); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving repayment of $105 million of outstanding revolving obligations on an interim basis); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving repayment of $78 million outstanding revolving obligations on an interim basis).[9]

52.    Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to enter into the DIP Facilities and comply with the provisions of the DIP Documents, including the gradual roll-up and ultimate refinancing of the Prepetition ABL Obligations, as a sound exercise of the Debtors' business judgment.

## IV.    The DIP Facilities' Fees Are Reasonable and Should Be Approved.

53.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders in exchange for their providing the DIP Facilities.  Specifically, the Debtors have agreed to pay the following fees under the DIP ABL Facility: (a) a closing fee, (b) an unused revolver fee, and (c) letter of credit fee, which the Debtors propose to seal pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File Exit Backstop Commitment Letter and Fee Letters Under Seal and (II) Granting Related Relief* (the "Fee Sealing Motion"), filed contemporaneously herewith.  The Debtors have also agreed to pay the following fees under the DIP Term Loan Facility:  (a) a commitment fee, (b) a backstop fee, (c) a DIP Term Loan Agent fee, (d) an unused commitment fee, (e) and an exit fee, which the Debtors propose to seal pursuant to the Fee Sealing Motion.  As described in the Burian

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

KE 61190851

Declaration, these fees are reasonable in the context of the nature and extent of the credit provided under the Debtors' circumstances.

54.     It is understood and agreed by all parties, including the Debtors, that these fees are an integral component of the overall terms of the DIP Facilities, and were required by the applicable DIP Agents and the DIP Lenders as consideration for the extension of postpetition financing.  *See* Burian Decl. ¶ 9.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**V.     Modification of the Automatic Stay Is Warranted.**

55.     The DIP Documents and the proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to permit the DIP Agent and the DIP Lenders to enforce their rights under the DIP Documents and the proposed Interim Order.  Specifically, upon the occurrence of an Event of Default and following the giving of seven days' prior written notice (with such notice period extended to the next Business Day if such period expires on a day that is not a Business Day) to the Debtors and certain other interested parties, the DIP Lenders and the DIP Agent may exercise any remedies available to them, including foreclosure on the Collateral.  No such notice is required for an acceleration.  The Debtors believe that this seven-day notice period will provide the Debtors and other interested parties sufficient time to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing, especially in light of the provision for an extension to the next Business Day should the notice period expire on a day that is not a Business Day.

56.     Stay modification provisions are ordinary features of debtor in possession financing facilities and, in the Debtors' business judgment, this modification is reasonable under the circumstances.  Courts in this jurisdiction have approved similar provisions.  *See, e.g.*, *In re Aegean*

43

*Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019); *In re*

*Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 28, 2018); *In re Cenveo*,

No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018); *In re BCBG Max Azria Global Holdings,*

*LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 28, 2017); *In re Avaya, Inc.*, No. 17-10089

(SMB) (Bankr. S.D.N.Y. Mar. 10, 2017).

## VI.    The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e).

57.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).  Because "good faith" is not defined in the Bankruptcy Code, courts often look

to case law under section 363(m).  *7 Collier on Bankruptcy*, 16th ed. ¶ 364.08, p. 37

("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer

or lessee of property of the estate in a section 363 transaction.").  As one court in this district

explained, "the misconduct that would destroy a purchaser's good faith status at a judicial sale

involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders." *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM),

1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d

1195, 1198 (7th Cir. 1978)); *accord In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y.

2010).

58.     As explained in detail herein and in the Burian Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain necessary postpetition financing, and (b) extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  *See, e.g., Gen. Growth Props.*, 423 B.R. at 722 (finding good faith based on testimony that the terms of the debtor-in-possession financing were "vigorously negotiated at arm's length and in good faith.").

59.     The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**VII.     Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.**

60.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Bankruptcy Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

61.     The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business. The Debtors believe that substantially all of their available cash constitutes the Prepetition Lenders' Cash Collateral.  Moreover, the Debtors

do not have sufficient cash on hand to fund their ongoing operations without access to the DIP Facilities. The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to the Cash Collateral or the DIP Facilities and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. In short, the Debtors' ability to administer these chapter 11 cases through immediate access to the DIP Facilities and the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

62.     The Debtors request that the Bankruptcy Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for a Final Hearing

63.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date which is no later than 25 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this motion. The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## Notice

64.     The Debtors will provide notice of this motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent for the Debtors'

46

term loan facility and counsel thereto; (d) the administrative agent for the Debtors' asset-based loan credit facility and counsel thereto; (e) the administrative agent for the Debtors' proposed debtor in possession term loan financing facility and counsel thereto; (f) the administrative agent for the Debtors' proposed debtor in possession asset-based loan credit facility and counsel thereto; (g) the United States Attorney's Office for the Southern District of New York; (h) the Internal Revenue Service; (i) the attorneys general for the states in which the Debtors operate; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

65.     No prior request for the relief sought in this motion has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

WHEREFORE, for the reasons set forth herein, in the First Day Declaration, and in the Burian Declaration, the Debtors respectfully request that this Court (a) enter the Interim Order and the Final Order granting the relief requested herein on an interim and permanent basis, respectively, and (b) grant such other and further relief as the Court deems appropriate.

New York, New York
Dated:  May 19, 2019

/s/  Joshua A. Sussberg
Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION**
**FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,**
**(C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO**
**THE PREPETITION LENDERS, (E) MODIFYING THE AUTOMATIC STAY,**
**(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the motion, dated May 19, 2019 (the "DIP Motion") of Hollander Sleep Products, LLC (the "DIP Term Loan Borrower") and Hollander Home Fashions Holdings, LLC, Hollander Sleep Products Kentucky, LLC, Hollander Sleep Products Canada Limited, Pacific Coast Feather, LLC and Pacific Coast Feather Cushion, LLC (collectively the "DIP ABL Borrowers" and together with the Term Loan Borrower, the "Borrowers") on behalf of themselves and their affiliated debtors and debtors-in possession (together with Dream II Holdings, LLC ("Parent"), collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim Order") and a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Local Rule 4001-2, *inter alia*:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

(i)        authorizing the Debtors to obtain $90 million senior secured postpetition financing on a superpriority basis (the "DIP ABL Credit Facility" and the loans under the DIP ABL Credit Facility, the "DIP ABL Loans") pursuant to the terms and conditions of that certain Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP ABL Credit Agreement"), by and among the DIP ABL Borrowers, Parent, as guarantor, and such other guarantors thereto from time to time (the "DIP ABL Guarantors," together with the DIP ABL Borrowers, the "DIP ABL Loan Parties"), Wells Fargo Bank, National Association, as agent (in such capacity, the "DIP ABL Agent"), for and on behalf of itself and the other lenders party thereto (the "DIP ABL Lenders"), the Issuing Lenders (as therein defined) and the Bank Product Providers (as therein defined) (collectively, the "DIP ABL Parties"), substantially in the form of **Exhibit B** attached to the DIP Motion;

(ii)       authorizing the Debtors party thereto to execute and deliver the DIP ABL Credit Agreement and any other agreements and documents related thereto (collectively with the DIP ABL Credit Agreement, the "DIP ABL Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP ABL Documents;

(iii)      granting the DIP ABL Credit Facility and all obligations owing thereunder and under the DIP ABL Documents to the DIP ABL Agent and DIP ABL Parties (collectively, and including all "Obligations" as described in the DIP ABL Credit Agreement (including the Last Out Obligations), the "DIP ABL Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein);

(iv)      authorizing the Debtors (other than Debtor Hollander Sleep Products Canada Limited) to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $28,000,000.00 (the "DIP Term Loan Credit Facility," and the loans

thereunder, the "DIP Term Loans," and the DIP Term Loan Credit Facility together with the DIP ABL Credit Facility, the "DIP Facilities") pursuant to the terms and conditions of that certain superpriority secured Debtor-in-Possession Term Loan Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Loan Credit Agreement," and together with the DIP ABL Credit Agreement, the "DIP Agreements"), by and among the DIP Term Loan Borrower, the guarantors party thereto from time to time (the "DIP Term Loan Guarantors," and together with the DIP ABL Guarantors, the "DIP Guarantors") (the DIP Term Loan Guarantors, together with the DIP Term Loan Borrower, the "DIP Term Loan Parties") (the DIP Term Loan Parties, together with the DIP ABL Loan Parties, the "DIP Parties"), the financial institutions party thereto from time to time as lenders (collectively, the "DIP Term Loan Lenders," and together with the DIP Term Loan Agent (defined below), the "DIP Term Loan Secured Parties") (the DIP Term Loan Secured Parties, together with the  DIP ABL Parties, the "DIP Lenders"), and Barings Finance LLC, as administrative agent (in such capacity, the "DIP Term Loan Agent," and, together with the DIP ABL Agent,  collectively, the "DIP Agents") for and on behalf of itself and the DIP Term Loan Lenders, substantially in the form of **Exhibit C** attached to the DIP Motion;

(v)    authorizing the Debtors party thereto to execute and deliver the DIP Term Loan Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Term Loan Credit Agreement, the "DIP Term Loan Documents," and together with the DIP ABL Documents, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Term Loan Documents;

(vi)    granting the DIP Term Loan Credit Facility and all obligations owing thereunder and under the DIP Term Loan Documents to the DIP Term Loan Agent and DIP Term Loan

KE 61698457

Lenders (collectively, and including all "Obligations" as described in the DIP Term Loan Credit Agreement, the "DIP Term Loan Obligations," and together with the DIP ABL Obligations, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases, in each case subject to the Carve Out (as defined herein);

(vii)    granting to the DIP Agents, for the benefit of themselves and the DIP Lenders and the DIP Obligations, automatically perfected security interests in and liens on all of the DIP ABL Collateral (as defined below), or DIP Term Collateral (as defined herein), as applicable, including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the Carve Out and the priorities set forth herein;

(viii)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' respective attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the applicable DIP Documents;

(ix)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral (each as defined below) of the Prepetition ABL Secured Parties and Prepetition ABL Obligations under the Prepetition ABL Documents and the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents (each as defined below), and providing adequate protection to the Prepetition ABL Secured Parties, Prepetition ABL Obligations and Prepetition Term Loan Secured Parties for any Diminution in Value (as defined below) of their respective

KE 61698457

interests in the Prepetition Collateral, including the Cash Collateral, as applicable, and subject to the Carve Out;

(x)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the *Declaration of Saul Burian in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Lenders, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief*, the DIP Documents, the *Declaration of Marc Pfefferle, Chief Executive Officer of Hollander Sleep Products, LLC, in Support of Debtors' Chapter 11 Petitions and First Day Motions*, and the evidence submitted and argument made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and all parties-in-interest, and is essential for the continued operation of

the Debtors' businesses and the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Agreements is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A.    **Petition Date**.  On May 19, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Court").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cases.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief sought in the Motion and granted in this Interim Order

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6

are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002,
4001, 6004, and 9014, and the Local Rules.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the
Southern District of New York (the "U.S. Trustee") has not appointed an official committee of
unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors'
Committee").

E.    **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion has been
provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules,
and no other or further notice of the Motion with respect to the relief requested at the Interim
Hearing or the entry of this Interim Order shall be required.  The interim relief granted herein is
necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final
Hearing.

F.    **Debtors' Stipulations**.    After consultation with their attorneys and financial
advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 39
herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge,
and agree as follows (paragraphs F(i) through F(xv) below are referred to herein, collectively, as
the "Debtors' Stipulations"), which Debtors' Stipulations shall not constitute a finding of this
Court in accordance with Local Bankruptcy Rule 4001-2(g)(4):

(i)    *Prepetition ABL Facility*.  Pursuant to that certain Third Amended and
Restated Credit Agreement dated as of June 9, 2017 (as amended, restated, supplemented, or
otherwise modified from time to time, the "Prepetition ABL Credit Agreement," and collectively
with any other agreements and documents executed or delivered in connection therewith, each as
may be amended, restated, supplemented, or otherwise modified from time to time, the

7

"Prepetition ABL Documents"), among (a) the borrowers thereunder (the "Prepetition ABL Borrowers" and together with the "Guarantors" as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Loan Parties"), (b) Dream II Holdings, LLC as parent, (c) Wells Fargo Bank, National Association, as agent (in such capacity, the "Prepetition ABL Agent"), sole lead arranger and sole book runner, and (d) the lenders party thereto (the "Prepetition ABL Lenders," and collectively with the Prepetition ABL Agent, the "Issuing Lenders" (as defined under the Prepetition ABL Credit Agreement), and the "Bank Product Providers" (as defined under the Prepetition ABL Credit Agreement) the "Prepetition ABL Secured Parties"), the Prepetition ABL Lenders provided credit and other financial accommodations to, and issued letters of credit for the account of, the  Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Credit Facility").

(ii)     *Prepetition Put Agreement and Existing Participation Agreement.* Pursuant to that certain (i) Put Agreement dated as of November 27, 2018 (the "Put Agreement") among Sentinel Capital Partners V, L.P., Sentinel Dream Blocker, Inc., and Sentinel Capital Investors V, L.P. (the "Put Purchasers"), Wells Fargo Bank, National Association and SunTrust Bank, as lenders under the Prepetition ABL Credit Agreement, and the Prepetition ABL Agent, in consideration of providing the Prepetition ABL Borrowers with "Last Out Loans" (as defined in the Prepetition ABL Credit Agreement) (the "Last Out Loans") (the Last Out Loans and any interest, fees, costs, charges, indemnities and other amounts accrued thereon, the "Last Out Obligations"), the Put Purchasers agreed to purchase a one hundred percent subordinated participation interest in the Last Out Loans provided to the Prepetition ABL Borrowers pursuant to the Prepetition ABL Credit Agreement and (ii) Existing Participation Agreement (as defined in the DIP ABL Credit Agreement) and the occurrence of the "Exercise Date" (as defined in the

8

Existing Participation Agreement) upon the occurrence of the Petition Date and "Notice of Put Exercise" provided by Prepetition ABL Agent, the Put Purchasers acquired the Participation Interest (as defined in the Existing Participation Agreement) in respect of the Last Out Loans and Last Out Loan Obligations (as defined in the Prepetition ABL Credit Agreement).

(iii)    *Prepetition ABL Obligations*.  The Prepetition ABL Facility provided the Borrowers with, among other things, (x) $125,000,000 in aggregate Commitments (as defined in the Prepetition ABL Credit Agreement).  As of May 17, 2019, the aggregate principal amount of loans outstanding under the Prepetition ABL Facility was not less than $61,697,731 plus $5,136,180 in respect of letters of credit (together with accrued and unpaid interest, and outstanding letters of credit, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrower's and certain of the Prepetition ABL Guarantors' obligations pursuant to the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Credit Agreement, including the Last Out Obligations, "Existing Secured Canadian Obligations" (as defined in the DIP ABL Credit Agreement), and "Existing Secured US Obligations" (as defined in the DIP ABL Credit Agreement) (collectively, the "Prepetition ABL Obligations").

(iv)    *Prepetition ABL Liens and Prepetition ABL Priority Collateral*.  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL

KE 61698457

Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties and Prepetition ABL Obligations, a security interest in and continuing lien on (the "Prepetition ABL Liens") substantially all of their assets and property, including, without limitation, (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain DIP Intercreditor Agreement referred to and as defined below) and all substitutions, replacements, accessions, products and proceeds of any of the ABL Priority Collateral, in any form, including insurance proceeds and all claims against third parties for loss or damage to, or destruction of, or other voluntary conversion (including claims in respect of condemnation or expropriation) of any kind or nature of any or all of the foregoing (the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in that certain DIP Intercreditor Agreement referred to and as defined below) and all substitutions, replacements, accessions, products and proceeds of any of the Term Loan Priority Collateral, in any form, including insurance proceeds and all claims against third parties for loss or damage to, or destruction of, or other voluntary conversion (including claims in respect of condemnation or expropriation) of any kind or nature of any or all of the foregoing (collectively, the "Prepetition Term Loan Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral[3]").

      (v)    *Roll-Up of Obligations Under Prepetition ABL Credit Agreement.* Upon entry of the Final Order, all Existing Secured Obligations (as defined under the DIP ABL Credit Agreement as all "Obligations" under the Prepetition ABL Credit Agreement (as defined below)), including all accrued and unpaid interest thereon and fees, costs, other charges and expenses shall

---

[3]   Prepetition Term Loan Obligations and does not include any ABL Canadian Collateral (as defined in the Intercreditor Agreement).

KE 61698457

be repaid, deemed repaid, deemed issued or deemed incurred, or otherwise replaced, as applicable, as "Obligations" under the DIP ABL Credit Agreement subject to the terms herein and contained within the Final Order. Notwithstanding the foregoing, nothing in this Interim Order shall impact the ability for the Court to unwind or partially unwind, after notice and a hearing, the pay down of Obligations under the Prepetition ABL Credit Agreement, in the event there is a timely and successful Challenge (as defined below) to the validity, enforceability, extent, perfection or priority of the Prepetition ABL Lenders' liens or claims, or a determination that the Prepetition ABL Obligations were undersecured as of the Petition Date, or that the roll-up of Obligations under the Prepetition ABL Credit Agreement unduly advantaged the Prepetition ABL Lenders.

(vi)     *Prepetition Term Loan Facilities*. Pursuant to that certain Term Loan Credit Agreement dated as of June 9, 2017 (as amended, restated or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents") among (a) the borrower thereto (the "Prepetition Term Loan Borrower" and together with the "Guarantors" as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loan Parties"), (b) Dream II Holdings, LLC and Hollander Home Fashions Holdings, LLC, as parent guarantors, (c) Barings Finance LLC, as administrative agent (in such capacity, the "Prepetition Term Loan Administrative Agent," and together with the Prepetition ABL Agent, the "Prepetition Agents"), and (d) the lenders party thereto (the "Prepetition Term Loan Lenders," and together with the Prepetition Term Loan Agent, the "Prepetition Term Loan Secured Parties") (the Prepetition Term Loan Lenders, together with the Prepetition ABL Lenders, the "Prepetition Lenders") (the

11

Prepetition Term Loan Secured Parties, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), the Prepetition Term Loan Lenders provided first lien term loans to the Prepetition Term Loan Borrower (the "Prepetition Term Loan Credit Facility," and together with the Prepetition ABL Facility, the "Prepetition Secured Facilities").

(vii)    *Prepetition Term Loan Obligations*.  The Prepetition Term Loan Credit Facility provided the Prepetition Term Loan Borrower with commitments to provide term loans in the aggregate principal amount of up to $190,000,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Credit Agreement Facility was $166,472,407.49 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrowers  and certain Prepetition Term Loan Guarantors' obligations pursuant to the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

(viii)    *Prepetition Term Loan Liens and Prepetition Term Loan Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Loan Parties granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders  security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including, without limitation, (a) first priority

security interests in and continuing liens on the Prepetition Term Loan Priority Collateral, and (b) second priority security interests in and continuing liens on the Prepetition ABL Priority Collateral, provided however that the Prepetition Term Loan Secured Parties do not have liens on and security interests in the assets of the Canadian Loan Parties (as defined in the DIP Intercreditor Agreement).

(ix)    *Priority of Prepetition Liens; Prepetition Intercreditor Agreement; DIP Intercreditor Agreement*.  The Prepetition Agents entered into that certain Intercreditor Agreement dated as of June 9, 2017 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Prepetition Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors, including the Prepetition ABL Priority Collateral and Prepetition Term Loan Priority Collateral.  Each of the Prepetition ABL Borrowers and Prepetition Term Loan Borrower acknowledged the Prepetition Intercreditor Agreement.  The Prepetition Intercreditor Agreement is binding and enforceable against the Borrowers, the other "Grantors" thereunder and Prepetition Secured Parties in accordance with its terms and the Borrowers, such Grantors and the Prepetition Secured Parties are not entitled to take any action that would be contrary to the provisions thereof.  As of the Petition Date, the ABL Agent and Term Loan Agent entered into the Amended and Restated Intercreditor Agreement, amending and restating the Prepetition Intercreditor Agreement in its entirety (the "DIP Intercreditor Agreement").  The DIP Intercreditor Agreement is binding and enforceable against the Borrowers, the other "Grantors" thereunder, the Prepetition Secured Parties and the DIP Lenders in accordance with its terms and the Borrowers, the Prepetition Secured Parties and DIP Lenders are not entitled to take any action that would be contrary to the provisions thereof.

13

(x)    *Validity, Extent, Perfection and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  The Debtors acknowledge and agree that as of the Petition Date: (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties and Prepetition ABL Obligations, for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Loan Priority Collateral, and (2) certain liens otherwise permitted by the Prepetition ABL Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition ABL Liens as of the Petition Date, the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Loan Parties enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations (including the Last Out Obligations) is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise)  pursuant to the Bankruptcy Code or applicable non- bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or the Put Purchasers (as to the Put Purchasers, subject to and only effective upon the Disinterested Director's

14

Determination (as defined below)) or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition ABL Facility (including the Last Out Obligations) and entry into the Put Agreement and Existing Participation Agreement; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations (including the Last Out Obligations), the priority of the Prepetition ABL Loan Parties' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.  Notwithstanding the foregoing, all of the Debtors' rights and remedies (whether at law or in equity) in connection with any potential claim or cause of action against the Put Purchasers which are, or may be, the subject to investigation by the Debtors' disinterested director are preserved (and nothing shall impair any of the Debtors' right or remedies against the Put Purchasers) until (a) the completion of the investigation by the Debtors' disinterested director and (b) the disinterested director's determination that there are no such claims or causes of action against the Put Purchasers or their respective affiliates or agents (collectively (a) and (b), the "Disinterested Director's Determination").

(xi)    *Validity, Extent, Perfection and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  The Debtors further acknowledge and agree that, as of the Petition Date:  (a) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral (other than ABL Canadian Collateral), subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens otherwise permitted by the Prepetition Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the

Prepetition Term Loan Liens as of the Petition Date, the "<u>Prepetition Term Loan Permitted Prior</u> <u>Liens</u>," and together with the Prepetition ABL Permitted Prior Liens, the "<u>Permitted Prior Liens</u>");[4] (b) the Prepetition Term Loan Liens on the Prepetition Collateral (other than ABL Canadian Collateral) were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Secured Parties for fair consideration and reasonably equivalent value; (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Term Loan  Parties enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Term Loan Facilities; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of

---

[4] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agents, the Prepetition ABL Parties, the Prepetition Term Loan Secured Parties, or a Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien and/or security interests. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the Prepetition Liens and DIP Liens.

the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(xii)    *Default by the Debtors*.    The Debtors acknowledge and stipulate that the Prepetition ABL Loan Parties are in default of their obligations under the Prepetition ABL Documents and Prepetition Term Loan Parties are in default of their obligations under the Prepetition Term Loan Documents.

(xiii)    *Releases*.    Subject to entry of the Final Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and the Put Purchasers (as to the Put Purchasers, subject to and only effective upon the occurrence of the Disinterested Director's Determination) and their respective affiliates and each of their respective former, current or future officers, partners, directors, managers, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and theirs successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations

17

and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order arising out of or related to (as applicable) the Prepetition Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, whether such Released Claims are matured, contingent, liquidated, unliquidated, unmatured, known, unknown or otherwise.

(xiv)    *Cash Collateral.*  All cash, securities or other properties of the DIP Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the DIP Parties in any account or accounts were subject to rights of set-off under the Prepetition Documents and applicable law, for the benefit of the Prepetition Secured Parties and Prepetition Secured Obligations, subject to the terms of the DIP Intercreditor Agreement.  All proceeds of the Prepetition Collateral (including cash on deposit in any account or accounts as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "Cash Collateral" of the applicable Prepetition Secured Parties and Prepetition Secured Obligations within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), subject to the Carve Out and the terms of the DIP Intercreditor Agreement.

(xv)    *DIP Intercreditor Agreement.*  Pursuant to section 510 of the Bankruptcy Code, except as expressly provided by the terms of this Interim Order, the DIP Intercreditor Agreement and any other intercreditor agreement or subordination agreement between and/or

18

among any Prepetition ABL Loan Party, any Prepetition Term Loan Party, any Debtor or affiliate

thereof, and any other applicable intercreditor or subordination provisions contained in any of the

Prepetition Documents (i) shall remain in full force and effect, (ii) shall continue to govern the

relative priorities, rights and remedies of the Prepetition ABL Secured Parties and the Prepetition

Term Loan Secured Parties (including the relative priorities, rights and remedies of such parties

with respect to the replacement liens and administrative expense claims and superpriority

administrative expense claims granted, or amounts payable, by the Debtors under this Interim

Order or otherwise and the modification of the automatic stay), and (iii) shall not be deemed to be

amended, altered or modified by the terms of this Interim Order or the DIP Documents, unless

expressly set forth herein.  The DIP ABL Credit Facility is an ABL Document as that term is used

in the DIP Intercreditor Agreement, and any repayment of the Prepetition ABL Obligations

pursuant to this Interim Order shall not be deemed to constitute a "Payment in Full of ABL Debt"

as such term is defined in the DIP Intercreditor Agreement.  The DIP Term Loan Credit Facility

is a Term Loan Document as that term is used in the DIP Intercreditor Agreement.

G.    **Findings Regarding Postpetition Financing**

(i)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter

into the DIP Facilities on the terms described herein and in the DIP Documents, and (b) use Cash

Collateral on the terms described herein to administer their Cases and fund their operations.  At

the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and

use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which

shall be in form and substance acceptable to each of the DIP Agents, and DIP Term Loan Lenders

holding in excess of fifty percent (50%) of the outstanding loans and commitments under the DIP

Term Loan Credit Facility (the "Required DIP Term Loan Lenders") (the Required DIP Term

Loan Lenders or the "Required Lenders" under the DIP ABL Credit Agreement, as applicable, the "Required DIP Lenders").  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)    *Priming of the Prepetition Liens*.  The priming of the Prepetition Secured Parties on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facilities and as further described below, will enable the Debtors to obtain the DIP Facilities and to continue to operate their businesses to the benefit of their estates and creditors. The Prepetition ABL Secured Parties, the Prepetition ABL Obligations and the Prepetition Term Loan Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in value ("Diminution in Value") of each of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iii)    *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facilities and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) permit the orderly continuation of the operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (iii) make payroll, and (iv) satisfy other working capital and operational needs.  The access by the DIP Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern value of the DIP Parties and to a successful reorganization of the DIP Parties and DIP Obligations.  The terms of the proposed financing are fair and reasonable, reflect each DIP Parties'

20

exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)    *No Credit Available on More Favorable Terms*. The DIP Facilities are the best source of debtor in possession financing available to the Debtors. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been and are unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agents, for the benefit of themselves and the DIP Lenders and on account of the obligations under the DIP Facilities (including the Last Out Obligations): (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in paragraph 6 hereof, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)    *Use of proceeds of the DIP Facilities*. As a condition to entry into the DIP Documents, the extension of credit under the DIP Facilities and the authorization to use Cash Collateral, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facilities shall be used, in each case in a manner

consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the budget attached hereto as **Exhibit A**, as the same may be modified from time to time consistent with the terms of the DIP Documents, and subject to such variances as permitted in the DIP Agreements (such budget, as so modified, the "Approved Budget"),[5] solely for: (a) working capital and letters of credit; (b) other general corporate purposes of the Debtors; (c) permitted payment of costs of administration of the Cases; (d) (1) payment of such prepetition expenses of the Prepetition Term Loan Secured Parties as consented to by the DIP Term Agent and the Required DIP Term Loan Lenders, and (2) payment of such prepetition expenses of the Prepetition ABL Secured Parties as consented to by the DIP ABL Agent in its sole discretion, in each case under clauses (1) and (2) as approved by the Court; (e) payment of interest, fees and expenses (including without limitation, legal and other professionals' fees and expenses of the DIP Agents) owed under the DIP Documents; (f) payment of certain adequate protection amounts to the Prepetition Secured Parties and Prepetition Secured Obligations, as set forth in paragraph 16 hereof; (g) the reduction of the Prepetition ABL Obligations pending entry of the Final Order (or as otherwise required under any recognition orders by the Canadian Court (as defined in the DIP ABL Credit Agreement)) in respect of the Canadian Borrower (as defined in the DIP ABL Credit Agreement) and payment in full of the Prepetition ABL Obligations upon entry of a Final Order (or as otherwise required under such recognition orders of the Canadian Court in respect of the Canadian Borrower); (h) the Canadian Borrower to borrow under the DIP ABL Credit Agreement and lend such borrowed amounts to any Debtor other than the Canadian Borrower on a superpriority administrative expense basis pursuant to section 507(b) of the Bankruptcy Code (the "Canadian Intercompany Superpriority Administrative Claims"); (i) upon entry of the Final Order,

---

[5] A copy of the initial Approved Budget is attached hereto as **Exhibit 1**.

22

and delivery of the Participation Agreement (as defined in the DIP ABL Credit Agreement), deemed refinancing and replacement of the Last Out Obligations with the Last Out DIP Obligations[6] (as defined by the DIP ABL Credit Agreement), subject to the rights preserved in paragraph 42 of this Interim Order; and (j) payment of the Carve Out shall be in accordance with paragraph 39 of this Interim Order. The reduction of the Prepetition ABL Obligations from the Cash Collateral consisting of ABL Priority Collateral in accordance with this Interim Order is necessary as the Prepetition ABL Parties have not otherwise consented to the use of their Cash Collateral or the subordination of their liens to the DIP Liens (as defined below), and the DIP ABL Agent and the DIP ABL Lenders will not otherwise consent to providing the DIP ABL Credit Facility and extending credit to the Debtors thereunder. Further the DIP ABL Agent and DIP ABL Lenders are not willing to provide the DIP ABL Credit Facility unless the Canadian Borrower is a joint and several obligor with respect to the DIP ABL Obligations.

(vi) *Application of Proceeds of Collateral*. As a condition to entry into the DIP Agreements, the extension of credit under the DIP Facilities and authorization to use Cash Collateral, the Debtors, the DIP Agents, the DIP Lenders, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Intercreditor Agreement.

H.    **Adequate Protection**. Subject to the Carve Out, the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties on account of the Prepetition ABL Obligations (including the Last Out Obligations), and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Secured Parties, are each entitled to receive

---

[6]    "Last Out DIP Obligations" shall have the meaning ascribed to the term "Last Out Obligations" in the DIP ABL Credit Agreement.

KE 61698457

adequate protection to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral. Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, as adequate protection: (i) the Prepetition ABL Secured Parties and Prepetition ABL Obligations will receive adequate protection liens and superpriority claims, as more fully set forth in paragraphs 11-14 herein and the Prepetition ABL Secured Parties (other than on account of the Last Out Loans and Last Out Obligations) shall receive current payment of interest at the default rate (provided the Last Out Loans and Last Out Obligations shall accrue payment of interest at the default rate as part of the Last Out Loans and Last Out Obligations), reasonable and documented fees and expenses (including without limitation, legal and other professionals' fees and expenses of the Prepetition ABL Agent, whether arising before or after the Petition Date); and (ii) the Prepetition Term Loan Secured Parties will receive (a) adequate protection liens and superpriority claims, as more fully set forth in paragraphs 11-14 herein, and (b) current payment of reasonable and documented expenses (including without limitation, legal and other professionals' fees and expenses of the Prepetition Term Loan Agent whether arising before or after the Petition Date.

I.      **Sections 506(c) and 552(b)**. In light of (i) the DIP Agents' and DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve Out (including the caps and limitations set forth therein); (ii) the Prepetition ABL Secured Parties' agreement that, with respect to the Prepetition ABL Priority Collateral, their liens shall be subject to the Carve Out (and the caps and limitations set forth therein), subordinate to the DIP ABL Liens, and, in the case of the Prepetition Term Loan Priority Collateral, subordinate to the DIP Term Loan Liens and the Prepetition Term Loan Liens; and (iii) the Prepetition Term Loan Secured Parties' agreement that, with respect to the Prepetition Term Loan Priority Collateral, their liens shall not include the ABL Canadian Collateral (as defined in the DIP Intercreditor Agreement) and shall be subject to the

24

Carve Out and subordinate to the DIP Term Loan Liens and, in the case of the ABL Priority Collateral, subordinate to the DIP ABL Liens, the Prepetition ABL Liens and the DIP Term Loan Liens, (a) subject to entry of a Final Order, the Prepetition ABL Secured Parties, Prepetition ABL Obligations, and Prepetition Term Loan Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Agents, DIP Lenders, DIP Obligations, Prepetition ABL Secured Parties, Prepetition ABL Obligations, and Prepetition Term Loan Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code, subject to the terms of the DIP Intercreditor Agreement.

J.    **Good Faith of the DIP Agents and DIP Lenders**.

(i)    *Willingness to Provide Financing*.    The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to:  (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facilities and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; (d) entry of the Canadian Recognition Orders (as defined by the DIP ABL Credit Agreement) and (e) findings by this Court that the DIP Financing is essential to the Debtors' estates, that the DIP Agents and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agents' and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment*.    Based on the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing, (i) the terms of the financing provided by the DIP Facilities, (ii) the adequate protection provided by the Interim Order

and DIP Documents and (iii) the terms on which the DIP Parties may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are in each case fair and reasonable, reflect the DIP Parties' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represents the best financing (and terms) presently available.

(iii)    *Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facilities and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, DIP Agents, DIP Lenders, Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties, with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the DIP Facilities shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agents, DIP Lenders, Prepetition ABL Secured Parties, and Prepetition Term Loan Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

K.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).

L.    **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including, among others:  (i) the U.S. Trustee, (ii) those entities or individuals included on the Debtors' list of 50 largest unsecured creditors on a consolidated basis, (iii) counsel to the Prepetition ABL Agent, (iv)  counsel to the Prepetition Term Loan Agent; (v) counsel to the Put Purchasers; and (vi) all other parties entitled to notice under the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible

under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      <u>Interim Financing Approved</u>.    The DIP Motion is granted, the Interim Financing (as defined below) is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

**DIP Facilities Authorization**

2.      <u>Authorization of the DIP Financing</u>.    The Interim Financing is hereby approved.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facilities and the creation and perfection of the DIP Liens (as defined below) described in and provided for by this Interim Order and the DIP Documents.   The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Documents and all other documents comprising the DIP Facilities as such become due and without

KE 61698457

need to obtain further Court approval, including, without limitation, closing fees, letter of credit fees (including issuance, fronting, and other related charges), unused facility fees, continuing commitment fees, backstop fees, exit fees, servicing fees, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.  The Last Out DIP Obligations and Last Out Obligations (as applicable) shall include interest at the default rate and reasonable and documented fees and expenses of the Put Purchasers (such amounts not to be paid currently but to accrue as part of the Last Out DIP Obligations and Last Out Obligations (as applicable)).

3.      <u>Authorization to Borrow</u>.  In order to prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Declaration (as defined below), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to (a) forthwith borrow money pursuant to the DIP ABL Credit Agreement and the DIP ABL Guarantors are hereby authorized to guaranty the DIP ABL Obligations, in each case up to an aggregate principal or face

KE 61698457

amount equal to, on an interim basis, the amount of incremental funding under the DIP ABL Credit

Facility as set forth in the Approved Budget and in accordance with the terms of this Interim Order

pending entry of the Final Order, and up to $90 million under the DIP ABL Credit Facility upon

entry of the Final Order, together with applicable interest, expenses, fees and other charges payable

in connection with the DIP ABL Credit Facility, subject in each case to any limitations on

borrowing under the DIP ABL Documents, which shall be used for all purposes permitted under

the DIP Documents, including, without limitation, to refinance the portions of the  Prepetition

ABL Credit Facility and Prepetition ABL Obligations as provided herein and (ii) forthwith borrow

money pursuant to the DIP Term Loan Credit Agreement and the DIP Term Loan Guarantors are

hereby authorized to guaranty the DIP Term Loan Parties' DIP Term Loan Obligations with

respect to such borrowings, in each case up to an aggregate principal amount equal to $15,000,000

on an interim basis (together with the interim financing under the DIP ABL Credit Agreement, the

"Interim Financing") together with applicable interest, expenses, fees and other charges payable

in connection with the DIP Term Loan Credit Facility and, subject to entry of the Final Order, an

aggregate amount of $13 million, in two draws, $7 million upon entry of the Final Order and $6

million on the date contemplated in the Approved Budget, in each case together with applicable

interest,  expenses, fees and other charges payable in connection with the DIP Term Loan Credit

Facility, subject to any limitations on borrowing under the DIP Term Loan Documents, which

shall be used for all purposes permitted under the DIP Documents, including, without limitation,

to satisfy certain outstanding amounts of the Prepetition ABL Credit Facility and Prepetition ABL

Obligations as provided herein, to provide working capital for the DIP Parties and to pay interest,

fees, costs, charges and expenses in accordance with this Interim Order, the DIP Documents and

the Approved Budget (subject to the variances permitted by the DIP Agreements).  In connection

with obtaining and using funds to enable the Debtors to pay the expenses set forth in the Approved Budget (subject to the variances permitted by the DIP Agreements), the Debtors shall borrow and use (or in the case of amounts already then borrowed under the DIP Term Loan Credit Facility, use), on a weekly and cumulative basis, an approximately equal amount from the DIP ABL Credit Facility (subject to Availability) and the amounts borrowed under the DIP Term Loan Credit Facility; *provided, however*, until the entry of the Canadian Initial Recognition Order (as defined in the DIP ABL Credit Agreement), the Canadian Borrowing Base is deemed to be $0.

4.    <u>DIP Obligations</u>.    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversation of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").    Upon entry of this Interim Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or any of the DIP Lenders, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.    Upon entry of this Interim Order, all (i) Bank Products, (ii) Cash Management Services, and (iii) Letters of Credit (each as defined in the Prepetition ABL Credit Agreement) shall continue in place and all obligations under or in connection therewith shall be subject to the DIP ABL Credit Agreement and shall constitute DIP ABL Obligations. The DIP ABL Loan Parties shall be jointly and severally liable for the DIP ABL Obligations.    The DIP Term Loan Parties shall be jointly and

30

severally liable for the DIP Term Obligations. The DIP Obligations, as applicable, shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on each applicable Termination Date, as applicable, except as provided in paragraph 30 herein. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens, and including in connection with any adequate protection provided to the Prepetition Secured Parties and Prepetition Secured Obligations hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.    <u>DIP Liens</u>. In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the applicable DIP Agents, for the benefit of themselves and the DIP Lenders and/or DIP Obligations, are hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of, with respect to the DIP ABL Obligations, each of the DIP ABL Loan Parties (the "<u>DIP ABL Collateral</u>") or, with respect to the DIP Term Loan Obligations, each of the DIP Term Loan Parties (the "<u>DIP Term Collateral</u>," together with

31

the DIP ABL Collateral, the "<u>DIP Collateral</u>"),[7] including without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, (b) all owned real property interests and all proceeds of leased real property, (c) upon entry of a Final Order, proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral and, upon entry of a Final Order, proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code and (d) subject to entry of a Final Order, the Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof and including all DIP Collateral that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date. DIP Collateral that is of a type that would be ABL Priority Collateral (as defined the DIP Intercreditor Agreement) and the proceeds and products thereof shall in each case, constitute "<u>DIP ABL Priority Collateral</u>," DIP Collateral that is of a type that would be Term Loan Priority Collateral (as defined in the DIP Intercreditor Agreement) and the

---

[7]    For the avoidance of doubt, the DIP Term Collateral does not include ABL Canadian Collateral (as defined by the DIP Intercreditor Agreement).

KE 61698457

proceeds and products thereof and shall, in each case, constitute "DIP Term Loan Priority Collateral".

6.    DIP Lien Priority.  The DIP Liens securing the DIP ABL Obligations (the "DIP ABL Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP ABL Liens shall be subject to the Carve Out, and shall otherwise be junior only to: (i) as to the DIP ABL Priority Collateral, Permitted Prior Liens; and (ii) as to the DIP Term Loan Priority Collateral, (A) Permitted Prior Liens; (B) the DIP Term Loan Liens (as defined below); (C) the Prepetition Term Loan Liens; and (D) the Prepetition Term Loan Adequate Protection Liens.  The DIP Liens securing the DIP Term Loan Obligations (the "DIP Term Loan Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Term Loan Collateral, except that the DIP Term Loan Liens shall be (1) subject to the Carve Out and (2) shall otherwise be junior only to:  (i) as to the DIP Term Loan Priority Collateral, Permitted Prior Liens; and (ii) as to the DIP ABL Priority Collateral, (A) Permitted Prior Liens; (B) the DIP ABL Liens; (C) the Prepetition ABL Liens; (D) the Prepetition ABL Adequate Protection Liens; and (E) the Canadian Intercompany Superpriority Administrative Claims.  Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided

33

and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.  Notwithstanding anything herein to the contrary, none of the Prepetition Term Loan Adequate Protection Liens or DIP Term Loan Liens shall exist with respect to any ABL Canadian Collateral (as defined by the DIP Intercreditor Agreement).

7.    Superpriority Claims.  Upon entry of this Interim Order, the DIP Agents and DIP Lenders are hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations (including Last Out DIP Obligations):  (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be *pari passu* with each other, without otherwise impairing the lien priorities as set forth herein, and subject to the terms of the DIP Intercreditor Agreement and Carve Out (including the caps and limitations therein).

8.    No Obligation to Extend Credit.  Except as required to fund the Carve Out in accordance with the terms of this Order, the DIP Agents and DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions

34

precedent to the making of such extension of credit or the issuance, amendment, renewal or extension of such letter of credit or bankers' acceptance under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP ABL Agent (in its sole discretion), DIP Term Loan Agent (acting at the direction of the Required DIP Term Loan Lenders), as applicable, and in accordance with the terms of the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement, as applicable.

9.    <u>Use of Proceeds of DIP Facilities</u>.    From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities, in accordance with the Approved Budget (subject to such variances as permitted in the DIP Agreements), only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the terms and conditions in this Interim Order and the DIP Documents.

10.    <u>No Monitoring Obligation</u>.    No DIP Lender or DIP Agent shall have any obligation nor responsibility to monitor any DIP Party's use of DIP Facilities, and each DIP Lender or DIP Agent may rely upon each DIP Party's representation that the use of the DIP Facilities at any time is in accordance with the requirements of this Interim Order, the DIP Documents and Bankruptcy Rule 4001(c)(2).

**Authorization to Use Cash Collateral**

11.    <u>Authorization to Use Cash Collateral</u>.    Subject to the terms and conditions of this Interim Order, the DIP Facilities and the DIP Documents and in accordance with the Approved Budget (subject to variances as permitted in the DIP Agreements), the Debtors are authorized to use Cash Collateral until each applicable Termination Date.    Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except

as permitted in this Interim Order (including with respect to the Carve Out), the DIP Facilities, the DIP Documents, and in accordance with the Approved Budget (subject to such variances as permitted in the DIP Agreements). All Cash Collateral consisting of ABL Priority Collateral shall be applied to reduce the Prepetition ABL Obligations as set forth in the DIP ABL Credit Agreement.

12.     <u>Adequate Protection Liens</u>.  Subject to the terms of the DIP Intercreditor Agreement and the Carve Out:

(i)     *Prepetition ABL Adequate Protection Liens*.  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Secured Parties and the Prepetition ABL Obligations in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the DIP ABL Loan Parties hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties and the Prepetition ABL Obligations, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP ABL Collateral (the "<u>Prepetition ABL Adequate Protection Liens</u>").

(ii)     *Prepetition Term Loan Adequate Protection Liens*.  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Parties hereby grant to the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Term Collateral (the "<u>Prepetition Term Loan Adequate Protection Liens</u>," and together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").

13.    <u>Priority of Adequate Protection Liens</u>.    Subject to the terms of the DIP Intercreditor Agreement:

(i)    The Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out (and the caps and limitations set forth therein).  The Prepetition ABL Adequate Protection Liens shall otherwise be junior only to:  (a) with respect to the DIP ABL Priority Collateral (other than to the extent securing the Last Out Loan Obligations) (1) Permitted Prior Liens; (2) the DIP ABL Liens; and (3) the Prepetition ABL Liens; and (b) with respect to the DIP Term Loan Priority Collateral (1) Permitted Prior Liens; (2) the DIP Term Loan Liens; (3) the Prepetition Term Loan Liens; (4) the Prepetition Term Loan Adequate Protection Liens; (5) the DIP ABL Liens; and (6) the Prepetition ABL Liens.  The Prepetition ABL Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP ABL Loan Parties' assets.

(ii)    The Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior only to:  (a) with respect to the DIP ABL Priority Collateral (1) Permitted Prior Liens;  (2) the DIP ABL Liens;  (3) the Canadian Intercompany Superpriority Administrative Claims (4) the Prepetition ABL Liens;  (5) the Prepetition ABL Adequate Protection Liens; (6) the DIP Term Loan Liens; and (7) the Prepetition Term Loan Liens; and (b) with respect to the DIP Term Loan Priority Collateral (1) Permitted Prior Liens;  (2) the DIP Term Loan Liens;  and (3) the Prepetition Term Loan Liens.   The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Term Loan Parties' assets.  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and

37

enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

14.    <u>Adequate Protection Superpriority Claims</u>. Subject to the terms of the DIP Intercreditor Agreement and the Carve Out:

(i)    *Prepetition ABL Superpriority Claim*. As further adequate protection of the interests of the Prepetition ABL Secured Parties and Prepetition ABL Obligations in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties and Prepetition ABL Obligations, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>").

(ii)    *Prepetition Term Loan Superpriority Claim*. As further adequate protection of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral (other than the ABL Canadian Collateral) against any Diminution in Value of such interests in the Prepetition Collateral (other than the ABL Canadian Collateral), (x) the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (other than in the Case of the Canadian Borrower) (the "<u>Prepetition Term Loan Superpriority Claim</u>,"

38

and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

15.    Priority of the Adequate Protection Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided*, *however*, that the Adequate Protection Superpriority Claims shall be *pari passu* with each other (in each of the Cases other than the Case of the Canadian Borrower, which shall be limited to Adequate Protection Superpriority Claims in favor of the ABL Secured Parties), without otherwise impairing the lien priorities as set forth herein, and subject to the Carve Out and junior to the DIP Superpriority Claims.

16.    Adequate Protection Payments and Protections for Prepetition ABL Parties. As further adequate protection (the "Prepetition ABL Adequate Protection Payments"), the Debtors are authorized and directed to provide adequate protection to the (A) Prepetition ABL Secured Parties and Prepetition ABL Obligations in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) interest, at the default rate (other than on account of Last Out Loans and Last Out Obligations, provided that the Last Out Loans and Last Out Obligations shall accrue interest at the default rate as part of the Last Out Loans and Last Out Obligations), (ii) principal due under the Prepetition ABL Documents (other than on account of Last Out Loans and Last Out Obligations), subject to the rights preserved

39

in paragraph 42 below, and (iii) immediately upon entry of this Interim Order, payment of fees and expenses as provided in the DIP ABL Credit Agreement; *provided,* that Prepetition ABL Adequate Protection Payments with respect to the subsection (i) above shall be paid monthly and upon entry of the Final Order, all accrued and unpaid Prepetition ABL Adequate Protection Payments for the period prior to the entry of the Final Order shall be paid, in cash, upon entry of the Final Order.

17.    Adequate Protection Payments and Protections for Prepetition Term Loan Secured Parties.  As further adequate protection (the "Prepetition Term Loan Adequate Protection Payments," and together with the Prepetition ABL Adequate Protection Payments, the "Adequate Protection Payments"), the Debtors are authorized and directed to pay in cash in connection with these chapter 11 cases and the Case of the Canadian Borrower, without the need for the filing of formal fee applications, immediately upon entry of this Interim Order, payment of fees and expenses as provided in  the DIP Term Loan Credit Agreement.

18.    Adequate Protection Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties and Prepetition Secured Obligations hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties and Prepetition Secured Obligations of the adequate protection provided herein shall not be deemed an admission that the respective interests of the Prepetition Secured Parties and Prepetition Secured Obligations are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties and Prepetition Secured

40

Obligations to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**Provisions Common to DIP Financing and Use of Cash Collateral**

19.    <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without further order of the Court if:    (a) the amendment, modification, or supplement is in accordance with the DIP Documents, and (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel to each of the other DIP Agents, a Creditors' Committee (if appointed) or any other committee appointed under section 1102 or 1104 of the Bankruptcy Code, and the U.S. Trustee (collectively, the "<u>Notice Parties</u>"); and (c) the amendment, modification or supplement is filed with the Court; *provided*, *however*, that neither consent of the Notice Parties nor approval of the Court will be necessary to effectuate any such amendment, modification or supplement and provided further that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard; provided, further, that no such amendment, modification, or supplement shall modify the DIP Documents in a manner that is materially different from that approved by the Court.

20.    <u>Budget Maintenance</u>.  The use of borrowings and letters of credit under the DIP Facilities shall be in accordance with the Approved Budget (subject to such variances as permitted in the DIP Agreements) and the terms and conditions set forth in the DIP Documents. The Approved Budget and any modification to, or amendment or update of, the Approved Budget shall be subject to the reasonable approval of, and in form and substance reasonably acceptable to the applicable DIP Agents and the Required DIP Term Loan Lenders in accordance with the applicable DIP Documents.

KE 61698457

21.     <u>Budget Compliance</u>.  The use of borrowings and letters of credit under the DIP Facilities shall be in accordance with the Approved Budget (subject to such variances as permitted in the DIP Agreements) and the DIP Documents; *provided*, *however*, that, in the case of the fees, costs and expenses of the DIP Agents, the Debtors shall pay such fees, costs and expenses in accordance with the DIP Documents and this Interim Order without being limited by the Approved Budget.

22.     <u>Modification of Automatic Stay</u>.   The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or the Prepetition Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties under the DIP Documents, the DIP Facilities and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Agents, the DIP Lenders and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order and the DIP Documents.

23.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account

control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Adequate Protection Liens, or to entitle the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties and the Prepetition Secured Obligations to the priorities granted herein (subject to the DIP Intercreditor Agreement and Existing Participation Agreement, as applicable).  Notwithstanding the foregoing, the DIP Agents and the Prepetition Agents each are authorized to file, as in its reasonable discretion it deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens, or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver reasonably promptly to the DIP Agents and Prepetition Agents all such financing statements, mortgages, notices and other documents as the DIP Agents and Prepetition Agents may reasonably request; provided that nothing herein shall require the Debtors to obtain any required consent of third parties to any such financing statements, mortgages, notices, and other documents.  The DIP Agents and the Prepetition Agents, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.  To the extent that any Prepetition Agent  is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other Prepetition Documents or is listed as loss payee, lenders'

loss payee or additional insured under any of the Debtors' insurance policies, each DIP Agent (as applicable) shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Agents shall serve as agents for the DIP Agents for purposes of perfecting the DIP Agents' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

24.    <u>Application of Proceeds of Collateral</u>.  Subject to the Carve Out, as a condition to the entry of the DIP Documents, the extension of credit under the DIP Facilities and the authorization to use Cash Collateral, the Debtors have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply all net proceeds of DIP Collateral that is sold in the ordinary course or liquidated as follows:  (a) with respect to DIP ABL Priority Collateral (i) *first*, to costs and expenses of the DIP ABL Agent; (ii) *second*, to permanently reduce the Prepetition ABL Obligations (other than the Last Out Obligations); (iii) *third*, to reduce the DIP ABL Obligations (including the Last Out DIP Obligations or Last Out Obligations, as applicable), *fourth*, to the repayment of the Canadian Intercompany Superpriority Administrative Claims, and (v) after indefeasible repayment in full in cash of the Prepetition ABL Obligations and the DIP ABL Obligations (including, in each case, provision for contingent obligations), the termination of the DIP ABL Credit Facility and all commitments thereunder, and "payment in full" of all other DIP ABL Obligations as provided under the DIP ABL Credit Agreement and repayment in full of the Canadian Intercompany Superpriority Administrative Claims, (x) to costs and expenses of the DIP Term Loan Agent, (y) to reduce the DIP Term Loan Obligations, and (z) then to reduce the Prepetition Term Loan Obligations; and (b) with respect to DIP Term Loan Priority Collateral,

44

(i) *first*, to costs and expenses of the DIP Term Loan Agent; (ii) *second*, to reduce the DIP Term Loan Obligations; (iii) *third*, to reduce the Prepetition Term Loan Obligations, and (iv) after indefeasible repayment in full in cash of the Prepetition Term Loan Obligations and the DIP Term Loan Obligations (including, in each case, provision for contingent obligations), (w) to costs and expenses of the DIP ABL Agent, (x) to permanently reduce the Prepetition ABL Obligations, (y) to reduce the DIP ABL Obligations (including the Last Out DIP Obligations or Last Out Obligations, as applicable), and (z) to the repayment of the Canadian Intercompany Superpriority Administrative Claims. The reduction of the Prepetition Secured Obligations is subject to the preservation of rights provided in paragraph 42 herein. Notwithstanding anything herein, or in the Prepetition ABL Documents or DIP ABL Documents, (i) all ABL Priority Collateral (other than ABL Canadian Collateral) of the Debtors (other than the Canadian Borrower) to be applied to the Prepetition ABL Obligations and DIP ABL Obligations as provided in this Paragraph 24 shall be applied first to reduce the Prepetition ABL Obligations and DIP ABL Obligations of the Debtors other than the Canadian Borrower; and thereafter to the remaining DIP ABL Obligations of the Canadian Borrower, if any; and (ii) all ABL Canadian Collateral to be applied to the Prepetition ABL Obligations and DIP ABL Obligations as provided in this Paragraph 24 shall be applied first to reduce the Prepetition ABL Obligations of the Canadian Borrower, then to the direct DIP ABL Obligations of the Canadian Borrower, and then to remaining Prepetition ABL Obligations and DIP ABL Obligations of the Debtors, if any, but only to the extent not paid under clause (i) above and after all ABL Priority Collateral (other than ABL Canadian Collateral) of the Debtors (other than the Canadian Borrower) has been applied.

25.    <u>Protections of Rights of DIP Agents, DIP Lenders and Prepetition Secured Parties</u>.

KE 61698457

(i)      Unless the DIP Agents, the Required DIP Lenders and the Prepetition Agents shall have provided their prior written consent or all DIP Obligations and all Prepetition Secured Obligations have been indefeasibly paid in full in cash and all commitments thereunder are terminated, there shall not be entered in any of these Cases or any Successor Cases (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following:  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order and the Approved Budget, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise, or (iii) any modification of any of the DIP Agents', DIP Lenders', or the Prepetition Secured Parties' rights under this Interim Order, the DIP Documents or the Prepetition Documents with respect any DIP Obligations or Prepetition Secured Obligations.

(ii)      The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations have been indefeasibly paid in full in cash, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Agents and the DIP Lenders all such information and documents that any or all of the Debtors are obligated

(including upon reasonable request by any of the DIP Agents or the DIP Lenders) to provide under the DIP Documents or the provisions of this Interim Order or as reasonably requested by the DIP Agents or DIP Lenders, in each case as and to the extent required by the DIP Documents, (iii) upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of each of the DIP Agents, the DIP Lenders and the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors as and to the extent required by the DIP Documents and/or the Prepetition Documents, (iv) permit the DIP Agents, the DIP Lenders, and the Prepetition Agents, and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, in each case as and to the extent required by the DIP Documents, and (v) upon reasonable advance notice, permit the DIP Agents, the DIP Lenders and the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and Prepetition Collateral in each case as and to the extent required by the DIP Documents.

(iii)    No Debtor shall object to any DIP Lenders or any Prepetition Secured Parties credit bidding up to the full amount of the applicable outstanding DIP Obligations, Prepetition ABL Obligations (as applicable), and Prepetition Term Loan Obligations (as applicable), in each case, including any accrued interest and expenses, in any sale of any DIP

Collateral or Prepetition Collateral, as applicable, and whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, subject, in each case, to the rights and duties of the parties under the DIP Intercreditor Agreement, a Challenge (as defined herein), and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

26.    Proceeds of Subsequent Financing.    If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full of all DIP Obligations and Prepetition Secured Obligations, and the termination of the DIP Agents' and DIP Lenders' obligation to extend credit under the DIP Facilities, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agents to be applied in accordance with this Interim Order, the DIP Documents and the DIP Intercreditor Agreement.

27.    Cash Collection.    From and after the date of the entry of this Interim Order, the Debtors shall maintain cash management in accordance with the DIP Documents.    Unless otherwise agreed to in writing by the DIP Agents and Prepetition Agents, the Debtors shall maintain no accounts except those identified in  any interim and/or final order granting the *Debtors' Motions for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations*

*Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Order"). The Debtors and the financial institutions where the Debtors' maintain deposit accounts (as identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in such deposit accounts upon receipt of any direction to that effect from the applicable DIP Agent in accordance with the DIP Documents.  Until such time as Debtors are able to establish a deposit account at a bank other than Wells Fargo Bank, National Association to serve as the TL Deposit Account (as defined in the DIP Term Loan Credit Agreement), the account established for such purpose at Wells Fargo Bank, National Association shall constitute such TL Deposit Account and shall be subject to a fully perfected first priority lien and security interest in favor of the DIP Term Loan Agent as fully as if it were subject to a control agreement in favor of the DIP Term Loan Agent.  For the avoidance of doubt, any TL Deposit Account shall not be subject to any liens or security interests other than liens and security interests in favor of the DIP Term Loan Agent.

28.    Maintenance of DIP Collateral.  Until the indefeasible payment in full of all DIP Obligations (including "payment in full" of the DIP ABL Obligations as provided under the DIP ABL Credit Agreement), all Prepetition Secured Obligations, and the termination of the DIP Agents and the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents or the Prepetition Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any Cash Management Order which has first been agreed to by the DIP Agents or as otherwise required by the DIP Documents.

KE 61698457

29.    Disposition of DIP Collateral.  The Debtors shall not sell, transfer, lease,

encumber or otherwise dispose of any portion of the DIP ABL Priority Collateral or Prepetition

ABL Priority Collateral other than in the ordinary course of business without the prior written

consent of the DIP ABL Agent and Prepetition ABL Agent, except as otherwise provided for in

the DIP ABL Documents, and subject to the DIP Intercreditor Agreement.  The Debtors shall not

sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Term Loan Priority

Collateral or Prepetition Term Loan Priority Collateral other than in the ordinary course of

business without the prior written consent of the DIP Term Loan Agent (acting at the direction of

the Required Term DIP Lenders) and the Prepetition Term Loan Agent (acting at the direction of

the "Required Lenders" (as defined in the Prepetition Term Loan Credit Agreement) (and no such

consent shall be implied, from any other action, inaction or acquiescence by the DIP Term Loan

Agent, DIP Term Loan Lenders, or Prepetition Term Loan Secured Parties), except as otherwise

provided for in the DIP Term Loan Documents, and subject to the DIP Intercreditor Agreement.

30.    Termination Date.  On the applicable termination date, (a) all applicable

DIP Obligations shall be immediately due and payable, all commitments to extend credit under

the applicable DIP Facilities will terminate, other than as required in paragraph 39 with respect to

the Carve Out, and (b) all authority to use Cash Collateral shall cease.  For the purposes of this

Interim Order, the "DIP Term Loan Termination Date" shall mean the date the commitments are

terminated pursuant to the terms of the DIP Term Loan Credit Agreement; and the "DIP ABL

Termination Date" shall mean the date the commitments are terminated pursuant to the terms of

the DIP ABL Credit Agreement.

31.    Events of Default.  The occurrence of any of the following events, unless

waived by the DIP Agents in writing and in accordance with the terms of the applicable DIP

KE 61698457

Documents, shall constitute an event of default (collectively, the "Events of Default"):  (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order or any Canadian Recognition Order, including, without limitation, failure to make any payment under this Interim Order when due, (b) the occurrence of an "Event of Default" under, and as defined in, the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement, (c) any modifications, amendments, or reversal of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party, (d) an order converting or dismissing any of the Cases, (e) an order appoint a chapter 11 trustee in the Cases, (f) an order appointing an examiner with enlarged powers in the Cases (beyond those set forth in sections 1106(a)(3 and (4) of the Bankruptcy Code, and (g) a plan proposed by the Debtors or confirmation thereof that does not propose to indefeasibly repay the DIP Obligations (other than the Last Out DIP Obligations) in full in cash, unless otherwise consented to by the DIP Agents.

32.    Milestones.  As a condition to the DIP Facilities and the use of Cash Collateral, the Debtors shall comply with the case milestones set forth in the applicable DIP Agreements, subject to waiver or extension on the terms set forth in the DIP Agreements.

33.    Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default under either the DIP ABL Documents or the DIP Term Loan Documents, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order and the Canadian Recognition Orders (a) each DIP Agent may declare (any such declaration shall be referred to herein as a "Termination Declaration") (1) all DIP Obligations owing under the respective DIP Documents to be

51

immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the respective DIP Facilities, (3) termination of the respective DIP Credit Facilities and the respective DIP Documents as to any future liability or obligation of the applicable DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (4) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents, and (c) either the DIP ABL Agent (in the case of Cash Collateral of proceeds of the DIP ABL Priority Collateral) or the DIP Term Loan Agent (in the case of Cash Collateral of proceeds of the DIP Term Loan Priority Collateral), or both, may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date which is the earliest to occur of (i) any such date a Termination Declaration is delivered by either DIP ABL Agent or DIP Term Loan Agent and (ii) the DIP ABL Termination Date or DIP Term Loan Termination Date (as applicable), shall be referred to herein as the "Termination Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the DIP Agents, counsel to a Creditors' Committee (if appointed) or any other committee appointed under section 1102 or 1104 of the Bankruptcy Code, and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties is hereby modified so that seven (7) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"): (A) the applicable DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the respective DIP Documents and this Interim Order and shall be permitted to satisfy the relevant DIP Obligations, DIP Superpriority Claim and DIP Liens, subject to the Carve Out,

(B) the applicable Prepetition Secured Parties shall be entitled to exercise their rights and remedies to satisfy the relevant Prepetition Secured Obligations, Adequate Prepetition Superpriority Claims and Prepetition Adequate Protection Liens, subject to and consistent with (i) the Carve Out, (ii) this Interim Order, and (iii) the DIP Intercreditor Agreement.  During the Remedies Notice Period, unless otherwise ordered by the Court, the only basis on which the Debtors and/or a Creditors' Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing and the DIP Lenders shall consent to such an emergency hearing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties.  During the Remedies Notice Period, none of the DIP Agents or DIP Lenders shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facilities.  Unless the Court orders otherwise, the automatic stay, as to all of the DIP Agents, DIP Lenders, and Prepetition Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agents, DIP Lenders, and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, in the DIP Documents, the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the DIP Intercreditor Agreement and Existing Participation Agreement, as applicable.

34.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Agents, DIP Lenders, and the Prepetition Secured Parties

KE 61698457

have acted in good faith in connection with this Interim Order and are entitled to rely upon the

protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings

set forth in this Interim Order and the record made during the Interim Hearing, and in accordance

with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim

Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other

court, the DIP Agents, the DIP Lenders, the DIP Obligations, Prepetition Secured Parties and the

Prepetition Secured Obligations are entitled to the protections provided in section 364(e) of the

Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and

enforceability of any advances previously made or made hereunder, or lien, claim or priority

authorized or created hereby.

     35. <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay

all  reasonable and documented fees and expenses of (x) the DIP Agents and DIP Lenders in

connection with the DIP Facilities, as provided in the DIP Documents (subject to applicable

limitations on the DIP Parties' obligations to pay such amounts in the DIP Documents), whether

or not the transactions contemplated hereby are consummated, and (y) the Prepetition Agents

(including the fees and expenses of counsel), as provided in the applicable Prepetition Document.

Payment of all such fees and expenses shall not be subject to allowance by the Court.  Professionals

for the DIP Agents, the DIP Lenders and the Prepetition Agents shall not be required to comply

with the U.S. Trustee fee guidelines.  No attorney or advisor to the DIP Agents, DIP Lenders, or

Prepetition Agents shall be required to file an application seeking compensation for services or

reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the

Petition Date by any of the Debtors to (x) the DIP Agents or DIP Lenders in connection with or

with respect to the DIP Facilities, or (y) the Prepetition Secured Parties in connection with or with respect to the Prepetition Secured Facilities, are, in each case, hereby approved in full.

36.    <u>Budget</u>.  The Approved Budget is approved on an interim basis and the proceeds of the DIP Facilities and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with the Approved Budget (subject to such variances as permitted in the DIP Agreements), this Interim Order and the DIP Documents. None of the DIP Lenders' or DIP Agents' consent (if any) to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facilities or Cash Collateral beyond the respective maturity dates set forth in the DIP Documents, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

37.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Agents and the DIP Lenders in accordance with the terms and conditions of the DIP Agreements.

38.    <u>Master Proofs of Claim</u>.  The DIP Agents, the DIP Lenders, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, and in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each Prepetition Agent and/or other Prepetition Secured Party is authorized to file in the Debtors' lead chapter 11 Case, Case No. 19-11607, a single, master proof of claim on behalf of the relevant Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Documents and hereunder (each a "<u>Master Proof of Claim</u>") against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the Debtors,

KE 61698457

the Prepetition Secured Parties, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Documents, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon reasonable request to counsel to the applicable Prepetition Agent.

39.    Carve Out.

(a)    Carve Out.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at

any time, whether by interim order, procedural order, or otherwise (and, in the case of the Committee Professionals (as defined below), subject to the Approved Budget), all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP ABL Agent or DIP Term Loan Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,250,000 incurred after the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").[8]  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP ABL Agent or DIP Term Loan Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Post-Petition Obligations under the DIP ABL Agreement or the DIP Term Loan Agreement, respectively, stating that the Post Carve Out Trigger Notice Cap has been invoked.

---

[8]    Notwithstanding the foregoing, up to $250,000 of the Post-Carve Out Trigger Notice Cap may be used to pay Allowed Professional Fees of Professional Persons incurred prior to the delivery of a Carve Out Trigger Notice to the extent such Allowed Professional Fees exceed the Professional Fee Carve Out Cap (as defined below).

(b)      Fee Estimates.  Not later than 7:00 p.m. New York time on the third business

day of each week starting with the first full calendar week following the Closing Date, each

Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of

the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during

the preceding week by such Professional Person (through Saturday of such week, the "Calculation

Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and

expenses incurred through the applicable Calculation Date and a statement of the amount of such

fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly

Statement"); provided, that within one business day of the occurrence of the Termination

Declaration Date (as defined below), each Professional Person shall deliver one additional

statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and

expenses incurred during the period commencing on the calendar day after the most recent

Calculation Date for which a Weekly Statement has been delivered and concluding on the

Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement

within three calendar days after such Weekly Statement is due, such Professional Person's

entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the

aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such

Professional Person failed to deliver a Weekly Statement covering such period shall be limited to

the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for

such period for such Professional Person; provided, that such Professional Person shall be entitled

to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional

Fees included in the Approved Budget for such period for such Professional Person from a reserve

to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter

58

held by any Debtor pursuant to paragraph 39(c) below.  Solely as it relates to the DIP ABL Agent and DIP ABL Lenders, any deemed draw and borrowing pursuant to paragraph 39(c)(i)(x) for amounts under paragraph 39(a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date, and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for the period prior to the Termination Declaration Date (such amount, the "Professional Fee Carve Out Cap").  For the avoidance of doubt, the DIP ABL Agent and DIP ABL Lenders shall be entitled to maintain at all times a reserve (the "Carve-Out Reserve") in an amount (the "Carve-Out Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Approved Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the following week occurring after the most recent Calculation Date, *plus* (iv) the amounts contemplated under paragraph 39(a)(i) and 39(a)(ii) above.  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Closing Date, the Debtors shall deliver to the DIP ABL Agent or the DIP Term Loan Agent a report setting forth the Carve-Out Reserve Amount as of such time (the "Fee Report"), and, in setting the Carve-Out Reserve, the DIP ABL Agent and DIP ABL Lenders shall be entitled to rely upon such reports in accordance with the DIP ABL Agreement or the DIP Term

Loan Agreement. Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the DIP ABL Agent or the DIP Term Loan Agent may calculate the Carve-Out Reserve Amount by reference to the Approved Budget for subsection (i) of the Carve-Out Reserve Amount. Notwithstanding anything herein to the contrary, DIP ABL Agent may increase the Carve-Out Reserve Amount to include additional amounts with respect to any monitoring charge or other charge arising from the Canadian insolvency proceeding of the Canadian Borrower and for the projected amount of any success, completion, commission-based, or other non-hourly fees billed by or due to any financial advisor, investment banker, monitor, or other Professional engaged by any Debtor or any Committee in the Cases.

(c)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by either the DIP ABL Agent or the DIP Term Loan Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed (i) a draw request and notice of borrowing by the Debtors for DIP ABL Loans under the DIP ABL Agreement in an amount equal to the sum of (x) the amounts set forth in paragraphs (a)(i) and (a)(ii), above, and (y) the then unpaid amounts of the Allowed Professional Fees up to the ABL Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute DIP ABL  Loans) and (ii) a draw request and notice of borrowing by the Debtors for DIP Term Loans under the DIP Term Loan Facility in an amount equal to the unpaid amounts of the Allowed Professional Fees in excess of the Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute DIP Term Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests

60

and applicable DIP ABL Loans and DIP Term Loans pursuant to the foregoing clauses (i) and (ii) of this sentence of this paragraph (c)).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve").  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for (x) DIP ABL Loans under the DIP ABL Agreement in an amount equal to the Post Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP ABL Loans) and, (y) to the extent not funded by the DIP ABL Lenders, for DIP Term Loans in an amount equal to any unfunded portion of the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Term Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP ABL Loans and DIP Term Loans pursuant to the foregoing clauses (x) and (y) of this sentence of this paragraph (c)).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP ABL Agent in trust exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves").  On the third business day following the Termination Declaration Date and the deemed requests for the making of DIP ABL Loans and DIP Term Loans as provided in this paragraph (c),  notwithstanding anything in the DIP ABL Agreement or the DIP Term Loan Agreement to the contrary, including with respect to (1) the existence of a Default (as defined in the DIP ABL Agreement or the DIP Term Loan Agreement) or Event of Default, (2) the failure of the Debtors to satisfy any or all of the conditions precedent

61

for the making of any DIP ABL Loan under the DIP ABL Agreement or DIP Term Loans under the DIP Term Loan Agreement, respectively, (3) any termination of the DIP ABL Loan Commitments or DIP Term Loan Commitments following an Event of Default, or (4) the occurrence of the Maturity Date, each DIP ABL Lender and DIP Term Loan Lender with an outstanding Commitment shall make available to the DIP ABL Agent or DIP Term Loan Agent, as applicable, such DIP ABL Lender's or such DIP Term Loan Lender's pro rata share of such DIP ABL Loans or DIP Term Loans, as applicable.  For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order to secure payment of the Carve Out shall be limited to any shortfall in funding as provided below.

(d)    <u>Application of Carve Out Reserves</u>.  (i)  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subparagraphs (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap (other than amounts up to $250,000 to the extent the Pre-Carve Out Amounts exceed the Professional Fee Carve Out Cap), until paid in full.  If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP ABL Agent on account of the applicable DIP ABL Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Issuing Bank), and *thereafter* to the Prepetition ABL Lenders in accordance with their rights and priorities as of the Petition Date.

<div align="center">62</div>

(i)    All funds in the Post-Carve Out Trigger Notice Reserve (other than up to $250,000, which may be used to pay Pre-Carve Out Amounts to the extent they exceed the Professional Fee Carve Out Cap) shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts").  If the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP ABL Agent on account of the applicable DIP ABL Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Issuing Bank), and *thereafter* to the Prepetition ABL Lenders in accordance with their rights and priorities as of the Petition Date.

(ii)    Notwithstanding anything to the contrary in the Financing Agreements or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph (c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding prior to making any payments to the DIP ABL Agent or the Prepetition ABL Lenders, as applicable.

(iii)    Notwithstanding anything to the contrary in the Financing Agreements or the Interim Order, following the third business day after delivery of a Carve Out Trigger Notice, the DIP ABL Agent, the Prepetition ABL Agent, the DIP Term Loan Agent, and the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully

63

funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in paragraphs (ii) and (iii) above.

(iv)    Notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (ii) subject to the limitations with respect to the DIP ABL Agent, DIP ABL Lenders, Prepetition ABL Agent and Prepetition ABL Lenders set forth in paragraph (b), above, in no way shall the Initial Budget, any Approved Budget, Annual Operating Forecast, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP ABL Agreement or the DIP Term Loan Agreement, the Carve Out subject to the Professional Fee Carve Out Cap shall be senior to all liens and claims securing the DIP ABL Agreement or the DIP Term Loan Agreement, the Adequate Protection Liens, and the Diminution in Value claims, and any and all other forms of adequate protection, liens, or claims securing the Post-Petition Obligations or the Pre-Petition Obligations.

(v)    Notwithstanding anything herein to the contrary, the Carve Out in respect of any "Transaction Fees" for Houlihan Lokey will be junior to the Prepetition ABL Obligations and DIP ABL Obligations to the extent secured by the DIP ABL Priority Collateral, unless and to the extent otherwise agreed in writing by the DIP ABL Agent in its sole discretion.

(e)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  The DIP Agents and the DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall

be construed to obligate the DIP Agents or the DIP Lenders, or any Issuing Bank, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    _Payment of Allowed Professional Fees Prior to the Termination Declaration Date_.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)    _Payment of Carve Out On or After the Termination Declaration Date_.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the Obligations secured by the Post-Petition Collateral and shall be otherwise entitled to the protections granted under this Final Order, the Financing Agreements, the Bankruptcy Code, and applicable law.

(h)    _Reservation of Rights_. Nothing herein shall be construed to impair the right or ability of any party to object to the fees, expenses, reimbursement or other compensation described with respect to these Carve-Out provisions.

40.    _Limitations on the Use of DIP Proceeds, Cash Collateral and Carve Out_. The DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve Out may not be used in connection with:  (a) preventing, hindering, or delaying any of the DIP Agents', the DIP Lenders', DIP Obligations, or the Prepetition Secured Parties' or Prepetition Secured Obligations' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the applicable DIP Agents and the applicable Required DIP

Lenders; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the applicable DIP Agents and the applicable Required DIP Lenders; (d) incurring Indebtedness (as defined in the  DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement, as applicable) without the prior consent of the applicable DIP Agents and the applicable Required DIP Lenders, except to the extent permitted under the applicable DIP Agreements; (e) seeking to amend or modify any of the rights granted to the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Prepetition Liens, Prepetition Secured Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition Secured Obligations; *provided*, *however*, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for

allowed fees and expenses, in an amount not to exceed $25,000 in the aggregate, incurred solely by a Creditors' Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens (the "Limited Amount"); and *provided*, *further*, that during the Remedies Notice Period the Debtors and a Creditors' Committee (if appointed) shall be entitled to an emergency hearing before the Court to contest solely whether an Event of Default has occurred and/or is continuing. Notwithstanding anything to the contrary, any fees, expenses or costs incurred by Committee Professionals in excess of the Limited Amount or in excess of the amount budgeted for Committee Professionals set forth in the Approved Budget shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

41.    Payment of Compensation. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Agents, the DIP Lenders, the Prepetition ABL Secured Parties, or the Prepetition Term Loan Secured Parties to object to the allowance and payment of such fees and expenses. So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order of the Court (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Approved Budget provided by the Debtors to the DIP Agents.

42.    Effect of Stipulations on Third Parties.

(i)    *Generally*. Except as set forth in this Interim Order, the admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding in all circumstances and for all

purposes on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including, without limitation, any chapter 7 or chapter 11 trustee or examiner appoint or elected for any of the Debtors and official committee that may be appointed in these cases (each, a "Challenge Party"), unless, and solely to the extent that (a) the Debtors received from a Challenge Party notice of a potential Challenge (defined below) during the Challenge Period (defined below) and (b) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge (as defined herein); *provided, however*, that any releases by the DIP Term Loan Secured Parties and Prepetition Term Loan Secured Parties of the Put Purchasers shall be governed by the Restructuring Support Agreement (as defined in the Plan).  For purposes of this paragraph 40: (a) "Challenge" means any claim against any of the Prepetition Secured Parties or the Put Purchasers on behalf of the Debtors or the Debtors' creditors and interest holders, or to object to or to challenge the stipulations, findings or Debtors' Stipulations set forth herein, including, but not limited to those in relation to:  (i) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Secured Party; (ii) the validity, allowability, priority, or amount of the Prepetition Secured Obligations (including any fees included therein); (iii) the secured status of the Prepetition Secured Obligations; or (iv) any liability of any of the Prepetition Secured Parties or the Put Purchasers with respect to anything arising from any of the respective Prepetition Documents and the entry into the Put Agreement and Existing Participation Agreement; and (b) "Challenge Period" means (i) if the Creditors' Committee is not formed, seventy-five (75) calendar days (or such longer period as the Court orders for cause shown before the expiration of such period) from the entry of the Final Order and (ii) if the Creditors' Committee is formed, sixty (60) days after the entry of the Final Order (or

KE 61698457

such longer period as the Court orders for cause shown before the expiration of such period). During the Challenge Period, a Challenge Party shall be entitled to determine whether a basis to assert a Challenge exists. If a Challenge Party identifies a basis to assert a Challenge, it must notify the Debtors during the Challenge Period of its demand that the Debtors initiate an action or adversary proceeding relating thereto and from the date that the Debtors are so notified, the Debtors shall have five (5) days to notify the Challenge Party of whether the Debtors intend to initiate such action (or a settlement in lieu of an adversary) and ten (10) days to initiate such action. If the Debtors notify such Challenge Party that the Debtors do not intend to initiate an action, settlement, or adversary proceeding, the Challenge Party shall have ten (10) days from the receipt of such notice to seek standing to initiate an action or adversary proceeding. Nothing herein shall be deemed to grant standing in favor of any Challenge Party absent further order of this Court. The Debtors, if timely notified of a potential Challenge, shall retain authority to prosecute, settle or compromise such Challenge in the exercise of their business judgment and subject to any applicable further order of court.

(ii)    *Binding Effect*. Upon the expiration of the Challenge Period (subject to such ten (10) day periods described above) (the "Challenge Period Termination Date"), without the filing of a Challenge: (A) any and all such Challenges and objections by any party (including, without limitation, the Creditors' Committee, any Chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any Chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred, (B) all matters not subject to the Challenge, findings, Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Secured Parties' claims, liens, interests, and validity of the Prepetition Secured

69

Obligations shall be of full force and effect and forever binding upon the Debtors, the Debtors'

bankruptcy estates and all creditors, interest holders, and other parties in interest in these Cases

and any Successor Cases; and (C) any and all claims or causes of action against any of the

Prepetition Secured Parties or the Put Purchasers relating in any way to the Debtors or the

Prepetition Documents and entry into the Put Agreement and Existing Participation Agreement

shall be forever waived and released by the Debtors' estates, all creditors, interest holders and

other parties in interest in these Cases and any Successor Cases, provided that the binding effect

of the findings, Debtors' Stipulations and release of the Put Purchasers is only effective as to third

parties upon the later of the occurrence of the Disinterested Director's Determination and the

Challenge Period Termination Date.

43.    No Third Party Rights/No Superior Rights of Reclamation.  Except as

explicitly provided for herein, this Interim Order does not create any rights for the benefit of any

third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.  Based on the

findings and rulings herein concerning the integrated nature of the DIP Agreements and the

Prepetition Secured Facilities and the relation back of the DIP Liens, in no event shall any alleged

right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or

otherwise) be deemed to have priority over the DIP Liens.

44.    Section 506(c) Claims.  Subject to entry of a Final Order, no costs or

expenses of administration which have been or may be incurred in the Cases at any time shall be

charged against the DIP Agents, DIP Lenders, DIP Obligations, the Prepetition Secured Parties,

the Prepetition Secured Obligations, or any of their respective claims, the DIP Collateral, or the

Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise,

without the prior written consent, as applicable, of the DIP Agents, DIP Lenders, and Prepetition

KE 61698457

Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

45.     <u>No Marshaling/Applications of Proceeds</u>.  Subject to entry of a Final Order, the DIP Agents, DIP Lenders, DIP Obligations, and Prepetition Secured Parties and Prepetition Secured Obligations shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, including, for the avoidance of doubt, in accordance with paragraph 24 hereof, and the DIP Documents notwithstanding any other agreement or provision to the contrary.

46.     <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties  and Prepetition Secured Obligations are each entitled to all of the rights and benefits of section 552(h) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties and Prepetition Secured Obligations, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

47.     <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agents, exercisable on behalf of the DIP ABL Lenders and DIP Term Loan Lenders, respectively, contained in this Interim Order, the DIP ABL Documents, the DIP Term Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP ABL Documents and DIP Term Loan Documents, upon written notice to the landlord of any leased premises that an Event of Default or a Termination Date has occurred and is continuing, the DIP ABL Agent or DIP Term Loan Agent, as applicable, may, subject to the applicable notice provisions, if any, in this Interim Order and any separate

71

applicable agreement by and between such landlord and the DIP ABL Agent or DIP Term Loan Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, *provided* that the DIP ABL Agent and/or DIP Term Loan Agent, as applicable, shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP ABL Agent and/or DIP Term Loan Agent, as applicable, calculated on a daily per diem basis. Nothing herein shall require the DIP ABL Agent or DIP Term Loan Agent to assume any lease as a condition to the rights afforded in this paragraph.

48.    Exculpation. Nothing in this Interim Order, the DIP Documents, the existing agreements or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Lender, DIP Agent, or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the DIP Parties, including in the operation of their businesses, or in connection with their restructuring efforts and administration of these Cases. In addition, (a) the DIP Lenders and DIP Agents shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution in Value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the DIP Parties.

49.    Limits on Lender Liability. The DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall not be deemed in control of the operations of the Debtors or to be

acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).

50.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP ABL Agent (on behalf of the DIP ABL Parties), the DIP Term Loan Agent (on behalf of the DIP Term Loan Lenders), the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders), and the Prepetition Term Loan Agents (on behalf of the Prepetition Term Loan Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

51.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Borrowers and the DIP Guarantors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facilities and the DIP Documents.

52.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agents', DIP Lenders' and Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agents, DIP Lenders and Prepetition Secured Parties  under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor

73

Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) subject to the DIP Intercreditor Agreement, any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agents, DIP Lenders, or Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Creditors' Committee's (if appointed) or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the Debtors' Cases.

53.    No Waiver by Failure to Seek Relief. The failure of the DIP Agents, DIP Lenders, or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, DIP Lenders, Prepetition ABL Secured Parties, Prepetition Term Loan Secured Parties, Creditors' Committee (if appointed) or any party in interest.

54.    Binding Effect of Interim Order. Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agents, DIP Lenders, the DIP Obligations, the Prepetition ABL Secured Parties, the Prepetition ABL Obligations, Prepetition Term Loan Secured Parties, all other creditors of any of the Debtors, any Creditors' Committee (or any other court appointed

KE 61698457

committee) appointed in the Cases, and all other parties-in-interest and their respective successors
and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any
Successor Cases, or upon dismissal of any Case or Successor Case.

55.    No Modification of Interim Order.    Until and unless the DIP Obligations
and the Prepetition Secured Obligations have been indefeasibly paid in full in cash, and all letters
of credit under the DIP Facilities shall have been cancelled, backed, or cash collateralized in
accordance with the terms thereof (such payment being without prejudice to any terms or
provisions contained in the DIP Facilities which survive such discharge by their terms), and all
commitments to extend credit under the DIP Facilities have been terminated, the Debtors
irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:
(a) without the prior written consent of the DIP Agents and the DIP Lenders (or the Prepetition
Agents (acting, in the case of the Prepetition Term Loan Credit Agreements, at the direction of the
"Required Lenders" (as defined therein)), (i) any material modification, stay, vacatur or
amendment to this Interim Order; or (ii) a priority claim for any administrative expense or
unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature
whatsoever, including, without limitation any administrative expense of the kind specified in
sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor
Cases, equal or superior to the DIP Superpriority Claims or Adequate Protection Superpriority
Claims, other than the Carve Out; (b) without the prior written consent of the DIP Agents (or the
Prepetition Agents (acting, in the case of the Prepetition Term Loan Credit Agreements, at the
direction of the "Required Lenders" (as defined therein)) for any order allowing use of Cash
Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP
Collateral or Prepetition Collateral; (c) without the prior written consent of the applicable DIP

KE 61698457

Agents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (d) without the prior written consent of the Prepetition Agents (acting, in the case of the Prepetition Term Loan Credit Agreements, at the direction of the "Required Lenders" (as defined therein)), any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agents (or the Prepetition Agents (acting, in the case of the Prepetition Term Loan Credit Agreements, at the direction of the "Required Lenders" (as defined therein))), and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agents or the Prepetition Agents (acting, in the case of the Prepetition Term Loan Credit Agreements, at the direction of the "Required Lenders" (as defined therein)).

56.    Continuing Effect of DIP Intercreditor Agreement; Existing Participation Agreement.    The Debtors, DIP Agents, DIP Lenders, Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties each shall be bound by, and in all respects of the DIP Facilities shall be governed by, and be subject to all the terms, provisions and restrictions of the DIP Intercreditor Agreement, except as may be expressly modified by this Interim Order. The parties to the Existing Participation Agreement shall continue to be bound by, and governed by, and be subject to all the terms, provisions and restriction of the Existing Participation Agreement.

57.    Interim Order Controls.    In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

KE 61698457

58.  <u>Discharge</u>.  The DIP ABL Obligations, the DIP Term Loan Obligations, and
the obligations of the Debtors with respect to the adequate protection provided herein shall not be
discharged by the entry of an order confirming any plan of reorganization in any of the Cases,
notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations
have been indefeasibly paid in full in cash (and, in the case of DIP ABL Obligations, "payment in
full" as provided by the DIP ABL Credit Agreement), on or before the effective date of such
confirmed plan of reorganization, or each of the DIP Agents, DIP Lenders and Prepetition ABL
Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing.  None of
the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of
the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned
upon the indefeasible payment of the DIP ABL Obligations (in the case of the sale of DIP ABL
Priority Collateral) and DIP Term Loan Obligations (in the case of the sale of DIP Term Loan
Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate
protection provided for herein, in full in cash within a commercially reasonable period of time
(and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited
Plan or Sale</u>") without the written consent of each of the DIP Agents (at the direction of the
applicable Required DIP Lenders) and each of the Prepetition Agents, as applicable.  For the
avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of
an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP
Documents.

59.  <u>Survival</u>.  The provisions of this Interim Order and any actions taken
pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of
reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of

KE 61698457

the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agents, DIP Lenders, DIP Obligations, the Prepetition Secured Parties and the Prepetition Secured Obligations granted pursuant to this Interim Order and/or the DIP Documents, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until:  (i) in respect of the DIP ABL Credit Facility, all the DIP ABL Obligations, pursuant to the DIP ABL Documents and this Interim Order, have been indefeasibly paid in full in cash and all letters of credit under the DIP ABL Credit Facility shall have been cancelled or cash collateralized in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP ABL Credit Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP ABL Credit Facility are terminated; (ii) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been indefeasibly paid in full in cash; (iii) in respect of the DIP Term Loan Credit Facility, all the DIP Term Loan Obligations, pursuant to the DIP Term Loan Documents and this Interim Order, have been indefeasibly paid in full in cash or otherwise satisfied to the satisfaction of the DIP Term Loan Agent and DIP Term Loan Lenders; and (iv) in respect of the Prepetition Term Loan Credit Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been indefeasibly paid in full in cash or otherwise satisfied to the satisfaction of the Prepetition Secured Parties. The terms and provisions concerning the indemnification of the DIP Agents and DIP Lenders shall continue in the Cases, in any Successor Cases, following dismissal

of the Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Secured Parties notwithstanding the repayment in full or termination of the DIP ABL Obligations or the Prepetition ABL Obligations.

60.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final, approval of the DIP Facilities is scheduled for _____, 2019, at__:__ _.m., prevailing Eastern Time., 2019**,** before the Honorable United States Bankruptcy Judge _____, in Courtroom _____, at the United States Bankruptcy Court for the Southern District of New York. On or before _____, 2019, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order, the proposed Final Order and the DIP Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Creditors' Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on _____, 2019, which objections shall be served so as to be received on or before such date by:  (i) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. and Christopher T. Greco, P.C., and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654, Attn:  Joe Graham and Laura Krucks; (ii) counsel to the DIP ABL Agent and Prepetition ABL Agent, Goldberg Kohn Ltd. 55 East Monroe, Suite 3300, Chicago, Illinois 60603, Attn: Randall Klein and Prisca Kim; and (iii) counsel to the DIP Term Loan Agent

and Prepetition Term Loan Agent, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036, Attn: W. Austin Jowers, Christopher Boies, and Stephen M. Blank.

61.     <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions as are necessary or appropriate to implement the terms of this Interim Order.

62.     <u>Bankruptcy Rules</u>.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

63.     <u>Nunc Pro Tunc Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

64.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, or any local bankruptcy rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

65.     The Debtors shall within two (2) business days of its entry serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of right under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the interim Hearing, to any party that has filed a request for notices with this Court.

New York, New York
Dated: _____, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Budget**

KE 61698457

**DREAM II HOLDINGS**
**CASH FORECAST - WEEKLY**
**CONSOLIDATED - USD**

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | TOTAL 17 WEEKS | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | | 18 |
| Week Start Date | 5/13/19 | 5/20/19 | 5/27/19 | 6/3/19 | 6/10/19 | 6/17/19 | 6/24/19 | 7/1/19 | 7/8/19 | 7/15/19 | 7/22/19 | 7/29/19 | 8/5/19 | 8/12/19 | 8/19/19 | 8/26/19 | 9/2/19 | 9/9/19 | | 9/16/19 |
| Week End Date | 5/17/19 | 5/24/19 | 5/31/19 | 6/7/19 | 6/14/19 | 6/21/19 | 6/28/19 | 7/5/19 | 7/12/19 | 7/19/19 | 7/26/19 | 8/2/19 | 8/9/19 | 8/16/19 | 8/23/19 | 8/30/19 | 9/6/19 | 9/13/19 | | 9/20/19 |
| **RECEIPTS:** | | | | | | | | | | | | | | | | | | | | |
| Customer Accounts Receivable Collection | | 6,252 | 6,185 | 7,897 | 9,705 | 11,260 | 11,453 | 11,965 | 11,644 | 12,354 | 10,471 | 10,675 | 9,954 | 9,321 | 9,321 | 9,707 | 9,675 | 9,776 | 167,614 | |
| **TOTAL CASH RECEIPTS**  A | $ - | 6,252 | 6,185 | 7,897 | 9,705 | 11,260 | 11,453 | 11,965 | 11,644 | 12,354 | 10,471 | 10,675 | 9,954 | 9,321 | 9,321 | 9,707 | 9,675 | 9,776 | 167,614 | |
| **DISBURSEMENTS:** | | | | | | | | | | | | | | | | | | | | |
| **Material Purchases** | | | | | | | | | | | | | | | | | | | | |
| Future A/P Estimate - Current Open POs Post-Petition | | 2,512 | 2,593 | 1,563 | 811 | 524 | 359 | 577 | 158 | 61 | - | 102 | 52 | 1 | - | 99 | - | - | 9,412 | |
| Future A/P Estimate - Future POs | | 3,025 | 3,767 | 3,754 | 3,234 | 3,400 | 4,038 | 4,087 | 4,185 | 4,199 | 4,243 | 4,231 | 4,612 | 4,606 | 4,455 | 5,339 | 5,372 | 6,244 | 72,790 | |
| Critical/Hostage Payments | | 2,650 | 883 | 883 | 883 | - | | | | | | | | | | | | | 5,300 | |
| Inventory Reduction Safety Factor | | 154 | 154 | 154 | 154 | 154 | 154 | 154 | 154 | 154 | 154 | 154 | 154 | 154 | - | | | | 2,000 | |
| 503(b)(9) Payments | | - | - | - | - | | | | | | | | | | | | | 6,179 | 6,179 | |
| **Material Purchases Subtotal** | $ - | 8,341 | 7,397 | 6,354 | 5,082 | 4,078 | 4,552 | 4,817 | 4,497 | 4,414 | 4,397 | 4,487 | 4,818 | 4,761 | 4,455 | 5,439 | 5,372 | 12,423 | 95,682 | |
| **Other A/P** | | | | | | | | | | | | | | | | | | | | |
| Future A/P Estimate | | 2,212 | 2,212 | 2,212 | 2,212 | 2,212 | 2,212 | 2,212 | 2,212 | 2,212 | 2,212 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 37,953 | |
| Pre-Closing Plant Consolidation Initiatives | | - | - | - | - | - | 125 | 125 | 125 | 125 | 125 | 125 | | | | | | | 750 | |
| Margin Decrease From Lost Business | | - | - | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 1,731 | |
| Utility Deposits | | - | 250 | - | - | - | | | | | | | | | | | | | 250 | |
| Contingency/Cure Payments | | - | - | - | 83 | - | - | - | 83 | - | - | - | 83 | - | - | - | 83 | - | 333 | 2,000 |
| **Other A/P Subtotal** | $ - | 2,212 | 2,462 | 2,327 | 2,411 | 2,327 | 2,452 | 2,452 | 2,536 | 2,452 | 2,452 | 2,502 | 2,461 | 2,377 | 2,377 | 2,377 | 2,461 | 2,377 | 41,017 | |
| **Rent** | | | | | | | | | | | | | | | | | | | | |
| Current Rent | | - | - | 1,359 | - | - | - | 1,359 | - | - | - | 1,359 | - | - | - | 1,359 | - | - | 5,438 | |
| Stub & Cure Rent | | - | - | - | - | 614 | - | - | - | - | - | - | - | - | - | - | - | - | 614 | 745 |
| **Rent Sub-Total** | $ - | - | - | 1,359 | - | 614 | - | 1,359 | - | - | - | 1,359 | - | - | - | 1,359 | - | - | 6,052 | |
| **Royalty** | | | | | | | | | | | | | | | | | | | | |
| Royalty Payments | | 1,536 | - | - | - | - | - | 2,391 | - | - | - | 835 | - | - | - | - | - | 707 | 5,469 | |
| **Royalty Sub-Total** | $ - | 1,536 | - | - | - | - | - | 2,391 | - | - | - | 835 | - | - | - | - | - | 707 | 5,469 | |
| **Payroll** | | | | | | | | | | | | | | | | | | | | |
| Ordinary Course Payroll | | 1,287 | 2,140 | 1,296 | 2,159 | 1,314 | 2,167 | 1,320 | 2,174 | 1,324 | 2,174 | 1,324 | 2,174 | 1,324 | 2,174 | 1,324 | 2,174 | 1,324 | 29,167 | |
| Severance Payments | | 37 | 34 | 27 | 15 | 10 | 7 | 4 | 0 | - | - | - | - | - | - | - | - | - | 134 | |
| Board Fees | | - | - | 8 | - | - | - | - | 8 | - | - | - | 8 | - | - | - | 8 | - | 33 | |
| KEIP / KERP | | - | - | - | - | - | - | - | - | - | - | - | - | - | 125 | 125 | 125 | 125 | 500 | |
| **Payroll Sub-Total** | $ - | 1,324 | 2,174 | 1,332 | 2,174 | 1,324 | 2,174 | 1,332 | 2,174 | 1,324 | 2,174 | 1,332 | 2,174 | 1,324 | 2,299 | 1,449 | 2,307 | 1,449 | 29,834 | |
| **Restructuring Costs** | | | | | | | | | | | | | | | | | | | | |
| Restructuring Costs  C | | - | 250 | - | 250 | 404 | 250 | 1,249 | 250 | 1,376 | 400 | 1,564 | 250 | - | 1,466 | 1,275 | 250 | 5,619 | 14,850 | |
| D&O Tail | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 150 | 150 | |
| **Restructuring Costs Sub-Total** | $ - | - | 250 | - | 250 | 404 | 250 | 1,249 | 250 | 1,376 | 400 | 1,564 | 250 | - | 1,466 | 1,275 | 250 | 5,769 | 15,000 | |
| **Interest & Financing Payments** | | | | | | | | | | | | | | | | | | | | |
| Pre-Petition ABL Interest | | 155 | - | 102 | - | 159 | - | - | - | - | - | - | - | - | - | - | - | - | 417 | |
| ABL DIP Interest & Fees | | 1,350 | - | 56 | - | - | - | - | 301 | - | - | 281 | - | - | - | 278 | - | 118 | 2,384 | |
| Term DIP Interest & Fees | | - | - | 55 | - | 1,500 | - | - | 174 | - | - | 174 | - | - | - | 174 | - | 75 | 2,153 | |
| **Interest Payments Sub-Total** | $ - | 1,505 | - | 214 | - | 1,659 | - | - | 475 | - | - | 455 | - | - | - | 453 | - | 193 | 4,955 | |
| **TOTAL DISBURSEMENTS**  B | $ - | 14,918 | 12,282 | 11,586 | 9,916 | 10,407 | 9,427 | 14,077 | 9,456 | 9,565 | 9,422 | 12,534 | 9,702 | 8,461 | 10,596 | 10,992 | 11,749 | 22,918 | 198,009 | |
| **TOTAL NET OPERATING CASH FLOW**  A-B | $ - | (8,666) | (6,097) | (3,689) | (212) | 853 | 2,026 | (2,112) | 2,188 | 2,789 | 1,049 | (1,859) | 253 | 859 | (1,276) | (1,285) | (2,073) | (13,143) | (30,394) | |

**DREAM II HOLDINGS**
**CASH FORECAST - WEEKLY**
**CONSOLIDATED - USD**

| | Ref | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | TOTAL 17 WEEKS | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Start Date | | 5/13/19 | 5/20/19 | 5/27/19 | 6/3/19 | 6/10/19 | 6/17/19 | 6/24/19 | 7/1/19 | 7/8/19 | 7/15/19 | 7/22/19 | 7/29/19 | 8/5/19 | 8/12/19 | 8/19/19 | 8/26/19 | 9/2/19 | 9/9/19 | | 9/16/19 |
| Week End Date | | 5/17/19 | 5/24/19 | 5/31/19 | 6/7/19 | 6/14/19 | 6/21/19 | 6/28/19 | 7/5/19 | 7/12/19 | 7/19/19 | 7/26/19 | 8/2/19 | 8/9/19 | 8/16/19 | 8/23/19 | 8/30/19 | 9/6/19 | 9/13/19 | | 9/20/19 |
| **CASH BALANCE & AVAILABILITY** | | | | | | | | | | | | | | | | | | | | | |
| **Operating Cash Balance** | | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | A-B | 507 | 507 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 507 | |
| Net Operating Cash Flow | A-B | - | (8,666) | (6,097) | (3,689) | (212) | 853 | 2,026 | (2,112) | 2,188 | 2,789 | 1,049 | (1,859) | 253 | 859 | (1,176) | (1,285) | (2,073) | (13,143) | (30,394) | |
| Restructuring Cost Add-Back | C | - | - | 250 | - | 250 | 404 | 250 | 1,249 | 250 | 1,376 | 400 | 1,564 | 250 | - | 1,466 | 1,275 | 250 | 5,619 | 14,850 | |
| Professional Fee Carve Out Funding | D | - | (3,232) | (1,643) | (801) | (801) | (801) | (801) | (1,106) | (795) | (795) | (795) | (841) | (841) | (841) | (841) | (841) | (187) | 1,113 | (14,850) | |
| Term DIP Cash Disbursement | E | 8,449 | 1,246 | 2,245 | 382 | 1,500 | - | - | - | - | - | - | 1,467 | 341 | 54 | 724 | 1,277 | 2,793 | 6,634 | 27,110 | |
| ABL Draw/(Repayment) | | | 3,442 | 6,245 | 2,245 | 382 | (1,956) | (1,474) | 1,969 | (1,643) | (3,370) | (654) | (330) | (2) | (73) | (73) | (426) | (782) | (223) | 3,277 | |
| Net Operating Cash On Hand | | 507 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | |
| **Term DIP Cash Balance** | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | - | 14,166 | 5,717 | 4,472 | 2,226 | 8,845 | 7,345 | 7,345 | 7,345 | 7,345 | 7,345 | 7,345 | 5,878 | 5,537 | 5,483 | 4,759 | 3,482 | 690 | - | |
| Term DIP Draws | | 15,000 | - | - | - | 7,000 | - | - | - | - | - | - | - | - | - | - | - | - | 6,000 | 28,000 | |
| Disbursements | E | (834) | (8,449) | (1,246) | (2,245) | (382) | (1,500) | - | - | - | - | - | (1,467) | (341) | (54) | (724) | (1,277) | (2,793) | (6,634) | (27,944) | |
| Term DIP Cash Ending Balance | | 14,166 | 5,717 | 4,472 | 2,226 | 8,845 | 7,345 | 7,345 | 7,345 | 7,345 | 7,345 | 7,345 | 5,878 | 5,537 | 5,483 | 4,759 | 3,482 | 690 | 56 | 56 | |
| **Professional Fees Carve Out Balance** | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | - | - | 3,232 | 4,626 | 5,427 | 5,979 | 6,376 | 6,928 | 6,785 | 7,330 | 6,750 | 7,145 | 6,422 | 7,013 | 7,854 | 7,229 | 6,794 | 6,732 | - | |
| Funding | D | - | 3,232 | 1,643 | 801 | 801 | 801 | 801 | 1,106 | 795 | 795 | 795 | 841 | 841 | 841 | 841 | 841 | 187 | (1,113) | 14,850 | |
| Disbursements | C | - | - | (250) | - | (250) | (404) | (250) | (1,249) | (250) | (1,376) | (400) | (1,564) | (250) | - | (1,466) | (1,275) | (250) | (5,619) | (14,850) | |
| Professional Fees Carve Out Ending Balance | | - | 3,232 | 4,626 | 5,427 | 5,979 | 6,376 | 6,928 | 6,785 | 7,330 | 6,750 | 7,145 | 6,422 | 7,013 | 7,854 | 7,229 | 6,794 | 6,732 | - | - | |
| **Total Cash Balance** | | 14,673 | 6,217 | 4,972 | 2,726 | 9,345 | 7,845 | 7,845 | 7,845 | 7,845 | 7,845 | 7,845 | 6,378 | 6,037 | 5,983 | 5,259 | 3,982 | 1,190 | 556 | 556 | |
| **ABL Availability** | | | | | | | | | | | | | | | | | | | | | |
| ABL Total Borrowing Base After Reserves | | 64,782 | 60,284 | 72,479 | 74,231 | 74,982 | 73,661 | 72,163 | 69,444 | 67,667 | 64,592 | 63,237 | 61,697 | 61,695 | 61,622 | 61,549 | 61,123 | 60,341 | 60,118 | 60,118 | |
| Cash Secured L/C Balance | | | | | | | | | | | | | | | | | | | | | |
| ABL Balance | | (46,698) | (50,148) | (56,392) | (58,637) | (59,019) | (57,063) | (55,588) | (57,557) | (55,915) | (52,545) | (51,891) | (51,561) | (51,559) | (51,486) | (51,413) | (50,987) | (50,205) | (49,982) | (49,982) | |
| L/C Balance | | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | (5,136) | |
| Total Availability | | 12,948 | 5,000 | 10,951 | 10,458 | 10,827 | 11,462 | 11,439 | 6,750 | 6,616 | 6,911 | 6,210 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | |
| **Net Cash on Hand + Availability** | | 27,622 | 11,217 | 15,922 | 13,184 | 20,171 | 19,307 | 19,283 | 14,595 | 14,461 | 14,755 | 14,055 | 11,378 | 11,037 | 10,983 | 10,259 | 8,982 | 6,190 | 5,556 | 5,556 | |
| **Pre-Petition ABL Balance** | | | | | | | | | | | | | | | | | | | | | |
| Pre-Petition ABL Beginning Balance | | 61,698 | 46,698 | 40,446 | 34,260 | 26,363 | 16,659 | - | - | - | - | - | - | - | - | - | - | - | - | $ 61,698 | |
| Draws | | - | | | | | | | | | | | | | | | | | | - | |
| Repayments | | | (6,252) | (6,185) | (7,897) | (9,705) | (11,260) | | | | | | | | | | | | | (41,299) | |
| Balance Transfer | | (15,000) | - | - | - | - | (5,399) | | | | | | | | | | | | | (20,399) | |
| Pre-Petition ABL Ending Balance | | 46,698 | 40,446 | 34,260 | 26,363 | 16,659 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **ABL DIP Balance** | | | | | | | | | | | | | | | | | | | | | |
| ABL DIP Beginning Balance | | - | - | 9,702 | 22,132 | 32,274 | 42,360 | 57,063 | 55,588 | 57,557 | 55,915 | 52,545 | 51,891 | 51,561 | 51,559 | 51,486 | 51,413 | 50,987 | 50,205 | $ - | |
| Draws | | - | 13,152 | 13,676 | 12,387 | 10,468 | 10,803 | 9,979 | 13,934 | 10,002 | 8,984 | 9,817 | 10,345 | 9,952 | 9,248 | 9,248 | 9,281 | 8,894 | 9,552 | 179,721 | |
| Repayments | | - | (3,450) | (1,246) | (2,245) | (382) | (1,500) | (11,453) | (11,965) | (11,644) | (12,354) | (10,471) | (10,675) | (9,954) | (9,321) | (9,321) | (9,707) | (9,675) | (9,776) | (126,316) | |
| Balance Transfer | | - | - | - | - | - | 5,399 | | | | | | | | | | | | | 5,399 | |
| Term Loan Draw Share | | | | | | | | | | | | | | | | | | | | (8,823) | |
| ABL DIP Ending Balance | | - | 9,702 | 22,132 | 32,274 | 42,360 | 57,063 | 55,588 | 57,557 | 55,915 | 52,545 | 51,891 | 51,561 | 51,559 | 51,486 | 51,413 | 50,987 | 50,205 | 49,982 | 49,982 | |
| **Total Wells ABL/ABL DIP Balance** | | 46,698 | 50,148 | 56,392 | 58,637 | 59,019 | 57,063 | 55,588 | 57,557 | 55,915 | 52,545 | 51,891 | 51,561 | 51,559 | 51,486 | 51,413 | 50,987 | 50,205 | 49,982 | 49,982 | |
| **Term DIP Balance** | | | | | | | | | | | | | | | | | | | | | |
| DIP Beginning Balance | | - | 15,000 | 15,000 | 15,000 | 15,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | $ - | |
| Draws | | 15,000 | - | - | - | 7,000 | - | - | - | - | - | - | - | - | - | - | - | - | 6,000 | 28,000 | |
| Repayments | | | | | | | | | | | | | | | | | | | | | |
| DIP Ending Balance | | 15,000 | 15,000 | 15,000 | 15,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 28,000 | 28,000 | |
| **Sentinel ABL** | | | | | | | | | | | | | | | | | | | | | |
| Sentinel ABL Beginning Balance | | - | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | $ - | |
| Balance Transfer | | 15,000 | | | | | | | | | | | | | | | | | | 15,000 | |
| Sentinel ABL Ending Balance | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | |

**<u>Exhibit B</u>**

**DIP ABL Credit Agreement**

KE 61190851



**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**by and among**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Agent,**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Sole Lead Arranger,**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Sole Book Runner,**

**THE LENDERS THAT ARE PARTIES HERETO**

**as the Lenders,**

**DREAM II HOLDINGS, LLC**

**as Parent**

**HOLLANDER HOME FASHIONS HOLDINGS, LLC,**

**HOLLANDER SLEEP PRODUCTS, LLC,**

**HOLLANDER SLEEP PRODUCTS KENTUCKY, LLC,**

**HOLLANDER SLEEP PRODUCTS CANADA LIMITED**

**PACIFIC COAST FEATHER, LLC,**

**and**

**PACIFIC COAST FEATHER CUSHION, LLC,**

**as Borrowers**

**Dated as of May __, 2019**

# TABLE OF CONTENTS

**Page**

1.    DEFINITIONS AND CONSTRUCTION. ................................................................. 2

    1.1.    **Definitions** ................................................................................................. 2

    1.2.    **Accounting Terms** .................................................................................... 2

    1.3.    **Code; PPSA** ............................................................................................. 2

    1.4.    **Construction** ............................................................................................ 3

    1.5.    **Time References** ....................................................................................... 4

    1.6.    **Schedules and Exhibits** .......................................................................... 4

    1.7.    **Exchange Rates; Currency Equivalents; Applicable Currency.** ..................... 5

    1.8.    **Divisions** .................................................................................................. 5

2.    LOANS AND TERMS OF PAYMENT. ............................................................. 5

    2.1.    **Revolving Loans.** ..................................................................................... 5

    2.2.    **Last Out Loans.** ....................................................................................... 7

    2.3.    **Borrowing Procedures and Settlements** ................................................. 8

    2.4.    **Payments; Reductions of Commitments; Prepayments.** .............................. 19

    2.5.    **Promise to Pay; Promissory Notes.** ........................................................ 29

    2.6.    **Interest Rates and Letter of Credit Fee:  Rates, Payments, and
            Calculations.** ........................................................................................... 30

    2.7.    **Crediting Payments** ................................................................................ 33

    2.8.    **Designated Accounts** .............................................................................. 33

    2.9.    **Maintenance of Loan Account; Statements of Obligations** ......................... 33

    2.10.    **Fees.** ...................................................................................................... 34

    2.12.    **Non-Base Rate Option.** ......................................................................... 53

    2.13.    **Capital Requirements.** .......................................................................... 56

    2.14.    **[Reserved].** ........................................................................................... 57

    2.15.    **Joint and Several Liability of Borrowers** ............................................ 57

    2.16.    **Currencies** ............................................................................................ 60

    2.17.    **Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of
             Interest** .................................................................................................. 60

    2.18.    **Existing Hedging Obligations and other Existing Bank Product
             Obligations** ........................................................................................... 61

# TABLE OF CONTENTS
### (continued)

Page

2.19.   **Superpriority.** ........................................................................ 62

2.20.   **Waiver of any Priming Rights.** .......................................... 62

3.    **CONDITIONS; TERM OF AGREEMENT** ............................ 62

3.1.   **Conditions Precedent to the Effectiveness of this Agreement** ..................... 62

3.2.   **Conditions Precedent to all Extensions of Credit** ........................ 62

3.3.   **Maturity** ..................................................................... 63

3.4.   **Effect of Maturity** ....................................................... 63

3.5.   **Early Termination by Borrowers** ...................................... 64

4.    **REPRESENTATIONS AND WARRANTIES.** ..................... 64

4.1.   **Due Organization and Qualification; Subsidiaries.** ................. 64

4.2.   **Due Authorization; No Conflict.** ...................................... 65

4.3.   **Governmental Consents** .............................................. 66

4.4.   **Binding Obligations; Perfected Liens.** ............................. 66

4.5.   **Title to Assets; No Encumbrances** ................................. 67

4.6.   **Litigation** ................................................................ 67

4.7.   **Compliance with Laws** ............................................... 67

4.8.   **No Material Adverse Effect** ......................................... 67

4.9.   **No Fraudulent Conveyance** ......................................... 67

4.10.   **Employee Benefits.** ................................................... 68

4.11.   **Environmental Condition** .......................................... 68

4.12.   **Complete Disclosure** ................................................ 69

4.13.   **Patriot Act** ............................................................. 70

4.14.   **Indebtedness** ........................................................... 70

4.15.   **Payment of Taxes** .................................................... 70

4.16.   **Margin Stock** .......................................................... 70

4.17.   **Governmental Regulation** .......................................... 71

4.18.   **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws** ............................................................... 71

4.19.   **Employee and Labor Matters** ...................................... 71

4.20.   [Reserved] ................................................................. 72

## TABLE OF CONTENTS
### (continued)

Page

4.21.   **Broker Fees** ................................................................ 72

4.22.   **Eligible Accounts** ....................................................... 72

4.23.   **Eligible Inventory** ....................................................... 72

4.24.   **Location of Inventory** .................................................. 72

4.25.   **Inventory Records** ....................................................... 72

4.26.   **Suppliers and Customers** ............................................ 72

4.27.   **Term Loan Documents** ................................................ 72

4.28.   **Hedge Agreements** ...................................................... 72

4.29.   **[Reserved]** .................................................................. 72

4.30.   **Financing Order and DIP Recognition Order** .............. 73

4.31.   **Exit Financing Commitment Letter** ............................. 73

4.32.   **Restructuring Support Agreement** ............................... 73

4.33.   **Bankruptcy Cases and Recognition Proceedings**......... 73

4.34.   **Financing Order and DIP Recognition Order**. ............. 73

4.35.   **Insurance**.. ................................................................. 73

5.      **AFFIRMATIVE COVENANTS** ................................. 73

5.1.    **Financial Statements, Reports, Certificates** ................ 73

5.2.    **Reporting** ................................................................... 74

5.3.    **Existence** .................................................................... 75

5.4.    **Maintenance of Properties** .......................................... 76

5.5.    **Taxes** .......................................................................... 76

5.6.    **Insurance** .................................................................... 76

5.7.    **Inspection** ................................................................... 77

5.8.    **Compliance with Laws** ............................................... 78

5.9.    **Environmental** ............................................................ 78

5.10.   **Disclosure Updates** .................................................... 79

5.11.   **[Reserved]** .................................................................. 79

5.12.   **Further Assurances** .................................................... 79

5.13.   **[Reserved]**. ................................................................ 80

5.14.   **Location of Inventory** .................................................. 80

# TABLE OF CONTENTS
## (continued)

Page

5.15.    **[Reserved]**. ........................................................................................ 80

5.16.    **Compliance with ERISA and the IRC** ........................................... 80

5.17.    **Canadian Compliance** ..................................................................... 81

5.18.    **Bank Products** .................................................................................. 81

5.19.    **Canadian Cash Management** ........................................................... 81

5.20.    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws** ................................................................................................... 82

5.21.    **Bankruptcy Transaction Milestones** ............................................... 82

5.22.    **Investment Banker** ........................................................................... 82

5.23.    **Consultant** ........................................................................................ 83

5.24.    **Exit Financing Commitment Letter** ................................................ 84

5.25.    **Sale of Collateral** .............................................................................. 84

5.26.    **Bankruptcy Covenants**.. ................................................................... 84

5.27.    **Bankruptcy Cases**. ............................................................................ 84

5.28.    **Budget Matters** ................................................................................. 85

6.    **NEGATIVE COVENANTS**. .................................................................... 85

6.1.    **Indebtedness** ..................................................................................... 85

6.2.    **Liens** .................................................................................................. 85

6.3.    **Restrictions on Fundamental Changes** ........................................... 85

6.4.    **Disposal of Assets** ............................................................................ 86

6.5.    **Nature of Business** ........................................................................... 86

6.6.    **Prepayments and Amendments** ...................................................... 86

6.7.    **Restricted Payments** ........................................................................ 87

6.8.    **Accounting Methods** ........................................................................ 87

6.9.    **Investments** ...................................................................................... 87

6.10.    **Transactions with Affiliates** ........................................................... 87

6.11.    **Use of Proceeds** ............................................................................... 88

6.12.    **Limitation on Issuance of Equity Interests** ................................... 89

6.13.    **Parent as Holding Company** ........................................................... 89

6.14.    **Sale and Leaseback Transactions** ................................................... 89

# TABLE OF CONTENTS
## (continued)

Page

6.15.   **Employee Benefits**...................................................................... 90

6.16.   **Burdensome Agreements**............................................................ 90

6.17.   **Financing Order; Administrative Expense Priority; Payments**.................. 91

6.18.   **Restructuring Support Agreement**............................................ 92

6.19.   **Applications Under the CCAA and BIA**........................................ 92

6.20.   **Term Loan Proceeds Account**. ................................................. 92

6.21.   **Chapter 11 and Other Claims**................................................... 92

7.     **FINANCIAL COVENANTS.**......................................................... 93

8.     **EVENTS OF DEFAULT**............................................................. 94

8.1.   **Payments**................................................................................ 94

8.2.   **Covenants**............................................................................... 94

8.3.   **Judgments**.............................................................................. 94

8.4.   **[Reserved]**.............................................................................. 95

8.5.   **Material Adverse Effect**........................................................... 95

8.6.   **Default Under Other Agreements**............................................. 95

8.7.   **Representations, etc**................................................................ 95

8.8.   **Guaranty**................................................................................ 96

8.9.   **Security Documents**................................................................ 96

8.10.   **Loan Documents**..................................................................... 96

8.11.   **Invalidity of Subordination Provisions**.................................... 96

8.12.   **Change in Control**................................................................... 96

8.13.   **ERISA**.................................................................................... 96

8.14.   **Participation Put Agreement**................................................... 97

8.15.   **Consultant**............................................................................. 97

8.16.   **Bankruptcy Matters**............................................................... 97

8.17.   **Permitted Variance**................................................................ 101

9.     **RIGHTS AND REMEDIES**......................................................... 101

9.1.   **Rights and Remedies**.............................................................. 101

9.2.   **Remedies Cumulative**............................................................. 102

# TABLE OF CONTENTS
## (continued)

Page

10. **WAIVERS; INDEMNIFICATION.**...............................................................102

   10.1. **Demand; Protest; etc.**.......................................................................102

   10.2. **The Lender Group's Liability for Collateral**...............................102

   10.3. **Indemnification**...............................................................................103

11. **NOTICES**...................................................................................................104

12. **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.**.............................................................105

13. **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**............107

   13.1. **Assignments and Participations**......................................................107

   13.2. **Successors**.......................................................................................111

14. **AMENDMENTS; WAIVERS.**...................................................................111

   14.1. **Amendments and Waivers.**...............................................................111

   14.2. **Replacement of Certain Lenders.**...................................................114

   14.3. **No Waivers; Cumulative Remedies**................................................114

15. **AGENT; THE LENDER GROUP.**...........................................................115

   15.1. **Appointment and Authorization of Agent**......................................115

   15.2. **Delegation of Duties**.......................................................................116

   15.3. **Liability of Agent**...........................................................................116

   15.4. **Reliance by Agent**...........................................................................116

   15.5. **Notice of Default or Event of Default**............................................117

   15.6. **Credit Decision**...............................................................................117

   15.7. **Costs and Expenses; Indemnification**............................................118

   15.8. **Agents in Individual Capacity**........................................................118

   15.9. **Successor Agent**..............................................................................119

   15.10. **Lender in Individual Capacity**......................................................119

   15.11. **Collateral Matters.**........................................................................120

   15.12. **Restrictions on Actions by Lenders; Sharing of Payments.**........122

   15.13. **Agency for Perfection**...................................................................122

   15.14. **Payments by Agent to the Lenders**...............................................122

   15.15. **Concerning the Collateral and Related Loan Documents**...........122

-vi-

# TABLE OF CONTENTS
### (continued)

Page

15.16. **Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information** ................................................................. 123

15.17. **Several Obligations; No Liability** ......................................................... 124

15.18. **Sole Lead Arranger and Sole Book Runners** ..................................... 124

15.19. **Appointment for the Province of Quebec** ........................................... 124

16.  **WITHHOLDING TAXES** ......................................................................... 125

16.1. **Payments** ................................................................................................... 125

16.2. **Exemptions.** ............................................................................................... 126

16.3. **Reductions.** ................................................................................................ 128

16.4. **Refunds** ...................................................................................................... 128

17.  **GENERAL PROVISIONS.** ....................................................................... 129

17.1. **Effectiveness** ............................................................................................. 129

17.2. **Section Headings** ...................................................................................... 129

17.3. **Interpretation** ........................................................................................... 129

17.4. **Severability of Provisions** ...................................................................... 129

17.5. **Bank Product Providers** ......................................................................... 129

17.6. **Debtor-Creditor Relationship** ............................................................... 130

17.7. **Counterparts; Electronic Execution** .................................................... 130

17.8. **Revival and Reinstatement of Obligations; Certain Waivers** ......... 130

17.9. **Confidentiality** .......................................................................................... 131

17.10. **Survival** ..................................................................................................... 133

17.11. **Patriot Act** ................................................................................................. 133

17.12. **Integration** ................................................................................................ 133

17.13. **HSP as Agent for Borrowers** ................................................................ 134

17.14. **Judgment Currency** ................................................................................. 134

17.15. **No Setoff** .................................................................................................... 135

17.16. **Quebec Interpretation** ............................................................................ 135

17.17. **English Language Only** ........................................................................... 135

17.18. **Canadian Amalgamations** ...................................................................... 135

17.19. **Acknowledgement and Consent to Bail-In of EEA Financial Institutions** ................................................................................................ 136

## TABLE OF CONTENTS
### (continued)

**Page**

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of Borrowing Base Certificate |
| Exhibit B-2 | Form of Bank Product Letter Agreement |
| Exhibit B-3 | Form of Initial Approved Budget |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit F-1 | Form of Interim Financing Order |
| Exhibit L-1 | Form of Non-Base Notice |

| | |
|---|---|
| Schedule A-1 | Agent's Canadian Account |
| Schedule A-2 | Agent's US Account |
| Schedule A-3 | Authorized Persons |
| Schedule C-1 | Commitments |
| Schedule D-1 | Canadian Designated Account |
| Schedule D-2 | US Designated Account |
| Schedule E-1 | Eligible Inventory Locations |
| Schedule H-1 | Existing Hedge Agreements |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule R-1 | Real Property Collateral |
| Schedule 1.1 | Definitions |
| Schedule 2.11(A) | Existing US Letters of Credit |
| Schedule 2.11(B) | Existing Canadian Letters of Credit |
| Schedule 3.1 | Conditions Precedent |
| Schedule 4.1(b) | Subscriptions, Options, Warrants, Calls of Parent |
| Schedule 4.1(c) | Capitalization of Parent's Subsidiaries |
| Schedule 4.1(d) | Subscriptions, Options, Warrants, Calls of Parent's Subsidiaries |
| Schedule 4.10 | Benefit Plans |
| Schedule 4.11 | Environmental Matters |
| Schedule 4.14 | Permitted Indebtedness |
| Schedule 4.24 | Location of Inventory |
| Schedule 4.35 | Insurance |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |
| Schedule 5.21 | Milestones |
| Schedule 6.5 | Nature of Business |
| Schedule 6.10 | Affiliate Transactions |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "Agreement"), is entered into as of May __, 2019, by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender", as that term is hereinafter further defined), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as administrative agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Agent"), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as sole lead arranger (in such capacity, together with its successors and assigns in such capacity, the "Sole Lead Arranger"), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as sole book runner (in such capacity, together with its successors and assigns in such capacity, the "Sole Book Runner"), **DREAM II HOLDINGS, LLC**, a Delaware limited liability company ("Parent"), **HOLLANDER HOME FASHIONS HOLDINGS, LLC**, a Delaware limited liability company ("HHFH"), **HOLLANDER SLEEP PRODUCTS, LLC** (formerly known as Hollander Home Fashions, LLC), a Delaware limited liability company ("HSP"), **HOLLANDER SLEEP PRODUCTS KENTUCKY, LLC**, a Delaware limited liability company ("Hollander Kentucky"), **PACIFIC COAST FEATHER, LLC**, a Delaware limited liability company ("PCF"), and **PACIFIC COAST FEATHER CUSHION, LLC**, a Delaware limited liability company ("Cushion"; HHFH, HSP, Hollander Kentucky, PCF and Cushion, are collectively, the "US Borrowers" and individually a "US Borrower), and **HOLLANDER SLEEP PRODUCTS CANADA LIMITED** (formerly known as Hollander Canada Home Fashions Limited), a British Columbia corporation ("Canadian Borrower;" US Borrowers and Canadian Borrower are collectively, the "Borrowers" and individually a "Borrower").

**WHEREAS**, on May __, 2019 (the "Filing Date"), Parent, Borrowers, and their respective Domestic Subsidiaries (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, the Canadian Loan Parties will be debtors in the Bankruptcy Cases, and, within 3 Business Days following entry of the Interim Financing Order, HSP, in its capacity as foreign representative on behalf of the Loan Parties (the "Foreign Representative"), will commence a recognition proceeding under Part IV of the CCAA in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to recognize the Bankruptcy Cases as "foreign main proceedings" (the "Recognition Proceedings");

**WHEREAS**, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code and the applicable sections of the CCAA;

**WHEREAS**, Borrowers have requested that Lenders provide a secured revolving credit facility to Borrowers in order to (i) fund the continued operation of Borrowers' businesses as debtor and debtor-in-possession under the Bankruptcy Code and the CCAA during the

pendency of the Bankruptcy Cases and the Recognition Proceedings and (ii) repay in full the Existing Secured Obligations (as hereinafter defined); and

**WHEREAS**, the Lenders are willing to make available to Borrowers such postpetition loans, other extensions of credit and financial accommodations upon the terms and subject to the conditions set forth herein.

The parties agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION**.

1.1.    **Definitions**.    Capitalized terms used in this Agreement (including the preamble) shall have the meanings specified therefor on Schedule 1.1.

1.2.    **Accounting Terms**.    All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Agent that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision (or if Agent notifies Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Agent and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and Borrowers after such Accounting Change conform as nearly as possible to their respective positions before such Accounting Change and, until any such amendments have been agreed upon and agreed to by the Required Lenders, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred; provided, further, that notwithstanding any Accounting Change after the Closing Date that would require lease obligations that would be treated as operating leases as of the Closing Date to be classified and accounted for as capital leases or otherwise reflected on Parent and its Subsidiaries' consolidated balance sheet, for the purposes of determining compliance with any covenant contained herein, such obligations shall be treated in the same manner as operating leases are treated as of the Closing Date.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.  Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof.

1.3.    **Code; PPSA**.    Any terms used in this Agreement that are defined in (a) the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern and (b) the PPSA shall be construed and defined as set forth

in the PPSA. Notwithstanding the foregoing, and where the context so requires, (i) any term defined in this Agreement by reference to the "Code", the "UCC" or the "Uniform Commercial Code" shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the *Personal Property Security Act* of each applicable province of Canada, the *Bills of Exchange Act* (Canada) and the *Depository Bills and Notes Act* (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Collateral, (ii) all references in this Agreement to "Article 8" shall be deemed to refer also to applicable Canadian securities transfer laws (including, without limitation, the *Securities Transfer Act* of each applicable province of Canada (the "STA")), (iii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (iv) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, and (v) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal where applicable and provincial securities laws in Canada.

1.4.    **Construction**.   Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."   The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.   Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to "law" means all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, by-laws, ordinances, decrees, codes and administrative or judicial or arbitral or administrative or ministerial or departmental or regulatory precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.   Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.   Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties.   All references to "province" or like terms shall include "territory" and like terms.   Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds in the Applicable Currency of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans and "Loans" (as defined in the Existing Credit Agreement), together with the payment of any

premium applicable to the repayment of the Loans and "Loans" (as defined in the Existing Credit Agreement), (ii) all Lender Group Expenses and "Lender Group Expenses" (as defined in the Existing Credit Agreement) that have accrued and are unpaid regardless of whether demand has been made therefor, (iii) all fees or charges that have accrued hereunder or under any other Loan Document or Existing Loan Document and are unpaid, (b) in the case of contingent reimbursement obligations with respect to Letters of Credit, Existing US Letters of Credit or Existing Canadian Letters of Credit, providing Letter of Credit Collateralization and "Letter of Credit Collateralization" (as defined in the Existing Credit Agreement) in the Applicable Currency, (c) in the case of obligations with respect to Bank Products (other than Hedge Obligations) and "Bank Products" (other than "Hedge Obligations") (each as defined in the Existing Credit Agreement), providing Bank Product Collateralization and "Bank Product Collateralization" (as defined in the Existing Credit Agreement) in the Applicable Currency, (d) the receipt by Agent of cash collateral in the Applicable Currency in order to secure any other contingent Obligations or Existing Secured Obligations for which a claim or demand for payment has been made on or prior to such time or that Agent reasonably expects will be made or in respect of matters or circumstances known to Agent, a Lender, Existing Agent or an Existing Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, (e) the payment or repayment in full in immediately available funds in the Applicable Currency of all other outstanding Obligations and Existing Secured Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations or Existing Secured Obligations) under Hedge Agreements provided by Hedge Providers and "Hedge Agreements" (as defined in the Existing Credit Agreement) provided by "Hedge Providers" (as defined in the Existing Credit Agreement)) other than in each case of clauses (a) to (e) hereof, (i) Unasserted Contingent Indemnification Obligations, (ii) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (iii) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid, and (f) the termination of all of the Commitments of the Lenders.  Any reference herein to any Person shall be construed to include such Person's permitted successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

1.5.    **Time References**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Pacific Standard Time or Pacific daylight saving time, as in effect in Los Angeles, California on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Agent or any Lender, such period shall in any event consist of at least one full day.

1.6.    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.7.    **Exchange Rates; Currency Equivalents; Applicable Currency**.

(a)    For purposes of this Agreement and the other Loan Documents, the Dollar Equivalent of any Revolving Loans, Letters of Credit, other Obligations and other references to amounts denominated in a currency other than Dollars shall be determined in accordance with the terms of this Agreement.    Such Dollar Equivalent shall become effective as of such Revaluation Date for such Revolving Loans, Letters of Credit and other Obligations and shall be the Dollar Equivalent employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur for such Revolving Loans, Letters of Credit and other Obligations.    Except as otherwise expressly provided herein, the applicable amount of any currency for purposes of the Loan Documents (including for purposes of financial statements and all calculations in connection with the covenants, including the financial covenants) shall be the Dollar Equivalent thereof.

(b)    Wherever in this Agreement and the other Loan Documents in connection with a borrowing, conversion, continuation or prepayment of a Revolving Loan or the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Revolving Loan or Letter of Credit is denominated in Canadian Dollars, such amount shall be the relevant Canadian Dollar Equivalent of such Dollar amount (rounded to the nearest Canadian Dollar, with 0.5 of a unit being rounded upward).

1.8.    **Divisions**.    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

2.    **LOANS AND TERMS OF PAYMENT**.

2.1.    **Revolving Loans**.

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Revolving Lender with a US Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans in Dollars ("US Revolving Loans") to US Borrowers in an amount at any one time outstanding not to exceed the lesser of:

(i)    such Lender's US Revolver Commitment, and

(ii)    such Lender's Pro Rata Share of an amount equal to the lesser of:

(A)    the amount equal to (1) the US Maximum Revolver Amount less (2) the sum of (w) the US Letter of Credit Usage at such time, plus (x) the principal amount of US Swing Loans outstanding at such time, and (y) the Dollar Equivalent of the Canadian Revolver Usage at such time less (3) the principal amount of any Reinstated Existing

Secured Obligations less (4) the principal amount of Existing Secured Obligations (including, for the avoidance of doubt, Existing Last Out Obligations) then outstanding, and

(B)    the amount equal to (1) the US Borrowing Base as of such date (based upon the US Borrowing Base set forth in the most recent Borrowing Base Certificate delivered by Borrowers to Agent) less (2) the sum of (x) the US Letter of Credit Usage at such time, plus (y) the principal amount of US Swing Loans outstanding at such time less (3) the principal amount of any Reinstated Existing Secured US Obligations less (4) the principal amount of any Existing Secured US Obligations (excluding Existing Last Out Obligations and obligations in respect of guaranties of Existing Secured Canadian Obligations) then outstanding.

(b)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Revolving Lender with a Canadian Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans in Dollars or Canadian Dollars (as selected by Administrative Borrower) ("Canadian Revolving Loans") to Canadian Borrower in an amount at any one time outstanding not to exceed the Dollar Equivalent of the lesser of:

(i)    such Lender's Canadian Revolver Commitment, and

(ii)    such Lender's Pro Rata Share of an amount equal to the lesser of:

(A)    the amount equal to (1) the Canadian Maximum Revolver Amount less (2) the sum of (x) the Canadian Letter of Credit Usage at such time, and (y) the principal amount of Canadian Swing Loans outstanding at such time less (3) the principal amount of any Reinstated Existing Secured Canadian Obligations less (4) the principal amount of Existing Secured Canadian Obligations then outstanding, and

(B)    the amount equal to (1) the Canadian Borrowing Base as of such date (based upon the Canadian Borrowing Base set forth in the most recent Borrowing Base Certificate delivered by Borrowers to Agent) less (2) the sum of (x) the Canadian Letter of Credit Usage at such time, plus (y) the principal amount of the Canadian Swing Loans outstanding at such time less (3) the principal amount of any Reinstated Existing Secured Canadian Obligations less (4) the principal amount of any Existing Secured Canadian Obligations then outstanding.

(c)    Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right (but not the obligation), in the exercise of its Permitted Discretion, to establish and increase or decrease (i) Receivable Reserves, (ii) Inventory Reserves, (iii) Bank Product Reserves, (iv) with respect to the US Borrowing Base only (except that in its Permitted Discretion, Agent may establish Reserves with respect to the Carveout against the Canadian Borrowing Base (without duplication) for amounts of the Carveout representing the Administration Charge and professionals providing services to Canadian Borrower), Reserves with respect to the Carveout and Specified Reserves (but, in the case of Specified Reserves, only to the extent provision for payment of any applicable claim under Section 503(b)(9) of the Bankruptcy Code is not (or is no longer) provided for under the Term Loan Credit Agreement and the Final Financing Order), (v) with respect to the Canadian Borrowing Base only, Reserves including with respect to Canadian Priority Payables Reserves and (to the extent not reserved

against the US Borrowing Base pursuant to clause (iv) above), the Administration Charge, (vi) Reserves to address the results of any audit or appraisal performed by or on behalf of Agent from time to time after the Closing Date, and (vii) other Reserves against the US Borrowing Base or the Canadian Borrowing Base.  The amount of any such Reserve established by Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve and shall not be duplicative of any other reserve or eligibility criteria established and currently maintained, and any Reserve established by Agent or Lenders that was not in effect prior to the Filing Date under the Existing Credit Agreement or reflected in the Initial Approved Budget, shall only be permitted if established by Agent in its Permitted Discretion, in accordance with its customary practices for financings of this type.  Agent shall provide Administrative Borrower with concurrent written notice of the implementation of any reserve.  In the event the circumstances, conditions, events or contingencies underlying any such reserve cease to exist or the liability that is the basis for any such reserve has been reduced, in each case as determined by Agent in its Permitted Discretion, such reserve shall be rescinded or reduced by an amount as determined in Agent's Permitted Discretion.

(d)    Amounts borrowed pursuant to this <u>Section 2.1</u> may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.  The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(e)    Anything to the contrary in this <u>Section 2.1</u> notwithstanding, at no time shall the sum of the US Revolver Usage and the Dollar Equivalent of the Canadian Revolver Usage exceed the US Maximum Revolver Amount and at no time shall the Dollar Equivalent of the Canadian Revolver Usage exceed the Canadian Maximum Revolver Amount.

2.2.    **<u>Last Out Loans</u>**.

(a)    Last Out Loans shall be deemed to be requested by US Borrowers and deemed to be made hereunder as of the date of the entry of the Final Financing Order in an amount equal to $15,000,000, and when made shall be deemed to repay in full the Existing Last Out Loans (with such Last Out Loans held by each Lender hereunder in an amount equal to the principal balance of the Existing Last Out Loans held by such Lender immediately prior to such repayment).  Such Last Out Loans shall be deemed made on a "first-in-last out" basis.  Upon the deemed making of the Last Out Loans hereunder, all interest that has accrued and not been paid in respect of the Existing Last Out Loans shall be deemed to be accrued and unpaid interest on the Last Out Loans hereunder and shall be subject to clauses (b) and (c) below.

(b)    Interest on the Last Out Loans shall accrue at the same rate, on a daily basis, as the weighted average interest rate applicable to the then outstanding US Revolving Loans (and, if no such US Revolving Loans are then outstanding, the rate of interest on the Last Out Loans shall be a rate elected by the US Borrowers in the same manner as the Borrowers are permitted to elect the rate of interest applicable to the US Revolving Loans) and shall accrue, but not be paid until all Existing Secured Obligations and Obligations other than Last Out Loans have been paid in full.  The Last Out Loans shall be considered US Revolving Loans, Revolving

Loans, Revolver Usage and US Revolver Usage hereunder for purposes of determining the availability of Loans or other extensions of credit under <u>Section 2.1(a)(ii)(A)</u> (but not <u>Section 2.1(a)(ii)(B)</u>), <u>clause (B)</u> (but not <u>clause (A)</u>) of the first sentence of <u>Section 2.4(e)(i)</u> and <u>clause (b)(ii)</u> (but not <u>clause (b)(iii)</u>) of <u>Section 2.11A</u>.

(c)    The outstanding principal amount of the Last Out Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which any other Loans are declared due and payable pursuant to the terms of this Agreement; provided that, notwithstanding anything in this Agreement or in the Existing Credit Agreement to the contrary, payments of principal, interest, fees, expenses or any other amounts in respect of the Last Out Loans or the Existing Last Out Loans shall not be paid until all other Obligations (other than the Last Out Obligations) and Existing Secured Obligations (other than the Existing Last Out Obligations) have been paid in full.

(d)    Notwithstanding anything to the contrary set forth herein, if on any date Last Out Loans are the only Loans outstanding hereunder, then (i) Agent or Required Lenders may elect in writing to the Borrowers to terminate the Commitments as of such date, and (ii) upon such written election, no Lender shall have any obligation to make additional Revolving Loans hereunder (or to extend any other credit hereunder).

2.3.    **<u>Borrowing Procedures and Settlements</u>**.

(a)    **Procedure for Borrowing Revolving Loans**.  Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent and received by Agent no later than 10:00 a.m. (i) on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan, and (ii) on the Business Day that is one Business Day prior to the requested Funding Date in the case of all other requests, specifying (A) the amount of such Borrowing and whether such Borrowing is for the account of US Borrowers or Canadian Borrower (and if for Canadian Borrower, whether in Dollars or Canadian Dollars), and (B) the requested Funding Date (which shall be a Business Day); <u>provided</u>, that Agent may, in its sole discretion, elect to accept as timely requests that are received later than 10:00 a.m. on the applicable Business Day.  At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time.  In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.  Borrowings for the account of US Borrowers shall be denominated in Dollars and Borrowings for the account of Canadian Borrower shall be denominated in Dollars or Canadian Dollars (as selected by Administrative Borrower).  All Borrowing requests which are not made on-line via Agent's electronic platform or portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Revolving Loan.  Requests for Non-Base Rate Loans will also be subject to <u>Section 2.12</u>.  Notwithstanding anything to the contrary in this Agreement, (a) a request for Borrowings for the account of US Borrowers in respect of the Existing Secured US Obligations (excluding the Existing Last Out Obligations, which shall be subject to <u>Section 2.2</u>, and excluding guaranties of Existing Secured

Canadian Obligations) will be deemed to have been submitted for Borrowings within one Business Day of entry of the Final Financing Order in an amount equal to the Existing Secured US Obligations on such date (excluding the Existing Last Out Obligations and excluding guaranties of Existing Secured Canadian Obligations) and (b) a request for Borrowings for the account of Canadian Borrower in respect of the Existing Secured Canadian Obligations will be deemed to have been submitted for Borrowings within one Business Day of issuance of the Canadian Final DIP Recognition Order in an amount equal to the Existing Secured Canadian Obligations as of such date.  The proceeds of the Borrowings referenced in (a) and (b) of the immediately preceding sentence, in each case, will be applied (it being understood that such application shall be settled as a cashless transaction, that such Borrowings shall not be subject to the limitations set forth in Sections 2.1(a)(ii) and 2.1(b)(ii), and the amount of such Borrowings shall not be counted for determining Excess Availability hereunder other than on a pro forma basis immediately after giving effect to the application of the proceeds of such Borrowings to the applicable Existing Secured Obligations) to repay the Existing Secured US Obligations (excluding guaranties of Existing Secured Canadian Obligations, and excluding the Existing Last Out Obligations, which shall be subject to Section 2.2) and, subject to the issuance by the Canadian Court of the Canadian Final DIP Recognition Order, the Existing Secured Canadian Obligations, as applicable.

(b)    **Making of Swing Loans**.

(i)    In the case of a request for a US Swing Loan and so long as either (i) the aggregate amount of US Swing Loans made since the last Settlement Date, minus all payments or other amounts applied to US Swing Loans since the last Settlement Date, plus the amount of the requested US Swing Loan does not exceed 12.5% of the US Maximum Revolver Amount or (ii) US Swing Lender, in its sole discretion, agrees to make a US Swing Loan notwithstanding the foregoing limitation, US Swing Lender shall make a US Revolving Loan (any such US Revolving Loan made by US Swing Lender pursuant to this Section 2.3(b) being referred to as a "US Swing Loan" and all such US Revolving Loans being referred to as "US Swing Loans") available to US Borrowers on the Funding Date applicable thereto by transferring immediately available funds in the amount of such requested Borrowing to the US Designated Account.  Each US Swing Loan shall be deemed to be a US Revolving Loan hereunder and shall be subject to all the terms and conditions (including Section 3) applicable to other US Revolving Loans, except that all payments (including interest) on any US Swing Loan shall be payable to US Swing Lender solely for its own account.  Subject to the provisions of Section 2.3(d)(ii), US Swing Lender shall not make and shall not be obligated to make any US Swing Loan if US Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the US Availability on such Funding Date.  US Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 3 have been satisfied on the Funding Date applicable thereto prior to making any US Swing Loan.  The US Swing Loans shall constitute US Revolving Loans and US Obligations, and bear interest at the rate applicable from time to time to US Revolving Loans that are Base Rate Loans.

(ii)    In the case of a request for a Canadian Swing Loan and so long as either (i) the aggregate amount of Canadian Swing Loans made since the last Settlement Date,

minus all payments or other amounts applied to Canadian Swing Loans since the last Settlement Date, plus the amount of the requested Canadian Swing Loan does not exceed 10% of the Canadian Maximum Revolver Amount or (ii) Canadian Swing Lender, in its sole discretion, agrees to make a Canadian Swing Loan notwithstanding the foregoing limitation, Canadian Swing Lender shall make a Canadian Revolving Loan (any such Canadian Revolving Loan made by Canadian Swing Lender pursuant to this Section 2.3(b) being referred to as a "Canadian Swing Loan" and all such Canadian Revolving Loans being referred to as "Canadian Swing Loans") available to Canadian Borrower on the Funding Date applicable thereto by transferring immediately available funds in the amount of such requested Borrowing to the Canadian Designated Account. Each Canadian Swing Loan shall be deemed to be a Canadian Revolving Loan hereunder and shall be subject to all the terms and conditions (including Section 3) applicable to other Canadian Revolving Loans, except that all payments (including interest) on any Canadian Swing Loan shall be payable to Canadian Swing Lender solely for its own account. Subject to the provisions of Section 2.3(d)(ii), Canadian Swing Lender shall not make and shall not be obligated to make any Canadian Swing Loan if Canadian Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Canadian Availability on such Funding Date. Canadian Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 3 have been satisfied on the Funding Date applicable thereto prior to making any Canadian Swing Loan. The Canadian Swing Loans shall constitute Canadian Revolving Loans and Canadian Obligations, and bear interest at the rate applicable from time to time to Canadian Revolving Loans that are Base Rate Loans.

(c)    **Making of Revolving Loans**.

(i)    In the event that the applicable Swing Lender is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the applicable Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing (and whether such Borrowing is for the account of US Borrowers or for the account of Canadian Borrower), such notification to be sent on the Business Day that is one Business Day prior to the requested Funding Date. Each Lender with the applicable Revolver Commitment shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds in the Applicable Currency, to Agent's Applicable Account, not later than 10:00 a.m. on the Business Day that is the requested Funding Date. After Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Agent shall make the proceeds thereof available to US Borrowers or Canadian Borrower, as applicable, on the applicable Funding Date by transferring immediately available funds in the Applicable Currency equal to such proceeds received by Agent to the US Designated Account or the Canadian Designated Account, as applicable; provided, that, subject to the provisions of Section 2.3(d)(ii), no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the US Availability (in the case of a US Borrowing) or Canadian Availability (in the case of a Canadian Borrowing) on such Funding Date.

(ii)    Unless Agent receives notice from a Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Agent for the account of US Borrowers or Canadian Borrower, as applicable, the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds in the Applicable Currency on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to US Borrowers or Canadian Borrower, as applicable, a corresponding amount.  If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Agent in immediately available funds and if Agent has made available to US Borrowers or Canadian Borrower, as applicable, such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Applicable Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Agent's separate account).  If any Lender shall not remit the full amount that it is required to make available to Agent in immediately available funds as and when required hereby and if Agent has made available to US Borrowers or Canadian Borrower, as applicable, such amount, then that Lender shall be obligated to immediately remit such amount to Agent, together with interest at the applicable Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Agent to any Lender with respect to amounts owing under this Section 2.3(c)(ii) shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Agent, then such payment to Agent shall constitute such Lender's US Revolving Loans (in the case of Revolving Loans for the account of US Borrowers) or Canadian Revolving Loans (in the case of Revolving Loans for the account of Canadian Borrower) for all purposes of this Agreement.  If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Borrower of such failure to fund and, upon demand by Agent, US Borrowers (in the case of US Revolving Loans) and Canadian Borrower (in the case of Canadian Revolving Loans) shall pay such amount to Agent, together with interest thereon for each day elapsed since the date of such Borrowing, for Agent's account, at a rate per annum equal to the interest rate applicable at the time to the applicable Revolving Loans composing such Borrowing.

(d)    **Protective Advances and Optional Overadvances**.

(i)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 2.3(d)(iv), at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in Section 3 are not satisfied, Agent hereby is authorized by Borrowers and the Lenders, from time to time, in Agent's sole discretion, to make US Revolving Loans to, or for the benefit of, US Borrowers and/or Canadian Revolving Loans to, or for the benefit of Canadian Borrower, in each case on behalf of the applicable Revolving Lenders, that Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, (2) to enhance the likelihood of repayment of the Obligations, other than the Bank Product Obligations (the US Revolving Loans described in this Section 2.3(d)(i) shall be referred to as "US Protective Advances" and the Canadian Revolving

-11-

Loans described in this <u>Section 2.3(d)(i)</u> shall be referred to as the "<u>Canadian Protective Advances</u>") or (3) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement, including Lender Group Expenses and the costs, fees and expenses described in <u>Section 9</u>. Notwithstanding the foregoing, without the prior written consent of Required Lenders, the aggregate Dollar Equivalent amount of all Protective Advances outstanding at any one time shall not exceed 10% of the US Maximum Revolver Amount.

(ii)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to <u>Section 2.3(d)(iv)</u>, the Lenders hereby authorize Agent or applicable Swing Lender, as applicable, and either Agent or the applicable Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make US Revolving Loans to US Borrowers and Canadian Revolving Loans to Canadian Borrower notwithstanding that an Overadvance exists or would be created thereby, so long as (A) with respect to any such US Revolving Loan, (i) after giving effect to such US Revolving Loans, the outstanding US Revolver Usage does not, unless Required Lenders otherwise consent, exceed the US Borrowing Base by more than 10% of the US Maximum Revolver Amount, and (ii) after giving effect to such US Revolving Loans, the sum of the outstanding US Revolver Usage (except for and excluding amounts charged to the US Loan Account for interest, fees, or Lender Group Expenses) and the Dollar Equivalent of the Canadian Revolver Usage (except for and excluding amounts charged to the Canadian Loan Account for interest, fees, or Lender Group Expenses) does not exceed the US Maximum Revolver Amount, and (B) with respect to any such Canadian Revolving Loans, (i) after giving effect to such Canadian Revolving Loans, the Dollar Equivalent of the outstanding Canadian Revolver Usage does not, unless Required Lenders otherwise consent, exceed the Canadian Borrowing Base by more than 10% of the Canadian Maximum Revolver Amount, and (ii) after giving effect to such Canadian Revolving Loans, the sum of the Dollar Equivalent of the outstanding Canadian Revolver Usage (except for and excluding amounts charged to the Canadian Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Canadian Maximum Revolver Amount; <u>provided</u>, that, unless Required Lenders otherwise agree, Agent shall not have authority to knowingly and intentionally make US Revolving Loans or Canadian Revolving Loans that constitute Overadvances on any day if any Overadvance then existing has been outstanding for at least 60 consecutive days. In the event Agent obtains actual knowledge that the US Revolver Usage or Canadian Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the applicable Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with the Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with the applicable Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the applicable Revolving Loans to such Borrowers to an amount permitted by the preceding sentence. In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders. The foregoing provisions are meant for the benefit of the Lenders and Agent and are not meant for the benefit of Borrowers, which shall continue to be

bound by the provisions of Section 2.4(e). Each Lender with a Revolver Commitment shall be obligated to make Revolving Loans in accordance with Section 2.3(c) in, or settle Overadvances made by Agent with Agent as provided in Section 2.3(e) (or Section 2.3(g), as applicable) for, the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this Section 2.3(d)(ii), and any Overadvances resulting from the charging to the applicable Loan Account of interest, fees, or Lender Group Expenses.

(iii)    Each US Protective Advance and each US Overadvance (each, a "US Extraordinary Advance") shall be deemed to be a US Revolving Loan hereunder and each Canadian Protective Advance and each Canadian Overadvance (each, a "Canadian Extraordinary Advance") shall be deemed to be a Canadian Revolving Loan hereunder. No Extraordinary Advance shall be eligible to be a Non-Base Rate Loan. Prior to Settlement with respect to any Extraordinary Advances, all payments on the Extraordinary Advances, including interest thereon, shall be payable to Agent solely for its own account. The US Extraordinary Advances shall be repayable on demand, constitute US Obligations hereunder, and bear interest at the rate applicable from time to time to US Revolving Loans that are Base Rate Loans and the Canadian Extraordinary Advances shall be repayable on demand, constitute Canadian Obligations hereunder, and bear interest at the rate applicable from time to time to Canadian Revolving Loans that are Base Rate Loans. The provisions of this Section 2.3(d) are for the exclusive benefit of Agent, the Swing Lenders, and the Lenders and are not intended to benefit Borrowers (or any other Loan Party) in any way.

(iv)    Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, unless Required Lenders otherwise consent, no Extraordinary Advance may be made by Agent if such Extraordinary Advance would cause (A) the aggregate Dollar Equivalent principal amount of Extraordinary Advances outstanding to exceed an amount equal to 10% of the US Maximum Revolver Amount, or (B) the aggregate Dollar Equivalent Revolver Usage to exceed the US Maximum Revolver Amount.

(e)    **Settlement**. It is agreed that each Lender's funded portion of the (i) US Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding US Revolving Loans and (ii) Canadian Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Canadian Revolving Loans. Such agreement notwithstanding, Agent, Swing Lenders, and the other Lenders agree (which agreement shall not be for the benefit of Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans (including the Swing Loans, and the Extraordinary Advances) shall take place on a periodic basis in accordance with the following provisions:

(i)    Agent shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent in its sole discretion (1) on behalf of US Swing Lender, with respect to the outstanding US Swing Loans, (2) on behalf of Canadian Swing Lender, with respect to the outstanding Canadian Swing Loans, (3) for itself, with respect to the outstanding Extraordinary Advances, and (4) with respect to Loan Parties' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. on

the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date").  Such notice of a Settlement Date shall include a summary statement of the amount of outstanding US Swing Loans, US Extraordinary Advances and other US Revolving Loans, and Canadian Swing Loans, Canadian Extraordinary Advances and other Canadian Revolving Loans for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including Section 2.3(g)):  (y) if the amount of the applicable Revolving Loans (including Swing Loans and Extraordinary Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the applicable Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, then Agent shall, by no later than 12:00 noon on the Settlement Date, transfer in immediately available funds in the Applicable Currency to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the US Revolving Loans (including US Swing Loans and US Extraordinary Advances) and Canadian Revolving Loans (including Canadian Swing Loans and Canadian Extraordinary Advances), and (z) if the amount of the applicable Revolving Loans (including Swing Loans and Extraordinary Advances) made by a Lender is less than such Lender's Pro Rata Share of the applicable Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, such Lender shall no later than 12:00 noon on the Settlement Date transfer in immediately available funds in the Applicable Currency to Agent's Applicable Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the US Revolving Loans (including US Swing Loans and US Extraordinary Advances) and Canadian Revolving Loans (including Canadian Swing Loans and Canadian Extraordinary Advances).  Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Extraordinary Advances, as applicable, and shall constitute Revolving Loans of such Lenders.  If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)    In determining whether a Lender's balance of the applicable Revolving Loans (including Swing Loans and Extraordinary Advances) is less than, equal to, or greater than such Lender's Pro Rata Share of the applicable Revolving Loans as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments applicable to such Obligations actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)    Between Settlement Dates, Agent, to the extent Extraordinary Advances for the account of Agent or Swing Loans for the account of a Swing Lender are outstanding, may pay over to Agent or such Swing Lender, as applicable, any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the applicable Revolving Loans, for application to the Extraordinary Advances or Swing Loans.  Between Settlement Dates, Agent, to the extent no Extraordinary Advances or Swing Loans are outstanding, may pay over to the applicable Swing Lender any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the applicable Revolving Loans, for application

to the applicable Swing Lender's Pro Rata Share of the applicable Revolving Loans and, to the extent such amounts are not paid to the applicable Swing Lender or exceed such Swing Lender's Pro Rata Share of the applicable Revolving Loans, they shall be paid to the account of each Lender in reduction of the applicable Revolving Loans.  If, as of any Settlement Date, payments or other amounts of Loan Parties received since the then immediately preceding Settlement Date have been applied to a Swing Lender's Pro Rata Share of the applicable Revolving Loans other than to its Swing Loans, as provided for in the previous sentence, such Swing Lender shall pay to Agent for the accounts of the Lenders, and Agent shall pay to the Lenders (other than a Defaulting Lender if Agent has implemented the provisions of <u>Section 2.3(g)</u>), to be applied to the outstanding applicable Revolving Loans of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the applicable Revolving Loans.  During the period between Settlement Dates, a Swing Lender with respect to its Swing Loans, Agent with respect to Extraordinary Advances, and each Lender with respect to the Revolving Loans other than Swing Loans and Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by such Swing Lender, Agent, or the Lenders, as applicable.

(iv)    Anything in this <u>Section 2.3(e)</u> to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in <u>Section 2.3(g)</u>.

(f)    **Notation**.  Agent, as a non-fiduciary agent for Borrowers, shall maintain a register showing, in the Applicable Currency, the principal amount and stated interest of the Revolving Loans, owing to each Lender, including Swing Loans owing to the applicable Swing Lender, and Extraordinary Advances owing to Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)    **Defaulting Lenders**.

(i)    Notwithstanding the provisions of <u>Section 2.4(b)(ii)</u>, Agent shall not be obligated to transfer to a Defaulting Lender any payments made by any Borrower to Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such proceeds of Collateral or payments (A) pertaining to or securing US Obligations, (i) first, to Agent to the extent of any US Extraordinary Advances that were made by Agent and that were required to be, but were not, paid by Defaulting Lender, (ii) second, to US Swing Lender to the extent of any US Swing Loans that were made by US Swing Lender and that were required to be, but were not, paid by the Defaulting Lender, (iii) third, to US Issuing Lender, to the extent of the portion of a US Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (iv) fourth, to each Non-Defaulting Lender ratably in accordance with their US Revolver Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a US Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (v) fifth, in Agent's sole discretion, to a suspense account maintained by Agent, the proceeds of

which may be retained by Agent and may be made available to be re-advanced to or for the benefit of US Borrowers (upon the request of Borrowers and subject to the conditions set forth in Section 3.2) as if such Defaulting Lender had made its portion of US Revolving Loans (or other funding obligations) hereunder, and (vi) sixth, from and after the date on which all other US Obligations have been paid in full, to such Defaulting Lender in accordance with tier (A)(13) of Section 2.4(b)(ii), and (B) pertaining to or securing Canadian Obligations, (i) first, to Agent to the extent of any Canadian Extraordinary Advances that were made by Agent and that were required to be, but were not, paid by Defaulting Lender, (ii) second, to Canadian Swing Lender to the extent of any Canadian Swing Loans that were made by Canadian Swing Lender and that were required to be, but were not, paid by the Defaulting Lender, (iii) third, to Canadian Issuing Lender, to the extent of the portion of a Canadian Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (iv) fourth, to each Non-Defaulting Lender ratably in accordance with their Canadian Revolver Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Canadian Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (v) fifth, in Agent's sole discretion, to a suspense account maintained by Agent, the proceeds of which may be retained by Agent and may be made available to be re-advanced to or for the benefit of Canadian Borrower (upon the request of Borrowers and subject to the conditions set forth in Section 3.2) as if such Defaulting Lender had made its portion of Canadian Revolving Loans (or other funding obligations) hereunder, and (vi) sixth, from and after the date on which all other Canadian Obligations have been paid in full, to such Defaulting Lender in accordance with tier (B)(12) of Section 2.4(b)(ii).  Subject to the foregoing, Agent may hold and, in its discretion, re-lend to the applicable Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender.   Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fees payable under Section 2.10(b), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 14.1(a)(i) through (iii) that affect such Lender. The provisions of this Section 2.3(g) shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Agent, Issuing Lenders, and Borrowers shall have waived, in writing, the application of this Section 2.3(g) to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Agent pursuant to Section 2.3(g)(ii) shall be released to the applicable Borrowers).  The operation of this Section 2.3(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by any Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent, Issuing Lenders, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers, at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitments of such Defaulting Lender and the commitments of any Affiliate of such Lender, such substitute Lender

to be reasonably acceptable to Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lenders shall have no right to refuse to be replaced hereunder, and agree to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agree that they shall be deemed to have executed and delivered such document if they fail to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); provided, that any such assumption of the Commitments of such Defaulting Lenders shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this Section 2.3(g) and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(g) shall control and govern.

(ii)    If any Swing Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)    such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Pro Rata Shares of the US Revolver Usage and Canadian Revolver Usage, plus such Defaulting Lender's US Swing Loan Exposure, US Letter of Credit Exposure, Canadian Swing Loan Exposure and Canadian Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' US Revolver Commitments, (y) the sum of all Non-Defaulting Lenders' Pro Rata Shares of the Canadian Revolver Usage, plus such Defaulting Lender's Canadian Swing Loan Exposure and Canadian Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Canadian Revolver Commitments, and (z) the conditions set forth in Section 3.2 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, the applicable Borrower shall within one Business Day following notice by Agent (x) first, prepay such Defaulting Lender's applicable Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) and (y) second, cash collateralize such Defaulting Lender's applicable Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to Agent, for so long as such Letter of Credit Exposure is outstanding; provided, that Borrowers shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also an Issuing Lender;

(C)    if the applicable Borrower cash collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.3(g)(ii), such Borrower shall not be required to pay any Letter of Credit Fees to Agent for the account of such Defaulting Lender pursuant to Section 2.6(b) with respect to such cash collateralized portion of

such Defaulting Lender's Letter of Credit Exposure during the period such Letter of Credit Exposure is cash collateralized;

(D)    to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.3(g)(ii), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.6(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure;

(E)    to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.3(g)(ii), then, without prejudice to any rights or remedies of any Issuing Lender or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.6(b) with respect to such portion of such Letter of Credit Exposure shall instead be payable to the applicable Issuing Lender until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(F)    so long as any Lender is a Defaulting Lender, no Swing Lender shall be required to make any Swing Loan and no Issuing Lender shall be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Loans or Letter of Credit cannot be reallocated pursuant to this Section 2.3(g)(ii) or (y) the applicable Swing Lender or Issuing Lender, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the applicable Swing Lender or Issuing Lender, as applicable, and Borrowers to eliminate such Swing Lender's or Issuing Lender's risk with respect to the Defaulting Lender's participation in such Swing Loans or Letters of Credit; and

(G)    Agent may release any cash collateral provided by Borrowers pursuant to this Section 2.3(g)(ii) to the applicable Issuing Lender and such Issuing Lender may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by the applicable Borrowers in respect of its Letter of Credit Obligations.

(iii)    If any Lender with a US Revolver Commitment is a Defaulting Lender, then any Affiliate of such Lender with a Canadian Revolver Commitment shall be deemed to be a Defaulting Lender and if any Lender with a Canadian Revolver Commitment is a Defaulting Lender, then any Affiliate of such Lender with a US Revolver Commitment shall be deemed to be a Defaulting Lender.

(h)    **Independent Obligations**.    All Revolving Loans (other than Swing Loans, Protective Advances and, at Agent's election, Overadvances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4.    **Payments; Reductions of Commitments; Prepayments**.

(a)    **Payments by Borrowers**.

(i)    Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Applicable Account for the account of the Lender Group and shall be made in immediately available funds in the Applicable Currency, no later than 1:30 p.m. on the date specified herein. Any payment received by Agent later than 1:30 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from Borrowers prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application**.

(i)    So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account or for the separate account of an Issuing Lender) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates. Subject to Section 2.4(b)(iv) and Section 2.4(e), all payments in respect of US Obligations to be made hereunder by US Borrowers shall be remitted to Agent and all such payments, and all proceeds of Collateral securing US Obligations received by Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, first, to reduce the balance of the Existing Secured US Obligations (excluding the Existing Last Out Obligations and excluding guaranties of Existing Secured Canadian Obligations) in the manner set forth in the Existing Credit Agreement, second, to reduce the balance of the Existing Secured Canadian Obligations in the manner set forth in the Existing Credit Agreement, third, to reduce the balance of the US Revolving Loans outstanding, fourth, to reduce the balance of the Canadian Revolving Loans outstanding, and, thereafter, to US Borrowers (to be wired to the US Designated Account) or such other Person entitled thereto under applicable law. Subject to Section 2.4(b)(iv) and Section 2.4(e), all payments in respect of Canadian Obligations to be made hereunder by Canadian Borrower shall be remitted to Agent and all such payments, and all proceeds of Collateral securing Canadian Obligations received by Agent, shall be applied, so

-19-

long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, first, to reduce the balance of the Existing Secured Canadian Obligations in the manner set forth in the Existing Credit Agreement, second, to reduce the balance of the Canadian Revolving Loans outstanding, third, to reduce the balance of the US Revolving Loans outstanding, and, thereafter, to Canadian Borrower (to be wired to the Canadian Designated Account) or such other Person entitled thereto under applicable law.

(ii)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows:

(A)    All payments in respect of US Obligations and all proceeds of Collateral securing the US Obligations received by Agent shall be applied as follows:

(1)    first, to reduce the balance of the Existing Secured US Obligations (excluding the Existing Last Out Obligations and excluding guaranties of Existing Secured Canadian Obligations) in the manner set forth in the Existing Credit Agreement,

(2)    second, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents in respect of the US Obligations, until paid in full,

(3)    third, to pay any fees or premiums, if any, then due to Agent under the Loan Documents in respect of the US Obligations until paid in full,

(4)    fourth, to pay interest due in respect of all US Protective Advances until paid in full,

(5)    fifth, to pay the principal of all US Protective Advances until paid in full,

(6)    sixth, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents in respect of the US Obligations, until paid in full,

(7)    seventh, ratably, to pay any fees or premiums, if any, then due to any of the Lenders under the Loan Documents in respect of the US Obligations until paid in full,

(8)    eighth, to pay interest accrued in respect of the US Swing Loans until paid in full,

(9)    ninth, to pay the principal of all US Swing Loans until paid in full,

(10)   tenth, ratably, to pay interest accrued in respect of the US Revolving Loans until paid in full,

(11)   eleventh, ratably

i.     to pay the principal of all US Revolving Loans until paid in full,

ii.     to Agent, to be held by Agent, for the benefit of US Issuing Lender (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of US Issuing Lender, a share of each US Letter of Credit Disbursement), as cash collateral in an amount up to 105% of the US Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any US Letter of Credit Disbursement as and when such disbursement occurs and, if a US Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (A)(1) hereof),

iii.     up to the amount (after taking into account any amounts previously paid pursuant to this clause iii. during the continuation of the applicable Application Event) of the most recently established US Bank Product Reserve, which amount was established prior to the occurrence of, and not in contemplation of, the subject Application Event, to (y) ratably (based on the US Bank Product Reserve established for each US Bank Product) to the Bank Product Providers of US Bank Products up to the amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be due and payable to such Bank Product Provider on account of US Bank Product Obligations, and (z) with any balance to be paid to Agent, to be held by Agent, for the ratable benefit (based on the US Bank Product Reserve established for each US Bank Product) of the Bank Product Providers on account of Bank Product Obligations, of US Bank Products, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to US Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such US Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such US Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (A)(1) hereof),

(12)   twelfth, to pay any Existing Secured US Obligations arising as a result of any guaranty by a US Loan Party of the Existing Secured Canadian Obligations (and if no amounts are due under any such guaranty, to cash collateralize the obligations under such guaranty unless the Existing Secured Canadian Obligations have been paid in full),

(13)    thirteenth, to pay any US Obligations arising as a result of any joint and several liability of the US Borrowers for any Canadian Obligations and any guaranty by a US Loan Party of the Canadian Obligations (and if no amounts are due under any such guaranty, to cash collateralize the obligations under such guaranty unless the Canadian Revolver Commitments of Lenders to make Canadian Revolving Loans have terminated and the Canadian Obligations have been paid in full),

(14)    fourteenth, ratably to pay any other US Obligations other than US Obligations owed to Defaulting Lenders (including being paid, ratably, to the Bank Product Providers on account of all amounts then due and payable in respect of US Bank Product Obligations, with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to US Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such US Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such US Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (A)(1) hereof),

(15)    fifteenth, ratably to pay any US Obligations owed to Defaulting Lenders;

(16)    sixteenth, ratably to pay the Last Out Obligations (it being understood that notwithstanding anything to the contrary set forth above, no payment in respect of the Last Out Obligations shall be made pursuant to any clause set forth above); and

(17)    seventeenth, to US Borrowers (to be wired to the US Designated Account) or such other Person entitled thereto under applicable law.

(B)    All payments in respect of Canadian Obligations and all proceeds of Collateral securing the Canadian Obligations received by Agent shall be applied as follows:

(1)    first, to reduce the balance of the Existing Secured Canadian Obligations in the manner set forth in the Existing Credit Agreement,

(2)    second, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents in respect of the Canadian Obligations, until paid in full,

(3)    third, to pay any fees or premiums then due to Agent under the Loan Documents in respect of the Canadian Obligations until paid in full,

(4)    fourth, to pay interest due in respect of all Canadian Protective Advances until paid in full,

(5)    <u>fifth</u>, to pay the principal of all Canadian Protective Advances until paid in full,

(6)    <u>sixth</u>, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents in respect of the Canadian Obligations, until paid in full,

(7)    <u>seventh</u>, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents in respect of the Canadian Obligations until paid in full,

(8)    <u>eighth</u>, to pay interest accrued in respect of the Canadian Swing Loans until paid in full,

(9)    <u>ninth</u>, to pay principal of all Canadian Swing Loans until paid in full,

(10)    <u>tenth</u>, ratably, to pay interest accrued in respect of the Canadian Revolving Loans until paid in full,

(11)    <u>eleventh</u>, ratably

i.    to pay the principal of all Canadian Revolving Loans until paid in full,

ii.    to Agent, to be held by Agent, for the benefit of Canadian Issuing Lender (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of Canadian Issuing Lender, a share of each Canadian Letter of Credit Disbursement), as cash collateral in an amount up to 105% of the Canadian Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Canadian Letter of Credit Disbursement as and when such disbursement occurs and, if a Canadian Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this <u>Section 2.4(b)(ii)</u>, beginning with tier (B)(1) hereof),

iii.    up to the amount (after taking into account any amounts previously paid pursuant to this clause iii. during the continuation of the applicable Application Event) of the most recently established Canadian Bank Product Reserve, which amount was established prior to the occurrence of, and not in contemplation of, the subject Application Event, (y) ratably (based on the Canadian Bank Product Reserve established for each Canadian Bank Product) to the Bank Product Providers of Canadian Bank Products up to the amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be due and payable to such Bank Product Provider on account of Canadian Bank Product Obligations, and (z) with any balance to be paid to Agent, to be held by Agent, for the ratable

benefit (based on the Canadian Bank Product Reserve established for each Canadian Bank Product) of the Bank Product Providers on account of Bank Product Obligations, of Canadian Bank Products, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Canadian Bank Product Obligations owed by any Canadian Loan Party to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Canadian Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Canadian Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (B)(1) hereof),

(12)    twelfth, to pay any Canadian Obligations arising as a result of any joint and several liability of the Canadian Borrower for any US Obligations and any guaranty by a Canadian Loan Party of the US Obligations (and if no amounts are due under any such guaranty, to cash collateralize the obligations under such guaranty unless the US Obligations have been paid in full),

(13)    thirteenth, ratably to pay any other Canadian Obligations other than Canadian Obligations owed to Defaulting Lenders (including being paid, ratably, to the Bank Product Providers on account of all amounts then due and payable in respect of Canadian Bank Product Obligations, with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Canadian Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Canadian Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Canadian Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(ii), beginning with tier (B)(1) hereof),

(14)    fourteenth, ratably to pay any Canadian Obligations owed to Defaulting Lenders;

(15)    fifteenth, ratably to pay the Last Out Obligations (it being understood that notwithstanding anything to the contrary set forth above, no payment in respect of the Last Out Obligations shall be made pursuant to any clause set forth above); and

(16)    sixteenth, to Canadian Borrower (to be wired to the Canadian Designated Account) or such other Person entitled thereto under applicable law.

(iii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(iv)    In each instance, so long as no Application Event has occurred and is continuing, Section 2.4(b)(i) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(v)    For purposes of Section 2.4(b)(ii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vi)    In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in this Agreement or any other Loan Document (excluding the Intercreditor Agreement, which shall control and govern in any event), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of Section 2.3(g) and this Section 2.4, then the provisions of Section 2.3(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.4 shall control and govern.

(vii)    Payments from US Loan Parties shall be deemed to be in respect of US Obligations and payments from Canadian Loan Parties shall be deemed to be in respect of Canadian Obligations. If payment is from proceeds of Collateral that secures both US Obligations and Canadian Obligations, such payment shall be, so long as no Application Event has occurred and is continuing, as specified by the Borrowers or, if not so specified or if an Application Event has occurred and is continuing, as determined by Agent (and in the absence of such determination, shall be assumed to be a payment in respect of US Obligations until the US Obligations are paid in full).

(c)    **Reduction of Revolver Commitments**. The Revolver Commitments shall terminate on the Maturity Date. With not less than five Business Days' written notice to Agent (provided, that such notice may be withdrawn by US Borrowers at any time prior to the date specified in such notice for the reduction of Commitments), US Borrowers may reduce the US Revolver Commitments to an amount (which may be zero) not less than the sum of (A) the US Revolver Usage as of such date, plus (B) the principal amount of all US Revolving Loans not yet made as to which a request has been given by US Borrowers under Section 2.3(a), plus (C) the amount of all US Letters of Credit not yet issued as to which a request has been given by US Borrowers pursuant to Section 2.11A(a), plus (D) the Canadian Revolver Usage as of such date, plus (E) the principal amount of all Canadian Revolving Loans not yet made as to which a request has been given by Canadian Borrower under Section 2.3(a), plus (F) the amount of all Canadian Letters of Credit not yet issued as to which a request has been given by Canadian Borrower pursuant to Section 2.11B(a). Each such reduction shall be in an amount which is not

less than $1,000,000 (unless the US Revolver Commitments are being reduced to zero and the amount of the US Revolver Commitments in effect immediately prior to such reduction are less than $1,000,000), and shall be made by providing not less than five Business Days prior written notice to Agent; provided, that US Borrowers may rescind such notices relative to a proposed reduction in the US Revolver Commitments to zero in connection with a payment in full of the Obligations with the proceeds of third party Indebtedness or from a sale if the closing for such issuance, incurrence or sale does not happen on or before the date of the proposed reduction (in which case, a new notice shall be required to be sent in connection with any subsequent reduction to zero), and (b) US Borrowers may extend the date of reduction at any time with the consent of Agent (which consent shall not be unreasonably withheld, conditioned or delayed). With not less than five Business Days written notice to Agent (provided, that such notice may be withdrawn by Canadian Borrower at any time prior to the date specified in such notice for the reduction of Commitments), Canadian Borrower may reduce the Canadian Revolver Commitments to an amount (which may be zero) not less than the sum of (A) the Canadian Revolver Usage as of such date, plus (B) the principal amount of all Canadian Revolving Loans not yet made as to which a request has been given by Canadian Borrower under Section 2.3(a), plus (C) the amount of all Canadian Letters of Credit not yet issued as to which a request has been given by Canadian Borrower pursuant to Section 2.11B(a). Each such reduction shall be in an amount which is not less than $1,000,000 (unless the Canadian Revolver Commitments are being reduced to zero and the amount of the Canadian Revolver Commitments in effect immediately prior to such reduction are less than $1,000,000), and shall be made by providing not less than five Business Days prior written notice to Agent; provided, that Canadian Borrower may rescind such notices relative to a proposed reduction in the Canadian Revolver Commitments to zero in connection with a payment in full of the Obligations with the proceeds of third party Indebtedness or from a sale if the closing for such issuance, incurrence or sale does not happen on or before the date of the proposed reduction (in which case, a new notice shall be required to be sent in connection with any subsequent reduction to zero), and (b) Canadian Borrower may extend the date of reduction at any time with the consent of Agent (which consent shall not be unreasonably withheld, conditioned or delayed).  Once reduced, the Revolver Commitments may not be increased.  The US Maximum Revolver Amount and the Canadian Maximum Revolver Amount shall be adjusted accordingly for such reductions in the Revolver Commitments pursuant to this Section 2.4(c).  Each reduction of the Revolver Commitments pursuant to this Section 2.4(c) shall reduce the Revolver Commitments of each Lender proportionately in accordance with its ratable share thereof.  In connection with any reduction in the Revolver Commitments prior to the Maturity Date, if any Loan Party or any of its Subsidiaries owns any Margin Stock, Borrowers shall deliver to Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as Agent shall reasonably request, in order to enable Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Federal Reserve Board.

(d)     **Optional Prepayments**.  Borrowers may prepay the principal of any Revolving Loan at any time in whole or in part, without premium or penalty.

(e)    **Mandatory Prepayments**.

(i)    **Borrowing Base**.  If, at any time, (A)(x) the US Revolver Usage (excluding Last Out Obligations) on such date exceeds (y) the US Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers to Agent, or (B)(x) the US Revolver Usage (including Last Out Obligations) on such date exceeds (y) the US Maximum Revolver Amount less the Dollar Equivalent of the Canadian Revolver Usage, then, in each case, US Borrowers shall within one Business Day prepay the US Obligations in accordance with Section 2.4(f)(i) in an aggregate amount equal to the amount of such excess.  If, at any time, (A) the Dollar Equivalent of the Canadian Revolver Usage on such date exceeds (B) the lesser of the Canadian Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers to Agent and the Canadian Maximum Revolver Amount, then Canadian Borrower shall within one Business Day prepay the Canadian Obligations in accordance with Section 2.4(f)(i) in an aggregate amount equal to the amount of such excess.

(ii)    **Disgorgement**.  In the event that Existing Agent or any of the Existing Lenders are required to repay or disgorge to Debtors or any representatives of the Debtors' estate (as agents, with derivative standing or otherwise) all or any portion of the Existing Secured Obligations authorized and directed to be repaid pursuant to the Financing Order, or any payment on account of the Existing Secured Obligations made to Existing Agent or any Existing Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or other applicable Insolvency Laws or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, Borrowers shall prepay the Revolving Loans in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by Debtors or any representative of the Debtors' estate.

(iii)    **Dispositions**.  Immediately upon receipt by any Loan Party or any of its Subsidiaries of the Net Cash Proceeds of any disposition of any ABL Priority Collateral outside the ordinary course of business (including Net Cash Proceeds of insurance or arising from casualty losses or condemnations and payments in lieu thereof), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such disposition of such ABL Priority Collateral.  Nothing contained in this Section 2.4(e)(iii) shall permit any Loan Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 6.4.

(iv)    **Extraordinary Receipts**.  Immediately upon receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of such Extraordinary Receipts.

(f)    **Application of Payments**.

(i)    Each prepayment pursuant to the first sentence of Section 2.4(e)(i) shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the US Revolving Loans until paid in full and *second*, to cash collateralize the US Letters of Credit in an amount equal to 105% of the then outstanding US Letter of Credit Usage, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii). Each prepayment pursuant to the second sentence of Section 2.4(e)(i) shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Canadian Revolving Loans until paid in full and *second*, to cash collateralize the Canadian Letters of Credit in an amount equal to 105% of the then outstanding Canadian Letter of Credit Usage, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii). Each prepayment pursuant to Section 2.4(e)(ii) shall, (A) if such prepayment is in connection with an Avoided Payment on account of Existing US Secured Obligations, (1) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Revolving Loans (*first*, with application to the US Revolving Loans, *second*, with application to the Canadian Revolving Loans) until paid in full and *second*, to cash collateralize the Letters of Credit (*first*, with application to the US Letters of Credit, *second*, with application to the Canadian Letters of Credit) in an amount equal to 105% of the then outstanding Letter of Credit Usage, and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii)(A) and (B) if such prepayment is in connection with an Avoided Payment on account of Existing Canadian Secured Obligations, (1) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Revolving Loans (*first*, with application to the Canadian Revolving Loans, *second*, with application to the US Revolving Loans) until paid in full and *second*, to cash collateralize the Letters of Credit (*first*, with application to the Canadian Letters of Credit, *second*, with application to the US Letters of Credit) in an amount equal to 105% of the then outstanding Letter of Credit Usage, and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii)(B). Each prepayment pursuant to Section 2.4(e)(iii) and (iv) shall, (A) if such prepayment is in connection with a disposition, casualty or Extraordinary Receipt of a US Loan Party, as applicable (1) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to reduce the balance of the Existing Secured US Obligations (excluding the Existing Last Out Obligations and excluding guaranties of Existing Secured Canadian Obligations) in the manner set forth in the Existing Credit Agreement, *second*, to reduce the balance of the Existing Secured Canadian Obligations in the manner set forth in the Existing Credit Agreement, *third*, to reduce the balance of the US Revolving Loans outstanding, *fourth*, to reduce the balance of the Canadian Revolving Loans outstanding, *fifth*, to cash collateralize the Letters of Credit (*first*, with application to the US Letters of Credit, *second* with application to Canadian Letters of Credit) in an amount equal to 105% of the then outstanding Letter of Credit Usage, and, thereafter, to US Borrowers (to be wired to the US Designated Account) or such other Person entitled thereto under applicable law and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii)(A) and (B) if such prepayment is in connection with a disposition, casualty or Extraordinary Receipt of a Canadian Loan Party, as applicable (1) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to reduce the balance of the Existing Secured Canadian

Obligations in the manner set forth in the Existing Credit Agreement, *second*, to reduce the balance of the Canadian Revolving Loans outstanding, *third*, to reduce the balance of the US Revolving Loans outstanding, *fourth*, to cash collateralize the Letters of Credit (*first*, with application to the Canadian Letters of Credit, *second* with application to US Letters of Credit) in an amount equal to 105% of the then outstanding Letter of Credit Usage, and, thereafter, to Canadian Borrower (to be wired to the Canadian Designated Account) or such other Person entitled thereto under applicable law and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii)(B).

(ii)    No prepayment applied to the Revolving Loans or to cash collateralize Letter of Credit Usage under Section 2.4(f)(i) shall result in a reduction in the US Maximum Revolver Amount or Canadian Maximum Revolver Amount.

(g)    Notwithstanding anything herein to the contrary, (i) Borrowers may not elect to repay the principal amount of the Existing Last Out Loans or the Last Out Loans or interest accrued thereon until the payment in full of all other outstanding Existing Secured Obligations and Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (A) Unasserted Contingent Indemnification Obligations, (B) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (C) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid, and the cash collateralization in accordance with the terms hereof of all outstanding Letters of Credit and the termination of all of the Commitments of the Lenders, and (ii) all amounts that are otherwise required to be applied to repay the principal amount of Revolving Loans, any other Obligations or any Existing Secured Obligations shall be applied *first*, to repay the Existing Secured Obligations and Obligations that are not Existing Last Out Loans or Last Out Loans in the manner otherwise set forth hereunder, and thereafter, to repay Existing Last Out Loans and Last Out Loans.

(h)    **Letter of Credit Obligations**.  In the event any Letters of Credit are outstanding at the time that the Revolver Commitments are terminated or Letters of Credit are required to be cash collateralized at any time pursuant to the terms of this Agreement, Borrowers shall deposit with Agent for the benefit of all Lenders cash in an amount equal to 105% of the aggregate outstanding obligations and the applicable US Reimbursement Undertakings or Canadian Reimbursement Undertakings in connection with such Letters of Credit to be available to Agent to reimburse payments of drafts drawn under such Letters of Credit and pay any fees and expenses related thereto.

2.5.    **Promise to Pay; Promissory Notes**.

(a)    Each Borrower agrees to pay the Lender Group Expenses owing by such Borrower on the earlier of (i) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred or (ii) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the applicable Loan Account pursuant to the provisions of Section

2.6(d) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)).  Each Borrower promises to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) owing by such Borrower in full on the Maturity Date or, if earlier, on the date on which such Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of this Agreement.  Borrowers agree that their obligations contained in the first sentence of this Section 2.5 shall survive payment or satisfaction in full of all other Obligations.

(b)        Any Lender may request that any portion of its Commitments or the Loans made by it be evidenced by one or more promissory notes.  In such event, the applicable Borrower shall execute and deliver to such Lender the requested promissory notes payable to such Lender in a form furnished by Agent and reasonably satisfactory to such Borrower. Thereafter, the portion of the Commitments and Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the payee named therein.

   2.6.    **Interest Rates and Letter of Credit Fee:   Rates, Payments, and Calculations**.

(a)        **Interest Rates**.  Except as provided in Section 2.6(c),

(i)        all US Revolving Loans and all other US Obligations (except for undrawn US Letters of Credit) that have been charged to the US Loan Account pursuant to the terms hereof shall bear interest as follows:

(A)        if the relevant US Obligation is a Non-Base Rate Loan, at a per annum rate equal to the US LIBOR Rate plus the Non-Base Rate Margin,

(B)        otherwise, at a per annum rate equal to the US Base Rate plus the Base Rate Margin;

(ii)        all Canadian Revolving Loans and all other Canadian Obligations (except for undrawn Canadian Letters of Credit) that have been charged to the Canadian Loan Account pursuant to the terms hereof shall bear interest as follows:

(A)        if the relevant Canadian Obligation is a Non-Base Rate Loan, at a per annum rate equal to the US LIBOR Rate plus the Non-Base Rate Margin (it being understood that any Canadian Obligation that is a Non-Base Rate Loan shall be denominated in Dollars),

(B)        if the relevant Canadian Obligation is a Base Rate Loan denominated in Dollars, at a per annum rate equal to the US Base Rate plus the Base Rate Margin, and

(C)        otherwise, at a per annum rate equal to the Canadian Base Rate plus the Non-Base Rate Margin;

(b)    **Letter of Credit Fee**.  US Borrowers shall pay Agent (for the ratable benefit of the Revolving Lenders with a US Revolver Commitment), a Letter of Credit fee (the "US Letter of Credit Fee") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11A(k)) that shall accrue at a *per annum* rate equal to the Non-Base Rate Margin times the US Letter of Credit Usage.   Canadian Borrower shall pay Agent (for the ratable benefit of the Revolving Lenders with a Canadian Revolver Commitment), a Letter of Credit fee (the "Canadian Letter of Credit Fee") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11B(k)) that shall accrue at a *per annum* rate equal to the Non-Base Rate Margin times the Canadian Letter of Credit Usage.

(c)    **Default Rate**.  Upon the occurrence and during the continuation of an Event of Default and at the election of the Agent or Required Lenders,

(i)    all Revolving Loans and all other Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a per annum rate equal to 2 percentage points above the per annum rate otherwise applicable thereunder, and

(ii)    the applicable Letter of Credit Fee shall be increased to 2 percentage points above the per annum rate otherwise applicable hereunder.

(d)    **Payment.**  Except to the extent provided to the contrary in Section 2.10, Section 2.11A(k), Section 2.11B(k) or Section 2.12(a), (i) all interest (other than interest due on Non-Base Rate Loans) and all other fees payable hereunder or under any of the other Loan Documents (except as otherwise expressly provided) shall be due and payable, in arrears, on the first day of each calendar month, (ii) all Letter of Credit Fees payable hereunder or under any of the other Loan Documents (except as expressly provided) shall be due and payable, in arrears, on the first Business Day of each calendar month, and (iii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all Lender Group Expenses shall be due and payable on the earlier of (x) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred or (y) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the applicable Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)).  All interest in respect of Non-Base Rate Loans shall be due and payable as provided in Section 2.12(a).  US Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge to the US Loan Account (A) on the first day of each calendar month, all interest (other than interest due on Non-Base Rate Loans) accrued during the prior calendar month on the US Revolving Loans hereunder, (B) on the date due pursuant to Section 2.12(a), all interest in respect of US Revolving Loans that are Non-Base Rate Loans, (C) on the first day of each calendar month, all US Letter of Credit Fees accrued or chargeable hereunder during the prior calendar month, (D) as and when due and payable, all fees and costs owing by US Loan Parties provided for in Section 2.10(a) or (c), (E) on the first day of each calendar month, the Unused Line Fee accrued during the prior calendar month pursuant to Section 2.10(b), (F) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents by US Loan Parties, (G) as and when incurred or accrued, the

fronting fees and all commissions, other fees, charges and expenses provided for in <u>Section 2.11A(k)</u>, (H) as and when due and payable, all other Lender Group Expenses owing by US Loan Parties, and (I) as and when due and payable all other payment obligations payable by US Loan Parties under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of US Bank Products).  All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable by US Loan Parties hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the US Loan Account shall thereupon constitute US Revolving Loans hereunder, shall constitute US Obligations hereunder, and shall initially accrue interest at the rate then applicable to US Revolving Loans that are Base Rate Loans (unless and until converted into Non-Base Rate Loans in accordance with the terms of this Agreement).  Canadian Borrower hereby authorizes Agent, from time to time without prior notice to Borrowers, to charge to the Canadian Loan Account (A) on the first day of each calendar month, all interest (other than interest due on Non-Base Rate Loans) accrued during the prior calendar month on the Canadian Revolving Loans hereunder, (B) on the date due pursuant to <u>Section 2.12(a)</u>, all interest in respect of Canadian Revolving Loans that are Non-Base Rate Loans, (C) on the first day of each calendar month, all Canadian Letter of Credit Fees accrued or chargeable hereunder during the prior calendar month, (D) as and when due and payable, all fees and costs owing by Canadian Loan Parties provided for in <u>Section 2.10(a)</u> or <u>(c)</u>, (E) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents by Canadian Loan Parties, (F) as and when incurred or accrued, the fronting fees and all commissions, other fees, charges and expenses provided for in <u>Section 2.11B(k)</u>, (G) as and when due and payable, all other Lender Group Expenses owing by Canadian Loan Parties, and (H) as and when due and payable all other payment obligations payable by Canadian Loan Parties under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Canadian Bank Products).  All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable by Canadian Loan Parties hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the Canadian Loan Account shall thereupon constitute Canadian Revolving Loans hereunder, shall constitute Canadian Obligations hereunder, and shall initially accrue interest at the rate then applicable to Canadian Revolving Loans that are Base Rate Loans (unless and until converted into Non-Base Rate Loans in accordance with the terms of this Agreement).

(e)    **Computation**.    All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue; <u>provided</u> that Base Rate Loans (including Revolving Loans bearing interest at the Canadian Base Rate), shall, in each case, be calculated on the basis of a 365 day year (or a 366 day year, in the case of a leap year). In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)    **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest

and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the applicable Obligations to the extent of such excess.

2.7.    **Crediting Payments**.  The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds in the Applicable Currency made to Agent's Applicable Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Applicable Account on a Business Day on or before 1:30 p.m.  If any payment item is received into Agent's Applicable Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8.    **Designated Accounts**.  Agent is authorized to make the Revolving Loans and each Issuing Lender is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d).  US Borrowers agree to establish and maintain the US Designated Account with the US Designated Account Bank for the purpose of receiving the proceeds of the US Revolving Loans requested by US Borrower and made by Agent or the Lenders hereunder.  Unless otherwise agreed by Agent and Administrative Borrower, any US Revolving Loan requested by US Borrowers and made by Agent or the Lenders hereunder shall be made to the US Designated Account.  Canadian Borrower agrees to establish and maintain the Canadian Designated Account with the Canadian Designated Account Bank for the purpose of receiving the proceeds of the Canadian Revolving Loans requested by Canadian Borrower and made by Agent or the Lenders hereunder.  Unless otherwise agreed by Agent and Canadian Borrower, any Canadian Revolving Loan requested by Canadian Borrower and made by Agent or the Lenders hereunder shall be made to the Canadian Designated Account.

2.9.    **Maintenance of Loan Account; Statements of Obligations**.  Agent shall maintain an account on its books in the name of US Borrowers (the "US Loan Account") on which US Borrowers will be charged with all US Revolving Loans (including US Extraordinary Advances and US Swing Loans) made by Agent, US Swing Lender, or the Lenders to US Borrowers or for US Borrowers' account, the US Letters of Credit issued or arranged by US Issuing Lender for US Borrowers' account, and with all other payment US Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses with respect thereto.  In accordance with Section 2.7, the US Loan Account will be credited with all payments received by Agent from US Borrowers or for US Borrowers' account.  Agent shall maintain an account on its books in the name of Canadian Borrower (the "Canadian Loan Account") on which Canadian Borrower will be charged with all Canadian Revolving Loans (including Canadian Extraordinary Advances and Canadian Swing Loans)

made by Agent, Canadian Swing Lender or the Lenders to Canadian Borrower or for Canadian Borrower's account, the Canadian Letters of Credit issued or arranged by Canadian Issuing Lender for Canadian Borrower's account, and with all other Canadian Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses with respect thereto. In accordance with Section 2.7, the Canadian Loan Account will be credited with all payments received by Agent from Canadian Borrower or for Canadian Borrower's account. Agent shall make available to Borrowers monthly statements regarding the Loan Accounts, including the principal amount of the Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within thirty (30) days after Agent first makes such a statement available to Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in such statement.

2.10.    **Fees**.

(a)    **Agent Fees**. Borrowers shall pay to Agent, as and when due and payable under the terms of the Fee Letter, the agent fee set forth in the Fee Letter.

(b)    **Unused Line Fee**. US Borrowers shall pay to Agent, for the ratable account of the Revolving Lenders with a US Revolver Commitment, an unused line fee (the "Unused Line Fee") in an amount equal to the Applicable Unused Line Fee Percentage *per annum* times the result of (i) the aggregate amount of the US Revolver Commitments, less (ii) the average amount of the sum of the US Revolver Usage (which shall be deemed to include for this purpose the principal amount of the Existing Secured Obligations (including Existing Last Out Obligations) and the Last Out Obligations) and Dollar Equivalent of the Canadian Revolver Usage (which shall be deemed to include for this purpose the principal amount of Existing Secured Canadian Obligations) during the immediately preceding calendar month (or portion thereof), which Unused Line Fee shall be due and payable on the first day of each calendar month from and after the Closing Date up to the first day of the calendar month, prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c)    **Field Examination and Other Fees**. Borrowers shall pay to Agent field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows: (i) a fee of $1,000 per day, per examiner, plus reasonable out-of-pocket expenses (including travel, meals, and lodging) for each field examination of Parent or its Subsidiaries performed by personnel employed by Agent, (ii) if implemented, a fee of $1,000 per day, per examiner, plus reasonable out-of-pocket expenses (including travel, meals and lodging) for the establishment of electronic collateral reporting, and (iii) the fees or charges paid or incurred by Agent (including travel, meals, and lodging) if it elects to employ the services of one or more third Persons to perform field examinations of Parent or its Subsidiaries or to appraise the Collateral, or any portion thereof; provided, that so long as no Event of Default shall have occurred and be continuing, Borrowers shall not be obligated to reimburse Agent for more than (A) one field examination during the initial five month period following the Closing Date (and if

the Existing Secured Obligations and the Obligations are not paid in full within one hundred fifty (150) days of the Closing Date, one additional field examination thereafter) or (B) one appraisal of the Inventory during the initial five month period following the Closing Date (and if the Existing Secured Obligations and the Obligations are not paid in full within one hundred fifty (150) days of the Closing Date, one additional appraisal thereafter) (it being understood that the initial field examination of the Accounts of the Loan Parties conducted in connection with the Closing Date of this Agreement and the appraisal of the Inventory of the Loan Parties commenced prior to the Closing Date but not completed as of the Closing Date shall not count toward the limits described above).

(d)    **Closing Fee**.  Borrowers shall pay to Agent, for the ratable account of the Lenders, as and when due and payable under the terms of the Fee Letter, the closing fee set forth in the Fee Letter (the "Closing Fee").

2.11A    **US Letters of Credit**.

(a)    Subject to the terms and conditions of this Agreement, upon the request of Administrative Borrower made in accordance herewith, and prior to the Maturity Date, US Issuing Lender agrees to issue a requested US Letter of Credit for the account of US Borrowers. By submitting a request to US Issuing Lender for the issuance of a US Letter of Credit, US Borrowers shall be deemed to have requested that US Issuing Lender issue the requested US Letter of Credit.  Each request for the issuance of a US Letter of Credit, or the amendment, renewal, or extension of any outstanding US Letter of Credit, shall be made in writing by an Authorized Person and delivered to US Issuing Lender via telefacsimile or other electronic method of transmission reasonably acceptable to US Issuing Lender and reasonably in advance of the requested date of issuance, amendment, renewal, or extension.  Each such request shall be in form and substance reasonably satisfactory to US Issuing Lender and (i) shall specify (A) the amount of such US Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such US Letter of Credit, (C) the proposed expiration date of such US Letter of Credit, (D) the name and address of the beneficiary of the US Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the US Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such US Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Agent or US Issuing Lender may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that US Issuing Lender generally requests for US Letters of Credit in similar circumstances.

(b)    US Issuing Lender shall not issue a US Letter of Credit if any of the following would result after giving effect to the requested issuance:

(i)    the US Letter of Credit Usage would exceed $8,000,000 minus the Dollar Equivalent of the Canadian Letter of Credit Usage, or

(ii)    the US Letter of Credit Usage would exceed the US Maximum Revolver Amount less the sum of the outstanding amount of US Revolving Loans (including US Swing Loans) and the Dollar Equivalent of the Canadian Revolver Usage less the principal

amount of any Reinstated Existing Secured Obligations less the principal amount of any Existing Secured Obligations (including, for the avoidance of doubt, Existing Last Out Obligations), or

(iii)    the US Letter of Credit Usage would exceed the US Borrowing Base at such time less the sum of the outstanding principal balance of the US Revolving Loans (inclusive of US Swing Loans) at such time less the principal amount of any Reinstated Existing Secured Obligations less the principal amount of Existing Secured Obligations (excluding Existing Last Out Obligations)).

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a US Letter of Credit, the US Issuing Lender shall not be required to issue or arrange for such US Letter of Credit to the extent (i) the Defaulting Lender's US Letter of Credit Exposure with respect to such US Letter of Credit may not be reallocated pursuant to Section 2.3(g)(ii), or (ii) the US Issuing Lender has not otherwise entered into arrangements reasonably satisfactory to it and Administrative Borrower to eliminate the US Issuing Lender's risk with respect to the participation in such US Letter of Credit of the Defaulting Lender, which arrangements may include US Borrowers cash collateralizing such Defaulting Lender's US Letter of Credit Exposure in accordance with Section 2.3(g)(ii).  Additionally, US Issuing Lender shall have no obligation to issue a US Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain US Issuing Lender from issuing such US Letter of Credit, or any law applicable to US Issuing Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over US Issuing Lender shall prohibit or request that US Issuing Lender refrain from the issuance of letters of credit generally or such US Letter of Credit in particular, or (B) the issuance of such US Letter of Credit would violate one or more policies of US Issuing Lender applicable to letters of credit generally.

(d)    Any US Issuing Lender (other than Wells Fargo or any of its Affiliates) shall notify Agent in writing no later than the Business Day immediately following the Business Day on which such US Issuing Lender issued any US Letter of Credit; provided that (i) until Agent advises any such US Issuing Lender that the provisions of Section 3.2 are not satisfied, or (ii) unless the aggregate amount of the US Letters of Credit issued in any such week exceeds such amount as shall be agreed by Agent and such US Issuing Lender, such US Issuing Lender shall be required to so notify Agent in writing only once each week of the US Letters of Credit issued by such US Issuing Lender during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as Agent and such US Issuing Lender may agree.  Each US Letter of Credit shall be in form and substance reasonably acceptable to US Issuing Lender, including the requirement that the amounts payable thereunder must be payable in Dollars.  If US Issuing Lender makes a payment under a US Letter of Credit, US Borrowers shall pay to Agent an amount equal to the applicable US Letter of Credit Disbursement on the Business Day such US Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the US Letter of Credit Disbursement immediately and automatically shall be deemed to be a US Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and, initially, shall bear interest at the rate then applicable to US Revolving Loans that are Base Rate Loans. If a US Letter of Credit Disbursement is deemed to be a US Revolving Loan hereunder, US Borrowers' obligation to pay the amount of such US Letter of Credit Disbursement to US

-36-

Issuing Lender shall be automatically converted into an obligation to pay the resulting US Revolving Loan.  Promptly following receipt by Agent of any payment from US Borrowers pursuant to this paragraph, Agent shall distribute such payment to US Issuing Lender or, to the extent that any Revolving Lender have made payments pursuant to Section 2.11A(e) to reimburse US Issuing Lender, then to such Revolving Lender and US Issuing Lender as their interests may appear.

(e)    Promptly following receipt of a notice of a US Letter of Credit Disbursement pursuant to Section 2.11A(d), each Revolving Lender agrees to fund its Pro Rata Share of any US Revolving Loan deemed made pursuant to Section 2.11A(d) on the same terms and conditions as if US Borrowers had requested the amount thereof as a US Revolving Loan and Agent shall promptly pay to US Issuing Lender the amounts so received by it from the Revolving Lenders.  By the issuance of a US Letter of Credit (or an amendment, renewal, or extension of a US Letter of Credit) and without any further action on the part of US Issuing Lender or the Revolving Lenders, US Issuing Lender shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each US Letter of Credit issued by US Issuing Lender, in an amount equal to its Pro Rata Share of such US Letter of Credit, and each such Revolving Lender agrees to pay to Agent, for the account of US Issuing Lender, such Revolving Lender's Pro Rata Share of any US Letter of Credit Disbursement made by US Issuing Lender under the applicable US Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of US Issuing Lender, such Revolving Lender's Pro Rata Share of each US Letter of Credit Disbursement made by US Issuing Lender and not reimbursed by US Borrowers on the date due as provided in Section 2.11A(d), or of any reimbursement payment that is required to be refunded (or that Agent or US Issuing Lender elects, based upon the advice of counsel, to refund) to US Borrowers for any reason.  Each Revolving Lender acknowledges and agrees that its obligation to deliver to Agent, for the account of US Issuing Lender, an amount equal to its respective Pro Rata Share of each US Letter of Credit Disbursement pursuant to this Section 2.11A(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3.  If any such Revolving Lender fails to make available to Agent the amount of such Revolving Lender's Pro Rata Share of a US Letter of Credit Disbursement as provided in this Section, such Revolving Lender shall be deemed to be a Defaulting Lender and Agent (for the account of US Issuing Lender) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)    US Borrowers agree to indemnify, defend and hold harmless each Letter of Credit Related Person (to the fullest extent permitted by law) from and against any Letter of Credit Indemnified Costs, which arise out of or in connection with, or as a result of:

(i)    any US Letter of Credit or any pre-advice of its issuance;

(ii)    any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any US Letter of Credit;

(iii)    any action or proceeding arising out of, or in connection with, any US Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any US Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any US Letter of Credit;

(iv)    any independent undertakings issued by the beneficiary of any US Letter of Credit;

(v)    any unauthorized instruction or request made to US Issuing Lender in connection with any US Letter of Credit or requested US Letter of Credit or error in computer or electronic transmission;

(vi)    an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated in connection with any US Letter of Credit;

(vii)    any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of US Letter of Credit proceeds or holder of an instrument or document;

(viii)    the fraud, forgery or illegal action of parties in connection with a US Letter of Credit other than the Letter of Credit Related Person;

(ix)    US Issuing Lender's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation in connection with a US Letter of Credit; or

(x)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person related to a US Letter of Credit;

in each case, including that result from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  US Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.11A(f).  If and to the extent that the obligations of US Borrowers under this Section 2.11A(f) are unenforceable for any reason, US Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable law.  This indemnification provision shall survive termination of this Agreement and all US Letters of Credit.

(g)    The liability of US Issuing Lender (or any other Letter of Credit Related Person) under, in connection with or arising out of any US Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrowers that are caused directly by US Issuing Lender's gross negligence

or willful misconduct in (i) honoring a presentation under a US Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such US Letter of Credit, (ii) failing to honor a presentation under a US Letter of Credit that strictly complies with the terms and conditions of such US Letter of Credit or (iii) retaining Drawing Documents presented under a US Letter of Credit.  US Issuing Lender shall be deemed to have acted with due diligence and reasonable care if US Issuing Lender's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.  US Borrowers' aggregate remedies against US Issuing Lender and any Letter of Credit Related Person for wrongfully honoring a presentation under any US Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by US Borrowers to US Issuing Lender in respect of the honored presentation in connection with such US Letter of Credit under Section 2.11A(d), plus interest at the rate then applicable to US Revolving Loans that are Base Rate Loans hereunder.  US Borrowers shall take action to avoid and mitigate the amount of any damages claimed against US Issuing Lender or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the US Letters of Credit.  Any claim by US Borrowers under or in connection with any US Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by US Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had US Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing US Issuing Lender to effect a cure.

(h)    US Borrowers are responsible for preparing or approving the final text of the US Letter of Credit as issued by US Issuing Lender, irrespective of any assistance US Issuing Lender may provide such as drafting or recommending text or by US Issuing Lender's use or refusal to use text submitted by US Borrowers.  US Borrowers are solely responsible for the suitability of the US Letter of Credit for US Borrowers' purposes.  With respect to any US Letter of Credit containing an "automatic amendment" to extend the expiration date of such US Letter of Credit, US Issuing Lender, in its sole and absolute discretion, may give notice of nonrenewal of such US Letter of Credit only if such automatic extension would result in any expiry date of such Letter of Credit beyond the Maturity Date, and, if US Borrowers do not at any time want such US Letter of Credit to be renewed, US Borrowers will so notify Agent and US Issuing Lender at least fifteen (15) calendar days before US Issuing Lender is required to notify the beneficiary of such US Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such US Letter of Credit.

(i)    US Borrowers' reimbursement and payment obligations under this Section 2.11A are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)    any lack of validity, enforceability or legal effect of any US Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)    payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable US Letter of Credit or which proves to be fraudulent, forged or invalid in any

respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such US Letter of Credit;

(iii)   US Issuing Lender or any of its branches or Affiliates being the beneficiary of any US Letter of Credit;

(iv)   US Issuing Lender or any correspondent honoring a drawing against a Drawing Document up to the amount available under any US Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the US Letter of Credit;

(v)   the existence of any claim, set-off, defense or other right that Parent or any of its Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, US Issuing Lender or any other Person;

(vi)   any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.11A(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any US Letter of Credit, whether against US Issuing Lender, the beneficiary or any other Person; or

(vii)   the fact that any Default or Event of Default shall have occurred and be continuing;

provided, however, that subject to Section 2.11A(g) above, the foregoing shall not release US Issuing Lender from such liability to US Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against US Issuing Lender following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of US Borrowers to US Issuing Lender arising under, or in connection with, this Section 2.11A or any US Letter of Credit.

(j)   Without limiting any other provision of this Agreement, and subject to Section 2.11A(g) above and Section 2.11B(g) below, US Issuing Lender and each other Letter of Credit Related Person (if applicable) shall not be responsible to US Borrowers for, and US Issuing Lender's rights and remedies against US Borrowers and the obligation of US Borrowers to reimburse US Issuing Lender for each drawing under each US Letter of Credit shall not be impaired by:

(i)   honor of a presentation under any US Letter of Credit that on its face substantially complies with the terms and conditions of such US Letter of Credit, even if the US Letter of Credit requires strict compliance by the beneficiary;

(ii)   honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a US Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the US Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than US Issuing Lender's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the US Letter of Credit);

(v)    acting upon any instruction or request relative to a US Letter of Credit or requested US Letter of Credit that US Issuing Lender in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to US Borrowers;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and US Borrowers or any of the parties to the underlying transaction to which the US Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)    payment to any paying or negotiating bank (designated or permitted by the terms of the applicable US Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where US Issuing Lender has issued, confirmed, advised or negotiated such US Letter of Credit, as the case may be;

(xi)    honor of a presentation after the expiration date of any US Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by US Issuing Lender if subsequently US Issuing Lender or any court or other finder of fact determines such presentation should have been honored;

(xii)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by US Issuing Lender to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)    US Borrowers shall pay immediately upon demand to Agent for the account of US Issuing Lender as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the US Loan Account pursuant to the provisions of <u>Section 2.6(d)</u> shall be deemed to constitute a demand for payment thereof for the purposes of this <u>Section 2.11A(k)</u>): (i) a fronting fee which shall be imposed by US Issuing Lender upon the issuance of each US Letter of Credit of 0.125% per annum of the face amount thereof, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, US Issuing Lender, or by any adviser, confirming institution or entity or other nominated person, relating to US Letters of Credit, at the time of issuance of any US Letter of Credit and upon the occurrence of any other activity with respect to any US Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).  Notwithstanding the foregoing, if US Issuing Lender is a Person other than Wells Fargo, all fronting fees payable in respect of US Letters of Credit issued by such US Issuing Lender shall be paid by US Borrowers immediately upon demand directly to such US Issuing Lender for its own account.

(l)    If by reason of (x) any Change in Law, or (y) compliance by US Issuing Lender or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)    any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any US Letter of Credit issued or caused to be issued hereunder or hereby, or

(ii)    there shall be imposed on US Issuing Lender or any other member of the Lender Group any other condition regarding any US Letter of Credit,

and the result of the foregoing is to increase, directly or indirectly, the cost to US Issuing Lender or any other member of the Lender Group of issuing, making, participating in, or maintaining any US Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Administrative Borrower, and US Borrowers shall pay on demand, such amounts as Agent may specify to be necessary to compensate US Issuing Lender or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to US Revolving Loans that are Base Rate Loans hereunder.  The determination by Agent of any amount due pursuant to this <u>Section 2.11A(l)</u>, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m)    Unless otherwise expressly agreed by US Issuing Lender and US Borrowers when a US Letter of Credit is issued, (i) the rules of the ISP and UCP 600 shall apply to each standby US Letter of Credit, and (ii) the rules of UCP 600 shall apply to each commercial US Letter of Credit.

(n)    In the event of a direct conflict between the provisions of this <u>Section 2.11A</u> and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.11A</u> shall control and govern.

(o)    <u>Schedule 2.11(A)</u> hereto contains a list of all US Letters of Credit outstanding on the Filing Date pursuant to the Existing Credit Agreement.  For the period from and after the effective date of the Interim Financing Order, each such US Letter of Credit set forth on <u>Schedule 2.11(A)</u>, including any extension or renewal thereof, that remains outstanding on the effective date of the Interim Financing Order (each, as amended from time to time in accordance with the terms thereof and hereof, an "<u>Existing US Letter of Credit</u>") shall be deemed US Letters of Credit re-issued hereunder for the account of Borrowers, for all purposes of this Agreement, including, without limitation, calculations of US Availability, the US Borrowing Base, US Letter of Credit Usage and all other fees and expenses relating to the US Letters of Credit (including any related indemnification obligations).  US Issuing Lender hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the issuers of the Existing US Letters of Credit.  Borrowers agree to execute and deliver such documentation, if any, requested by Agent, or a US Issuing Lender to evidence, record, or further the foregoing deemed re-issuance.

(p)    The expiration date of each US Letter of Credit, other than the Existing US Letters of Credit, shall be on a date that is not later than fifteen (15) days prior to the Maturity Date unless Borrower provides cash collateral for the obligations and US Reimbursement Undertakings associated with such US Letters of Credit in the manner set forth in <u>Section 2.4(h)</u> hereof; <u>provided</u>, that a US Letter of Credit may provide for automatic extensions of its expiration date for one or more successive periods of up to twelve (12) months for each period; <u>provided</u>, <u>further</u>, that the applicable US Issuing Lender has the right to terminate such US Letter of Credit on each such expiration date and no renewal term may extend the term of the US Letter of Credit to a date that is later than the fifteenth (15th) day prior to the Maturity Date unless Borrowers provide cash collateral for the obligations and US Reimbursement Undertakings associated with such US Letters of Credit in the amount set forth in <u>Section 2.4(h)</u>.  Upon direction by Agent or Required Lenders, the applicable US Issuing Lender shall not renew any such US Letter of Credit at any time during the continuance of an Event of Default; <u>provided</u>, that in the case of a direction by Agent or Required Lenders, the US Issuing Lender receives such directions prior to the date notice of non-renewal is required to be given by the US Issuing Lender and the US Issuing Lender has had a reasonable period of time to act on such notice.

2.11B    <u>**Canadian Letters of Credit**</u>.

(a)    Subject to the terms and conditions of this Agreement, upon the request of Canadian Borrower made in accordance herewith, and prior to the Maturity Date, Canadian Issuing Lender agrees to issue, or to cause a Canadian Underlying Issuer (including as Canadian Issuing Lender's agent) to issue, a requested Canadian Letter of Credit for the account of Canadian Borrower.  If Canadian Issuing Lender, at its option, elects to cause a Canadian Underlying Issuer to issue a requested Canadian Letter of Credit, then Canadian Issuing Lender

agrees that it will enter into arrangements relative to the reimbursement of such Canadian Underlying Issuer (which may include, among other means, by becoming an applicant with respect to such Canadian Letter of Credit or entering into undertakings or other arrangements that provide for reimbursement of such Canadian Underlying Issuer with respect to such drawings under Canadian Letter of Credit; each such obligation or undertaking, irrespective of whether in writing, a "Canadian Reimbursement Undertaking") with respect to Canadian Letters of Credit issued by such Canadian Underlying Issuer for the account of Canadian Borrower.  By submitting a request to Canadian Issuing Lender for the issuance of a Canadian Letter of Credit, Canadian Borrower shall be deemed to have requested that (x) Canadian Issuing Lender issue the requested Canadian Letter of Credit or (y) a Canadian Underlying Issuer issue the requested Canadian Letter of Credit (and, in such case, to have requested Canadian Issuing Lender to issue a Canadian Reimbursement Undertaking with respect to such requested Canadian Letter of Credit).  Each request for the issuance of a Canadian Letter of Credit, or the amendment, renewal, or extension of any outstanding Canadian Letter of Credit, shall be made in writing by an Authorized Person and delivered to Canadian Issuing Lender via telefacsimile or other electronic method of transmission reasonably acceptable to Canadian Issuing Lender and reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance reasonably satisfactory to Canadian Issuing Lender and (i) shall specify (A) the amount of such Canadian Letter of Credit and whether to be issued in Dollars or Canadian Dollars, (B) the date of issuance, amendment, renewal, or extension of such Canadian Letter of Credit, (C) the proposed expiration date of such Canadian Letter of Credit, (D) the name and address of the beneficiary of the Canadian Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Canadian Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Canadian Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Agent, Canadian Issuing Lender or Canadian Underlying Issuer may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Canadian Issuing Lender or Canadian Underlying Issuer generally requests for Canadian Letters of Credit in similar circumstances.

(b)    Canadian Issuing Lender shall not issue a Canadian Letter of Credit or a Canadian Reimbursement Undertaking in respect of a Canadian Letter of Credit, in either case, if any of the following would result after giving effect to the requested issuance:

(i)    the Dollar Equivalent of the Canadian Letter of Credit Usage would exceed $1,000,000, or

(ii)    the Dollar Equivalent of the Canadian Letter of Credit Usage would exceed the Canadian Maximum Revolver Amount less the outstanding amount of Canadian Revolving Loans (including Canadian Swing Loans) less Reinstated Existing Secured Canadian Obligations and Existing Secured Canadian Obligations then outstanding,

(iii)    the Dollar Equivalent of the Canadian Letter of Credit Usage would exceed the Canadian Borrowing Base at such time less the outstanding principal balance of the Canadian Revolving Loans (inclusive of Canadian Swing Loans) at such time less

Reinstated Existing Secured Canadian Obligations and Existing Secured Canadian Obligations then outstanding, or

(iv)    the Dollar Equivalent of US Letter of Credit Usage and Canadian Letter of Credit Usage would exceed $8,000,000.

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Canadian Letter of Credit, the Canadian Issuing Lender shall not be required to issue or arrange for such Canadian Letter of Credit or any applicable Canadian Reimbursement Undertaking to the extent (i) the Defaulting Lender's Canadian Letter of Credit Exposure with respect to such Canadian Letter of Credit or any applicable Canadian Reimbursement Undertaking may not be reallocated pursuant to Section 2.3(g)(ii), or (ii) the Canadian Issuing Lender has not otherwise entered into arrangements reasonably satisfactory to it and Canadian Borrower to eliminate the Canadian Issuing Lender's risk with respect to the participation in such Canadian Letter of Credit or any applicable Canadian Reimbursement Undertaking of the Defaulting Lender, which arrangements may include Canadian Borrower cash collateralizing such Defaulting Lender's Canadian Letter of Credit Exposure in accordance with Section 2.3(g)(ii).  Additionally, Canadian Issuing Lender shall have no obligation to issue a Canadian Letter of Credit or a Canadian Reimbursement Undertaking in respect of a Canadian Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Canadian Issuing Lender from issuing such Canadian Letter of Credit or a Canadian Reimbursement Undertaking or Canadian Underlying Issuer from issuing such Canadian Letter of Credit, or any law applicable to Canadian Issuing Lender or Canadian Underlying Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Canadian Issuing Lender or Canadian Underlying Issuer shall prohibit or request that Canadian Issuing Lender or Canadian Underlying Issuer refrain from the issuance of letters of credit generally or such Canadian Letter of Credit or Canadian Reimbursement Undertaking, as applicable, in particular, or (B) the issuance of such Canadian Letter of Credit or Canadian Reimbursement Undertaking would violate one or more policies of Canadian Issuing Lender or Canadian Underlying Issuer applicable to letters of credit generally.

(d)    Any Canadian Issuing Lender (other than WF Canada or any of its Affiliates) shall notify Agent in writing no later than the Business Day immediately following the Business Day on which such Canadian Issuing Lender issued any Canadian Letter of Credit or Canadian Reimbursement Undertaking; provided that (i) until Agent advises any such Canadian Issuing Lender that the provisions of Section 3.2 are not satisfied, or (ii) unless the aggregate amount of the Canadian Letters of Credit issued in any such week exceeds such amount as shall be agreed by Agent and such Canadian Issuing Lender, such Canadian Issuing Lender shall be required to so notify Agent in writing only once each week of the Canadian Letters of Credit or Canadian Reimbursement Undertaking issued by such Canadian Issuing Lender during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as Agent and such Canadian Issuing Lender may agree.  Canadian Borrower and the Lender Group hereby acknowledge and agree that all Existing Canadian Letters of Credit shall constitute Canadian Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Existing Canadian Letters of Credit were issued by Canadian Issuing Lender at the request of Canadian

Borrower on the Closing Date.  Each Canadian Letter of Credit shall be in form and substance reasonably acceptable to Canadian Issuing Lender and Canadian Underlying Issuer, including the requirement that the amounts payable thereunder must be payable in Dollars or Canadian Dollars.  If Canadian Issuing Lender makes a payment under a Canadian Letter of Credit or a Canadian Reimbursement Undertaking, Canadian Borrower shall pay to Agent an amount equal to the applicable Canadian Letter of Credit Disbursement on the Business Day such Canadian Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Canadian Letter of Credit Disbursement immediately and automatically shall be deemed to be a Canadian Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and, initially, shall bear interest at the rate then applicable to Canadian Revolving Loans that are Base Rate Loans. If a Canadian Letter of Credit Disbursement is deemed to be a Canadian Revolving Loan hereunder, Canadian Borrower's obligation to pay the amount of such Canadian Letter of Credit Disbursement to Canadian Issuing Lender shall be automatically converted into an obligation to pay the resulting Canadian Revolving Loan.  Promptly following receipt by Agent of any payment from Canadian Borrower pursuant to this paragraph, Agent shall distribute such payment to Canadian Issuing Lender or, to the extent that any Revolving Lender have made payments pursuant to Section 2.11B(e) to reimburse Canadian Issuing Lender, then to such Revolving Lender and Canadian Issuing Lender as their interests may appear.

(e)    Promptly following receipt of a notice of a Canadian Letter of Credit Disbursement pursuant to Section 2.11B(d), each Revolving Lender agrees to fund its Pro Rata Share of any Canadian Revolving Loan deemed made pursuant to Section 2.11B(d) on the same terms and conditions as if Canadian Borrower had requested the amount thereof as a Canadian Revolving Loan and Agent shall promptly pay to Canadian Issuing Lender the amounts so received by it from the Revolving Lenders.  By the issuance of a Canadian Letter of Credit or Canadian Reimbursement Undertaking (or an amendment, renewal, or extension of a Canadian Letter of Credit Canadian Reimbursement Undertaking) and without any further action on the part of Canadian Issuing Lender or the Revolving Lenders, Canadian Issuing Lender shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Canadian Letter of Credit issued by Canadian Issuing Lender and each Canadian Reimbursement Undertaking, in an amount equal to its Pro Rata Share of such Canadian Letter of Credit or Canadian Reimbursement Undertaking, and each such Revolving Lender agrees to pay to Agent, for the account of Canadian Issuing Lender, such Revolving Lender's Pro Rata Share of any Canadian Letter of Credit Disbursement made by Canadian Issuing Lender under the applicable Canadian Letter of Credit or Canadian Reimbursement Undertaking.  In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of Canadian Issuing Lender, such Revolving Lender's Pro Rata Share of each Canadian Letter of Credit Disbursement made by Canadian Issuing Lender and not reimbursed by Canadian Borrower on the date due as provided in Section 2.11B(d), or of any reimbursement payment that is required to be refunded (or that Agent or Canadian Issuing Lender elects, based upon the advice of counsel, to refund) to Canadian Borrower for any reason.  Each Revolving Lender acknowledges and agrees that its obligation to deliver to Agent, for the account of Canadian Issuing Lender, an amount equal to its respective Pro Rata Share of each Canadian Letter of Credit Disbursement pursuant to this Section 2.11B(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of

Default or Default or the failure to satisfy any condition set forth in <u>Section 3</u>. If any such Revolving Lender fails to make available to Agent the amount of such Revolving Lender's Pro Rata Share of a Canadian Letter of Credit Disbursement as provided in this Section, such Revolving Lender shall be deemed to be a Defaulting Lender and Agent (for the account of Canadian Issuing Lender) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)    Canadian Borrower agrees to indemnify, defend and hold harmless each Letter of Credit Related Person (to the fullest extent permitted by law) from and against any Letter of Credit Indemnified Costs, which arise out of or in connection with, or as a result of:

(i)    any Canadian Letter of Credit or any pre-advice of its issuance or Canadian Reimbursement Undertaking;

(ii)    any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Canadian Letter of Credit or Canadian Reimbursement Undertaking;

(iii)    any action or proceeding arising out of, or in connection with, any Canadian Letter of Credit or Canadian Reimbursement Undertaking (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Canadian Letter of Credit or Canadian Reimbursement Undertaking, or for the wrongful dishonor of, or honoring a presentation under, any Canadian Letter of Credit;

(iv)    any independent undertakings issued by the beneficiary of any Canadian Letter of Credit;

(v)    any unauthorized instruction or request made to Canadian Issuing Lender or Canadian Underlying Issuer in connection with any Canadian Letter of Credit or Canadian Reimbursement Undertaking or requested Canadian Letter of Credit or Canadian Reimbursement Undertaking or error in computer or electronic transmission;

(vi)    an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated in connection with any Canadian Letter of Credit or Canadian Reimbursement Undertaking;

(vii)    any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Canadian Letter of Credit proceeds or holder of an instrument or document;

(viii)    the fraud, forgery or illegal action of parties in connection with a Canadian Letter of Credit or Canadian Reimbursement Undertaking other than the Letter of Credit Related Person;

(ix)    Canadian Issuing Lender's or Canadian Underlying Issuer's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation in connection with a Canadian Letter of Credit; or

(x)      the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person related to a Canadian Letter of Credit or Canadian Reimbursement Undertaking;

in each case, including that result from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  Canadian Borrower hereby agrees to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.11B(f).  If and to the extent that the obligations of Canadian Borrower under this Section 2.11B(f) are unenforceable for any reason, Canadian Borrower agrees to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable law.   This indemnification provision shall survive termination of this Agreement and all Canadian Letters of Credit and Canadian Reimbursement Undertaking.

(g)      The liability of Canadian Issuing Lender (or any other Letter of Credit Related Person) under, in connection with or arising out of any Canadian Letter of Credit (or pre-advice) or Canadian Reimbursement Undertaking, regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrowers that are caused directly by Canadian Issuing Lender's gross negligence or willful misconduct in (i) honoring a presentation under a Canadian Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Canadian Letter of Credit, (ii) failing to honor a presentation under a Canadian Letter of Credit that strictly complies with the terms and conditions of such Canadian Letter of Credit or (iii) retaining Drawing Documents presented under a Canadian Letter of Credit.  Each Canadian Issuing Lender and Canadian Underlying Issuer shall be deemed to have acted with due diligence and reasonable care if such Person's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.  Canadian Borrower's aggregate remedies against Canadian Issuing Lender and any other Letter of Credit Related Person for wrongfully honoring a presentation under any Canadian Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Canadian Borrower to Canadian Issuing Lender in respect of the honored presentation in connection with such Canadian Letter of Credit under Section 2.11B(d), plus interest at the rate then applicable to Canadian Revolving Loans that are Base Rate Loans hereunder.  Canadian Borrower shall take action to avoid and mitigate the amount of any damages claimed against Canadian Issuing Lender or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Canadian Letters of Credit.  Any claim by Canadian Borrower under or in connection with any Canadian Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Canadian Borrower as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had Canadian Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Canadian Issuing Lender or Canadian Underlying Issuer to effect a cure.

(h)    Canadian Borrower is responsible for preparing or approving the final text of the Canadian Letter of Credit as issued by Canadian Issuing Lender or Canadian Underlying Issuer, irrespective of any assistance Canadian Issuing Lender or Canadian Underlying Issuer may provide such as drafting or recommending text or by Canadian Issuing Lender's or Canadian Underlying Issuer's use or refusal to use text submitted by Canadian Borrower.    Canadian Borrower is solely responsible for the suitability of the Canadian Letter of Credit for Canadian Borrower's purposes.    With respect to any Canadian Letter of Credit containing an "automatic amendment" to extend the expiration date of such Canadian Letter of Credit, each of Canadian Issuing Lender and Canadian Underlying Issuer, in its sole and absolute discretion, may give notice of nonrenewal of such Canadian Letter of Credit only if such automatic extension would result in an expiry date of such Letter of Credit beyond the Maturity Date, and, if Canadian Borrower does not at any time want such Canadian Letter of Credit to be renewed, Canadian Borrower will so notify Agent and Canadian Issuing Lender at least fifteen (15) calendar days before Canadian Issuing Lender or Canadian Underlying Issuer is required to notify the beneficiary of such Canadian Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Canadian Letter of Credit.

(i)    Canadian Borrower's reimbursement and payment obligations under this Section 2.11B are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)    any lack of validity, enforceability or legal effect of any Canadian Letter of Credit, any Canadian Reimbursement Undertaking or this Agreement or any term or provision therein or herein;

(ii)    payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Canadian Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Canadian Letter of Credit;

(iii)    Canadian Issuing Lender or any of its branches or Affiliates or Canadian Underlying Issuer or any of its branches or Affiliates being the beneficiary of any Canadian Letter of Credit;

(iv)    Canadian Issuing Lender or any correspondent or Canadian Underlying Issuer or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Canadian Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Canadian Letter of Credit;

(v)    the existence of any claim, set-off, defense or other right that Parent or any of its Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, Canadian Issuing Lender, Canadian Underlying Issuer or any other Person;

-49-

(vi)    any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this <u>Section 2.11B(i)</u>, constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Canadian Letter of Credit, whether against Canadian Issuing Lender, Canadian Underlying Issuer, the beneficiary or any other Person; or

(vii)    the fact that any Default or Event of Default shall have occurred and be continuing;

<u>provided</u>, <u>however</u>, that subject to <u>Section 2.11B(g)</u> above, the foregoing shall not release Canadian Issuing Lender or Canadian Underlying Issuer from such liability to Canadian Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Canadian Issuing Lender or Canadian Underlying Issuer following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Canadian Borrower to Canadian Issuing Lender arising under, or in connection with, this <u>Section 2.11B</u> or any Canadian Letter of Credit or Canadian Reimbursement Undertaking or its correspondent.

(j)    Without limiting any other provision of this Agreement and subject to <u>Section 2.11A(g)</u> and <u>Section 2.11B(g)</u> above, Canadian Issuing Lender and each other Letter of Credit Related Person (if applicable) shall not be responsible to Canadian Borrower for, and Canadian Issuing Lender's rights and remedies against Canadian Borrower and the obligation of Canadian Borrower to reimburse Canadian Issuing Lender for each drawing under each Canadian Letter of Credit and each Canadian Reimbursement Undertaking shall not be impaired by:

(i)    honor of a presentation under any Canadian Letter of Credit that on its face substantially complies with the terms and conditions of such Canadian Letter of Credit, even if the Canadian Letter of Credit requires strict compliance by the beneficiary;

(ii)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Canadian Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Canadian Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Canadian Issuing Lender's or Canadian Underlying issuer's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Canadian Letter of Credit);

(v)    acting upon any instruction or request relative to a Canadian Letter of Credit or requested Canadian Letter of Credit that each of Canadian Issuing Lender and Canadian Underlying Issuer in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Canadian Borrower;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and Canadian Borrower or any of the parties to the underlying transaction to which the Canadian Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)    payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Canadian Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Canadian Issuing Lender or Canadian Underlying Issuer has issued, confirmed, advised or negotiated such Canadian Letter of Credit, as the case may be;

(xi)    honor of a presentation after the expiration date of any Canadian Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Canadian Issuing Lender or Canadian Underlying Issuer, as applicable, if subsequently Canadian Issuing Lender or Canadian Underlying Issuer, as applicable, or any court or other finder of fact determines such presentation should have been honored;

(xii)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by Canadian Issuing Lender or Canadian Underlying Issuer, as applicable, to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)    Canadian Borrower shall pay immediately upon demand to Agent for the account of Canadian Issuing Lender as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Canadian Loan Account pursuant to the provisions of Section 2.6(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.11B(k)): (i) a fronting

fee which shall be imposed by Canadian Issuing Lender upon the issuance of each Canadian Letter of Credit of 0.125% per annum of the face amount thereof, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, Canadian Issuing Lender or Canadian Underlying Issuer, or by any adviser, confirming institution or entity or other nominated person, relating to Canadian Letters of Credit, at the time of issuance of any Canadian Letter of Credit and upon the occurrence of any other activity with respect to any Canadian Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations). Notwithstanding the foregoing, if Canadian Issuing Lender is a Person other than WF Canada, all fronting fees payable in respect of Canadian Letters of Credit issued by such Canadian Issuing Lender shall be paid by Canadian Borrower immediately upon demand directly to such Canadian Issuing Lender for its own account. Canadian Borrower shall also pay directly to Canadian Underlying Issuer all of its fees, commissions and charges.

(l)     If by reason of (x) any Change in Law, or (y) compliance by Canadian Issuing Lender or any other member of the Lender Group or Canadian Underlying Issuer with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Canadian Letter of Credit or any Canadian Reimbursement Undertaking issued or caused to be issued hereunder or hereby, or

(ii)     there shall be imposed on Canadian Issuing Lender or any other member of the Lender Group or Canadian Underlying Issuer any other condition regarding any Canadian Letter of Credit or any Canadian Reimbursement Undertaking,

and the result of the foregoing is to increase, directly or indirectly, the cost to Canadian Issuing Lender or any other member of the Lender Group or Canadian Underlying Issuer of issuing, making, participating in, or maintaining any Canadian Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Canadian Borrower, and Canadian Borrower shall pay on demand, such amounts as Agent may specify to be necessary to compensate Canadian Issuing Lender or any other member of the Lender Group or Canadian Underlying Issuer for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Canadian Revolving Loans that are Base Rate Loans hereunder. The determination by Agent of any amount due pursuant to this Section 2.11B(l), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m)     Unless otherwise expressly agreed by Canadian Issuing Lender and Canadian Borrower when a Canadian Letter of Credit is issued, (i) the rules of the ISP and UCP 600 shall apply to each standby Canadian Letter of Credit, and (ii) the rules of UCP 600 shall apply to each commercial Canadian Letter of Credit.

(n)   In the event of a direct conflict between the provisions of this <u>Section 2.11B</u> and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.11B</u> shall control and govern.

(q)   <u>Schedule 2.11(B)</u> hereto contains a list of all Canadian Letters of Credit outstanding on the Filing Date pursuant to the Existing Credit Agreement.  For the period from and after the effective date of the Interim Financing Order, subject to the Canadian Court granting the Canadian Interim DIP Recognition Order, each such Canadian Letter of Credit set forth on <u>Schedule 2.11(B)</u>, including any extension or renewal thereof, that remains outstanding on the effective date of the Interim Financing Order, subject to the Canadian Court granting the Canadian Interim DIP Recognition Order (each, as amended from time to time in accordance with the terms thereof and hereof, an "<u>Existing Canadian Letter of Credit</u>") shall be deemed Canadian Letters of Credit re-issued hereunder for the account of Borrowers, for all purposes of this Agreement, including, without limitation, calculations of Canadian Availability, the Canadian Borrowing Base, Canadian Letter of Credit Usage and all other fees and expenses relating to the Canadian Letters of Credit (including any related indemnification obligations).  Canadian Issuing Lender hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the issuers of the Existing Canadian Letters of Credit.  Borrowers agree to execute and deliver such documentation, if any, requested by Agent, or a Canadian Issuing Lender to evidence, record, or further the foregoing deemed re-issuance.

(r)   The expiration date of each Canadian Letter of Credit, other than the Existing Canadian Letters of Credit, shall be on a date that is not later than fifteen (15) days prior to the Maturity Date unless Borrower provides cash collateral for the obligations and Canadian Reimbursement Undertakings associated with such Canadian Letters of Credit in the manner set forth in <u>Section 2.4(h)</u> hereof; <u>provided</u>, that a Canadian Letter of Credit may provide for automatic extensions of its expiration date for one or more successive periods of up to twelve (12) months for each period; <u>provided</u>, <u>further</u>, that the applicable Canadian Issuing Lender has the right to terminate such Canadian Letter of Credit on each such expiration date and no renewal term may extend the term of the Canadian Letter of Credit to a date that is later than the fifteenth (15th) day prior to the Maturity Date unless Borrowers provide cash collateral for the obligations and Canadian Reimbursement Undertakings associated with such Canadian Letters of Credit in the amount set forth in <u>Section 2.4(h)</u>.  Upon direction by Agent or Required Lenders, the applicable Canadian Issuing Lender shall not renew any such Canadian Letter of Credit at any time during the continuance of an Event of Default; <u>provided</u>, that in the case of a direction by Agent or Required Lenders, the Canadian Issuing Lender receives such directions prior to the date notice of non-renewal is required to be given by the Canadian Issuing Lender and the Canadian Issuing Lender has had a reasonable period of time to act on such notice.

2.12.   **Non-Base Rate Option**.

(a)   **Interest and Interest Payment Dates**.  In lieu of having interest charged at the rate based upon the Base Rate, Borrowers shall have the option, subject to <u>Section 2.12(b)</u> below (the "<u>Non-Base Rate Option</u>") to have interest on all or a portion of the Revolving Loans made in Dollars be charged (whether at the time when made (unless otherwise provided herein),

upon conversion from a Base Rate Loan to a Non-Base Rate Loan, or upon continuation of a Non-Base Rate Loan as a Non-Base Rate Loan) at a rate of interest based upon the US LIBOR Rate (provided, that all Revolving Loans for the account of Canadian Borrower in Canadian Dollars shall be Base Rate Loans).  Interest on Non-Base Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; provided, that, subject to the following clauses (ii) and (iii), in the case of any Interest Period greater than 3 months in duration, interest shall be payable at 3 month intervals after the commencement of the applicable Interest Period and on the last day of such Interest Period), (ii) the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof.  With respect to US Revolving Loans, on the last day of each applicable Interest Period, unless US Borrowers have properly exercised the Non-Base Rate Option with respect thereto, the interest rate applicable to such Non-Base Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder.  With respect to Canadian Revolving Loans, on the last day of each applicable Interest Period, unless Canadian Borrower has properly exercised the Non-Base Rate Option with respect thereto, the interest rate applicable to such Non-Base Rate Loan automatically shall convert to the Base Rate then applicable to Canadian Revolving Loans.  At any time that an Event of Default has occurred and is continuing, at the written election of Agent or the Required Lenders, Borrowers no longer shall have the option to request that Revolving Loans bear interest at a rate based upon the Non-Base Rate.

(b)    **Non-Base Election**.

(i)    Borrowers may, at any time and from time to time, so long as Borrowers have not received a notice from Agent (which notice Agent may elect to give or not give in its discretion unless Agent is directed to give such notice by the Required Lenders, in which case, it shall give the notice to Borrowers), after the occurrence and during the continuance of an Event of Default, exercising Lenders' rights to terminate the right of Borrowers to exercise the Non-Base Rate Option during the continuance of such Event of Default, elect to exercise the Non-Base Rate Option by notifying Agent prior to 11:00 a.m. at least three Business Days prior to the commencement of the proposed Interest Period (the "Non-Base Rate Deadline").  The election of the Non-Base Rate Option by US Borrowers or Canadian Borrower, as applicable, for a permitted portion of its Revolving Loans and an Interest Period pursuant to this Section shall be made by delivery to Agent of a Non-Base Rate Notice received by Agent before the Non-Base Rate Deadline, or by telephonic notice received by Agent before the Non-Base Rate Deadline (to be confirmed by delivery to Agent of a Non-Base Rate Notice received by Agent prior to 5:00 p.m. on the same day).  Promptly upon its receipt of each such Non-Base Rate Notice, Agent shall provide a copy thereof to each of the affected Lenders.  Notwithstanding the foregoing, no such Non-Base Rate election shall be permitted with respect to Canadian Revolving Loans made in Canadian Dollars.

(ii)    Each Non-Base Rate Notice shall be irrevocable and binding on Borrowers.  In connection with each Non-Base Rate Loan, US Borrowers, if such Non-Base Rate Loan is a US Revolving Loan, or Canadian Borrower, if such Non-Base Rate Loan is a Canadian Revolving Loan, shall indemnify, defend, and hold Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Agent or any Lender as a result of (A) the payment or required assignment of any principal of such Non-Base Rate Loan other than on the last day of

an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of such Non-Base Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any Non-Base Rate Loan on the date specified in such Non-Base Rate Notice delivered pursuant hereto (such losses, costs, or expenses, "Funding Losses").  A certificate of Agent or a Lender delivered to Borrowers setting forth in reasonable detail any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.12 shall be conclusive absent manifest error.  US Borrowers, if such Non-Base Rate Loan is a US Revolving Loan, or Canadian Borrower, if such Non-Base Rate Loan is a Canadian Revolving Loan, shall pay such amount to Agent or the Lender, as applicable, within thirty (30) days of the date of its receipt of such certificate.

(iii)    Unless Agent, in its sole discretion, agrees otherwise, Borrowers shall have not more than eight Non-Base Rate Loans in effect at any given time.  Borrowers may only exercise their Non-Base Rate Option for proposed Non-Base Rate Loans of at least $500,000.

(c)    **Conversion**.  Borrowers may convert Non-Base Rate Loans to Base Rate Loans at any time; provided, that in the event that Non-Base Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any prepayment through the required application by Agent of any payments or proceeds of Collateral in accordance with Section 2.4(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, Borrowers shall indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with Section 2.12 (b)(ii).

(d)    **Special Provisions Applicable to Non-Base Rate**.

(i)    The applicable Non-Base Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any Eurodollar deposits, Canadian Dollar deposits or increased costs, in each case, due to a Change in Law (other than changes in laws relative to Taxes, which shall be governed by Sections 16) occurring subsequent to the commencement of the then applicable Interest Period, including any changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the applicable Non-Base Rate.  In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (A) require such Lender to furnish to Borrowers a statement setting forth in reasonable detail the basis for adjusting such Non-Base Rate and the method for determining the amount of such adjustment, or (B) repay the Non-Base Rate Loans of such Lender with respect to which such adjustment is made (together with any amounts due under Section 2.12(b)(ii)).

(ii)    In the event that any change in market conditions or any Change in Law shall at any time after the date hereof in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Non-Base Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the Non-Base Rate, such

Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (y) in the case of any Non-Base Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Non-Base Rate Loans, and interest upon the Non-Base Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrowers shall not be entitled to elect their Non-Base Rate Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(e)   **No Requirement of Matched Funding**.   Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire Eurodollar or Canadian Dollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the applicable Non-Base Rate.

2.13.   **Capital Requirements**.

(a)   If, after the date hereof, Issuing Lender or any Lender determines that (i) any Change in Law regarding capital or reserve requirements for banks or bank holding companies, or (ii) compliance by Issuing Lender or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity (whether or not having the force of law), has the effect of reducing the return on Issuing Lender's, such Lender's, or such holding companies' capital as a consequence of Issuing Lender's or such Lender's commitments hereunder to a level below that which Issuing Lender, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration Issuing Lender's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy or liquidity and assuming the full utilization of such entity's capital) by any amount deemed by Issuing Lender or such Lender to be material, then Issuing Lender or such Lender may notify Borrowers and Agent thereof.  Following receipt of such notice, Borrowers agree to pay Issuing Lender or such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within thirty (30) days after presentation by Issuing Lender or such Lender of a statement in the amount and setting forth in reasonable detail Issuing Lender's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, Issuing Lender or such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of Issuing Lender or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of Issuing Lender's or such Lender's right to demand such compensation; provided that Borrowers shall not be required to compensate Issuing Lender or a Lender pursuant to this Section for any reductions in return incurred more than one hundred eighty (180) days prior to the date that Issuing Lender or such Lender notifies Borrowers of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further that if such claim arises by reason of the Change in Law that is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)   If Issuing Lender or any Lender requests additional or increased costs referred to in Section 2.11A(l), Section 2.11(B)(1) or Section 2.12(d)(i) or amounts under

Section 2.13(a) or sends a notice under Section 2.12(d)(ii) relative to changed circumstances (such Issuing Lender or Lender, an "Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.11A(l), Section 2.11(B)(1), Section 2.12(d)(i) or Section 2.13(a), as applicable, or would eliminate the illegality or impracticality of funding or maintaining Non-Base Rate Loans and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrowers agree to pay all reasonable and documented out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.11A(l), Section 2.11(B)(1), Section 2.12(d)(i) or Section 2.13(a), as applicable, or to enable Borrowers to obtain Non-Base Rate Loans, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.11A(l), Section 2.11(B)(1), Section 2.12(d)(i) or Section 2.13(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.11A(l), Section 2.11(B)(1), Section 2.12(d)(i) or Section 2.13(a), as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain Non-Base Rate Loans, may designate a different Issuing Lender or substitute a Lender, in each case, reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender (and its Affiliates) and such Affected Lender's (and its Affiliates') commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender (and its Affiliates) shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Lender" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender (and its Affiliates) shall cease to be "Issuing Lender" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)    Notwithstanding anything herein to the contrary, the protection of Sections 2.11A(l), 2.11(B)(1), 2.12(d), and 2.13 shall be available to Issuing Lender and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the Change in Law which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith. Notwithstanding any other provision herein, neither Issuing Lender nor any Lender shall demand compensation pursuant to this Section 2.13 if it shall not at the time be the general policy or practice of Issuing Lender or such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

2.14.    **[Reserved]**.

2.15.    **Joint and Several Liability of Borrowers**.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by

the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(d)    The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.15(d)) or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Revolving Loans or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.15, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain

unsatisfied, the Obligations of each Borrower under this <u>Section 2.15</u> shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this <u>Section 2.15</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(f)    Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)    The provisions of this <u>Section 2.15</u> are made for the benefit of Agent, each member of the Lender Group, each Bank Product Provider, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any member of the Lender Group, any Bank Product Provider, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 2.15</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this <u>Section 2.15</u> will forthwith be reinstated in effect, as though such payment had not been made.

(h)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any member of the Lender Group hereunder or under any of the Bank Product Agreements are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)    Notwithstanding anything to the contrary in the foregoing, no Borrower that is not a Qualified ECP Guarantor shall be jointly and severally liable for any Excluded Swap Obligations in respect of such Borrower.

(j)    Each Borrower that is a Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower to guaranty and otherwise honor all Obligations in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 2.15(j) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 2.15(j), or otherwise under the Loan Documents, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor intends that this Section 2.15(j) constitute, and this Section 2.15(j) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Grantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

2.16.    **Currencies**. The US Revolving Loans and other US Obligations (unless such other US Obligations expressly provide otherwise) shall be made and repaid in Dollars. The Canadian Revolving Loans and other Canadian Obligations (unless such other Canadian Obligations expressly provide otherwise) shall be made in Dollars or Canadian Dollars, as selected by Administrative Borrower as provided herein. All such Canadian Obligations denominated in Dollars shall be repaid in Dollars and all such Canadian Obligations denominated in Canadian Dollars shall be repaid in Canadian Dollars.

2.17.    **Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of Interest**. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, solely to the extent that: (i) a court of competent jurisdiction finally determines that the calculation or determination of interest payable by Canadian Borrower in respect of the Obligations pursuant to this Agreement and the other Loan Documents shall be governed by the laws of any province of Canada and the federal laws of Canada; or (ii) the Interest Act (Canada) otherwise applies:

(a)    whenever interest payable by Canadian Borrower is calculated on the basis of a period which is less than the actual number of days in a calendar year, each rate of interest determined pursuant to such calculation is, for the purposes of the *Interest Act* (Canada), equivalent to such rate multiplied by the actual number of days in the calendar year in which such rate is to be ascertained and divided by the number of days used as the basis of such calculation;

(b)    in no event shall the aggregate "interest" (as defined in Section 347 of the *Criminal Code*, R.S.C. 1985, c. C-46, as the same shall be amended, replaced or re-enacted from time to time (the "Criminal Code Section")) payable (whether by way of payment, collection or demand) by Canadian Borrower to Agent or any Lender under this Agreement or any other Loan Document exceed the effective annual rate of interest on the "credit advanced" (as defined in that section) under this Agreement or such other Loan Document lawfully permitted under that

-60-

section and, if any payment, collection or demand pursuant to this Agreement or any other Loan Document in respect of "interest" (as defined in that section) is determined to be contrary to the provisions of that section and the amount of such payment or collection shall be refunded by Agent and Lenders to Canadian Borrower with such "interest" deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by the Criminal Code Section to result in a receipt by Agent or such Lender of interest at a rate not in contravention of the Criminal Code Section, such adjustment to be effected, to the extent necessary, as follows: firstly, by reducing the amounts or rates of interest required to be paid to Agent or that Lender; and then, by reducing any fees, charges, expenses and other amounts required to be paid to the affected Agent or Lender which would constitute "interest".  Notwithstanding the foregoing, and after giving effect to all such adjustments, if Agent or any Lender shall have received an amount in excess of the maximum permitted by the Criminal Code Section, then Canadian Borrower shall be entitled, by notice in writing to Agent or the affected Lender, to obtain reimbursement from Agent or that Lender in an amount equal to such excess.  For the purposes of this Agreement and each other Loan Document to which Canadian Borrower is a party, the effective annual rate of interest payable by Canadian Borrower shall be determined in accordance with generally accepted actuarial practices and principles over the term of the loans on the basis of annual compounding for the lawfully permitted rate of interest and, in the event of dispute, a certificate of a Fellow of the Institute of Actuaries appointed by Agent for the account of Canadian Borrower will be conclusive for the purpose of such determination in the absence of evidence to the contrary;

(c)    all calculations of interest payable by Canadian Borrower under this Agreement or any other Loan Document are to be made on the basis of the nominal interest rate described herein and therein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest.  The parties acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest;

(d)    any provision of this Agreement that would oblige Canadian Borrower to pay any fine, penalty or rate of interest on any arrears of principal or interest secured by a mortgage on real property or hypothec on immovables that has the effect of increasing the charge on arrears beyond the rate of interest payable on principal money not in arrears shall not apply to Canadian Borrower, which shall be required to pay interest on money in arrears at the same rate of interest payable on principal money not in arrears; and

(e)    if there is a conflict, inconsistency, ambiguity or difference between any provision of this Section 2.17 and Section 2.6(f) vis a vis Canadian Borrower then the provisions of this Section 2.17 shall prevail and be paramount.

2.18.    **Existing Hedging Obligations and other Existing Bank Product Obligations**.  All Existing Secured Obligations under Existing Hedge Agreements and all other "Bank Product Obligations" (as defined in the Existing Credit Agreement) shall be deemed to have been incurred pursuant hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof and shall constitute Canadian Bank Product Obligations or US Bank Product Obligations hereunder, as applicable (to constitute Canadian

Bank Product Obligations to the extent constituting "Canadian Bank Product Obligations" under the Existing Credit Agreement, and otherwise to constitute US Bank Product Obligations). Each Hedge Provider and each other Bank Product Provider hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the "Hedge Provider " (as defined in the Existing Credit Agreement) or other "Bank Product Provider" (as defined in the Existing Credit Agreement) in accordance with and pursuant to the Existing Credit Agreement and this Agreement, as applicable. Borrowers agree to execute and deliver such documentation, if any, requested by Agent, a Hedge Provider or other Bank Product Provider to evidence, record, or further the foregoing deemed re-incurrence.

2.19.    **Superpriority**. Except as set forth herein or in the Financing Order or the DIP Recognition Order, no other claim having a priority superior or pari passu to that granted to the Agent and the Lenders by the Financing Order shall be granted or approved while any Obligations under this Agreement remain outstanding. Except for the Carveout and subject to entry of the Final Financing Order and the DIP Recognition Order, no costs or expenses of administration shall be imposed against the Agent, the Lenders or any of the Collateral or any of the Existing Agent, the Existing Lenders or the Collateral (as defined in the Existing Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent, Lenders or any of the Collateral or any of the Existing Agent or the Existing Lenders.

2.20.    **Waiver of any Priming Rights**. On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers and the Guarantors hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, in each case other than as contemplated herein or by the Term Loan Documents.

3.    **CONDITIONS; TERM OF AGREEMENT**.

3.1.    **Conditions Precedent to the Effectiveness of this Agreement**. The effectiveness of this Agreement is subject to the fulfillment of each of the conditions precedent set forth on Schedule 3.1 (the making of the initial extension of credit hereunder by Lenders being conclusively deemed to be its satisfaction or waiver of the conditions precedent).

3.2.    **Conditions Precedent to all Extensions of Credit**. The obligation of the Lender Group (or any member thereof) to make any Revolving Loans hereunder (or to extend any other credit hereunder) at any time (other than the Closing Date, except with respect to clause (f) below) shall be subject to the following conditions precedent:

(a)    the representations and warranties of Parent or its Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent

that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)    no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower, Agent, or any Lender;

(d)    no Material Adverse Effect shall have occurred since the Closing Date;

(e)    with respect to any Loan or Letter of Credit to be made or issued forty (40) days from the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order and within three Business Days after entry of such Final Financing Order the Canadian Court shall have issued the Canadian Final DIP Recognition Order, which Final Financing Order and Canadian Final DIP Recognition Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of Agent, and

(f)    with respect to the making of any Canadian Revolving Loan or other extension of credit to Canadian Borrower hereunder, the Canadian Court shall have entered the Canadian Initial Recognition Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order, which orders (i) shall have been issued by the Canadian Court upon an application or motion of the Foreign Representative satisfactory in form and substance to Agent in its sole discretion and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed (other than in respect of the Canadian Interim DIP Recognition Order by the Canadian Final DIP Recognition Order); and, if the Canadian Interim DIP Recognition Order is the subject of a pending objection, appeal or motion for reconsideration in any respect (other than in respect of the Canadian Interim DIP Recognition Order by the Canadian Final DIP Recognition Order), neither the Canadian Interim DIP Recognition Order, nor the making of the Loans or the performance by the Loan Parties of any of the Obligations shall be the subject of a presently effective stay, and (iii) shall otherwise be in form and substance satisfactory Agent.

3.3.    **Maturity**.  Unless otherwise terminated earlier in accordance with <u>Section 3.5</u> hereof, this Agreement shall continue in full force and effect for a term ending on the Maturity Date.

3.4.    **Effect of Maturity**.  On the Maturity Date, all commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all of the Obligations immediately shall become due and payable without notice or demand and Borrowers shall be required to repay all of the Obligations in full.  No termination of the obligations of the

Lender Group (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated.  When all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will promptly, at Borrowers' sole expense and without representation or warranty, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent, and subject to any applicable intercreditor agreement, return any possessory collateral then held in connection therewith.

3.5.    **Early Termination by Borrowers**.  Borrowers have the option, at any time upon five Business Days prior written notice to Agent (<u>provided</u>, that such notice may be withdrawn by Borrowers at any time prior to the date specified in such notice for such termination of Commitments), to terminate this Agreement and terminate the Commitments hereunder by repaying to Agent all of the Obligations in full.  The foregoing notwithstanding, (a) Borrowers may rescind termination notices relative to proposed payments in full of the Obligations with the proceeds of third party Indebtedness or from a sale if the closing for such issuance, incurrence or sale does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (b) Borrowers may extend the date of termination at any time with the consent of Agent (which consent shall not be unreasonably withheld, conditioned or delayed).

4.    **REPRESENTATIONS AND WARRANTIES**.

In order to induce the Lender Group to enter into this Agreement, each of Parent and each Borrower makes at and as of the Closing Date and at and as of the date of the making of each Revolving Loan (or other extension of credit) made after the Closing Date, each of the following representations and warranties to the Lender Group, which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date and each date thereafter of the making of each Revolving Loan (or other extension of credit), as though made on and as of the date of such Revolving Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1.    **Due Organization and Qualification; Subsidiaries**.

(a)    Each Loan Party (i) is duly organized or incorporated and existing and in good standing (or, if such jurisdiction does not provide for good standing status, the equivalent

status provided for in such jurisdiction) under the laws of the jurisdiction of its organization or incorporation, (ii) is qualified or registered to do business in any state, province or territory where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Other than as described on <u>Schedule 4.1(b)</u>, as of the Closing Date, there are no subscriptions, options, warrants, or calls relating to any shares of Parent's Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.  As of the Closing Date, other than pursuant to any equity compensation plan or arrangement benefiting, or pursuant to any agreement with, any current or former employer, officer, director or consultant of any Loan Party, Parent is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)    As of the Closing Date, set forth on <u>Schedule 4.1(c)</u> is a complete and accurate list of Parent's Subsidiaries, showing:  (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned by Parent or a Subsidiary of Parent.  All of the outstanding Equity Interests of each such Subsidiary have been validly issued and are fully paid and non-assessable, to the extent applicable.

(d)    As of the Closing Date, except as set forth on <u>Schedule 4.1(d),</u> there are no subscriptions, options, warrants, or calls relating to any shares of Parent's Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.

4.2.    **<u>Due Authorization; No Conflict</u>**.

(a)    Subject to entry of the Financing Order, as to each Loan Party and, solely with respect to the performance by the Canadian Borrower under the Loan Documents, subject to the entry of the Canadian Interim DIP Recognition Order, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)    Subject to entry of the Financing Order, as to each Loan Party and solely with respect to the performance by the Canadian Borrower under the Loan Documents, subject to the entry of the Canadian Interim DIP Recognition Order, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, provincial, foreign or local law or regulation applicable to any Loan Party or its Subsidiaries or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, (ii) violate the Governing Documents of any Loan Party or its Subsidiaries, (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any agreement of any Loan Party or its Subsidiaries where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iv) result in or require

the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (v) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3.    **Governmental Consents**.  Subject to entry of the Financing Order and the DIP Recognition Order, the execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices or actions (i) that have been obtained and that are in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Closing Date, or (ii) are necessary or advisable in connection with filing Agent's Liens.

4.4.    **Binding Obligations; Perfected Liens**.

(a)    Subject to entry of the Financing Order, each Loan Document has been duly executed and delivered by each Loan Party and, solely with respect to the performance by the Canadian Borrower under the Loan Documents, subject to the entry of the Canadian Interim DIP Recognition Order, that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms.

(b)    Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order and the DIP Recognition Order, Agent's Liens are validly created and the Lien created by the Security Agreements shall constitute a perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Collateral, in each case subject to no Liens other than Permitted Liens.

(c)    The entry of the Financing Order and the issuance of the DIP Recognition Order is effective to create in favor of Agent, for the benefit of the Lenders, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and Section 11.2 of the CCAA, subject to the Intercreditor Agreement and (ii) an allowed administrative expense in each of the Bankruptcy Cases and the Recognition Proceedings having priority under Section 364(c)(1) of the Bankruptcy Code or under the CCAA over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code and the applicable sections of the CCAA), subject only to the Permitted Priority Liens and the Carveout (the "Superpriority Claims").

(d)    Except for the Financing Order and the DIP Recognition Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for either (x) the pledge or grant by Parent or any of its Subsidiaries of the Liens purported to be created in favor of Agent pursuant to this Agreement or any of the other

Loan Documents or (y) the exercise by Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to this Agreement, any of the other Loan Documents or created or provided for by applicable law), except as may be required in connection with the disposition of any pledged Collateral by laws generally affecting the offering and sale of securities.

4.5.     **Title to Assets; No Encumbrances**.  Each Loan Party has (a) good and sufficient legal title (in the case of any fee interest in Real Property), (b) valid leasehold interest in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property) all of its material personal property assets, in each case, free and clear of Liens except for Permitted Liens and, in the case of Real Property, minor defects in title that do not materially interfere with such Loan Party's ability to conduct its business or to utilize such assets for their intended purposes.

4.6.     **Litigation**.  Other than the filing, commencement and continuation of the Bankruptcy Cases and the Recognition Proceedings and any litigation resulting therefrom, there are no actions, suits, or proceedings pending or, to the actual knowledge of Borrowers threatened in writing against a Loan Party or any of its Subsidiaries that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

4.7.     **Compliance with Laws**.  Except as otherwise permitted by the Bankruptcy Code, the CCAA or pursuant to any order of the Bankruptcy Court or the Canadian Court, which order shall be in form and substance acceptable to the Agent, no Loan Party nor any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.8.     **No Material Adverse Effect**.   All financial statements (other than projections, budgets, other forecasts and comparisons) relating to Loan Parties and their Subsidiaries that have been delivered by any Loan Party to the Lender Group have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, Loan Parties' and their Subsidiaries' (taken as a whole) financial condition as of the date thereof and results of operations for the period then ended.  Except the filing, commencement and continuation of the Bankruptcy Cases and the Recognition Proceedings and any litigation resulting therefrom, there has not been a Material Adverse Effect with respect to Loan Parties and their Subsidiaries since the Closing Date.

4.9.     **No Fraudulent Conveyance**.  No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.10.    **Employee Benefits**.

(a)    Except as set forth on Schedule 4.10, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any Pension Plan or Multiemployer Plan.

(b)    Each Loan Party has complied in all material respects with ERISA, the IRC and all applicable laws regarding each Employee Benefit Plan, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(c)    Each Employee Benefit Plan is, and has been, maintained in substantial compliance with ERISA, the IRC, all applicable laws and the terms of each such Employee Benefit Plan, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(d)    Except as could not reasonably be expected to result in a Material Adverse Effect, each Employee Benefit Plan that is intended to qualify under Section 401(a) of the IRC has received a favorable determination letter from the Internal Revenue Service or an application for such letter is currently being processed by the Internal Revenue Service, and nothing has occurred which could reasonably be expected to prevent, or cause the loss of, such qualification.

(e)    Except as could not reasonably be expected to result in a Material Adverse Effect, no liability to the PBGC (other than for the payment of current premiums which are not past due) by any Loan Party or ERISA Affiliate has been incurred or is expected by any Loan Party or ERISA Affiliate to be incurred with respect to any Pension Plan.

(f)    Except as could not reasonably be expected to result in a Material Adverse Effect, no Notification Event exists or has occurred in the past six (6) years.

(g)    Except as could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or ERISA Affiliate has provided any security under Section 436 of the IRC.

(h)    Except as set forth on Schedule 4.10, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any Canadian Pension Plan. No Loan Party, nor any of their Subsidiaries, maintains or contributes to any Canadian Defined Benefit Plan. Except as set forth on Schedule 4.10, as of the Closing Date, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any material Canadian Benefits Plan. Each Loan Party has materially complied with the *Income Tax Act* (Canada) and all applicable laws regarding each Canadian Pension Plan or Canadian Benefits Plan. Each Canadian Pension Plan or Canadian Benefits Plan is, and has been maintained in compliance to the *Income Tax Act* (Canada), all applicable laws and the terms of each such Canadian Benefits Plan. No Loan Party, nor any of their Subsidiaries, has any material liability for any Canadian Pension Plan or Canadian Benefits Plan which has been discontinued.

4.11.    **Environmental Condition**. Except as set forth on Schedule 4.11, (a) to each Borrower's knowledge, none of Loan Parties' or their Subsidiaries' properties has ever been used by Loan Parties, their Subsidiaries, or, to each Borrower's knowledge, by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any

Hazardous Materials, where such use, disposal, production, storage, handling, treatment, release or transport was in violation of any applicable Environmental Law or resulted in an Environmental Action, except as would not reasonably be expected to result in a Material Adverse Effect, (b) to each Borrower's knowledge, none of Loan Parties' nor their Subsidiaries' properties or assets has ever been designated or identified by a Governmental Authority pursuant to RCRA, CERCLA or any analogous statute as a Hazardous Materials disposal site or a site that requires Remedial Action, in either case that could reasonably be expected to result in a Material Adverse Effect, (c) no Environmental Lien (other than a Permitted Lien) has attached to any revenues of the Loan Parties or their Subsidiaries or to Real Property owned by the Loan Parties or their Subsidiaries, or, to each Borrower's knowledge, operated, but not owned, by Loan Parties or their Subsidiaries, (d) none of Loan Parties nor any of their Subsidiaries have received a summons, citation, written notice, or directive from the United States Environmental Protection Agency or any other federal (including the federal government of Canada), state or provincial governmental agency concerning any action or omission by any Loan Party or any Subsidiary of a Loan Party resulting in the releasing or disposing of Hazardous Materials into the environment which could reasonably be expected to result in a Material Adverse Effect, (e) each of the Loan Parties, their Subsidiaries, and their respective operations have at all times been in compliance with Environmental Laws, except as would not reasonably be expected to result in a Material Adverse Effect, (f) each of the Loan Parties and their Subsidiaries have obtained all permits, licenses, authorizations and approvals required under Environmental Law for the conduct of their business and operations (collectively, "Environmental Permits"), and are in compliance with the terms and conditions of such Environmental Permits, except as would not reasonably be expected to result in a Material Adverse Effect, and (g) none of the Loan Parties nor any of their Subsidiaries are subject to any Environmental Action or Environmental Liability, except as would not reasonably be expected to result in a Material Adverse Effect.

4.12.    **Complete Disclosure**.  All written factual information (other than projections, budgets, estimates, forward-looking statements, information of a general economic nature, general information about Borrowers' industry or general market data) (when taken as a whole) furnished by or on behalf of Loan Parties in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) in or pursuant to this Agreement, the other Loan Documents, or in connection with any transaction contemplated herein or therein, is (other than the projections, budgets, estimates, forward-looking statements, information of a general economic nature, general information about Borrowers' industry or general market data) (when taken as a whole) and hereafter furnished by or on behalf of Loan Parties or their Subsidiaries in writing to Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified, and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.  The Initial Approved Budget and each Weekly Cash Flow Forecast delivered thereafter are prepared in good faith based upon estimates and assumptions believed by management of the Borrowers to be reasonable and fair in light of current conditions and facts known to the Borrowers at the time delivered (it being understood that such Approved Budget and the Weekly Cash Flow Forecasts and the assumptions on which they were based, may or may not prove to be correct).

4.13.    **Patriot Act**.

(a)    To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").  No part of the proceeds of the loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b)    Canadian Anti-Money Laundering & Anti-Terrorism Compliance.  The Lenders may be subject to Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations, and they hereby notify each Loan Party that in order to comply with such legislations, rules and regulations, they may be, among other things, required to obtain, verify and record information pertaining to such Loan Party, which information may relate to among other things, the names, addresses, corporate directors, corporate registration numbers, corporate tax numbers, corporate shareholders and banking transactions of such Loan Party.  Each Loan Party hereby agrees to take such actions and to provide, upon request, such information and access to information regarding such Loan Party is required to enable the Lenders to comply with such Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations.

4.14.    **Indebtedness**.  Set forth on Schedule 4.14 is a true and complete list as of the Closing Date of all secured Indebtedness (including Capital Leases) of each Loan Party and each of its Subsidiaries outstanding immediately prior to the Closing Date that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date and such Schedule accurately sets forth in all material respects the aggregate principal amount of such Indebtedness as of the Closing Date.

4.15.    **Payment of Taxes**.  All material tax returns and reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and, except to the extent subject to the automatic stay in connection with the Bankruptcy Cases and the Recognition Proceedings, all material taxes that are due and payable and all material assessments, fees and other governmental charges upon a Loan Party and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable unless subject to a Permitted Protest.  Each Loan Party and each of its Subsidiaries have made adequate provision in accordance with GAAP for all taxes not yet due and payable.  Borrowers know of no proposed material tax assessment against a Loan Party or any of its Subsidiaries that is not subject to a Permitted Protest.

4.16.    **Margin Stock**.  Neither any Loan Party nor any of its Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the

proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors. Neither any Loan Party nor any of its Subsidiaries expects to acquire any Margin Stock.

4.17.    **Governmental Regulation**.    No Loan Party nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18.    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.    No Loan Party or any of its Subsidiaries is in violation of any Sanctions. No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Lender, Bank Product Provider, or other individual or entity participating in any transaction).

4.19.    **Employee and Labor Matters**.    (i) There is no unfair labor practice complaint pending or, to the knowledge of Borrowers, threatened against Parent or its Subsidiaries before any Governmental Authority and there is no grievance or arbitration proceeding pending or threatened against Parent or its Subsidiaries which arises out of or under any collective bargaining agreement except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (ii) there is no strike, labor dispute, slowdown, stoppage or labor grievance pending or threatened in writing against Parent or its Subsidiaries that could reasonably be expected to result in a material loss or liability, (iii) none of Parent or its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied, (iv) the hours worked and payments made to employees of Parent or its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (v) all payments due from Parent or its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Parent.

4.20.    [Reserved].

4.21.    **Broker Fees**.    There are no brokerage commissions, finder's fees or investment banking fees payable by Parent or any of its Affiliates in connection with any Transactions.

4.22.    **Eligible Accounts**.  As to each Account that is identified by Borrowers as an Eligible Account in a Borrowing Base Certificate submitted to Agent, as of the date of such Borrowing Base Certificate, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtors created by the sale and delivery of Inventory or the rendition of services to such Account Debtors in the ordinary course of Loan Parties' business, (b) owed to Loan Parties, and (c) not excluded as ineligible by virtue of one or more of the excluding criteria (other than Agent's discretionary criteria of which Administrative Borrower has not been notified) set forth in the definition of US Eligible Accounts or Canadian Eligible Accounts, as applicable.

4.23.    **Eligible Inventory**.    As to each item of Inventory that is identified by Borrowers as Eligible Inventory in a Borrowing Base Certificate submitted to Agent, as of the date of such Borrowing Base Certificate, such Inventory is not excluded as ineligible by virtue of one or more of the excluding criteria (other than Agent's discretionary criteria of which Administrative Borrower has not been notified) set forth in the definition of US Eligible Inventory or Canadian Eligible Inventory, as applicable.

4.24.    **Location of Inventory**.  Other than Inventory in transit in the ordinary course of business and samples of Inventory delivered to customers in the ordinary course of business, the Inventory of Borrowers is not stored with a bailee, warehouseman, or similar party and is located only at, or in-transit between, the locations identified on Schedule 4.24 (as such Schedule may be updated pursuant to Section 5.14).

4.25.    **Inventory Records**.  Each Loan Party keeps correct and accurate records in all material respects itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

4.26.    **Suppliers and Customers**.    To the actual knowledge of the Loan Parties, there exists no actual or threatened in writing termination, cancellation, or limitation of or modification to or change to the business relationship between any Loan Party and any supplier or customer except to the extent such termination, cancellation, limitation, modification or change is not reasonably expected to have a Material Adverse Effect.

4.27.    **Term Loan Documents**.  Borrowers have delivered to Agent a complete and correct copy of all material Term Loan Documents, including all schedules and exhibits thereto.

4.28.    **Hedge Agreements**.  On each date that any Hedge Agreement is executed by any Hedge Provider, Borrowers and each other Loan Party satisfy all eligibility, suitability and other requirements under the Commodity Exchange Act (7 U.S.C. § 1, et seq., as in effect from time to time) and the Commodity Futures Trading Commission regulations.

4.29.    **[Reserved]**.

4.30.    **Financing Order and DIP Recognition Order**.  Each of the Financing Order and the applicable DIP Recognition Order (from and after the date of the applicable DIP Recognition Order) is in full force and effect, is not subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order and has not been reversed, modified, amended, stayed or vacated except with Agent's written consent.

4.31.    **Exit Financing Commitment Letter**.  Following the date that is one hundred twenty (120) days following the Filing Date (or such later date as may be consented to by Agent in its sole discretion), each Exit Financing Commitment Letter duly executed and delivered in accordance with Section 5.24 remains in full force and effect.

4.32.    **Restructuring Support Agreement**.  The Restructuring Support Agreement is in full force and effect.

4.33.    **Bankruptcy Cases and Recognition Proceedings**.  The Bankruptcy Cases were commenced on the Filing Date in accordance with applicable law, and the Recognition Proceedings have been or will be commenced within 3 Business Days following entry of the Interim Financing Order and proper notice has been or will be given of (i) the motion seeking approval of the Loan Documents, the Interim Financing Order, the Canadian Initial Recognition Order, the Canadian Supplemental Order, the Canadian Interim DIP Recognition Order, the Final Financing Order and the Canadian Final DIP Financing Order, (ii) the hearing for the entry of the Interim Financing Order, the Canadian Initial Recognition Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order, as applicable and (iii) the hearing for the entry of the Final Financing Order and the Canadian Final DIP Recognition Order, as applicable.

4.34.    **Financing Order and DIP Recognition Order**.  The Loan Parties are in compliance with the terms and conditions of the Financing Order and, following issuance thereof, the applicable DIP Recognition Order.  Each of the Interim Financing Order (with respect to the period prior to the entry of the Final Financing Order) or the Final Financing Order (from after the date the Final Financing Order is entered) and following entry thereof, the applicable DIP Recognition Order as in effect at such time, is in full force and effect and has not been vacated, reversed or rescinded, amended or modified (except as otherwise consented to by Agent in its sole discretion) and no appeal of such order has been timely filed or, if timely filed, a stay pending such appeal is currently effective.

4.35.    **Insurance**.  All properties of each Loan Party and its Subsidiaries are insured to the extent required by Section 5.6.  Schedule 4.35 sets forth a description of such insurance as of the Closing Date.

5.    **AFFIRMATIVE COVENANTS**.

Each of Parent and each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations:

5.1.    **Financial Statements, Reports, Certificates**.  Borrowers (a) will deliver to Agent, for itself and each Lender, each of the financial statements, reports, and other items set forth on Schedule 5.1 no later than the times specified therein, (b) agree that no Subsidiary of a

Loan Party will have a fiscal year different from that of Parent (unless otherwise agreed to by Agent in its reasonable discretion), (c) agree to maintain a system of accounting that enables Borrowers to produce financial statements with respect to material financial transactions and matters involving the assets and business of Parent or any if its Subsidiaries, as the case may be, in accordance with GAAP (it being understood and agreed that certain foreign Subsidiaries, other than any Canadian Loan Party, may maintain individual books and records in conformity with general accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach) and maintain records pertaining to the Collateral that contain information as from time to time that reasonably may be requested by Agent, and (d) agree that they will, and will cause each other Loan Party to, (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales, and (ii) maintain their billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent (such consent not to be unreasonably withheld, conditioned or delayed).

      5.2.    **Reporting**.  Borrowers (a) will deliver to Agent (for itself and the Lenders) each of the reports set forth on Schedule 5.2 at the times specified therein, and (b) agree to cooperate with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.  Borrowers and Agent hereby agree that the delivery of the Borrowing Base Certificate through the Agent's electronic platform or portal, subject to Agent's authentication process, by such other electronic method as may be approved by Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Bases as may be approved by Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrowers to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrowers and delivered to Agent.  Following the delivery of the Initial Approved Budget on the Closing Date, (i) by 12:00 p.m. New York City time on the third Friday following the Filing Date and by 12:00 p.m. New York City time on the Friday that is every two weeks thereafter through the Life of the Case, the Borrowers shall provide the Agent with an updated cash flow forecast for the Loan Parties and their Subsidiaries, with line item detail of projected sales, disbursements, collections, net cash flows, the outstanding amount of Revolving Loans and the other items set forth in the Initial Approved Budget for the then-upcoming seventeen (17) week period (or such shorter, or longer, period, as applicable, to coincide with the Life of the Case), in each case, in substance reasonably satisfactory (such satisfaction not to be unreasonably withheld, delayed or conditioned) to and approved by the Agent and substantially consistent with the form of the Initial Approved Budget delivered on the Closing Date (the "Weekly Cash Flow Forecast"); (ii) by 12:00 p.m. New York City time beginning on the third Friday following the Filing Date, and by 12:00 p.m. New York City time on the Friday of each two-week period thereafter, a variance report (the "Variance Report") setting forth, on a consolidated basis, actual cumulative aggregate cash receipts, disbursements and cash flows of the Loan Parties for the most recent three- or two-week period (as applicable) covered by such Variance Report and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report on a weekly and cumulative basis for the period from the first week commencing after the Filing Date through the end of the week in regard to which such variance report is being delivered

(which shall not exceed what is permitted by the Permitted Variance), and each such Variance Report shall include explanations for all material variances for the most recent three- or two-week period in regard to which such variance report is being delivered and shall be certified by a Financial Officer of the Loan Parties, and (iii) deliver to Agent and Lenders, on at least a bi-weekly (i.e., once every two weeks) basis, a written narrative report of the key performance metrics monitored by management of the Loan Parties regarding the business of the Borrowers and their Subsidiaries.  Notwithstanding the foregoing, nothing in the Approved Budget shall limit the payment of allowed professional fees and expenses and restructuring expenses to the Case Professionals, and the amounts thereof shall be excluded from the cumulative amount of projected and actual cash disbursements of the Loan Parties and their Subsidiaries on a consolidated basis for any period.

In addition to the foregoing, upon the reasonable request of Agent, Borrowers will participate in conference calls with Agent and Lenders and their representatives, consultants (including, without limitation, any Agent Consultant), and agents, at such mutually convenient dates and times (with frequency not to be unreasonable) to be proposed by Agent upon reasonable notice, and will cause available senior members of management, Consultant, and any investment bankers (including the Investment Banker) and other advisors of Parent and its Subsidiaries, as applicable or as requested by Agent or such Lenders, and solely to the extent reasonably requested by Agent, one or more members of the board of directors of Parent and its Subsidiaries, to participate in such calls for the purpose of discussing the status of the financial, collateral, and operational condition, businesses, liabilities, assets, and prospects of the Borrower and their Subsidiaries and any sale, refinance or other strategic transaction efforts; provided, that the Borrowers acknowledge that such calls scheduled as frequently as once per week shall not be unreasonable.  Upon Agent's reasonable request, and subject to any confidentiality restrictions, the Parent and its Subsidiaries shall promptly provide copies of all non-privileged material written materials and reports (in each case, excluding drafts) produced by Parent and its Subsidiaries and shared with third parties in connection with any sale, refinance, or other strategic transaction efforts, and any written indications of interest, letters of intent, draft purchase documents, and commitment letters received by Parent and its Subsidiaries relating to such sale, refinance, or other strategic transaction efforts of the Parent and its Subsidiaries or any other non-privileged written materials as Agent and the Lenders may request from time to time; provided, that such materials may be redacted to the extent information contained therein would adversely affect any attorney-client privilege; provided, further, that only final versions of such documents, or versions of such documents shared with third parties, shall be provided.  Without limiting the foregoing, Borrowers agree to notify Agent promptly upon any Borrower becoming aware of any material change or development relating to any sale or refinance efforts or to the financial, collateral, or operational condition, businesses, assets, liabilities, or prospects of such Borrower, any of its Affiliates, or any of their respective Subsidiaries.

5.3.    **Existence**.

(a)    Except as otherwise permitted by Section 6.4, Parent will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect each Loan Party's and each Loan Party's Subsidiaries' valid existence and good standing (or, if such jurisdiction does not provide for good standing status, the equivalent status provided for in such jurisdiction) and governmental and similar rights, permits, licenses, authorizations or other

approvals and franchises, in each case (except with respect to existence and good standing in any jurisdiction of organization), if the failure to do so could reasonably be expected to result in a Material Adverse Effect.

(b)    Parent will, and will cause each of its Subsidiaries to, (i) take all reasonable actions to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of the business of the Parent and its Subsidiaries, taken as a whole, including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral to the extent that failure to comply therewith, in the aggregate, would reasonably be expected to be adverse to the Lenders or any Loan Party in any material respect; (ii) maintain a cash management system substantially as in effect on the Filing Date, and (iii) in accordance with the Bankruptcy Code and subject to any required approval by any applicable order of the Bankruptcy Court, comply with all post-petition Contractual Obligations and Contractual Obligations entered into prior to the Filing Date and assumed except to the extent that failure to comply therewith, in the aggregate, would not reasonably be expected to be adverse to the Lenders or any Loan Party in any material respect.

5.4.    **Maintenance of Properties**.    Parent will, and will cause each of its Subsidiaries to, maintain and preserve all of their properties which are necessary in the proper conduct of their business in working order and condition in the ordinary course of business, ordinary wear, tear, and damage by casualty and condemnation and Permitted Dispositions excepted.

5.5.    **Taxes**.    Parent will, and will cause each of its Subsidiaries to, timely file all material tax returns and pay in full before delinquency or before the expiration of any extension period (including any extension by virtue of the Bankruptcy Cases and the Recognition Proceedings) relating to the payment of all material governmental assessments and taxes with respect to periods after the Filing Date whether real, personal or otherwise, due and payable by, or imposed, levied, or assessed against it, or any of its assets, including all amounts reflected on its material tax returns, except to the extent that the validity of such governmental assessment or tax is the subject of a Permitted Protest.

5.6.    **Insurance**.    Parent will, and will cause each of its Subsidiaries to, at Borrowers' expense, (a) maintain insurance respecting each of Parent's and its Subsidiaries' assets wherever located, covering liabilities, losses or damages, in each case, as are customarily insured against by other Persons engaged in the same or similar businesses and similarly situated and located.    All such policies of insurance shall be with financially sound and reputable insurance companies reasonably acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of Borrowers in effect as of the Closing Date are acceptable to Agent).    All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral

and to any payments to be made under such policies.  All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation.  If Parent or its Subsidiaries fail to maintain such insurance, Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Administrative Borrower shall give Agent prompt notice of any loss exceeding $500,000 covered by its or its Subsidiaries' casualty or business interruption insurance.  Upon the occurrence and during the continuance of an Event of Default, Agent shall have the right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.   In addition, if at any time the area in which any improvement on any Real Property constituting Collateral is located in an area identified as a special flood hazard area in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), Parent will, and will cause each of its Subsidiaries to, at their expense, obtain flood insurance in such amount and with such deductible as is required to ensure compliance with the Flood Laws and deliver to the Agent evidence of such insurance.

5.7.    **Inspection**.  Parent will, and will cause each of its Subsidiaries to, permit Agent, any Lender (so long as such Lender accompanies Agent), and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided an authorized representative of Administrative Borrower shall be allowed to be present) at such reasonable times and intervals as Agent, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Administrative Borrower and during regular business hours; provided, that Borrowers' obligations to reimburse Agent for the foregoing shall be subject to the limitations set forth in Section 2.10(c).   Borrowers agree to cooperate in connection with any field exams, audits, appraisals, or valuations that Agent may conduct or cause to be conducted at any time, including, without limitation, those performed by any Agent Consultant, and will provide any Agent Consultant with reasonable access at all times to all documentation, places of business, officers, Consultant, any Investment Banker, consultants, and employees of Borrowers and Borrowers' other advisors.  Borrowers will promptly provide to any Agent Consultant such financial information concerning the Borrowers' financial, collateral, and operational condition, businesses, assets, liabilities, and prospects as Agent Consultant may request from time to time.  Borrowers will reimburse Agent in cash, upon demand, for any and all reasonable fees, costs, expenses, and other charges incurred by Agent relating to the engagement of any Agent Consultant from time to time (in each case, whether or not included in the Approved Budget).  Notwithstanding anything to the contrary in this Section 5.7, none of Parent or any of its Subsidiaries will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrowers (based on the advice of counsel) violate attorney-client privilege or is otherwise prohibited by law or fiduciary duty,

(ii) such information constitutes attorney work product, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which any Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Agent or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters with respect thereto.

5.8.    **Compliance with Laws**.  Parent will, and will cause each of its Subsidiaries to, comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.9.    **Environmental**.  Parent will, and will cause each of its Subsidiaries to,

(a)    keep (i) any real property that any Loan Party owns free of any Environmental Liens, other than Permitted Liens, and (ii) any real property that any Loan Party leases or operates free of any Environmental Liens, other than Permitted Liens, except in the case of each of clauses (i) and (ii) above with respect to any such Environmental Lien that could not reasonably be expected to result in a Material Adverse Effect, or where the Loan Party has posted bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by any such Environmental Liens,

(b)    comply, in all respects, with Environmental Laws, obtain and maintain in full force and effect all Environmental Permits and provide to Agent documentation of any compliance or non-compliance with Environmental Laws which Agent reasonably requests, except, in each case, for any such compliance or non-compliance or failure to comply, obtain or maintain that could not reasonably be expected to result in a Material Adverse Effect,

(c)    promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto real property owned, leased or operated by any Loan Party and take any Remedial Actions with respect to such releases required to come into compliance with applicable Environmental Law, except with respect to any such releases that would not reasonably be expected to result in a Material Adverse Effect, and

(d)    promptly, but in any event within fifteen (15) Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) written notice that an Environmental Lien (other than a Permitted Lien) has been filed against any of the real or personal property of any Loan Party, (ii) written notice of commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party which Environmental Action could reasonably be expected to result in a Material Adverse Effect, and (iii) written notice of a violation, citation, or other administrative order arising under Environmental Laws with respect to a Loan Party, its operations or any of the real property owned, leased or operated by a Loan Party or for which a Loan Party may be liable, which could reasonably be expected to result in a Material Adverse Effect, and, in each case, to the extent failure to do so could reasonably be expected to cause a Material Adverse Effect promptly take all action required to address and resolve such Environmental Lien, Environmental Action, violation, citation or other administrative order.

5.10.    **Disclosure Updates**.  Borrowers will, promptly and in no event later than ten (10) Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to the Lender Group (other than the projections, budgets, estimates, forward-looking statements, information of a general economic nature, general information about the Borrowers' industry or general market data), at the time it was furnished (and when taken as a whole), contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (when taken as a whole) not materially misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto (except that Schedule 4.24 may be amended as expressly provided in Section 5.14).

5.11.    **[Reserved]**.

5.12.    **Further Assurances**.  Subject to the limitations and exceptions on creation and perfection set forth herein and in the other Loan Documents, Parent will, and will cause each of the other Loan Parties to, at any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, mortgages, deeds of trust, opinions of counsel, and all other documents (the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect (unless perfection is not required by the Loan Documents), and continue perfected (unless perfection is not required by the Loan Documents) or to better perfect (unless perfection is not required by the Loan Documents) Agent's Liens in all of the assets of Parent and its Subsidiaries, other than Excluded Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens (subject to Permitted Liens) in favor of Agent in any Real Property acquired in fee by any Loan Party that is also subject to perfected Liens securing Term Loan Debt (or, if the Term Loan Debt has been paid in full, to the extent such Real Property has a fair market value greater than $1,000,000), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents; provided that (i) the foregoing shall not apply to any Excluded Subsidiary, (ii) no action in any jurisdiction outside of the United States and Canada or required by the laws of any jurisdiction outside of the United States and Canada shall be required in order to create any security interests in assets located or titled outside of the United States or Canada or to perfect any security interests therein (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any jurisdiction outside of the United States and Canada), (iii) no action shall be required to perfect security interests in aircraft, railcars and other assets perfected under a federal filing system (other than intellectual property), and (iv) no action shall be required to perfect any Collateral as to which Agent agrees that the costs of taking such actions are excessive in relation to the benefit to the Lenders of the security to be afforded thereby (the foregoing clauses (i) through (iv) collectively, the "Excluded Actions").  Notwithstanding anything herein or in any other Loan Document to the contrary, the US Borrowers shall not be required to obtain or deliver any consents or approvals from any applicable Chinese Governmental Authority in connection with its 65% pledge of the Equity Interests of Hollander China or PCF (Shanghai) Quality Management Consulting Co., Ltd.  To the maximum extent permitted by applicable law, if any Loan Party

refuses or fails to execute or deliver any reasonably requested Additional Documents within a reasonable period of time following the request to do so and receipt of execution versions of such Additional Documents, each Loan Party hereby authorizes Agent to execute any such Additional Documents in the applicable Loan Party's name and authorizes Agent to file such executed Additional Documents in any appropriate filing office. In furtherance of, and not in limitation of, the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of Parent and its Subsidiaries, including all of the outstanding capital Equity Interests of Borrowers and Borrowers' Subsidiaries (subject to exceptions and limitations contained herein and in the other Loan Documents on creation and perfection, including, in so far as the US Obligations are concerned, with respect to any Subsidiary described in clause (d) of the definition of Excluded Subsidiary). In addition, to the extent a security interest in and mortgage lien on any owned Real Property is required by this <u>Section 5.12</u>, at least ten (10) Business Days prior to the execution of a Mortgage over such Real Property, the Agent shall have received (and shall have further provided to each Lender), in order to comply with the Flood Laws, the following documents: (A) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such Real Property Collateral (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Administrative Borrower), together with any other documents Agent (or any Lender through Agent) may reasonably request to enable it or any Lender to complete its flood insurance due diligence; and (B) if any improvements on such Real Property are located within an area designated as a special flood hazard area, evidence of such flood insurance as may be required under <u>Section 5.6</u>.

5.13.    **[Reserved]**.

5.14.    **Location of Inventory**. Parent will, and will cause each of its Subsidiaries to, keep its Inventory (other than Inventory in transit in the ordinary course of business and samples of Inventory delivered to customers in the ordinary course of business) only at the locations identified, or in transit between locations identified, on <u>Schedule 4.24</u> and their chief executive offices only at the locations identified on <u>Schedule 4.24</u> as their chief executive offices; <u>provided</u>, that Borrowers may amend <u>Schedule 4.24</u> and <u>Schedule E-1</u> so long as such amendment occurs by written notice to Agent not less than ten (10) days prior to the date on which such Inventory is moved to such new location or such chief executive office is relocated and so long as such new location is within the continental United States (in the case of a US Loan Party) and Canada (in the case of a Canadian Loan Party).

5.15.    **[Reserved]**.

5.16.    **Compliance with ERISA and the IRC**. In addition to and without limiting the generality of <u>Section 5.8</u>, Parent will and will cause each of its Subsidiaries to, (a) comply with applicable provisions of ERISA and the IRC with respect to all Employee Benefit Plans except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect, (b) without the prior written consent of Agent and the Required Lenders, not take any action or fail to take action which could reasonably be expected to result in a Loan Party or ERISA Affiliate incurring a liability to the PBGC or to a Multiemployer Plan (other than to pay contributions or premiums payable in the ordinary course) that could reasonably be expected

to result in a Material Adverse Effect, (c) not allow any facts or circumstances to exist with respect to one or more Employee Benefit Plans that, in the aggregate, reasonably could be expected to result in a Material Adverse Effect, (d) not participate in any prohibited transaction that could result in a civil penalty excise tax, fiduciary liability or correction obligation under ERISA or the IRC that could reasonably be expected to result in a Material Adverse Effect, (e) operate each Employee Benefit Plan in such a manner that will not incur any tax liability under the IRC (including Section 4980B of the IRC) except where failure to do so could not reasonably be expected to result in a Material Adverse Effect, and (f) furnish to Agent upon Agent's written request such additional information about any Employee Benefit Plan for which any Loan Party or ERISA Affiliate could reasonably expect to incur any liability that could reasonably be expected to result in a Material Adverse Effect. With respect to each Pension Plan (other than a Multiemployer Plan) except as could not reasonably be expected to result in a Material Adverse Effect, the Loan Parties shall (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the material contribution and funding requirements of the IRC and of ERISA, and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any material late payment or underpayment charge or penalty, all premiums required pursuant to ERISA.

5.17.    **Canadian Compliance**. In addition to and without limiting the generality of Section 5.8, Parent will and will cause each of its Subsidiaries to (a) comply in all material respects with applicable provisions of the *Income Tax Act* (Canada) and applicable federal or provincial pension benefits legislation with respect to all Canadian Benefit Plans and Canadian Pension Plans, (b) not allow any facts or circumstances to exist with respect to one or more Canadian Benefit Plans or Canadian Pension Plans that, in the aggregate, reasonably could be expected to result in a Material Adverse Effect, (c) operate each Canadian Benefit Plan and Canadian Pension Plan in such a manner that will not incur any material tax liability under the *Income Tax Act* (Canada), and (d) furnish to Agent notice of any Canadian Pension Termination Event promptly after the occurrence thereof and upon Agent's written request such additional information about any Canadian Benefit Plan or Canadian Pension Plan for which any Loan Party or any other Subsidiaries could reasonably expect to incur any material liability. With respect to each Canadian Pension Plan and Canadian Benefit Plan except as could not reasonably be expected to result in material liability to the Loan Parties, the Loan Parties shall (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the material contribution and funding requirements of the *Income Tax Act* (Canada) and applicable federal or provincial pension benefits legislation, and (ii) pay, or cause to be paid, to a timely manner, without incurring any material late payment or underpayment charge or penalty, all required premiums.

5.18.    **Bank Products**. The US Loan Parties shall maintain all of their depository and treasury management relationships with Wells Fargo at all times during the term of the Agreement (other than the Term Loan Proceeds Account, which may or may not be maintained at Wells Fargo).

5.19.    **Canadian Cash Management**. At all times (unless an alternative instruction is delivered to Borrowers by Agent or unless Agent has directed the applicable Controlled Account Bank (as defined in the Canadian Security Agreement) to cease following the instructions of the Loan Parties with respect Controlled Accounts maintained at such Controlled

Account Bank), Borrowers shall and shall cause all other Loan Parties, in each case to the extent such Person is a "Grantor" under the Canadian Security Agreement, to transfer at the end of each Business Day all amounts in the applicable Controlled Account to the Agent's Account to be applied to the Canadian Obligations, and to make no other disbursements from such Controlled Accounts without Agent's prior consent.

5.20.    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  Each Loan Party will, and will cause each of its Subsidiaries to comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

5.21.    **Bankruptcy Transaction Milestones**.  Parent will, and will cause each of its Subsidiaries to, cause the performance and delivery of the items set forth on Schedule 5.21 on or before the dates specified therein with respect to such items (the "Milestones").

5.22.    **Investment Banker**.

(a)    Borrowers shall continue to engage an investment banker (the "Investment Banker") pursuant to a Qualified Investment Banker Engagement and cause the Investment Banker to promptly provide Agent and Lenders, and their respective agents, advisors, and consultants, with such reasonably requested information, drafts, and reports (including, without limitation, relating to any potential strategic alternatives or transactions) regarding the process for which the Investment Banker was engaged, and, upon reasonable prior notice to the Borrowers and the Investment Banker, schedule conference calls (with a frequency which shall not be unreasonable, provided, that the Borrowers acknowledge that such calls scheduled as frequently as once per week shall not be unreasonable) with the Investment Banker and the Agent and (to the extent available) Lenders, and their respective agents, advisors, and consultants (with each such call to be scheduled at a mutually convenient time during normal business hours), regarding the process for which the Investment Banker was engaged, all as Agent and Lenders may reasonably request from time to time.  Borrowers may participate in such discussions at the times scheduled pursuant to the immediately preceding sentence, provided, that any Borrower's failure to elect to do so will not prevent Agent or any Lender (or their respective agents, advisors, or consultants) from proceeding with such discussions.  Borrowers shall, as a component of any Qualified Investment Banker Engagement, cause the applicable Investment Banker to maintain an appropriate data room to which Agent and any consultant, financial advisor or counsel engaged by Agent or its counsel at any time will have reasonable access and review rights at all times.  In addition to the foregoing, Agent, each Lender, and any consultant, financial advisor, or counsel engaged by Agent or any Lender, or their counsel, at any and all times, will have reasonable access and review rights with respect to any data room (and the information contained therein) maintained by any Investment Banker or Borrowers with respect to any actual or contemplated sale of any of the equity interests or assets of any

Borrower, any refinancing relating to the Obligations, or any other process for which the Investment Banker was engaged.

(b)    Except as otherwise agreed to in writing by Agent, all fees, costs and expenses of the Investment Banker shall be solely the responsibility of Borrowers, and in no event will Agent or any Lender have any liability or responsibility of any kind with respect to the Investment Banker (including, without limitation, as to the payment of any of the Investment Banker's fees, costs or expenses), and Agent and Lenders will not have any obligation or liability of any kind or nature to Borrowers, the Investment Banker or any other Person by reason of any acts or omissions of the Investment Banker.

(c)    No Borrower shall amend or otherwise modify in any manner that could reasonably be expected to be materially adverse to the Agent or Lenders the terms of the Investment Banker's engagement with the Borrowers in each case without the prior written consent of the Agent.  In the event that any Investment Banker resigns, is suspended, or has its services modified in any manner that could reasonably be expected to be materially adverse to the Agent or Lenders, or is terminated at any time prior to the consummation of the transaction contemplated by the applicable Qualified Investment Banker Engagement, the Borrowers shall consummate a new Qualified Investment Banker Engagement within ten (10) Business Days after the date on which such Investment Banker resigns, is suspended, or has its services modified, or is terminated.

5.23.    **Consultant**.  Borrowers will continue to engage a Consultant on terms and conditions acceptable to the Agent (it being understood that the terms of the Carl Marks Engagement Agreement are acceptable to Agent) and on the terms and conditions set forth in, or consistent with, the retention order authorizing the continued engagement of the Consultant. Borrowers hereby do, and will continue to, authorize and instruct the Consultant acting through the interim management team furnished to Borrowers, to (a) share with the Agent and Lenders all budgets, records, projections, financial information, reports and other information relating to the Collateral, the financial condition, operations and prospects of Borrowers and their Affiliates prepared by Consultant with respect to Borrowers and their Affiliates after the Closing Date, and (b)  make such persons acting as interim officers of Borrowers available for discussions with the Agent and the Lenders as requested by Agent and the Lenders from time to time. Borrowers will at all times reasonably cooperate with the Consultant and provide Consultant reasonably complete access to all of the Borrowers' books and records, all of Borrowers' premises and to Borrowers' management. Notwithstanding anything to the contrary in this Section 5.23, none of Parent or any of its Subsidiaries or Consultant will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrowers (based on the advice of counsel) violate attorney-client privilege or is otherwise prohibited by law or fiduciary duty, (ii) such information constitutes attorney work product, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which any Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Agent or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters with respect thereto. All fees and expenses of the Consultant shall be solely the responsibility of Borrowers and in no event shall Agent or any Lender have any obligation, liability or responsibility of any kind or nature whatsoever for the payment of any such fees, expenses or other obligations, nor shall Agent or any Lender have any

obligation or liability to Borrowers, their Affiliates, or any other Person by reason of any acts or omissions whatsoever of the Consultant at any time.

5.24.    **Exit Financing Commitment Letter**.  Parent and Borrowers will deliver to Agent, no later than one hundred twenty (120) days after the Closing Date, a fully executed Exit Financing Commitment Letter.

5.25.    **Sale of Collateral**.  In the event the Loan Parties sell (or engage in offers or discussions to sell or otherwise seek to sell) any material portion of the Term Loan Priority Collateral (or a sale of Equity Interests that effectively results in a transfer of a material portion of the Term Loan Priority Collateral), in each case, as a going concern (any such sale, a "Term Loan Priority Collateral Sale"), Parent will, and will cause each of its Subsidiaries to, unless otherwise agreed in writing by Agent, cause any such Term Loan Priority Collateral Sale (or offers or discussions related thereto) to also include all or substantially all of the ABL Priority Collateral.  For the avoidance of doubt, this Section 5.25 shall not be construed to permit the sale of any Collateral or other assets of the Loan Parties that is not permitted under this Agreement.

5.26.    **Bankruptcy Covenants**.  Notwithstanding anything in the Loan Documents to the contrary, the Loan Parties shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Financing Order and the applicable DIP Recognition Order.

5.27.    **Bankruptcy Cases**.

(a)    Bankruptcy Cases Documents and Notices.  Each Loan Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable, all material pleadings, motions and other documents (provided that any of the foregoing relating to the Loans shall be deemed material) to be filed on behalf of the Loan Parties with the Bankruptcy Court or the Canadian Court to the Agent and its counsel.  If not otherwise provided by the Bankruptcy Court's electronic docketing system , Borrowers shall provide (x) copies to the Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court and the Canadian Court, distributed by or on behalf of the Loan Parties to any Committee, filed with respect to the Bankruptcy Cases or the Recognition Proceedings or filed with respect to any Loan Document and (y) such other reports and information as the Agent may, from time to time, reasonably request.  In connection with the Bankruptcy Cases and the Recognition Proceedings, the Loan Parties shall give the proper notice for (x) the motions seeking approval of the Loan Documents, the Financing Order and the DIP Recognition Orders and (y) the hearings for the approval of the Financing Order and the DIP Recognition Orders.  The Borrower and the other Loan Parties shall give, on a timely basis as specified in the Financing Order and, if applicable, the applicable DIP Recognition Order, all notices required to be given to all parties specified in the Financing Order.  The Borrowers and the other Loan Parties shall use reasonable best efforts to obtain the Final Financing Order and the Canadian Final DIP Recognition Order.

(b)    Restructuring Proposals.  Each Loan Party shall promptly deliver or cause to be delivered to the Agent and the Lenders copies of any term sheets, proposals, or

presentations from any party, related to (i) the restructuring of the Loan Parties, or (ii) the sale of assets of one or all of the Loan Parties.

(c)    Repayment of Indebtedness.  Except to the extent permitted hereunder, under the Financing Order or under the Approved Budget, no Loan Party shall, without the express prior written consent of the Agent or pursuant to an order of the Bankruptcy Court after notice and a hearing, make any Pre-Petition Payment.

5.28.    **Budget Matters**.  Borrowers hereby acknowledge and agree that any Weekly Cash Flow Forecast provided to the Agent and the Lenders shall not amend or supplement the applicable Approved Budget until the Agent delivers a notice (which may be delivered by electronic mail) to the Borrowers stating that the Agent has approved of such Weekly Cash Flow Forecast (such approval not to be unreasonably withheld or delayed); provided, that if the Agent does not deliver a notice of approval to Borrowers, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Weekly Cash Flow Forecast is agreed to among Borrowers and the Agent in accordance with this Section 5.28.  Once such Weekly Cash Flow Forecast is so approved in writing by the Agent, it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget.

6.    **NEGATIVE COVENANTS**.

Each of Parent and each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations:

6.1.    **Indebtedness**.  Parent will not, and will not permit any of its Subsidiaries to create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2.    **Liens**.  Parent will not, and will not permit any of its Subsidiaries to create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.  Notwithstanding anything to the contrary in this Agreement or other Loan Documents, Parent will not, and will not permit any of its Subsidiaries to, create, incur, assume, or suffer to exist, directly or indirectly, any Lien with priority over the Liens created by the Loan Documents and the Term Loan Documents (other than the Permitted Priority Liens and the Carveout).

6.3.    **Restrictions on Fundamental Changes**.  Parent will not, and will not permit any of its Subsidiaries to,

(a)    enter into any merger, consolidation, amalgamation, statutory division, reorganization, or recapitalization, or reclassify its Equity Interests,

(b)    liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution),

(c)      suspend or cease operating a material portion of its or their business except in connection with a transaction permitted under Section 6.4,

(d)      take any action to change or have the effect of changing (i) the tax classification of Parent or any of its Subsidiaries from the classification as of the Closing Date or (ii) the legal form of Parent or Holdings, or

(e)      form any new Subsidiary without Agent's prior written consent; provided, that, to the extent the Agent consents to the formation of any new Subsidiary, such new Subsidiary shall guaranty all of the Obligations and any Existing Secured Obligations and grant Liens on substantially all of its assets to secure the Obligations and any Existing Secured Obligations pursuant to documentation in form and substance acceptable to Agent.

6.4.      **Disposal of Assets**.    Other than Permitted Dispositions, or transactions expressly permitted by Sections 6.2, 6.3 or 6.9, Parent will not, and will not permit any of its Subsidiaries to convey, sell, lease, license, assign, transfer, or otherwise dispose of any of its or their assets (including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division").

6.5.      **Nature of Business**.    Parent will not, and will not permit any of its Subsidiaries to make any change in the nature of its or their business as described in Schedule 6.5 or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent Parent and its Subsidiaries from engaging in any business that is reasonably related or ancillary to its or their business.

6.6.      **Prepayments and Amendments**.    Parent will not, and will not permit any of its Subsidiaries to,

(a)      optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of Parent or its Subsidiaries, other than (A) the Existing Secured Obligations and the Reinstated Existing Secured Obligations in accordance with the Existing Credit Agreement and this Agreement, (B) Obligations in accordance with this Agreement, (B) Permitted Intercompany Advances owing to a Loan Party, and (C) the termination of Hedge Agreements,

(b)      make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions applicable thereto, or

(c)      directly or indirectly, amend, modify, or change any of the terms or provisions of

(i)      the Governing Documents of any Loan Party or any of its Subsidiaries if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of the Lenders,

(ii)      the Management Services Agreement, or

(iii)    the Term Loan Documents except in accordance with the Intercreditor Agreement.

6.7.    **Restricted Payments**.  Parent will not make any Restricted Payment.

6.8.    **Accounting Methods**.    Parent will not, and will not permit any of its Subsidiaries to modify or change its fiscal year, fiscal quarter, or its method of accounting (other than (i) as may be required to conform to GAAP or (ii) to the extent consented to by Agent (such consent not to be unreasonably withheld, conditioned or delayed)).

6.9.    **Investments**.  Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, make or acquire any Investment except for Permitted Investments.

6.10.    **Transactions with Affiliates**.  Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction with any Affiliate of Parent or any of its Subsidiaries except for

(a)    any existing transactions between Parent or its Subsidiaries, on the one hand, and any Affiliate of Parent or Parent's Subsidiaries, on the other hand, entered into prior to the Closing Date and any payments made pursuant thereto (other than to direct or indirect holders of Equity Interests in the Parent) to the extent permitted hereunder and made in accordance with the Approved Budget, provided (i) that the terms of such Affiliate Transaction are not less favorable, taken as a whole, to Parent or the applicable Subsidiary, as the case may be, than those that could be obtained at the time in a transaction with a Person who is not such an Affiliate, and (ii) no payments shall be permitted under the Management Services Agreement,

(b)    so long as it has been approved by Parent's or its applicable Subsidiary's Board of Directors in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of Parent, any direct or indirect parent of Parent or the applicable Subsidiary of Parent,

(c)    so long as it has been approved by Parent's or its applicable Subsidiary's Board of Directors in accordance with applicable law, to the extent set forth in the Approved Budget, the payment of reasonable compensation, insurance, expense reimbursement, indemnity (other than with respect to directors (or other comparable managers)), severance, and employee benefit arrangements to employees, individual contractors, officers, and directors (or comparable managers) of Parent, any direct or indirect parent of Parent or the applicable Subsidiaries of Parent in the ordinary course of business and consistent with industry practice,

(d)    transactions permitted by Section 6.3, Section 6.4, or any Permitted Intercompany Advance,

(e)    [reserved],

(f)    the Related Transactions or any amendments or modifications thereto permitted hereby, and any payments made pursuant thereto to the extent permitted hereunder and made in accordance with the Approved Budget;

(g)    any Loan Party may enter into transactions with any other Loan Party to the extent not otherwise prohibited hereunder,

(h)    [reserved],

(i)    any Subsidiary that is not a Loan Party may enter into transactions with any other Subsidiary that is not a Loan Party to the extent not otherwise prohibited hereunder,

(j)    [reserved],

(k)    [reserved],

(l)    transactions in existence on the Closing Date set forth on <u>Schedule 6.10</u>, and

(m)    the transactions contemplated by the Existing Participation Agreement, the Participation Agreement, the Participation Put Agreement, and the acquisition of a participation interest in the Loans pursuant to the terms of the Participation Agreement.

Except for Permitted Intercompany Advances, as otherwise permitted under this Agreement, and as set forth on <u>Schedule 6.10</u>, no Loan Party shall enter into any transaction with, make any loan, advance or other Investment in, or otherwise transfer any property to any Subsidiary of Parent that is not a Loan Party.  Notwithstanding anything to the contrary on this Section 6.10, no payments shall be permitted under the Management Services Agreement.

6.11.    **Use of Proceeds**.  Parent will not, and will not permit any of its Subsidiaries to use the proceeds of any loan made hereunder for any purpose other than, (i) in accordance with and subject to the Approved Budget (subject to Permitted Variances) and the Financing Order, to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, the commencement of the Bankruptcy Cases and the Recognition Proceedings and the transactions contemplated hereby and thereby, as and when such expenses are due and payable, (ii) to the extent not otherwise prohibited by the Loan Documents or the Final Financing Order, to fund working capital needs and general corporate purposes of Borrowers, at such times and in such amounts as are in compliance with <u>Section 7</u>, (iii) to provide cash "adequate protection" (as set forth in Section 361 of the Bankruptcy Code and the relevant sections of other applicable Insolvency Laws) in favor of the Existing Agent and the Existing Lenders (other than in respect of the Existing Last Out Obligations) and (iv) to repay upon the entry of the Final Financing Order and the issuance of the Canadian Final DIP Recognition Order, in full, the Existing Secured Obligations, including outstanding principal, accrued interest, and accrued fees and expenses owing under or in connection with the Existing Credit Agreement and other Existing Loan Documents; <u>provided</u>, that no part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, (u) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Existing Agent, Existing Lenders, Agent or Lenders, or in connection with the Obligations or Existing Secured Obligations, except for an amount up to the limit set forth in the Financing Order for such purpose, for investigation costs of any official statutory committee appointed pursuant to Bankruptcy Code § 1102, (v) toward repayment of the Existing Term Loan Debt or the Term Loan Debt (including any "adequate protection" payments with

respect thereto), (w) [reserved], (x) to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (y) to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person, and (z) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

6.12.   **Limitation on Issuance of Equity Interests**.  No Loan Party will issue or sell or enter into any agreement or arrangement for the issuance or sale of any of its Equity Interests.

6.13.   **Parent as Holding Company**.   Parent will not (a) incur any material liabilities (other than (i) liabilities arising under the Loan Documents, the Term Loan Documents (or any agreement otherwise permitted hereunder and under the Intercreditor Agreement refinancing any of the facilities made pursuant to the Term Loan Documents in whole or in part), and the Equity Documents, in each case to which it is a party, (ii) guarantees of leases and trade contracts in the ordinary course of business, (iii) liabilities arising under agreements with respect to Investments expressly permitted hereunder, (iv) indemnification obligations under the PCF Acquisition Agreement, (v) other Indebtedness permitted to be incurred by Parent pursuant to Section 6.1, (vi) tax liabilities, (vii) obligations under or in connection with the Transaction, (viii) liabilities under the Management Services Agreement, and (ix) liabilities under employment or engagement agreements or agreements with employees, officers and directors)), (b) own or acquire any assets (other than (i) the Equity Interests of its Subsidiaries, (ii) immaterial assets which in the aggregate have de minimis value, (iii) contractual rights incidental or related to maintenance of its organizational existence and the issuance of its Equity Interests, (iv) Investments expressly permitted by Section 6.9 and contractual rights with respect thereto, (v) rights under or incidental to the PCF Acquisition Agreement, and (vi) rights under insurance policies) or (c) engage itself in any operations or business, except (i) in connection with its ownership of its Subsidiaries and its rights and obligations under the Loan Documents, the Term Loan Documents (or any agreement otherwise permitted hereunder and under the Intercreditor Agreement refinancing any of the facilities made pursuant to the Term Loan Documents in whole or in part) and the Equity Documents, in each case to which it is a party (and activities incidental or related thereto), and (ii) activities incidental or related to holding the assets or incurring the liabilities permitted by this Section 6.13 and the maintenance of its organizational existence and the issuance of its Equity Interests.

6.14.   **Sale and Leaseback Transactions**.   Parent will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

6.15.    **Employee Benefits**.

Parent will not, and will not permit any of its Subsidiaries to:

(a)    terminate, or permit any ERISA Affiliate to terminate, any Pension Plan in a manner, or take any other action with respect to any Pension Plan, which could reasonably be expected to result in any material liability of any Loan Party to the PBGC,

(b)    fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Benefit Plan, agreement relating thereto or applicable Law, any Loan Party or ERISA Affiliate is required to pay if such failure could reasonably be expected to result in material liability,

(c)    permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Pension Plan which exceeds $500,000 with respect to all Pension Plans in the aggregate which could reasonably be expected to result in liability which exceeds $500,000 to any Loan Party,

(d)    maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Canadian Defined Benefit Plan,

(e)    terminate, or permit any Loan Party or Subsidiary thereof to terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan, which could reasonably be expected to result in any liability of any Loan Party or a Subsidiary thereof, or

(f)    fail to make, or permit any Subsidiary to fail to make, full payment when due of all amounts which, under the provisions of any Canadian Benefit Plan, agreement relating thereto or applicable Law, any Loan Party or Subsidiary thereof is required to pay if such failure could reasonably be expected to result in material liability.

6.16.    **Burdensome Agreements**.

Parent will not, and will not permit any of its Subsidiaries to, enter into any contractual obligation that: limits the ability (a) of any Subsidiary to make loans, advances, or Restricted Payments to any Loan Party; (b) of any Subsidiary to guarantee the Indebtedness of the Borrowers under the Loan Documents or (c) of Parent or any of its Subsidiaries to create, incur, assume or suffer to exist Liens on property of such Person to secure the obligations of the Loan Parties under the Loan Documents, other than, in each case limitations and restrictions:

(a)    set forth in this Agreement and any other Loan Document,

(b)    set forth in Term Loan Documents as in effect on the date hereof or as modified in accordance with the Intercreditor Agreement (or in any agreement otherwise permitted hereunder and under the Intercreditor Agreement which refinances any of the facilities made pursuant to the Term Loan Documents in whole or in part),

(c)    on subletting or assignment of any leases or licenses of Parent or any Subsidiary or on the assignment of a contractual obligation or any rights thereunder or any other customary non-assignment provisions, in each case entered into in the ordinary course of business,

(d)    set forth in contractual obligations for the disposition of assets (including any Equity Interests in any Subsidiary and including pursuant to any sale and leaseback transactions permitted hereunder) of Parent or any Subsidiary of Parent; provided, such restrictions and conditions apply only to the assets or Subsidiary that is to be sold and cease to apply upon the consummation of such sale,

(e)    [reserved], or

(f)    (i) set forth in any contractual obligation governing Indebtedness permitted under clauses (a), (e), (m) and (y) of the definition of Permitted Indebtedness and (ii) with respect to cash or other deposits (including escrowed funds) received by Parent or any Subsidiary in the ordinary course of business and assets subject to Liens permitted under clauses (m), (n), (s), (x) and (y) of the definition of "Permitted Lien".

6.17.    **Financing Order; Administrative Expense Priority; Payments**.  Parent will not, and will not permit any of its Subsidiaries to:

(a)    seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order or any DIP Recognition Order, except for modifications and amendments joined in or agreed to in writing by Agent in its sole discretion,

(b)    seek the use of "Cash Collateral" (as defined in the Financing Order) in a manner inconsistent with the terms of the Financing Order or any DIP Recognition Order without the prior written consent of Agent,

(c)    suffer to exist at any time a priority for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 365, 503((b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code) or any other superpriority claim which is equal or superior to the priority of the Lender Group or "Lender Group" (as defined in the Existing Credit Agreement) in respect of the Obligations or Existing Secured Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carveout (including with respect to Canadian Borrower and Collateral located in Canada of the other Loan Parties, the Administration Charge) and as otherwise set forth in the Loan Documents and reasonably acceptable to Agent,

(d)    directly or indirectly seek, consent or suffer to exist at any time any Lien with priority over the Liens created by the Loan Documents or the Existing Loan Documents on any properties, assets or rights except (x) for Permitted Priority Liens and (y) to the extent set forth in the Financing Order and the Intercreditor Agreement, in respect of the Existing Term Loan Debt and the Term Loan Debt, and

(e)    prior to the date on which the Obligations and Existing Secured Obligations have been indefeasibly paid in full in cash, all Letters of Credit have been cash collateralized or returned for cancellation pursuant to this Agreement, and this Agreement has been terminated, pay any administrative expenses, except administrative expenses incurred in the ordinary course of the business of the Loan Parties and in amounts substantially consistent with (and in no event, in excess of what is permitted by the Permitted Variance) the Approved Budget, subject to and in accordance with the Financing Order and any applicable DIP Recognition Order; provided, however notwithstanding the foregoing, the Loan Parties shall be permitted to pay as the same may become due and payable (i) to the extent substantially consistent with the Approved Budget (and in no event, in excess of what is permitted by the Permitted Variance), administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business and to the extent otherwise authorized under the Financing Order and this Agreement and (ii) compensation and reimbursement of expenses to professionals allowed and payable under Sections 330 and 331 of the Bankruptcy Code to the extent permitted by the Financing Order and, if applicable, the applicable DIP Recognition Order.

6.18.    **Restructuring Support Agreement**.  Parent will not, and will not permit any of its Subsidiaries to amend, modify or change in any manner that could reasonably be expected to be adverse to the interests of the Agent or Lenders, any term, condition or provision of the Restructuring Support Agreement, or terminate the Restructuring Support Agreement.

6.19.    **Applications Under the CCAA and BIA**.  Each Loan Party and its Subsidiaries acknowledges that its business and financial relationships with the Lenders are unique from its relationship with any other of its creditors.  Each Loan Party and its Subsidiaries agrees that it shall not file any plan of compromise and arrangement under the CCAA or proposal under the *Bankruptcy and Insolvency Act (Canada)* (the "BIA"), or any plan of arrangement under any corporate statute, which provides for, or would permit, directly or indirectly, the Lenders to be classified with any other creditors of such Loan Party and its Subsidiaries for purposes of such plan of compromise and arrangement, proposal, plan or arrangement or otherwise.

6.20.    **Term Loan Proceeds Account**.  Parent will not, and will not permit any of its Subsidiaries to deposit funds in the Term Loan Proceeds Account unless such funds are direct proceeds of Term Loan Debt funded on or after the Closing Date.

6.21.    **Chapter 11 and Other Claims**.  Except for the Carveout (including, with respect to the Canadian Borrower and Collateral located in Canada of the other Loan Parties, the Administration Charge) and Permitted Priority Liens and as provided in the Financing Order and (with respect to the Administration Charge, as provided for in the applicable DIP Recognition Order), Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien that is pari passu with or senior to the claims or DIP Liens, as the case may be, of the Agent, the Lenders and the Bank Product Providers against the Loan Parties hereunder or under the Financing Order, any DIP Recognition Order, or apply to the Bankruptcy Court or the Canadian Court for authority to do so.  Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, (a) seek, support, consent to or suffer to exist any modification, stay, vacation or

amendment of any Financing Order or DIP Recognition Order except for any modifications and amendments agreed to in writing by the Agent, in its sole discretion, or (b) apply to the Bankruptcy Court or the Canadian Court, as applicable, for authority to take any action prohibited by this Section 6 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Agent, in its sole discretion).

## 7.    FINANCIAL COVENANTS.

Each of Parent and each Borrower covenants and agrees that, after the Closing Date until termination of all of the Commitments and payment in full of the Obligations, Parent and Borrowers will:

(a)    Budget Compliance.  Except as otherwise provided herein or approved by the Agent (in its sole discretion), the Loan Parties will not, and will not permit any Subsidiary thereof to, directly or indirectly, (i) use any cash, including the proceeds of any Loans, in a manner or for a purpose other than those permitted under this Agreement or contemplated by the Financing Order or the Approved Budget, (ii) permit a disbursement causing any variance from the Approved Budget other than Permitted Variances without the prior written consent of the Agent (in its sole discretion), (iii) make any Pre-Petition Payment or application for authority to make any Pre-Petition Payment, other than those permitted by this Agreement, the Financing Order or the Approved Budget, (iv) make or commit to make payments to critical vendors (other than those critical vendors set forth in the Financing Order or in the Approved Budget, in each case as approved in writing by the Agent in respect of any pre-petition amount in excess of the amount included in the Approved Budget, (v) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash disbursements (in any event excluding disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Filing Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (vi) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder and under the Term Loan Credit Agreement) as reported in the Variance Reports delivered with respect to periods ending after the Closing Date through the end of such Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder and under the Term Loan Credit Agreement) forecast in the Approved Budget for the same such period, and (vii) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual net cash flow (in any event excluding from the calculation thereof disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Filing Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period.

(b)    Minimum Excess Availability.  Maintain, at all times, Excess Availability of not less than $5,000,000 (such amount, "Minimum Excess Availability").

8.    **EVENTS OF DEFAULT**.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default"):

8.1.    **Payments**.  If any Borrower fails to pay when due and payable, or when declared due and payable in accordance with the terms hereof, (a) all or any portion of the Obligations consisting of interest and such failure continues for a period of two Business Days, (b) all or any portion of the Obligations consisting of fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of the Bankruptcy Cases), and such failure continues for a period of three Business Days, (c) all or any portion of the principal of the Loans, or (d) any amount payable to an Issuing Lender in reimbursement of any drawing under a Letter of Credit, or (e) all or any portion of the Existing Secured Obligations as and when due and payable in accordance with the Financing Order and the applicable DIP Recognition Order;

8.2.    **Covenants**.  If any Loan Party or any of its Subsidiaries:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i) Section 5.2 of this Agreement (other than the first sentence thereof), 5.3 (solely if a Loan Party is not in good standing (or equivalent) in its jurisdiction of organization), 5.5, 5.6, 5.7, 5.16, 5.17, 5.19, 5.20, 5.21, 5.22, 5.23 and 5.24 of this Agreement, (ii) Section 6 of this Agreement, (iii) Section 7 of this Agreement, (iv) Section 7(c), (j) or (k) of the US Security Agreement, or (v) Section 7(c), (j) or (k)  of the Canadian Security Agreement;

(b)    fails to perform or observe any covenant or other agreement contained in any of Sections 5.3 (other than if a Loan Party is not in good standing (or equivalent) in its jurisdiction of organization), 5.8, 5.12 and 5.14 of this Agreement and such failure continues for a period of fifteen (15) days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) the date on which written notice thereof is given to Administrative Borrower by Agent;

(c)    fails to perform or observe any covenant or other agreement contained in Section 5.1 or the first sentence of Section 5.2 of this Agreement and such failure shall continue (x) with respect to Section 5.1, for a period of three days or (y) with respect to the first sentence of Section 5.2, for a period of one day; or

(d)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and such failure continues for a period of thirty (30) days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) the date on which written notice thereof is given to Administrative Borrower by Agent;

8.3.    **Judgments**.  If, after the Filing Date, (a) one or more judgments, orders, or awards for the payment of money involving an aggregate amount (less the amount covered by

insurance pursuant to which the insurer has not denied coverage) of $1,000,000 is entered or filed against a Loan Party or any of its Subsidiaries, or with respect to any of their respective assets, and either (i) there is a period of forty-five (45) consecutive days at any time after the entry of any such judgment, order, or award during which (A) the same is not discharged, paid, satisfied, vacated, or bonded pending appeal, or (B) a stay of enforcement thereof is not in effect, or (ii) enforcement proceedings are commenced upon such judgment, order, or award or (b) any Loan Party or any of its Subsidiaries shall fail within forty-five (45) days to discharge one or more non-monetary judgments or orders, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued so long as such proceedings have the effect of staying the enforcement of such judgment or judgments;

8.4.    **[Reserved]**;

8.5.    **Material Adverse Effect**.  There shall have occurred after the Closing Date an event which has resulted in a Material Adverse Effect;

8.6.    **Default Under Other Agreements**.  If, first arising after the Filing Date, there is (a) an "Event of Default" (as defined in the Term Loan Credit Agreement), (b) a default (after the expiration of any grace periods applicable thereto) in one or more agreements to which a Loan Party or any of its Subsidiaries is a party with one or more third Persons relative to a Loan Party's or any of its Subsidiaries' Indebtedness (other than the Term Loan Debt) involving an aggregate amount of $1,000,000 or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's or its Subsidiary's obligations thereunder where payment and enforcement thereof is not subject to a stay of proceedings in the Bankruptcy Court (provided, that, if such default has been cured, waived or otherwise no longer in existence, the Event of Default resulting from this clause (b) shall be deemed to be cured, waived and no longer in existence), or (c) a default in or an involuntary early termination of one or more Hedge Agreements to which a Loan Party or any of its Subsidiaries is a party which results in net termination payment obligations being owed by the Loan Parties and their respective Subsidiaries an aggregate amount of $1,000,000 or more at any one time outstanding, other than (i) any default arising prior to the Filing Date, (ii) due to Borrowers' filing, commencement and continuation of the Bankruptcy Cases and the Recognition Proceedings and any litigation arising therefrom, (iii) due to restrictions on payments arising as a result of the Bankruptcy Cases and the Recognition Proceedings or (iv) except with respect to the Term Loan Credit Agreement, where payment or enforcement, acceleration or termination thereof by the holders of such obligations is and remains subject to a stay of proceedings in the Bankruptcy Case. Notwithstanding anything in this Section 8.6 to the contrary, to the extent a payment or covenant "Event of Default" (as defined in the Term Loan Credit Agreement) is waived in accordance with the Term Loan Credit Agreement on or after the Closing Date, any such waiver shall automatically result in a waiver of any Event of Default under Section 8.6 hereof, solely to the extent Agent has not taken any enforcement action in respect of such Event of Default under Section 8.6 hereunder;

8.7.    **Representations, etc.**  If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to Agent or any

Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

8.8.    **Guaranty**.  If the obligation of any Guarantor under any guaranty of the Obligations is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement, the US Security Agreement or the Canadian Security Agreement);

8.9.    **Security Documents**.  If this Agreement or any other Loan Document that purports to create a perfected Lien (except to the extent such Lien cannot be perfected or is otherwise not required to be perfected by the Loan Documents), shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (subject to the Intercreditor Agreement and to Permitted Liens) on or security interest in the Collateral covered hereby or thereby, except (i) as a result of any action by Agent or any Lender or the failure of Agent or any Lender to take any action, in each case, within its control, or (ii) as a result of a disposition of the applicable Collateral in a transaction expressly permitted under the Loan Documents;

8.10.    **Loan Documents**.  Any material provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability of any provision shall be contested by any Loan Party, or a proceeding shall be commenced by any Loan Party, or by any Governmental Authority having jurisdiction over any Loan Party, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny that it has any liability or obligation purported to be created under any Loan Document;

8.11.    **Invalidity of Subordination Provisions**.  The subordination provisions of the Intercreditor Agreement or any agreement or instrument governing any subordinated Indebtedness shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, in any material respect, or any Loan Party or Sponsor or any of their respective Affiliates shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not in any material respect have the priority contemplated by this Agreement or such subordination provisions;

8.12.    **Change in Control**.  A Change in Control shall occur, whether directly or indirectly;

8.13.    **ERISA**.  The occurrence of any of the following events:  (a) any Loan Party or ERISA Affiliate fails to make full payment when due of all amounts which any Loan Party or ERISA Affiliate is required to pay as contributions, installments, or otherwise to or with respect to a Pension Plan or Multiemployer Plan, and such failure could reasonably be expected to result in liability to any Loan Party in excess of $1,000,000, (b) an accumulated funding deficiency or funding shortfall in excess of $1,000,000 occurs or exists, whether or not waived, with respect to any Pension Plan, which could reasonably be expected, individually or in the aggregate to any Loan Party, to result in a liability in excess of $1,000,000, (c) a Notification Event, which could

reasonably be expected to result in liability to a Loan Party in excess of $1,000,000, either individually or in the aggregate to any Loan Party, (d) any Loan Party or ERISA Affiliate completely or partially withdraws from one or more Multiemployer Plans and as a result of such withdrawal, any Loan Party would reasonably be expected to incur Withdrawal Liability in excess of 1,000,000 in the aggregate, (e) any Loan Party or Subsidiary thereof fails to make full payment when due of all amounts which any Loan Party or Subsidiary thereof is required to pay as contributions, installments, or otherwise to or with respect to a Canadian Pension Plan, and such failure could reasonably be expected to result in liability to any Loan Party in excess of $1,000,000, or (f) with respect to (x) any Canadian Pension Plan, the occurrence of any Canadian Pension Termination Event or (y) if any trust, deemed trust or Lien has been or may be imposed on a Loan Party or Subsidiary thereof or its property as a result of the occurrence of such event and such trust, deemed trust or Lien, and in each case will or would reasonably be likely to result in a liability to the Loan Parties in excess of $1,000,000;

8.14.    **Participation Put Agreement** .  (a) Sponsor or any Sponsor Affiliated Entity fails to perform or observe any covenant or other agreement contained in the Existing Participation Agreement, the Participation Agreement or the Participation Put Agreement (or in any participation agreement (or amendment and restatement or replacement thereof entered into in connection therewith)), (b) [reserved] or (c) any material provision of the Participation Put Agreement (or in any participation agreement (or amendment and restatement or replacement thereof entered into in connection therewith)) shall at any time for any reason be declared to be null and void, or the validity or enforceability of any provision shall be contested by Sponsor or any Sponsor Affiliated Entity, or a proceeding shall be commenced by any such Person, or by any Governmental Authority having jurisdiction over any such Person, seeking to establish the invalidity or unenforceability thereof, or any such Person shall deny that it has any liability or obligation purported to be created under any such agreement; or

8.15.    **Consultant**.  (a) If the Consultant is terminated or disqualified for any reason and Borrowers have not engaged a replacement Consultant reasonably acceptable to Agent within five (5) Business Days thereafter, (b) the terms of the Consultant's engagement by Borrowers are modified in any material manner not reasonably acceptable to Agent, (c) the Consultant is instructed to cease working, (d) the Consultant's engagement by Borrowers, or any of the responsibilities, authority, powers, or duties of the Consultant, is terminated, suspended, or restricted in any material respect, or (e) the Consultant resigns and Borrowers have not engaged a replacement Consultant reasonably acceptable to the Agent within five (5) Business Days;

8.16.    **Bankruptcy Matters**.

(a)    (i) The Canadian Interim DIP Recognition Order is not issued within 3 Business Days following the entry of the Interim Financing Order, (ii) the Final Financing Order is not entered within forty (40) days following the Filing Date or (iii) the Canadian Final DIP Recognition Order is not issued within 3 Business Days following the entry of the Final Financing Order;

(b)    Any of the Interim Financing Order, the Final Financing Order, the Canadian Interim DIP Recognition Order or the Canadian Final DIP Recognition Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified by the

Bankruptcy Court without the express prior written consent of the Agent (such consent to be given in its sole discretion);

(c)    Any Debtor shall file a pleading seeking to modify or otherwise alter the Interim Financing Order, the Final Financing Order, the Canadian Interim DIP Recognition Order, the Canadian Final DIP Recognition Order, any Loan Document, any Existing Loan Document or any of the transactions contemplated in any of the foregoing without the prior consent of Agent, such consent to be given in its sole discretion;

(d)    Without the written consent of the Agent, (i) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (A) appointing a trustee under Section 1104 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business of the Loan Parties under Section 1106(b) of the Bankruptcy Code, which appointment shall not have been reversed, stayed or vacated within three days, or (B) terminating or shortening any Debtor's exclusive rights to file and solicit acceptances for a plan of reorganization in the Bankruptcy Cases, or (ii) an order with respect to the Recognition Proceedings shall be entered by the Canadian Court (A) appointing any monitor, trustee, receiver, interim receiver, receiver and manager or other similar Person in any Canadian proceeding under any Insolvency Laws, or an examiner with enlarged powers relating to the operation of the business of the Loan Parties pursuant to applicable Insolvency Laws (other than, for the avoidance of doubt, the appointment of the Information Officer) or (B) terminating or shortening any Debtor's exclusive rights to file and solicit acceptances for a plan of reorganization in the Bankruptcy Cases;

(e)    (i) Any Loan Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Agent and the Lenders, or otherwise in respect of the Obligations or Existing Secured Obligations, claims or rights against Loan Parties or any of their Subsidiaries or to subject any Collateral to assessment pursuant to Section 105, 506(c), 552 or any other section of the Bankruptcy Code or other applicable Insolvency Laws, (ii) any lien, security interest or Superpriority Claim created by the Loan Documents, the Financing Order or the applicable DIP Recognition Order shall, for any reason, cease to be valid, (iii) any action is commenced by any Loan Party or any of its Subsidiaries which contests the extent, validity, perfection, enforceability or priority of any of the liens and security interests of Agent, Existing Agent, the Lenders or Existing Lenders or in respect of the Existing Secured Obligations or the Obligations (including the Last Out Loans or the Last Out Obligations) created by the Loan Documents, the Existing Credit Agreement, the Existing Loan Documents, the Financing Order or the applicable DIP Recognition Order or (iv) any Loan Party or any Subsidiary of any Loan Party challenges the extent, validity or priority of the Obligations or the Existing Secured Obligations or the application of any payments or collections received by Agent, Lenders, Existing Agent, or Existing Lenders to the Obligations or Existing Secured Obligations as provided for herein or in the Financing Order;

(f)    Without the written consent of the Agent, (i) an order with respect to any of the Bankruptcy Cases or the Recognition Proceedings shall be entered by the Bankruptcy Court or the Canadian Court dismissing any of the Bankruptcy Cases or the Recognition Proceedings or converting any of the Bankruptcy Cases (or any case comprising part of any of the Bankruptcy Cases) to a case under chapter 7 of the Bankruptcy Code or the applicable

provisions of other Insolvency Laws, which dismissal or conversion shall not have been reversed, stayed or vacated within 3 days, (ii) any Insolvency Proceeding with respect to the Loan Parties or their Subsidiaries other than the Recognition Proceedings shall be commenced in Canada under applicable Insolvency Laws or (iii) the Loan Parties shall seek or request the entry of any order to effect any of the events described in subclauses (i) and (ii) of this paragraph (f);

(g)    An order with respect to any of the Bankruptcy Cases or the Recognition Proceedings shall be entered without the express prior written consent of Agent, (i) to revoke, vacate, reverse, stay, modify, supplement or amend the Existing Credit Agreement, any Loan Document, any Existing Loan Document, the Financing Order, the applicable DIP Recognition Order or the transactions contemplated in any of the foregoing, or (ii) to permit any administrative expense, claim or lien (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of the Agent, Existing Agent, Lenders and Existing Lenders in respect of the Obligations and Existing Secured Obligations;

(h)    An order shall be entered by the Bankruptcy Court or the Canadian Court granting relief from the automatic stay in connection with the Bankruptcy Cases and the Recognition Proceedings to any party that affects the Loan Parties' property (including, without limitation, to permit foreclosure or enforcement on the Collateral) with a fair market value in excess of $500,000 without the written consent of the Agent;

(i)    Any plan of reorganization is filed by the Debtors, Sponsor or the Term Loan Lenders that, or an order shall be entered by the Bankruptcy Court or issued by the Canadian Court confirming a reorganization plan in any of the Bankruptcy Cases or the Recognition Proceedings which, does not (i) contain a provision that all Obligations and all Existing Secured Obligations shall be paid in full in a manner satisfactory to the Agent on or before the effective date, or substantial consummation, of such plan (other than in respect of the Last Out Obligations) and (ii) provide for the continuation of the liens and security interests granted to Agent and priorities (subject to the Existing Intercreditor Agreement and Participation Agreement in respect of the Last Out Obligations) until such plan effective date all Obligations and Existing Secured Obligations are paid in full (other than in respect of the Last Out Obligations as set forth above);

(j)    Unless otherwise agreed to by Agent, other than with respect to the Term Loan Debt, a motion shall be filed by any Loan Party seeking authority, or an order shall be entered in any of the Bankruptcy Cases or the Recognition Proceedings, that (i) permits any Loan Party or any Subsidiary of any Loan Party to incur indebtedness secured by any claim under Bankruptcy Code Section 364(c)(1) or any corresponding provision under other applicable Insolvency Laws or by a Lien pari passu with or superior to the lien granted under the Loan Documents and the Existing Loan Documents and Bankruptcy Code Sections 364(c)(2) (or any corresponding provision under other applicable Insolvency Laws) or (d) unless (A) all of the Obligations and Existing Secured Obligations have been paid in full at the time of the entry of any such order, or (B) the Obligations and the Existing Secured Obligations are paid in full with such indebtedness, or (ii) permits any Loan Party or any Subsidiary of any Loan Party the right to use cash Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations and Existing Secured Obligations shall have been paid in full;

(k)    Subject to the Existing Intercreditor Agreement, any motions in the Bankruptcy Cases or the Recognition Proceedings to sell Collateral (other than Term Loan Priority Collateral) or approve procedures regarding the same, or any orders of the Bankruptcy Court or Canadian Court approving or amending any of the foregoing, are not in form and substance reasonably acceptable to Agent;

(l)    Any Loan Party or any Subsidiary of any Loan Party shall fail to maintain sufficient projected borrowing capacity under the Credit Agreement plus cash plus projected cash flow plus undrawn commitments under the Term Loan Credit Agreement to pay all accrued administrative obligations and other administrative claims when due, and sufficient additional borrowing capacity to enable such other unpaid administrative obligations and administrative claims that are required to be paid in full prior to such time that all Obligations and Existing Secured Obligations are paid in full;

(m)    Three Business Days after written notice to the Loan Parties of the failure by the Loan Parties to deliver to the Agent any of the documents or other written information required to be delivered pursuant to the Financing Order when due (during which time the Loan Parties may cure) or any such documents or other written information shall contain a misrepresentation of a material fact when made so as to make the written information provided to the Agent and Lenders, taken as a whole, materially misleading;

(n)    Except as set forth herein, the failure by the Loan Parties to observe or perform any of the material terms or provisions contained in the Financing Order in any respect adverse to the interests of the Lenders;

(o)    The entry of an order of the Bankruptcy Court granting any lien on or security interest in any of the Collateral that is pari passu with or senior to the DIP Liens held by the Agent on or as security interests in the Collateral, the Adequate Protection Liens, the Superpriority Claims or the Liens securing the Existing Obligations, or the Loan Parties and any of their Subsidiaries shall seek or request (or support another party in the filing of) the entry of any such order, other than the Term Loan Debt;

(p)    The Loan Parties' creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the Agent and the Lenders, the Adequate Protection Liens, the Superpriority Claims or the Pre-Petition Term Liens, except for the Carveout, the liens securing the Existing Term Loan Debt and the liens securing the Term Loan Debt, and the Permitted Priority Liens;

(q)    The Parent or any of its Subsidiaries using the proceeds of the Loans for any item other than in compliance with Section 7(a), other than the Carveout, or makes any Pre-Petition Payment (other than the obligations under the Existing Term Loan Debt as contemplated by the Term Loan Credit Agreement and in accordance with the Approved Budget), in each case except as agreed in writing in advance by the Agent;

(r)    Any uninsured judgments are entered with respect to any post-petition liabilities against any of the Loan Parties or any of their respective properties in a combined

-100-

aggregate amount in excess of $200,000 unless stayed, vacated or satisfied for a period of twenty (20) calendar days after entry thereof;

(s)    Any Loan Party asserts a right of subrogation or contribution against any other Loan Party prior to the date upon which all Obligations and Existing Secured Obligations have been paid in full and all Commitments have been terminated;

(t)    Any Loan Party shall seek to sell any of its assets that are ABL Priority Collateral outside the ordinary course of business, unless (i) the proceeds of such sale are used to indefeasibly pay the Obligations and Existing Secured Obligations in full in cash unless such sale is consented to by the Agent (it being agreed that such consent is deemed to be given with respect to the Proposed Plan as in effect on the date hereof), or (ii) such sale is pursuant to bidding procedures approved by the Agent;

(u)    The Parent or any of its Subsidiaries (or any party with the support of any of the Parent or any of its Subsidiaries) shall challenge the validity or enforceability of any of the Loan Documents or the Existing Loan Documents;

(v)    Upon the consummation of a sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale are applied to the indefeasible payment in full the Obligations and Existing Secured Obligations or otherwise applied in accordance with the DIP Orders or (ii) such sale is consented to by the Agent;

(w)    Payment of or granting adequate protection with respect to any Indebtedness that was existing prior to the Filing Date other than as expressly provided in the Financing Order or permitted under the Intercreditor Agreement or as consented to by the Agent; and

(x)    The termination of the Restructuring Support Agreement by any part thereto; or

8.17.    **Permitted Variance**.  Permitted Variances under the Approved Budget are exceeded for any period of time.

9.    **RIGHTS AND REMEDIES**.

9.1.    **Rights and Remedies**.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the occurrence and during the continuation of an Event of Default and subject to any notice required under the Financing Order or any DIP Recognition Order, the Required Lenders (at their election but without notice of their election and without demand (but with concurrent written notice to Administrative Borrower in the case of clauses (a) and (b) below) may authorize and instruct Agent to do any one or more of the following on behalf of the Lender Group (and Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of the Lender Group), all of which are authorized by Borrowers:

(a)    (i) declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations),

whether evidenced by this Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Borrower, and (ii) direct Borrowers to provide (and Borrowers agree that upon receipt of such notice Borrowers will provide) Letter of Credit Collateralization to Agent to be held as security for Borrowers' reimbursement obligations for drawings that may subsequently occur under issued and outstanding Letters of Credit;

(b)    declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Revolving Lender to make Revolving Loans, (ii) the obligation of any Swing Lender to make Swing Loans, and (iii) the obligation of any Issuing Lender to issue Letters of Credit;

(c)    terminate the Loan Parties' right to use Cash Collateral by written notice thereof to counsel for the Loan Parties, counsel for the Committee (if any), the U.S. Trustee, and the Information Officer, without further notice, application or order of the Bankruptcy Court or the Canadian Court;

(d)    subject to the applicable terms, if any, of the Financing Order (which will include, without limitation, a seven (7) Business Day advance written notice period requirement) and the applicable DIP Recognition Order, exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity; provided, that, during such seven (7) Business Day period, none of the Agent or Lenders shall be required to provide any Loans or other financial accommodations under this Agreement.

9.2.    **Remedies Cumulative**.  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver.  No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

10.    **WAIVERS; INDEMNIFICATION**.

10.1.    **Demand; Protest; etc.**  Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any Borrower may in any way be liable.

10.2.    **The Lender Group's Liability for Collateral**.  Each Borrower hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier,

warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

10.3.    **Indemnification**.  Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to (1) the execution and delivery, advising, structuring, drafting, reviewing, administering or syndicating, or the monitoring of Parent's and its Subsidiaries' compliance with the terms of, the Loan Documents or any Existing Loan Documents (provided that any legal fees incurred in connection therewith shall be limited to the reasonable fees and reasonable out-of-pocket expenses of one primary counsel for all Indemnified Persons (taken as a whole) (and, solely in the case of an actual conflict of interest, one additional counsel as necessary to the affected Indemnified Persons taken as a whole) and to the extent reasonably necessary, one local counsel in each relevant material jurisdiction)), (2) enforcement (including any restructuring or workout with respect hereto and in connection with the Bankruptcy Cases) of this Agreement, any of the other Loan Documents or any Existing Loan Document, or the transactions contemplated hereby or thereby (provided, that the indemnification in this clause (a) shall not extend to (i) any dispute among Indemnified Persons that does not arise out of an act or omission by Borrower or any other Loan Party or Subsidiary thereof (other than any claims against Agent or a Lead Arranger in their capacity as such), or (ii) any claims primarily related to Taxes or any costs attributable to such Tax claims, which shall be governed by Section 16), (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document or any Existing Loan Document, the making of any Loans or issuance of any Letters of Credit hereunder, or the use of the proceeds of the Loans or the Letters of Credit provided hereunder or under the Existing Credit Agreement (irrespective of whether any Indemnified Person or Loan Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any violation of Environmental Law by Parent or any of its Subsidiaries, any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Borrower or any of its Subsidiaries, or any Environmental Actions against, Environmental Liabilities of, or Remedial Actions required of, Parent or any of its Subsidiaries, or related in any way to any operations, assets or properties of any Borrower or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities").   The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.3 with respect to any (a) material breach of any Indemnified Person of their obligations (or the obligations of such Indemnified Persons' Agent-Related Persons) under the Loan Documents, as finally determined by a court of competent jurisdiction or (b) Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents.  This provision shall survive the termination of this Agreement and the repayment in full of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an

Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto. **WITHOUT LIMITATION, EXCEPT AS SET FORTH ABOVE, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON**.

11.    **NOTICES**.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to Parent, any Borrower or Agent, as the case may be, they shall be sent to the respective address set forth below:

|  |  |
|---|---|
| If to Parent or any Borrower: | **HOLLANDER SLEEP PRODUCTS, LLC**<br>6501 Congress Avenue Suite 300<br>Boca Raton, Florida 33487<br>Attn: Stephen Cumbow<br>Fax No. 561-214-4030 |
| with copies to (which shall not constitute notice or service of process): | **SENTINEL CAPITAL PARTNERS, L.L.C.**<br>330 Madison Avenue, 27th Floor<br>New York, New York 10017<br>Attn: Michael Fabian<br>Fax No. (212) 688-6513 |
|  | **KIRKLAND & ELLIS**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Yongjin Im<br>Fax No. (212) 446-4900 |
| If to Agent: | **WELLS FARGO BANK, NATIONAL ASSOCIATION**<br>2450 Colorado Avenue, Suite 3000 West<br>Santa Monica, California 90404<br>Attn: Account Manager – Hollander<br>Fax No. (866) 495-9803 |

|  |  |
|---|---|
| with copies to<br>(which shall not<br>constitute notice or<br>service of process): | **GOLDBERG KOHN LTD.**<br>55 East Monroe Street, Suite 3300<br>Chicago, Illinois  60606<br>Attn:  Randall L. Klein<br>Fax No. (312) 863-7474 |

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this <u>Section 11</u>, shall be deemed received on the earlier of the date of actual receipt or three Business Days after the deposit thereof in the mail; <u>provided</u>, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

12.    **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.**

(a)    **THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

(b)    **IF THE BANKRUPTCY COURT ABSTAINS FROM HEARING OR REFUSES TO EXERCISE JURISDICTION OVER ANY OF THE FOLLOWING, THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE COURTS AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; <u>PROVIDED</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH OF PARENT AND EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS**

OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>.

(c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF PARENT AND EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "<u>CLAIM</u>"). EACH OF PARENT AND EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENT AND WARRANT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)    THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK AND THE STATE OF NEW YORK AND THE BANKRUPTCY COURT, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)    NO CLAIM MAY BE MADE BY ANY LOAN PARTY AGAINST AGENT, ANY SWING LENDER, ANY OTHER LENDER, ANY ISSUING LENDER, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH LOAN PARTY HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

**NOTWITHSTANDING ANY OTHER PROVISION OF THIS <u>SECTION 12</u>, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.**

13.    **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS**.

13.1.    **<u>Assignments and Participations</u>**.

(a)    (i)    Subject to the conditions set forth in clause (a)(ii) below, any Lender may assign and delegate all or any portion of its rights and duties under the Loan Documents (including the Obligations owed to it and its Commitments) to one or more assignees so long as such prospective assignee is an Eligible Transferee (each, an "<u>Assignee</u>"), with the prior written consent (such consent not be unreasonably withheld or delayed) of:

(A)    solely to the extent such Assignee is a Specified Competitor, Administrative Borrower; <u>provided</u>, that no such consent of Administrative Borrower shall be required with respect to any such assignment if an Event of Default has occurred and is continuing; and

(B)    Agent, Swing Lenders, and Issuing Lenders.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    no assignment may be made to a natural person;

(B)    no assignment may be made to a Loan Party or any of its Subsidiaries, or any Sponsor Affiliated Entity (except with respect to Last Out Loans with the consent of the Agent or upon payment in full of the Obligations (other than the Last Out Loans) as contemplated by the Participation Agreement);

(C)    the amount of the Commitments and the other rights and obligations of the assigning Lender hereunder and under the other Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be in a minimum amount (unless waived by Agent) of $5,000,000 (or lesser amounts, if agreed by Agent, or otherwise if less, all of such Lender's remaining Commitments and Loans) (except such minimum amount shall not apply to (I) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender or (II) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000);

(D)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(E)    the parties to each assignment shall execute and deliver to Agent an Assignment and Acceptance; <u>provided,</u> that Borrowers and Agent may continue to deal

solely and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Administrative Borrower and Agent by such Lender and the Assignee;

(F)    unless waived by Agent, the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500; and

(G)    the assignee, if it is not a Lender, shall deliver to Agent an Administrative Questionnaire in a form approved by Agent (the "Administrative Questionnaire").

(b)    From and after the date that Agent receives the executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall be a "Lender" and shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such

Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (other than, so long as no Event of Default has occurred, a Specified Competitor) (a "Participant") participating interests in all or any portion of its Obligations, its Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decreases the amount or postpones the due dates of scheduled principal repayments or prepayments or premiums payable to such Participant through such Lender (for the avoidance of doubt, mandatory prepayments pursuant to Section 2.4(e) may be postponed, delayed, waived or modified without the consent of a Participant), (v) no participation shall be sold to a natural person, (vi) no participation shall be sold to a Loan Party, an affiliate of a Loan Party or any Sponsor Affiliated Entity, except pursuant to and in accordance with the terms of the Existing Participation Agreement or the Participation Agreement, and (vii) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, each Participant shall be entitled to the benefits of Section 16 as

if it were a Lender provided such Participant delivers the forms and documentation required by Section 16 and otherwise agrees in writing to be subject to Section 16 as if it were a Lender. Subject to the foregoing, sentence, the rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)     In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.9, disclose all documents and information which it now or hereafter may have relating to Parent and its Subsidiaries and their respective businesses.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

(h)     Agent (as a non-fiduciary agent on behalf of Borrowers) shall maintain, or cause to be maintained, a register (the "Register") on which it enters the name and address of each Lender as the registered owner of the Revolver Commitments (and the principal amount thereof and stated interest thereon) held by such Lender (each, a "Registered Loan"). Other than in connection with an assignment by a Lender of all or any portion of its portion of the Revolver Commitments to an Affiliate of such Lender or a Related Fund of such Lender (i) a Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide) and (ii) any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any evidencing the same), Borrowers shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary, absent manifest error. In the case of any assignment by a Lender of all or any portion of its Revolver Commitments to an Affiliate of such Lender or a Related Fund of such Lender, and which assignment is not recorded in the Register, the assigning Lender, on behalf of Borrowers, shall maintain a register comparable to the Register. This Section 13.1(h) shall be construed so that the Revolver Commitments are at all times maintained in "registered form" within the meaning of Section 163(f), 165(g), 871(h)(2), 881(c)(2) and 4701 of the IRC.

(i)     In the event that a Lender sells participations in the Registered Loan, such Lender, as a non-fiduciary agent on behalf of Borrowers, shall maintain (or cause to be maintained) a register in accordance with Section 5f.103-1(c) of the United States Treasury Regulations on which it enters the name of all participants in the Registered Loans held by it (and the principal amount (and stated interest thereon) of the portion of such Registered Loans that is subject to such participations) (the "Participant Register").  A Registered Loan (and the Registered Note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.

(j)     Agent shall make a copy of the Register (and each Lender shall make a copy of its Participant Register to the extent it has one) available for review by Borrowers from time to time as Borrowers may reasonably request.

(k)     Notwithstanding anything contained herein to the contrary, no assignment may be made unless after giving effect thereto the Pro Rata Share of the US Revolver Commitments of a Lender and its Affiliates shall equal the Pro Rata Share of the Canadian Revolver Commitments of such Lender and its Affiliates and the Pro Rata Share of the Canadian Revolver Commitments of a Lender and its Affiliates shall equal the Pro Rata Share of the US Revolver Commitments of such Lender and its Affiliates.

(l)     Notwithstanding anything to the contrary set forth herein, the participations and assignments contemplated by the Participation Agreement shall be permitted hereunder.

13.2.    **Successors**.  This Agreement shall bind and inure to the benefit of the respective permitted successors and assigns of each of the parties; provided, that, except to the extent otherwise expressly permitted hereunder, no Borrower may assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void ab initio.  No consent to assignment by the Lenders shall release any Borrower from its Obligations.  A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 and, except as expressly required pursuant to Section 13.1, no consent or approval by any Loan Party is required in connection with any such assignment.

## 14.    **AMENDMENTS; WAIVERS**.

### 14.1.    **Amendments and Waivers**.

(a)     No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements or the Fee Letter), and no consent with respect to any departure by Borrowers therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific

purpose for which given; <u>provided,</u> that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly and adversely affected thereby and all of the Loan Parties that are party thereto, do any of the following:

(i)    increase the amount of or extend the expiration date of any Commitment of such Lender or amend, modify, or eliminate the last sentence of <u>Section 2.4(c)</u> (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default or a waiver of a mandatory prepayment under <u>Section 2.4(e)</u> shall not constitute an extension or increase of any Commitment),

(ii)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to <u>Section 2.4(e)</u> may be postponed, delayed, waived or modified with the consent of Required Lenders) due to such Lender,

(iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document other than the Fee Letter due to such Lender (except (i) in connection with the waiver of applicability of <u>Section 2.6(c)</u> and (ii) in connection with the waiver of a mandatory prepayment under <u>Section 2.4(e)</u>, which, in each case, shall be effective with the written consent of the Required Lenders),

(iv)    amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)    amend, modify, or eliminate the definitions of "Required Lenders" or "Pro Rata Share",

(vi)    other than in connection with a transaction expressly permitted by the terms hereof or the other Loan Documents, release or contractually subordinate all or substantially all of the value of the Guarantees or Collateral, or

(vii)    amend, modify, or eliminate any of the provisions of <u>Section 2.4(b)(i)</u> or <u>(ii)</u>.

(b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate,

(i)    the definition of, or any of the terms or provisions of, the Fee Letter, without the written consent of Agent and Borrowers, and shall not require the written consent of any of the Lenders, or

(ii)    any provision of <u>Section 15</u> pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders.

(c)       No amendment, waiver, modification, elimination, or consent shall, without written consent of Agent, Borrowers and each Lender,

(i)       amend, modify, or eliminate the definition of US Borrowing Base, Canadian Borrowing Base or any of the defined terms (including the definitions of US Eligible Accounts, Canadian Eligible Accounts, US Eligible Inventory and Canadian Eligible Inventory) that are used in such definition to the extent that any such change results in more credit being made available to Borrowers based upon the US Borrowing Base or Canadian Borrowing Base, but not otherwise, or the definition of US Maximum Revolver Amount or Canadian Maximum Revolver Amount,

(ii)      amend, modify, or eliminate Section 3.1 or 3.2 (provided, that a waiver of a Default or Event of Default or an event or circumstance that could give rise to a Default or Event of Default shall not constitute an amendment or modification of Section 3.1 or 3.2),or

(iii)     amend, modify, or eliminate the definition of "Initial Approved Budget" or "Approved Budget".

(d)       No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to an Issuing Lender, or any other rights or duties of an Issuing Lender under this Agreement or the other Loan Documents, without the written consent of the applicable Issuing Lender, Agent, Borrowers, and the Required Lenders,

(e)       No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Swing Lender, or any other rights or duties of Swing Lender under this Agreement or the other Loan Documents, without the written consent of Swing Lender, Agent, Borrowers, and the Required Lenders,

(f)       Anything in this Section 14.1 to the contrary notwithstanding, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Parent or any Borrower, shall not require consent by or the agreement of any Loan Party, and (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by Section 14.1(a)(i) through (iii) that affect such Lender, and

(g)       The terms of the Existing Participation Agreement, the Participation Agreement and the Participation Put Agreement (unless earlier terminated) and any participation entered into thereunder shall be binding on the successors and assignees of each Lender party thereto.

Notwithstanding anything to the contrary herein, with the consent of Agent at the request of the Administrative Borrower (without the need to obtain any consent of any Lender), any

-113-

Loan Document may be amended to cure any obvious error or any error or omission of a technical nature that is jointly identified by Agent and the Administrative Borrower.

14.2.    **Replacement of Certain Lenders**.

(a)    If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders, but not of all Lenders or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under Section 16, then Borrowers or Agent, upon at least five Business Days prior irrevocable notice (or such shorter period as Agent may agree), may permanently replace any Lender (and its Affiliates) that failed to give its consent, authorization, or agreement (a "Non-Consenting Lender") or any Lender that made a claim for compensation (a "Tax Lender") with one or more Replacement Lenders, and the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, shall have no right to refuse to be replaced hereunder. Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, being repaid in full its share of the outstanding Obligations (without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due in payable in respect thereof, and (ii) an assumption of its Pro Rata Share of participations in the Letters of Credit. If the Non-Consenting Lender (or its Affiliates) or Tax Lender (or its Affiliates), as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name of and on behalf of the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Non-Consenting Lender (or its Affiliates) or Tax Lender (or its Affiliates), as applicable, shall be made in accordance with the terms of Section 13.1. Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, hereunder and under the other Loan Documents, the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, shall remain obligated to make the Non-Consenting Lender's (and its Affiliates) or Tax Lender's (and its Affiliates), as applicable, Pro Rata Share of Revolving Loans and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of participations in such Letters of Credit.

14.3.    **No Waivers; Cumulative Remedies**. No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or

delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Parent and Borrowers of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

15.     **AGENT; THE LENDER GROUP**.

15.1.     **Appointment and Authorization of Agent**.  Each Lender hereby designates and appoints Wells Fargo as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as agent for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this Section 15.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.  Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral.  Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and

cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Parent or its Subsidiaries, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

15.2.    **Delegation of Duties**.    Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents (including WF Canada), employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Each member of the Lender Group and each Loan Party acknowledges and agrees that any agent appointed by Agent shall be entitled to the rights and benefits of this Section 15.  Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3.    **Liability of Agent**.    None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by Parent or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of Parent or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of Parent or its Subsidiaries.

15.4.    **Reliance by Agent**.    Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent.  Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable.  If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and, if it so elects, the Bank Product Providers) against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan

Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and Bank Product Providers).

15.5.    **Notice of Default or Event of Default**.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Administrative Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default.  Each Lender shall be solely responsible for giving any notices to its Participants, if any.  Subject to <u>Section 15.4</u>, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with <u>Section 9</u>; <u>provided</u>, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6.    **Credit Decision**.  Each Lender (and Bank Product Provider) acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Parent and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender (or Bank Product Provider).  Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of any Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers.  Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of any Borrower or any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender (or Bank Product Provider) with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Borrower or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons.  Each Lender acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider

shall be deemed to acknowledge) that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to Borrowers, their Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

15.7.    **Costs and Expenses; Indemnification**.    Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise.    Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders (or Bank Product Providers).    In the event Agent is not reimbursed for such costs and expenses by Parent or its Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable thereof.    Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers.    The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8.    **Agents in Individual Capacity**.    Wells Fargo and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Parent and its Subsidiaries and Affiliates and any other Person party to any Loan Document as though it were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.    The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, Wells Fargo or its Affiliates may receive information regarding Parent or its Affiliates or any

other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Parent or such other Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include Wells Fargo in its individual capacity.

15.9.    **Successor Agent**.  Agent may resign as Agent upon thirty (30) days (ten (10) days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such resignation is made pursuant to Section 9 of the Participation Agreement or such notice or applicable notice period is otherwise waived by the Required Lenders, in which case no such prior notice shall be required) and without any notice to the Bank Product Providers.  If Agent resigns under this Agreement, the Required Lenders shall be entitled, appoint a successor Agent for the Lenders (and the Bank Product Providers).  If, at the time that Agent's resignation is effective, it is acting as an Issuing Lender or a Swing Lender, such resignation shall also operate to effectuate its resignation as an Issuing Lender or a Swing Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, or to make Swing Loans.  If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders, a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders.  In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  If no successor Agent has accepted appointment as Agent by the date which is thirty (30) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10.    **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Parent and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group (or the Bank Product Providers).  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Parent or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Parent or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering

into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11.    **Collateral Matters**.

(a)    The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrowers certify to Agent that the sale or disposition is permitted under Section 6.4 (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which neither Parent or its Subsidiaries owned any interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to Parent or its Subsidiaries under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 15.11. Notwithstanding anything to the contrary in the foregoing, to the extent property is sold or disposed of pursuant to and in accordance with Section 6.4 to a Person that is not a Loan Party (or required to become a Loan Party), Agent's Lien on such sold or disposed of Collateral shall automatically terminate. The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, based upon the instruction of the Required Lenders, to (a) consent to, credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code and any similar laws in any other jurisdictions in which a Loan Party is subject, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code or the PPSA, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, based upon the instruction of the Required Lenders, may accept non-cash

consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the Obligations owed to the Lenders and the Bank Product Providers (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration; provided, that Bank Product Obligations not entitled to the application set forth in Section 2.4(b)(ii)(A)(10) or Section 2.4(b)(ii)(B)(10) shall not be entitled to be, and shall not be, credit bid, or used in the calculation of the ratable interest of the Lenders and Bank Product Providers in the Obligations which are credit bid.  Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers).   Upon request by Agent or Borrowers at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 15.11; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrowers in respect of) any and all interests retained by any Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)     Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) (i) to verify or assure that the Collateral exists or is owned by Parent or its Subsidiaries or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall not have any other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise expressly provided herein.

(c)     Wells Fargo maintains internal policies and procedures, standards and/or other documentation that address requirements placed on federally-regulated lenders under Flood Laws. Agent will post on the Platform documents that it receives in connection with the Flood Laws. However, Agent reminds each Lender that, pursuant to the Flood Laws, each federally regulated lender is responsible for assuring its own compliance with the flood insurance requirements.

15.12.    **Restrictions on Actions by Lenders; Sharing of Payments**.

(a)    Each of the Lenders agrees that it shall not, without the express written consent of Agent, set off against the Obligations, any amounts owing by such Lender to Parent or its Subsidiaries or any deposit accounts of Parent or its Subsidiaries now or hereafter maintained with such Lender.   Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)    If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13.    **Agency for Perfection**.   Agent hereby appoints each other Lender (and each Bank Product Provider) as its agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code or the applicable provisions of the PPSA or the STA can be perfected by possession or control.   Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14.    **Payments by Agent to the Lenders**.   All payments to be made by Agent to the Lenders (or Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.   Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15.    **Concerning the Collateral and Related Loan Documents**.   Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan

Documents.  Each member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders (and such Bank Product Provider).

15.16.    **Field Examination Reports**; **Confidentiality**; **Disclaimers by Lenders**; **Other Reports and Information**.  By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting Parent or its Subsidiaries (each, a "Report") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any field examination will inspect only specific information regarding Parent and its Subsidiaries and will rely significantly upon Parent's and its Subsidiaries' books and records, as well as on representations of Borrowers' personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 17.9, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, documented or invoiced out-of-pocket attorneys' fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing, (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Parent or its Subsidiaries to Agent that has not been contemporaneously provided by Parent or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the

Loan Documents, to request additional reports or information from Parent or its Subsidiaries, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Parent or such Subsidiary, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Borrowers a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17.    **Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 15.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein.

15.18.    **Sole Lead Arranger and Sole Book Runners**.  Each of the Sole Lead Arranger and Sole Book Runner, in such capacities, shall not have any right, power, obligation, liability, responsibility, or duty under this Agreement other than those applicable to it in its capacity as a Lender, as Agent, as a Swing Lender, or as an Issuing Lender.  Without limiting the foregoing, each of the Sole Lead Arranger and Sole Book Runner, in such capacities, shall not have or be deemed to have any fiduciary relationship with any Lender or any Loan Party.  Each Lender, Agent, Swing Lender, Issuing Lender, and each Loan Party acknowledges that it has not relied, and will not rely, on the Sole Lead Arranger and Sole Book Runner in deciding to enter into this Agreement or in taking or not taking action hereunder.  Each of the Sole Lead Arranger and Sole Book Runner, in such capacities, shall be entitled to resign at any time by giving notice to Agent and Borrowers.

15.19.    **Appointment for the Province of Quebec**.  Without prejudice to Section 15.1 above, each member of the Lender Group hereby appoints and by entering into a Bank Product Agreement each of the Bank Product Providers shall be deemed to appoint the Agent as hypothecary representative  of the Lender Group and the Bank Product Providers as contemplated under Article 2692 of the Civil Code of Quebec (in such capacity, the "Hypothecary Representative"), to enter into, to take and to hold on their behalf, and for their benefit, any deed of hypothec ("Deed of Hypothec") executed or to be executed by any of the Borrowers or Guarantors granting a hypothec pursuant to the laws of the Province of Quebec

(Canada), as security for, inter alia, the Obligations (or any portion thereof) and to exercise such powers and duties which are conferred thereupon under such deed. The Hypothecary Representative shall (A) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Agent, as Hypothecary Representative, with respect to the property or assets charged under any Deed of Hypothec under any other applicable law or otherwise, and (B) benefit from and be subject to all provisions hereof with respect to Agent *mutatis mutandis*, including, without limitation, all such provisions with respect to the liability or responsibility to and indemnification by the Lender Group and the Bank Product Providers, the Borrowers or the Guarantors. The execution prior to the date hereof by the Agent, as Hypothecary Representative of any Deed of Hypothec made pursuant to the laws of the Province of Quebec (Canada) is hereby ratified and confirmed. The appointment of the Agent as Hypothecary Representative shall be deemed to have been ratified and confirmed by each Person accepting an assignment of, a participation in or an arrangement in respect of, all or any portion of any of the Lender Group's or the Bank Product Providers' rights and obligations under this Agreement by the execution of an assignment, including an Assignment and Acceptance Agreement or other agreement pursuant to which it becomes such assignee or participant, and by each successor Agent by the execution of an assignment agreement or other agreement, or by the compliance with other formalities, as the case may be, pursuant to which it becomes a successor Agent hereunder. Each successor Agent appointed pursuant to the terms of this Agreement shall, automatically and without any further action or formality, become the successor Hypothecary Representative under each Deed of Hypothec (subject only to the registration of a notice of replacement in accordance with 2692 of the Civil Code of Quebec prior to exercising the rights relating to any Deed of Hypothec).

16.    **WITHHOLDING TAXES**.

16.1.    **Payments**.  All payments under the Loan Documents by or on account of any obligation of any Loan Party will be made free and clear of, and without deduction or withholding for, any present or future Taxes, except as required by applicable law.  If any Taxes are required to be deducted or withheld from any payment by or on account of any obligation of any Loan Party under the Loan Documents, the applicable Loan Party shall deduct, withhold or pay (as the case may be) the full amount of such Taxes to the relevant Governmental Authority and, if such taxes are Indemnified Taxes, the amount payable by the Loan Parties shall be increased as is necessary so that after withholding or deduction for or on account of such Indemnified Taxes, the amount received by the Lender, Agent, or other applicable recipient will not be less than the amount the applicable Lender, Agent, or other recipient would have received had no such withholding or deduction in respect of Indemnified Taxes been made.  Borrowers will furnish to Agent promptly after the date the payment of any Tax is due pursuant to applicable law, certified copies of tax returns and receipts (or such other similar documents as may be available) evidencing such payment by Borrowers, or other evidence of payment reasonably satisfactory to Agent.  Each Borrower agrees to pay any present or future stamp, value added, court or documentary, intangible, recording, filing or similar taxes or any other excise or property taxes, charges, or similar levies, other than Excluded Taxes ("Other Taxes") that arise from any payment made hereunder or from the execution, delivery, performance, recordation, registration, from the receipt or perfection of a security interest under, or filing of, or otherwise with respect to this Agreement or any other Loan Document within ten (10) days after receipt of demand therefor.  The Loan Parties shall jointly and severally indemnify each

Indemnified Person (as defined in <u>Section 10.3</u>) (collectively a "<u>Tax Indemnitee</u>") for the full amount of Indemnified Taxes or Other Taxes arising in connection with this Agreement or any other Loan Document (including, without limitation, any Indemnified Taxes or Other Taxes imposed or asserted on, or attributable to, amounts payable under this <u>Section 16</u>) imposed on, or paid by, or required to be withheld on payments to, such Tax Indemnitee and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts or consultants, and all other reasonable costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification, as and when they are incurred and irrespective of whether suit is brought, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to a Borrower by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. The obligations of the Borrowers and Loan Parties under this <u>Section 16</u> shall survive the termination of this Agreement and the repayment of the Loans.

16.2.  **<u>Exemptions</u>**.

(a)    Each Lender and Agent agrees to deliver to Agent and Borrowers and each Participant agrees to deliver to the Originating Lender, two original copies of the following forms, as applicable, before receiving its first payment under this Agreement, but only if such Lender, Participant or Agent is legally able to deliver such forms:

(i)    if such Lender or Participant or Agent is a Foreign Lender entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of the Lender or Participant or Agent, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of any Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to any Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, IRS Form W-8BEN-E or Form W-8IMY (with proper attachments);

(ii)    if such Lender or Participant or Agent is a Foreign Lender entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E;

(iii)    if such Lender or Participant or Agent is a Foreign Lender entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender or Participant or Agent is a Foreign Lender entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because such Lender or Participant or Agent serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or

(v)    if such Lender or Participant or Agent is a U.S. Person, a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be

required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

(b)        Each Lender or Participant or Agent shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms, or if any such form becomes inaccurate in any respect, and to promptly notify Agent and Borrowers, or the Originating Lender in the case of a Participant, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)        If a Lender or Participant or Agent is entitled to claim an exemption or reduction from withholding tax in a jurisdiction other than the United States, such Lender or such Agent agrees with and in favor of Agent and Borrowers or the Participant agrees with and in favor of the Originating Lender, to deliver to Agent and Borrowers, or the Originating Lender in the case of a Participant, any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement (including, for the avoidance of doubt, to the extent required, Canada Revenue Agency Forms NR-301, NR-302 or NR-303, as applicable), but only if such Lender or such Participant or such Agent is legally able to deliver such forms, provided, that nothing in this Section 16.2 shall require a Lender or Participant or Agent to disclose any information that it deems to be confidential (including without limitation, its tax returns).  Each Lender and each Participant and each Agent shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent and Borrowers, or the Originating Lender in the case of a Participant, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)        If a Lender or Participant claims exemption from, or reduction of, withholding tax and such Lender or Participant sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender or Participant, such Lender or Participant agrees to notify Agent and Borrowers (or, in the case of a sale of a participation interest, to the Lender granting the participation) of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender or Participant.  To the extent of such percentage amount, Agent and Borrowers will treat such Lender's or the Originating Lender will treat such Participant's documentation provided pursuant to Section 16.2(a), 16.2(c) or 16.2(e) as no longer valid.  With respect to such percentage amount, such Participant or Assignee shall provide new documentation to Agent and Borrowers, or the Originating Lender in the case of a Participant, pursuant to Section 16.2(a), 16.2(c) or 16.2(e), if applicable.  Borrowers agree that each Participant shall be entitled to the benefits of this Section 16 with respect to its participation in any portion of the Commitments and the Obligations so long as such Participant complies with the obligations set forth in this Section 16 with respect thereto.

(e)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable due diligence and reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), such Lender shall deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) at the time

-127-

or times prescribed by law and at such time or times reasonably requested by Agent (or, in the case of a Participant, the Lender granting the participation) such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by Agent (or, in the case of a Participant, the Lender granting the participation) as may be necessary for Agent or Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

16.3.    **Reductions**.

(a)    If a Lender or a Participant is entitled to a reduction in the applicable withholding tax, Agent (or, in the case of a Participant, the Lender granting the participation) or the Borrowers may withhold from any payment to such Lender or such Participant an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by Section 16.2(a), 16.2(c) or 16.2(e) are not delivered to Agent (or, in the case of a Participant, to the Lender granting the participation), then Agent (or, in the case of a Participant, the Lender granting the participation) or the Borrowers may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax or required by applicable law.

(b)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent (or, in the case of a Participant, to the Lender granting the participation) did not properly withhold tax from amounts paid to or for the account of any Lender or any Participant due to a failure on the part of the Lender or any Participant (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent (or such Participant failed to notify the Lender granting the participation) of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless (or, in the case of a Participant, such Participant shall indemnify and hold Agent and the Lender granting the participation harmless) for all amounts paid, directly or indirectly, by Agent (or, in the case of a Participant, to the Lender granting the participation), as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent (or, in the case of a Participant, to the Lender granting the participation only) under this Section 16, together with all costs and expenses (including attorneys' fees and expenses). The obligation of the Lenders and the Participants under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

16.4.    **Refunds**. If Agent or a Lender or Participant determines, in its sole discretion, that it has received a refund of any Indemnified Taxes with respect to which Borrowers have paid additional amounts pursuant to this Section 16, so long as no Default or Event of Default has occurred and is continuing, it shall pay over such refund to Borrowers (but only to the extent of payments made, or additional amounts paid, by Borrowers under this Section 16 with respect to Indemnified Taxes giving rise to such a refund), net of all out-of-

pocket expenses (including Taxes) of Agent or such Lender or such Participant and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); provided, that Borrowers, upon the request of Agent or such Lender or such Participant, agrees to repay the amount paid over to Borrowers (plus any penalties, interest or other charges, imposed by the applicable Governmental Authority, other than such penalties, interest or other charges imposed as a result of the willful misconduct, bad faith or gross negligence of Agent or such Lender or such Participant hereunder) to Agent or such Lender or such Participant in the event Agent or such Lender or such Participant is required to repay such refund to such Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, this <u>Section 16</u> shall not be construed to require Agent or any Lender or any Participant to make available its tax returns (or any other confidential information) to any Borrower or any other Person.

17.     **GENERAL PROVISIONS**.

17.1.     **<u>Effectiveness</u>**.  This Agreement shall be binding and deemed effective when executed by Parent, each Borrower, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2.     **<u>Section Headings</u>**.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3.     **<u>Interpretation</u>**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Parent or any Borrower, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4.     **<u>Severability of Provisions</u>**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5.     **<u>Bank Product Providers</u>**.  Each Bank Product Provider in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Agent is acting.  Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Agent as its agent and to have accepted the benefits of the Loan Documents.  It is understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of

Agent to determine or insure whether the amount of any such reserve is appropriate or not. In connection with any such distribution of payments or proceeds of Collateral, Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Agent as to the amounts that are due and owing to it and such written certification is received by Agent a reasonable period of time prior to the making of such distribution. Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the applicable Bank Product Provider. In the absence of an updated certification, Agent shall be entitled to assume that the amount due and payable to the applicable Bank Product Provider is the amount last certified to Agent by such Bank Product Provider as being due and payable (*less* any distributions made to such Bank Product Provider on account thereof). Borrowers may obtain Bank Products from any Bank Product Provider, although Borrowers are not required to do so. Each Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product Provider is in the sole and absolute discretion of such Bank Product Provider. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

17.6.     **Debtor-Creditor Relationship**.  The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor.  No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.7.     **Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document mutatis mutandis.

17.8.     **Revival and Reinstatement of Obligations; Certain Waivers**.  If any member of the Lender Group or any Bank Product Provider repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously

-130-

paid or transferred to such member of the Lender Group or such Bank Product Provider in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document or any Bank Product Agreement, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group or Bank Product Provider elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group or Bank Product Provider elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys' fees of such member of the Lender Group or Bank Product Provider related thereto, the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist as if such Voidable Transfer had never been made.

17.9.    **Confidentiality**.

(a)    Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Parent and its Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.9, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested by any Governmental Authority, provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the applicable request or by law and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be requested by such Governmental Authority pursuant to such applicable request, (vii) as required by any Governmental Authority

pursuant to any subpoena or other legal process, <u>provided</u>, that, (x) prior to any disclosure under this clause (vii) the disclosing party agrees to provide Borrower with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrower pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vii) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (viii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (ix) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement, provided that prior to receipt of Confidential Information any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information either subject to the terms of this <u>Section 17.9</u> or pursuant to confidentiality requirements substantially similar to those contained in this <u>Section 17.9</u> (and such Person may disclose such Confidential Information to Persons employed or engaged by them as described in clause (i) above), (x) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; <u>provided</u>, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (ix) with respect to litigation involving any Person (other than any Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior written notice thereof, (xi) for the exercise of any secured creditor remedy under this Agreement or under any other Loan Document and (xii) for purposes of establishing a "due diligence" or similar defense in any legal proceeding.

(b)     Anything in this Agreement to the contrary notwithstanding, Agent may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of any Borrower or the other Loan Parties and the Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of Agent or any Lender.

(c)     The Loan Parties hereby acknowledge that Agent or its Affiliates may make available to the Lenders materials or information provided by or on behalf of Borrowers hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks, SyndTrak or another similar electronic system (the "<u>Platform</u>").  The Platform is provided "as is" and "as available."  Agent does not warrant the accuracy or completeness of the Borrower Materials, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by Agent in connection with the Borrower Materials or the Platform.  In no event shall Agent or any of the Agent-Related Persons have any liability to the Loan Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan

-132-

Party's or Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct. Each Loan Party further agrees that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties shall be deemed to have authorized Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Loan Parties or their securities for purposes of United States federal and state securities laws. All Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor" (or another similar term). Agent and its Affiliates and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Platform not marked as "Public Investor" (or such other similar term).

17.10.    **Survival**.  All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent, any Issuing Lender, or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or been terminated.

17.11.    **Patriot Act**.  Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act.  In addition, Agent and each Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and legal and beneficial owners.  Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agent shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

17.12.    **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.  The foregoing to the contrary notwithstanding, all Bank Product Agreements, if any, are independent agreements governed by the written provisions of such Bank Product Agreements, which will remain in full force and effect, unaffected by any repayment, prepayments, acceleration, reduction, increase, or change in the terms of any credit extended hereunder, except as otherwise expressly provided in such Bank Product Agreement.

17.13.     **HSP as Agent for Borrowers**.  Each Borrower hereby irrevocably appoints HSP as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.    Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide Agent with all notices with respect to Revolving Loans and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from members of the Lender Group (and any notice or instruction provided by any member of the Lender Group to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Revolving Loans and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Accounts and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Accounts and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.  To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loan Accounts and Collateral of Borrowers as herein provided, or (ii) the Lender Group's relying on any instructions of the Administrative Borrower, except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this Section 17.13 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, or its Affiliates, officers, directors, employees, attorneys or agents as the case may be.

17.14.     **Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of each Borrower in respect of any such sum due from it to Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.

If the amount of the Agreement Currency so purchased is less than the sum originally due to Agent or any Lender from any Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Agent or such Lender, as the case may be, against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to Agent or any Lender in such currency, Agent or such Lender, as the case may be, agrees to return the amount of any excess to such Borrower (or to any other Person who may be entitled thereto under applicable law).

17.15.    **No Setoff**.  All payments made by Borrowers hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense.

17.16.    **Quebec Interpretation**.  For all purposes of any assets, liabilities or entities located in the Province of Quebec and for all purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (a) "personal property" shall include "movable property", (b) "real property" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "prior claim" and a "resolutory clause", (f) all references to filing, registering or recording under the Code or PPSA shall include publication under the Civil Code of Quebec, (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" lien or security interest as against third parties, (h) any "right of offset", "right of setoff' or similar expression shall include a "right of compensation", (i) "goods" shall include corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" shall include "legal hypothecs", (l) "joint and several" shall include solidary, (m) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership ", (o) "easement" shall include "servitude", (p) "priority" shall include "prior claim" or "rank", as applicable, (q) "survey" shall include "certificate of location and plan", and (r) "fee simple title" shall include "absolute ownership".

17.17.    **English Language Only**.  The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated hereby be drawn up in the English language only and that all other documents contemplated hereunder or relating hereto, including notices, shall also be drawn up in the English language only.  *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisages par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

17.18.    **Canadian Amalgamations**.  Each Loan Party acknowledges that, in the event it amalgamates with any other corporation or corporations under the laws of Canada or any Province thereof, it is the intention of the parties hereto that the term "Loan Party", "Borrower" or "Guarantor" when used in this Agreement or any other Loan Document, shall apply to each of the amalgamating corporations and to the amalgamated corporation, such that the security interest granted under any Loan Document:

(a)    shall extend to Collateral owned by each of the amalgamating corporations and the amalgamated corporation at the time of amalgamation and to any Collateral thereafter owned or acquired by the amalgamated corporation; and

(b)    shall secure all Obligations of each of the amalgamating corporations and the amalgamated corporation to Agent for the benefit of the Lenders, at the time of amalgamation and all Obligations of the amalgamated corporation to Agent for the benefit of the Lenders.  The security interest granted under any Loan Document shall attach to all Collateral owned by each corporation amalgamating with such Loan Party, and by the amalgamated corporation, at the time of the amalgamation, and shall attach to all Collateral thereafter owned or acquired by the amalgamated corporation when such becomes owned or is acquired.

17.19.    **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Signature pages to follow.]

## Schedule 1.1

As used in the Agreement, the following terms shall have the following definitions:

"ABL Priority Collateral" has the meaning specified therefor in the Intercreditor Agreement.

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Accounting Changes" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions) or the Canadian Institute of Chartered Accountants (or successor thereto).

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting in, directly or indirectly, (a) the purchase or other acquisition by a Person or its Subsidiaries of all or substantially all of the assets of (or any division or business line of) any other Person, or (b) the purchase or other acquisition (whether by means of a merger, consolidation, or otherwise) by a Person or its Subsidiaries of all or substantially all of the Equity Interests of any other Person.

"Additional Documents" has the meaning specified therefor in Section 5.12 of the Agreement.

"Adequate Protection Liens" has the meaning specified therefore in the Financing Order.

"Administration Charge" means the charge granted by the Canadian Court on the Collateral of the Canadian Borrower and Collateral located in Canada of the other Loan Parties in a maximum amount of $200,000 to secure the professional fees and disbursements of the Information Officer and its counsel, in each case incurred in respect of the Recognition Proceedings, both before and after the making of the Canadian Interim DIP Recognition Order, which charge shall rank ahead of the Liens granted in respect of the Agent and Lenders hereunder and in the Canadian Interim DIP Recognition Order.

"Administrative Borrower" has the meaning specified therefor in Section 17.13 of the Agreement.

"Administrative Questionnaire" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Affected Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"<u>Affiliate</u>" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; <u>provided</u>, that, for purposes of the definition of US Eligible Accounts, Canadian Eligible Accounts and <u>Section 6.10</u> of the Agreement: (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"<u>Agent</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Agent Consultant</u>" means any consultant, financial advisor, appraiser, or other professional engaged by Agent or any legal counsel to Agent.

"<u>Agent-Related Persons</u>" means Agent, together with Agent's Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Agent's Applicable Account</u>" means the Agent's US Account and/or Agent's Canadian Account, as the context requires.

"<u>Agent's Canadian Account</u>" means the Deposit Account identified on <u>Schedule A-1</u> as Agent's Canadian Account (or such other Deposit Account that has been designated as such, in writing, by Agent to Administrative Borrower and the Lenders).

"<u>Agent's Liens</u>" means the Liens granted by Parent or its Subsidiaries to Agent under the Loan Documents and securing all or a portion of the Obligations.

"<u>Agent's US Account</u>" means the Deposit Account identified on <u>Schedule A-2</u> as Agent's US Account (or such other Deposit Account that has been designated as such, in writing, by Agent to Administrative Borrower and the Lenders).

"<u>Agreement</u>" means the Debtor-in-Possession Credit Agreement to which this <u>Schedule 1.1</u> is attached.

"<u>Anti-Corruption Laws</u>" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Currency" means Dollars; provided, that with respect to Canadian Revolving Loans and other Obligations denominated in Canadian Dollars, Applicable Currency means Canadian Dollars.

"Applicable Margin" means, as of any date of determination and with respect to Base Rate Loans, 2.00 percentage points (the "Base Rate Margin"), or Non-Base Rate Loans, 4.00 percentage points (the "Non-Base Rate Margin").

"Applicable Unused Line Fee Percentage" means 0.375 percentage points.

"Application Event" means the occurrence of (a) a failure by Borrowers to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by the Agent to require that payments and proceeds of Collateral be applied pursuant to Section 2.4(b)(ii) of the Agreement.

"Approved Budget" means the Initial Approved Budget as amended and supplemented by any Weekly Cash Flow Forecast delivered in accordance with Section 5.2(a) and approved by the Agent in accordance with Section 5.28.

"Assignee" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1 to the Agreement.

"Authorized Person" means any one of the individuals identified on Schedule A-3 to the Agreement, as such schedule is updated from time to time by written notice from Administrative Borrower to Agent.

"Avoidance Actions" means any and all claims and causes of action of any Borrower's estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payments" has the meaning specified in Section 2.4(e)(ii) of the Agreement.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Product Agreements" means the US Bank Product Agreements and/or the Canadian Bank Product Agreements, as the context requires.

"Bank Product Collateralization" means, with respect to the US Bank Product Obligations or the Canadian Bank Product Obligations, as applicable, providing cash collateral (pursuant to documentation reasonably satisfactory to Agent) in the Applicable Currency to be held by Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Product Obligations (other than Hedge Obligations).

"Bank Product Obligations" means the US Bank Product Obligations and/or the Canadian Bank Product Obligations, as the context requires.

"Bank Product Provider" means any Lender or any of its Affiliates, including each of the foregoing in its capacity, if applicable, as a Hedge Provider; provided, that no such Person (other than Wells Fargo or its Affiliates) shall constitute a Bank Product Provider with respect to a Bank Product unless and until Agent receives a Bank Product Provider Agreement from such Person and with respect to the applicable Bank Product within ten (10) days after the provision of such Bank Product to Parent or its Subsidiaries; provided further, that if, at any time, a Lender ceases to be a Lender under the Agreement (prior to the payment in full of the Obligations), then, from and after the date on which it ceases to be a Lender thereunder, neither it nor any of its Affiliates shall constitute Bank Product Providers and the obligations with respect to Bank Products provided by such former Lender or any of its Affiliates shall no longer constitute Bank Product Obligations.

"Bank Product Provider Agreement" means an agreement in substantially the form attached hereto as Exhibit B-2 to the Agreement, in form and substance satisfactory to Agent, duly executed by the applicable Bank Product Provider, Borrowers, and Agent.

"Bank Product Reserves" means the US Bank Product Reserves and/or the Canadian Bank Product Reserves, as the context requires.

"Bank Products" means US Bank Products and/or Canadian Bank Products, as the context requires.

"Bankruptcy Cases" means the cases of Debtors jointly administered under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court, bearing case number [_____] and any superseding chapter 7 case or cases.

"Bankruptcy Code" means (i) title 11 of the United States Code, (ii) the *Bankruptcy and Insolvency Act* (Canada), (iii) the CCAA, (iv) the *Winding-Up and Restructuring Act* (Canada), (v) the *Canada Business Corporations Act* (Canada) where such statute is used by a Person to propose an arrangement and/or (vi) any similar legislation in a relevant jurisdiction, in each case as applicable and as in effect from time to time.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Base Rate" means the US Base Rate; provided, that with respect to Canadian Obligations denominated in Canadian Dollars, Base Rate means the Canadian Base Rate.

"Base Rate Loan" means each portion of the Loans that bears interest at a rate determined by reference to the applicable Base Rate.

"Base Rate Margin" has the meaning set forth in the definition of Applicable Margin.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) subject to Title IV of ERISA for which Parent or any of its Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors, board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble to the Agreement.

"Borrower Materials" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"Borrowing" means a US Borrowing and/or a Canadian Borrowing, as the context requires.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit B-1, prepared by the Borrowers' management, in consultation with Consultant, which form of Borrowing Base Certificate may be amended, restated, supplemented or otherwise modified from time to time (including without limitation changes to the format thereof), as requested by Borrowers and approved by Agent in Agent's sole discretion.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of California or Florida, except that (a) if a determination of a Business Day shall relate to a Non-Base Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market, and (b) if a determination of a Business Day shall relate to a Canadian Revolving Loan or Canadian Letter of Credit (including a request therefor), the term "Business Day" also shall exclude any day on which banks are authorized or required to close in Toronto, Ontario, Canada.

"Canadian Anti-Money Laundering & Anti-Terrorism Legislation" means the Criminal Code, R.S.C. 1985, c. C-46, The Proceeds of Crime (Money Laundering) and Terrorist

Financing Act, S.C. 2000, c. 17, the United Nations Act, R.S.C. 1985, c.U-2 and the Corruption of Foreign Public Officials Act (S.C. 1998, c. 34) or any similar Canadian legislation, together with all rules, regulations and interpretations thereunder or related thereto including, without limitation, the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations promulgated under the United Nations Act.

"Canadian Availability" means, as of any date of determination, the Dollar Equivalent amount that Canadian Borrower is entitled to borrow as Canadian Revolving Loans under Section 2.1 of the Agreement (after giving effect to the then outstanding Canadian Revolver Usage).

"Canadian Bank Product" means any one or more of the following financial products or accommodations extended to a Canadian Loan Party by a Bank Product Provider: (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or " p-cards ")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"Canadian Bank Product Agreements" means those agreements entered into from time to time by a Canadian Loan Party with a Bank Product Provider in connection with the obtaining of any of the Canadian Bank Products.

"Canadian Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by Canadian Loan Parties to any Bank Product Provider pursuant to or evidenced by a Canadian Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Canadian Hedge Obligations, and (c) all amounts that Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Canadian Bank Products provided by such Bank Product Provider to Canadian Loan Parties.

"Canadian Bank Product Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of Canadian Loan Parties in respect of Canadian Bank Product Obligations after notice by Bank Product Providers to, and with the consent of, Agent) in respect of Canadian Bank Products then provided or outstanding.

"Canadian Base Rate" means the Canadian CDOR Rate plus 1.50 percentage points (which shall be determined on a daily basis).

"Canadian Benefit Plan" means any plan, fund, program, or policy, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, providing material employee benefits, including medical, hospital care, dental, sickness, accident, disability, life insurance, pension, retirement or savings benefits, under which a Loan Party or a Subsidiary thereof has any liability with respect to any employee or former employee in Canada.

"Canadian Borrowing" means a borrowing consisting of Canadian Revolving Loans made on the same day by the Lenders (or Agent on behalf thereof), or by Canadian Swing Lender in the case of a Canadian Swing Loan, or by Agent in the case of an Canadian Extraordinary Advance.

"Canadian Borrowing Base" means, as of any date of determination, the Dollar Equivalent amount of the result of:

(a)    85% of the amount of Canadian Eligible Accounts, less the amount, if any, of the Canadian Dilution Reserve, *plus*

(b)    *the lower of*

(i)    the product of 75% multiplied by the value (calculated at the lower of cost or market on a basis consistent with Canadian Loan Parties' historical accounting practices) of Canadian Eligible Inventory at such time,

(ii)    the product of 85% multiplied by the Net Recovery Percentage identified in the most recent inventory appraisal ordered and obtained by Agent multiplied by the value (calculated at the lower of cost or market on a basis consistent with the Canadian Loan Parties' historical accounting practices) of Canadian Eligible Inventory (such determination may be made as to different categories of Eligible Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, and

(iii)    an amount equal to (A) $37,500,000, minus (B) the amount of the contribution of US Eligible Inventory to the US Borrowing Base under clause (b) of the definition of US Borrowing Base, *minus*

(c)    the aggregate amount of reserves, if any, established by Agent under Section 2.1(c) of the Agreement;

provided, that Canadian Availability attributable to Canadian Eligible Inventory consisting of Canadian Eligible In-Transit Inventory shall not exceed $3,000,000 at any time.

Notwithstanding anything else herein to the contrary, the Canadian Borrowing Base shall be deemed to be $0 until such time as the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order.

"Canadian CDOR Rate" means for any particular day the average rate per annum as reported on the Reuters Screen CDOR Page (or any successor page or such other page or commercially available service displaying Canadian interbank bid rates for Canadian Dollar bankers' acceptances having a 1 month duration as the Agent may designate from time to time, or if no such substitute service is available, the rate quoted by a Schedule I bank under the Bank Act (Canada) selected by the Agent at which such bank is offering to purchase Canadian Dollar bankers' acceptances) as of 10:00 a.m. Eastern (Toronto) time on such day, or if such day is not a Business Day, the on the immediately preceding Business Day, for a one month period, and in

an amount comparable to the amount of the applicable Canadian Obligation (and, if any such reported rate is below zero, then the rate determined pursuant to this clause (b) shall be deemed to be zero).  Each determination of the Canadian CDOR Rate shall be made by the Agent and shall be conclusive in the absence of manifest error.

"Canadian Court" has the meaning specified therefore in the recitals to this Agreement.

"Canadian Defined Benefit Plan" means any Canadian Pension Plan which contains a "defined benefit provision" as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"Canadian Designated Account" means the Canadian Deposit Account of Canadian Borrower identified on Schedule D-1 to the Agreement (or such other Deposit Account of Canadian Borrower located at Canadian Designated Account Bank that has been designated as such, in writing, by Canadian Borrower to Agent).

"Canadian Designated Account Bank" has the meaning specified therefor in Schedule D-1 to the Agreement (or such other bank that is located within Canada that has been designated as such, in writing, by Canadian Borrower to Agent).

"Canadian Dilution" means, as of any date of determination, a percentage, based upon the experience of the immediately prior 12 months, that is the result of dividing the amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to a Canadian Loan Party's Accounts during such period, by (b) a Canadian Loan Party's billings with respect such Canadian Loan Party's Accounts during such period.

"Canadian Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against Canadian Eligible Accounts by 1 percentage point for each percentage point by which Canadian Dilution is in excess of 5%.  If the Canadian Dilution does not exceed 5%, the Canadian Dilution Reserve shall be zero.

"Canadian Dollar Equivalent" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in Canadian Dollars as determined by Agent at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date or such other date as determined by Agent) for the purchase of Canadian Dollars with Dollars.

"Canadian Dollars" or "Cdn$" means the lawful currency of Canada, as in effect from time to time.

"Canadian Eligible Accounts" means those Accounts created by a Canadian Loan Party in the ordinary course of its business, that arise out of such Canadian Loan Party's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Canadian Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination performed by (or on behalf of) Agent from time to

time after the Closing Date.  In determining the amount to be included, Canadian Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, discounts, credits, allowances, and rebates.  Canadian Eligible Accounts shall not include the following:

   (a) Accounts that the Account Debtor has failed to pay within ninety (90) days of original invoice date or within sixty (60) days of original due date,

   (b) Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

   (c) Accounts with respect to which the Account Debtor is an Affiliate of a Borrower or an employee or agent of a Borrower or any Affiliate of a Borrower, excluding, however, any Account Debtor that is an Affiliate of a Loan Party, solely because such Affiliate is owned or controlled by the Sponsor or its Affiliates so long as such transactions are on terms no less favorable than similar transactions with independent third parties,

   (d) Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

   (e) Accounts that are not payable in Dollars or Canadian Dollars,

   (f) Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in Canada or the United States, or (ii) is not organized under the laws of Canada or any province or territory thereof or under the laws of the United States or any state or territory thereof, or (iii) is the government of any foreign country or sovereign state (for greater certainty, other than Canada), or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is directly drawable by Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent,

   (g) Accounts with respect to which the Account Debtor is a Canadian Governmental Authority (exclusive, however, of Accounts with respect to which the applicable Canadian Loan Party has complied, to the reasonable satisfaction of Agent, with any assignment of claims statute, including the Financial Administration Act (Canada)),

   (h) Accounts with respect to which the Account Debtor is a creditor of a Loan Party, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

   (i) Accounts with respect to an Account Debtor whose total obligations owing to Canadian Loan Parties exceeds 15% of all Canadian Eligible Accounts (or, if the

Account Debtor is (A) Wal-Mart, 50% of all Canadian Eligible Accounts, (B) Costco, 50% of all Canadian Eligible Accounts, and (C) Hudson Bay, 30% of all Canadian Eligible Accounts), to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that, in each case, the amount of Canadian Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Agent based on all of the otherwise Canadian Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit,

(j)    to Borrowers' knowledge, Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which a Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(k)    Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(l)    Accounts that are not subject to a valid and perfected first priority Agent's Lien (subject to Permitted Liens having priority under applicable law for which reserves have been established pursuant to Section 2.1(c)),

(m)    Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(n)    Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity, or

(o)    Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by Loan Parties of the subject contract for goods or services.

"Canadian Eligible In-Transit Inventory" means Eligible In-Transit Inventory owned by a Canadian Loan Party.

"Canadian Eligible Inventory" means Inventory of a Canadian Loan Party consisting of raw materials and finished goods, that complies with each of the representations and warranties respecting Canadian Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Canadian Loan Parties' historical accounting practices.  An item of Inventory shall not be included in Canadian Eligible Inventory if:

(a)    a Canadian Loan Party does not have good, valid, and marketable title thereto,

(b)      a Canadian Loan Party does not have actual and exclusive possession thereof (either directly or through a bailee or agent of such Canadian Loan Party),

(c)      it is not located at one of the locations in Canada set forth on <u>Schedule E-1</u> (as such schedule may be updated pursuant to <u>Section 5.14</u>) to the Agreement (or in-transit from one such location to another such location),

(d)      it is in-transit to or from a location of a Canadian Loan Party (other than in-transit from one location set forth on <u>Schedule E-1</u> to the Agreement to another location set forth on <u>Schedule E-1</u> to the Agreement), unless it is Canadian Eligible In-Transit Inventory,

(e)      it is located on real property leased by a Canadian Loan Party or in a contract warehouse, in each case, unless either (i) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises or (ii) Agent has established a Landlord Reserve with respect to such location,

(f)      it is the subject of a bill of lading or other document of title, unless it is Canadian Eligible In-Transit Inventory,

(g)      it is not subject to a valid and perfected first priority Agent's Lien (subject to Permitted Liens having priority under applicable law for which reserves have been established pursuant to <u>Section 2.1(c)</u>),

(h)      it consists of goods returned or rejected by a Canadian Loan Party's customers unless such goods are in salable condition and may be sold as new and unused Inventory by Canadian Loan Parties in the ordinary course of their business to their customers,

(i)      it consists of goods that are obsolete or slow moving, work-in-process, restrictive or custom items, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in a Canadian Loan Party's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment, or

(j)      it is subject to third party trademark or other intellectual property or proprietary rights, unless (i) Agent is reasonably satisfied that such Inventory can be freely sold by Agent on and after the occurrence of an Event of a Default, without Agent infringing any rights of, or incurring any liabilities to, any licensor or owner of such third party rights, other than the payment of royalties at the contractual rate with respect to Inventory subject to a third party license with a Loan Party or (ii) reserves have been established pursuant to <u>Section 2.1(c)</u>.

"<u>Canadian Extraordinary Advances</u>" has the meaning specified therefor in <u>Section 2.3(d)(iii)</u> of the Agreement.

"<u>Canadian Final DIP Recognition Order</u>" means an order of the Canadian Court in the Recognition Proceedings, which order shall be satisfactory in form and substance to Agent, which order shall recognize and enforce the Final Financing Order in Canada.

"Canadian Guarantor" means (a) each Subsidiary of Parent organized under the laws of Canada, or any province or territory thereof, that is or becomes a guarantor of all or any part of the Obligations or (b) such Persons that are debtors in the Bankruptcy Cases, the Recognition Proceedings or as are required from time to time to become a Canadian Guarantor pursuant to the terms hereof.

"Canadian Hedge Obligations" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of any Canadian Loan Party arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"Canadian Initial Recognition Order" means an order of the Canadian Court, in form and substance satisfactory to Agent, which order shall recognize the Bankruptcy Cases as foreign main proceedings under Part IV of the CCAA and shall grant an interim stay in Canada.

"Canadian Interim DIP Recognition Order" means an order of the Canadian Court, in form and substance satisfactory to Agent, which order shall, among other things, recognize the Interim Financing Order and provide for a super priority charge over the Collateral of the Canadian Borrower and Collateral located in Canada of the other Loan Parties in respect of the Agent's and the Lenders' claims.  For the avoidance of doubt, the Canadian Interim DIP Recognition Order may be part of the Canadian Supplemental Order.

"Canadian Issuing Lender" means WF Canada or any other Lender that, at the request of Administrative Borrower and with the consent of Agent (such consent not to be unreasonably withheld or delayed), agrees, in such Lender's sole discretion, to become a Canadian Issuing Lender for the purpose of issuing Canadian Letters of Credit or Canadian Reimbursement Undertakings pursuant to Section 2.11B of the Agreement and Canadian Issuing Lender shall be a Lender.

"Canadian Letter of Credit" means a letter of credit (as that term is defined in the Code) issued by Canadian Issuing Lender or Canadian Underlying Issuer for the account of Canadian Borrower.

"Canadian Letter of Credit Disbursement" means a payment made by Canadian Issuing Lender pursuant to a Canadian Letter of Credit or a Canadian Reimbursement Undertaking.

"Canadian Letter of Credit Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Canadian Letter of Credit Usage on such date (including such Lender's Pro Rata Share of Canadian Reimbursement Undertakings on such date).

"Canadian Letter of Credit Fee" has the meaning specified therefor in Section 2.6(b) of the Agreement.

"Canadian Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding Canadian Letters of Credit.

"Canadian Loan Account" has the meaning specified therefor in Section 2.9 of the Agreement.

"Canadian Loan Party" means Canadian Borrower or any Canadian Guarantor.

"Canadian Maximum Revolver Amount" means $20,000,000 decreased by the amount of reductions in the Canadian Revolver Commitments made in accordance with Section 2.4(c) of the Agreement.

"Canadian Obligations" means (a) all loans (including the Canadian Revolving Loans (inclusive of Canadian Extraordinary Advances and Canadian Swing Loans)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), reimbursement or indemnification obligations with respect to Canadian Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to the Canadian Loan Account pursuant to the Agreement), obligations (including indemnification obligations) of any Canadian Loan Party, fees (including the fees provided for in the Fee Letter) of any Canadian Loan Party, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) of any Canadian Loan Party, guaranties of any Canadian Loan Party, and all covenants and duties of any other kind and description owing by any Canadian Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Canadian Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, (b) all debts, liabilities, or obligations (including reimbursement obligations, irrespective of whether contingent) owing by Canadian Borrower or any other Canadian Loan Party to Canadian Issuing Lender now or hereafter arising from or in respect of a Canadian Letters of Credit, and (c) all Canadian Bank Product Obligations; provided, that Canadian Obligations shall not include Excluded Swap Obligations. Without limiting the generality of the foregoing, the Canadian Obligations under the Loan Documents include the obligation to pay (i) the principal of the Canadian Revolving Loans, (ii) interest accrued on the Canadian Revolving Loans, (iii) the amount necessary to reimburse Canadian Issuing Lender for amounts paid or payable pursuant to Canadian Letters of Credit, (iv) Letter of Credit commissions, charges, expenses, and fees, in each case in respect of Canadian Letters of Credit (v) Lender Group Expenses of any Canadian Loan Party, (vi) fees payable by any Canadian Loan Party under the Agreement or any of the other Loan Documents, and (vii) indemnities and other amounts payable by any Canadian Loan Party under any Loan Document (excluding Excluded Swap Obligations) and (viii) the joint and several liability of the Canadian Borrower in respect of the Obligations hereunder and any guaranties by any Canadian Loan Party of all or any part of the US Obligations. Any reference in the Agreement or in the Loan Documents to the Canadian Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"Canadian Overadvance" means, as of any date of determination, that the Canadian Revolver Usage is greater than any of the limitations set forth in Section 2.1 or Section 2.11B.

"Canadian Patent Security Agreement" has the meaning specified therefor in the Canadian Security Agreement.

"Canadian Pension Plan" means each pension plan required to be registered under Canadian federal or provincial law that is maintained or contributed to, or to which there is or may be an obligation to contribute by a Loan Party or a Subsidiary thereof, for its employees or former employees, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively.

"Canadian Pension Termination Event " means (a) the voluntary full or partial wind up of a Canadian Pension Plan by any Loan Party or Subsidiary thereof or initiation of any action or filing to do so; (b) the institution of proceedings by any Governmental Authority to terminate in whole or in part or have a trustee appointed to administer any Canadian Pension Plan; or (c) any other event or condition which might constitute grounds for the termination of, winding up or partial termination of, winding up or the appointment of trustee to administer, any Canadian Pension Plan.

"Canadian Priority Payables Reserves" means reserves (determined from time to time by Agent in its Permitted Discretion) for:  (a) the amount past due and owing by any Canadian Loan Party, or the accrued amount for which such Canadian Loan Party has an obligation to remit, to a Governmental Authority or other Person pursuant to any applicable law, rule or regulation, in respect of (i) goods and services taxes, sales taxes, employee income taxes, municipal taxes and other taxes payable or to be remitted or withheld; (ii) workers' compensation or employment insurance; (iii) vacation or holiday pay; and (iv) other like charges and demands, in each case, to the extent that any Governmental Authority or other Person may claim a lien, security interest, hypothec, trust or other claim ranking or capable of ranking in priority to or *pari passu* with one or more of the Liens granted in the Loan Documents; and (b) the aggregate amount of any other liabilities of any Canadian Loan Party (i) in respect of which a trust or deemed trust has been or may be imposed on any Collateral to provide for payment, or (ii) in respect of unpaid or unremitted pension plan contributions, including amounts representing any unfunded liability, solvency deficiency or wind-up deficiency whether or not due with respect to a Canadian Pension Plan, or (iii) which are secured by a lien, security interest, pledge, charge, right or claim on any Collateral (other than Permitted Liens that do not have priority over Agent's Liens); in each case, pursuant to any applicable law, rule or regulation and which such lien, trust, security interest, hypothec, pledge, charge, right or claim ranks or in the Permitted Discretion of Agent, is capable of ranking in priority to or *pari passu* with one or more of the Liens granted in the Loan Documents (such as liens, trusts, security interests, hypothecs, pledges, charges, rights or claims in favor of employees, landlords, warehousemen, customs brokers, carriers, mechanics, materialmen, labourers, or suppliers, or liens, trusts, security interests, hypothecs, pledges, charges, rights or claims for ad valorem, excise, sales, or other taxes where given priority under applicable law); in each case net of the aggregate amount of all restricted cash held or set aside for the payment of such obligations.

"Canadian Protective Advances" has the meaning specified therefor in Section 2.3(d)(i) of the Agreement.

"Canadian Recognition Orders" means (i) the Canadian Initial Recognition Order, the Canadian Supplemental Order and the applicable DIP Recognition Order at such time in form and substance satisfactory to Agent and (ii) and any other order of the Canadian Court issued from time to time in form and substance satisfactory to Agent.

"Canadian Reimbursement Undertaking" has the meaning specified therefor in Section 2.11B(a) of the Agreement.

"Canadian Revolver Commitment" means, with respect to each Revolving Lender, its Canadian Revolver Commitment, and, with respect to all Revolving Lenders, their Canadian Revolver Commitments, in each case as set forth beside such Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Revolving Lender became a Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Canadian Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding Canadian Revolving Loans (inclusive of Canadian Swing Loans and Canadian Protective Advances), plus (b) the amount of the Canadian Letter of Credit Usage.

"Canadian Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the Canadian Revolver Commitments, the amount of such Lender's Canadian Revolver Commitment, and (b) after the termination of the Canadian Revolver Commitments, the aggregate outstanding principal amount of the Canadian Revolving Loans of such Lender.

"Canadian Revolving Loans" has the meaning specified therefor in Section 2.1(b) of the Agreement.

"Canadian Security Agreement" means that certain Guaranty and Security Agreement dated as of the Closing Date, as the same may subsequently be amended, executed and delivered by each Loan Party party thereto to Agent.

"Canadian Security Documents" means the Canadian Security Agreement, the Quebec Security Documents and any other Loan Document that grants or purports to grant a Lien on any of the assets or interests, and the proceeds thereof, of any Canadian Loan Party.

"Canadian Supplemental Order" means an order of the Canadian Court, in form and substance satisfactory to Agent, and the Lenders, which order shall grant customary additional relief in the Recognition Proceedings.

"Canadian Swing Lender" means WF Canada or any other Lender that, at the request of Canadian Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the Canadian Swing Lender under Section 2.3(b) of the Agreement.

"Canadian Swing Loan" has the meaning specified therefor in Section 2.3(b) of the Agreement.

"Canadian Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Canadian Swing Loans on such date.

"Canadian Trademark Security Agreement" has the meaning specified therefor in the Canadian Security Agreement.

"Canadian Underlying Issuer" means The Toronto-Dominion Bank or one of its Affiliates or such other Person that is reasonably acceptable to Agent.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carl Marks Engagement Agreement" means that certain Amended Advisory Agreement dated as of May 17, 2019 by and between HSP and Carl Marks Advisory Group LLC as the same may be further amended, restated, supplemented or otherwise modified in a manner reasonably acceptable to Agent.

"Carveout" or "Carve-Out" has the meaning specified therefor in the Interim Financing Order or the Final Financing Order, as applicable.

"Case Professionals" means any professional (other than an ordinary course professional) retained by the Borrowers or a Committee pursuant to a final order of the Bankruptcy Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code.

"Cash Equivalents" means (a) Domestic Cash Equivalents; and (b) Foreign Cash Equivalents.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system or Canadian Payments Association) and other customary cash management arrangements.

"CCAA" means the *Companies' Creditors Arrangement Act (Canada)*, R.S.C. 1985, C-36, as amended.

"CFC" means a controlled foreign corporation (as that term is defined in the IRC) of which any Loan Party is a "United States shareholder" within the meaning of Section 951(b) of the IRC.

"Change in Control" means the occurrence of any of the following events: (a) Sponsor Affiliated Entity ceases to beneficially own and control, directly or indirectly, more than 50.0% of the voting and economic Equity Interests in Parent on a fully diluted basis, (b) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 promulgated under the Exchange Act) other than Sponsor Affiliated Entity shall have acquired beneficial ownership on a fully diluted basis of the voting Equity Interests of Parent sufficient (whether or not exercised) to elect a majority of the members of the Board of Directors of Parent, (c) Sponsor Affiliated Entity ceases to have the power to elect or designate, directly or indirectly, a majority of the Board of Directors of Parent by voting power, contract or otherwise, (d) Parent ceases to beneficially own and control, directly or indirectly, all of the Equity Interests in each Borrower or (e) Administrative Borrower ceases to beneficially own and control, directly or indirectly, all of the Equity Interests in PCF.

"Change in Law" means the occurrence after the date of the Agreement of:  (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Closing Date" means May __, 2019.

"Closing Fee" has the meaning specified therefor in Section 2.10(d) of this Agreement.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by Parent or any of its Subsidiaries in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents. Without limitation of the foregoing, subject to the terms of the Interim Financing Order, Final Financing Order, the Intercreditor Agreement and the Carveout, the Collateral shall include all proceeds of any and all Avoidance Actions.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in Parent's or its Subsidiaries' books and records, Equipment, or Inventory, in each case, in form and substance reasonably

satisfactory to Agent (it being agreed that each "Collateral Access Agreement" entered into in connection with the Existing Credit Agreement shall be a Collateral Access Agreement).

"Commodity Exchange Act" has the meaning specified therefor in the Security Agreement.

"Commitment" means, with respect to each Lender, its Revolver Commitment and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts or Canadian Dollar amounts, as applicable, are set forth beside such Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Committees" means, collectively, the official committee of unsecured creditors and any other committee formed, appointed or approved in any Bankruptcy Case.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 to the Agreement delivered by the Financial Officer of Administrative Borrower to Agent.

"Confidential Information" has the meaning specified therefor in Section 17.9(a) of the Agreement.

"Consultant" means a Person providing interim management services for the Borrowers and/or acting as financial consultant of Borrowers; such person (other than as set forth in the next sentence) to be reasonably acceptable to Agent and engaged by Borrowers pursuant to the terms of an engagement agreement reasonably acceptable to Agent. As of the Closing Date, the Consultant is Carl Marks Advisory Group LLC under and pursuant to the Carl Marks Engagement Agreement.

"Contractual Obligation" means as to any Person, any provision of any material security issued by such Person or of any material agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by Parent or one of its Subsidiaries, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account) (it being agreed that each "Control Agreement" entered into in connection with the Existing Credit Agreement shall be a Control Agreement).

"Cushion" has the meaning specified therefor in the preamble to the Agreement.

"Customs Broker Agreement" means a customs broker agreement of a customs broker in possession of documents evidencing in-transit Inventory, in form and substance reasonably satisfactory to Agent.

"Debtor" has the meaning specified therefor in the recitals to this Agreement.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement on the date that it is required to do so under the Agreement (including the failure to make available to Agent amounts required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) notified Borrowers, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within one Business Day after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement on the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) becomes the subject of a Bail-in Action.

"Defaulting Lender Rate" means (a) with respect to US Obligations, (i) for the first three days from and after the date the relevant payment is due, the US Base Rate, and (ii) thereafter, the interest rate then applicable to US Revolving Loans that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto), and (b) with respect to Canadian Obligations, (i) for the first three days from and after the date the relevant payment is due, the Canadian Base Rate (if such Canadian Obligations are denominated in Canadian Dollars) or the US Base Rate (if such Canadian Obligations are denominated in Dollars), and (ii) thereafter, the interest rate then applicable to Canadian Revolving Loans that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"DIP Liens" means the Liens granted to the Agent under the Loan Documents and authorized by the Financing Order.

"DIP Recognition Order" means the Canadian Interim DIP Recognition Order and the Canadian Final DIP Recognition Order, whichever is in effect as of the relevant date in question.

"Disqualified Equity Interests" means any Equity Interests that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which

they are exchangeable), or upon the happening of any event or condition (a) matures or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale or other disposition or casualty event so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale or other disposition or casualty event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provide for the scheduled payments of dividends in cash, or (d) are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is one hundred eighty (180) days after the Maturity Date (as determined on the date of the issuance thereof).

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in another currency, the equivalent amount thereof in Dollars as determined by Agent, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date or such other date determined by Agent) for the purchase of Dollars with such currency.

"Dollars" or "$" means United States dollars.

"Domestic Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than two hundred seventy (270) days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than (x) $250,000,000 in the case of U.S. banks and (y) $1,000,000,000 (or the dollar equivalent thereof as of the date of determination in the case of any United States branch of a foreign bank), (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than (x) $250,000,000 in the case of U.S. banks and (y) $1,000,000,000 (or dollar equivalent thereof as of the date of determination) in the case of any United States branch of a foreign bank, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by

Schedule 1.1 – Page 20

standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, (h) [reserved], and (i) investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (h) above.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Tax Rate" means the aggregate Federal, state and local income tax rate applicable to an individual resident in the city of New York (or such other jurisdiction having the highest aggregate Federal, state and local income tax rate applicable to any equity owner of Parent) subject to tax at the highest marginal income tax rates provided for under the applicable Federal, state and local laws then in effect, taking into account the character of income and assuming full deductibility of state and local taxes.

"Eligible Accounts" means the US Eligible Accounts and/or the Canadian Eligible Accounts, as the context requires.

"Eligible In-Transit Inventory" means Inventory of a Loan Party that (a) is currently in transit from outside the United States to a location set forth on Schedule E-1 (as updated pursuant to Section 5.14) and (b) satisfies the following additional criteria:  (i) under the terms of sale, title and risk of loss with respect to such Inventory have passed from Vendor to, and such Inventory is owned, by a Loan Party, or Agent is otherwise satisfied that a final sale of such Inventory to such Loan Party has occurred, (ii) such Inventory is not in transit for more than forty-five (45) days, (iii) no default exists under any agreement in effect between the vendor of such Inventory and such Loan Party that would permit such vendor under any applicable law (including the UCC) to divert, reclaim, reroute or stop shipment of such Inventory, (iv) such Inventory is covered by marine cargo insurance and is insured against types of loss, damage, hazards and risks, and in amounts, satisfactory to Agent in its Permitted Discretion, and (v) such Inventory is subject to a negotiable bill of lading or a non-negotiable bill of lading with Agent listed as consignee (x) that is consigned to Agent (either directly or by means of endorsements), (y) that was issued by the carrier in possession of the subject Inventory, and (z) that is in the United States in the possession of a customs broker that has executed a Customs Broker Agreement.

"Eligible Inventory" means the US Eligible Inventory and/or the Canadian Eligible Inventory, as the context requires.

"Eligible Transferee" means (a) any Lender (other than a Defaulting Lender), any Affiliate of any Lender and any Related Fund of any Lender; (b) (i) a commercial bank organized under the laws of the United States or any state thereof, and having total assets in excess of $1,000,000,000; (ii) a savings and loan association or savings bank organized under the laws of the United States or any state thereof, and having total assets in excess of $1,000,000,000; or (iii) a commercial bank organized under the laws of any other country or a political subdivision thereof; provided that (A) (x) such bank is acting through a branch or agency located in the United States or (y) such bank is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country, and (B) such bank has total assets in excess of $1,000,000,000; (c) any other entity (other than a natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act) that extends credit or buys loans as one of its businesses including insurance companies, investment or mutual funds and lease financing companies, and having total assets in excess of $1,000,000,000; and (d) any other Person approved by Agent; provided, that no Sponsor Affiliated Entity shall qualify as an Eligible Transferee (except with respect to Last Out Loans to the extent so consented to by Agent or upon payment in full of the Obligations (other than Last Out Loans) as contemplated by the Participation Agreement).

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is or within the preceding 6 years has been sponsored, maintained or contributed to by any Loan Party or ERISA Affiliate or (b) to which any Loan Party or ERISA Affiliate has, or has had at any time within the preceding 6 years, any liability, contingent or otherwise, excluding any Canadian Benefit Plan or Canadian Pension Plan.

"Environmental Action" means any written complaint, demand, summons, citation, notice, directive, order, claim, litigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving liabilities under Environmental Laws, violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of Parent, any Subsidiary of Parent, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by Parent, any Subsidiary of Parent, or any of their predecessors in interest.

"Environmental Law" means any applicable United States or foreign federal, state, provincial, territorial, municipal or local statute, law, rule having the force and effect of law, regulation, ordinance, code, binding and enforceable guideline or rule of common law now or hereafter in effect and in each case as amended, or any binding and enforceable judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, relating to the environment, Hazardous Materials affecting employee or worker health or safety, or Hazardous Materials, in each case as amended from time to time. Without limitation, Environmental Law includes the *Resource Conservation and Recovery Act* ("RCRA"), the *Comprehensive Environmental Response, Compensation and Liability Act* ("CERCLA"), the *Canadian Environmental Protection Act* (Canada), the *Fisheries*

*Act* (Canada), the *Transportation of Dangerous Goods Act* (Canada) and the *Ontario Water Resources Act* (Ontario).

"Environmental Liabilities" means all liabilities, obligations (including monetary obligations), losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred (i) as a result of or related to any Environmental Action or Remedial Action or (ii) under Environmental Law.

"Environmental Lien" means any Lien in favor of any Governmental Authority related to or arising out of Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"Equity Documents" means, collectively, the (i) Amended and Restated Limited Liability Company Agreement of Parent, dated as of October 21, 2014, (ii) Securityholders Agreement, dated as of October 21, 2014, by and among Parent and other Persons party thereto, (iii) Registration Rights Agreement, dated as of October 21, 2014, by and among Parent and the other Persons party thereto, (iv) Contribution and Exchange Agreement, dated as of September 18, 2014, by and among Parent and the other Persons party thereto, (v) Subscription Agreements, dated as of October 21, 2014, by and among Parent and the other Persons party thereto, (vi) Securities Purchase Agreement, dated as of September 18, 2014, by and among HHFH, HHF Holdings, LLC, Hollander Home Fashions Corp., Jeffrey Hollander Irrevocable Exempt Trust dated October 29, 2012 and each of the other Persons party thereto, (vii) certificate of incorporation, bylaws, operating agreement or other organizational document of the Borrowers as of the Closing Date, and (viii) Management Services Agreement, in each case, as amended.

"Equity Interests" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of Parent or its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Parent or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Parent or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with Parent or any of its Subsidiaries and whose employees are aggregated with the employees of Parent or its Subsidiaries under IRC Section 414(o).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"Excess Availability" means, as of any date of determination, the Dollar Equivalent of the sum of (a) US Availability plus (b) Canadian Availability.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Actions" has the meaning specified therefor in Section 5.12 of the Agreement.

"Excluded Collateral" has the meaning specified therefor in the Security Agreement.

"Excluded Subsidiary" means any Subsidiary of Parent (a) [reserved], (b) [reserved], (c) [reserved], and (d) that is a Foreign Subsidiary of Parent (other than any direct or indirect wholly owned Subsidiary of Parent that is organized under the laws of Canada or any province or other political subdivision thereof (each, a "Canadian Subsidiary")) that is a CFC) to Parent or one of its Subsidiaries (as reasonably determined by Parent in consultation with Agent).

"Excluded Swap Obligation" has the meaning specified therefore in the Security Agreement.

"Excluded Taxes" means (i) any Tax imposed on the net income or net profits of any Lender or any Participant (including any branch profits Taxes and franchise Taxes imposed in lieu of net income Taxes), in each case imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender or such Participant is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's or such Participant's principal office is located in or as a result of a present or former connection between such Lender or such Participant and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Lender or such Participant having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under this Agreement or any other Loan Document); (ii) United States or Canadian federal Taxes that would not have been imposed but for a Lender's or a Participant's or Agent's failure to comply with the requirements of Section 16.2 of the Agreement, (iii) Canadian federal Taxes imposed on a recipient of a payment under the Loan Documents with which the applicable payor does not deal at arm's length (with the meaning provided by the *Income Tax Act* (Canada), (iv) any United States or Canadian federal withholding Taxes that would be imposed on amounts payable to a Lender or Participant or Agent based upon the applicable withholding rate in effect at the time such Lender or Participant or Agent becomes a party to the Agreement (or designates a new lending office), except that Taxes shall include (A) any Tax amount that such Lender or Participant or Agent (or its assignor,

if any) was previously entitled to receive pursuant to <u>Section 16.1</u> of the Agreement, if any, with respect to such withholding Tax at the time of designation of a new lending office (or assignment), and (B) additional United States or Canadian federal withholding taxes that may be imposed after the time such Lender or Participant or Agent becomes a party to the Agreement (or designates a new lending office), as a result of a change in law, rule, treaty, regulation, order or other decision with respect to any of the foregoing by any Governmental Authority; and (v) any United States federal withholding taxes imposed under FATCA.

"<u>Existing Agent</u>" means Wells Fargo Bank, National Association, in its capacity as administrative agent for the Existing Lenders.

"<u>Existing Bank Product Obligations</u>" means "Bank Product Obligations" as defined in the Existing Credit Agreement.

"<u>Existing Canadian Letters of Credit</u>" has the meaning set forth in <u>Section 2.11(B)(o)</u>.

"<u>Existing Credit Agreement</u>" means that certain Third Amended and Restated Credit Agreement, dated as of June 9, 2017 by and among Borrowers, the Existing Lenders and Existing Agent, as administrative agent, as amended from time to time.

"<u>Existing Hedge Agreements</u>" means any Hedge Agreement entered into by any Loan Party or any Subsidiary that is (a) outstanding on the Closing Date and (b) listed on <u>Schedule H-1</u>.

"<u>Existing Intercreditor Agreement</u>" means that certain Intercreditor Agreement, dated as of June 9, 2017, by and between Existing Agent and Barings Finance LLC, as the administrative agent under the Existing Term Loan Credit Agreement (or any successor or assignee thereto), and acknowledged by Parent and Borrowers, as amended or modified from time to time.

"<u>Existing Last Out Loans</u>" means the "Last Out Loans" as defined in the Existing Credit Agreement.

"<u>Existing Last Out Obligations</u>" means all principal, interest, fees and other amounts due and payable in connection with the Existing Last Out Loans.

"<u>Existing Lenders</u>" means the lenders from time to time party to the Existing Credit Agreement.

"<u>Existing Loan Documents</u>" means "Loan Documents" as defined in the Existing Credit Agreement.

"<u>Existing Participation Agreement</u>" means that certain Subordinated Participation Agreement, dated on or about the Filing Date by and among SENTINEL CAPITAL PARTNERS V, L.P., SENTINEL DREAM BLOCKER, INC., SENTINEL CAPITAL INVESTORS V, L.P. and Existing Lenders.

"Existing Secured Canadian Obligations" means the Existing Secured Obligations constituting "Canadian Obligations" under the Existing Credit Agreement (in any event excluding, for the avoidance of doubt, upon the Canadian Court issuing the Canadian Interim DIP Recognition Order, the reimbursement obligations with respect to the Existing Canadian Letters of Credit that are deemed to be reissued as Canadian Letters of Credit hereunder upon the Canadian Court issuing the Canadian Interim DIP Recognition Order).

"Existing Secured Obligations" means all outstanding principal, accrued interest, accrued fees and expenses and any other indebtedness and amounts owing to Existing Lenders (or the agents therefor) under the Existing Loan Documents and all Existing Bank Product Obligations (in any event excluding, for the avoidance of doubt, (x) upon the Closing Date, the reimbursement obligations with respect to the Existing US Letters of Credit that are deemed to be reissued as US Letters of Credit hereunder on the Closing Date and (y) upon the Canadian Court issuing the Canadian Interim DIP Recognition Order, the reimbursement obligations with respect to the Existing Canadian Letters of Credit that are deemed to be reissued as Canadian Letters of Credit upon the Canadian Court issuing the Canadian Interim DIP Recognition Order).

"Existing Secured US Obligations" means the Existing Secured Obligations constituting "US Obligations" under the Existing Credit Agreement (in any event excluding, for the avoidance of doubt, upon the Closing Date, the reimbursement obligations with respect to the Existing US Letters of Credit that are deemed to be reissued as US Letters of Credit hereunder on the Closing Date).

"Existing Term Loan Agent" means the "Term Loan Agent" as defined in the Existing Intercreditor Agreement.

"Existing Term Loan Credit Agreement" means that certain Term Loan Credit Agreement dated as of June 9, 2017, by and among Borrowers, the Existing Term Loan Agent and the lenders from time to time party thereto, as amended from time to time to the extent permitted under the Existing Intercreditor Agreement.

"Existing Term Loan Debt" means "Term Loan Debt" as defined in the Existing Intercreditor Agreement.

"Existing Term Loan Documents" means the "Term Loan Documents" as defined in the Existing Intercreditor Agreement.

"Existing US Letters of Credit" has the meaning set forth in Section 2.11(A)(o).

"Exit Financing Commitment Letter" means a fully executed commitment letter for an exit financing from a commercial bank or other financial institution or fund which is engaged in making, purchasing or otherwise investing in commercial loans for its own account, in each case, in form and substance reasonably acceptable to the Agent, that provides for the payment in full in cash of the Obligations (other than Obligations in respect of the Last Out Loans) and, to the extent of any, Existing Secured Obligations, with only customary conditions precedent for financings of this type.

"Extraordinary Advances" means the US Extraordinary Advances and/or the Canadian Extraordinary Advances, as the context requires.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person that is not contemplated in the Approved Budget and is not in the ordinary course of business (other than any such cash received or paid from Recovery Events or Avoided Payments), including tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments; provided, however, that an Extraordinary Receipt shall not include indemnity payments to the extent that payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto; provided, further, that Extraordinary Receipts shall not include items of Term Loan Priority Collateral or proceeds of any assets of the categories in the definition of Term Loan Priority Collateral.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and (a) any current or future regulations or official interpretations thereof, (b) any agreements entered into pursuant to Section 1471(b)(1) of the IRC, and (c) any intergovernmental agreement entered into by the United States (or any fiscal or regulatory legislation, rules, or practices adopted pursuant to any such intergovernmental agreement entered into in connection therewith).

"Federal Funds Rate" means, for any period, a fluctuating interest rate *per annum* equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Fee Letter" means that certain fee letter, dated as of the Closing Date, among Borrowers and Agent.

"Filing Date" has the meaning specified therefor in the recitals to this Agreement.

"Final Financing Order" means the "Final Order" as defined in the Interim Financing Order, which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Agent, in its sole discretion.

"Financial Officer" of any Person means the chief financial officer, the treasurer, any assistant treasurer, any vice president of finance, the chief accountant or the controller of such Person or any officer with substantially equivalent responsibilities of any of the foregoing (which may be a Person employed by the Consultant).

"Financing Order" means (a) until the entry of the Final Financing Order, the Interim Financing Order, and (b) from and after entry of the Final Financing Order, the Final

Financing Order, together with all amendments, modifications and supplements to such Interim Financing Order or Final Financing Order, as applicable, which are acceptable to Agent in its sole discretion.

"First Day Hearing" means the first day of the hearing scheduled on which entry of the Interim Financing Order shall be heard.

"Flood Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 and the Biggert –Waters Flood Insurance Reform Act of 2012.

"Foreign Cash Equivalents" means, in the case of any Subsidiary (other than a US Loan Party or other Subsidiary organized under the laws of the United States or a political subdivision thereof), investments denominated in the currency of the jurisdiction in which such Subsidiary is organized or in Dollars, in each case which are of substantially the same type as the items specified in the definition of Domestic Cash Equivalents.

"Foreign Lender" means any Lender or Participant that is not a United States person within the meaning of IRC section 7701(a)(30).

"Foreign Representative" has the meaning specified therefor in the recitals to this Agreement.

"Foreign Subsidiary" means any Subsidiary that is not organized under the laws of a state of the United States or the District of Columbia.

"Funding Date" means the date on which a Borrowing occurs.

"Funding Losses" has the meaning specified therefor in Section 2.12(b)(ii) of the Agreement.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation or formation (or equivalent thereof), by-laws (or equivalent thereof), or other organizational documents of such Person.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantors" means US Guarantors and Canadian Guarantors.

"Hazardous Materials" means (a) substances that are regulated under Environmental Laws or are defined or listed in, or otherwise classified pursuant to, any Environmental Laws as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, (d) asbestos in any form, and (e) electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means (a) a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code and (b) any Existing Hedge Agreement.

"Hedge Obligations" means US Hedge Obligations and/or Canadian Hedge Obligations, as the context requires.

"Hedge Provider" means any Bank Product Provider that is a party to a Hedge Agreement with a Loan Party or its Subsidiaries or otherwise provides US Bank Products or Canadian Bank Products under clause (f) of such definitions, as applicable; provided, that if, at any time, a Lender ceases to be a Lender under this Agreement (prior to the payment in full of the Obligations), then, from and after the date on which it ceases to be a Lender thereunder, neither it nor any of its Affiliates shall constitute Hedge Providers and the obligations with respect to Hedge Agreements entered into with such former Lender or any of its Affiliates shall no longer constitute Hedge Obligations.

"HHFH" has the meaning specified therefor in the preamble to the Agreement.

"Hollander China" means Hollander Home Fashions Trading (Shanghai) Co., Ltd, a company organized under the laws of China.

"HSP" has the meaning specified therefor in the preamble to the Agreement.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets and any earn-out or similar obligations to the extent included, or required to be included, as a liability on the balance sheet of such Person at such time (other than (i) trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices, (ii) royalty payments payable in the ordinary course of business in respect of non-exclusive licenses, (iii) working capital and other similar purchase price adjustments, (iv) any earn-out obligation that is not yet

due and payable unless such obligation is not paid promptly after becoming due and payable, (v) customary cash pooling and cash management practices and other intercompany indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) incurred in the ordinary course of business, (vi) accruals for payroll or other employee compensation and other liabilities incurred in the ordinary course of business and (vii) any accrued or deferred management fees, including pursuant to the Management Services Agreement, (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) the liquidation value of any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Taxes" means, (a) any Taxes imposed on or with respect to a payment under, or on account of, any Loan Document, other than Excluded Taxes and (b) to the extent not described in (a), Other Taxes.

"Initial Approved Budget" means the 17-week operating budget (or such shorter, or longer, period, as applicable, to coincide with the Life of the Case) setting forth, on a consolidated basis with respect to the Loan Parties and their respective Subsidiaries, all forecasted consolidated cash receipts, consolidated cash disbursements and consolidated net cash flow on a weekly basis for the relevant period beginning as of the week of the Filing Date, broken down by week, including the anticipated weekly uses of the proceeds of the Loans for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the Loans, fees and expenses related to the Bankruptcy Cases, and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the Agent.  Such Initial Approved Budget shall be in the form set forth in Exhibit B-3 hereto. For all purposes hereunder, the Initial Approved Budget shall constitute an "Approved Budget".

"Information Officer" means KSV Kofman Inc., in its capacity as court-appointed information officer of the Loan Parties in connection with the Recognition Proceedings.

"Insolvency Laws" means (i) the Bankruptcy Code, (ii) the *Bankruptcy and Insolvency Act (Canada)*, (iii) the CCAA, (iv) the *Winding-Up and Restructuring Act* (Canada), (v) the *Canada Business Corporations Act* (Canada) or provincial corporate laws where such statute is used by a Person to propose an arrangement or compromise of some or all of the debts of a Person or a stay of proceedings to enforce some or all claims of creditors against a Person, and/or (vi) any similar legislation in a relevant jurisdiction, in each case as applicable and as in effect from time to time.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other applicable Insolvency Laws, each as now and hereafter in effect, any successors to such statutes, and any similar laws in any jurisdiction including, without limitation, any laws relating to assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief (including the Bankruptcy Cases and the Recognition Proceedings) and any law permitting a debtor to obtain a stay or a compromise of the claims of its creditors.

"Intercompany Subordination Agreement" means that certain "Intercompany Subordination Agreement" as defined in the Existing Credit Agreement and as amended pursuant to the Reaffirmation Agreement.

"Intercreditor Agreement" means the Amended and Restated Intercreditor Agreement, dated as of the date hereof, by and between Agent and Barings Finance LLC, as the administrative agent under the Term Loan Credit Agreement (or any successor or assignee thereto), and acknowledged by Parent and Borrowers, which amends and restates in its entirety the Existing Intercreditor Agreement.

"Interim Financing Order" means collectively, the order of the Bankruptcy Court substantially in the form of Exhibit I-1 (except as may otherwise be agreed in writing or on the record by the Agent at the interim hearing with respect to such order in the Bankruptcy Cases) entered in the Bankruptcy Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to Agent, in its sole discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, Debtors to execute and perform under the terms of this Agreement and the other Loan Documents

"Interest Period" means, with respect to each Non-Base Rate Loan, a period commencing on the date of the making of such Non-Base Rate Loan (or the continuation of a Non-Base Rate Loan or the conversion of a Base Rate Loan to a Non-Base Rate Loan) and ending 1 month thereafter; provided, that (a) interest shall accrue at the applicable rate based upon the Non-Base Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last

Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (d) Borrowers may not elect an Interest Period which will end after the Maturity Date.

"Inventory" means inventory (as that term is defined in the Code).

"Inventory Reserves" means, as of any date of determination, (a) Landlord Reserves, and (b) those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage unless taken into account in the most recent Inventory appraisal delivered to Agent) with respect to US Eligible Inventory, Canadian Eligible Inventory, the US Maximum Revolver Amount, or the Canadian Maximum Revolver Amount.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivable arising in the ordinary course of business), or acquisitions of Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"Investment Banker" has the meaning specified therefor in Section 5.21(a) of the Agreement.

"IRC" means the Internal Revenue Code of 1986, as amended, and any successor statutes, and all regulations and guidance promulgated thereunder.  Any reference to a specific section of the IRC shall be deemed to be a reference to such section of the IRC and any successor statutes, and all regulations promulgated thereunder.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by a Borrower in favor of Issuing Lender and relating to such Letter of Credit.

"Issuing Lender" means US Issuing Lender and/or Canadian Issuing Lender, as the context requires.

"Judgment Currency" has the meaning specified therefor in Section 17.14 of the Agreement.

"Landlord Reserve" means, as to each location at which any Loan Party has Inventory or Equipment included in the US Borrowing Base or Canadian Borrowing Base or books and records located and as to which a Collateral Access Agreement has not been received by Agent, a reserve in an amount equal to 3 months' rent under the lease relative to such location; provided that no such reserve shall be established with respect to locations in which 3 or more months' worth of rent is already reflected in the net orderly liquidation value attributable to such Collateral in the applicable appraisal.

"Last Out Loans" means the loans deemed to be funded hereunder upon the entry of the Final Financing Order pursuant to Section 2.2.

"Last Out Obligations" means all principal, interest, fees and other amounts due and payable in connection with the Last Out Loans.

"Lender" has the meaning set forth in the preamble to the Agreement, shall include each Issuing Lender and each Swing Lender, and shall also include any other Person made a party to the Agreement pursuant to the provisions of Section 13.1 of the Agreement and "Lenders" means each of the Lenders or any one or more of them.

"Lender Group" means each of the Lenders (including each Issuing Lender and each Swing Lender) and Agent, or any one or more of them.

"Lender Group Expenses" means (a) costs or expenses (including taxes and insurance premiums) required to be paid by Parent or its Subsidiaries under any of the Loan Documents or the Existing Loan Documents that are paid, advanced, or incurred by the Agent, the Existing Agent, the Existing Lenders and the Lender Group, (b) documented out-of-pocket fees or charges paid or incurred by Agent or the Existing Agent in connection with the Existing Lenders' or the Lender Group's transactions with Parent and its Subsidiaries under any of the Loan Documents or the Existing Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Agent's and Existing Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to Parent or its Subsidiaries, (d) Agent's and Existing Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent or Existing Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable, documented out-of-pocket costs and expenses paid or incurred by the Existing Lenders or the Lender Group to correct any default or enforce any provision of the Loan Documents or the Existing Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral or the Collateral (as defined in the Existing Loan Documents), or any portion thereof, irrespective of whether a sale is consummated (which, in the

case of attorneys' fees, shall be limited to reasonable documented out-of-pocket attorneys' fees of one primary outside counsel to the Lender Group, one New York local counsel, one Ontario local counsel, one local counsel for each other material jurisdiction (including Quebec) in connection with the Bankruptcy Cases, Agent Consultant, and, to the extent applicable, one local counsel in each relevant jurisdiction, and any other specialty counsel, regulatory counsel and, in the event of an actual or perceived conflict, counsel to avoid conflicts of interest as are required or advisable and in any case, shall not be duplicative of attorneys' fees pursuant to clause (i) below), (g) field examination, appraisal, and valuation fees and expenses of Agent, Existing Agent, any Agent Consultant, any Lender or any Existing Lender related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in Section 2.10 of the Agreement (in each case, whether or not included in the Approved Budget), and including, without limitation, any charges relating to the engagement of any Agent Consultant from time to time (in each case, whether or not included in the Approved Budget), (h) Agent's, Existing Agent's, Existing Lenders' and Lenders' reasonable, documented costs and expenses (including reasonable and documented attorneys' fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents, the Existing Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, the Existing Loan Documents, Agent's Liens in and to the Collateral, Existing Agent's Liens in and to the Collateral (as defined in the Existing Loan Documents, or the Existing Lenders' or the Lender Group's relationship with Parent or any of its Subsidiaries, (i) Agent's and Existing Agent's reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and due diligence expenses (which, in the case of attorneys' fees, shall be limited to reasonable documented out-of-pocket attorneys' fees of one primary outside counsel to the Lender Group, one New York local counsel, one Ontario local counsel, one local counsel for each other material jurisdiction (including Quebec) in connection with the Bankruptcy Cases, Agent Consultant, and, to the extent applicable, one local counsel in each relevant jurisdiction, and any other specialty counsel, regulatory counsel and, in the event of an actual or perceived conflict, counsel to avoid conflicts of interest as are required or advisable and in any case, shall not be duplicative of attorneys' fees pursuant to clause (f) above)) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging) syndication (including reasonable costs and expenses relative to the rating of the Loan, CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents or the Existing Loan Documents, and (j) Agent's, Existing Agent's, each Existing Lender's and each Lender's reasonable and documented costs and expenses (including reasonable documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a response to a third-party subpoena or investigation, the Bankruptcy Cases, the Recognition Proceedings or with such other "workout," a "restructuring," or an Insolvency Proceeding concerning Parent or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents or the Existing Loan Documents), or defending the Loan Documents or the Existing Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the Collateral (which, in the case of attorneys' fees, shall be limited to reasonable documented out-of-pocket attorneys' fees of one primary outside counsel to the Lender Group, one New York

local counsel, one Ontario local counsel, one local counsel for each other material jurisdiction (including Quebec) in connection with the Bankruptcy Cases, Agent Consultant, and, to the extent applicable, one local counsel in each relevant jurisdiction, and specialty counsel, regulatory counsel and, in the event of an actual or perceived conflict, counsel to avoid conflicts of interest as are required or advisable) or the Collateral (as defined in the Existing Loan Documents) (including any such costs and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code in connection with the Bankruptcy Cases and the Recognition Proceedings, or any other action or participation by any member of the Lender Group in the Bankruptcy Cases or the Recognition Proceedings, including any contested matters or adversary proceedings, to the extent related to any of the foregoing).

"<u>Lender Group Representatives</u>" has the meaning specified therefor in <u>Section 17.9</u> of the Agreement.

"<u>Lender-Related Person</u>" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Letter of Credit</u>" means a US Letter of Credit and/or a Canadian Letter of Credit, as the context requires.

"<u>Letter of Credit Collateralization</u>" means with respect to the US Letter of Credit Obligations or the Canadian Letter of Credit Obligations, as applicable, either (a) providing cash collateral in the Applicable Currency (pursuant to documentation reasonably satisfactory to Agent, including provisions that specify that the applicable Letter of Credit Fees and all fees, charges and commissions provided for in the Agreement (including any fronting fees) will continue to accrue while the applicable Letters of Credit are outstanding) to be held by Agent for the benefit of the applicable Revolving Lenders in an amount equal to 105% of the then existing US Letter of Credit Usage and 105% of the then existing Canadian Letter of Credit, (b) delivering to Agent documentation executed by all beneficiaries under the applicable Letters of Credit, in form and substance reasonably satisfactory to Agent and the applicable Issuing Lender, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent in the Applicable Currency, from a commercial bank acceptable to Agent (in its sole discretion) in an amount equal to 105% of the then existing US Letter of Credit Usage and 105% of the then existing Canadian Letter of Usage (it being understood that the applicable Letter of Credit Fee and all fronting fees set forth in the Agreement will continue to accrue while the applicable Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"<u>Letter of Credit Disbursement</u>" means a US Letter of Credit Disbursement and/or a Canadian Letter of Credit Disbursement, as the context requires.

"<u>Letter of Credit Exposure</u>" means the US Letter of Credit Exposure and/or the Canadian Letter of Credit Exposure, as the context requires.

"<u>Letter of Credit Fees</u>" means the US Letter of Credit Fees and/or the Canadian Letter of Credit Fees, as the context requires.

"Letter of Credit Indemnified Costs" means any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable documented fees and disbursements of attorneys or experts, and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of the indemnification set forth in Section 2.11A or Section 2.11B (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than Taxes, which shall be governed by Section 16) in connection with any Letter of Credit.

"Letter of Credit Related Person" means each member of the Lender Group (including each of each Issuing Lender and its branches, Affiliates, and correspondents and Canadian Underlying Issuer and its branches, Affiliates and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents.

"Letter of Credit Usage" means the US Letter of Credit Usage and/or the Canadian Letter of Credit Usage, as the context requires.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, hypothec or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including all "liens" as defined by Section 101(37) of the Bankruptcy Code and any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Life of the Case" means the period beginning on the Filing Date and lasting through (and including) the Plan Effective Date of the Plan.

"Loan" means any Revolving Loan (including any Swing Loan or Extraordinary Advance) made (or to be made) hereunder.

"Loan Account" has the meaning specified therefor in Section 2.9 of the Agreement.

"Loan Documents" means the Agreement, the Financing Order, the Canadian Recognition Orders, the Reaffirmation Agreement, the Borrowing Base Certificates, the Fee Letter, any Issuer Documents, the Letters of Credit, the US Security Agreement, the Canadian Security Documents, the US Guaranty, the Intercompany Subordination Agreement, Control Agreements, the US Copyright Security Agreement, the US Patent Security Agreement, the US Trademark Security Agreement, the Canadian Copyright Security Agreement, the Canadian Patent Security Agreement, the Canadian Trademark Security Agreement, the Mortgages, any guaranties executed by any Loan Party, any note or notes executed by any Borrower in connection with the Agreement and payable to any member of the Lender Group, and any other instrument or agreement entered into, now or in the future, by Parent or any of its Subsidiaries and any member of the Lender Group in connection with the Agreement.  For the avoidance of doubt, any agreements evidencing Bank Products shall not constitute Loan Documents.

"Loan Parties" means the US Loan Parties and/or the Canadian Loan Parties, as the context requires.

"Management Services Agreement" means that certain Amended and Restated Management Services Agreement, dated as of the June 9, 2017, by and between Parent and Sponsor, as the same may be amended in accordance with the terms hereof.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means any event, circumstance or condition that has had or would reasonably be expected to have a material and adverse effect on (a) the business or financial condition of the Loan Parties and their Subsidiaries, taken as a whole, (b) the ability of Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents, or (c) the rights and remedies of Agent and the Lenders under the Loan Documents, taken as a whole, in each case, except for the commencement of the Bankruptcy Cases and the Recognition Proceedings and the events that customarily and reasonably result from the commencement of the Bankruptcy Cases and the Recognition Proceedings.

"Maturity Date" means the earliest of (a) the date that is one hundred fifty (150) days after the Filing Date, (b) the consummation of a sale of all or substantially all of the Debtors' assets, (c) if the Final Financing Order has not been entered, the date that is forty (40) days after the date of the First Day Hearing, (d) the Plan Effective Date of a Plan and (e) the Maturity Date (under and as defined in the Term Loan Credit Agreement).

"Maximum Borrowing Amount" means at any time the lesser of (a) the US Maximum Revolver Amount and (b) the sum of the US Borrowing Base and the Canadian Borrowing Base.

"Milestones" has the meaning specified therefor in Section 5.21 of the Agreement.

"Minimum Excess Availability" has the meaning specified therefor in Section 7(b) of the Agreement.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Mortgages" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by Parent or one of its Subsidiaries in favor of Agent, in form and substance reasonably satisfactory to Agent, that encumber any Real Property.

"Multiemployer Plan" means any multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA with respect to which any Loan Party has an obligation to contribute or has any liability, (including on behalf of an ERISA Affiliate) or could be assessed Withdrawal Liability assuming a complete withdrawal from any such multiemployer plan.

"Net Cash Proceeds" means, with respect to any sale or disposition by Parent or any of its Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of Parent or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under this Agreement or the other Loan Documents or the Existing Credit Agreement or Existing Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which (subject to the Intercreditor Agreement and the Financing Order) is required to be, and is, repaid in connection with such sale or disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by Parent or such Subsidiary in connection with such sale or disposition, excluding amounts payable to a Loan Party or Affiliate thereof, (iii) taxes paid or payable to any taxing authorities by Parent or such Subsidiary in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid or anticipated to be payable, and are properly attributable to such transaction, and (iv) all amounts that are set aside as a reserve (A) for adjustments in respect of the purchase price of such assets, (B) for any liabilities associated with such sale or casualty, to the extent such reserve is required by GAAP, and (C) for the payment of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 90 days after, the date of such sale or other disposition, to the extent that in each case the funds described above in this clause (iv) are (x) deposited into escrow with a third party escrow agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of Agent and (y) paid to Agent as a prepayment of the applicable Obligations and Existing Secured Obligations in accordance with Section 2.4(e) of this Agreement at such time when such amounts are no longer required to be set aside as such a reserve.

"Net Recovery Percentage" means, as of any date of determination, the percentage of the book value of Canadian Loan Parties' or US Borrowing Base Companies', as applicable, Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be determined as to each category of Inventory and to be as specified in the most recent appraisal received by Agent from an appraisal company selected by Agent.

"Non-Base Rate Deadline" has the meaning specified therefor in Section 2.12(b)(i) of the Agreement.

"Non-Base Rate Notice" means a written notice in the form of Exhibit L-1.

"Non-Base Rate Option" has the meaning specified therefor in Section 2.12(a) of the Agreement.

"Non-Base Rate" means the US LIBOR Rate.

"Non-Base Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the applicable Non-Base Rate.

"Non-Base Rate Margin" has the meaning specified therefor in the definition of Applicable Margin.

"Non-Consenting Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Notification Event" means (a) the occurrence of a "reportable event" described in Section 4043(c) of ERISA with respect to a Pension Plan for which the 30-day notice requirement has not been waived by applicable regulations issued by the PBGC, (b) the withdrawal of any Loan Party or ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC or any Pension Plan or Multiemployer Plan administrator, (e) any other event or condition that would constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC or ERISA in connection with any Employee Benefit Plan or the existence of any facts or circumstances that could reasonably be expected to result in the imposition of a Lien, (g) the partial or complete withdrawal of any Loan Party or ERISA Affiliate from a Multiemployer Plan (other than any withdrawal that would not constitute an Event of Default under Section 8.12), (h) any event or condition that results in the insolvency of a Multiemployer Plan under Section 4245 of ERISA, (i) any event or condition that results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan under ERISA, (j) any Pension Plan being in "at risk status" within the meaning of IRC Section 430(i), (k) any Multiemployer Plan being in "endangered status" or "critical status" within the meaning of IRC Section 432(b) or the determination that any Multiemployer Plan is or is expected to be insolvent within the meaning of Title IV of ERISA, (l) with respect to any Pension Plan, any Loan Party or ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e), (m) an "accumulated funding deficiency" within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) or the failure of any Pension Plan or Multiemployer Plan to meet the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA), in each case, whether or not waived, (n) the filing of an application for a waiver of the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) with respect to any Pension Plan or Multiemployer Plan, (o) the failure to make by its due date a required payment or contribution with respect to any Pension Plan or Multiemployer Plan, or (p) any event that results in or could reasonably be expected to result in a liability by a Loan Party pursuant to Title I of ERISA or the excise tax provisions of the IRC relating to Employee Benefit Plans or any event that results in or could reasonably be expected to result in a liability to any Loan Party or ERISA Affiliate pursuant to Title IV of ERISA or Section 401(a)(29) of the IRC.

"Obligations" means the US Obligations and/or the Canadian Obligations, as the context requires.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Originating Lender" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Other Taxes" has the meaning specified therefor in Section 16.1 of the Agreement.

"Overadvance" means a US Overadvance and/or a Canadian Overadvance, as the context requires.

"Parent" has the meaning specified therefor in the preamble to the Agreement.

"Participant" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Participant Register" has the meaning set forth in Section 13.1(i) of the Agreement.

"Participation Agreement" means that certain Subordinated Participation Agreement, dated as of the date hereof but effective upon entry of the Final Financing Order by and among SENTINEL CAPITAL PARTNERS V, L.P., SENTINEL DREAM BLOCKER, INC., SENTINEL CAPITAL INVESTORS V, L.P. and Lenders.

"Participation Put Agreement" means that certain Put Agreement, dated as November 27, 2018, by and among SENTINEL CAPITAL PARTNERS V, L.P., SENTINEL DREAM BLOCKER, INC., SENTINEL CAPITAL INVESTORS V, L.P. and Agent.

"Patriot Act" has the meaning specified therefor in Section 4.13 of the Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"PCF" has the meaning specified therefor in the preamble to this Agreement.

"PCF Acquisition Agreement" means that certain Stock Purchase Agreement, dated as of the June 9, 2017, among HSP, PCF, each of the shareholders of PCF listed on the signature pages thereto and Joseph T. Crawford, as agent for the sellers.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV or Section 302 of ERISA or Sections 412 or 430 of the Code sponsored, maintained, or contributed to by any Loan Party or which any Loan Party has any liability (including on behalf of an ERISA Affiliate), excluding any Canadian Pension Plan.

"Permitted Discretion" means a determination made by Agent in good faith, in its commercially reasonable judgment and in accordance with its regular business practices and

policies (as in effect from time to time) generally applicable to asset-based credit facilities with advance rates based on current assets.

"Permitted Dispositions" means:

(a)     sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases (or the termination or abandonment thereof) of Real Property not useful in any material respect in the conduct of the business of Parent and its Subsidiaries,

(b)     sales of Inventory to buyers in the ordinary course of business,

(c)     the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents,

(d)     the non-exclusive licensing or sub-licensing of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business,

(e)     [reserved],

(f)     the making of Permitted Investments that are expressly permitted to be made pursuant to the Agreement,

(g)     sales or dispositions between or among Loan Parties,

(h)     voluntary terminations of any Hedging Agreements,

(i)     [reserved],

(j)     the sale or disposition of shares of Equity Interests of any Subsidiary of any Borrower (i) in order to qualify members of the governing body of the Subsidiary if and to the extent required by applicable law or (ii) to nationals of the jurisdiction of organization of any Subsidiary to the extent required by applicable law,

(k)     the granting of Permitted Liens,

(l)     any involuntary loss, damage or destruction of property,

(m)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(n)     the leasing or subleasing of assets of Parent or its Subsidiaries in the ordinary course of business,

(o)     the expiration, abandonment or lapse of patents, trademarks, copyrights, domain names or other intellectual property of Parent and its Subsidiaries (i) to the extent immaterial or not economically desirable in the conduct of their business (ii) in accordance with their respective statutory terms, or (iii) in the ordinary course of business, and

(p)    so long as no Event of Default has occurred and is continuing at the time of such disposition, sales of fixed assets of the Canadian Borrower located in Toronto for fair value and for 100% cash consideration in an amount not to exceed $500,000 in the aggregate for all such sales.

"Permitted Indebtedness" means, without duplication:

(a)    the Obligations, including Indebtedness evidenced by the Agreement or the other Loan Documents, as well as Indebtedness owed to any Issuing Lender with respect to Letters of Credit,

(b)    Indebtedness outstanding on the Filing Date and set forth on Schedule 4.14 to the Agreement,

(c)    [reserved],

(d)    endorsement of instruments or other payment items for deposit, and Indebtedness of the Parent or any of its Subsidiaries arising from the honoring of a check, draft or similar instrument of such Person drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence,

(e)    Existing Secured Obligations, including any Indebtedness reinstated by the Bankruptcy Court or the Canadian Court and constituting Reinstated Existing Secured Obligations,

(f)    [reserved,]

(g)    [reserved],

(h)    [reserved],

(i)    Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards"), or Cash Management Services,

(j)    Indebtedness representing deferred compensation or similar obligations to employees incurred in the ordinary course of business,

(k)    Indebtedness constituting Permitted Investments,

(l)    Indebtedness outstanding under the Existing Term Loan Documents in accordance with the Financing Order, together with any Refinancing (as defined in the Existing Intercreditor Agreement) thereof in accordance with the Existing Intercreditor Agreement;

(m)    Indebtedness under the Term Loan Documents in accordance with the Financing Order, together with any Refinancing (as defined in the Intercreditor Agreement) thereof in accordance with the Intercreditor Agreement,

(n)    unsecured Indebtedness (subject to customary rights of setoff) incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business,

(o)    accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness,

(p)    to the extent constituting Indebtedness, unsecured Indebtedness consisting of take-or-pay obligations contained in supply agreements entered into by any Loan Party in the ordinary course of business consistent with past practices, in an aggregate principal amount not to exceed $500,000,

(q)    Indebtedness in respect of workers' compensation claims, self-insurance obligations, expert or import indemnitees or similar instruments, customs bonds, governmental contracts and leases provided a by Loan Party in the ordinary course of its business and under any letters of credit, bank guarantees or similar instruments supporting the same,

(r)    Indebtedness in respect of taxes, assessments or governmental charges to the extent that payment thereof shall not at the time be required to be made in accordance with Section 5.5,

(s)    [reserved],

(t)    [reserved],

(u)    [reserved],

(v)    [reserved],

(w)    Indebtedness incurred in the ordinary course of business owed to any Person providing property, casualty, liability, or other insurance to Parent or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year, and

(x)    unsecured guarantees issued by (x) Loan Parties to guaranty the underlying Indebtedness of another Loan Party and (y) a Subsidiary of Parent that is not a Loan Party to guaranty the underlying indebtedness of any other Subsidiary of Parent to the extent that such Subsidiary is a party to an Intercompany Subordination Agreement, in each case to the extent that such Indebtedness is permitted under this Agreement (other than guaranties by US Borrower or any US Guarantor of any Indebtedness of any Canadian Loan Party, except for the US Guaranty), and

(y)    Indebtedness of a Foreign Subsidiary (other than Canadian Borrower or any Subsidiary organized under the laws of Canada or a province thereof) in an aggregate principal amount not to exceed $1,000,000 at any time.

"Permitted Intercompany Advances" means loans and other Investments made by (a) a Loan Party to another Loan Party, (b) a Subsidiary of Parent that is not a Loan Party to another Subsidiary of Parent that is not a Loan Party, (c) a Subsidiary of Parent that is not a Loan Party to a Loan Party, so long as the parties thereto are party to the Intercompany Subordination Agreement, and (d) a Loan Party to a Subsidiary of Parent that is not a Loan Party so long as (i) the aggregate amount of all such loans and other Investments after the Closing Date does not exceed $1,000,000 at any time outstanding and is permitted to be made as "other payables" under the Approved Budget, and (ii) at the time of the making of such Loan or other Investment, no Default or Event or Default has occurred and is continuing or would result therefrom.

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents,

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(c)    extensions of trade credit made in connection with sales of goods or services in the ordinary course of business and consistent with past practices,

(d)    Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor, upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries or in connection with an out-of-court restructuring of an Account Debtor,

(e)    Investments owned by any Loan Party or any of its Subsidiaries on the Closing Date and set forth on Schedule P-1 to the Agreement,

(f)    deposits of cash outstanding on the Filing Date made in the ordinary course of business to secure performance of operating leases,

(g)    Permitted Intercompany Advances,

(h)    guarantees permitted under the definition of Permitted Indebtedness,

(i)    Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(j)    [reserved],

(k)    [reserved],

(l)    [reserved],

(m)    [reserved],

(n)    so long as no Event of Default has occurred and is continuing at the time such Investment is made or would result therefrom, any other Investments in an aggregate amount not to exceed the lesser of $250,000 outstanding at any time and the amounts therefor permitted in compliance with the Approved Budget,

(o)    [reserved],

(p)    Investments (i) by any Borrower or any Subsidiary that is a Loan Party in any Borrower or any Subsidiary that is a Loan Party, (ii) by any non-Loan Party in any other non-Loan Party that is a Subsidiary and (iii) by any non-Loan Party in any Borrower or any Subsidiary that is a Loan Party,

(q)    [reserved],

(r)    [reserved],

(s)    advances in connection with purchases of goods or services in the ordinary course of business and consistent with past practice and to the extent set forth in Approved Budget,

(t)    Indebtedness owing to a landlord arising under a lease of Real Property as a result of an ordinary course "build out" provision in connection with the financing by such landlord of leasehold improvements,

(u)    [reserved], and

(v)    advances of payroll payments to employees in the ordinary course of business to the extent set forth in the Approved Budget.

"Permitted Liens" means

(a)    Liens granted to, or for the benefit of, Agent to secure any of the Obligations,

(b)    Liens for unpaid taxes, assessments, or other governmental charges or levies, and other statutory inchoate Liens, in each case that either (i) are not more than thirty (30) days past due (provided that Agent may establish a reserve in its Permitted Discretion with respect to such Liens immediately) or (ii) the underlying taxes, assessments, charges, levies or other obligations are the subject of Permitted Protests,

(c)    judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.3 of the Agreement so long as such judgments are stayed during the pendency of the Bankruptcy Cases and the Recognition Proceedings,

(d)    Liens set forth on Schedule P-2 to the Agreement; provided, that to qualify as a Permitted Lien, any such Lien described on Schedule P-2 to the Agreement shall only secure the Indebtedness that it secures on the Closing Date,

(e)     the interests of lessors and sublessors under operating leases and subleases and non-exclusive licensors and sublicensors under license agreements and sublicense agreements, in each case, incurred in the ordinary course of business,

(f)     [reserved],

(g)     Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, contractor, or suppliers, construction liens and other like liens, in each case incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not more than thirty days past due (provided that Agent may establish a reserve in its Permitted Discretion with respect to such Liens immediately), or (ii) are the subject of Permitted Protests,

(h)     Liens on amounts deposited to secure Parent's and its Subsidiaries obligations in connection with worker's compensation or other unemployment insurance and other social security legislation or other insurance related obligations (including obligations in respect of letters of credit, bank guarantees or similar instruments) securing the same,

(i)     Liens on amounts or Cash Equivalents deposited to secure Parent's and its Subsidiaries obligations in connection with the making or entering into of bids, tenders, contracts, or leases in the ordinary course of business, or statutory obligations and, in each case, not in connection with the borrowing of money,

(j)     Liens on amounts deposited to secure Parent's and its Subsidiaries' reimbursement obligations with respect to surety, performance, bid or appeal bonds, completion guaranties and similar obligations in the ordinary course of business,

(k)     with respect to any Real Property, (i) easements, covenants, conditions, reservations, declarations, rights of way, and zoning restrictions (including deed restrictions utilized in connection with any Remedial Actions required under Environmental Laws) and other similar matters of record affecting title to such Real Property, (ii) any state of facts that a current accurate survey and visual inspection would disclose, in either case, that do not materially interfere with or impair the use or operation thereof and (iii) all Liens and other matters disclosed in any Mortgage title insurance policy,

(l)     licenses and sublicenses of patents, trademarks, copyrights, or other intellectual property rights in existence as of the Filing Date in the ordinary course of business,

(m)     Liens granted or authorized by the Financing Order, including, without limitation, replacement Liens granted to Existing Agent,

(n)     Liens on Collateral securing the Existing Term Loan Debt subject to the Intercreditor Agreement,

(o)     Liens on Collateral securing the Indebtedness under the Term Loan Documents subject to the Intercreditor Agreement,

(p)    (i) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of Deposit Accounts in the ordinary course of business, (ii) Liens of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, and (iii) Liens attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes,

(q)    Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is expressly permitted under Section 6.1,

(r)    Liens in favor of customs and revenue authorities on or prior to the Filing Date arising as a matter of law to secure payment of customs duties not yet delinquent in connection with the importation of goods,

(s)    Liens granted to, or for the benefit of, Agent to secured the Existing Secured Obligations,

(t)    Liens on amounts deposited to secure amounts incurred in the ordinary course of business owing to public utilities or to any municipalities or Governmental Authorities or other public authority when required by the utility, municipality or Governmental Authorities or other public authority in connection with the supply of services or utilities to any Loan Party,

(u)    Liens on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business,

(v)    Liens in the nature of precautionary UCC or PPSA filings (or similar filings) by lessors under operating leases,

(w)    any interest of a lessee or sublessee or licensee under any lease or license of excess office, warehouse or other space by a Loan Party in the ordinary course of business consistent with past practices,

(x)    the Administration Charge,

(y)    [reserved],

(z)    [reserved],

(aa)    Liens in favor of Canadian Borrower on the assets of US Loan Parties constituting ABL Priority Collateral, which are junior and subordinate to the Agent's Liens but are senior to the Liens securing the Term Loan Debt, to secure the repayment of Permitted Intercompany Advances that are made following the Closing Date by Canadian Borrower to one or more US Loan Parties with proceeds of Canadian Revolving Loans advanced hereunder following the Closing Date, in each case pursuant to and subject to the Financing Order and the applicable DIP Recognition Order (it being agreed that notwithstanding anything herein to the

contrary, the Canadian Intercompany Superpriority Administrative Claims (as defined in the Financing Order) shall not be deemed to violate any provision of this Agreement,

> (bb) contractual rights of set-off relating to purchase orders and other agreements entered into in the ordinary course of business, and

> (cc) inchoate Liens and Liens for which a Canadian Priority Payables Reserve for the amount of such Lien has been established.

> "Permitted Priority Liens" means all Liens permitted to have priority over the Liens in favor of Agent, solely to the extent that such Liens are valid, perfected and non-avoidable as of the Filing Date (or as may be permitted to be perfected after the Filing Date pursuant to section 546 of the Bankruptcy Code) and were not subordinated by agreement or applicable law, subject to the terms of the Financing Order, the DIP Recognition Order and otherwise agreed to by Agent.

> "Permitted Protest" means the right of Parent or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), Taxes, or rental or other lease payment, provided that (a) a reserve with respect to such obligation is established on Parent's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted in accordance with applicable law diligently by Parent or its Subsidiary, as applicable, in good faith, and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens.

> "Permitted Variances" means, with respect to determining compliance with Section 7(a) relating to the Borrowers' cash receipts, cash disbursements and net cash flow, (i) all variances favorable to the Borrowers and their Subsidiaries; (ii) with respect to determining compliance with Section 7(a)(v) or 7(a)(vi) as of the end of any Testing Period, an unfavorable cumulative variance of 10.0% (in each case compared to the relevant amounts forecast for the same period in the Approved Budget); and (iii) with respect to determining compliance with Section 7(a)(vii) as of the end of any Testing Period, an unfavorable cumulative variance of 15.0% (in each case compared to the amount forecast for the same period in the Approved Budget).

> "Person" means natural persons, corporations, limited liability companies, limited partnerships, unlimited liability companies, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

> "Plan" means a plan of reorganization in form and substance satisfactory to Agent in its sole discretion with respect to the economic and non-economic treatment of the Obligations (other than the Last Out Obligations), the Existing Secured Obligations (other than the Existing Last Out Obligations), Agent, Existing Agent, Lenders and Existing Lenders, and in form and substance satisfactory to Agent in its reasonable discretion as to all other matters (it being agreed that the Proposed Plan is satisfactory to the Agent).

"Plan Effective Date" means the date in which all conditions precedent to the effectiveness of a Plan have been satisfied or waived in accordance with such Plan.

"Platform" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"PPSA" means the *Personal Property Security Act (Ontario),* and the regulations promulgated thereunder and other applicable personal property security legislation of Canada or any applicable Canadian province or provinces in respect of the Canadian Loan Parties or Collateral (including the Civil Code of Quebec and the regulation respecting the register of personal and movable real rights promulgated thereunder) as all such legislation now exists or may from time to time hereafter be amended, modified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness, trade payables or other pre-petition claims against any Loan Party.

"Pro Rata Share" means, as of any date of determination:

(a)    with respect to a Lender's obligation to make all or a portion of the US Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the US Revolving Loans, and with respect to all other computations and other matters related to the US Revolver Commitments or the US Revolving Loans, the percentage obtained by dividing (i) the US Revolving Loan Exposure of such Lender by (ii) the aggregate US Revolving Loan Exposure of all Lenders,

(b)    with respect to a Lender's obligation to make all or a portion of the Canadian Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the Canadian Revolving Loans, and with respect to all other computations and other matters related to the Canadian Revolver Commitments or the Canadian Revolving Loans, the percentage obtained by dividing (i) the Canadian Revolving Loan Exposure of such Lender by (ii) the aggregate Canadian Revolving Loan Exposure of all Lenders,

(c)    with respect to a Lender's obligation to participate in the US Letters of Credit, with respect to such Lender's obligation to reimburse US Issuing Lender, and with respect to such Lender's right to receive payments of US Letter of Credit fees, and with respect to all other computations and other matters related to the US Letters of Credit, the percentage obtained by dividing (i) the US Revolving Loan Exposure of such Lender by (ii) the aggregate US Revolving Loan Exposure of all Lenders; provided, that if all of the US Revolving Loans have been repaid in full and all US Revolver Commitments have been terminated, but US Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined as if the US Revolver Commitments had not been terminated and based upon the US Revolver Commitments as they existed immediately prior to their termination,

(d)    with respect to a Lender's obligation to participate in the Canadian Letters of Credit, with respect to such Lender's obligation to reimburse Canadian Issuing Lender, and

with respect to such Lender's right to receive payments of Canadian Letter of Credit fees, and with respect to all other computations and other matters related to the Canadian Letters of Credit, the percentage obtained by dividing (i) the Canadian Revolving Loan Exposure of such Lender by (ii) the aggregate Canadian Revolving Loan Exposure of all Lenders; provided, that if all of the Canadian Revolving Loans have been repaid in full and all Canadian Revolver Commitments have been terminated, but Canadian Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined as if the Canadian Revolver Commitments had not been terminated and based upon the Canadian Revolver Commitments as they existed immediately prior to their termination,

(e)    with respect to all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.7 of the Agreement), the Dollar Equivalent of the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 13.1; provided, that if all of the Loans have been repaid in full, all Letters of Credit have been made the subject of Letter of Credit Collateralization, and all Commitments have been terminated, Pro Rata Share under this clause shall be determined as if the Revolving Loan Exposures had not been repaid, collateralized, or terminated and shall be based upon the Revolving Loan Exposures as they existed immediately prior to their repayment, collateralization, or termination.

"Proposed Plan" means (a) as of the date hereof, the chapter 11 plan of reorganization attached to the Restructuring Support Agreement as in effect on the date hereof, and (b) upon any such modification, such chapter 11 plan of reorganization as such chapter 11 plan of reorganization may be modified from time to time with the consent of Agent in Agent's sole discretion with respect to the economic and non-economic treatment of the Obligations (other than the Last Out Obligations), the Existing Secured Obligations (other than the Existing Last Out Obligations), and the Agent, Existing Agent, Lenders and Existing Lenders, and with the consent of Agent in Agent's reasonable discretion with respect to all other matters.

"Protective Advances" means the US Protective Advances and/or the Canadian Protective Advances, as the context requires.

"Public Lender" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"Qualified Equity Interests" means and refers to any Equity Interests issued by Parent (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"Qualified Investment Banker Engagement" means the engagement and retention by the Borrowers of an investment banker reasonably satisfactory to Agent, at Borrowers' sole cost and expense and on terms and conditions reasonably satisfactory to Agent, for purposes of preparing, marketing, and consummating the sale of all or substantially all of the assets of the Borrowers, and such other potential strategic alternatives (including, without limitation, potential equity sales, refinancing transactions, capital investment raise transactions, and other transactions) as may be acceptable to the Borrowers and the Agent, the consummation of each of which shall be subject to the terms and provisions of this Agreement.

"Quebec Security Documents" means the Deed of Hypothec (as such term is defined in Section 15.19 of the Agreement) in form and substance reasonably satisfactory to Agent and all other documents contemplated thereby or delivered in connection therewith, each executed and delivered by any of the Borrowers or Guarantors that is existing pursuant to the laws of the Province of Quebec or that has its registered office, chief executive office, head office or a place of business or any movable property or assets or Real Property Collateral located in the Province of Quebec, and each as amended or modified from time to time.

"Reaffirmation Agreement" means that certain Reaffirmation of Prepetition Loan Documents, dated as of the Closing Date, by and among the Loan Parties and the Agent.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by Parent or one of its Subsidiaries and the improvements thereto.

"Real Property Collateral" means the Real Property identified on Schedule R-1 to the Agreement and any Real Property hereafter acquired to the extent any mortgage is granted to secure the Term Loan Debt (or, if the Term Loan Debt has been paid in full, to the extent owned by any Loan Party in fee simple with a fair market value greater than $1,000,000).

"Receivable Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish and maintain (including reserves for rebates, discounts, warranty claims, and returns) with respect to the US Eligible Accounts, Canadian Eligible Accounts, US Maximum Revolver Amount and/or the Canadian Maximum Revolver Amount.

"Recognition Proceedings" has the meaning specified in the recitals to this Agreement.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Loan Party giving rise to Net Cash Proceeds to such Loan Party, as the case may be, to the extent that such settlement or payment does not constitute reimbursement or compensation for amounts previously paid by the Borrower or any other Loan Party in respect of such casualty or condemnation.

"Register" has the meaning set forth in Section 13.1(h) of the Agreement.

"Registered Loan" has the meaning set forth in Section 13.1(h) of the Agreement.

"Reinstated Existing Secured Canadian Obligations" means any Reinstated Existing Secured Obligations in respect of Canadian Obligations (as defined in the Existing Credit Agreement).

"<u>Reinstated Existing Secured Obligations</u>" means any Existing Secured Obligations constituting Avoided Payments, to the extent such obligations have been reinstated, in each case, pursuant to, and subject to the requirements and terms of the Bankruptcy Court.

"<u>Reinstated Existing Secured US Obligations</u>" means any Reinstated Existing Secured Obligations in respect of US Obligations (as defined in the Existing Credit Agreement).

"<u>Related Fund</u>" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"<u>Related Transactions</u>" means (a) the execution, delivery and performance by the Loan Parties of this Agreement and each other Loan Document to which they are a party, the borrowing hereunder of the Loans and the use of the proceeds thereof, and the grant of DIP Liens by the Borrower on the Collateral pursuant to this Agreement, the Financing Order and the Security Agreements, (b) the commencement and filing of the Bankruptcy Cases and (c) the payment of all fees, costs and expenses associated with all of the foregoing.

"<u>Remedial Action</u>" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"<u>Replacement Lender</u>" has the meaning specified therefor in <u>Section 2.13(b)</u> of the Agreement.

"<u>Report</u>" has the meaning specified therefor in <u>Section 15.16</u> of the Agreement.

"<u>Required Lenders</u>" means, at any time, Lenders having or holding more than 50% of the sum of the aggregate Dollar Equivalent of Revolving Loan Exposure of all Lenders; <u>provided</u>, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders, and (ii) at any time there are 2 or more Lenders, "Required Lenders" must include at least 2 Lenders (who are not Affiliates of one another).

"<u>Reserves</u>" means, as of any date of determination, those reserves (other than Receivable Reserves, Bank Product Reserves, and Inventory Reserves) that Agent deems necessary or appropriate, in its Permitted Discretion and subject to <u>Section 2.1(c)</u>, to establish and maintain (including reserves with respect to (a) sums that Parent or its Subsidiaries are required to pay under any Section of the Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, (b) amounts owing by Parent or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Agent likely would have a

priority superior to Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral, (c) fluctuations in the currency exchange rates, and (d) amounts owing to freight forwarders and customs brokers) with respect to the US Borrowing Base or Canadian Borrowing Base.  Without limiting the foregoing, Agent may, in its Permitted Discretion, establish Canadian Priority Payables Reserves (without duplication of any amount referred to in the immediately preceding sentence) with respect to the Canadian Borrowing Base.

"Responsible Officer" of any Person means the chief executive officer, the president, executive vice president, any senior vice president, any vice president, the chief operating officer, the legal representative, the general manager or any Financial Officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of the Agreement.  Agent and each Lender shall be entitled to conclusively presume that (i) any document delivered hereunder that is signed by a Responsible Officer of a Loan Party has been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and (ii) such Responsible Officer has acted on behalf of such Loan Party.

"Restricted Payment" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by Parent (including any such payment in connection with any merger, amalgamation or consolidation involving Parent) or to the direct or indirect holders of Equity Interests issued by Parent in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by Parent), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger, amalgamation or consolidation involving Parent) any Equity Interests issued by Parent, and (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of Parent now or hereafter outstanding.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of or prior to the Filing Date, by and among certain Existing Term Lenders, Sponsor and the Loan Parties party thereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof.

"Revaluation Date" means (a) with respect to any Revolving Loan denominated in Canadian Dollars, each of the following:  (i) each date of a Borrowing of such Revolving Loan, (ii) each date of a continuation of such Revolving Loan pursuant to Section 2.12, and (iii) such additional dates as Agent shall determine or the Required Lenders shall require, (b) with respect to any Letter of Credit denominated in Canadian Dollars, each of the following:  (i) each date of issuance of such Letter of Credit, (ii) each date of an amendment of such Letter of Credit having the effect of increasing the amount thereof, (iii) each date of any payment by an Issuing Lender under such Letter of Credit, and (iv) such additional dates as Agent or an Issuing Lender shall determine or the Required Lenders shall require, and (c) with respect to any other Obligations denominated in Canadian Dollars, each date as Agent shall determine unless otherwise prescribed in this Agreement or any other Loan Documents.

"Revolver Commitments" means the US Revolver Commitments and/or the Canadian Revolver Commitments, as the context requires.

"Revolver Usage" means the US Revolver Usage and/or the Canadian Revolver Usage, as the context requires.

"Revolving Lender" means a Lender that has a Revolver Commitment or that has an outstanding Revolving Loan.

"Revolving Loan Exposure" means the US Revolving Loan Exposure and/or the Canadian Revolving Loan Exposure, as the context requires.

"Revolving Loans" means a US Revolving Loan and/or a Canadian Revolving Loan, as the context requires.

"RSA Termination Event" means the occurrence of any of the events set forth in Sections 9, 10 or 11 of the Restructuring Support Agreement (as in effect on the date hereof or as modified in accordance with the terms of this Agreement).

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or territory sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC or OFAC's consolidated Non-SDN list, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly majority-owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, (d) the Government of Canada or (e) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreements" means the US Security Agreement and the Canadian Security Agreement.

"Settlement" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Settlement Date" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Sole Book Runner" has the meaning set forth in the preamble to the Agreement.

"Sole Lead Arranger" has the meaning set forth in the preamble to the Agreement.

"Specified Competitor" means those Persons that are competitors of Parent and its Subsidiaries identified by name in a writing (together with any holders of controlling Equity Interests of such Persons or Subsidiaries of such Persons that are clearly identifiable as such by virtue of their names, but excluding any direct or indirect owners constituting financial institutions, institutional funds or other institutional investors that own equity interests in a portfolio of companies) delivered by or on behalf of Parent to Agent prior to the date hereof that is clearly and conspicuously marked "Specified Competitor Listing" and that has been expressly acknowledged and agreed to in writing by Agent prior to the date hereof (it being agreed that no Specified Competitor shall exist if such list is not so delivered to or acknowledged by Agent).

"Specified Reserves" means a reserve in an amount equal to the sum of any claims under § 503(b)(9) of the Bankruptcy Code.

"Sponsor" means Sentinel Capital Partners, L.L.C.

"Sponsor Affiliated Entity" means Sponsor or any of its Affiliates (other than Loan Parties or their Subsidiaries and other than operating portfolio companies of Sponsor and its Affiliates).

"Spot Rate" means, for a currency, the rate determined by Agent to be the rate quoted by Wells Fargo acting in such capacity as the spot rate for the purchase by Wells Fargo of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. (New York time) on the date two Business Days prior to the date as of which the foreign exchange computation is made; provided, that Agent may obtain such spot rate from another financial institution designated by Agent if Wells Fargo acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Standard Letter of Credit Practice" means, for an Issuing Lender, any domestic or foreign law or letter of credit practices applicable in the city in which such Issuing Lender

issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, unlimited liability company or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, unlimited liability company, or other entity.

"Superpriority Claim" has the meaning specified therefore in Section 4.4(c) of the Agreement.

"Swap Obligation" has the meaning specified therefor in the Security Agreement.

"Swing Lender" means the US Swing Lender and/or the Canadian Swing Lender, as the context requires.

"Swing Loan" means the US Swing Loan and/or the Canadian Swing Loan, as the context requires.

"Swing Loan Exposure" means the US Swing Loan Exposure and/or the Canadian Swing Loan Exposure, as the context requires.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Term Loan Agent" means "Term Loan Agent" as defined in the Intercreditor Agreement.

"Term Loan Credit Agreement" means the Debtor-in-Possession Credit Agreement, dated as of the date hereof, by and among Parent, HHFH and HSP, the lenders from time to time party thereto and Barings Finance LLC, as the administrative agent thereunder.

"Term Loan Debt" means the Indebtedness under the Term Loan Documents and the Pre-Petition Term Facility Documents (as defined in the Term Loan Credit Agreement as in effect on the date hereof).

"Term Loan Documents" means the "Term Loan Documents" as defined in the Intercreditor Agreement.

"Term Loan Lenders" means the lenders party to the Term Loan Credit Agreement.

"Term Loan Priority Collateral Sale" has the meaning specified therefor in Section 5.25.

"Term Loan Proceeds Account" means a special account established by HSP (or, prior to the establishment of such account pursuant to the Term Loan Credit Agreement, an existing account of US Borrowers at Wells Fargo that is not subject to a Control Agreement and does not hold other amounts other then pending payroll disbursements) into which the proceeds of the Indebtedness funded under the Term Loan Credit Agreement shall be deposited (with no other funds to be deposited in such account) until such proceeds are used in compliance with Section 7 hereof.

"Term Loan Priority Collateral" has the meaning specified therefor in the Intercreditor Agreement.

"Testing Period" means (x) as of end of the week that is the third Friday after the Filing Date, the period commencing with the first day of the first calendar week covered by the Approved Budget and ending with the last day of such week; and (y) as of the end of each consecutive two-week period ending thereafter (ending with the last such full two-week period ending during the Life of the Case), the period commencing with the first day of the first calendar week covered by the Approved Budget and ending with the last day of the applicable week referenced in this clause (y).

"Transactions" means, collectively, (a) commencement of the Bankruptcy Cases, and the Recognition Proceedings, (b) the funding of the Term Loans (as defined in the Term Loan Credit Agreement) on the Closing Date in accordance with the terms hereof and thereof, (c) the initial extensions of credit under this Agreement and (d) the payment of all fees, costs and expenses in connection with the foregoing to the extent set forth in the Approved Budget.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Unasserted Contingent Indemnification Obligations" means contingent indemnification obligations to the extent no demand or claim has been made with respect thereto and no claim giving rise thereto has been asserted.

"United States" means the United States of America.

"Unused Line Fee" has the meaning specified therefor in Section 2.10(b) of the Agreement.

"US Availability" means, as of any date of determination, the amount that US Borrowers are entitled to borrow as US Revolving Loans under Section 2.1 of the Agreement (after giving effect to the then outstanding US Revolver Usage).

"US Bank Product" means any one or more of the following financial products or accommodations extended to Parent or its Subsidiaries (other than a Canadian Loan Party) by a Bank Product Provider:  (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or " p-cards")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"US Bank Product Agreements" means those agreements entered into from time to time by Parent or its Subsidiaries (other than a Canadian Loan Party) with a Bank Product Provider in connection with the obtaining of any of the US Bank Products.

"US Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by Parent or its Subsidiaries (other than a Canadian Loan Party) to any Bank Product Provider pursuant to or evidenced by a US Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all US Hedge Obligations, and (c) all amounts that Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the US Bank Products provided by such Bank Product Provider to Parent or its Subsidiaries (other than a Canadian Loan Party).

"US Bank Product Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of Parent and its Subsidiaries (other than any Canadian Loan Party) in respect of US Bank Product Obligations after notice by US Bank Product Providers to, and with the consent of Agent) in respect of US Bank Products then provided or outstanding.

"US Base Rate" means the greatest of (a) the Federal Funds Rate plus ½%, (b) the Non-Base Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis), plus 1.50 percentage points, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (c) shall be deemed to be zero)

"US Borrowing" means a borrowing consisting of US Revolving Loans made on the same day by the Lenders (or Agent on behalf thereof), or by US Swing Lender in the case of a US Swing Loan, or by Agent in the case of an US Extraordinary Advance.

"US Borrowing Base" means, as of any date of determination, the result of:

(a)    85% of the amount of US Eligible Accounts, less the amount, if any, of the US Dilution Reserve, *plus*

(b)    *the lower of*

(i)    the product of 75% multiplied by the value (calculated at the lower of cost or market on a basis consistent with US Borrowing Base Companies' historical accounting practices) of US Eligible Inventory at such time,

(ii)    the product of 85% multiplied by the Net Recovery Percentage identified in the most recent inventory appraisal ordered and obtained by Agent multiplied by the value (calculated at the lower of cost or market on a basis consistent with the US Borrowing Base Companies' historical accounting practices) of US Eligible Inventory (such determination may be made as to different categories of Eligible Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, and

(iii)    an amount equal to (A) $37,500,000, minus (B) the amount of the contribution of Canadian Eligible Inventory to the Canadian Borrowing Base under clause (b) of the definition of Canadian Borrowing Base, *minus*

(c)    the aggregate amount of reserves, if any, established by Agent under Section 2.1(c) of the Agreement;

provided, that US Availability attributable to US Eligible Inventory consisting of US Eligible In-Transit Inventory shall not exceed $15,000,000.

"US Borrowing Base Company" means HSP, PCF, Cushion and each US Guarantor other than Parent or HHFH.

"US Copyright Security Agreement" has the meaning specified therefor in the US Security Agreement.

"US Designated Account" means the US Deposit Account identified on Schedule D-2 to the Agreement (or such other Deposit Account located at US Designated Account Bank that has been designated as such, in writing, by Administrative Borrower to Agent).

"US Designated Account Bank" has the meaning specified therefor in Schedule D-2 to the Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Administrative Borrower to Agent).

"US Dilution" means, as of any date of determination, a percentage, based upon the experience of the immediately prior 12 months, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to all US Borrowing Base Companies' Accounts during such period, by (b) all

US Borrowing Base Companies' billings with respect to all US Borrowing Base Companies' Accounts during such period.

"US Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against US Eligible Accounts by 1 percentage point for each percentage point by which US Dilution is in excess of 5%. If the US Dilution does not exceed 5%, the US Dilution Reserve shall be zero.

"US Eligible Accounts" means those Accounts created by a US Borrowing Base Company in the ordinary course of its business, that arise out of such US Borrowing Base Company's sale of goods or rendition of services, that comply with each of the representations and warranties respecting US Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination performed by (or on behalf of) Agent from time to time after the Closing Date. In determining the amount to be included, US Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, discounts, credits, allowances, and rebates. US Eligible Accounts shall not include the following:

(a)     Accounts that the Account Debtor has failed to pay within ninety (90) days of original invoice date or within sixty (60) days of original due date,

(b)     Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)     Accounts with respect to which the Account Debtor is an Affiliate of a Borrower or an employee or agent of a Borrower or any Affiliate of a Borrower, excluding, however, any Account Debtor that is an Affiliate of a Loan Party, solely because such Affiliate is owned or controlled by the Sponsor or its Affiliates so long as such transactions are on terms no less favorable than similar transactions with independent third parties,

(d)     Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e)     Accounts that are not payable in Dollars,

(f)     Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or any territory thereof, or (ii) is not organized under the laws of the United States or any state or territory thereof, or (iii) is the government of any foreign country or sovereign state (for greater certainty, other than the United States), or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is

directly drawable by Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent,

(g)        Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which the applicable US Borrowing Base Company has complied, to the reasonable satisfaction of Agent, with the Assignment of Claims Act, 31 USC §3727), or (ii) any state of the United States,

(h)        Accounts with respect to which the Account Debtor is a creditor of a Loan Party, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(i)        Accounts with respect to an Account Debtor whose total obligations owing to US Borrowing Base Companies exceeds 15% of all US Eligible Accounts (or, if the Account Debtor is (A) Wal-Mart, 50% of all US Eligible Accounts, (B) Kohl's, 50% of all US Eligible Accounts (or during April 1 through September 30 of any year, 25% of all US Eligible Accounts), (C) Costco, 25% of all US Eligible Accounts, and (D) Bed, Bath & Beyond, 25% of all US Eligible Accounts), to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that, in each case, the amount of US Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Agent based on all of the otherwise US Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit,

(j)        to Borrowers' knowledge, Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which a Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(k)        Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(l)        Accounts that are not subject to a valid and perfected first priority Agent's Lien (subject to Permitted Liens having priority under applicable law for which reserves have been established pursuant to Section 2.1(c)),

(m)        Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(n)        Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity, or

(o)        Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by Loan Parties of the subject contract for goods or services.

"US Eligible In-Transit Inventory" means Eligible In-Transit Inventory owned by a US Borrowing Base Company.

"US Eligible Inventory" means Inventory of a US Borrowing Base Company consisting of raw materials and finished goods, that complies with each of the representations and warranties respecting US Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date. In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with the applicable US Borrowing Base Company's historical accounting practices. An item of Inventory shall not be included in US Eligible Inventory if:

(a)    the applicable US Borrowing Base Company does not have good, valid, and marketable title thereto,

(b)    the applicable US Borrowing Base Company does not have actual and exclusive possession thereof (either directly or through a bailee or agent of such US Borrowing Base Company),

(c)    it is not located at one of the locations in the continental United States set forth on Schedule E-1 (as such schedule may be updated pursuant to Section 5.14) to the Agreement (or in-transit from one such location to another such location),

(d)    it is in-transit to or from a location of the applicable US Borrowing Base Company (other than in-transit from one location set forth on Schedule E-1 to the Agreement to another location set forth on Schedule E-1 to the Agreement), unless it is US Eligible In-Transit Inventory,

(e)    it is located on real property leased by the applicable US Borrowing Base Company or in a contract warehouse, in each case, unless either (i) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises or (ii) Agent has established a Landlord Reserve with respect to such location,

(f)    it is the subject of a bill of lading or other document of title, unless it is US Eligible In-Transit Inventory,

(g)    it is not subject to a valid and perfected first priority Agent's Lien (subject to Permitted Liens having priority under applicable law for which reserves have been established pursuant to Section 2.1(c)),

(h)    it consists of goods returned or rejected by a US Borrowing Base Company's customers unless such goods are in salable condition and may be sold as new and unused Inventory by US Loan Parties in the ordinary course of their business to their customers,

(i)    it consists of goods that are obsolete or slow moving, work-in-process, restrictive or custom items or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in a US Borrowing Base Company's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment, or

(j)    it is subject to third party trademark, or other intellectual property or proprietary rights, unless Agent is reasonably satisfied that such Inventory can be freely sold by Agent on and after the occurrence of an Event of a Default, without Agent infringing any rights of, or incurring any liabilities to, any licensor or owner of such third party rights, other than royalties at the contractual rate with respect to Inventory subject to a third party license with a Loan Party.

"US Extraordinary Advances" has the meaning specified therefor in Section 2.3(d)(iii) of the Agreement.

"US Foreign Holdco" means any Subsidiary of Parent organized under the laws of a State of the United States or the District of Columbia and whose assets consist substantially of stock or other equity (or instruments treated as equity for U.S. federal income tax purposes) of one or more CFCs and other assets of *de minimis* value (including, without limitation, Canadian Borrower).

"US Guarantor" means (a) Parent and (b) each Subsidiary of Parent that is or becomes a guarantor of all or a part of the US Obligations or Canadian Obligations, or (c) such Persons that are debtors in the Bankruptcy Cases or as are required from time to time to become a US Guarantor pursuant to the terms hereof.

"US Guaranty" means that certain Guaranty dated as of the October 21, 2014, executed and delivered by the US Guarantors to Agent, with respect to the Canadian Obligations, as amended pursuant to the Reaffirmation Agreement.

"US Hedge Obligations" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of Parent or its Subsidiaries (other than any Canadian Loan Party) arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"US Issuing Lender" means Wells Fargo or any other Lender that, at the request of Administrative Borrower and with the consent of Agent (such consent not to be unreasonably withheld or delayed), agrees, in such Lender's sole discretion, to become a US Issuing Lender for the purpose of issuing US Letters of Credit pursuant to Section 2.11A of the Agreement and US Issuing Lender shall be a Lender.

"US Letter of Credit" means a letter of credit (as that term is defined in the Code) issued by US Issuing Lender for the account of a US Borrower.

"US Letter of Credit Disbursement" means a payment made by US Issuing Lender pursuant to a US Letter of Credit.

"US Letter of Credit Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the US Letter of Credit Usage on such date.

"US Letter of Credit Fee" has the meaning specified therefor in Section 2.6(b) of the Agreement.

"US Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding US Letters of Credit.

"US LIBOR Rate" means the rate *per annum* as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Agent may designate from time to time) as of 11:00 a.m., London time, two Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the Non-Base Rate Loan requested (whether as an initial Non-Base Rate Loan or as a continuation of a Non-Base Rate Loan or as a conversion of a Base Rate Loan to a Non-Base Rate Loan) by Borrowers in accordance with this Agreement (and, if any such published rate is below zero, the Non-Base Rate shall be deemed to be zero). Each determination of the US LIBOR Rate shall be made by Agent and shall be conclusive in the absence of manifest error.

"US Loan Account" has the meaning specified therefor in Section 2.9 of the Agreement.

"US Loan Party" means any US Borrower or any US Guarantor.

"US Maximum Revolver Amount" means $90,000,000, as may be decreased by the amount of reductions in the US Revolver Commitments made in accordance with Section 2.4(c) of the Agreement.

"US Obligations" means (a) all loans (including the US Revolving Loans (inclusive of US Extraordinary Advances and US Swing Loans)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), reimbursement or indemnification obligations with respect to US Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to the US Loan Account pursuant to the Agreement), obligations (including indemnification obligations) of any US Loan Party, fees (including the fees provided for in the Fee Letter) of any US Loan Party, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) of any US Loan Party, guaranties of any US Loan Party, and all covenants and duties of any other kind and description owing by any US Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any US Loan Party is required to pay or reimburse by the Loan Documents or by

law or otherwise in connection with the Loan Documents, (b) all debts, liabilities, or obligations (including reimbursement obligations, irrespective of whether contingent) owing by any US Borrower or any other US Loan Party to US Issuing Lender now or hereafter arising from or in respect of a US Letters of Credit, and (c) all US Bank Product Obligations; provided, that US Obligations shall not include Excluded Swap Obligations.  Without limiting the generality of the foregoing, the US Obligations under the Loan Documents include the obligation to pay (i) the principal of the US Revolving Loans, (ii) interest accrued on the US Revolving Loans, (iii) the amount necessary to reimburse US Issuing Lender for amounts paid or payable pursuant to US Letters of Credit, (iv) Letter of Credit commissions, charges, expenses, and fees, in each case in respect of US Letters of Credit, (v) Lender Group Expenses of any US Loan Party, (vi) fees payable by any US Loan Party under the Agreement or any of the other Loan Documents, (vii) indemnities and other amounts payable by any US Loan Party under any Loan Document (excluding Excluded Swap Obligations), and (viii) any guaranties by any US Loan Party of all or any part of the Canadian Obligations.   Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"US Overadvance" means, as of any date of determination, that the US Revolver Usage is greater than any of the limitations set forth in Section 2.1 or Section 2.11A.

"US Patent Security Agreement" has the meaning specified therefor in the US Security Agreement.

"US Person" means any Person that is organized under the laws of a State of the United States or the District of Columbia.

"US Protective Advances" has the meaning specified therefor in Section 2.3(d)(i) of the Agreement.

"US Revolver Commitment" means, with respect to each Revolving Lender, its US Revolver Commitment, and, with respect to all Revolving Lenders, their US Revolver Commitments, in each case as set forth beside such Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Revolving Lender became a Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"US Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding US Revolving Loans (inclusive of US Swing Loans and US Protective Advances but excluding, for the avoidance of doubt, the Last Out Loans), plus (b) the amount of the US Letter of Credit Usage.

"US Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the US Revolver Commitments, the amount of such Lender's US Revolver Commitment, and (b) after the termination of the US

Revolver Commitments, the aggregate outstanding principal amount of the US Revolving Loans of such Lender.

"US Revolving Loans" has the meaning specified therefor in Section 2.1(a) of the Agreement.

"US Security Agreement" means that certain Guaranty and Security Agreement, dated as of Closing Date, as the same may be further amended, executed and delivered by each Loan Party party thereto to Agent.

"US Swing Lender" means Wells Fargo or any other Lender that, at the request of US Administrative Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the US Swing Lender under Section 2.3(b) of the Agreement.

"US Swing Loan" has the meaning specified therefor in Section 2.3(b) of the Agreement.

"US Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the US Swing Loans on such date.

"US Trademark Security Agreement" has the meaning specified therefor in the US Security Agreement.

"Variance Report" has the meaning specified therefor in Section 5.2(a) of the Agreement.

"Vendor" means a Person that sells in-transit Inventory to a Borrower.

"Voidable Transfer" has the meaning specified therefor in Section 17.8 of the Agreement.

"Weekly Cash Flow Forecast" has the meaning specified therefore in Section 5.2(a) of the Agreement.

"Wells Fargo" means Wells Fargo Bank, National Association, a national banking association.

"WF Canada" means Wells Fargo Capital Finance Corporation Canada.

"Withdrawal Liability" means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**<u>Exhibit C</u>**

**DIP Term Loan Credit Agreement**

KE 61190851

*Filing Version*

**DEBTOR-IN-POSSESSION**

**TERM LOAN CREDIT AGREEMENT**

**dated as of May __, 2019**

**by and among**

**DREAM II HOLDINGS, LLC**
and
**HOLLANDER HOME FASHIONS HOLDINGS, LLC,**
**as Parent Guarantors,**

**HOLLANDER SLEEP PRODUCTS, LLC,**
**as Borrower**

**THE LENDERS THAT ARE PARTIES HERETO,**
**as the Lenders, and**

**BARINGS FINANCE LLC,**
**as Administrative Agent**

# Table of Contents

**Page**

1.    DEFINITIONS AND CONSTRUCTION. ...............................................................1
    1.1    Definitions..................................................................................................2
    1.2    Accounting Terms .......................................................................................2
    1.3    Code ............................................................................................................2
    1.4    Construction ...............................................................................................2
    1.5    Time References ..........................................................................................3
    1.6    Schedules and Exhibits ..............................................................................3
    1.7    Divisions .....................................................................................................3

2.    DIP LOANS AND TERMS OF PAYMENT. ......................................................4
    2.1    DIP Loans ...................................................................................................4
    2.2    [Intentionally Omitted]. ..............................................................................4
    2.3    Borrowing Procedures. ...............................................................................4
    2.4    Payments; Prepayments ..............................................................................6
    2.5    Promise to Pay; Promissory Notes............................................................10
    2.6    Interest Rates:  Rates, Payments, and Calculations. ...............................11
    2.7    Crediting Payments ...................................................................................12
    2.8    [Intentionally Omitted] .............................................................................12
    2.9    [Intentionally Omitted]. ............................................................................12
    2.10   Fees ...........................................................................................................12
    2.11   [Intentionally Omitted]. ............................................................................12
    2.12   LIBOR Option. .........................................................................................12
    2.13   Capital Requirements................................................................................14
    2.14   Superpriority Nature of DIP Facility Obligations and Agent' DIP Liens. ............16
    2.15   No Discharge; Survival of Claims .............................................................16
    2.16   Waiver of any Priming Rights ...................................................................17

3.    CONDITIONS; TERM OF AGREEMENT. .......................................................17
    3.1    Conditions Precedent to the Effective Date ..............................................17
    3.2    Conditions Precedent to Funding on the Final Order Effective Date ....................20
    3.3    Conditions to Each Extension of Credit.....................................................21

4.    REPRESENTATIONS AND WARRANTIES......................................................22
    4.1    Due Organization and Qualification; Subsidiaries ....................................22
    4.2    Due Authorization; No Conflict.................................................................23
    4.3    Governmental Consents .............................................................................23
    4.4    Binding Obligations ..................................................................................23
    4.5    Title to Assets; No Encumbrances .............................................................24
    4.6    Litigation...................................................................................................24
    4.7    Compliance with Laws ..............................................................................24
    4.8    No Material Adverse Effect .......................................................................24
    4.9    No Default..................................................................................................24
    4.10   Employee Benefits.....................................................................................24

i

|       |                                                      |     |
|-------|------------------------------------------------------|-----|
| 4.11  | Environmental Condition                              | 25  |
| 4.12  | Complete Disclosure                                  | 26  |
| 4.13  | Patriot Act; Foreign Corrupt Practices Act           | 27  |
| 4.14  | Chapter 11 Cases                                     | 27  |
| 4.15  | Payment of Taxes                                     | 27  |
| 4.16  | Margin Stock                                         | 27  |
| 4.17  | Governmental Regulation                              | 27  |
| 4.18  | OFAC                                                 | 28  |
| 4.19  | Employee and Labor Matters                           | 28  |
| 4.20  | [Reserved]                                           | 28  |
| 4.21  | Broker Fees                                          | 28  |
| 4.22  | Suppliers and Customers                              | 28  |
| 4.23  | Security Interest                                    | 28  |
| 4.24  | DIP Orders                                           | 29  |
| 4.25  | Immaterial Subsidiaries                              | 29  |
| 4.26  | Intellectual Property                                | 29  |
| 4.27  | Insurance                                            | 29  |
| 4.28  | Purpose of DIP Loans                                 | 29  |

| 5.    | AFFIRMATIVE COVENANTS.                               | 30  |
|-------|------------------------------------------------------|-----|
| 5.1   | Financial Statements                                 | 30  |
| 5.2   | Reporting                                            | 30  |
| 5.3   | Maintenance of Existence                             | 33  |
| 5.4   | Maintenance of Properties                            | 33  |
| 5.5   | Taxes                                               | 33  |
| 5.6   | Insurance                                            | 33  |
| 5.7   | Inspection                                           | 34  |
| 5.8   | Compliance with Laws                                 | 34  |
| 5.9   | Environmental                                        | 35  |
| 5.10  | Disclosure Updates                                   | 35  |
| 5.11  | [Reserved]                                           | 36  |
| 5.12  | Further Assurances                                   | 36  |
| 5.13  | Compliance with ERISA and the IRC                    | 37  |
| 5.14  | Pre-Petition Credit Enhancements                     | 37  |
| 5.15  | Bankruptcy Covenants                                 | 38  |
| 5.16  | Chapter 11 Cases                                     | 38  |
| 5.17  | Accounting Changes                                   | 39  |
| 5.18  | Use of Proceeds                                      | 39  |
| 5.19  | TL Deposit Account                                   | 39  |
| 5.20  | Budget Matters                                       | 39  |

| 6.    | NEGATIVE COVENANTS                                   | 40  |
|-------|------------------------------------------------------|-----|
| 6.1   | Indebtedness                                         | 40  |
| 6.2   | Liens                                               | 40  |
| 6.3   | Restrictions on Fundamental Changes                  | 40  |
| 6.4   | Disposal of Assets                                   | 41  |
| 6.5   | Nature of Business                                   | 41  |

ii

6.6      Prepayments and Amendments.................................................................41
6.7      Restricted Payments..................................................................................41
6.8      Accounting Methods..................................................................................42
6.9      Investments................................................................................................42
6.10     Transactions with Affiliates......................................................................42
6.11     Use of Proceeds.........................................................................................43
6.12     Limitation on Issuance of Equity Interests...............................................43
6.13     Parent Guarantors as Holding Companies................................................44
6.14     Sale and Leaseback Transactions..............................................................44
6.15     Employee Benefits.....................................................................................44
6.16     Burdensome Agreements...........................................................................45
6.17     Sanctions....................................................................................................46
6.18     Chapter 11 Claims.....................................................................................46
6.19     Compliance with Approved Budget...........................................................46
6.20     [Reserved]..................................................................................................47
6.21     Use of DIP Collateral................................................................................47
6.22     Access to TL Deposit Account..................................................................48

7.       [RESERVED]...................................................................................................48

8.       EVENTS OF DEFAULT...................................................................................48
8.1      Payments....................................................................................................48
8.2      Representations and Warranties.................................................................48
8.3      Loan Parties...............................................................................................49
8.4      Default Under Other Agreements..............................................................49
8.5      Material Adverse Effect.............................................................................50
8.6      Change in Control......................................................................................50
8.7      Security Documents...................................................................................50
8.8      Loan Documents........................................................................................50
8.9      Termination Events; Milestones................................................................50
8.10     RSA.  The termination of the RSA by any party thereto. ........................54
8.11     ERISA........................................................................................................54
8.12     Permitted Variances...................................................................................54
8.13     ABL DIP Facility.......................................................................................55

9.       RIGHTS AND REMEDIES. .............................................................................55
9.1      Rights and Remedies..................................................................................55

10.      WAIVERS; INDEMNIFICATION. ...................................................................55
10.1     Demand; Protest; etc..................................................................................55
10.2     The Lender Group's Liability for Collateral..............................................56
10.3     Indemnification..........................................................................................56

11.      NOTICES...........................................................................................................57

12.      CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL
         REFERENCE PROVISION. .............................................................................58

13.     ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS. ........................................59
        13.1    Assignments and Participations ...........................................................59
        13.2    Successors .....................................................................................64

14.     AMENDMENTS; WAIVERS. ..........................................................................65
        14.1    Amendments and Waivers ..................................................................65
        14.2    Mitigation; Replacement of Certain Lenders.........................................67
        14.3    No Waivers; Cumulative Remedies ......................................................68

15.     AGENT; THE LENDER GROUP. .....................................................................68
        15.1    Appointment and Authorization of Agent ............................................68
        15.2    Delegation of Duties .........................................................................69
        15.3    Liability of Agent .............................................................................69
        15.4    Reliance by Agent ............................................................................69
        15.5    Notice of Default or Event of Default...................................................70
        15.6    Credit Decision ...............................................................................70
        15.7    Costs and Expenses; Indemnification ..................................................71
        15.8    Agents in Individual Capacity ............................................................71
        15.9    Successor Agent...............................................................................72
        15.10   Lender in Individual Capacity ............................................................72
        15.11   Collateral Matters............................................................................72
        15.12   Restrictions on Actions by Lenders; Sharing of Payments........................74
        15.13   Agency for Perfection .......................................................................74
        15.14   Payments by Agent to the Lenders ......................................................75
        15.15   Concerning the Collateral and Related Loan Documents...........................75
        15.16   [Intentionally Omitted] .....................................................................75
        15.17   Several Obligations; No Liability ........................................................75
        15.18   [Reserved] ......................................................................................75

16.     WITHHOLDING TAXES. ...............................................................................75
        16.1    Payments .......................................................................................75
        16.2    Exemptions .....................................................................................76
        16.3    Reductions .....................................................................................78
        16.4    Refunds .........................................................................................79

17.     GENERAL PROVISIONS. ..............................................................................79
        17.1    Effectiveness ...................................................................................79
        17.2    Section Headings .............................................................................79
        17.3    Interpretation..................................................................................79
        17.4    Severability of Provisions ..................................................................79
        17.5    [Intentionally Omitted] .....................................................................80
        17.6    Debtor-Creditor Relationship..............................................................80
        17.7    Counterparts; Electronic Execution .....................................................80
        17.8    Revival and Reinstatement of DIP Facility Obligations; Certain Waivers............80
        17.9    Confidentiality ................................................................................80
        17.10   Survival .........................................................................................82
        17.11   Patriot Act .....................................................................................82
        17.12   Integration .....................................................................................82

17.13   [Intentionally Omitted] ...........................................................................................82
17.14   Judgment Currency ...............................................................................................83
17.15   No Setoff ...............................................................................................................83
17.16   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ............83

EXHIBITS AND SCHEDULES

Exhibit 2.3(a)        Form of Notice of Borrowing
Exhibit 3.1           Form of Officer's Certificate
Exhibit 5.2(b)        Form of Compliance Certificate
Exhibit A-1           Form of Assignment and Acceptance
Exhibit I-1           Form of Initial Approved Budget
Exhibit I-2           Form of Interim DIP Order
Exhibit L-1           Form of LIBOR Notice


Schedule A-1          Agent's Account
Schedule D-1          DIP Loan Commitments
Schedule P-1          Permitted Investments
Schedule R-1          Real Property Collateral
Schedule 1.1          Definitions
Schedule 1.1A         Permitted Liens
Schedule 4.1(b)       Subscriptions, Options, Warrants, Calls of Parent
Schedule 4.1(c)       Capitalization of Parent's Subsidiaries
Schedule 4.1(d)       Subscriptions, Options, Warrants, Calls of Parent's Subsidiaries
Schedule 4.6(a)       Litigation
Schedule 4.10         Benefit Plans
Schedule 4.11         Environmental Matters
Schedule 4.14         Permitted Indebtedness
Schedule 4.25         Immaterial Subsidiaries
Schedule 4.26         Intellectual Property
Schedule 4.27         Insurance
Schedule 6.10         Affiliate Transactions

## DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT

**THIS DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** (this "Agreement"), is entered into as of May [__], 2019, by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender", as that term is hereinafter further defined), **BARINGS FINANCE LLC**, as administrative agent for each member of the Lender Group (in such capacity, together with its successors and assigns in such capacity, "Agent"), **DREAM II HOLDINGS, LLC**, a Delaware limited liability company ("Parent"), **HOLLANDER HOME FASHIONS HOLDINGS, LLC**, a Delaware limited liability company ("HHFH" or "Holdings" and together with Parent, the "Parent Guarantors") and **HOLLANDER SLEEP PRODUCTS, LLC**, a Delaware limited liability company ("HSP" or the "Borrower").

**WHEREAS**, on May [__], 2019 (the "Petition Date"), the Borrower and the Guarantors commenced Chapter 11 case numbers [__] through [__], as jointly administered for procedural purposes at Chapter 11 case number [__] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code");

**WHEREAS**, each of the Loan Parties is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrower has requested the Lenders to extend credit to the Borrower in form of term loans consisting of a superpriority debtor-in-possession secured credit facility in an aggregate principal amount not to exceed $28,000,000 (the "DIP Facility") subject to this Agreement and, when entered, the Interim DIP Order, and the Final DIP Order, as applicable, which will be used in accordance with the Approved Budget and the terms of this Agreement.

**WHEREAS**, the Borrower has requested the ABL DIP Lenders to extend credit to the Borrower in the form of revolving credit commitments in an aggregate of $90,000,000 (the "ABL DIP Facility") pursuant to the terms of that certain ABL DIP Facility Agreement.

**WHEREAS**, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrower hereunder, the Borrower has agreed to provide the Agent and the Lenders, in each case subject to the Carve-Out, with DIP Liens on the DIP Collateral; and

**WHEREAS**, the Lenders are willing to make the requested DIP Facility available to the Borrower on the terms and conditions set forth in this Agreement and the Interim DIP Order and the Final DIP Order, as applicable:

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

**1.     DEFINITIONS AND CONSTRUCTION.**

1.1    **Definitions.**  Capitalized terms used in this Agreement (including the preamble) shall have the meanings specified therefor on Schedule 1.1.

1.2    **Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrower notifies Agent that Borrower requests an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Effective Date or in the application thereof on the operation of such provision (or if Agent notifies Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Agent and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and Borrower after such Accounting Change conform as nearly as possible to their respective positions before such Accounting Change and, until any such amendments have been agreed upon and agreed to by the Required Lenders, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred; provided, further, that notwithstanding any Accounting Change after the Effective Date that would require lease obligations that would be treated as operating leases as of the Effective Date to be classified and accounted for as capital leases or otherwise reflected on Parent and its Subsidiaries' consolidated balance sheet, for the purposes of determining compliance with any covenant contained herein, such obligations shall be treated in the same manner as operating leases are treated as of the Effective Date.  When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.  Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof.

1.3    **Code**.  Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4    **Construction**.   Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."   The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other DIP Loan Document refer to this Agreement or such other DIP Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other DIP Loan Document, as the case may be.  Unless the context of this Agreement or any other DIP Loan Document clearly requires otherwise, references to "law" means all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, by-laws, ordinances, decrees, codes and administrative or judicial or arbitral or

2

administrative or ministerial or departmental or regulatory precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other DIP Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Any reference herein or in any other DIP Loan Document to the satisfaction, repayment, or payment in full of the DIP Facility Obligations shall mean (a) the payment or repayment in full in immediately available funds in Dollars of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding DIP Loans, (ii) all Lender Group Expenses that have accrued and are unpaid regardless of whether demand has been made therefor, (iii) all fees or charges that have accrued hereunder or under any other DIP Loan Document and are unpaid, (b) the receipt by Agent of cash collateral in Dollars in order to secure any other contingent DIP Facility Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent DIP Facility Obligations, (c) the payment or repayment in full in immediately available funds in Dollars of all other outstanding DIP Facility Obligations other than in each case of <u>clauses (a)</u> to <u>(c)</u> hereof, Unasserted Contingent Indemnification Obligations, and (d) the termination of all of the DIP Loan Commitments of the Lenders.  Any reference herein to any Person shall be construed to include such Person's permitted successors and assigns.  Any requirement of a writing contained herein or in any other DIP Loan Document shall be satisfied by the transmission of a Record.

1.5    **Time References**.  Unless the context of this Agreement or any other DIP Loan Document clearly requires otherwise, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City, New York on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; <u>provided</u> that, with respect to a computation of fees or interest payable to Agent or any Lender, such period shall in any event consist of at least one full day.

1.6    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.7    **Divisions**.  For all purposes under the DIP Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred

from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## 2. DIP LOANS AND TERMS OF PAYMENT.

2.1 **DIP Loans**.

(a)     On the Effective Date, each Lender, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make an Interim DIP Loan to and for the account of the Borrower as provided herein, in the amount of such Lender's Interim DIP Loan Commitment (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable). The Interim DIP Loans shall be made in one draw on the Effective Date, and the Interim DIP Loan Commitments shall be immediately terminated after the funding of the Interim DIP Loans. Once repaid, no part of the Interim DIP Loans may be reborrowed.

(b)     On the Final Order Effective Date, each Lender, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make a Final DIP Loan to and for the account of the Borrower as provided herein, in the amount of such Lender's Final DIP Loan Commitment (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable). The Final DIP Loans shall be made in one draw on the Final Order Effective Date, and the Final DIP Loan Commitments shall be immediately terminated after the funding of the Final DIP Loans. Once repaid, no part of the Final DIP Loans may be reborrowed.

(c)     On the date that is the first Business Day of the last week of the Life of the Case (such earlier date, the "Budget Advance Date"), each Lender, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make a Budget Advance Date DIP Loan to and for the account of the Borrower as provided herein, in the amount of such Lender's Budget Advance Date Commitment (subject to any limitations contained within the DIP Orders). The Budget Advance Date DIP Loans shall be made in one draw on the Budget Advance Date, and the Budget Advance Date Commitments shall be immediately terminated after the funding of the Budget Advance Date Loans. Once repaid, no part of the Budget Advance Date DIP Loans may be reborrowed.

2.2 **[Intentionally Omitted].**

2.3 **Borrowing Procedures.**

(a)     **Procedure for Borrowing DIP Loans**. Borrower shall deliver to Agent a notice of borrowing, in substantially the form set forth on Exhibit 2.3(a), not later than 12:00 p.m. one Business Day (or such shorter period as Agent may agree in its reasonable discretion) before (i) the anticipated Effective Date, requesting that the Lenders make the Interim DIP Loans on the Effective Date, (ii) the anticipated Final Order Effective Date, requesting that the Lenders make the Final DIP Loans on the Final Order Effective Date, and (iii) the anticipated Budget Advance Date, requesting that the Lenders make the Budget Advance Date DIP Loans on the Budget Advance Date. The notice of borrowing shall be irrevocable and shall specify (i) the

principal amount of the DIP Loans to be borrowed, (ii) the requested date of the borrowing (which shall be a Business Day), and (iii) the location and number of the accounts to which funds are to be disbursed. Requests for LIBOR Rate Loans will also be subject to Section 2.12.

(b)     **Making of DIP Loans**.  Upon receipt of such notice of borrowing, the Agent shall promptly notify each Lender thereof.  Not later than 12:00 p.m. (or, if later, promptly following the satisfaction of the conditions precedent to the initial extension of credit hereunder set forth in Section 3), on (i) the Effective Date, each Lender shall make available to Borrower an amount (through the Agent) in immediately available funds equal to such Lender's Pro Rata Share of the requested Interim DIP Loans, (ii) the Final Order Effective Date, each Lender shall make available to Borrower an amount (through the Agent) in immediately available funds equal to such Lender's Pro Rata Share of the requested Final DIP Loans, and (iii) the Budget Advance Date, each Lender shall make available to Borrower an amount (through the Agent) in immediately available funds equal to such Lender's Pro Rata Share of the requested Budget Advance Date DIP Loans.

(c)     **Independent Obligations**.  All DIP Loans shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any DIP Loan hereunder, nor shall any DIP Loan Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

(d)     **Defaulting Lenders**.  Notwithstanding anything to the contrary contained in this Agreement (including Section 2.4(b)(ii)), if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law, any payment of principal, interest, fees or other amounts received by Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) or received by Agent from a Defaulting Lender pursuant to any right of setoff shall be applied at such time or times as may be determined by Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to Agent hereunder; second, if Borrower requests (so long as no Default or Event of Default exists), to the funding of any DIP Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Agent; third, if so determined by Agent and Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to DIP Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by Agent or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any DIP Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such DIP Loans were made at a time when the conditions set forth in Section 3.1

5

were satisfied or waived in accordance with this Agreement, such payment shall be applied solely to pay the DIP Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any DIP Loans of such Defaulting Lender until such time as all DIP Loans are funded by the Lenders pro rata in accordance with the DIP Loan Commitments under the applicable tranche of DIP Loans. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.3(d) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

2.4    **Payments; Prepayments**.

(a)    **Payments by Borrower**.

(i)    Except as otherwise expressly provided herein, all payments by Borrower shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds in Dollars, no later than 2:00 p.m. on the date specified herein.  Any payment received by Agent later than 2:00 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from Borrower prior to the date on which any payment is due to the Lenders that Borrower will not make such payment in full as and when required, Agent may assume that Borrower has made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due to such Lender.  If and to the extent Borrower does not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at applicable interest rate for the amount being repaid for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application**.

(i)    So long as no Application Event has occurred and is continuing, and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the DIP Facility Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account) shall be apportioned ratably among the Lenders having a Pro Rata Share of the outstanding DIP Loans to which a particular fee or expense relates.  Subject to Section 2.4(b)(iv) and Section 2.4(e), all payments in respect of DIP Facility Obligations to be made hereunder by Borrower shall be remitted to Agent and all such payments, and all proceeds of DIP Collateral securing DIP Facility Obligations received by Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, to reduce the balance of the DIP Loans outstanding and, thereafter, to Borrower (to be wired to any account or accounts

6

located in the United States specified by Borrower) or such other Person entitled thereto under applicable law.

(ii)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments in respect of DIP Facility Obligations and all proceeds of DIP Collateral securing the DIP Facility Obligations received by Agent shall be applied as follows:

(A)    first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the DIP Loan Documents in respect of the DIP Facility Obligations, until paid in full,

(B)    second, to pay any fees then due to Agent under the DIP Loan Documents in respect of the DIP Facility Obligations, until paid in full,

(C)    third, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the DIP Loan Documents in respect of the DIP Facility Obligations, until paid in full,

(D)    fourth, ratably, to pay any fees or premiums then due to any of the Lenders under the DIP Loan Documents in respect of the DIP Facility Obligations, until paid in full,

(E)    fifth, ratably, to pay interest accrued in respect of the DIP Loans, until paid in full,

(F)    sixth, ratably, to pay the principal of all DIP Loans, until paid in full,

(G)    seventh, ratably to pay any other DIP Facility Obligations, and

(H)    eighth, to Borrower (to be wired to any account or accounts in the United States specified by Borrower) or such other Person entitled thereto under applicable law.

(iii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive.

(iv)    In each instance, so long as no Application Event has occurred and is continuing, Section 2.4(b)(i) shall not apply to any payment made by Borrower to Agent and specified by Borrower to be for the payment of specific DIP Facility Obligations then due and payable (or prepayable) under any provision of this Agreement or any other DIP Loan Document.

(v)     For purposes of <u>Section 2.4(b)(ii)</u>, "paid in full" of a type of DIP Facility Obligation means payment in Dollars in cash or immediately available funds of all amounts owing on account of such type of DIP Facility Obligation.

(vi)    In the event of a direct conflict between the priority provisions of this <u>Section 2.4</u> and any other provision contained in this Agreement or any other DIP Loan Document (excluding the Intercreditor Agreement, which shall control and govern in any event), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of this <u>Section 2.4</u>, then the terms and provisions of this <u>Section 2.4</u> shall control and govern.

(c)     **Optional Prepayments**. Borrower may prepay the principal of the DIP Loans at any time in whole or in part upon written notice, subject to the payment of any fees, premiums or other amounts owed under the Fee Letter and subject to any Funding Losses pursuant to <u>Section 2.12(b)(ii)</u>, to Agent prior to 1:00 P.M., New York City time three Business Days prior to the date of prepayment (in the case of LIBOR Rate Loans), or prior to 1:00 P.M., New York City time at least one Business Day prior to the date of prepayment (in the case of Base Rate Loans). Such notice shall specify, in the case of any prepayment of DIP Loans, the date and amount of prepayment and whether the prepayment is of LIBOR Rate Loans or Base Rate Loans or a combination thereof, and, in each case if a combination thereof, the principal amount allocable to each. Any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by Borrower (by written notice to Agent on or prior to the specified effective date) if such condition is not satisfied. Upon the receipt of any such notice Agent shall promptly notify each affected Lender thereof. If any such notice is given and not revoked, the amount specified in such notice shall be due and payable on the date specified therein, together with (if a LIBOR Rate Loan is prepaid other than at the end of the Interest Period applicable thereto) any accrued and unpaid interest on the DIP Loans being repaid and amounts payable pursuant to <u>Section 2.12(b)(ii)</u>. Any prepayment of LIBOR Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof; and any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Agent shall apply any such optional prepayment to the outstanding amount of DIP Loans.

(d)     **Mandatory Prepayments**.

(i)     **Repayment of DIP Loans**.

(A)     Borrower hereby unconditionally promises to pay to Agent for the ratable account of each Lender the then unpaid principal amount of, and unpaid accrued interest on, each DIP Loan of such Lender made to Borrower, on the Maturity Date (or such earlier date on which the DIP Loans become due and payable pursuant to <u>Section 9.1</u>) in cash without further application to or order of the Bankruptcy

Court.  Borrower hereby further agrees to pay interest in cash on the unpaid principal amount of such DIP Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth herein.

(B)     Notwithstanding the foregoing Section 2.4(d)(i)(A), in lieu of any applicable portion of the cash payments otherwise owed to the Lenders with respect to the DIP Loans, the Lenders may receive non-cash consideration in the form of senior secured debt and equity in the reorganized Loan Parties on the Plan Effective Date of a confirmed Plan if a Plan as contemplated by the RSA is confirmed.

(ii)     **Dispositions; Indebtedness; Extraordinary Receipts**.  Subject to any provisions of the Intercreditor Agreement to the contrary, (x) Borrower shall, in accordance with Section 2.4(e), prepay the DIP Loans to the extent required by Section 2.4(b)(iii), (y) if on or after the Effective Date, Borrower or any of its Subsidiaries shall Incur Indebtedness for borrowed money (excluding Indebtedness permitted pursuant to Section 6.1), Borrower shall, in accordance with Section 2.4(e), prepay the DIP Loans in an amount equal to 100% of the Net Cash Proceeds thereof with such prepayment to be made on or before the fifth Business Day following notice given to each Lender of the Prepayment Date, as contemplated by Section 2.4(f), and (z) promptly upon receipt by any Loan Party of cash proceeds from any Extraordinary Receipt, Borrower shall prepay the DIP Loans in an aggregate amount equal to 100% of the Net Cash Proceeds of such Extraordinary Receipt in accordance with Section 2.4(e). Any prepayment pursuant to this Section 2.4(d)(ii) shall be accompanied by any accrued and unpaid interest on the DIP Loans being repaid and amounts payable pursuant to Section 2.12.

(iii)     **Asset Dispositions**.  Subject to any provisions of the Intercreditor Agreement to the contrary, in the event that on or after the Effective Date the Borrower or any Loan Party shall make an asset disposition of DIP Collateral that is not permitted by Section 6.4, or a Recovery Event in respect of DIP Collateral shall occur, an amount equal to 100% of the Net Cash Proceeds from such asset disposition or Recovery Event shall be applied by the Borrower (or any Loan Party, as the case may be) as follows:  (x) to the extent such asset disposition or Recovery Event is an asset disposition or Recovery Event of assets that constitute DIP Collateral (other than ABL Priority Collateral), to prepay the DIP Loans in accordance with Section 2.4(d)(ii)(x) and (y) to the extent such asset disposition is an asset disposition of ABL Priority Collateral or assets that do not constitute DIP Collateral, subject to the terms of the DIP Orders and the Intercreditor Agreement, to prepay the DIP Loans in accordance with Section 2.4(d)(ii)(x); provided, however, that, so long as no Default or Event of Default has occurred and is continuing, Net Cash Proceeds from insurance or condemnation proceeds shall not be required to be applied to prepay the DIP Loans to the extent Borrower delivers to Agent a certificate stating that the Loan Parties intend to use such Net Cash Proceeds to acquire capital assets useful to the business of the Loan Parties within thirty (30) days of the receipt of such Net Cash Proceeds, it being expressly agreed that any Net Cash Proceeds not so reinvested shall be applied to prepay the DIP Loans immediately thereafter.  Notwithstanding the foregoing, with respect to any Foreign Asset Sale, Borrower may elect in a written notice to Agent delivered not later than

9

when Borrower delivers the notice to Agent pursuant to Section 2.4(f) to reduce the amount of such prepayment by the amount of any Restricted Asset Sale Proceeds included in such Net Cash Proceeds; provided, that (i) if the amount of Restricted Asset Sale Proceeds is at any time, and from time to time, reduced either as a result of (x) the circumstances described in clause (a) of the definition thereof ceasing to apply, or (y) the elimination of a prohibition or a change in a restriction described in clause (b) of the definition thereof, Borrower shall repatriate the amount by which the Restricted Asset Sale Proceeds are reduced within five Business Days and apply such amount in accordance with this Section 2.4(d)(iii), and (ii) Borrower shall, and shall cause the applicable Foreign Subsidiary to, use its commercially reasonable efforts (including by taking all commercially reasonable actions required by the applicable law, rule, regulation or contract to permit such repatriation) to repatriate any amounts constituting Restricted Asset Sale Proceeds pursuant solely to clause (b) of the definition thereof as promptly as practicable following the date of such prepayment.

(e)     **Mandatory Prepayment Application**.  Each prepayment of DIP Loans pursuant to Section 2.4(d) shall be allocated pro rata among the DIP Loans.  Amounts prepaid on account of DIP Loans pursuant to Sections 2.4(c) or (d) may not be reborrowed.

(f)     **Mandatory Prepayment Notice**.  Borrower shall give notice to Agent of any mandatory prepayment of the DIP Loans promptly (and in any event within five Business Days) upon becoming obligated to make such prepayment.  Such notice shall state the date on which Borrower is offering to make or will make such mandatory prepayment (the "Prepayment Date").  Once given, such notice shall be irrevocable and all amounts subject to such notice shall be due and payable on the Prepayment Date.  Upon receipt by Agent of such notice, Agent shall promptly give notice to each Lender of the prepayment and the Prepayment Date.

2.5     **Promise to Pay; Promissory Notes.**

(a)     Subject to the DIP Order, Borrower agrees to pay the Lender Group Expenses owing by Borrower on the earlier of (i) the first Business Day of the month following the date on which the applicable Lender Group Expenses were first incurred or (ii) the date on which demand therefor is made by Agent.  Borrower promises to pay all of the DIP Facility Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) owing by Borrower in full on the Maturity Date or, if earlier, on the date on which such DIP Facility Obligations become due and payable pursuant to the terms of this Agreement.  Borrower agrees that its obligations contained in the first sentence of this Section 2.5 shall survive payment or satisfaction in full of all other DIP Facility Obligations.

(b)     Any Lender may request that any portion of its DIP Loans made by it be evidenced by one or more promissory notes.  In such event, Borrower shall execute and deliver to such Lender the requested promissory notes payable to such Lender and its registered assigns in a form furnished by Agent and reasonably satisfactory to Borrower.  Thereafter, the portion of the DIP Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the payee named therein.

2.6    **Interest Rates:  Rates, Payments, and Calculations.**

(a)    **Interest Rates**.  Except as provided in Section 2.6(c), (i) all LIBOR Rate Loans shall bear interest at a per annum rate equal to the LIBOR Rate plus 7.00% and (ii) all Base Rate Loans shall bear interest at a per annum rate equal to the Base Rate plus 6.00%.

(b)    **[Intentionally Omitted]**.

(c)    **Default Rate**.  Automatically upon the occurrence of an Event of Default described in Section 8.1, (x) all the DIP Loans shall bear interest at a default rate of interest equal to an additional 2.00% per annum over the rate otherwise applicable and (y) all other DIP Facility Obligations under the DIP Loan Documents that are past due shall bear interest at a default rate of interest equal to (I) in the case of past due interest, the default rate applicable to the DIP Loans giving rise to such interest and (II) in the case of all such other DIP Facility Obligations, the default rate applicable to Base Rate Loans whether or not such Base Rate Loans are actually outstanding at such time, and, in each case, all such interest will be payable on demand.

(d)    **Payment**.  Except to the extent provided to the contrary in Section 2.12(a), (i) all interest (other than interest due on LIBOR Rate Loans) shall be due and payable, in arrears, on the last Business Day of each calendar quarter, and (ii) all costs and expenses payable hereunder or under any of the other DIP Loan Documents and all Lender Group Expenses shall be due and payable on the earlier of (x) the first Business Day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred or (y) the date on which demand therefor is made by Agent. All interest in respect of LIBOR Rate Loans shall be due and payable as provided in Section 2.12(a)

(e)    **Computation**.  All interest and fees chargeable under the DIP Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue; provided that Base Rate Loans shall be calculated on the basis of a 365 day year (or a 366 day year, in the case of a leap year).  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)    **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrower and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Borrower is and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the applicable DIP Facility Obligations to the extent of such excess.

11

2.7    **Crediting Payments**.  The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds in Dollars made to Agent's Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Account on a Business Day on or before 4:30 p.m.  If any payment item is received into Agent's Account on a non-Business Day or after 4:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8    **[Intentionally Omitted]**.

2.9    **[Intentionally Omitted]**.

2.10    **Fees**.

(a)    Borrower shall pay to Agent and each Lender, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(b)    Borrower agrees to pay to the Agent, for the ratable benefit of the Lenders having DIP Loan Commitment exposure, a fee calculated at a rate per annum equal to 0.50% on the average daily unused portion of the DIP Loan Commitments, payable in arrears on the last Business Day of each calendar quarter.

2.11    **[Intentionally Omitted]**.

2.12    **LIBOR Option**.

(a)    **Interest and Interest Payment Dates.**  In lieu of having interest charged at the rate based upon the Base Rate, Borrower shall have the option, subject to Section 2.12(b) below (the "LIBOR Option"), to have interest on all or a portion of the DIP Loans be charged (whether at the time when made (unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate.  Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; provided that, subject to the following clauses (ii) and (iii), in the case of any Interest Period greater than 3 months in duration, interest shall be payable at 3 month intervals after the commencement of the applicable Interest Period and on the last day of such Interest Period, (ii) the date on which all or any portion of the DIP Facility Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof.  On the last day of each applicable Interest Period, unless Borrower has properly exercised the LIBOR Rate Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder.  At any time that an Event of Default has occurred and is continuing, at the written election of Agent or the Required Lenders, Borrower no longer shall have the option to request that DIP Loans bear interest at a rate based upon the LIBOR Rate.

12

(b)    **LIBOR Election**.

(i)    Borrower may, at any time and from time to time, so long as Borrower has not received a notice from Agent (which notice Agent may elect to give or not give in its discretion unless Agent is directed to give such notice by the Required Lenders, in which case, it shall give the notice to Borrower), after the occurrence and during the continuance of an Event of Default, exercising Lenders' rights to terminate the right of Borrower to exercise the LIBOR Option during the continuance of such Event of Default, elect to exercise the LIBOR Option by notifying Agent prior to 1:00 p.m. at least 3 Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline").  The election of the LIBOR Option by Borrower for a permitted portion of its DIP Loans and an Interest Period pursuant to this Section shall be made by delivery to Agent of a LIBOR Notice received by Agent before the LIBOR Deadline, or by telephonic notice received by Agent before the LIBOR Deadline (to be confirmed by delivery to Agent of a LIBOR Notice received by Agent prior to 5:00 p.m. on the same day).  Promptly upon its receipt of each such LIBOR Notice, Agent shall provide a copy thereof to each of the affected Lenders.

(ii)    Each LIBOR Notice shall be irrevocable and binding on Borrower.  In connection with each LIBOR Rate Loan, Borrower shall indemnify, defend, and hold Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Agent or any Lender as a result of (A) the payment of any principal of such LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of such LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in such LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses, "Funding Losses").  A certificate of Agent or a Lender delivered to Borrower setting forth in reasonable detail any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.12 shall be conclusive absent manifest error.  Borrower shall pay such amount to Agent or the Lender, as applicable, within 30 days of the date of its receipt of such certificate.

(iii)    Unless Agent, in its sole discretion, agrees otherwise, Borrower shall have not more than 10 LIBOR Rate Loans in effect at any given time.  Borrower may only exercise the LIBOR Option for proposed LIBOR Rate Loans of at least $1,000,000 (and in increments of $500,000 in excess thereof).

(c)    **Conversion**.  Borrower may convert LIBOR Rate Loans to Base Rate Loans at any time by notifying Agent prior to 1:00 p.m. at least 3 Business Days prior to the date of the proposed conversion; provided that, in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any prepayment through the required application by Agent of any payments or proceeds of Collateral in accordance with Section 2.4(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the DIP Facility Obligations pursuant to the terms hereof, Borrower shall indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with Section 2.12 (b)(ii); provided, further, that any such conversions are subject to the minimum amounts set forth in clause (b)(iii) above.

13

(d)    **Special Provisions Applicable to LIBOR Rate**.

(i)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any Eurodollar deposits or increased costs, in each case, due to a Change in Law (including any Change in Law that subjects any Recipient to any Taxes (other than (A) Indemnified Taxes and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto) occurring subsequent to the commencement of the then applicable Interest Period, including any changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBOR Rate.  In any such event, the affected Lender shall give Borrower and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrower may, by notice to such affected Lender (A) require such Lender to furnish to Borrower a statement setting forth in reasonable detail the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (B) repay the LIBOR Rate Loans of such Lender with respect to which such adjustment is made (together with any amounts due under Section 2.12(b)(ii)).

(ii)    In the event that any change in market conditions or any Change in Law shall, at any time after the date hereof in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrower and Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrower shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(e)    **No Requirement of Matched Funding**.    Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their respective Participants, is required actually to acquire Eurodollar deposits to fund or otherwise match fund any DIP Facility Obligation as to which interest accrues at the LIBOR Rate.

2.13    **Capital Requirements**.

(a)    If, after the date hereof, any Lender determines that (i) any Change in Law regarding capital or reserve requirements for banks or bank holding companies, or (ii) compliance by such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity (whether or not having the force of law), has the effect of reducing the return on such Lender's, or such holding companies' capital as a consequence of such Lender's commitments hereunder to a level below that which such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration such Lender's, or

such holding companies' then existing policies with respect to capital adequacy or liquidity and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrower and Agent thereof. Following receipt of such notice, Borrower agrees to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 30 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that such Lender notifies Borrower of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)     If any Lender requests additional or increased costs referred to in Section 2.12(d)(i) or amounts under Section 2.13(a) or sends a notice under Section 2.12(d)(ii) relative to changed circumstances (such Lender, an "Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.12(d)(i) or Section 2.13(a), as applicable, or would eliminate the illegality or impracticality of funding or maintaining LIBOR Rate Loans and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrower agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrower's obligation to pay any future amounts to such Affected Lender pursuant to Section 2.12(d)(i) or Section 2.13(a), as applicable, or to enable Borrower to obtain LIBOR Rate Loans, then Borrower (without prejudice to any amounts then due to such Affected Lender under Section 2.12(d)(i) or Section 2.13(a), as applicable), may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.12(d)(i) or Section 2.13(a), as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain LIBOR Rate Loans, may designate a substitute Lender reasonably acceptable to Agent to purchase the DIP Facility Obligations owed to such Affected Lender (and its Affiliates) and such Affected Lender's (and its Affiliates') commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender (and its Affiliates) shall assign to the Replacement Lender its DIP Facility Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be a "Lender" for purposes of this Agreement and such Affected Lender (and its Affiliates) shall cease to be a "Lender" for purposes of this Agreement.

(c)     Notwithstanding anything herein to the contrary, the protection of Section 2.13 shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law which shall have occurred or been imposed, so long as it shall be customary for lenders affected thereby to comply therewith.  Notwithstanding any other provision no Lender shall demand compensation pursuant to this Section 2.13 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

2.14    **Superpriority Nature of DIP Facility Obligations and Agent' DIP Liens.**

(a)     The priority of Lenders' DIP Liens on the DIP Collateral owned by the Loan Parties shall be set forth in the Interim DIP Order and the Final DIP Order.

(b)     Subject to the Carve-Out, all DIP Facility Obligations shall constitute administrative expenses of Borrower and Guarantors in the Chapter 11 Cases pursuant to Section 364(c) of the Bankruptcy Code with priority over all other claims and administrative expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code, and shall at all times during the period that the DIP Loans remain outstanding, remain senior in priority to all other claims or administrative expenses (other than the Carve-Out and the ABL DIP Obligations, in each case to the extent as set forth in the DIP Orders) (the "DIP Superpriority Claim").

(c)     The DIP Liens granted to Agent for the benefit of the Lenders on the DIP Collateral owned by Borrower and Guarantors shall be valid and perfected on the basis and with the priority set forth in the definition of "DIP Lien" herein and in the DIP Orders.

(d)     The "Carve Out" has the meaning assigned to that term in the Interim DIP Order and the Final DIP Order, as applicable.

(e)     Except as set forth herein or in the DIP Orders, no other claim having a priority superior or pari passu to that granted to the Agent and the Lenders by the DIP Orders shall be granted or approved while any DIP Facility Obligations under this Agreement remain outstanding.  Except for the Carve-Out and subject to entry of the Final DIP Order, no costs or expenses of administration shall be imposed against the Agent, the Lenders or any of the DIP Collateral or any of the Pre-Petition Term Agent, the Pre-Petition Term Lenders or the Collateral (as defined in each of the Pre-Petition Term Facility Agreements) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent, Lenders or any of the DIP Collateral or any of the Pre-Petition Term Agent or the Pre-Petition Term Lenders.

2.15    **No Discharge; Survival of Claims.**  Until payment in full of the DIP Loans and all other DIP Facility Obligations, each of the Borrower and the Guarantors agrees that (a) the DIP Facility Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such

discharge) and (b) the DIP Superpriority Claim and the DIP Liens granted to the Agent pursuant to the DIP Orders and described in this Section 2.15 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case.

2.16    **Waiver of any Priming Rights**.  On and after the Effective Date, and on behalf of themselves and their estates, and for so long as any DIP Facility Obligations shall be outstanding, the Borrower and the Guarantors hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the DIP Facility Obligations, or to approve a claim of equal or greater priority than the DIP Facility Obligations, in each case other than as contemplated by the ABL DIP Facility Documents.

## 3.    CONDITIONS; TERM OF AGREEMENT.

3.1    **Conditions Precedent to the Effective Date**.  As a condition to the effectiveness of this Agreement and the availability of the Interim DIP Loan Commitment, each of the following documents (each in form and substance reasonably satisfactory to the Agent and the Required Lenders unless otherwise indicated) shall have been delivered to the Agent, and the following conditions shall have been satisfied:

(a)    Corporate Due Diligence.

(i)    The Agent shall have received a certificate of corporate good standing issued by the Secretary of State of each State in which a Loan Party is organized dated as of a recent date prior to the Effective Date.

(ii)    The Agent shall have received a copy of the resolutions or equivalent action, in form and substance reasonably satisfactory to the Agent, of the Board of Directors of each Loan Party authorizing, as applicable, (i) the execution, delivery and performance of this Agreement and the other DIP Loan Documents to which it is or will be a party as of the Effective Date, (ii) the Extensions of Credit to such Loan Party (if any) contemplated hereunder and (iii) the granting by it of the DIP Liens to be created pursuant to the Security Documents to which it will be a party as of the Effective Date, certified by a Responsible Officer or other authorized representative of such Loan Party as of the Effective Date, and stating that the resolutions or other action thereby certified have not been amended, modified (except as any later such resolution or other action may modify any earlier such resolution or other action), superseded or revoked  in any respect and are in full force and effect as of the Effective Date.

(iii)    The Agent shall have received a certificate of each Loan Party, dated as of the Effective Date, as to the incumbency and signature of the officers or other authorized signatories of such Loan Party

executing any DIP Loan Document with respect to such Loan Party on the Effective Date.

(iv)    The Agent shall have received copies of the Governing Documents of each Loan Party, in each case certified as of the Effective Date as true, correct and complete copies (as amended through the Effective Date) by (if applicable) the Secretary of State and a Responsible Officer.

(v)    The Agent shall have received the Initial Approved Budget attached hereto as Exhibit B-3.

(b)    DIP Loan Documents.  (A) All material documentation relating to the DIP Facility shall be in form and substance satisfactory to the Agent and the Lenders and their counsel and (B) the Agent shall have received the following DIP Loan Documents, executed and delivered as required below:

(i)    this Agreement, executed and delivered by a duly authorized officer of the Borrower;

(ii)    the Guaranty and Security Agreement;

(iii)    the Intercreditor Agreement; and

(iv)    the Fee Letter.

(c)    Borrowing Notice.  With respect to the Interim DIP Loans, the Agent shall have received a notice of such borrowing as required by Section 2.3(a) and an accompanying funds flow.

(d)    The Related Transactions.    The Related Transactions required to be performed on or prior to the Effective Date shall have been performed in a manner contemplated in the Related Agreements.

(e)    Officers' Certificates.  The Agent shall have received a certificate from the Borrower, dated the Effective Date, substantially in the form of Exhibit 3.1 hereto, with appropriate insertions and attachments.

(f)    Representations and Warranties.  Each of the representations made by or on behalf of the Loan Parties in this Agreement or in any of the other DIP Loan Documents or in any other report, statement, document, or paper provided by or on behalf of a Loan Party shall be true and complete in all material respects as of the date as of which such representation or warranty was made, except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(g)    Litigation; Judgments.  Other than the Chapter 11 Cases, or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or

18

Governmental Authority that (i) except as disclosed, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon the DIP Facility, the DIP Collateral or the transactions contemplated hereby.

(h)    Consents; Absence of Conflicts.    Other than the DIP Orders, (i) all governmental and third party consents and approvals necessary in connection with the DIP Facility and the Related Transactions shall have been obtained (without the imposition of any conditions that are not acceptable to the Agent and the Required Lenders in their reasonable discretion) and shall remain in effect, and (ii) there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the Agent at the direction of the Required Lenders of its rights as a secured party with respect to the DIP Collateral.

(i)    Cases.    The Loan Parties shall have filed the Petitions with the Bankruptcy Court commencing the Chapter 11 Cases.

(j)    Interim DIP Order and First Day Motions.    The Agent shall have received a copy of the Interim DIP Order, which Interim DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the Effective Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Agent and the Required Lenders (such consent to be given in their sole discretion) and, if the Interim DIP Order is the subject of a pending appeal in any respect, neither the making of the Interim DIP Loans, nor the performance by the Loan Parties of any of their respective obligations hereunder, under the other DIP Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.    Such Interim DIP Order shall authorize and approve the DIP Loans, this Agreement and the DIP Loan Documents contemplated hereby and thereby.    All "first day" motions to be filed with and submitted to the Bankruptcy Court on the Petition Date and related orders to be entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders.

(k)    Motions and Documents.    All material motions and other material documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders.

(l)    ABL DIP Facility Documents.    The ABL DIP Facility Agreement and the other ABL DIP Facility Documents shall have been duly executed and delivered by the parties thereto, and shall be in full force and effect and shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders.

(m)    Validity and Priority of DIP Liens.    Pursuant to the Interim DIP Order, the Agent, for the benefit of the Lenders, shall have a valid and perfected DIP Lien on and security interest in the DIP Collateral on the basis and with the priority set forth in the definition of "DIP Lien" herein and in the Interim DIP Order.

19

(n)  Insurance.  Upon request of the Agents, the Borrower shall obtain endorsements naming the Agent, on behalf of the Lenders, as an additional insured or loss payee, as applicable, under all insurance policies to be maintained with respect to the properties of the Loan Parties and their Subsidiaries forming part of the DIP Collateral, which endorsements shall provide for 30 days' (or 10 days for failure to pay premiums) prior notice of cancellation of such policies to be delivered to the Agent; provided that in the event such endorsements are not delivered on the Effective Date, Borrower shall provide such endorsements within thirty (30) days of the Effective Date.

(o)  All Fees and Expenses Paid.  All fees due at or immediately after the first funding under the DIP Facility and all reasonable and documented out-of-pocket costs, disbursements and expenses incurred by the Agent in connection with the establishment of the DIP Facility contemplated hereby, the Chapter 11 Cases and the Recognition Proceedings shall have been paid (to the extent then invoiced), including without limitation all reasonable and documented fees and out-of-pocket expenses of (i) the Agent's counsel, King & Spalding LLP, Agent's Canadian counsel, Blakes, Cassels & Graydon LLP, Agent's prior counsel, Winston & Strawn LLP, and, to the extent necessary, a firm of local counsel engaged by the Agent in connection with the Chapter 11 Cases, and (ii) any financial advisor retained by the Agent (if any).

(p)  [reserved].

(q)  RSA.  The Agent shall have received an executed copy of the RSA, in form and substance satisfactory to the Agent and the Required Lenders.

(r)  PATRIOT Act.  The Agent and the Lenders shall have received at least one Business Day prior to the Effective Date all documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act that has been reasonably requested in writing at least 3 Business Days prior to the Effective Date.

(s)  Investment Banker.  The Loan Parties shall have filed an application seeking the retention of an investment banker reasonably acceptable to the Agent and the Required Lenders (it being understood that Houlihan Lokey is acceptable to the Agent and the Required Lenders).

3.2  **Conditions Precedent to Funding on the Final Order Effective Date** .  As a condition to the availability of the Final DIP Loan Commitments on or after the Final Order Effective Date and the Budget Advance Date DIP Loans on the Budget Advance Date, the following conditions shall have been satisfied:

(a)  Final DIP Order.  The Agent and the Required Lenders shall have received a copy of the Final DIP Order, which Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the date that is 40 calendar days after the Petition Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Agent and the Required Lenders (such consent to be given in their sole discretion); and, if the Final DIP Order is the subject of a

20

pending appeal in any respect, neither the making of the Final DIP Loans, nor the performance by the Loan Parties of any of their respective obligations hereunder, under the other DIP Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal. Such Final DIP Order shall authorize and approve the DIP Loans, this Agreement and the DIP Loan Documents contemplated hereby and thereby. All material motions, material orders and other material documents to be filed with and submitted to the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders.

(b)    Insurance. The endorsements (if any) required under Section 3.1(n) shall have been delivered to the Agent.

3.3    **Conditions to Each Extension of Credit**. The agreement of each Lender to make any Extension of Credit requested to be made by it on any date (including the Effective Date, the Final Order Effective Date and the Budget Advance Date) is subject to the satisfaction or waiver of the following conditions precedent:

(a)    Representations and Warranties. Each of the representations and warranties made by any Loan Party pursuant to this Agreement or any other DIP Loan Document (or in any amendment, modification or supplement hereto or thereto) to which it is a party, and each of the representations and warranties contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any other DIP Loan Document shall, except to the extent that they relate to a particular date (in which case such representations and warranties shall be true and correct in all material respects on and as of such particular date), be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of such date as if made on and as of such date, in each case immediately prior to, and immediately after giving effect to, the funding of any DIP Loans.

(b)    No Default. No Default or Event of Default shall have occurred and be continuing on such date or immediately after giving effect to the Extensions of Credit requested to be made on such date.

(c)    Notice. The Agent shall have received a notice of borrowing as required by Section 2.3(a).

(d)    Law. Other than the DIP Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the Agent at the direction of the Lenders of its rights as a secured party with respect to the DIP Collateral.

(e)    No MAE. Other than the commencement and continuation of the Chapter 11 Cases, no Material Adverse Effect shall have occurred.

(f)    No injunction. The making of such DIP Loan shall not (i) violate any (x) applicable laws, rules, regulations, executive orders, or codes that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or (y) result in or cause a default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department,

21

commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and (ii) not be enjoined temporarily, preliminarily or permanently.

(g)    Compliance with Approved Budget.  The use of proceeds of such DIP Loan giving effect to the application thereof on the date of such funding complies with the Approved Budget, subject to Permitted Variances, or has otherwise been approved in writing by the Agent (at the direction of the Required Lenders, in their sole discretion).

(h)    DIP Orders.  The DIP Orders, as applicable, shall have been entered by the Bankruptcy Court and shall be in full force and effect.

Each borrowing of DIP Loans by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such borrowing that the conditions contained in this Section 3.3 have been satisfied.

## 4.    REPRESENTATIONS AND WARRANTIES.

In order to induce the Lender Group to enter into this Agreement and to make the Extensions of Credit requested to be made by it on the Effective Date and the Final Order Effective Date, each of Parent and Borrower makes, as of the Effective Date, each of following representations and warranties to the Lender Group:

4.1    **Due Organization and Qualification; Subsidiaries**.

(a)    Each Loan Party (i) is duly organized or incorporated and existing and in good standing (or, if such jurisdiction does not provide for good standing status, the equivalent status provided for in such jurisdiction) under the laws of the jurisdiction of its organization or incorporation, (ii) is qualified or registered to do business in any state, province or territory where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the DIP Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Other than as described on Schedule 4.1(b), as of the Effective Date, there are no subscriptions, options, warrants, or calls relating to any shares of Parent's Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.  As of the Effective Date, other than pursuant to any equity compensation plan or arrangement benefiting, or pursuant to any agreement with, any current or former employer, officer, director or consultant of any Loan Party, Parent is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)    As of the Effective Date, set forth on Schedule 4.1(c) is a complete and accurate list of Parent's Subsidiaries, showing:  (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned by Parent or a Subsidiary of

Parent.  All of the outstanding Equity Interests of each such Subsidiary have been validly issued and are fully paid and non-assessable, to the extent applicable.

(d)      As of the Effective Date, except as set forth on <u>Schedule 4.1(d)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of Parent's Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.

4.2    **Due Authorization; No Conflict**.

(a)      Subject to the entry by the Bankruptcy Court of the Interim DIP Order and Final DIP Order, as applicable as to each Loan Party, the execution, delivery, and performance by such Loan Party of the DIP Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)      Subject to the entry by the Bankruptcy Court of the Interim DIP Order and Final DIP Order, as applicable, and as to each Loan Party, the execution, delivery, and performance by such Loan Party of the DIP Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, provincial, foreign or local law or regulation applicable to any Loan Party or its Subsidiaries or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, where any such violation individually or in the aggregate could reasonably be expected to have a Material Adverse Effect, (ii) violate the Governing Documents of any Loan Party or its Subsidiaries, (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any agreement of any Loan Party or its Subsidiaries where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iv) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (v) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3    **Governmental Consents**.  Subject to the entry by the Bankruptcy Court of the Interim DIP Order and Final DIP Order, as applicable, the execution, delivery, and performance by each Loan Party of the DIP Loan Documents to which such Loan Party is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices or actions (i) that have been obtained and that are in force and effect (other than for filings and recordings with respect to DIP Collateral to be made, or otherwise delivered to the Agent for filing or recordation, as of the Effective Date), (ii) are necessary or advisable in connection with releasing existing liens or filing Agent's DIP Liens, or (iii) the failure of which to receive would not reasonably be expected to cause a Material Adverse Effect.

4.4    **Binding Obligations**.  Subject to the entry by the Bankruptcy Court of the Interim DIP Order and Final DIP Order, each DIP Loan Document has been duly executed and

delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

4.5     **Title to Assets; No Encumbrances**.  Each Loan Party has (a) good and sufficient legal title (in the case of any fee interest in Real Property), (b) valid leasehold interest in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property) all of its material assets, in each case, free and clear of Liens except for Permitted Liens and, in the case of Real Property, minor defects in title that do not materially interfere with such Loan Party's ability to conduct its business or to utilize such assets for their intended purposes.

4.6     **Litigation**.  Other than the filing, commencement and continuation of the Chapter 11 Cases and as listed on Schedule 4.6(a) and/or any litigation resulting therefrom, there are no actions, suits, or proceedings pending or, to the actual knowledge of Borrower or any Guarantor, threatened in writing against a Loan Party or any of its Subsidiaries that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

4.7     **Compliance with Laws**.  Except as otherwise permitted by an order of the Bankruptcy Court, no Loan Party nor any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.8     **No Material Adverse Effect**.  All financial statements (other than Projections, budgets, other forecasts and comparisons) relating to Loan Parties and their Subsidiaries that have been delivered by any Loan Party to the Lender Group have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, Loan Parties' and their Subsidiaries' (taken as a whole) financial condition as of the date thereof and results of operations for the period then ended.  Except the filing, commencement and continuation of the Chapter 11 Cases and any litigation resulting therefrom, there has not been a Material Adverse Effect with respect to Loan Parties and their Subsidiaries since the Effective Date.

4.9     **No Default**.  No Loan Party nor any of their Subsidiaries are in default under any of the DIP Loan Documents.

4.10    **Employee Benefits**.

(a)     Except as set forth on Schedule 4.10, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any Pension Plan or Multiemployer Plan.

24

(b)    Each Loan Party has complied in all material respects with ERISA, the IRC and all applicable laws regarding each Employee Benefit Plan, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(c)    Each Employee Benefit Plan is, and has been, maintained in substantial compliance with ERISA, the IRC, all applicable laws and the terms of each such Employee Benefit Plan, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(d)    Except as could not reasonably be expected to result in a Material Adverse Effect, each Employee Benefit Plan that is intended to qualify under Section 401(a) of the IRC has received a favorable determination letter from the Internal Revenue Service or an application for such letter is currently being processed by the Internal Revenue Service, and nothing has occurred which could reasonably be expected to prevent, or cause the loss of, such qualification.

(e)    Except as could not reasonably be expected to result in a Material Adverse Effect, no liability to the PBGC (other than for the payment of current premiums which are not past due) by any Loan Party or ERISA Affiliate has been incurred or is expected by any Loan Party or ERISA Affiliate to be incurred with respect to any Pension Plan.

(f)    Except as could not reasonably be expected to result in a Material Adverse Effect, no Notification Event exists or has occurred in the past six (6) years.

(g)    Except as could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or ERISA Affiliate has provided any security under Section 436 of the IRC.

(h)    Except as set forth on Schedule 4.10, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any Canadian Pension Plan. No Loan Party, nor any of their Subsidiaries, maintains or contributes to any Canadian Defined Benefit Plan. Except as set forth on Schedule 4.10, as of the Effective Date, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any material Canadian Benefits Plan. Each Loan Party has complied with the *Income Tax Act* (Canada) and all applicable laws regarding each Canadian Pension Plan or Canadian Benefits Plan, except in each case where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. Each Canadian Pension Plan or Canadian Benefits Plan is, and has been maintained in compliance to the *Income Tax Act* (Canada), all applicable laws and the terms of each such Canadian Benefits Plan, except in each case where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. No Loan Party, nor any of their Subsidiaries, has any liability for any Canadian Pension Plan or Canadian Benefits Plan which has been discontinued, except as could not reasonably be expected to result in a Material Adverse Effect.

4.11    **Environmental Condition**.    Except as set forth on Schedule 4.11, (a) to Borrower's knowledge, none of Loan Parties' or their Subsidiaries' properties has ever been used by Loan Parties, their Subsidiaries, or, to Borrower's knowledge, by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such use, disposal, production, storage, handling, treatment, or

release or transport was in violation of any applicable Environmental Law or resulted in an Environmental Action, except as would not reasonably be expected to result in a Material Adverse Effect, (b) to Borrower's knowledge, none of Loan Parties' nor their Subsidiaries' properties or assets has ever been designated or identified by a Governmental Authority pursuant to RCRA, CERCLA or any analogous statute as a Hazardous Materials disposal site or a site that requires Remedial Action, in either case that could reasonably be expected to result in a Material Adverse Effect, (c) no Environmental Lien (other than a Permitted Lien) has attached to any revenues of the Loan Parties or their Subsidiaries or to any Real Property owned by the Loan Parties or their Subsidiaries, or, to Borrower's knowledge, operated, but not owned, by Loan Parties or their Subsidiaries, (d) none of Loan Parties nor any of their Subsidiaries have received a summons, citation, written notice, or directive from the United States Environmental Protection Agency or any other federal (including the federal government of Canada), state or provincial governmental agency concerning any action or omission by any Loan Party or any Subsidiary of a Loan Party resulting in the releasing or disposing of Hazardous Materials into the environment which could reasonably be expected to result in a Material Adverse Effect, (e) each of the Loan Parties, their Subsidiaries, and their respective operations are and have at all times been in compliance with Environmental Laws, except as would not reasonably be expected to result in a Material Adverse Effect, (f) each of the Loan Parties and their Subsidiaries have obtained all permits, licenses, authorizations and approvals required under Environmental Law for the conduct of their business and operations (collectively, "<u>Environmental Permits</u>"), and are in compliance with the terms and conditions of such Environmental Permits, except as would not reasonably be expected to result in a Material Adverse Effect, and (g) none of the Loan Parties nor any of their Subsidiaries are subject to any Environmental Action or Environmental Liability, except as would not reasonably be expected to result in a Material Adverse Effect.

4.12    **<u>Complete Disclosure</u>**.

(a)    As of the Effective Date, all written factual information (other than the projections, budgets, estimates, forward-looking statements, information of a general economic nature, general information about Borrower's industry or general market data) (when taken as a whole) furnished by or on behalf of Loan Parties in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other DIP Loan Documents) in or pursuant to this Agreement, the other DIP Loan Documents, or in connection with any transaction contemplated herein or therein, is (other than the projections, budgets, estimates, forward-looking statements, information of a general economic nature, general information about Borrower's industry or general market data) (when taken as a whole), and hereafter furnished by or on behalf of Loan Parties or their Subsidiaries in writing to Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified, and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

(b)    The Initial Approved Budget and each Weekly Cash Flow Forecast delivered thereafter are prepared in good faith based upon estimates and assumptions believed by management of the Borrower to be reasonable and fair in light of current conditions and facts known to the Borrower at the time delivered (it being understood that such Approved Budget and

26

the Weekly Cash Flow Forecasts and the assumptions on which they were based, may or may not prove to be correct).

4.13    **Patriot Act; Foreign Corrupt Practices Act**.  To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").  No part of the proceeds of the loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.14    **Chapter 11 Cases**.  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice has been or will be given of (i) the motion seeking approval of the DIP Loan Documents, the Interim DIP Order and the Final DIP Order, (ii) the hearing for the entry of the Interim DIP Order, and (iii) the hearing for the entry of the Final DIP Order, as applicable.

4.15    **Payment of Taxes**.  All material tax returns and Tax reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and, except to the extent subject to the automatic stay in connection with the Chapter 11 Cases, all material Taxes that are due and payable and all material assessments, fees and other governmental charges upon a Loan Party and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable unless subject to a Permitted Protest.  Each Loan Party and each of its Subsidiaries have made adequate provision in accordance with GAAP for all material Taxes not yet due and payable.  Neither Borrower nor any Guarantor knows of any proposed material Tax assessment against a Loan Party or any of its Subsidiaries that is not subject to a Permitted Protest.

4.16    **Margin Stock**.  No Loan Party nor any of its Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the loans made to Borrower will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.  Neither any Loan Party nor any of its Subsidiaries expects to acquire any Margin Stock.

4.17    **Governmental Regulation**.  No Loan Party nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the DIP Facility Obligations unenforceable. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company

"controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18 **OFAC**.  No Loan Party nor any of its Subsidiaries is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, in each case, that would constitute a violation of applicable Laws.

4.19 **Employee and Labor Matters**.  (i) There is no unfair labor practice complaint pending or, to the knowledge of Borrower or any Guarantor, threatened against Parent or its Subsidiaries before any Governmental Authority and there is no grievance or arbitration proceeding pending or threatened against Parent or its Subsidiaries which arises out of or under any collective bargaining agreement except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (ii) there is no strike, labor dispute, slowdown, stoppage or labor grievance pending or threatened in writing against Parent or its Subsidiaries that could reasonably be expected to result in a material liability, (iii) none of Parent or its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied, (iv) the hours worked and payments made to employees of Parent or its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (v) all payments due from Parent or its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Parent.

4.20 **[Reserved]**.

4.21 **Broker Fees**.  There are no brokerage commissions, finder's fees or investment banking fees payable by Parent or any of its Affiliates in connection with any Transactions.

4.22 **Suppliers and Customers**.  To the actual knowledge of the Loan Parties, there exists no actual or threatened in writing termination, cancellation, or limitation of or modification to or change to the business relationship between any Loan Party and any supplier or customer except to the extent such termination, cancellation, limitation, modification or change is not reasonably expected to have a Material Adverse Effect.

4.23 **Security Interest**.  This Agreement and the Security Documents, including the DIP Orders, are effective to create in favor of the Agent, for the benefit of the Lenders, legal, valid, enforceable and continuing first priority Liens on, and security interests in, the DIP Collateral pledged hereunder or thereunder, in each case subject to no Liens other than Permitted Priority Liens with the relative priorities granted pursuant to the terms of the Intercreditor Agreement and the DIP Orders, as applicable.  Pursuant to the terms of the DIP Orders, no filing

or other action will be necessary to perfect or protect such DIP Liens and security interests. Pursuant to and to the extent provided in the DIP Orders, the Indebtedness of the Loan Parties under this Agreement will constitute part of the DIP Superpriority Claim

4.24    **DIP Orders**.  The Loan Parties are in compliance with the terms and conditions of the DIP Orders.  Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from after the date the Final DIP Order is entered) is in full force and effect and has not been vacated, reversed or rescinded without the prior written consent of the Agent and Required Lenders, in their sole discretion.

4.25    **Immaterial Subsidiaries.**  As of the Effective Date, each of the Subsidiaries of Parent set forth on Schedule 4.25 have been designated as Immaterial Subsidiaries by Parent and each such Subsidiary satisfies the criteria for such designation.

4.26    **Intellectual Property.**    All registered patents, patent applications, trademark registrations, trademark applications, service mark registrations, service mark applications, copyright registrations, copyright applications and tradename registrations owned by each Loan Party as of the Effective Date are set forth on Schedule 4.26 (as such Schedule 4.26 may be updated at any time upon written notice to Agent to reflect any such Intellectual Property (as defined below) acquired after the Effective Date).  Each Loan Party and each of its Subsidiaries owns, or has the legal right to use, all United States and foreign patents, patent applications, trademarks, trademark applications, trade names, copyrights, technology, know-how and processes necessary for each of them to conduct its business as currently conducted (the "Intellectual Property") except as would not reasonably be expected to result in a Material Adverse Effect.  Except as provided on Schedule 4.26, no claim has been asserted and is pending by any Person against any Loan Party or any of its Subsidiaries challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower know of any such claim, and, to the knowledge of the Borrower, the use of such Intellectual Property by the Loan Parties and their Subsidiaries does not infringe on the rights of any Person, except for such claims and infringements which in the aggregate would not reasonably be expected to be materially adverse to the Lenders.

4.27    **Insurance**.  All properties of each Loan Party and its Subsidiaries are insured to the extent required by Section 5.6.  Schedule 4.27 sets forth a description of such insurance as of the Effective Date.

4.28    **Purpose of DIP Loans**.    The proceeds of DIP Loans shall be used by the Borrower only for the following purposes, in each case in accordance with and subject to compliance with Section 6.19 and the DIP Orders (except as otherwise agreed by the Agent and the Required Lenders): (i) working capital and general corporate purposes of the Loan Parties, (ii) to fund the costs of the administration of the Chapter 11 Cases and the consummation of the Plan under the Bankruptcy Code, (iii) to fund interest, fees, and other payments contemplated in respect of this Agreement and the other DIP Loan Documents, and (iv) to fund allowed administrative expenses incurred during the Chapter 11 Cases.

## 5.    AFFIRMATIVE COVENANTS.

Each of Parent and Borrower covenants and agrees that, until termination of all of the DIP Loan Commitments and payment in full of the DIP Facility Obligations:

5.1    **Financial Statements**.  Borrower will deliver to Agent, which shall furnish to each Lender, each of the following:

(a)    [reserved];

(b)    [reserved];

(c)    as soon as available, but in any event no later than 30 days after the end of each fiscal month of each year, an unaudited consolidated balance sheet, income statement, and statement of cash flow covering Parent's and its Subsidiaries' operations during such period, together with a report setting forth comparisons to the corresponding figures for the corresponding periods of the applicable month and year to date period for the previous year and applicable month and year to date period set forth in the Projections; and

(d)    all such financial statements delivered pursuant to Section 5.1(c) shall be certified by a Responsible Officer of the Parent to fairly present in all material respects the financial condition of the Parent and its Subsidiaries in conformity with GAAP and to be (and, in the case of any financial statements delivered pursuant to Section 5.1(c) shall be certified by a Responsible Officer of the Parent as being) in reasonable detail and prepared in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods that began on or after the Effective Date (except, in the case of any financial statements delivered pursuant to Section 5.1(c), for the absence of certain footnotes).

5.2    **Reporting; Certificates; Other Information**.  Furnish to the Agent for delivery to each Lender:

(a)    following the delivery of the Initial Approved Budget on the Effective Date, (i) by 12:00 p.m. New York City time on the third Friday following the Petition Date and by 12:00 p.m. New York City time on the Friday that is every two weeks thereafter through the Life of the Case, the Borrower shall provide the Agent with an updated cash flow forecast for the Loan Parties and their Subsidiaries, with line item detail of projected sales, disbursements, collections, net cash flow, the outstanding amount of Revolving Loans (as defined in the ABL DIP Facility Documents) and the other items set forth in the Initial Approved Budget for the then-upcoming seventeen (17) week period (or such shorter, or longer, period, as applicable, to coincide with the Life of the Case), in each case, in substance reasonably satisfactory (such satisfaction not to be unreasonably withheld, delayed or conditioned) to and approved by the Agent  and substantially consistent with the form of the Initial Approved Budget delivered on the Effective Date (the "Weekly Cash Flow Forecast"); (ii) by 12:00 p.m. New York City time beginning on the third Friday following the Petition Date, and by 12:00 p.m. New York City time on the Friday of each two-week period thereafter, a variance report (the "Variance Report") setting forth, on a consolidated basis, actual cumulative aggregate cash receipts, disbursements and cash flows of the Loan Parties for the most recent three- or two-week period (as applicable) covered by such Variance Report and setting forth all the variances, on a line-item and aggregate

basis, from the amount set forth for such period as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report on a weekly and cumulative basis for the period from the first week commencing after the Petition Date through the end of the week in regard to which such variance report is being delivered (which shall not exceed what is permitted by the Permitted Variance), and each such Variance Report shall include explanations for all material variances for the most recent three- or two-week period in regard to which such variance report is being delivered and shall be certified by a Financial Officer of the Loan Parties, and (iii) deliver to Agent and Lenders, on at least a bi-weekly (i.e., once every two weeks) basis, a written narrative report of the key performance metrics monitored by management of the Loan Parties regarding the business of the Borrowers and their Subsidiaries, in each case in a form reasonably acceptable to the Agent.

(b)    concurrently with the delivery of the financial statements and reports referred to in Section 5.1(c), a certificate signed by a Financial Officer of the Borrower (a "Compliance Certificate"), substantially in the form of Exhibit 5.2(b), stating that, to the best of such Financial Officer's knowledge, each of the Parent and its Subsidiaries during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement or the other DIP Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Financial Officer has obtained no knowledge of any Default or Event of Default, except, in each case, as specified in such certificate.

(c)    [reserved].

(d)    As soon as possible and in event later than 3 Business Days after Parent or any of its Subsidiaries has knowledge of (i) any event or condition that constitutes a Default or an Event of Default under this Agreement, (ii) any default or event of default under the Pre-Petition Term Facility, the Senior ABL Facility, or the ABL DIP Facility, or (iii) any payment default with respect to other obligations in excess of $100,000 that constitute an administrative expense.

(e)    within 5 days after Parent or any of its Subsidiaries has knowledge thereof

(i)    notice of any pending or threatened labor dispute, strike, walkout, or union organizing activity with respect to any employees of Parent or any of its Subsidiaries which could reasonably be expected to result in a Material Adverse Effect;

(ii)    notice of (i) any material default by Parent or any of its Subsidiaries under or (ii) termination of any material contracts, in each case, which could reasonably be expected to result in a Material Adverse Effect;

(iii)    [reserved];

(iv)    any amendment, supplement or other modification to the ABL DIP Facility Documents; and

31

      (v)     copies of any financial statements or other reports sent to public security holders or filed with the SEC, and copies of any registrations or amendments (including any registration statements and amendments thereto) filed with the SEC.

(f)     [reserved].

(g)     Except as otherwise provided in <u>Section 5.9(d)</u>, within 10 days of receipt by Parent or any of its Subsidiaries, notice of receipt by Parent or any of its Subsidiaries from any local, state or federal authority advising such Person of any Environmental Liability arising from such Person's operations, its premises, its waste disposal practices, or waste disposal sites used by such Person, which Environmental Liability would reasonably be expected to result in a Material Adverse Effect.

(h)     On a quarterly basis with the delivery of a Compliance Certificate pursuant to <u>Section 5.2(b)</u> (or, if an Event of Default has occurred and is continuing, more frequently if requested by Agent), a written report regarding Intellectual Property in accordance with Section 7(g)(v) of the Guaranty and Security Agreement.

(i)     Concurrently with the delivery by any Loan Party or promptly upon receipt by any Loan Party, as applicable, (i) such collateral reports, certificates and other information delivered pursuant to the ABL DIP Facility Agreement and (ii) any appraisal or field exam prepared in connection with the ABL DIP Facility Agreement.

(j)     Upon request by Agent or any Lender, such other reports as to the DIP Collateral or the financial condition of Parent or any of its Subsidiaries, as Agent or such Lender may reasonably request (it being agreed, without limitation, that any such request made following the occurrence and during the continuation of an Event of Default shall be deemed reasonable for purposes of this <u>Section 5.2(j)</u>).

(k)     For so long any Small Business Investment Company that becomes a Lender on or after the Effective Date is a Lender, within thirty (30) days of its request, Borrowers shall provide to any such Lender such forms and financial and other information with respect to any business or financial condition of the Loan Parties and their Subsidiaries required by the SBA, including, but not limited to, (i) forms and information with respect to such Lender's reporting requirements under SBA Form 468, (ii) information regarding the full-time equivalent jobs created or retained in connection with such Lender's investment in Loan Parties, the impact of the financing on Loan Parties' business in terms of revenues and profits and on taxes paid by Loan Parties and their employees and (iii) a list of Lenders (other than such Lender).

Documents required to be delivered pursuant to <u>Sections 5.1(c)</u>, <u>5.2(a)</u>, <u>5.2(b)</u>, <u>5.2(c)</u>, <u>5.2(d)</u>, <u>5.2(e)</u>, <u>5.2(f)</u> or <u>5.2(g)</u> may at the Borrower's option be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which Borrower delivers such documents by electronic mail to the Agent or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender

and each Agent have access (whether a commercial, third party website or whether sponsored by the Agent).

5.3    **Maintenance of Existence and Conduct of Business**.

(a)    Except as otherwise permitted by Sections 6.3 and 6.4, Parent will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect each Loan Party's and each Loan Party's Subsidiaries' valid existence and good standing (or, if such jurisdiction does not provide for good standing status, the equivalent status provided for in such jurisdiction) and governmental and similar rights, permits, licenses, authorizations or other approvals and franchises, in each case, if the failure to do so could reasonably be expected to result in a Material Adverse Effect.

(b)    Parent will, and will cause each of its Subsidiaries to, (i) take all reasonable actions to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of the business of the Parent and its Subsidiaries, taken as a whole, including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the DIP Collateral to the extent that failure to comply therewith, in the aggregate, would not reasonably be expected to be adverse to the Lenders or any Loan Party in any material respect; (ii) maintain a cash management system substantially as in effect on the Petition Date, and (iii) in accordance with the Bankruptcy Code and subject to any required approval by any applicable order of the Bankruptcy Court, comply with all post-petition Contractual Obligations and Contractual Obligations entered into prior to the Petition Date and assumed except to the extent that failure to comply therewith, in the aggregate, would not reasonably be expected to be adverse to the Lenders or any Loan Party in any material respect.

5.4    **Maintenance of Properties**.  Parent will, and will cause each of its Subsidiaries to, maintain and preserve all of their properties which are necessary in the proper conduct of their business in working order and condition in the ordinary course of business, ordinary wear, tear, and damage by casualty and condemnation and Permitted Dispositions excepted (and except where the failure to do so could not be expected to result in a Material Adverse Effect).

5.5    **Taxes**.  Parent will, and will cause each of its Subsidiaries to, timely file all material tax returns and pay in full before delinquency or before the expiration of any extension period (including any extension by virtue of the Chapter 11 Cases) relating to the payment of all material governmental assessments and Taxes with respect to periods after the Petition Date whether real, personal or otherwise, due and payable by, or imposed, levied, or assessed against it, or any of its assets, including all amounts reflected on its material tax returns, except to the extent that the validity of such governmental assessment or Tax is the subject of a Permitted Protest.

5.6    **Insurance**.  Parent will, and will cause each of its Subsidiaries to, at Borrower's expense, (a) maintain insurance respecting each of Parent's and its Subsidiaries' assets wherever located, covering liabilities, losses or damages, in each case, as are customarily insured against by other Persons engaged in the same or similar businesses and similarly situated and located. All such policies of insurance shall be with financially sound and reputable insurance companies

reasonably acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of Borrower in effect as of the Effective Date are acceptable to Agent).  All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation.  If Parent or its Subsidiaries fail to maintain such insurance, Agent may arrange for such insurance, but at Borrower's expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Borrower shall give Agent prompt notice of any loss exceeding $500,000 covered by its or its Subsidiaries' casualty or business interruption insurance.  Upon the occurrence and during the continuance of an Event of Default, Agent shall have the right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7    **Inspection**.  Parent will, and will cause each of its Subsidiaries to, permit Agent, any Lender (so long as such Lender accompanies Agent), and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided an authorized representative of Borrower shall be allowed to be present) at such reasonable times and intervals as Agent, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Borrower and during regular business hours; provided, that so long as no Event of Default shall have occurred and be continuing, Borrower shall not be obligated to reimburse Agent for more than one (1) inspection during any calendar year.  Notwithstanding anything to the contrary in this Section 5.7, none of Parent or any of its Subsidiaries will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrower (based on the advice of counsel) violate attorney-client privilege or is otherwise prohibited by law or fiduciary duty, (ii) such information constitutes attorney work, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Agent or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters with respect thereto.

5.8    **Compliance with Laws**.  Parent will, and will cause each of its Subsidiaries to, comply with the requirements of all applicable laws, rules, regulations, and orders of any

34

Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

     5.9    **Environmental**.  Parent will, and will cause each of its Subsidiaries to,

     (a)    keep (i) any real property that any Loan Party owns free of any Environmental Liens, other than Permitted Liens, and (ii) any real property that any Loan Party leases or operates free of any Environmental Liens, other than Permitted Liens, except in the case of each of clauses (i) and (ii) above with respect to any such Environmental Lien that could not reasonably be expected to result in a Material Adverse Effect, or where the Loan Party has posted bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by any such Environmental Liens,

     (b)    comply, in all respects, with Environmental Laws, obtain and maintain in full force and effect all Environmental Permits and provide to Agent documentation of any compliance or non-compliance with Environmental Laws which Agent reasonably requests, except, in each case, for any such compliance or non-compliance or failure to comply, obtain or maintain that could not reasonably be expected to result in a Material Adverse Effect,

     (c)    promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto real property owned, leased or operated by any Loan Party and take any Remedial Actions with respect to such releases required  to come into compliance with applicable Environmental Law, except with respect to any such releases that would not reasonably be expected to result in a Material Adverse Effect, and

     (d)    promptly, but in any event within 15 Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) written notice that an Environmental Lien (other than a Permitted Lien) has been filed against any of the real or personal property of any Loan Party, (ii) written notice of commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party which Environmental Action could reasonably be expected to result in a Material Adverse Effect, and (iii) written notice of a violation, citation, or other administrative order arising under Environmental Laws with respect to a Loan Party, its operations or any of the real property owned, leased or operated by a Loan Party or for which a Loan Party may be liable, which could reasonably be expected to result in a Material Adverse Effect, and, in each case, to the extent failure to do so could reasonably be expected to cause a Material Adverse Effect, promptly take all action required to address and resolve such Environmental Lien, Environmental Action, violation, citation or other administrative order.

     5.10    **Disclosure Updates**.  Borrower will, promptly and in no event later than 10 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to the Lender Group (other than the projections, budgets, estimates, forward-looking statements, information of a general economic nature, general information about Borrower's industry or general market data), at the time it was furnished (and when taken as a whole), contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (when taken as a whole) not materially

misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.11    **[Reserved]**.

5.12    **Further Assurances**. Subject to the limitations and exceptions on creation and perfection set forth herein and in the DIP Orders and the other DIP Loan Documents, Parent will, and will cause each of the other Loan Parties to, at any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, mortgages, deeds of trust, opinions of counsel, and all other documents (the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect (unless perfection is not required by the DIP Loan Documents), and continue perfected (unless perfection is not required by the DIP Loan Documents) or to better perfect (unless perfection is not required by the DIP Loan Documents) Agent's DIP Liens in all of the assets of the Loan Parties, other than Excluded Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect DIP Liens (subject to Permitted Liens) in favor of Agent in any Real Property acquired in fee by any Loan Party that is also subject to perfected Liens securing the ABL DIP Facility (or, if the ABL DIP Facility has been paid in full, to the extent such Real Property has a fair market value greater than $1,000,000), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents; provided that (i) the foregoing shall not apply to any Excluded Subsidiary, (ii) no action in any jurisdiction outside of the United States and Canada or required by the laws of any jurisdiction outside of the United States and Canada shall be required in order to create any security interests in assets located or titled outside of the United States or Canada or to perfect any security interests therein (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any jurisdiction outside of the United States and Canada), (iii) no action shall be required to perfect security interests in aircraft, railcars and other assets perfected under a federal filing system (other than intellectual property), and (iv) no action shall be required to perfect any DIP Collateral as to which Agent agrees that the costs of taking such actions are excessive in relation to the benefit to the Lenders of the security to be afforded thereby (the foregoing clauses (i) through (iv) collectively, the "Excluded Actions"). Notwithstanding anything herein or in any other DIP Loan Document to the contrary, the Loan Parties shall not be required to obtain or deliver any consents or approvals from any applicable Chinese Governmental Authority in connection with its 65% pledge of the Equity Interests of Hollander China or PCF (Shanghai) Quality Management Consulting Co., Ltd. To the maximum extent permitted by applicable law, if any Loan Party refuses or fails to execute or deliver any reasonably requested Additional Documents within a reasonable period of time following the request to do so and receipt of execution versions of such Additional Documents, each Loan Party hereby authorizes Agent to execute any such Additional Documents in the applicable Loan Party's name and authorizes Agent to file such executed Additional Documents in any appropriate filing office. In furtherance of, and not in limitation of, the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the DIP Facility Obligations are guaranteed by the Guarantors and are secured by substantially

all of the assets of Parent and its Subsidiaries, including all of the outstanding capital Equity Interests of Borrowers and Borrowers' Subsidiaries (subject to exceptions and limitations contained herein and in the other DIP Loan Documents on creation and perfection, including, in so far as the DIP Facility Obligations are concerned, with respect to any Subsidiary described in clause (d) of the definition of Excluded Subsidiary). Notwithstanding anything herein to the contrary, (i) none of the Borrowers shall be required to make any filing or recording in connection with any intellectual property with any jurisdiction outside the United States or Canada, and (ii) the Agent and Lenders agree that they will not require the filing of any mortgages or entry into any control agreements (other than in respect of the TL Deposit Account pursuant to Section 5.19) with respect to the Collateral on the Effective Date, it being understood and agreed that the Required Lenders may, in their reasonable discretion, at any time after the Effective Date require the satisfaction of any requirements for the granting or perfection of liens required or desirable pursuant to any foreign applicable laws, provided, however, that (x) the Loan Parties shall be given a reasonable amount of time to satisfy such requirements and (y) no such request will be made to the extent the costs and burden of doing so reasonably outweigh the benefits to be gained as reasonably determined by the Required Lenders.

5.13    **Compliance with ERISA and the IRC**. In addition to and without limiting the generality of Section 5.8, Parent will and will cause each of its Subsidiaries to, (a) comply with applicable provisions of ERISA and the IRC with respect to all Employee Benefit Plans except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect, (b) without the prior written consent of Agent and the Required Lenders, not take any action or fail to take action which could reasonably be expected to result in a Loan Party or ERISA Affiliate incurring a liability to the PBGC or to a Multiemployer Plan (other than to pay contributions or premiums payable in the ordinary course) that could reasonably be expected to result in a Material Adverse Effect, (c) not allow any facts or circumstances to exist with respect to one or more Employee Benefit Plans that, in the aggregate, reasonably could be expected to result in a Material Adverse Effect, (d) not participate in any prohibited transaction that could result in a civil penalty excise tax, fiduciary liability or correction obligation under ERISA or the IRC that could reasonably be expected to result in a Material Adverse Effect, (e) operate each Employee Benefit Plan in such a manner that will not incur any tax liability under the IRC (including Section 4980B of the IRC) except where failure to do so could not reasonably be expected to result in a Material Adverse Effect, and (f) furnish to Agent upon Agent's written request such additional information about any Employee Benefit Plan for which any Loan Party or ERISA Affiliate could reasonably expect to incur any liability that could reasonably be expected to result in a Material Adverse Effect. With respect to each Pension Plan (other than a Multiemployer Plan) except as could not reasonably be expected to result in a Material Adverse Effect, the Loan Parties shall (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the material contribution and funding requirements of the IRC and of ERISA, and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any material late payment or underpayment charge or penalty, all premiums required pursuant to ERISA.

5.14    **Pre-Petition Credit Enhancements**. If any Pre-Petition Term Agent or Pre-Petition Term Lender, in its capacity as such, or if the Senior ABL Facility Agent or any Senior ABL Facility Lender receives any additional guaranty after the date hereof (other than from Canadian Loan Parties (as defined in the ABL DIP Facility Agreement as in effect on the date

hereof)), the Borrower shall cause the same to be granted to the Agent, for its own benefit and the benefit of the Secured Parties (subject to the DIP Orders).

5.15    **Bankruptcy Covenants**.  Notwithstanding anything in the DIP Loan Documents to the contrary, the Loan Parties shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

5.16    **Chapter 11 Cases**.

(a)    Chapter 11 Case Documents and Notices.  Each Loan Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable, all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Loan Parties with the Bankruptcy Court to the Agent and its counsel.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrower shall provide (x) copies to the Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court, distributed by or on behalf of the Loan Parties to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any DIP Loan Document and (y) such other reports and information as the Agent may, from time to time, reasonably request.  In connection with the Chapter 11 Cases, the Loan Parties shall give the proper notice for (x) the motions seeking approval of the DIP Loan Documents and the DIP Orders and (y) the hearings for the approval of the DIP Orders.  The Borrower and the other Loan Parties shall give, on a timely basis as specified in the DIP Orders, all notices required to be given to all parties specified in the DIP Orders.  The Borrower and the other Loan Parties shall use reasonable best efforts to obtain the Final DIP Order.

(b)    Progress Calls.  Starting in the first week following the Effective Date, and thereafter every other week until the payment in full in cash of the DIP Facility Obligations, Borrower and the Financial Advisor will participate in a conference call with the Agent and the Lenders and their representatives, consultants, and agents, at such mutually convenient dates and times to be proposed by Agent upon reasonable notice, and will use commercially reasonable efforts to cause available senior members of management and any investment bankers and other advisors of Parent and its Subsidiaries, as applicable or as requested by Agent or such Lenders, and solely to the extent reasonably requested by Agent, one or more members of the board of directors of Parent and its Subsidiaries, to participate in such calls for the purpose of discussing the status of the financial, collateral, and operational condition, businesses, liabilities, assets, and prospects of the Borrower and their Subsidiaries and any sale, refinance or other strategic transaction efforts; provided, that the Borrower acknowledges that such calls scheduled as frequently as once per week shall not be unreasonable.  Upon Agent's reasonable request, and subject to any confidentiality restrictions, the Parent and its Subsidiaries shall promptly provide copies of all non-privileged material written materials and reports (in each case excluding drafts) produced by Parent and its Subsidiaries and shared with third parties in connection with any sale, refinance, or other strategic transaction efforts, and any written indications of interest, letters of intent and commitment letters received by Parent and its Subsidiaries relating to such sale, refinance, or other strategic transaction efforts of the Parent and its Subsidiaries; provided, that such materials may be redacted to the extent information contained therein would adversely affect any attorney-client privilege or accountant-client privilege, and further provided that only

final versions of such documents shall be provided. Without limiting the foregoing, Borrower agrees to notify Agent promptly upon Borrower becoming aware of any material change or development relating to any sale or refinance efforts or to the financial, collateral, or operational condition, businesses, assets, liabilities, or prospects of such Borrower, any of its Affiliates, or any of their respective Subsidiaries.

(c)    Restructuring Proposals.  Each Loan Party shall promptly deliver or cause to be delivered to the Agent and the Lenders copies of any term sheets, proposals, or presentations from any party, related to (i) the restructuring of the Loan Parties, or (ii) the sale of assets of one or all of the Loan Parties.

(d)    Advisors.  The Loan Parties shall continue to retain the Financial Advisor. The Loan Parties shall allow the Agent and the Lenders access to, upon reasonable notice during normal business hours in a time and manner (and with a frequency) to minimize disruption to the Loan Parties, the Financial Advisor and any other third party advisors of the Loan Parties, as applicable.

(e)    Repayment of Indebtedness.  Except to the extent permitted hereunder, under the DIP Orders or under the Approved Budget, no Loan Party shall, without the express prior written consent of the Agent and Required Lenders or pursuant to an order of the Bankruptcy Court after notice and a hearing, make any Pre-Petition Payment.

(f)    [Reserved].

5.17    **Accounting Changes**.  Parent agrees that no Subsidiary of a Loan Party will have a fiscal year different from that of Parent (unless otherwise agreed to by Agent in its reasonable discretion) and agrees to maintain a system of accounting that enables Parent to produce financial statements with respect to material financial transactions and matters involving the assets and business of Parent or any of its Subsidiaries, as the case may be, in accordance with GAAP (it being understood and agreed that certain foreign Subsidiaries may maintain individual books and records in conformity with general accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach).

5.18    **Use of Proceeds**.  Parent will, and will cause each of its Subsidiaries to, use the proceeds of the DIP Loans only for the purposes set forth in Section 4.28.

5.19    **TL Deposit Account**.  All proceeds of the DIP Loans shall be held in the TL Deposit Account.  The Borrower shall use commercially reasonable efforts to enter into a Control Agreement in respect of the TL Deposit Account within 14 days of the Petition Date, which such Control Agreement shall establish "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the Agent for the benefit of the Lenders, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders).

5.20    **Budget Matters**.  The Borrower hereby acknowledges and agrees that any Weekly Cash Flow Forecast provided to the Agent and the Lenders shall not amend and supplement the applicable Approved Budget until the Agent delivers a notice (which may be delivered by electronic mail) to the Borrower stating that the Agent and the Required Lenders

have approved of such Weekly Cash Flow Forecast (such approval not to be unreasonably withheld, delayed or conditioned); provided, that if the Agent does not deliver a notice of approval to the Borrower, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Weekly Cash Flow Forecast is agreed to among the Borrower, the Agent and the Required Lenders in accordance with this Section 5.20. Once such Weekly Cash Flow Forecast is so approved in writing by the Agent and the Required Lenders, it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget.

## 6.    NEGATIVE COVENANTS.

Each of Parent and Guarantors and Borrower covenants and agrees that, until termination of all of the DIP Loan Commitments and payment in full of the DIP Facility Obligations:

6.1    **Indebtedness**.  Parent will not, and will not permit any of its Subsidiaries to create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens**.  Parent will not, and will not permit any of its Subsidiaries to create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes**.  Parent will not, and will not permit any of its Subsidiaries to,

(a)    enter into any merger, consolidation, amalgamation, statutory division, reorganization, or recapitalization, or reclassify its Equity Interests;

(b)    liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for pursuant to a confirmed chapter 11 plan of reorganization, the terms and conditions of which are satisfactory to Agent and all Lenders and is consistent with the terms and conditions of the RSA;

(c)    suspend or cease operating a material portion of its or their business, except as permitted pursuant to clauses (a) or (b) above or in connection with a transaction permitted under Section 6.4;

(d)    take any action to change or have the effect of changing (i) the tax classification of Parent or any of its Subsidiaries from the classification as of the Effective Date or (ii) the legal form of Parent or Holdings; or

(e)    form any new Subsidiary without Agent's prior written consent; provided, that, to the extent the Agent consents to the formation of any new Subsidiary, such new Subsidiary shall guaranty all of the DIP Facility Obligations and grant Liens on substantially all of its assets to secure the DIP Facility Obligations pursuant to documentation in form and substance acceptable to Agent.

40

6.4    **Disposal of Assets**.  Other than Permitted Dispositions or transactions expressly permitted by Sections 6.2, 6.3, 6.7, or 6.9, Parent will not, and will not permit any of its Subsidiaries to convey, sell, lease, license, assign, transfer, or otherwise dispose of any of its or their assets.

6.5    **Nature of Business**.  Parent will not, and will not permit any of its Subsidiaries to make any change in the nature of its or their business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent Parent and its Subsidiaries from engaging in any business that is reasonably related or ancillary to its or their business.

6.6    **Prepayments and Amendments**.  Parent will not, and will not permit any of its Subsidiaries to,

(a)    make any prepayment on account of Indebtedness that has been contractually subordinated in right of payment or security to the DIP Facility Obligations if such payment is not permitted at such time under the subordination terms and conditions applicable thereto, or

(b)    directly or indirectly, amend, modify, or change any of the terms or provisions of:

(i)    the Governing Documents of any Loan Party or any of its Subsidiaries if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of the Lenders;

(ii)    the Management Services Agreement, in each case, except any such amendment, modification, alteration, increase, or change that, as a whole, is more favorable to Loan Parties; provided, however, that no such amendment, modification, alteration, increase or change to the Management Services Agreement shall increase the amount of fees payable thereunder,

(iii)    the ABL DIP Facility Documents or the Senior ABL Facility Documents except in accordance with the Intercreditor Agreement.

6.7    **Restricted Payments**.  Parent will not make any Restricted Payment, except:

(a)    distributions by Parent to, or the making of loans to, any direct or indirect equity owner of Parent in amounts required for any direct or indirect equity owner to pay: (i) franchise and excise taxes (not in the nature of income taxes), and other fees and expenses, required to maintain its organizational existence, (ii) subject to the terms of Section 6.10(c), operating costs and expenses and other corporate overhead costs and expenses (including (A) administrative, legal, accounting, filing and similar expenses and (B) salary, bonus and other benefits payable to officers and employees of Parent or any direct or indirect parent company of Parent), in each case to the extent such costs, expenses, fees, salaries, bonuses and benefits are attributable to the ownership or operations of Parent and its Subsidiaries, are reasonable and incurred in the ordinary course of business for the benefit of Parent and its Subsidiaries, and (iii) the payments described in Section 6.10(c),

41

(b)    Restricted Payments required in connection with the DIP Orders, and

(c)    Borrower, HHFH and each of their Subsidiaries may make Permitted Tax Distributions to Parent.

6.8    **Accounting Methods**.  Parent will not, and will not permit any of its Subsidiaries to modify or change its fiscal year, fiscal quarter, or its method of accounting (other than (i) as may be required to conform to GAAP or (ii) to the extent consented to by Agent (such consent not to be unreasonably withheld, conditioned or delayed)).

6.9    **Investments**.  Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, make or acquire any Investment except for Permitted Investments.

6.10    **Transactions with Affiliates**.  Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction or series of related transactions with any Affiliate of Parent or any of its Subsidiaries except for:

(a)    any existing transactions between Parent or its Subsidiaries, on the one hand, and any Affiliate of Parent or Parent's Subsidiaries, on the other hand, entered into prior to the Effective Date and any payments made pursuant thereto (other than to direct or indirect holders of Equity Interests in the Parent) to the extent permitted hereunder and made in accordance with the Approved Budget, provided (i) that the terms of such Affiliate Transaction are not less favorable, taken as a whole, to Parent or the applicable Subsidiary, as the case may be, than those that could be obtained at the time in a transaction with a Person who is not such an Affiliate, and (ii) no payments shall be permitted under the Management Services Agreement;

(b)    so long as it has been approved by Parent's or its applicable Subsidiary's Board of Directors in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of Parent, any direct or indirect parent of Parent or the applicable Subsidiary of Parent;

(c)    so long as it has been approved by Parent's or its applicable Subsidiary's Board of Directors in accordance with applicable law, to the extent set forth in the Approved Budget, the payment of reasonable compensation, insurance, expense reimbursement, indemnity (other than with respect to directors (or other comparable managers)), severance, and employee benefit arrangements to employees, individual contractors, officers, and directors (or comparable managers) of Parent, any direct or indirect parent of Parent or the applicable Subsidiaries of Parent in the ordinary course of business and consistent with industry practice;

(d)    transactions permitted by Section 6.3, Section 6.4, Section 6.7 or any Permitted Intercompany Advance;

(e)    Borrower shall be permitted to maintain any existing transactions (such transactions, "Affiliate Transactions") entered into prior to the Effective Date and any payments made pursuant thereto to the extent permitted hereunder and made in accordance with the Approved Budget; provided (i) that the terms of such Affiliate Transaction are not materially less favorable to the Borrower or such Subsidiary, as the case may be, than those that could be obtained at the time in a transaction with a Person who is not such an Affiliate and (ii) no

42

payments shall be permitted under the Management Services Agreement, (b) for any transaction between or among any of the Borrower or one or more Loan Parties, and (c) the Related Transactions, or any amendments or modifications thereto and permitted hereby, and any payments made pursuant thereto to the extent permitted hereunder and made in accordance with the Approved Budget;

(f)    any Loan Party may enter into transactions with any other Loan Party to the extent not otherwise prohibited hereunder;

(g)    any Subsidiary that is not a Loan Party may enter into transactions with any other Subsidiary that is not a Loan Party or any Affiliate thereof (other than any Loan Party) to the extent not otherwise prohibited hereunder;

(h)    transactions between any Loan Party, on the one hand, and any Canadian Loan Party (as defined in the ABL DIP Facility Documents), on the other hand (i) permitted under clause (g) of the definition of Permitted Dispositions and (ii) so long as such transactions are no less favorable, taken as a whole, to such Loan Party, than would be obtained in an arm's length transaction with a non-Affiliate and to the extent not otherwise prohibited hereunder;

(i)    transactions in existence on the Effective Date set forth on <u>Schedule 6.10</u>, and

(j)    the transactions contemplated by the Existing Participation Agreement (as defined in the ABL DIP Facility Documents), the Participation Agreement (as defined in the ABL DIP Facility Documents), the Participation Put Agreement (as defined in the ABL DIP Facility Documents), and the acquisition of a participation interest in the ABL DIP Obligations pursuant to the terms of the Participation Agreement (as defined in the ABL DIP Facility Documents).

Except for Permitted Intercompany Advances, as otherwise expressly permitted under this Agreement, and as set forth on <u>Schedule 6.10</u>, (i) no Loan Party shall enter into any transaction with, make any loan, advance or other Investment in, or otherwise transfer any property to any Subsidiary of Parent that is not a Loan Party and (ii) no Loan Party shall enter into any transaction with, make any loans, advances or other Investments in, or otherwise transfer any property constituting Term Loan Priority Collateral to any Canadian Loan Party (as defined in the ABL DIP Facility Documents).  Notwithstanding anything to the contrary in this <u>Section 6.10</u>, no payments shall be permitted under the Management Services Agreement.

6.11    <u>**Use of Proceeds**</u>.  Parent will not, and will not permit any of its Subsidiaries to use the proceeds of any DIP Loan made hereunder for any purpose other than as set forth in <u>Section 4.28</u>.

6.12    <u>**Limitation on Issuance of Equity Interests**</u>.  No Loan Party will issue or sell or enter into any agreement or arrangement for the issuance or sale of any of its Equity Interests other than a proposed debt-for-equity exchange to be authorized by an order confirming a chapter 11 plan of reorganization in the Chapter 11 Cases, the terms and conditions of which comply with the RSA.

6.13    **Parent Guarantors as Holding Companies**.  No Parent Guarantor will (a) incur any material liabilities (other than (i) liabilities arising under the DIP Loan Documents, the ABL DIP Facility Documents (or any agreement otherwise permitted hereunder and under the Intercreditor Agreement refinancing any of the facilities made pursuant to the ABL DIP Facility Documents in whole or in part), including Existing Secured Obligations under (and as defined in) the ABL DIP Facility Documents, and the Equity Documents, in each case to which it is a party, (ii) guarantees of leases and trade contracts in the ordinary course of business, (iii) liabilities arising under agreements with respect to Investments expressly permitted hereunder, (iv) indemnification obligations under the PCF Acquisition Agreement (as defined in the ABL DIP Facility Documents), (v) other Indebtedness permitted to be incurred by Parent Guarantors pursuant to Section 6.1, (vi) Tax liabilities, (vii) obligations under or in connection with the transaction contemplated herein, (viii) liabilities under the Management Services Agreement, and (ix) liabilities under employment or engagement agreements or agreements with employees, officers and directors)), (b) own or acquire any assets (other than (i) the Equity Interests of its Subsidiaries, (ii) immaterial assets which in the aggregate have de minimis value, (iii) contractual rights incidental or related to maintenance of its organizational existence and the issuance of its Equity Interests, (iv) Investments expressly permitted by Section 6.9 and contractual rights with respect thereto, (v) rights under or incidental to the PCF Acquisition Agreement (as defined in the ABL DIP Facility Documents), and (vi) rights under insurance policies) or (c) engage itself in any operations or business, except (i) in connection with its ownership of its Subsidiaries and its rights and obligations under the DIP Loan Documents, the ABL DIP Facility Documents (or any agreement otherwise permitted hereunder and under the Intercreditor Agreement refinancing any of the facilities made pursuant to the ABL DIP Facility Documents in whole or in part) and the Equity Documents, in each case to which it is a party (and activities incidental or related thereto), and (ii) activities incidental or related to holding the assets or incurring the liabilities permitted by this Section 6.13 and the maintenance of its organizational existence and the issuance of its Equity Interests.

6.14    **Sale and Leaseback Transactions**.  Parent will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

6.15    **Employee Benefits**.

Parent will not, and will not permit any of its Subsidiaries to:

(a)    Terminate, or permit any ERISA Affiliate to terminate, any Pension Plan in a manner, or take any other action with respect to any Plan, which could reasonably be expected to result in any liability of any Loan Party to the PBGC that could reasonably be expected to result in a Material Adverse Effect.

(b)    Subject to the DIP Orders, fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Benefit Plan, agreement relating thereto or applicable Law, any Loan Party or ERISA Affiliate is required to pay if such failure could reasonably be expected to have a Material Adverse Effect.

(c)    Permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Plan which exceeds $500,000 with respect to all Pension Plans in the aggregate which could reasonably be expected to result in a liability which exceeds $500,000 to any Loan Party.

(d)    Maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Canadian Defined Benefit Plan.

(e)    Terminate, or permit any Loan Party or Subsidiary thereof to terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan, which could reasonably be expected to result in any material liability of any Loan Party or a Subsidiary thereof.

(f)    Subject to the DIP Orders, fail to make, or permit any Subsidiary to fail to make, full payment when due of all amounts which, under the provisions of any Canadian Benefit Plan, agreement relating thereto or applicable Law, any Loan Party or Subsidiary thereof is required to pay if such failure could reasonably be expected to have a Material Adverse Effect.

6.16    **Burdensome Agreements**.

Parent will not, and will not permit any of its Subsidiaries to, enter into any contractual obligation that: limits the ability (x) of any Subsidiary to make loans, advances, or Restricted Payments to any Loan Party; (y) of any Subsidiary to guarantee the DIP Facility Obligations under the DIP Loan Documents or (z) of Parent or any of its Subsidiaries to create, incur, assume or suffer to exist Liens on property of such Person to secure the DIP Facility Obligations of the Loan Parties under the DIP Loan Documents, other than, in each case limitations and restrictions:

(a)    set forth in this Agreement and any other DIP Loan Document;

(b)    set forth in the ABL DIP Facility Documents (including Existing Secured Obligations under (and as defined in) the ABL DIP Facility Document) as in effect on the date hereof or as modified in accordance with the Intercreditor Agreement (or in any agreement otherwise permitted hereunder and under the Intercreditor Agreement which refinances any of the facilities made pursuant to the ABL DIP Facility Documents in whole or in part),

(c)    on subletting or assignment of any leases or licenses of Parent or any Subsidiary or on the assignment of a contractual obligation or any rights thereunder or any other customary non-assignment provisions, in each case entered into in the ordinary course of business,

(d)    set forth in contractual obligations for the disposition of assets (including any Equity Interests in any Subsidiary and including pursuant to any sale and leaseback transactions permitted hereunder) of Parent or any Subsidiary of Parent; provided, such restrictions and conditions apply only to the assets or Subsidiary that is to be sold and cease to apply upon the consummation of such sale,

(e)      set forth in any contractual obligation governing Indebtedness permitted under clauses (a), (b), (f), (g), (i) and (t) of the definition of "Permitted Indebtedness",

(f)      with respect to cash or other deposits (including escrowed funds) received by Parent or any Subsidiary in the ordinary course of business and assets subject to Liens permitted by under clauses (k), (p), (r), (t), (v) and (y) of the definition of "Permitted Lien", or

(g)      set forth in joint venture agreements and other similar agreements concerning joint ventures and applicable solely to such joint venture and that restrict the transfer of Equity Interests in such joint venture.

6.17      **Sanctions**.      Parent will not, and will not permit any of its Subsidiaries to, knowingly permit the proceeds of any DIP Loan to be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, in each case, that would constitute a violation of applicable Laws.

6.18      **Chapter 11 Claims**.      Except for the Carve-Out and Permitted Priority Liens and as provided in the DIP Orders, Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien that is pari passu with or senior to the claims or DIP Liens, as the case may be, of the Agent and the Lenders hereunder or under the DIP Orders, or apply to the Bankruptcy Court for authority to do so.  Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, (a) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of any DIP Order except for any modifications and amendments agreed to in writing by the Agent and the Required Lenders, such agreement to be made in their sole discretion, or (b) apply to the Bankruptcy Court for authority to take any action prohibited by this Section 6 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Agent and the Required Lenders, such consent not to be unreasonably withheld, delayed or conditioned).

6.19      **Compliance with Approved Budget**.

(a)      Except as otherwise provided herein or approved by the Agent (at the direction of the Required Lenders, in their sole discretion), the Loan Parties will not, and will not permit any Subsidiary thereof to, directly or indirectly, (a) use any cash, including the proceeds of any DIP Loans, in a manner or for a purpose other than those permitted under this Agreement or contemplated by the DIP Orders or the Approved Budget, (b) permit a disbursement causing any variance from the Approved Budget other than Permitted Variances without the prior written consent of the Agent (at the direction of the Required Lenders, in their sole discretion), (c) make any Pre-Petition Payment or application for authority to make any Pre-Petition Payment, other than those permitted by this Agreement, the DIP Orders or the Approved Budget, (d) make or commit to make payments to critical vendors (other than those critical vendors set forth in the DIP Orders or in the Approved Budget, in each case as approved in writing by the Agent at the direction of the Required Lenders) in respect of any pre-petition amount in excess of the amount included in the Approved Budget, (e) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash disbursements (in any event excluding disbursements for professional fees and expenses and restructuring expenses) as reported in the

46

Variance Reports delivered with respect to periods ending after the Petition Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period, (f) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings of DIP Loans) as reported in the Variance Reports delivered with respect to periods ending after the Effective Date through the end of such Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings of DIP Loans) forecast in the Approved Budget for the same such period, and (g) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual net cash flow (in any event excluding from the calculation thereof disbursements for professional fees and expenses and restructuring expenses) as reported in the Variance Reports delivered with respect to periods ending after the Petition Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Approved Budget for the same such period; and

      (b)    [Reserved].

6.20    **[Reserved]**.

6.21    **Use of DIP Collateral**.  No DIP Collateral, proceeds of DIP Loans, portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity for any of the following purposes (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

      (a)    to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the DIP Loans (except for the loans advanced under the ABL DIP Facility); or

      (b)    except as provided in the DIP Orders, to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any of the Agent, the Lenders, the Pre-Petition Term Agent, the Pre-Petition Term Lenders, the Senior ABL Facility Agent, the Senior ABL Facility Lenders, the ABL DIP Agent, the ABL DIP Lenders and any of their controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including (A) any claims or causes of action arising under Chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Facility Obligations, the DIP Liens hereunder, the DIP Loan Documents, the Pre-Petition Term Obligations, the Pre-Petition Term Facility Documents, the Pre-Petition Term Obligations, the Superpriority Claims, the ABL DIP

Facility Documents, the ABL DIP Obligations or the liens granted under the ABL DIP Facility, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Facility Obligations, the Pre-Petition Term Obligations or the ABL DIP Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (1) the Agent or the Lenders hereunder or under any of the DIP Loan Documents, (2) the Pre-Petition Term Agents or the Pre-Petition Term Lenders any of the Pre-Petition Term Facility Documents or (3) the ABL DIP Agent or the ABL DIP Lenders under any of the ABL DIP Facility Documents (in each case, including claims, proceedings or actions that might prevent, hinder or delay any assertions, enforcements, realizations or remedies on or against the DIP Collateral by any of the Agent, the Lenders, the Secured Parties, the Pre-Petition Term Agents, the Pre-Petition Term Lenders, the ABL DIP Agent or the ABL DIP Lenders under any of the Pre-Petition Term Facility Documents in accordance with the applicable DIP Loan Documents, Pre-Petition Term Facility Loan Documents, ABL DIP Facility Documents and the DIP Orders, as applicable), or (F) objecting to, contesting, or interfering with, in any way, the Agent's, the Lenders' and the Secured Parties' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; provided, however, that no more than $50,000 in the aggregate of the DIP Collateral, the Carve-Out or proceeds of the DIP Loans may be used by the Committee to investigate such claims and/or Liens.

6.22    **Access to TL Deposit Account**.  Parent will not, and will not permit any of its Subsidiaries to, withdraw funds from the TL Deposit Account after the occurrence and during the continuance of a Default or Event of Default.  Withdrawals from TL Deposit Account shall only be used for the permitted purposes described in Section 4.28.  Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the TL Deposit Account or the proceeds thereof held therein or credited thereto be used for any purpose not permitted under the DIP Orders.

7.    **[RESERVED]**.

8.    **EVENTS OF DEFAULT**.

Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, any of the following from and after the Effective Date shall constitute an "Event of Default", with the exception of any such event occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply with the requirements referenced in the subsections below:

8.1    **Payments**.  The Borrower shall fail to pay any principal of any DIP Loan when due in accordance with the terms hereof (whether at stated maturity, by mandatory prepayment or otherwise); or the Borrower shall fail to pay any interest on any DIP Loan, or any other amount payable hereunder, within two (2) Business Days after any such interest or other amount becomes due in accordance with the terms hereof.

8.2    **Representations and Warranties**.  Any representation or warranty made or deemed made by any Loan Party herein or in any other DIP Loan Document (or in any

amendment, modification or supplement hereto or thereto) or which is contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any such other DIP Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made.

8.3     **Loan Parties**.  Any Loan Party or any Subsidiary of a Loan Party (a) shall default in the payment, observance or performance of any term, covenant or agreement contained in Section 5.1, Section 5.2(a) or Section 6; or (b) shall default in the observance or performance of any other agreement contained in this Agreement or any other DIP Loan Document (other than as provided in Sections 8.1, 8.2 and 8.3(a)), and such default shall continue unremedied for a period of 30 days after the earlier of (A) the date on which a Responsible Officer of the Borrower becomes aware of such failure and (B) the date on which written notice thereof shall have been given to the Borrower by the Agent or the Required Lenders.

8.4     **Default Under Other Agreements**.

(a)     Any Loan Party or any of its Subsidiaries shall (i) default in (x) any payment of principal of or interest on (A) the ABL DIP Facility or (B) any Indebtedness (excluding the DIP Loans) in excess of $1,000,000, or (y) the payment of (A) any Guarantee Obligation in respect of the ABL DIP Facility or (B) any Guarantee Obligation in excess of $1,000,000 in each case referred to in this clause (i) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created, it being understood that Indebtedness and Guaranteed Obligations referred to in this clause (i) are limited solely to those not subject to  stay of proceedings in the Chapter 11 Cases; or (ii) default in the observance or performance of any other agreement or condition relating to any Indebtedness (excluding the DIP Loans) or Guarantee Obligation referred to in clause (i) above or contained in any instrument or agreement evidencing, securing or relating thereto or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice or lapse of time if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable (an "Acceleration"), and such time shall have lapsed and, if any notice (a "Default Notice") shall be required to commence a grace period or declare the occurrence of an event of default before notice of Acceleration may be delivered, such Default Notice shall have been given and such default shall not have been remedied or waived by or on behalf of such holder or holders; provided that the foregoing shall not apply to (A) any default under Indebtedness existing prior to the Petition Date and which has been accelerated by virtue of the filing of the Chapter 11 Cases, (B) any default due to Borrowers' filing, commencement and continuation of the Chapter 11 Cases and any litigation arising therefrom or (C) any default due to restrictions on payments arising as a result of the Chapter 11 Cases; and provided, further, that if any such default or event of default has been cured, waived or is otherwise no longer in existence, the Event of Default arising under this Section 8.4 shall be deemed to be cured, waived and no longer in existence).

(b)     Notwithstanding anything in this Section 8.4 to the contrary, to the extent a payment or covenant "Event of Default" (as defined in the ABL DIP Facility Agreement) is

waived in accordance with the ABL DIP Facility Agreement on or after the Effective Date, any such waiver shall automatically result in a waiver of any Event of Default under <u>Section 8.4</u> hereof in respect of such payment or covenant "Event of Default", solely to the extent Agent has not taken any enforcement action in respect of such Event of Default under <u>Section 8.4</u> hereunder.

8.5    **<u>Material Adverse Effect</u>**.  There shall have occurred after the Effective Date an event which has resulted in a Material Adverse Effect.

8.6    **<u>Change in Control</u>**.  A Change of Control shall have occurred.

8.7    **<u>Security Documents</u>**.  (i) Any of the DIP Loan Documents shall cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party which is a party to any such DIP Loan Document shall so assert in writing, (ii) the guarantee of the Guarantors contained in the Guaranty and Security Agreement shall cease, for any reason, to be in full force and effect, other than pursuant to the terms thereof or as a result of acts or omissions from the Lenders, or (iii) the DIP Lien created by any of the Security Documents and the DIP Orders shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the DIP Collateral (other than in connection with any termination of such DIP Lien in respect of any DIP Collateral as permitted hereby or by any Security Document) and such failure of such DIP Lien to be perfected and enforceable with such priority shall have continued unremedied for a period of twenty (20) days.

8.8    **<u>Loan Documents</u>**.  Any material provision of any DIP Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability of any provision shall be contested by any Loan Party, or a proceeding shall be commenced by any Loan Party, or by any Governmental Authority having jurisdiction over any Loan Party, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny that it has any liability or obligation purported to be created under any DIP Loan Document;

8.9    **<u>Termination Events; Milestones</u>**.  The occurrence of any of the following in any Chapter 11 Case (each, a "<u>Termination Event</u>"):

(a)    The reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order without the express prior written consent of the Agent (acting at the direction of the Required Lenders);

(b)    Without the written consent of the Agent acting at the direction of the Required Lenders, (A) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court ordering dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor in any of the Chapter 11 Cases, which dismissal, conversion or appointment shall not have been reversed, stayed or vacated within three (3) days, (B) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court ordering termination of the exclusive period for the Loan Parties to file a Plan in the Chapter 11 Cases, or (C) the Loan Parties shall seek or

request the entry of any order to effect any of the events described in subclause (A) of this clause (ii);

(c)     The entry by the Bankruptcy Court of an order granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code sought by any party that affects the Loan Parties' property (including, without limitation, to permit foreclosure or enforcement on the DIP Collateral) with a fair market value in excess of $500,000 without the written consent of the Agent (which consent shall not be unreasonably withheld, delayed or conditioned);

(d)     Three (3) Business Days after written notice to the Loan Parties of the failure by the Loan Parties to deliver to the Agent any of the documents or other written information required to be delivered pursuant to the DIP Orders when due (during which time the Loan Parties may cure) or any such documents or other written information shall contain a misrepresentation of a material fact when made so as to make the written information provided to the Agent and the Lenders, taken as a whole, materially misleading;

(e)     Except as set forth herein, the failure by the Loan Parties to observe or perform any of the material terms or provisions contained in the DIP Orders in any respect adverse to the interests of the Lenders;

(f)     The entry of an order of the Bankruptcy Court granting any lien on or security interest in any of the DIP Collateral that is pari passu with or senior to the DIP Liens held by the Agent on or as security interests in the DIP Collateral, the Adequate Protection Liens, the Superpriority Claims or the Pre-Petition Term Liens, in each case, other than any Liens in connection with any Permitted Intercompany Advances authorized by the DIP Orders, or the Loan Parties and any of their Subsidiaries shall seek or request (or support another party in the filing of) the entry of any such order, other than the ABL DIP Facility;

(g)     The Loan Parties' creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the Agent and the Lenders, the Adequate Protection Liens, the Superpriority Claims or the Pre-Petition Term Liens, except for the Carve-Out, the liens securing the Senior ABL Facility, the liens securing the ABL DIP Facility, and any Liens in connection with any Permitted Intercompany Advances authorized by the DIP Orders;

(h)     The Parent or any of its Subsidiaries filing a pleading, or in any way support another party's pleading, seeking to modify or otherwise alter any of the terms and conditions set forth in the DIP Orders in any respect adverse to the interests of the Lenders without the prior written consent of the Agent (acting at the direction of the Required Lenders), such consent to be given in its sole discretion;

(i)     The entry of an order of the Bankruptcy Court amending, supplementing or otherwise altering any of the terms and conditions set forth in the DIP Orders in any respect adverse to the interests of the Lenders without the prior written consent of the Agent (acting at the direction of the Required Lenders), such consent to be given in its sole discretion;

(j)     The Parent or any of its Subsidiaries using the proceeds of the DIP Facility for any item other than in compliance with Section 6.19 other than the Carve-Out, or makes any Pre-Petition Payment (other than the obligations under the Senior ABL Facility as contemplated

by the ABL DIP Facility and the DIP Orders or under the Approved Budget), in each case except as agreed in writing in advance by the Agent (acting at the direction of the Required Lenders);

(k)   Any of the Loan Parties or their Subsidiaries (or any party with the support of any of the Loan Parties) shall file a Plan in any of the Chapter 11 Cases that does not propose to indefeasibly repay the DIP Facility Obligations in full in cash, unless otherwise consented to by the Agent (acting at the direction of the Required Lenders) (such consent to be given in its sole discretion (it being agreed that such consent is deemed given with respect to the Plan attached to the RSA));

(l)   Any uninsured judgments are entered with respect to any post-petition liabilities against any of the Loan Parties or any of their respective properties in a combined aggregate amount in excess of $200,000 unless stayed, vacated or satisfied for a period of twenty (20) calendar days after entry thereof;

(m)   The failure of the Loan Parties to meet any of the following milestones (individually a "Milestone" and collectively, the "Milestones") unless extended or waived by the prior written consent of the Agent and the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), except to the extent such failure is reasonably the result of Bankruptcy Court unavailability:

(i)   The Interim DIP Order shall have been entered by the Bankruptcy Court on or before two (2) Business Days following the date of the First Day Hearing;

(ii)   On or before the date that is 7 days following the Petition Date, the Loan Parties shall have filed a motion requesting an order from the Bankruptcy Court approving bid procedures relating to the solicitations of qualified bids for the sale of substantially all of the Loan Parties' assets and business (the "Bidding Procedures"), which motion and Bidding Procedures shall each be in form and substance reasonably satisfactory to Agent (it being agreed that the proposed bidding procedures order filed with the Bankruptcy Court on the Petition Date is satisfactory to the Agent);

(iii)   The Final DIP Order shall have been entered by the Bankruptcy Court on or before forty (40) days following the date of the First Day Hearing;

(iv)   Within forty (40) calendar days of the Petition Date, but in any event no later than entry of the Final DIP Order, the Loan Parties shall file a plan of reorganization (the "Proposed Plan"), and a disclosure statement relating to such Plan (the "Disclosure Statement"), in each case, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders) (it being agreed that the plan of reorganization in the

form attached to the RSA is satisfactory to the Agent and the Lenders);

(v)     No later than forty-five (45) calendar days after the Petition Date, the Loan Parties shall have filed their Schedules and Statement of Financial Affairs pursuant to Section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure with the Bankruptcy Court;

(vi)    No later than forty-five (45) calendar days after the Petition Date the Bankruptcy Court shall have entered an order setting the date (the "Bar Date") by which proofs of claim for general unsecured creditors must be filed;

(vii)   On or before the date that is 45 days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders) (it being agreed that the proposed bidding procedures order filed with the Bankruptcy Court on the Petition Date is satisfactory to the Agent at the direction of the Required Lenders);

(viii)  The Bar Date shall have occurred on or before seventy-five (75) days following the Petition Date;

(ix)    No later than seventy-five (75) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and voting and solicitation procedures for the Proposed Plan in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders);

(x)     No later than one hundred ten (110) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Agent (acting at the direction of the Required Lenders) confirming the Proposed Plan (such date, the "Confirmation Date");

(xi)    No later than the Confirmation Date, Borrower shall have entered into a commitment letter reasonably acceptable to the Agent with respect to the funding of an exit asset-backed credit facility; and

(xii)   No later than one hundred twenty days (120) calendar days after the Petition Date, the Plan Effective Date shall have occurred.

(n)     Any Loan Party asserts a right of subrogation or contribution against any other Loan Party prior to the date upon which all DIP Loans under the DIP Facility have been paid in full and all DIP Loan Commitments have been terminated;

(o)     Any Loan Party shall seek to sell any of its assets that are Term Loan Priority Collateral outside the ordinary course of business, unless (i) the proceeds of such sale are used to indefeasibly pay the DIP Facility Obligations in full in cash unless such sale is consented to by the Agent (acting at the direction of the Required Lenders), or (ii) such sale is pursuant to bidding procedures approved by the Agent (acting at the direction of the Required Lenders);

(p)     The Parent or any of its Subsidiaries (or any party with the support of any of the Parent or any of its Subsidiaries) shall challenge the validity or enforceability of any of the DIP Loan Documents or the Pre-Petition Term Facility Documents;

(q)     Upon the consummation of a sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale are applied to indefeasibly satisfy in full the DIP Facility Obligations or (ii) such sale is consented to by the Agent (acting at the direction of the Required Lenders);

(r)     Payment of or granting adequate protection with respect to any Indebtedness that was existing prior to the Petition Date other than as expressly provided in the DIP Orders or permitted under the Intercreditor Agreement or as consented to by the Agent (acting at the direction of the Required Lenders).

8.10    **RSA**.  The termination of the RSA by any party thereto.

8.11    **ERISA**.  The occurrence of any of the following events to the extent it would have a Material Adverse Effect:  (a) any Loan Party or ERISA Affiliate fails to make full payment when due of all amounts which any Loan Party or ERISA Affiliate is required to pay as contributions, installments, or otherwise to or with respect to a Pension Plan or Multiemployer Plan, and such failure could reasonably be expected to result in liability to any Loan Party, (b) an accumulated funding deficiency or funding shortfall occurs or exists, whether or not waived, with respect to any Pension Plan, which could reasonably be expected individually or in the aggregate to result in liability to any Loan Party, (c) a Notification Event, which could reasonably be expected to result in liability to a Loan Party, either individually or in the aggregate, (d) any Loan Party or ERISA Affiliate completely or partially withdraws from one or more Multiemployer Plans and as a result of such withdrawal, any Loan Party would reasonably be expected to incur Withdrawal Liability, (e) any Loan Party or Subsidiary thereof fails to make full payment when due of all amounts which any Loan Party or Subsidiary thereof is required to pay as contributions, installments, or otherwise to or with respect to a Canadian Pension Plan, and such failure could reasonably be expected to result in liability to any Loan Party, or (f) with respect to (x) any Canadian Pension Plan, the occurrence of any Canadian Pension Termination Event or (y) if any trust, deemed trust or Lien has been or may be imposed on a Loan Party or Subsidiary thereof or its property as a result of the occurrence of such event and such trust, deemed trust or Lien, and in each case will or would reasonably be likely to result in a liability to the Loan Parties.

8.12    **Permitted Variances**. Permitted Variances under the Approved Budget are exceeded for any period of time.

8.13 **ABL DIP Facility**. The ABL DIP Agent and/or the Senior ABL Facility Agent imposes a reserve or block on availability of revolving loans in excess of $1,500,000 of such reserves or blocks in place on the Effective Date or otherwise modifies, changes or amends the calculation of the borrowing base in any manner that reduces availability under the ABL DIP Facility and/or the Senior ABL Facility by more than $1,500,000.

## 9. RIGHTS AND REMEDIES.

9.1 **Rights and Remedies**.

(a) If any Event of Default occurs and is continuing, then, and in any such event, notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any application, motion or notice, hearing before, or order from, the Bankruptcy Court but subject to the DIP Orders and any notice required thereunder, with the consent of the Required Lenders, the Agent may, or upon the request of the Required Lenders, the Agent shall, (i) by written notice to the Borrower, declare all of the DIP Loans hereunder, (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable, (ii) immediately terminate the Loan Parties' limited use of any cash collateral; (iii) cease making any DIP Loans under the DIP Facility; (iv) subject to the terms of the DIP Orders, sweep all funds contained in the TL Deposit Account; (v) subject to the terms of the DIP Orders and the Intercreditor Agreement, immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Agent or the Lenders against the DIP Facility Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Facility Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law to effect the repayment of the DIP Facility Obligations; provided that prior to the exercise of any right in clauses (ii), (v) or (vi) of this Section 9.1(a), the Agent shall be required to provide seven (7) Business Days written notice to the Loan Parties, the ABL DIP Agent, and the Committee (if any) of the Agent's intent to exercise its rights and remedies; provided, further, that neither the Loan Parties, the Committee (if any) nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the DIP Orders and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents. The Loan Parties shall cooperate fully with the Agent and the Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

(b) Except as expressly provided above in this Section 9, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

## 10. WAIVERS; INDEMNIFICATION.

10.1 **Demand; Protest; etc.** Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper,

and guarantees at any time held by the Lender Group on which Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral**.  Borrower hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrower.

10.3    **Indemnification**.  Borrower and each Guarantor shall pay, indemnify, defend, and hold Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to (1) the execution and delivery, advising, structuring, drafting, reviewing, administering or syndicating, or the monitoring of Parent's and its Subsidiaries' compliance with the terms of, the DIP Loan Documents (provided that any legal fees incurred in connection therewith shall be limited to the reasonable fees and reasonable out-of-pocket expenses of one primary counsel, which shall be King & Spalding LLP, for all Indemnified Persons (taken as a whole) (and, solely in the case of an actual conflict of interest, one additional counsel as necessary to the affected Indemnified Persons taken as a whole) and to the extent reasonably necessary, one local counsel in each relevant material jurisdiction, or (2) enforcement (including in connection with the Chapter 11 Cases) of this Agreement, any of the other DIP Loan Documents, or the transactions contemplated hereby or thereby (provided, that the indemnification in this clause (a) shall not extend to (i) any dispute among Indemnified Persons that does not arise out of an act or omission by Borrower or any other Loan Party or Subsidiary thereof (other than any claims against Agent in its capacity as such), or (iii) any Taxes or any costs attributable to Taxes, other than any Taxes that represent losses, claims, damages or other similar amounts arising from any non-Tax Claim), (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other DIP Loan Document, the making of any DIP Loans hereunder, or the use of the proceeds of the DIP Loans provided hereunder (irrespective of whether any Indemnified Person or Loan Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any violation of Environmental Law by Parent or any of its Subsidiaries, any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by Borrower or any of its Subsidiaries, or any Environmental Actions against, Environmental Liabilities of, or Remedial Actions required of, Parent or any of its Subsidiaries, or related in any way to any operations, assets or properties of Borrower or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrower shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any (a) material breach of such Indemnified Person of its obligations (or the obligations of such Indemnified

Persons' Agent-Related Persons) under the DIP Loan Documents, as finally determined by a court of competent jurisdiction or (b) Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment in full of the DIP Facility Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto. **WITHOUT LIMITATION, EXCEPT AS SET FORTH ABOVE, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON**.

## 11.   NOTICES.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other DIP Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to Parent, Borrower or Agent, as the case may be, they shall be sent to the respective address set forth below:

If to Parent or Borrower:  **HOLLANDER SLEEP PRODUCTS, LLC**
6501 Congress Avenue Suite 300
Boca Raton, Florida  33487
Attn:  Stephen Cumbow
Fax No.  561-214-4030

with copies to (which shall   **SENTINEL CAPITAL PARTNERS, L.L.C.**
not constitute notice or   330 Madison Avenue, 27th Floor
service of process):   New York, NY 10017
Attn:  Michael Fabian
Fax No. (212) 688-6513

**KIRKLAND & ELLIS, LLP**
601 Lexington Avenue
New York, NY 10022
Attn:  Yongjin Im
Fax No. (212) 446-6460

If to Agent:   **BARINGS FINANCE LLC**
300 South Tryon Street, Suite 2500
Charlotte, North Carolina 28202

Attn: Brady Sutton
Fax No. (413) 226-3953

with copies to (which shall
not constitute notice or
service of process):

**KING & SPALDING LLP**
1185 6th Avenue
New York, NY
Attn: W. Austin Jowers
Fax No. (212) 556-2222

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 11</u>, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; <u>provided</u>, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

**12.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.**

(a)    **THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

(b)    Each party hereto hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other DIP Loan Documents to which it is a party to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "<u>New York Supreme Court</u>"), and the United States District Court for the Southern District of New York (the "<u>Federal District Court</u>," and together with the New York Supreme Court, the "<u>New York Courts</u>") and appellate courts from either of them except to the extent that the provisions of the Bankruptcy Code are

applicable and specifically conflict with the foregoing; provided that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the DIP Collateral or any other security for the DIP Facility Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this Section 12 would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment and (iii) if all such New York Courts decline jurisdiction over any Person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction;

(ii)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

(iii)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, the applicable Lender or the Agent, as the case may be, at the address specified in Section 11 or at such other address of which the Agent, any such Lender and the Borrower shall have been notified pursuant thereto;

(iv)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 12 any consequential or punitive damages.

Notwithstanding any other provision of this Section 12, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this agreement or the other DIP Loan Documents.

## 13.   ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.

### 13.1   **Assignments and Participations**.

(a)     (i)     Subject to the conditions set forth in <u>clause (a)(ii)</u> below, any Lender may assign and delegate all or any portion of its rights and duties under the DIP Loan

Documents (including the DIP Facility Obligations owed to it and its DIP Loan Commitments) to one or more assignees so long as such prospective assignee is an Eligible Transferee (each, an "Assignee"), without the prior written consent of Borrower; and

(ii)    Assignments shall be subject to the following additional conditions:

(A)    no assignment may be made to a natural person;

(B)    the amount of the DIP Loan Commitments and DIP Loans and the other rights and obligations of the assigning Lender hereunder and under the other DIP Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be in a minimum amount of $1,000,000 (or lesser amounts, if agreed between Borrower and Agent, or otherwise if less, all of such Lender's remaining DIP Loan Commitments and DIP Loans) and in integral multiples of $100,000 in excess thereof, except such minimum amount shall not apply to (I) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender or (II) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $1,000,000);

(C)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(D)    the parties to each assignment shall execute and deliver to Agent an Assignment and Acceptance; provided, that Borrower and Agent may continue to deal solely and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrower and Agent by such Lender and the Assignee;

(E)    unless waived by Agent (and except in the case of an assignment to an Affiliate or Related Fund of the assigning Lender), the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500;

(F)    [intentionally omitted]; and

(G)    no assignment may be made to any Disqualified Lender.

(b)    From and after the date that Agent receives the executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have

been assigned to it pursuant to such Assignment and Acceptance, shall be a "Lender" and shall have the rights and obligations of a Lender under the DIP Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other DIP Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 15.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other DIP Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other DIP Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other DIP Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other DIP Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Loans assigned to it arising therefrom.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons, other than a Disqualified Lender (a "Participant") participating interests in all or any portion of its DIP Facility Obligations, its DIP Loan Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other DIP Loan Documents and the Participant receiving the participating interest in the DIP Facility Obligations, the DIP Loan

Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other DIP Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrower, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other DIP Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other DIP Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other DIP Loan Document would (A) extend the final maturity date of the DIP Facility Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the DIP Facility Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the DIP Collateral or guaranties (except to the extent expressly provided herein or in any of the DIP Loan Documents) supporting the DIP Facility Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decrease the amount or postpone the due dates of scheduled principal repayments or prepayments or premiums payable to such Participant through such Lender (for the avoidance of doubt, mandatory prepayments pursuant to Section 2.4(d)(ii) or Section 2.4(d)(iii) may be postponed, delayed, waived or modified without the consent of a Participant), (v) no participation shall be sold to a natural person, (vi) [intentionally omitted], and (vii) all amounts payable by Borrower hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that each Participant shall be entitled to the benefits of Section 16 as if it were a Lender provided such Participant delivers the forms and documentation required by Section 16 (it being understood that the documentation under Section 16 shall be delivered to the Participating Lender) and otherwise agrees in writing to be subject to Section 16 as if it were a Lender. Subject to the foregoing, sentence, the rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other DIP Loan Documents or any direct rights as to the other Lenders, Agent, Borrower, the Collateral, or otherwise in respect of the DIP Facility Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)    In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.9, disclose all documents and information which it now or hereafter may have relating to Parent and its Subsidiaries and their respective businesses.

(g)    Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and

interest in this Agreement to secure obligations of such Lender, including any security interest or pledge in favor of any Federal Reserve Bank (or any central bank having jurisdiction over such Lender) in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and the holder of such security interest or pledge (including such Federal Reserve Bank or central bank) may enforce such pledge or security interest in any manner permitted under applicable law. Without limiting the foregoing, in the case of any Lender that is a fund that invests in bank loans and similar extensions of credit, such Lender may, without the consent of Agent or any other Person, collaterally assign or pledge all or any portion of its rights as a Lender under the DIP Loan Documents to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued by such fund, as security for such obligations or securities.

(h)        Agent (as a non-fiduciary agent on behalf of Borrower) shall maintain, or cause to be maintained, a register (the "Register") in the United States on which it enters the name and address of each Lender as the registered owner of the DIP Loan Commitments, the principal amount of DIP Loans owing to it and stated interest thereon, held by such Lender (each, a "Registered Loan"). A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide), and any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any evidencing the same), Borrower shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary, absent manifest error. This Section 13.1(h) shall be construed so that the DIP Loans are at all times maintained in "registered form" within the meaning of Section 5f.103-1(b) of the United States Treasury Regulation.

(i)        In the event that a Lender sells participations in the Registered Loan, such Lender, as a non-fiduciary agent on behalf of Borrower, shall maintain (or cause to be maintained) a register in accordance with Section 5f.103-1(c) of the United States Treasury Regulations and Section 163(f), 165(g), 871(h)(2), 881(c)(2) and 4701 of the IRC on which it enters the name of all participants in the Registered Loans held by it (and the principal amount (and stated interest thereon) of the portion of such Registered Loans that is subject to such participations) (the "Participant Register"). A Registered Loan (and the Registered Note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any DIP Loan Document)

63

to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(j)     Agent shall make a copy of the Register available for review by Borrower from time to time as Borrower may reasonably request.

(k)     Lenders may not assign all or any portion of its DIP Loans hereunder to (i) the Parent or any of its Subsidiaries or (ii) any Person who, after giving effect to such assignment, would be an Affiliated Lender.

(l)     Notwithstanding anything in this Section 13.1 to the contrary, prior to any assignment or sale by any Lender (a "Selling Lender") as of the Effective Date to any Person that is not a Lender (or an Affiliate of a Lender) as of the Effective Date, such Selling Lender shall notify (a "Notice of Intent to Assign") the Agent of its intent to assign or sale its interests in its DIP Facility Obligations, including the amount of DIP Facility Obligations the Selling Lender seeks to assign or sell (the "Available DIP Obligations"). The Agent shall, within one Business Day, notify (such notification, a "Pending Assignment Notice") all Lenders of the Notice of Intent to Assign and the terms thereof. Each Lender shall have 3 Business Days (the "Election Period") to elect to purchase all of the Available DIP Obligations from the Selling Lender by delivering a notice (an "Election Notice") to the Agent. Each Election Notice shall include the amount of Available DIP Obligations such Lender is willing to purchase from the Selling Lender and the purchase price. The Selling Lender shall assign the Available DIP Obligations to the Lender that submitted an Election Notice within the Election Period, and such Lender shall purchase from the Selling Lender the Available DIP Obligations, for the highest price; provided, however, if two or more Lenders deliver an Election Notice during the Election Period for the same purchase price and that purchase price represents the highest purchase price submitted, then the Available DIP Obligations shall be assigned to such Lenders based on their Pro Rata Shares. If no Lenders submitted an Election Notice to the Agent within the Election Period, then the Selling Lender may proceed to seek to assign or sell the full amount of Available DIP Obligations set forth in the Notice of Intent to Assign (but not a partial or lesser amount) to any Eligible Transferee.

13.2    **Successors**.  This Agreement, the other DIP Loan Documents, and all Liens and DIP Liens and other rights and privileges created hereby or pursuant hereto or to any other DIP Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of any Loan Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other DIP Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agent and the Lenders and their respective assigns, transferees and endorsees. The Liens and DIP Liens created by this Agreement and the other DIP Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or

64

any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its Liens or DIP Liens under applicable law. This Agreement shall bind and inure to the benefit of the respective permitted successors and assigns of each of the parties; provided, that, except to the extent otherwise expressly permitted hereunder, Borrower may not assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by the Lenders shall release Borrower from its DIP Facility Obligations. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 and no consent or approval by any Loan Party is required in connection with any such assignment.

## 14.    AMENDMENTS; WAIVERS.

14.1    **Amendments and Waivers**.

(a)    No amendment, waiver or other modification of any provision of this Agreement, any other DIP Loan Document (other than the Fee Letter and the Intercreditor Agreement), and no consent with respect to any departure by Borrower or any other Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly and adversely affected thereby and all of the Loan Parties that are party thereto, do any of the following:

(i)    increase the amount of or extend the expiration date of any DIP Loan Commitment of such Lender (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default or mandatory prepayment pursuant to Section 2.4(d) (for clarity, excluding Section 2.4(d)(i)) shall not constitute an extension or increase of any DIP Loan Commitment),

(ii)    postpone or delay any date fixed by this Agreement or any other DIP Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other DIP Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 2.4(d) (for clarity, excluding Section 2.4(d)(i)) may be postponed, delayed, waived or modified with the consent of Required Lenders) due to such Lender,

(iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other DIP Loan Document other than the Fee Letter due to such Lender (except (i) in connection with the waiver of applicability of Section 2.6(c) and (ii) in connection with the waiver of a mandatory prepayment under Section 2.4(d) (for clarity, excluding Section 2.4(d)(i)), which, in each case, shall be effective with the written consent of the Required Lenders),

(iv)    amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)    amend the currency in which any DIP Loans or any other DIP Facility Obligations are payable to such Lender,

(vi)    [reserved],

(vii)    amend, modify, or eliminate the definitions of "Required Lenders", or "Pro Rata Share",

(viii)    other than in connection with a transaction permitted by the terms hereof or the other DIP Loan Documents, (x) release Borrower or (y) release or contractually subordinate all or substantially all of the value of the Guarantees or all or substantially all of the Collateral,

(ix)    amend, modify, or eliminate any of the provisions of Section 2.4(b)(i) or (ii), or

(x)    [reserved],

(b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other DIP Loan Documents, without the written consent of Agent, Borrower, and the Required Lenders.

(c)    [reserved].

(d)    For the avoidance of doubt, it is understood and agreed that each Lender shall be deemed directly and adversely affected by any amendments, modifications or waivers described in clauses (iv), (vii) (subject to the proviso in clause (vii)) or (viii) of Section 14.1(a).

(e)    [Intentionally Omitted].

(f)    Anything in this Section 14.1 to the contrary notwithstanding, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other DIP Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Parent or any Loan Party, shall not require consent by or the agreement of any Loan Party, and (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other DIP Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by Section 14.1(a)(i) through (iii) that affect such Lender.

Notwithstanding anything to the contrary herein, with the consent of Agent at the request of Borrower (without the need to obtain any consent of any Lender), any DIP Loan Document may be amended to cure any obvious error or any error or omission of a technical nature that is jointly identified by Agent and Borrower.

14.2    **Mitigation; Replacement of Certain Lenders**.

(a)    If any Lender requires Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 16, then such Lender shall (at the request of Borrower) use reasonable efforts to designate a different lending office for funding or booking its DIP Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 16 in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders, all Lenders, or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under Section 16, and has declined or is unable to designate a different lending office pursuant to Section 14.2(a), then Borrower or Agent, upon at least 5 Business Days prior irrevocable notice (or such shorter period as Agent may agree), may permanently replace any Lender (and its Affiliates) that failed to give its consent, authorization, or agreement (a "Non-Consenting Lender") or any Lender that made a claim for compensation (a "Tax Lender") with one or more Replacement Lenders, and the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, shall have no right to refuse to be replaced hereunder.  Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(c)    Prior to the effective date of such replacement, the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, being repaid in full its share of the outstanding DIP Facility Obligations (without any premium or penalty of any kind whatsoever, but including all interest, fees and other amounts that may be due in payable in respect thereof).  If the Non-Consenting Lender (or its Affiliates) or Tax Lender (or its Affiliates), as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name of and on behalf of the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Non-Consenting Lender (or its Affiliates) or Tax Lender (or its Affiliates), as applicable, shall be made in accordance with the terms of Section 13.1.  Until such time as one or more Replacement Lenders shall have acquired all of the DIP Facility Obligations, the DIP Loan Commitments, and the other rights and obligations of the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, hereunder and under the

other DIP Loan Documents, the Non-Consenting Lender (and its Affiliates) or Tax Lender (and its Affiliates), as applicable, shall remain obligated to make the Non-Consenting Lender's (and its Affiliates) or Tax Lender's (and its Affiliates), as applicable, Pro Rata Share of DIP Loans.

14.3    **No Waivers; Cumulative Remedies**.  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other DIP Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by the Parent Guarantors and Borrower of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other DIP Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

## 15.    AGENT; THE LENDER GROUP.

15.1    **Appointment and Authorization of Agent**.  Each Lender hereby designates and appoints Barings Finance LLC as its agent under this Agreement and the other DIP Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other DIP Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other DIP Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other DIP Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as agent for and on behalf of the Lenders on the conditions contained in this Section 15.  Any provision to the contrary contained elsewhere in this Agreement or in any other DIP Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other DIP Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other DIP Loan Document or otherwise exist against Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other DIP Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.  Each Lender hereby further authorizes Agent to act as the secured party under each of the DIP Loan Documents that create a DIP Lien on any item of DIP Collateral.  Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other DIP Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the DIP Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the DIP Facility Obligations, the DIP Collateral, payments and proceeds of DIP Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other

written agreements with respect to the DIP Loan Documents, (c) make DIP Loans, for itself or on behalf of Lenders, as provided in the DIP Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the DIP Collateral as provided in the DIP Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the DIP Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Parent or its Subsidiaries, the DIP Facility Obligations, the DIP Collateral, or otherwise related to any of same as provided in the DIP Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the DIP Loan Documents.

15.2    **Delegation of Duties.**  Agent may execute any of its duties under this Agreement or any other DIP Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Each member of the Lender Group and each Loan Party acknowledges and agrees that any agent appointed by Agent shall be entitled to the rights and benefits of this <u>Section 15</u>.  Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3    **Liability of Agent**.  None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other DIP Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by Parent or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other DIP Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other DIP Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other DIP Loan Document, or for any failure of Parent or its Subsidiaries or any other party to any DIP Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other DIP Loan Document, or to inspect the books and records or properties of Parent or its Subsidiaries.

15.4    **Reliance by Agent**.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrower or counsel to any Lender), independent accountants and other experts selected by Agent.  Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other DIP Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable.  If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability

and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other DIP Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

15.5   **Notice of Default or Event of Default**.   Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 9; provided, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6   **Credit Decision**.   Each Lender acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Parent and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower or any other Person party to a DIP Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrower. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other DIP Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower or any other Person party to a DIP Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower or any other Person party to a DIP Loan Document that may come into the possession of any of the Agent-Related Persons. Each Lender acknowledges that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender with any credit or other information with respect to Borrower, its Affiliates or any of its business, legal, financial or other affairs, and

irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement.

15.7    **Costs and Expenses; Indemnification**.  Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the DIP Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the DIP Collateral, whether or not Borrower is obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the DIP Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses by Parent or its Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable thereof. Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other DIP Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrower. The undertaking in this Section shall survive the payment of all DIP Facility Obligations hereunder and the resignation or replacement of Agent.

15.8    **Agents in Individual Capacity**.  Barings Finance LLC and its Affiliates may make loans to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Parent and its Subsidiaries and Affiliates and any other Person party to any DIP Loan Document as though it were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, Barings Finance LLC or its Affiliates may receive information regarding Parent or its Affiliates or any other Person party to any DIP Loan Documents that is subject to confidentiality obligations in favor of Parent or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include Barings Finance LLC in its individual capacity.

15.9   **Successor Agent**.  Agent may resign as Agent upon 30 days (10 days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice or applicable notice period is waived by the Required Lenders).  If Agent resigns under this Agreement, the Required Lenders shall be entitled, to appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders, a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders.  In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "<u>Agent</u>" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.   After any retiring Agent's resignation hereunder as Agent, the provisions of this <u>Section 15</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  If no successor Agent has accepted appointment as Agent by the date which is 30 days (10 days if an Event of Default has occurred and is continuing) following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10   **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide bank products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Parent and its Subsidiaries and Affiliates and any other Person party to any DIP Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Parent or its Affiliates or any other Person party to any DIP Loan Documents that is subject to confidentiality obligations in favor of Parent or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11   **Collateral Matters.**

(a)   The Lenders hereby irrevocably authorize Agent to release any DIP Lien on any DIP Collateral (i) upon the termination of the DIP Loan Commitments and payment and satisfaction in full by Borrower of all of the DIP Facility Obligations, (ii) constituting property being sold or disposed of (to Persons other than Loan Parties) if a release is required or desirable in connection therewith and if a Responsible Officer of Borrower certifies in writing to Agent that the sale or disposition is permitted under <u>Section 6.4</u> (and Agent may rely conclusively on any such certificate, without further inquiry), or (iii)  in connection with a credit bid or purchase authorized under this <u>Section 15.11</u>.  Notwithstanding anything to the contrary in the foregoing, to the extent property is sold or disposed of pursuant to and in accordance with <u>Section 6.4</u> (to Persons other than Loan Parties), the DIP Lien on such sold or disposed DIP Collateral shall

automatically terminate.  The Loan Parties and the Lenders hereby irrevocably authorize Agent, based upon the instruction of the Required Lenders, to (a) consent to, credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code and any similar laws in any other jurisdictions in which a Loan Party is subject, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the DIP Facility Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with DIP Facility Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the DIP Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the DIP Collateral that is the subject of such credit bid or purchase) and the Lenders whose DIP Facility Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their DIP Facility Obligations credit bid in relation to the aggregate amount of DIP Facility Obligations so credit bid) in the DIP Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the DIP Facility Obligations owed to the Lenders (ratably based upon the proportion of their DIP Facility Obligations credit bid in relation to the aggregate amount of DIP Facility Obligations so credit bid) based upon the value of such non-cash consideration.  Except as provided above, Agent will not execute and deliver a release of any DIP Lien on any DIP Collateral without the prior written authorization of (y) if the release is of all or substantially all of the DIP Collateral, all of the Lenders, or (z) otherwise, the Required Lenders.  Upon request by Agent or Borrower at any time, the Lenders will confirm in writing Agent's authority to release any such DIP Liens on particular types or items of DIP Collateral pursuant to this <u>Section 15.11</u>; <u>provided</u>, that (1) anything to the contrary contained in any of the DIP Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's reasonable opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such DIP Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the DIP Facility Obligations or any DIP Liens (other than those expressly released) upon (or obligations of Borrower in respect of) any and all interests retained by Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the DIP Collateral.

(b)      Agent shall have no obligation whatsoever to any of the Lenders (i) to verify or assure that the DIP Collateral exists or is owned by Parent or its Subsidiaries or is cared

for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's DIP Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of DIP Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the DIP Loan Documents, it being understood and agreed that in respect of the DIP Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the DIP Collateral in its capacity as one of the Lenders and that Agent shall not have any other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise expressly provided herein.

15.12  **Restrictions on Actions by Lenders; Sharing of Payments**.

(a)  Each of the Lenders agrees that it shall not, without the express written consent of Agent, set off against the DIP Facility Obligations, any amounts owing by such Lender to Parent or its Subsidiaries or any deposit accounts of Parent or its Subsidiaries now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any DIP Loan Document against Borrower or any Guarantor or to foreclose any DIP Lien on, or otherwise enforce any security interest in, any of the DIP Collateral.

(b)  If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of DIP Collateral or any payments with respect to the DIP Facility Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the DIP Facility Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the DIP Facility Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13  **Agency for Perfection**.  Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting Agent's DIP Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be

perfected by possession or control.  Should any Lender obtain possession or control of any such DIP Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such DIP Collateral to Agent or in accordance with Agent's instructions.

15.14    **Payments by Agent to the Lenders**.  All payments to be made by Agent to the Lenders shall be made as soon as reasonably practicable and, in any event, within two (2) Business Days of receipt from Borrower in immediately available funds, by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.  Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the DIP Facility Obligations.

15.15    **Concerning the Collateral and Related Loan Documents**.  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other DIP Loan Documents.  Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other DIP Loan Documents relating to the DIP Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

15.16    **[Intentionally Omitted]**.

15.17    **Several Obligations; No Liability**.  Notwithstanding that certain of the DIP Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective DIP Loan Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective DIP Loan Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the DIP Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 15.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for such Lender or on its behalf, nor to take any other action on behalf of such Lender hereunder or in connection with the financing contemplated herein.

15.18    **[Reserved]**.

# 16.    WITHHOLDING TAXES.

16.1    **Payments**.  All payments under the DIP Loan Documents by or on account of any obligation of any Loan Party will be made free and clear of, and without deduction or withholding for, any present or future Taxes, except as required by applicable law. If any Taxes

are required to be deducted or withheld from any payment by or on account of any obligation of any Loan Party under any DIP Loan Document, Borrower shall deduct, withhold or pay (as the case may be) the full amount of such Taxes to the relevant Governmental Authority and, if such Taxes are Indemnified Taxes, the amount payable by the Loan Parties shall be increased as is necessary so that after withholding or deduction for or on account of such Indemnified Taxes, the amount received by the applicable Recipient will not be less than the amount the applicable Recipient would have received had no such withholding or deduction in respect of Indemnified Taxes been made.  Borrower will furnish to Agent promptly after the date the payment of any Tax is due pursuant to applicable law, certified copies of tax returns and receipts (or such other similar documents as may be available) evidencing such payment by Borrower, or other evidence of payment reasonably satisfactory to Agent.  Borrower agrees to pay any present or future stamp, value added, court or documentary, intangible, recording, filing or similar taxes or any other excise or property taxes, charges, or similar levies, other than Excluded Taxes or Taxes resulting from an assignment ("Other Taxes") that arise from any payment made hereunder or from the execution, delivery, performance, recordation, registration, from the receipt or perfection of a security interest under, or filing of, or otherwise with respect to this Agreement or any other DIP Loan Document within 10 days after receipt of demand therefor.  The Loan Parties shall jointly and severally indemnify each Indemnified Person (as defined in Section 10.3) (collectively a "Tax Indemnitee") for the full amount of Indemnified Taxes or Other Taxes arising in connection with this Agreement or any other DIP Loan Document (including, without limitation, any Indemnified Taxes or Other Taxes imposed or asserted on, or attributable to, amounts payable under this Section 16) imposed on, or paid by, or required to be withheld on payments to, such Tax Indemnitee and all reasonable and documented fees and disbursements of attorneys, experts or consultants, and all other reasonable costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification, as and when they are incurred and irrespective of whether suit is brought, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. The obligations of Borrower and Loan Parties under this Section 16 shall survive the termination of this Agreement and the repayment of the Loans.

16.2    **Exemptions**.

(a)    Each Lender and Agent agrees to deliver to Agent and Borrower (and each Participant agrees to deliver to the Originating Lender), two original copies of the following forms, as applicable, before receiving its first payment under this Agreement, but only to the extent such Lender, Participant or Agent is legally entitled to deliver such forms:

(i)    if such Lender or Participant or Agent is a Foreign Lender entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of the Lender or Participant or Agent, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrower within the meaning of Section 864(d)(4) of

the IRC, and (B) a properly completed and executed IRS Form W-8BEN-E or Form W-8IMY (with proper attachments);

   (ii) if such Lender or Participant or Agent is a Foreign Lender entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN-E;

   (iii) if such Lender or Participant or Agent is a Foreign Lender entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

   (iv) if such Lender or Participant or Agent is a Foreign Lender entitled to claim that interest paid under this Agreement is exempt from United States withholding Tax because such Lender or Participant or Agent serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or

   (v) if such Lender or Participant or Agent is a U.S. Person, a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC as a condition to exemption from, or reduction of, United States withholding or backup withholding Tax.

   (b) Each Lender or Participant or Agent shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms, or if any such form becomes inaccurate in any respect, and promptly notify Agent and Borrower, or the Originating Lender in the case of a Participant, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

   (c) If a Lender or Participant or Agent is entitled to claim an exemption or reduction from withholding Tax in a jurisdiction other than the United States, such Lender or such Agent agrees with and in favor of Agent and Borrower or the Participant agrees with and in favor of the Originating Lender, to deliver to Agent and Borrower, or the Originating Lender in the case of a Participant, any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if such Lender or such Participant or such Agent is legally entitled to deliver such forms.  Nothing in this Section 16.2 shall require a Lender or Participant or Agent to disclose any information or provide documentation (i) that in Lender's reasonable judgment such completion, execution, submission would subject Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or (ii) that it deems to be confidential (including without limitation, its tax returns).  Each Lender and each Participant and each Agent shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent and Borrower, or the Originating Lender in the case of a Participant, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    If a Lender or Participant claims exemption from, or reduction of, withholding Tax and such Lender or Participant sells, assigns, grants a participation in, or otherwise transfers all or part of the DIP Facility Obligations of Borrower to such Lender or Participant, such Lender or Participant agrees to notify Agent and Borrower (or, in the case of a sale of a participation interest, to the Lender granting the participation) of the percentage amount in which it is no longer the beneficial owner of DIP Facility Obligations of Borrower to such Lender or Participant.  To the extent of such percentage amount, Agent and Borrower will treat such Lender's or the Originating Lender will treat such Participant's documentation provided pursuant to <u>Section 16.2(a)</u>, <u>16.2(c)</u> or <u>16.2(e)</u> as no longer valid.  With respect to such percentage amount, such Participant or Assignee shall provide new documentation to Agent and Borrower, or the Originating Lender in the case of a Participant, pursuant to <u>Section 16.2(a)</u>, <u>16.2(c)</u> or <u>16.2(e)</u>, if applicable.  Borrower agrees that each Participant shall be entitled to the benefits of this <u>Section 16</u> with respect to its participation in any portion of the DIP Loan Commitments and the DIP Facility Obligations so long as such Participant complies with the obligations set forth in this <u>Section 16</u> with respect thereto.

(e)    If a payment made to a Foreign Lender or Agent would be subject to United States federal withholding Tax imposed by FATCA if such Foreign Lender or Agent fails to comply with the applicable reporting requirements of FATCA, such Foreign Lender or Agent shall deliver to Agent and Borrower any documentation under any requirement of law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) or reasonably requested by Agent or Borrower sufficient for Agent or Borrower to comply with their obligations under FATCA and to determine whether such Foreign Lender or Agent has complied with such applicable reporting requirements.  Solely for purposes of this paragraph (e), "<u>FATCA</u>" shall include any amendments made to FATCA after the date of this Agreement.

16.3    **<u>Reductions</u>**.

(a)    If a Lender or a Participant is entitled to a reduction in the applicable withholding Tax, Agent (or, in the case of a Participant, the Lender granting the participation) or Borrower may withhold from any payment to such Lender or such Participant an amount equivalent to the applicable withholding Tax after taking into account such reduction.  If the forms or other documentation required by <u>Section 16.2(a)</u>, <u>16.2(c)</u> or <u>16.2(e)</u> are not delivered to Agent (or, in the case of a Participant, to the Lender granting the participation), then Agent (or, in the case of a Participant, the Lender granting the participation) or Borrower may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax as required by applicable law.

(b)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent (or, in the case of a Participant, to the Lender granting the participation) did not properly withhold Tax from amounts paid to or for the account of any Lender or any Participant due to a failure on the part of the Lender or any Participant (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent (or such Participant failed to notify the Lender granting the participation) of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent

harmless (or, in the case of a Participant, such Participant shall indemnify and hold Agent and the Lender granting the participation harmless) for all amounts paid, directly or indirectly, by Agent (or, in the case of a Participant, to the Lender granting the participation), as Tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent (or, in the case of a Participant, to the Lender granting the participation only) under this Section 16, together with all costs and expenses (including attorneys' fees and expenses).  The obligation of the Lenders and the Participants under this subsection shall survive the payment of all DIP Facility Obligations and the resignation or replacement of Agent.

16.4    **Refunds**.  If Agent or a Lender or Participant determines, in its sole discretion, that it has received a refund of any Indemnified Taxes with respect to which Borrower has paid additional amounts pursuant to this Section 16, so long as no Default or Event of Default has occurred and is continuing, it shall pay over such refund to Borrower (but only to the extent of payments made, or additional amounts paid, by Borrower under this Section 16 with respect to Indemnified Taxes giving rise to such a refund), net of all out-of-pocket expenses (including Taxes) of Agent or such Lender or such Participant and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); provided, that Borrower, upon the request of Agent or such Lender or such Participant, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges, imposed by the applicable Governmental Authority, other than such penalties, interest or other charges imposed as a result of the willful misconduct, bad faith or gross negligence of Agent or such Lender or such Participant hereunder) to Agent or such Lender or such Participant in the event Agent or such Lender or such Participant is required to repay such refund to such Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, this Section 16 shall not be construed to require Agent or any Lender or any Participant to make available its tax returns (or any other confidential information) to Borrower or any other Person.

## 17.    GENERAL PROVISIONS.

17.1    **Effectiveness**.  Subject to the entry of the DIP Orders, this Agreement shall be binding and deemed effective when executed by Parent, Borrower, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2    **Section Headings**.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3    **Interpretation**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Parent or Borrower, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4    **Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5    **[Intentionally Omitted]**.

17.6    **Debtor-Creditor Relationship.**    The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor.    No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the DIP Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any DIP Loan Document or any transaction contemplated therein.

17.7    **Counterparts; Electronic Execution**.    This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.    Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.    Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.    The foregoing shall apply to each other DIP Loan Document mutatis mutandis.

17.8    **Revival and Reinstatement of DIP Facility Obligations; Certain Waivers**.    If any member of the Lender Group repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of DIP Collateral) previously paid or transferred to such member of the Lender Group in full or partial satisfaction of any DIP Facility Obligation or on account of any other obligation of any Loan Party under any DIP Loan Document, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys' fees of such member of the Lender Group related thereto, the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist as if such Voidable Transfer had never been made.    This Section 17.8 shall survive the termination of this Agreement and the repayment in full of the DIP Loans and other DIP Facility Obligations.

17.9    **Confidentiality**.

(a)    Agent and Lenders each individually (and not jointly or jointly and severally) agree that information regarding Parent and its Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by

Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of any member of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group, provided that any such Subsidiary or Affiliate shall have been informed of the confidential nature of the Confidential Information and instructed to keep such information confidential in accordance with the terms of this Section 17.9, (iii) as may be required or requested by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrower with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrower pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrower, (vi) as requested by any Governmental Authority or self-regulatory authority, provided, that, (x) prior to any disclosure under this clause (vi) (except in the case of routine reviews, audits and examinations) the disclosing party agrees to provide Borrower with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrower pursuant to the terms of the applicable request and by law and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be requested by such Governmental Authority or self-regulatory authority pursuant to such applicable request, (vii) as required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (vii) the disclosing party agrees to provide Borrower with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrower pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vii) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (viii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (ix) in connection with any assignment, participation, or pledge of any Lender's interest under this Agreement, provided that prior to receipt of Confidential Information any such assignee, participant, or pledgee (other than the Federal Reserve Bank or any central bank in connection with a pledge thereto pursuant to Section 13.1(g)) shall have agreed in writing to receive such Confidential Information either subject to the terms of this Section 17.9 or pursuant to confidentiality requirements substantially similar to those contained in this Section 17.9 (and such Person may disclose such Confidential Information to Persons employed or engaged by them as described in clause (i) above), (x) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other DIP Loan Documents; provided, that, prior to any disclosure

to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (x) with respect to litigation involving any Person (other than Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrower with prior written notice thereof, (xi) to exercise of any secured creditor remedy under this Agreement or under any other DIP Loan Document, and (xii) for purposes of establishing a "due diligence" or similar defense in any legal proceeding.

(b)       Anything in this Agreement to the contrary notwithstanding, Agent or any Lender may disclose information concerning the terms and conditions of this Agreement and the other DIP Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of Borrower or the other Loan Parties and the DIP Loan Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of Agent or any Lender.

17.10    **Survival**.  All representations and warranties made by the Loan Parties in the DIP Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other DIP Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the DIP Loan Documents and the making of any DIP Loans regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any DIP Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid and so long as the DIP Loan Commitments have not expired or been terminated.

17.11    **Patriot Act**.  Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender to identify Borrower in accordance with the Patriot Act.  In addition, if Agent is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct (a) Patriot Act searches, OFAC/PEP searches, and customary individual background checks for the Loan Parties and (b) OFAC/PEP searches and customary individual background checks for the Loan Parties' senior management and key principals, and Borrower agrees to cooperate in respect of the conduct of such searches and further agrees that the reasonable costs and charges for such searches shall constitute Lender Group Expenses hereunder and be for the account of Borrower.

17.12    **Integration**.  This Agreement, together with the other DIP Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

17.13    **[Intentionally Omitted]**.

17.14  **Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other DIP Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of Borrower in respect of any such sum due from it to Agent or any Lender hereunder or under the other DIP Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to Agent or any Lender from Borrower in the Agreement Currency, Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Agent or such Lender, as the case may be, against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to Agent or any Lender in such currency, Agent or such Lender, as the case may be, agrees to return the amount of any excess to Borrower (or to any other Person who may be entitled thereto under applicable law).

17.15  **No Setoff**.  All payments made by Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense.

17.16  **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.  Notwithstanding anything to the contrary in any DIP Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any DIP Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)  the effects of any Bail-in Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other DIP Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Signature pages to follow.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**PARENT GUARANTORS:**      **DREAM II HOLDINGS, LLC**, a Delaware limited liability company


By:_____
Name:
Title:


**HOLLANDER HOME FASHIONS HOLDINGS, LLC**, a Delaware limited liability company


By:_____
Name:
Title:


**BORROWER:**      **HOLLANDER SLEEP PRODUCTS, LLC**, a Delaware limited liability company


By:_____
Name:
Title:

**BARINGS FINANCE LLC**, as Agent


By:_____
Name: Brady Sutton
Title:   Managing Director

EXHIBIT 2.3(a)

**FORM OF BORROWING NOTICE**

Barings Finance LLC, as Agent
300 South Tryon Street
Suite 2500
Charlotte NC 28202
Attn: Eric Langerman
Fax No. [_____]

Ladies and Gentlemen:

Reference is made to that certain **DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** (the "Credit Agreement") dated as of May [_], 2019, by and among the lenders identified on the signature pages thereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), **BARINGS FINANCE LLC**, as the arranger and administrative agent for the Lenders ("Agent"), **DREAM II HOLDINGS, LLC**, a Delaware limited liability company ("Parent"), **HOLLANDER HOME FASHIONS HOLDINGS, LLC**, a Delaware limited liability company (together with Parent the "Parent Guarantors"), and **HOLLANDER SLEEP PRODUCTS, LLC**, a Delaware limited liability company ("Borrower"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

1.      The Borrower hereby requests a DIP Loan to be made on the terms set forth below:

(a)  Date of borrowing:             [_]

(b)  Type of DIP Loan:              [_]

(c)  Interest election:             [Base Rate] / [LIBOR Rate with an Interest Period
                                    of [1][2][3] month(s)]]

(d)  Principal amount:              [_]

2.      The Borrower hereby requests that the proceeds of the DIP Loan described in this Notice of Borrowing be disbursed to the accounts and in the amounts set forth next to each account on the funds flow attached hereto as Exhibit A.

3.      As of the date hereof and after giving effect to the advance requested in this Notice of Borrowing, no Default or Event of Default has occurred and is continuing.

4.      Each of the conditions set forth in Section **[3.1/3.2]** and Section 3.3 of the Credit Agreement is satisfied as of the date hereof and immediately after giving effect to the advance requested in this Notice of Borrowing.

5.      The undersigned has been duly authorized by the Borrower to make this request for advance.

**[signature page to follow]**

**BORROWER**:

**HOLLANDER SLEEP PRODUCTS, LLC**, a
Delaware limited liability company

By: _____
Name: _____
Title: _____

**Exhibit A**

**FUNDS FLOW**

**EXHIBIT 3.1**

**FORM OF OFFICER'S CERTIFICATE**

<u>OMNIBUS CERTIFICATE</u>

May ___, 2019

Each of the undersigned hereby certifies that he or she is a duly elected, qualified and acting authorized officer of the entities listed on each schedule attached hereto (each listed entity, a "<u>Company</u>", and collectively, the "<u>Companies</u>"). Each of the undersigned hereby further certifies, as of the date hereof, solely on behalf of each Company, as applicable, and in such capacity (and not individually), that he or she is authorized to execute this certificate (this "<u>Certificate</u>") on behalf of the Companies and further hereby certifies that:

(a)    This Certificate is furnished pursuant to (i) that certain Debtor-in-Possession Term Loan Credit Agreement entered into as of the date hereof (the "<u>DIP Term Loan Credit Agreement</u>"), by and among the lenders identified on the signature pages thereto, Barings Finance LLC, as administrative agent for each member of the Lender Group (as defined in the DIP Term Loan Credit Agreement) (in such capacity, together with its successors and assigns in such capacity, "<u>DIP Term Loan Agent</u>"), Dream II Holdings, LLC, a Delaware limited liability company ("<u>Parent</u>"), Hollander Home Fashions Holdings, LLC, a Delaware limited liability company ("<u>HHFH</u>" and together with Parent, the "<u>Parent Guarantors</u>"), and Hollander Sleep Products, LLC, a Delaware limited liability company ("<u>HSP</u>" or "<u>Term Loan Borrower</u>"), and (ii) that certain Debtor-in-Possession Credit Agreement entered into as of the date hereof (the "<u>DIP ABL Credit Agreement</u>" and, together with the DIP Term Loan Credit Agreement, the "<u>Credit Agreements</u>" and each, a "<u>Credit Agreement</u>"), by and among the lenders identified on the signature pages thereto, Wells Fargo Bank, National Association, as administrative agent for each member of the Lender Group (as defined in the DIP ABL Credit Agreement) and the Bank Product Providers (as defined in the DIP ABL Credit Agreement) (in such capacity, together with its successors and assigns in such capacity, "<u>DIP ABL Agent</u>"), Parent, HHFH, HSP, Hollander Sleep Products Kentucky, LLC, a Delaware limited liability company ("<u>Hollander Kentucky</u>"), Pacific Coast Feather Cushion, LLC, a Delaware limited liability company ("<u>Cushion</u>"), and Pacific Coast Feather, LLC, a Delaware limited liability company ("<u>PCF</u>"; HHFH, HSP, Hollander Kentucky, Cushion and PCF, are collectively, the "<u>DIP ABL US Borrowers</u>" and individually an "<u>DIP ABL US Borrower</u>"), and Hollander Sleep Products Canada Limited (formerly known as Hollander Canada Home Fashions Limited), a Canadian federal corporation ("<u>DIP ABL Canadian Borrower</u>;" DIP ABL US Borrowers and DIP ABL Canadian Borrower are collectively, the "<u>DIP ABL Borrowers</u>" and individually a "<u>DIP ABL Borrower</u>").  Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the DIP Term Loan Credit

Agreement or the DIP ABL Credit Agreement, as applicable, as the context requires.

(b)     Attached hereto as <u>Exhibit A</u> are true, correct and complete copies of the Certificate of Formation of each Company (the "<u>Formation Documents</u>") as certified by the Secretary of State of the State of Delaware together with all amendments thereto adopted through the date hereof.  Except as attached hereto, such Formation Documents have not been amended, modified, revoked or rescinded since the date of adoption thereof and are in full force and effect on and as of the date hereof.  No actions have been taken by any of the Companies in contemplation of the dissolution of any of the Companies.

(c)     Attached hereto as <u>Exhibit B</u> are true, correct and complete copies of the limited liability company agreement or operating agreement, as applicable, of each Company (the "<u>Operating Agreements</u>") as in effect on the date hereof, together with all amendments thereto adopted through the date hereof. Such Operating Agreements have not been otherwise amended, modified, revoked or rescinded since the date of adoption thereof and are in full force and effect on and as of the date hereof.

(d)     Attached hereto as <u>Exhibit C</u> is a true, correct and complete copy of the resolutions duly adopted by each Company's board of directors or the sole member, as applicable (the "<u>Board</u>"), approving and authorizing the execution, delivery and performance of the Credit Agreements and the other Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) and the transactions contemplated thereby.  Such resolutions have not been amended, modified, revoked or rescinded since the date of adoption thereof, are in full force and effect on and as of the date hereof and are the only resolutions that have been adopted by the Board of each Company with respect to the subject matter thereof.

(e)     Each of the persons named on <u>Exhibit D</u> attached hereto are, on and as of the date hereof, duly elected, qualified and acting officers of each Company occupying the offices set forth opposite their respective names on <u>Exhibit D</u>, and the signatures set forth opposite their respective names are their true and genuine signatures, and each of such officers is duly authorized to execute and deliver on behalf of each Company each Credit Agreement and the other Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) and each of the related documents to which it is a party and any other agreement, instrument or document to be delivered by each Company pursuant to the Credit Agreements and the other Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) to which it is a party.

(f)     Attached hereto as <u>Exhibit E</u> is a true, correct and complete copy of the certificate of good standing for each Company (the "<u>Good Standing Certificates</u>"), certified as of a recent date by the Secretary of State of the State of Delaware. No change

has occurred in the legal existence and good standing of any Company since the date of the applicable Good Standing Certificate.

\*\*\*\*\*\*\*

IN WITNESS WHEREOF, the undersigned has caused this Certificate to be executed on behalf of each Company listed on <u>Schedule 1</u> and <u>Schedule 2</u> attached hereto as of the date first written above.

By: _____

Name:  Michael J. Fabian

Title:   Vice President


I, Eric D. Bommer, as President of each Company listed on <u>Schedule 1</u> and <u>Schedule 2</u> attached hereto, do hereby certify on behalf of each such Company that Michael J. Fabian is the duly elected, qualified and acting Vice President of each such Company and that the signature set forth above is the genuine signature of such person.

By:_____

Name:  Eric D. Bommer

Title:   President

Signature Page to Omnibus Certificate

### Schedule 1

1.  Dream II Holdings, LLC, a Delaware limited liability company

### Schedule 2

1.  Hollander Home Fashions Holdings, LLC, a Delaware limited liability company
2.  Hollander Sleep Products Kentucky, LLC, a Delaware limited liability company
3.  Hollander Sleep Products, LLC, a Delaware limited liability company (f/k/a Hollander Home Fashions, LLC)
4.  Pacific Coast Feather Cushion, LLC, a Delaware limited liability company (f/k/a Pacific Coast Feather Company, a Washington corporation)
5.  Pacific Coast Feather, LLC, a Delaware limited liability company (f/k/a Pacific Coast Feather Cushion Co., a Washington corporation)

# **EXHIBIT A**

Formation Documents

# **EXHIBIT B**

Operating Agreements

**EXHIBIT C**

Resolutions

**OMNIBUS WRITTEN CONSENT IN LIEU OF MEETINGS
OF THE BOARD OF DIRECTORS AND SOLE MEMBER**

May [_], 2019

The undersigned, being the board of directors or the sole member, as applicable (each, a "Board"), of each entity listed on Schedule 1 through Schedule 6 attached hereto (each, a "Company" and collectively the "Companies"), in lieu of holding a meeting of each Board, hereby take the following actions and adopt the following resolutions by unanimous written consent, pursuant to Section 18-404(d) of the Delaware Limited Liability Company Act and Section 18-302(d) of the Delaware Limited Liability Company Act, as applicable for each Company:

**APPROVAL OF THE DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT**

RESOLVED, that the form, terms and provisions of the Debtor-in-Possession Term Loan Credit Agreement, together with all exhibits, schedules and annexes thereto (as may be amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement"; capitalized terms used but not otherwise defined herein shall have the meanings specified in the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement (as defined below), as applicable, as the context requires), by and among the lenders identified on the signature pages thereto, Barings Finance LLC, as administrative agent for each member of the Lender Group (as defined in the DIP Term Loan Credit Agreement) (in such capacity, together with its successors and assigns in such capacity, "DIP Term Loan Agent"), Dream II Holdings, LLC, a Delaware limited liability company ("Parent"), Hollander Home Fashions Holdings, LLC, a Delaware limited liability company ("HHFH" and together with Parent, the "Parent Guarantors") and Hollander Sleep Products, LLC, a Delaware limited liability company ("HSP" or "DIP Term Loan Borrower"), and the transactions contemplated by the DIP Term Loan Credit Agreement and the other DIP Loan Documents (including, without limitation, the borrowings and other extensions of credit thereunder), and the guaranties, liabilities, obligations, security interest granted and notes issued, if any, in connection therewith, be and hereby are authorized, adopted and approved; and

RESOLVED, that each Company's execution and delivery of, and its performance of its obligations in connection with the DIP Term Loan Credit Agreement and the other DIP Loan Documents, are hereby, in all respects, authorized and approved; and further resolved, that each of the Chief Executive Officer, the Chief Financial Officer, the President, any Vice President, any other officer of each Company and any officer of the sole member and/or any manager of each Company, as applicable (each an "Authorized Officer" and collectively, the "Authorized Officers") is hereby authorized and directed to negotiate the terms of and to execute, deliver and perform its obligations under the DIP Term Loan Credit Agreement, the other DIP Loan Documents and any and all other documents, certificates, instruments or

agreements required to consummate the transactions contemplated by the DIP Term Loan Credit Agreement and the other DIP Loan Documents in the name and on behalf of each Company, in the form approved, with such changes therein and modifications and amendments thereto as any of the Authorized Officers may in his or her sole discretion approve, which approval shall be conclusively evidenced by his or her execution thereof. Such execution by any of the Authorized Officers is hereby authorized to be by facsimile, engraved or printed as deemed necessary and preferable; and

## APPROVAL OF THE DEBTOR-IN-POSSESSION ABL CREDIT AGREEMENT

> **RESOLVED**, that the form, terms and provisions of the Debtor-in-Possession Credit Agreement, together with all exhibits, schedules and annexes thereto (collectively, as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP ABL Credit Agreement" and, together with the DIP Term Loan Credit Agreement, the "Credit Agreements" and each, a "Credit Agreement"), by and among the lenders identified on the signature pages thereto, Wells Fargo Bank, National Association, as administrative agent for each member of the Lender Group (as defined in the DIP ABL Credit Agreement) and the Bank Product Providers (as defined in the DIP ABL Credit Agreement) (in such capacity, together with its successors and assigns in such capacity, "DIP ABL Agent"), Parent, HHFH, HSP, Hollander Sleep Products Kentucky, LLC, a Delaware limited liability company ("Hollander Kentucky"), Pacific Coast Feather Cushion, LLC, a Delaware limited liability company ("Cushion"), and Pacific Coast Feather, LLC, a Delaware limited liability company ("PCF"; HHFH, HSP, Hollander Kentucky, Cushion and PCF, are collectively, the "DIP ABL US Borrowers" and individually an "DIP ABL US Borrower"), and Hollander Sleep Products Canada Limited (formerly known as Hollander Canada Home Fashions Limited), a British Columbia corporation ("DIP ABL Canadian Borrower;" DIP ABL US Borrowers and DIP ABL Canadian Borrower are collectively, the "DIP ABL Borrowers" and individually a "DIP ABL Borrower"), and the transactions contemplated by the DIP ABL Credit Agreement and the other Loan Documents (as defined in the DIP ABL Credit Agreement), and the guaranties, liabilities, obligations, and notes issued, if any, in connection therewith, be and hereby are authorized, adopted and approved; and

> **RESOLVED**, that each Company's execution and delivery of, and its performance of its obligations in connection with the DIP ABL Credit Agreement and the other Loan Documents, are hereby, in all respects, authorized and approved; and further resolved, that each of the Authorized Officers is hereby authorized and directed to negotiate the terms of and to execute, deliver and perform such Company's obligations under the DIP ABL Credit Agreement, the other Loan Documents  and any and all other documents, certificates, instruments or agreements required to consummate the transactions contemplated by the DIP ABL Credit Agreement and such other Loan Documents in the name and on behalf of each Company, in the form approved, with such changes therein and modifications and amendments thereto as any of the Authorized Officers may in his or her sole discretion approve, which approval shall be conclusively evidenced by his or her execution thereof. Such execution by any of the Authorized Officers is hereby authorized to be by facsimile, engraved or printed as deemed necessary and preferable; and

## APPROVAL OF THE LOAN DOCUMENTS AND THE DIP LOAN DOCUMENTS

**RESOLVED**, that (i) the form, terms and provisions of the Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) to which any or all of the Companies are a party, (ii) the incurrence of indebtedness and borrowing of funds under the Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) (iii) the guarantee of all Obligations (as defined in the DIP ABL Credit Agreement) pursuant to the Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Facility Obligations (as defined in the DIP Term Loan Credit Agreement) and the DIP Facility Obligations (as defined in the DIP Term Loan Credit Agreement) pursuant to the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) by the Guarantors (as defined in each of the Credit Agreements), and (iv) the grant of security interests in and pledges of all or substantially all of the real and personal property, assets and rights now or hereafter owned by any or all of the Companies as collateral (including pledges of equity and personal property as collateral) under the Loan Documents (as defined in the DIP ABL Credit Agreement and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement), be and hereby are, authorized, adopted and approved; and

**RESOLVED**, that each Company's execution and delivery of, and performance of its obligations under, the Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) to which any or all of the Companies are a party, are hereby, in all respects, authorized and approved; and further resolved, that each of the Authorized Officers is hereby authorized and directed to negotiate the terms of and to execute, deliver and perform its obligations under the Loan Documents (as defined in the DIP ABL Credit Agreement) and the DIP Loan Documents (as defined in the DIP Term Loan Credit Agreement) to which any or all of the Companies are a party and any and all other documents, certificates, instruments or agreements required to consummate the transactions contemplated thereby in the name and on behalf of each Company, in the form approved, with such changes therein and modifications and amendments thereto as any of the Authorized Officers may in his/her sole discretion approve, which approval shall be conclusively evidenced by his/her execution thereof.  Such execution by any of the Authorized Officers is hereby authorized to be by facsimile, engraved or printed as deemed necessary and preferable; and

## GENERAL

**RESOLVED**, that in order to carry out fully the intent and effectuate the purposes of the foregoing resolutions, each of the Authorized Officers be, and hereby are, authorized and empowered to take all such further action including, without limitation, (i) to sell, transfer, lease, assign, set over, grant security interests in, mortgage or pledge any assets and properties of each Company, real personal, or mixed, tangible or intangible, now owned or hereafter acquired as such Authorized Officer determines necessary in connection with such financing and (ii) to arrange for, enter into or grant amendments and/or restatements (including, without limitation, amendments increasing or decreasing the amount of credit available under the Credit Agreements to the Companies acting as borrowers thereunder and/or extending the maturity of the same) and modifications to and waivers of the foregoing agreements (the

"<u>Agreements</u>"), and to arrange for and enter into supplemental agreements, instruments, certificates, financing statements and other documents relating to the transactions contemplated by the Agreements, and to execute, deliver and perform all such further amendments, modifications, waivers, supplemental agreements, instruments, certificates and documents as may be called for under or in connection with the Agreements, that may be determined by such Authorized Officer to be necessary or desirable, containing such terms and conditions and other provisions consistent with the Agreements, in the name and on behalf of each Company, and to pay all such fees and expenses, which shall in his or her judgment be deemed necessary, proper or advisable in order to perform each Company's obligations under or in connection with the Agreements and the transactions contemplated thereby; and

**RESOLVED**, that all actions taken by any of the Authorized Officers of each Company prior to the date of this written consent which are within the authority conferred hereby are hereby in all respects authorized, ratified, confirmed and approved.

The actions taken by this consent shall have the same force and effect as if taken at a meeting of each Board of each Company, pursuant to the limited liability company agreement or operating agreement, as applicable, of each Company and the laws of the State of Delaware.  This consent may be executed in one or more facsimile, electronic or original counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

* * * *

**<u>Schedule 1</u>**

2.  Dream II Holdings, LLC, a Delaware limited liability company

**<u>Schedule 2</u>**

1.  Hollander Home Fashions Holdings, LLC, a Delaware limited liability company

**<u>Schedule 3</u>**

1.  Hollander Sleep Products Kentucky, LLC, a Delaware limited liability company

**<u>Schedule 4</u>**

1.  Hollander Sleep Products, LLC, a Delaware limited liability company (f/k/a Hollander Home Fashions, LLC, a Delaware limited liability company)

**<u>Schedule 5</u>**

1.  Pacific Coast Feather Cushion, LLC, a Delaware limited liability company (f/k/a Pacific Coast Feather Company, a Washington corporation)

**<u>Schedule 6</u>**

1.  Pacific Coast Feather, LLC, a Delaware limited liability company (f/k/a Pacific Coast Feather Cushion Co., a Washington corporation)

IN WITNESS WHEREOF, the undersigned have executed this consent as of the date first set forth above.

**Board of the Company**
**set forth on Schedule 1:**

_____
Eric D. Bommer

_____
Michael J. Fabian

_____
Steve Cumbow

_____
Chris Baker

_____
Matthew Kahn

       IN WITNESS WHEREOF, the undersigned has executed this consent as of the date first set forth above.

**Sole Member of the Company**
**set forth on Schedule 2:**


**Dream II Holdings, LLC**, as Sole Member


By: _____
Name:  Michael J. Fabian
Title:   Vice President

IN WITNESS WHEREOF, the undersigned has executed this consent as of the date first set forth above.

**Sole Member of the Company**
**set forth on Schedule 3:**

**Hollander Sleep Products, LLC**, as Sole Member


By: _____
Name:  Michael J. Fabian
Title:   Vice President

IN WITNESS WHEREOF, the undersigned has executed this consent as of the date first set forth above.

**Sole Member of the Company**
**set forth on Schedule 4:**

**Hollander Home Fashions Holdings, LLC**, as Sole Member

By: _____
Name:  Michael J. Fabian
Title:    Vice President

IN WITNESS WHEREOF, the undersigned has executed this consent as of the date first set forth above.

**Sole Member of the Company**
**set forth on Schedule 5:**

**Pacific Coast Feather, LLC**, as Sole Member

By: _____
Name:  Michael J. Fabian
Title:   Vice President

IN WITNESS WHEREOF, the undersigned has executed this consent as of the date first set forth above.

**Sole Member of the Company
set forth on Schedule 6:**

**Hollander Sleep Products, LLC**, as Sole Member

By: _____
Name:  Michael J. Fabian
Title:   Vice President

# **EXHIBIT D**

Incumbency

Incumbency to Schedule 1

| **Name** | **Office** | **Signature** |
|---|---|---|
| Eric D. Bommer | President | _____ |
| Michael J. Fabian | Vice President and Treasurer | _____ |
| Steve Cumbow | Chief Financial Officer | _____ |
| Chris Baker | Executive Chairman | _____ |
| Marc L. Pfefferle | Chief Executive Officer | _____ |

Incumbency to Schedule 2

| **Name** | **Office** | **Signature** |
| --- | --- | --- |
| Eric D. Bommer | President | _____ |
| Michael J. Fabian | Vice President and Assistant Secretary | _____ |
| Marc L. Pfefferle | Chief Executive Officer | _____ |

# **EXHIBIT E**

Good Standing Certificates

**EXHIBIT 5.2(b)**

**FORM OF COMPLIANCE CERTIFICATE**

[on Borrower's letterhead]

To:    Barings Finance LLC, as Agent
300 South Tryon Street
Suite 2500
Charlotte NC 28202
Attn: Eric Langerman
Fax No. [_____]

Re:    Compliance Certificate dated _____

Ladies and Gentlemen:

Reference is made to that certain **DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** (the "Credit Agreement") dated as of May [ ], 2019, by and among the lenders identified on the signature pages thereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), **BARINGS FINANCE LLC**, as the arranger and administrative agent for the Lenders ("Agent"), **DREAM II HOLDINGS, LLC**, a Delaware limited liability company ("Parent"), **HOLLANDER HOME FASHIONS HOLDINGS, LLC**, a Delaware limited liability company (together with Parent the "Parent Guarantors"), and **HOLLANDER SLEEP PRODUCTS, LLC**, a Delaware limited liability company ("Borrower"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

Pursuant to Schedule 5.1 of the Credit Agreement, the chief financial officer or other senior financial officer of Borrower hereby certifies, solely in his/her capacity as an officer of Borrower and not in his/her individual capacity, that:

a.    The financial information of Parent and its Subsidiaries furnished in Schedule 1 attached hereto, has been prepared in accordance with GAAP (except, in the case of unaudited financial information, for year-end adjustments and the lack of footnotes), and fairly presents in all material respects the financial condition of Parent and its Subsidiaries as of the date hereof.

b.    Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Parent and its Subsidiaries during the accounting period covered by the financial statements delivered pursuant to paragraph 1 above.

c.      Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on <u>Schedule 2</u> attached hereto, specifying the nature and period of existence thereof and what action Parent and its Subsidiaries have taken, are taking, or propose to take with respect thereto.

[**signature page to follow**]

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this_____day of_____,_____.

**HOLLANDER SLEEP PRODUCTS, LLC**, a
Delaware limited liability company

By:_____

Name:_____

Title: _____

# **SCHEDULE 1**

**Financial Information**

**SCHEDULE 2**

**Default or Event of Default**

**EXHIBIT A-1**

**FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT**

This **ASSIGNMENT AND ACCEPTANCE AGREEMENT** ("Assignment Agreement") is entered into as of _____ between _____ ("Assignor") and _____ ("Assignee"). Reference is made to the Credit Agreement described in Annex I hereto (the "Credit Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

1.      In accordance with the terms and conditions of Section 13 of the Credit Agreement, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the DIP Loan Documents as of the date hereof with respect to the DIP Facility Obligations owing to the Assignor, and Assignor's portion of the DIP Loan Commitments, all to the extent specified on Annex I.

2.      The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statements, representations or warranties made in or in connection with the DIP Loan Documents, or (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Loan Documents or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or any Guarantor or the performance or observance by Borrower or any Guarantor of any of their respective obligations under the DIP Loan Documents or any other instrument or document furnished pursuant thereto, and (d) represents and warrants that the amount set forth as the Purchase Price on Annex I represents the amount owed by Borrower to Assignor with respect to Assignor's share of the DIP Loans assigned hereunder, as reflected on Assignor's books and records.

3.      The Assignee (a) confirms that it has received copies of the Credit Agreement and the other DIP Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon Agent, Assignor, or any other Lender, based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the DIP Loan Documents; (c) confirms that it is an Eligible Transferee; (d) appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under the DIP Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (e) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the DIP Loan Documents are required to be performed by it as a Lender; and (f) attaches (i) the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement, or (ii) such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.

4.      Following the execution of this Assignment Agreement by the Assignor and Assignee, the Assignor will deliver this Assignment Agreement to Agent for recording by Agent. The

effective date of this Assignment (the "<u>Settlement Date</u>") shall be the latest to occur of (a) the date of the execution and delivery hereof by the Assignor and the Assignee, (b) the receipt by Agent for its sole and separate account a processing fee in the amount of $3,500 (if required by the Credit Agreement), (c) the receipt of any required consent of Agent or Borrower, if applicable, and (d) the date specified in <u>Annex I</u>.

5.      As of the Settlement Date (a) the Assignee shall be a party to the Credit Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other DIP Loan Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Credit Agreement and the other DIP Loan Documents, provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a) of the Credit Agreement.

6.      Upon the Settlement Date, Assignee shall pay to Assignor the Purchase Price (as set forth in <u>Annex I</u>). From and after the Settlement Date, Agent shall make all payments that are due and payable to the holder of the interest assigned hereunder (including payments of principal, interest, fees and other amounts) to Assignor for amounts which have accrued up to but excluding the Settlement Date and to Assignee for amounts which have accrued from and after the Settlement Date. On the Settlement Date, Assignor shall pay to Assignee an amount equal to the portion of any interest, fee, or any other charge that was paid to Assignor prior to the Settlement Date on account of the interest assigned hereunder and that are due and payable to Assignee with respect thereto, to the extent that such interest, fee or other charge relates to the period of time from and after the Settlement Date.

7.      This Assignment Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Assignment Agreement may be executed and delivered by telecopier or other means of electronic transmission (including, without limitation, ".pdf" file) all with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

8.      THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**[signature pages to follow]**

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement and <u>Annex I</u> hereto to be executed by their respective officers, as of the first date written above.

**[NAME OF ASSIGNOR]**
as Assignor

By_____

     Name:
     Title:

**[NAME OF ASSIGNEE]**
as Assignee

By_____

     Name:
     Title:

ACCEPTED THIS_____DAY OF
_____

**BARINGS FINANCE LLC**, as Agent

By_____

     Name:
     Title:

**[HOLLANDER SLEEP PRODUCTS, LLC**, a
Delaware limited liability company

By:_____
Name:_____
Title:][1] _____

_____

[1] If required pursuant to the Terms of the Credit Agreement.

ANNEX FOR ASSIGNMENT AND ACCEPTANCE

ANNEX I

1.    Borrower:    Hollander Sleep Products, LLC, a Delaware limited liability company ("Borrower")

2.    Name and Date of Credit Agreement:

>    Debtor-In-Possession Term Loan Credit Agreement, dated as of May [_], 2019, by and among Dream  II Holdings, LLC, a Delaware limited liability company, Hollander Home Fashions Holdings, LLC, a Delaware limited liability company, Borrower, the lenders from time to time a party thereto, and Barings Finance LLC as the administrative agent for the Lenders

3.    Date of Assignment Agreement:                                           _____

4.    Amounts:

>    (a)    Assigned Amount of DIP Loans                              $_____

5.    Settlement Date:                                                          _____

6.    Purchase Price                                                         $_____

7.    Notice and Payment Instructions, etc.

Assignee:                                      Assignor:

_____        _____
_____        _____
_____        _____

8.      Agreed and Accepted:

   [**ASSIGNOR**]                              [**ASSIGNEE**]


   By: _____        By: _____
   Title: _____       Title: _____


ACCEPTED THIS_____DAY OF
_____


**BARINGS FINANCE LLC**, as Agent


By_____
       Name:
       Title:


[**HOLLANDER SLEEP PRODUCTS, LLC**, a
Delaware limited liability company


By:_____
Name:_____
Title:]² _____

_____

² If required pursuant to the Terms of the Credit Agreement.

**EXHIBIT I-1**

**FORM OF INITIAL APPROVED BUDGET**

**[To be provided.]**

**EXHIBIT I-2**

**FORM OF INTERIM DIP ORDER**

**[To be provided.]**

**EXHIBIT L-1**

**FORM OF LIBOR NOTICE**

Barings Finance LLC, as Agent
300 South Tryon Street
Suite 2500
Charlotte NC 28202
Attn: Eric Langerman
Fax No. [_____]

Ladies and Gentlemen:

Reference is made to that certain **DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** (the "Credit Agreement") dated as of May [_], 2019, by and among the lenders identified on the signature pages thereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), **BARINGS FINANCE LLC**, as the arranger and administrative agent for the Lenders ("Agent"), **DREAM II HOLDINGS, LLC**, a Delaware limited liability company ("Parent"), **HOLLANDER HOME FASHIONS HOLDINGS, LLC**, a Delaware limited liability company (together with Parent the "Parent Guarantors"), and **HOLLANDER SLEEP PRODUCTS, LLC**, a Delaware limited liability company ("Borrower"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

This LIBOR Notice represents Borrowers' request to elect the LIBOR Option with respect to outstanding DIP Loans in the amount of $_____(the "DIP Loan")[**, and is a written confirmation of the telephonic notice of such election given to Agent**].

The LIBOR Rate Loan will have an Interest Period of [**1, 2, 3 or 6**] month(s) commencing on_____.

This LIBOR Notice further confirms Borrowers' acceptance, for purposes of determining the rate of interest based on the LIBOR Rate under the Credit Agreement, of the LIBOR Rate as determined pursuant to the Credit Agreement.

[**signature pages to follow**]

Dated: _____

**BORROWER**:

**HOLLANDER SLEEP PRODUCTS, LLC**, a
Delaware limited liability company

By: _____
Name: _____
Title: _____

Acknowledged by:

**BARINGS FINANCE LLC,** as Agent

By _____
Name: _____
Title: _____

## **Schedule P-1**

### **Permitted Investments**

None.

**Schedule R-1**

**Real Property Collateral**

| **Loan Party** | **Address** | **County** | **State** |
|---|---|---|---|
| Pacific Coast Feather, LLC | 220 Miriam Street<br>Henderson, NC 27536 | Vance | North Carolina |

## Schedule 1.1

As used in the Agreement, the following terms shall have the following definitions:

"ABL DIP Agent" means Wells Fargo Bank, National Association, in its capacity as administrative agent under the ABL DIP Facility Documents, together with its successors and assigns.

"ABL DIP Facility" has the meaning specified therefor in the recitals.

"ABL DIP Facility Agreement" means the Debtor-in-Possession Credit Agreement, dated as of the date hereof, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, among the Borrower, the other borrowers party thereto from time to time, the lenders and other financial institutions party thereto from time to time and the ABL DIP Agent.

"ABL DIP Facility Documents" means the "Loan Documents" as defined in the ABL DIP Facility Agreement, as the same may be amended, supplemented, waived, otherwise modified, extended, renewed, refinanced, or replaced from time to time.

"ABL DIP Lenders" means the lenders under the ABL DIP Facility Agreement.

"ABL DIP Obligations" means the "Obligations" as defined under the ABL DIP Facility Agreement.

"ABL Priority Collateral" means "ABL Priority Collateral" as defined in the Intercreditor Agreement.

"Acceleration" has the meaning specified therefor in Section 8.4 of the Agreement.

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Accounting Changes" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"Additional Documents" has the meaning specified therefor in Section 5.12 of the Agreement.

"Adequate Protection Liens" has the meaning specified therefor in the DIP Orders.

"Affected Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"<u>Affiliate</u>" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; <u>provided</u>, that, for purposes of <u>Section 6.10</u> of the Agreement: (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"<u>Affiliated Lender</u>" means any Sponsor Affiliated Entity other than any natural person.

"<u>Agent</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Agent-Related Persons</u>" means Agent, together with Agent's Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Agent's Account</u>" means the Deposit Account identified on <u>Schedule A-1</u> as Agent's Account (or such other Deposit Account that has been designated as such, in writing, by Agent to Borrower and the Lenders).

"<u>Agent's DIP Liens</u>" means the DIP Liens granted by Parent or its Subsidiaries to Agent under the DIP Loan Documents and securing all or a portion of the DIP Facility Obligations.

"<u>Agreement</u>" has the meaning specified in the preamble to the Credit Agreement.

"<u>Allowed Professional Fees</u>" has the meaning specified in <u>Section 2.14(d)</u> of the Agreement.

"<u>Application Event</u>" means the occurrence of (a) a failure by Borrower to repay all of the DIP Facility Obligations in full on the Maturity Date or the date of any acceleration of the DIP Facility Obligations, or (b) an Event of Default and the election by the Required Lenders to require that payments and proceeds of DIP Collateral be applied pursuant to <u>Section 2.4(b)(ii)</u> of the Agreement.

"<u>Approved Budget</u>" means the Initial Approved Budget as amended and supplemented by any Weekly Cash Flow Forecast delivered in accordance with <u>Section 5.2(a)</u> and approved by the Agent and the Required Lenders in accordance with <u>Section 5.20</u>.

"<u>Assignee</u>" has the meaning specified therefor in <u>Section 13.1(a)</u> of the Agreement.

"<u>Assignment and Acceptance</u>" means an Assignment and Acceptance Agreement substantially in the form of <u>Exhibit A-1</u> to the Agreement.

"Available DIP Obligations" has the meaning specified therefor in Section 13.1(l) of the Agreement.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" has the meaning specified therefor in the recitals.

"Bankruptcy Court" has the meaning specified therefor in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"Bar Date" has the meaning specified therefor in Section 8.9(m)(iii) of the Agreement.

"Base Rate" means a floating rate of interest per annum equal to the greatest of (a) the rate last quoted by The Wall Street Journal (or, if such rate is no longer quoted by The Wall Street Journal, another national publication selected by Agent) as the U.S. "Prime Rate," (b) the Federal Funds Rate plus ½%, and (c) the sum of (i) LIBOR for an Interest Period of one month (giving effect to the minimum LIBOR Rate of 1.00%) plus (ii) 1.00%.

"Base Rate Loan" means each portion of the DIP Loans that bears interest at a rate determined by reference to the Base Rate.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) subject to Title IV of ERISA for which Parent or any of its Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Bidding Procedures" has the meaning specified therefor in Section 8.9(m)(ii) of the Agreement.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors, board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower" has the meaning set forth in the preamble to the Agreement.

"Borrowing" means a borrowing consisting of DIP Loans made on the same day by the Lenders (or Agent on behalf thereof).

"Budget Advance Date" has the meaning specified therefor in Section 2.1(c) of this Agreement.

"Budget Advance Date Commitment" means on the Budget Advance Date, with respect to each Lender holding a Budget Advance Date Commitment, the commitment of such Lender to make a Budget Advance DIP Loan, which commitment is in the amount set forth opposite such Lender's name on Schedule D-1 under the caption "Budget Advance Date Commitment", as amended to reflect Assignments; provided that such commitment shown on such Schedule shall, with the written consent of the Agent (which consent shall not be unreasonably withheld, delayed or conditioned), be increased by any portion of the Final DIP Loan Commitment of such Lender not funded on the Final Order Effective Date. The aggregate amount of the Budget Advance Date Commitments on the Budget Advance Date shall be (a) $6,000,000 plus (b) to the extent approved by the Agent in accordance with the preceding sentence, the difference between $28,000,000 minus the aggregate funded amount of Interim DIP Loans and Final DIP Loans. It is understood and agreed that the Budget Advance Date Commitments are in addition to the Interim DIP Loan Commitments and the Final DIP Loan Commitments, and not a replacement or substitute therefor.

"Budget Advance Date DIP Loans" means the single draw term loans to be made on the Budget Advance Date in an aggregate amount not to exceed the Budget Advance Date Commitments.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York, except that if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Canadian Benefit Plan" means any plan, fund, program, or policy, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, providing material employee benefits, including medical, hospital care, dental, sickness, accident, disability, life insurance, pension, retirement or savings benefits, under which a Loan Party or a Subsidiary thereof has any liability with respect to any employee or former employee in Canada.

"Canadian Defined Benefit Plan" means any Canadian Pension Plan which contains a "defined benefit provision" as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"Canadian Pension Plan" means each pension plan required to be registered under Canadian federal or provincial law that is maintained or contributed to, or to which there is or may be an obligation to contribute by a Loan Party or a Subsidiary thereof, for its employees or former employees, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively.

"Canadian Pension Termination Event" means (a) the voluntary full or partial wind up of a Canadian Pension Plan by any Loan Party or Subsidiary thereof or initiation of any action or

filing to do so; (b) the institution of proceedings by any Governmental Authority to terminate in whole or in part or have a trustee appointed to administer any Canadian Pension Plan; or (c) any other event or condition which might constitute grounds for the termination of, winding up or partial termination of, winding up or the appointment of trustee to administer, any Canadian Pension Plan.

"Canadian Priority Payables" means (a) the amount past due and owing by any Canadian Subsidiary, or the accrued amount for which such Canadian Subsidiary has an obligation to remit, to a Governmental Authority or other Person pursuant to any applicable law, rule or regulation, in respect of (i) goods and services taxes, sales taxes, employee income taxes, municipal taxes and other taxes payable or to be remitted or withheld; (ii) workers' compensation or employment insurance; (iii) vacation or holiday pay; and (iv) other like charges and demands, in each case, to the extent that any Governmental Authority or other Person may claim a lien, security interest, hypothec, trust or other claim; and (b) the aggregate amount of any other liabilities of any Canadian Subsidiary (i) in respect of which a trust or deemed trust has been or may be imposed to provide for payment, or (ii) in respect of unpaid or unremitted pension plan contributions, including amounts representing any unfunded liability, solvency deficiency or wind-up deficiency whether or not due with respect to a Canadian Pension Plan, or (iii) which are secured by a lien, security interest, pledge, charge, right or claim; in each case, pursuant to any applicable law, rule or regulation (such as liens, trusts, security interests, hypothecs, pledges, charges, rights or claims in favor of employees, landlords, warehousemen, customs brokers, carriers, mechanics, materialmen, labourers, or suppliers, or liens, trusts, security interests, hypothecs, pledges, charges, rights or claims for ad valorem, excise, sales, or other taxes where given priority under applicable law).

"Canadian Subsidiary" means any Subsidiary organized under the laws of Canada or any province (or other political subdivision) thereof.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve Out" has the meaning specified therefor in the DIP Orders.

"Carve Out Trigger Notice" has the meaning specified in Section 2.14(d) of the Agreement.

"Case Processionals" means any professional (other than an ordinary course professional) retained by the Borrower or the Committee pursuant to a final order of the Bankruptcy Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code.

"Cash Equivalents" means (a) Domestic Cash Equivalents; and (b) Foreign Cash Equivalents.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers

through the direct Federal Reserve Fedline system) and other customary cash management arrangements.

"CFC" means a controlled foreign corporation (as that term is defined in the IRC).

"Change in Control" means the occurrence of any of the following events:  (a) Sponsor Affiliated Entity ceases to beneficially own and control, directly or indirectly, more than 50.0% of the voting and economic Equity Interests in Parent on a fully diluted basis, (b) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 promulgated under the Exchange Act) other than Sponsor Affiliated Entity shall have acquired beneficial ownership on a fully diluted basis of the voting Equity Interests of Parent sufficient (whether or not exercised) to elect a majority of the members of the Board of Directors of Parent, (c) Sponsor Affiliated Entity ceases to have the power to elect or designate, directly or indirectly, a majority of the Board of Directors of Parent by voting power, contract or otherwise, (d) Parent ceases to beneficially own and control, directly, all of the Equity Interests in HHFH, or (e) HHFH ceases to beneficially own and control, directly, all of the Equity Interests in Borrower.

"Change in Law" means the occurrence after the date of the Agreement of:  (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning specified therefor in the recitals.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral Account Bank" means a bank consented to in writing by the Collateral Agent (such consent not to be unreasonably withheld or delayed) which shall not be Wells Fargo Bank, National Association or any Affiliate or subsidiary thereof; provided, that Wells Fargo Bank, National Association shall be the Collateral Account Bank until such time as the Borrower is able after the Effective Date to establish the TL Deposit Account at a different bank.

"Committee" means the official committee of unsecured creditors, if any, appointed in the Chapter 11 Cases.

"Commodity Exchange Act" has the meaning specified therefor in the Guaranty and Security Agreement.

"Compliance Certificate" has the meaning specified therefor in Section 5.2(b) of the Agreement.

"Confidential Information" has the meaning specified therefor in Section 17.9(a) of the Agreement.

"Confirmation Date" has the meaning specified therefor in Section 8.9(m)(x) of this Agreement.

"Contractual Obligation" means as to any Person, any provision of any material security issued by such Person or of any material agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by Parent or one of its Subsidiaries, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"Copyright Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Notice" has the meaning specified therefor in Section 8.4 of the Agreement.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement within two (2) Business Days of the date that it is required to do so under the Agreement, unless such Lender notifies Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) notified Borrower, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement, (c) has made a public statement (which such public statement Borrower and Agent should reasonably be expected to have knowledge thereof) to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within 1 Business Day after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement within two (2) Business Days of the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance

of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment (in each case other than by way of an Undisclosed Administration, for which purpose "Undisclosed Administration" shall mean in relation to a Lender, or its direct or indirect parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or such parent company is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed) or (iii) becomes the subject of a Bail-in Action.

"Deposit Account" means any deposit account (as that term is defined in the Code).

"DIP Collateral" means all the "DIP Collateral" (or equivalent term) as defined in the Guaranty and Security Agreement and assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a DIP Lien is granted by such Person in favor of Agent or the Lenders under any of the DIP Loan Documents.

"DIP Facility Obligations" means all DIP Loans, debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities, obligations (including indemnification obligations) of any Loan Party, fees (including the fees provided for in the Fee Letter) of any Loan Party, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) of any Loan Party, guaranties of any Loan Party, and all covenants and duties of any other kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other DIP Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Loan Party is required to pay or reimburse by the DIP Loan Documents or by law or otherwise in connection with the DIP Loan Documents.  Without limiting the generality of the foregoing, the DIP Facility Obligations under the DIP Loan Documents include the obligation to pay (i) the principal of the DIP Loans, (ii) interest accrued on the DIP Loans, (iii) Lender Group Expenses of any Loan Party, (iv) fees payable by any Loan Party under the Agreement or any of the other DIP Loan Documents, and (v) indemnities and other amounts payable by any Loan Party under any DIP Loan Document. Any reference in the Agreement or in the DIP Loan Documents to the DIP Facility Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"DIP Liens" means the Liens granted to the Agent for the benefit of the Lenders under the DIP Loan Documents and authorized by the DIP Orders.

"DIP Loan Commitments" means the Interim DIP Loan Commitments, the Final DIP Loan Commitments, and the Budget Advance Date Commitments, each as set forth of Schedule D-1.

"DIP Loan Documents" means the Agreement, any promissory note issued pursuant to Section 2.5, the Fee Letter, the Guaranty and Security Agreement, the DIP Orders, each instrument and document executed and/or delivered as contemplated by Section 3, and any other document, instrument or agreement executed in connection with the DIP Facility, each as amended, supplemented, waived or otherwise modified from time to time.

"DIP Loans" means the Interim DIP Loans, the Final DIP Loans, and the Budget Advance Date DIP Loans.

"DIP Orders" means, collectively, the Interim DIP Order and Final DIP Order.

"DIP Superpriority Claim" has the meaning specified therefor in Section 2.14(b) of the Agreement.

"Disclosure Statement" has the meaning specified therefor in Section 8.9(m)(iv) of the Agreement.

"Disqualified Equity Interests" means any Equity Interests that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are exchangeable), or upon the happening of any event or condition (a) matures or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale or other disposition or casualty event so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale or other disposition or casualty event shall be subject to the prior repayment in full of the Loans and all other DIP Facility Obligations that are accrued and payable and the termination of the DIP Loan Commitments), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provide for the scheduled payments of dividends in cash, or (d) are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date (as determined on the date of the issuance thereof).

"Disqualified Lender" means (i) those Persons that are competitors of Parent and its Subsidiaries identified by name in writing to Agent from time to time, (ii) those banks, financial institutions, institutional lenders and other persons or entities that have been specified to Agent by Parent or the Sponsor prior to the date hereof, which list may be updated once per quarter absent the existence and continuance of an Event of Default; provided that (A) subject to clause (B) below, no Person that is a Lender on the Effective Date or has otherwise become a Lender hereunder in accordance with the assignment and participations provisions described in Section 13.1 of the Agreement, respectively, or any Affiliate of any such Person, may be added to the list of Disqualified Lenders after the Effective Date unless such list was updated to add such Person to the list prior to the time such Person became a Lender or Affiliate thereof, and (B) if (1) any Lender enters into a binding commitment to assign any DIP Loan or participate any portion of its interest therein (in each case in accordance with Section 13.1 of the Agreement) to a Person that such Lender has not been advised is a Disqualified Lender, (2) such assigning Lender has requested the consent of Borrower if such Lender is required to do so in the case of an assignment to such Person prior to entering into such binding commitment and (3) such

assigning or participating Lender has confirmed with Agent (based solely on Agent's review of the list of Disqualified Lenders then provided to Agent by Borrower) that such Person is not a Disqualified Lender prior to entering into such binding assignment or participation, then such assignee or participant, as applicable, shall not be a Disqualified Lender, and (iii) any Person that is an Affiliate of a Person referred to <u>clauses (i)</u> and <u>(ii)</u> above, in each case, if such Affiliate is clearly identifiable as such based on its name (excluding bona fide debt funds); <u>provided</u> that, during the existence and continuance of an (x) an Event of Default, there shall be deemed to be no Disqualified Lenders.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Domestic Cash Equivalents</u>" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("<u>S&P</u>") or Moody's Investors Service, Inc. ("<u>Moody's</u>"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than (x) $250,000,000 in the case of U.S. banks and (y) $1,000,000,000 (or the dollar equivalent thereof as of the date of determination in the case of any United States branch of a foreign bank), (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in <u>clause (d)</u> above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of <u>clause (d)</u> of this definition or recognized securities dealer having combined capital and surplus of not less than (x) $250,000,000 in the case of U.S. banks and (y) $1,000,000,000 (or dollar equivalent thereof as of the date of determination) in the case of any United States branch of a foreign bank, having a term of not more than seven days, with respect to securities satisfying the criteria in <u>clauses (a)</u> or <u>(d)</u> above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in <u>clause (d)</u> above, (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in <u>clauses (a)</u> through <u>(g)</u> above and (i) investment funds investing at least 90% of their assets in securities of the types described in <u>clauses (a)</u> through <u>(h)</u> above.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established

in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means May ___, 2019.

"Effective Tax Rate" means the aggregate Federal, state and local Tax rate applicable to an individual resident in the city of New York (or such other jurisdiction having the highest aggregate Federal, state and local Tax rate applicable to any equity owner of Parent) subject to tax at the highest marginal rates provided for under the applicable Federal, state and local laws then in effect, taking into account the character of income and assuming full deductibility of state and local taxes.

"Election Notice" has the meaning specified therefor in Section 13.1(l) of the Agreement.

"Election Period" has the meaning specified therefor in Section 13.1(l) of the Agreement.

"Eligible Transferee" means (a) any Lender (other than a Defaulting Lender), any Affiliate of any Lender and any Related Fund of any Lender; (b) (i) a commercial bank organized under the laws of the United States or any state thereof, and having total assets in excess of $250,000,000; (ii) a savings and loan association or savings bank organized under the laws of the United States or any state thereof, and having total assets in excess of $250,000,000; or (iii) a commercial bank organized under the laws of any other country or a political subdivision thereof; provided that (A) (x) such bank is acting through a branch or agency located in the United States or (y) such bank is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country, and (B) such bank has total assets in excess of $250,000,000; (c) any other entity (other than a natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act) that extends credit or buys loans as one of its businesses including insurance companies, investment or mutual funds and lease financing companies, and having total assets in excess of $250,000,000; and (d) during the continuation of an Event of Default, any other Person approved by Agent; provided, that no Disqualified Lender shall qualify as an Eligible Transferee.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is or within the preceding 6 years has been sponsored, maintained or contributed to by any Loan Party or ERISA Affiliate or (b) to which any Loan Party or ERISA Affiliate has, or has had at any time within the preceding 6 years, any liability, contingent or otherwise, excluding any Canadian Benefit Plan or Canadian Pension Plan.

"Environmental Action" means any written complaint, demand, summons, citation, notice, directive, order, claim, litigation, judicial or administrative proceeding, judgment, letter,

or other written communication from any Governmental Authority or any third party involving liabilities under Environmental Laws, violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of Parent, any Subsidiary of Parent, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by Parent, any Subsidiary of Parent, or any of their predecessors in interest.

"Environmental Law" means any applicable United States or foreign federal, state, provincial, territorial, municipal or local statute, law, rule having the force and effect of law, regulation, ordinance, code, binding and enforceable guideline, or rule of common law now or hereafter in effect and in each case as amended, or any binding and enforceable judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, relating to the environment, Hazardous Materials affecting employee or worker health or safety, or Hazardous Materials, in each case as amended from time to time.  Without limitation, Environmental Law includes the *Resource Conservation and Recovery Act* ("RCRA"), the *Comprehensive Environmental Response, Compensation and Liability Act* ("CERCLA"), the *Canadian Environmental Protection Act* (Canada), the *Fisheries Act* (Canada), the *Transportation of Dangerous Goods Act* (Canada) and the *Ontario Water Resources Act* (Ontario).

"Environmental Liabilities" means all liabilities, obligations (including monetary obligations), losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred (i) as a result of or related to any Environmental Action or Remedial Action or (ii) under Environmental Law.

"Environmental Lien" means any Lien in favor of any Governmental Authority related to or arising out of Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"Equity Documents" means, collectively, the (i) Amended and Restated Limited Liability Company Agreement of Parent, dated as of October 21, 2014, (ii) Securityholders Agreement, dated as of October 21, 2014, by and among Parent and other Persons party thereto, (iii) Registration Rights Agreement, dated as of October 21, 2014, by and among Parent and the other Persons party thereto, (iv) Contribution and Exchange Agreement, dated as of September 18, 2014, by and among Parent and the other Persons party thereto, (v) Subscription Agreements, dated as of October 21, 2014, by and among Parent and the other Persons party thereto, (vi) Securities Purchase Agreement, dated as of September 18, 2014, by and among HHFH, HHF Holdings, LLC, Hollander Home Fashions Corp., Jeffrey Hollander Irrevocable Exempt Trust dated October 29, 2012 and each of the other Persons party thereto, (vii) certificate of incorporation, bylaws, operating agreement or other organizational document of the Loan Parties and their Canadian Subsidiaries as of the Effective Date, and (viii) Management Services Agreement, in each case, as amended.

"Equity Interests" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person,

whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of Parent or its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Parent or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Parent or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with Parent or any of its Subsidiaries and whose employees are aggregated with the employees of Parent or its Subsidiaries under IRC Section 414(o).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Actions" has the meaning specified therefor in Section 5.12 of the Agreement.

"Excluded Collateral" has the meaning specified therefor in the Guaranty and Security Agreement.

"Excluded Subsidiary" means any Subsidiary of Parent (a) [reserved], (b) that is an Immaterial Subsidiary, (c) acquired after the Effective Date (i) that is prohibited from guaranteeing the DIP Facility Obligations by applicable law, rule or regulation or by any contractual obligation existing on the date such Subsidiary is acquired (so long as, in respect of any such contractual prohibition, such prohibition is not incurred in contemplation of such acquisition and with respect to any Subsidiary that has material assets, Borrower and the Subsidiary Guarantors shall have used commercially reasonable efforts (not involving expending money in excess of de minimis amounts) to remove such prohibition), or (ii) that would require governmental (including regulatory) consent, approval, license or authorization to provide a Guaranty, (d) that is a (i) Foreign Subsidiary of Parent that is a CFC, (ii) US Foreign Holdco, (iii) US Person that is a Subsidiary of a CFC, or (iv) Subsidiary the provision of a Guaranty by which would result in a material adverse tax consequence (as a result of the operation of Section 956 of the IRC) to Parent or one of its Subsidiaries (as reasonably determined by Parent in consultation with Agent), (e) any not-for-profit Subsidiaries, captive insurance companies or other special purpose Subsidiaries (so long as such special purpose Subsidiary is not created in contemplation of circumventing the guarantee obligations), and (f) any other Subsidiary if the costs to the Loan Parties of providing such guaranty are excessive (as determined by Agent in

consultation with Borrower) in relation to the benefits to Agent and the Lenders afforded thereby; <u>provided</u>, that notwithstanding the foregoing <u>clauses (a)</u> through <u>(f)</u>, any Person that guarantees all or any portion of the US Obligations (as defined in the ABL DIP Facility Agreement as in effect on the date hereof) other than the Canadian Loan Parties (as defined in the ABL DIP Facility Agreement as in effect on the date hereof) shall not be an Excluded Subsidiary.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to, or required to be withheld or deducted from a payment to a Lender or Agent: (i) any Tax imposed on or measured by the net income or net profits (however denominated) of any Lender or Agent (including any branch profits taxes or franchise Taxes imposed in lieu thereof), in each case (A) imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender or Agent is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's or Agent's principal office is located or (B) as a result of a present or former connection between such Lender or Agent and the jurisdiction or taxing authority imposing the Tax (other than any such connection arising from such Lender or Agent having executed, delivered, become a party to, performed its obligations under, received payment under, received or perfected a security interest under, enforced its rights or remedies under or engaged in any other transaction pursuant to the Agreement or any other DIP Loan Document or sold or assigned an interest in any DIP Loan or DIP Loan Document); (ii) United States federal Taxes that would not have been imposed but for a Lender's or Agent's failure to comply with the requirements of <u>Section 16.2</u> of the Agreement, (iii) [intentionally omitted], (iv) any United States federal withholding Taxes that would be imposed on amounts payable to a Lender or Agent based upon the applicable law in effect at the time such Lender or Agent becomes a party to the Agreement (or designates a new lending office), <u>except</u> that Excluded Taxes shall not include any Tax amount that such Lender or Participant or Agent (or its assignor, if any) was previously entitled to receive pursuant to <u>Section 16.1</u> of the Agreement, if any, with respect to such withholding Tax at the time of designation of a new lending office (or assignment); and (v) withholding Taxes imposed under FATCA.

"<u>Extensions of Credit</u>" means the advancing of DIP Loans under this Agreement on the Effective Date and the Final Order Effective Date, as applicable.

"<u>Extraordinary Receipt</u>" means any cash received by or paid to or for the account of any Person that is not contemplated in the Approved Budget and is not in the ordinary course of business (other than any such cash received or paid from Recovery Events), including tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments; <u>provided</u>, <u>however</u>, that an Extraordinary Receipt shall not include indemnity payments to the extent that payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto; <u>provided</u>, <u>further</u>, that Extraordinary Receipts shall not include items of ABL Priority Collateral or Proceeds of any assets of the categories in the definition of ABL Priority Collateral.

"<u>FATCA</u>" means Sections 1471 through 1474 of the IRC as of the date of this Agreement (or any amended or successor version to the extent such version is substantively comparable and not materially more onerous to comply with), any current or future regulations or official

interpretations thereof, and any intergovernmental agreements entered into pursuant to Section 1471(b)(1) of the IRC.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it.

"Federal District Court" has the meaning specified therefor in Section 12.(b) of the Agreement.

"Fee Letter" means the fee letter, dated as of the Effective Date, between Borrower and the Lenders.

"Final DIP Loan Commitment" means on the Final Order Effective Date, with respect to each Lender holding a Final DIP Loan Commitment, the commitment of such Lender to make a Final DIP Loan, which commitment is in the amount set forth opposite such Lender's name on Schedule D-1 under the caption "Final DIP Loan Commitment", as amended to reflect Assignments; provided that such commitment shown on such Schedule shall, with the written consent of the Agent (which consent shall not be unreasonably withheld, delayed or conditioned), be increased by any portion of the Interim DIP Loan Commitment of such Lender not funded on the Effective Date.  The aggregate amount of the Final DIP Loan Commitments on the Final Order Effective Date shall be the lesser of (a) $7,000,000.00 and (b) such amount as approved by the Bankruptcy Court for funding on the Final Order Effective Date pursuant to the Final DIP Order. It is understood and agreed that the Final DIP Loan Commitments are in addition to the Interim DIP Loan Commitments and not a replacement or substitute therefor.

"Final DIP Loans" means the single draw term loans to be made on the Final Order Effective Date in an aggregate amount not to exceed the Final DIP Loan Commitments.

"Final DIP Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after notice and final hearing pursuant to the Bankruptcy Rules or such other procedures as approved by the Bankruptcy Court which, among other matters (but not by way of limitation), authorizes the Borrower to obtain credit and the Loan Parties to incur (or guaranty) the DIP Facility Obligations and grant DIP Liens under the DIP Loan Documents, as the case may be, and provides for the superpriority of the Agent's and the Lenders' claims, and authorizes the use of cash collateral, as the same shall be approved by, and may be modified or supplemented from time to time after the Final Order Effective Date with the written consent of, the Agent and Required Lenders in their sole and absolute discretion.

"Final Order Effective Date" means the date on which the conditions under Sections 3.2 and 3.3 are satisfied or waived as reasonably determined by the Agent and the Required Lenders.

"Financial Officer" of any Person means the chief financial officer, the treasurer, any assistant treasurer, any vice president of finance, the chief accountant or the controller of such

Person, the Financial Advisor or any officer with substantially equivalent responsibilities of any of the foregoing (which may be a Person employed by the Financial Advisor).

"Financial Advisor" means Carl Marks Advisory Group LLC.

"First Day Hearing" means the first day of the hearing scheduled on which entry of the Interim DIP Order shall be heard.

"Flow Through Entity" means an entity that (a) for federal income tax purposes constitutes (i) a "partnership" (within the meaning of Section 7701(a)(2) of the Code) other than a "publicly traded partnership" (as defined in Section 7704 of the Code), or (ii) any other business entity that is disregarded as an entity separate from its owners under the IRC, or any published administrative guidance of the Internal Revenue Service (each of the entities described in the preceding clauses (i) and (ii), a "Federal Flow Through Entity"), and (b) for state and local jurisdictions is subject to treatment on a basis under applicable state or local income tax law substantially similar to a Federal Flow Through Entity.

"Foreign Cash Equivalents" means, in the case of any Subsidiary (other than a Loan Party or other Subsidiary organized under the laws of the United States or a political subdivision thereof), investments denominated in the currency of the jurisdiction in which such Subsidiary is organized or in Dollars, in each case which are of substantially the same type as the items specified in the definition of Domestic Cash Equivalents.

"Foreign Lender" means any Lender or Participant that is not a United States person within the meaning of IRC section 7701(a)(30).

"Foreign Asset Sale" means an sale or disposition of assets consummated by a Foreign Subsidiary.

"Foreign Subsidiary" means any Subsidiary that is not a U.S. Person.

"Funding Losses" has the meaning specified therefor in Section 2.12(b)(ii) of the Agreement.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation or formation (or equivalent thereof), by-laws (or equivalent thereof), or other organizational documents of such Person.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantors" means (a) the Parent Guarantors and (b) each Subsidiary that is a U.S. Person and that is not an Excluded Subsidiary; provided that, notwithstanding the foregoing, any Person that guarantees all or any portion of the US Obligations (as defined in the ABL DIP Facility Agreement as in effect on the date hereof) other than the Canadian Loan Parties (as defined in the ABL DIP Facility Agreement as in effect on the date hereof) shall be a Guarantor.

"Guarantee Obligation" means as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any such obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guaranty and Security Agreement" means that certain DIP Loan Guaranty and Security Agreement, dated as of the Effective Date, executed and delivered by each Loan Party to Agent.

"Hazardous Materials" means (a) substances that are regulated under Environmental Laws or are defined or listed in, or otherwise classified pursuant to, any Environmental Laws as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, (d) asbestos in any form, and (e) electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"HHFH" has the meaning specified therefor in the preamble to the Agreement.

"Hollander China" means Hollander Home Fashions Trading (Shanghai) Co., Ltd, a company organized under the laws of China.

"Immaterial Subsidiary" means each Subsidiary set forth on Schedule 4.25 hereto, provided that:

(i)    the Immaterial Subsidiaries, taken together, do not, in the aggregate (x) comprise more than the lesser of $1,000,000 and 1.00% of the total revenue of Parent and its Subsidiaries for the period of 12 months most recently ended on April 30, 2019 and (y) do not hold consolidated assets representing more than the lesser of $1,000,000 and 1.00% of the total consolidated assets of Parent and its Subsidiaries on the last day of the most recent 12 month period ended on April 30, 2019,

(ii)    no Immaterial Subsidiary (x) comprises more than the lesser of $1,000,000 and 1.00% of the total revenue of Parent and its Subsidiaries for the period of 12 months most recently ended on April 30, 2019 or (y) holds consolidated assets representing more than the lesser of $1,000,000 and 1.00% of the total consolidated assets of Parent and its Subsidiaries on the last day of the most recent 12 month period ended on April 30, 2019, and

(iii)    if, at any time, the limits set forth in clauses (i) and (ii) are not satisfied as at or for the 12 month period ended on the most recently ended fiscal month for which financial statements have been delivered or required to be delivered to Agent hereunder on or prior to such date, Parent shall promptly (and in any event within 5 Business Days from the date such financial statements have been delivered or required to be delivered hereunder) re-designate one or more Immaterial Subsidiaries as no longer an Immaterial Subsidiary as may be necessary such that the foregoing limits shall be satisfied, and any such Subsidiary shall thereafter be deemed to no longer be an Immaterial Subsidiary hereunder.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets and any earn-out or similar obligations (to the extent included, or required to be included, as a liability on the balance sheet of such Person at such time) (other than (i) trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices, (ii) royalty payments payable in the ordinary course of business in respect of non-exclusive licenses, (iii) working capital and other similar purchase price adjustments), (iv) any earn-out obligation that is not yet due and payable unless such obligation is not paid promptly after becoming due and payable, (v) customary cash pooling and cash management practices and other intercompany indebtedness having a term not

exceeding 364 days (inclusive of any roll-over or extensions of terms) incurred in the ordinary course of business, (vi) accruals for payroll or other employee compensation and other liabilities incurred in the ordinary course of business and (vii) any accrued or deferred management fees, including pursuant to the Management Services Agreement, (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) the liquidation value of any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Taxes" means (a) any Taxes imposed on or with respect to a payment under or on account of any Loan Document, other than Excluded Taxes and (b) to the extent not described in (a), Other Taxes.

"Initial Approved Budget: means the 17-week operating budget (or such shorter, or longer, period, as applicable, to coincide with the Life of the Case) setting forth, on a consolidated basis with respect to the Loan Parties and their respective Subsidiaries, all forecasted consolidated cash receipts, consolidated cash disbursements and consolidated net cash flow on a weekly basis for the relevant period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Facility for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases, and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the Agent at the direction of the Required Lenders.  Such Initial Approved Budget shall be in the form set forth in Exhibit I-1 hereto.  For all purposes hereunder, the Initial Approved Budget shall constitute an "Approved Budget".

"Initial DIP Loans" means the DIP Loans made on the Effective Date.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other provincial, state or federal bankruptcy or insolvency law, each as now and hereafter in effect, any successors to such

statutes, and any similar laws in any jurisdiction including, without limitation, any laws relating to assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief and any law permitting a debtor to obtain a stay or a compromise of the claims of its creditors.

"Intellectual Property" has the meaning specified therefor in Section 4.26 of the Agreement.

"Intercompany Subordination Agreement" means an Intercompany Subordination Agreement, in form and substance satisfactory to Agent in its sole discretion, to be executed and delivered by Parent and each of its Subsidiaries and Agent, in accordance with this Agreement.

"Intercreditor Agreement" means the Amended and Restated Intercreditor Agreement, dated as of the date hereof, between Agent and ABL DIP Agent.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending 1, 2, 3, or 6 months thereafter; provided, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2, 3 or 6 months after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim DIP Loan Commitment" means on the Effective Date, with respect to each Lender holding an Interim DIP Loan Commitment,  the commitment of such Lender to make an Interim DIP Loan, which commitment is in the amount set forth opposite such Lender's name on Schedule D-1 under the caption "Interim DIP Loan Commitment", as amended to reflect Assignments.  The aggregate amount of the Interim DIP Loan  Commitments on the Effective Date shall be the lesser of (a) $15,000,000.00 and (b) such amount as approved by the Bankruptcy Court pursuant to the Interim DIP Order.

"Interim DIP Loans" means the single draw term loans to be made on the Effective Date but prior to the Final Order Effective Date, in an aggregate amount not to exceed the Interim DIP Loan Commitments.

"Interim DIP Order" means the order of the Bankruptcy Court substantially in the form of Exhibit I-2 (except as may otherwise be agreed in writing or on the record by the Agent and the Required Lenders at the interim hearing with respect to such order in the Chapter 11 Cases) entered in the Chapter 11 Cases after an interim hearing pursuant to the Bankruptcy Rules,

which, among other matters (but not by way of limitation), authorizes, on an interim basis, the Borrower to obtain credit and the Loan Parties to incur (or guaranty) the DIP Facility Obligations and grant DIP Liens under the DIP Loan Documents, as the case may be, and provides for the superpriority of the Agent's and the Lenders' claims, and authorizes the use of cash collateral, as the same shall be approved by, and may be modified or supplemented from time to time after the Interim Order Effective Date but before the Final Order Effective Date, with the written consent of the Agent and Required Lenders in their sole and absolute discretion.

"<u>Inventory</u>" means inventory (as that term is defined in the Code).

"<u>Investment</u>" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivable arising in the ordinary course of business), or acquisitions of Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended, and any successor statutes, and all regulations and guidance promulgated thereunder. Any reference to a specific section of the IRC shall be deemed to be a reference to such section of the IRC and any successor statutes, and all regulations promulgated thereunder.

"<u>Lender</u>" has the meaning set forth in the preamble to the Agreement and shall also include any other Person made a party to the Agreement pursuant to the provisions of <u>Section 13.1</u> of the Agreement and "<u>Lenders</u>" means each of the Lenders or any one or more of them.

"<u>Lender Group</u>" means each of the Lenders and Agent, or any one or more of them.

"<u>Lender Group Expenses</u>" means, without duplication, all (a) reasonable and documented or invoiced costs or expenses (including taxes and insurance premiums) required to be paid by Parent or its Subsidiaries under any of the DIP Loan Documents that are paid, advanced, or incurred by the Agent, (b) reasonable and documented out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Parent and its Subsidiaries under any of the DIP Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to Parent or its Subsidiaries, (d) Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrower (whether by wire transfer or otherwise), together with any documented or invoiced out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent resulting from the

dishonor of checks payable by or to any Loan Party, (f) reasonable documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the DIP Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the DIP Collateral, or any portion thereof, irrespective of whether a sale is consummated (which, in the case of attorneys' fees, shall be limited to reasonable documented out-of-pocket attorneys' fees of one primary outside counsel to the Lender Group, which shall be King & Spalding LLP, and to the extent applicable, one local (including foreign) counsel in each relevant jurisdiction, and specialty counsel, regulatory counsel and, in the event of an actual or perceived conflict, counsel to avoid conflicts of interest as are required or advisable and in any case, shall not be duplicative of attorneys' fees pursuant to clause (i) below), (g) [intentionally omitted], (h) Agent's reasonable and documented costs and out-of-pocket expenses (including reasonable documented attorneys' fees and expenses of one outside counsel, except that such limitation shall not apply to the extent local (including foreign) counsel, specialty counsel, regulatory counsel or counsel to avoid conflicts of interest are required or advisable) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the DIP Loan Documents or otherwise in connection with the transactions contemplated by the DIP Loan Documents, Agent's DIP Liens in and to the DIP Collateral, or the Lender Group's relationship with Parent or any of its Subsidiaries, (i) Agent's reasonable documented out-of-pocket costs and expenses, including due diligence expenses (which, in the case of attorneys' fees, shall be limited to reasonable documented out-of-pocket attorneys' fees of one primary outside counsel for Agent, and to the extent applicable, one local (including foreign) counsel in each relevant jurisdiction, and specialty counsel, regulatory counsel and counsel to avoid conflicts of interest as are required or advisable and in any case, shall not be duplicative of attorneys' fees pursuant to clause (f) above) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending, waiving, or modifying the DIP Loan Documents and in connection with the Chapter 11 Cases and the Recognition Proceedings, and (j) Agent's and each Lender's reasonable documented costs and expenses (including reasonable documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a response to a third-party subpoena or investigation, a "workout," a "restructuring," or an Insolvency Proceeding concerning Parent or any of its Subsidiaries or in exercising rights or remedies under the DIP Loan Documents), or defending the DIP Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the DIP Collateral, which, in the case of attorneys' fees, shall be limited to reasonable documented out-of-pocket attorneys' fees of one primary outside counsel for each of the Agent and Lenders, and to the extent applicable, one local (including foreign) counsel in each relevant jurisdiction, and specialty counsel, regulatory counsel and counsel to avoid conflicts of interest as are required or advisable and in any case, shall not be duplicative of attorneys' fees pursuant to clauses (f) and (g) above).

"Lender Group Representatives" has the meaning specified therefor in Section 17.9 of the Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"LIBOR Deadline" has the meaning specified therefor in Section 2.12(b)(i) of the Agreement.

"LIBOR Notice" means a written notice in the form of Exhibit L-1 to the Agreement.

"LIBOR Option" has the meaning specified therefor in Section 2.12(a) of the Agreement.

"LIBOR Rate" means the rate *per annum* (rounded upwards to the nearest $1/100^{th}$ of 1.0%), for each Interest Period, equal to the greater of (i) the rate administered by ICE Benchmark Administration Limited at which US dollar deposits are offered by leading banks in the London interbank deposit market on the first day of each month for the relevant Interest Period and that appears on the Reuters Screen LIBOR01 Page as displayed in the Bloomberg Financial Markets System at 11:00 a.m. London time (or, if not so appearing, as published in the "Money Rates" section of The Wall Street Journal or another national publication selected by the Collateral Agent) two Business Days prior to the first day of such Interest Period, and (ii) one percent (1.00%) *per annum*; provided that the determination of the LIBOR Rate shall be made by Agent and shall be conclusive in the absence of manifest error.

"LIBOR Rate Loan" means each portion of the DIP Loans that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, hypothec or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Life of the Case" means the period beginning on the Petition Date and lasting through (and including) the Plan Effective Date of the Proposed Plan.

"Loan Parties" means Borrower and Guarantors.

"Management Services Agreement" means that certain Amended and Restated Management Services Agreement, dated as of June 9, 2017, by and between Sponsor and Parent, as the same may be further amended in accordance with the terms hereof.

"Margin Stock" has the meaning specified therefor in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means any event, circumstance or condition that has had or would reasonably be expected to have a material and adverse effect on (a) the business or financial condition of the Loan Parties and their Subsidiaries, taken as a whole, (b) the ability of Loan Parties, taken as a whole, to perform their payment obligations under the DIP Loan Documents, or (c) the rights and remedies of Agent and the Lenders under the DIP Loan Documents, taken as a whole, in each case, except for the events leading up to the Chapter 11 Cases, the commencement of the Chapter 11 Cases and the events that customarily and reasonably result from the commencement of the Chapter 11 Cases.

"Maturity Date" means the earliest to occur of (a) the date that is one hundred fifty (150) days after the Petition Date, (b) the date that any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code is consummated, (c) if the Final DIP Order has not been entered, the date that is forty (40) days after the date of the First Day Hearing; (d) the Plan Effective Date of a Proposed Plan; and (e) the date of any acceleration of the DIP Loans hereunder or the termination of the DIP Loan Commitments hereunder.

"Milestones" has the meaning specified therefor in Section 8.9(m) of the Agreement.

"MNPI" means any material Nonpublic Information regarding Parent and its Subsidiaries or the DIP Loans or securities of any of them that has not been disclosed to the Lenders generally (other than Lenders who elect not to receive such information). For purposes of this definition "material Nonpublic Information" shall mean nonpublic information with respect to the business of Parent, Borrower or any of their Subsidiaries that would reasonably be expected to be material to a decision by any Lender to assign or acquire any DIP Loans or to enter into any of the transactions contemplated thereby or would otherwise be material for purposes of United States Federal and state securities laws.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Mortgages" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by Parent or one of its Subsidiaries in favor of Agent, in form and substance reasonably satisfactory to Agent, that encumber any Real Property.

"Multiemployer Plan" means any multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA with respect to which any Loan Party has an obligation to contribute or has any liability, (including on behalf of an ERISA Affiliate) or could be assessed Withdrawal Liability assuming a complete withdrawal from any such multiemployer plan.

"Net Cash Proceeds" means:

(a)        with respect to any sale or disposition by Parent or any of its Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of Parent or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under the Agreement or the other DIP Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which (subject to the Intercreditor Agreement and the DIP Orders) is required to be, and is, repaid in connection with such sale or disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by Parent or such Subsidiary in connection with such sale or disposition, excluding amounts payable to a Loan Party or Affiliate thereof, (iii) taxes paid or payable to any taxing authorities by Parent or such Subsidiary in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid or anticipated to be payable, and are properly attributable to such transaction, and (iv) all amounts that are set aside as a reserve (A) for adjustments in respect of the purchase price of such assets, (B) for any liabilities associated with such sale or casualty, to the extent such reserve is required by GAAP,

and (C) for the payment of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 90 days after, the date of such sale or other disposition, to the extent that in each case the funds described above in this <u>clause (iv)</u> are (x) deposited into escrow with a third party escrow agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of Agent and (y) paid to Agent as a prepayment of the applicable DIP Facility Obligations in accordance with <u>Section 2.4(e)</u> of the Agreement at such time when such amounts are no longer required to be set aside as such a reserve.

"<u>New York Courts</u>" has the meaning specified therefor in <u>Section 12.(b)</u> of the Agreement.

"<u>New York Supreme Court</u>" has the meaning specified therefor in <u>Section 12.(b)</u> of the Agreement.

"<u>Non-Consenting Lender</u>" has the meaning specified therefor in <u>Section 14.2(a)</u> of the Agreement.

"<u>Non-Defaulting Lender</u>" means each Lender other than a Defaulting Lender.

"<u>Notice of Intent to Assign</u>" has the meaning specified therefor in <u>Section 13.1(l)</u> of the Agreement.

"<u>Notification Event</u>" means (a) the occurrence of a "reportable event" described in Section 4043(c) of ERISA with respect to a Pension Plan for which the 30-day notice requirement has not been waived by applicable regulations issued by the PBGC, (b) the withdrawal of any Loan Party or ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC or any Pension Plan or Multiemployer Plan administrator, (e) any other event or condition that would constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC or ERISA in connection with any Employee Benefit Plan or the existence of any facts or circumstances that could reasonably be expected to result in the imposition of a Lien, (g) the partial or complete withdrawal of any Loan Party or ERISA Affiliate from a Multiemployer Plan (other than any withdrawal that would not constitute an Event of Default under <u>Section 8.11</u>), (h) any event or condition that results in the insolvency of a Multiemployer Plan under Section 4245 of ERISA, (i) any event or condition that results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan under ERISA, (j) any Pension Plan being in "at risk status" within the meaning of IRC Section 430(i), (k) any Multiemployer Plan being in "endangered status" or "critical status" within the meaning of IRC Section 432(b) or the determination that any Multiemployer Plan is or is expected to be insolvent within the meaning of Title IV of ERISA, (l) with respect to any Pension Plan, any Loan Party or ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e),

(m) an "accumulated funding deficiency" within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) or the failure of any Pension Plan or Multiemployer Plan to meet the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA), in each case, whether or not waived, (n) the filing of an application for a waiver of the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) with respect to any Pension Plan or Multiemployer Plan, (o) the failure to make by its due date a required payment or contribution with respect to any Pension Plan or Multiemployer Plan, or (p) any event that results in or could reasonably be expected to result in a liability by a Loan Party pursuant to Title I of ERISA or the excise tax provisions of the IRC relating to Employee Benefit Plans or any event that results in or could reasonably be expected to result in a liability to any Loan Party or ERISA Affiliate pursuant to Title IV of ERISA or Section 401(a)(29) of the IRC.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Originating Lender" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Other Taxes" has the meaning specified therefor in Section 16.1 of the Agreement.

"Parent" has the meaning specified therefor in the preamble to the Agreement.

"Parent Guarantors" has the meaning specified therefor in the preamble to the Agreement.

"Participant" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Participant Register" has the meaning set forth in Section 13.1(i) of the Agreement.

"Patent Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Patriot Act" has the meaning specified therefor in Section 4.13 of the Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pending Assignment Notice" has the meaning specified therefor in Section 13.1(l) of the Agreement.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV or Section 302 of ERISA or Sections 412 or 430 of the Code sponsored, maintained, or contributed to by any Loan Party or which any Loan Party has any liability (including on behalf of an ERISA Affiliate), excluding any Canadian Pension Plan.

"Permitted Dispositions" means:

(a)      sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases (or the termination or abandonment thereof) of Real Property not useful in any material respect in the conduct of the business of Parent and its Subsidiaries,

(b)      sales of ABL Priority Collateral permitted under the ABL DIP Facility Documents and in accordance with the Intercreditor Agreement,

(c)      the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other DIP Loan Documents,

(d)      the licensing or sub-licensing of Intellectual Property rights in the ordinary course of business,

(e)      the granting of Permitted Liens,

(f)      the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof,

(g)      any involuntary loss, damage or destruction of property,

(h)      any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(i)      the leasing or subleasing of assets of Parent or its Subsidiaries in the ordinary course of business,

(j)      the making of Restricted Payments that are expressly permitted to be made pursuant to the Agreement,

(k)      the making of Permitted Investments that are expressly permitted to be made pursuant to the Agreement,

(l)      the expiration, abandonment or lapse of patents, trademarks, copyrights, domain names or other intellectual property of Parent and its Subsidiaries (i) to the extent immaterial or not economically desirable in the conduct of their business (ii) in accordance with their respective statutory terms, or (iii) in the ordinary course of business,

(m)      sales or dispositions between or among Loan Parties,

(n)      voluntary terminations of any Hedge Agreements,

(o)      the discount or compromise of notes or accounts receivable (other than Eligible Accounts (as defined in the ABL DIP Facility Documents)) for less than the face value in the resolution of disputes that occur in the ordinary course of business,

(p)      the sale or disposition of shares of Equity Interests of any Subsidiary of Borrower (i) in order to qualify members of the governing body of the Subsidiary if and to the extent required by applicable law or (ii) to nationals of the jurisdiction of organization of any Subsidiary to the extent required by applicable law, and

(q)      so long as no Event of Default has occurred and is continuing, sales of fixed assets in Toronto for cash consideration in an amount not to exceed $500,000 in the aggregate.

"Permitted Indebtedness" means:

(a)      the DIP Facility Obligations, including Indebtedness evidenced by the Agreement or the other DIP Loan Documents,

(b)      the Pre-Petition Term Obligations incurred by the Loan Parties pursuant to the Pre-Petition Term Facility,

(c)      Indebtedness constituting Permitted Investments,

(d)      Indebtedness of the Parent or any of its Subsidiaries arising from the honoring of a check, draft or similar instrument of such Person drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

(e)      Indebtedness of the Parent or any Subsidiary in respect of (A) letters of credit, bankers' acceptances or other similar instruments or obligations issued, or relating to liabilities or obligations incurred in the ordinary course of business under indemnity, performance, surety, statutory, appeal and similar bonds, worker's compensation claims, bonds, letters of credit and completion guarantees, or (B) completion guarantees, surety, judgment, appeal or performance bonds, or other similar bonds, instruments or obligations, provided, or relating to liabilities or obligations incurred, in the ordinary course of business or (C) netting, overdraft protection and other arrangements arising under standard business terms of any bank at which the Parent or any of its Subsidiaries maintains an overdraft, cash pooling or other similar facility or arrangement,

(f)      Indebtedness under the ABL DIP Facility Documents in an aggregate principal amount not to exceed the amount thereof permitted under the DIP Orders, together with any Refinancing (as defined in the Intercreditor Agreement) thereof in accordance with the Intercreditor Agreement,

(g) the Senior ABL Facility Obligations incurred by the Loan Parties pursuant to the Senior ABL Facility Documents, in a maximum principal amount for all such Indebtedness at any time outstanding not to exceed the amount thereof permitted under the DIP Orders, together with any Refinancing (as defined in the Intercreditor Agreement) thereof in accordance with the Intercreditor Agreement,

(h)      Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards"), or Cash Management Services,

(i)      Indebtedness permitted to be incurred in accordance with the DIP Orders,

(j)      Indebtedness incurred in the ordinary course of business owed to any Person providing property, casualty, liability, or other insurance to Parent or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year,

(k)      endorsement of instruments or other payment items for deposit,

(l)      the incurrence by Parent or its Subsidiaries of Indebtedness under Hedge Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with Parent's and its Subsidiaries' operations and not for speculative purposes,

(m)      unsecured Indebtedness (subject to customary rights of setoff) incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business,

(n)      Indebtedness representing deferred compensation or similar obligations to employees incurred in the ordinary course of business,

(o)      accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness,

(p)      to the extent constituting Indebtedness, unsecured Indebtedness consisting of take-or-pay obligations contained in supply agreements entered into by any Loan Party in the ordinary course of business consistent with past practices not to exceed at any time outstanding an amount equal to $500,000,

(q)      Indebtedness in respect of workers' compensation claims, self-insurance obligations, expert or import indemnitees or similar instruments, customs bonds, governmental contracts and leases provided a by Loan Party in the ordinary course of its business and under any letters of credit, bank guarantees or similar instruments supporting the same,

(r)      Indebtedness in respect of taxes, assessments or governmental charges to the extent that payment thereof shall not at the time be required to be made in accordance with Section 5.5,

(s)      Indebtedness owing to a landlord arising under a lease of Real Property as a result of an ordinary course "build out" provision in connection with the financing by such landlord of leasehold improvements,

(t)      unsecured guarantees issued by (x) Loan Parties to guaranty the underlying Indebtedness of another Loan Party and (y) a Subsidiary of Parent that is not a Loan Party to guaranty the underlying indebtedness of any other Subsidiary of Parent to the extent that such Subsidiary is a party to an Intercompany Subordination Agreement, in each case to the extent

that such Indebtedness is permitted under this Agreement (other than guaranties by US Borrower (as defined in the ABL DIP Facility Agreement) or any US Guarantor (as defined in the ABL DIP Facility Agreement) of any Indebtedness of any Canadian Loan Party (as defined in the ABL DIP Facility Documents), except for the US Guaranty (as defined in the ABL DIP Facility Agreement)),

(u)    Indebtedness of a Foreign Subsidiary (other than Canadian Borrower (as defined in the ABL DIP Facility Agreement) or any Subsidiary organized under the laws of Canada or a province thereof) in an aggregate principal amount not to exceed $1,000,000 at any time, and

(v)    Indebtedness outstanding on the Petition Date and set forth on Schedule 4.14 to the Agreement.

"Permitted Intercompany Advances" means loans and other Investments made by (a) a Loan Party to another Loan Party, (b) a Subsidiary of Parent that is not a Loan Party to another Subsidiary of Parent that is not a Loan Party, (c) a Subsidiary of Parent that is not a Loan Party to a Loan Party, so long as the parties thereto are party to the Intercompany Subordination Agreement, (d) a Loan Party to a Subsidiary of Parent that is not a Loan Party so long as (i) the aggregate amount of all such loans and other Investments after the Effective Date does not exceed the greater of $500,000 outstanding at any one time and the amount of such loan or Investment permitted to be made as "other payables" under the Approved Budget, and (ii) at the time of the making of such loan or other Investment, no Default Event of Default has occurred and is continuing or would result therefrom, and (e) loans made from proceeds of a Canadian Borrowing (as defined in the ABL DIP Facility Agreement) by the Canadian Borrower (as defined in the ABL DIP Facility Agreement) to any US Borrower (as defined in the ABL DIP Facility Agreement) secured against assets of the US Borrowers (as defined in the ABL DIP Facility Agreement) pursuant to the DIP Orders, provided that such security is junior to the Liens securing the Existing Secured US Obligations (as defined in the ABL DIP Facility Agreement) and the US Obligations (as defined in the ABL DIP Facility Agreement).

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents,

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(c)    advances and extensions of trade credit made in connection with purchases of goods or services in the ordinary course of business and consistent with past practices,

(d)    Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor, upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries or in connection with an out-of-court restructuring of an Account Debtor,

(e)    Investments owned by any Loan Party or any of its Subsidiaries on the Effective Date and set forth on Schedule P-1 to the Agreement,

(f)     guarantees permitted under the definition of Permitted Indebtedness,

(g)     Permitted Intercompany Advances,

(h)     receivables owing to the Parent or any of its Subsidiaries, if created or acquired in the ordinary course of business,

(i)     [reserved],

(j)     deposits of cash outstanding on the Petition Date made in the ordinary course of business to secure performance of operating leases,

(k)     Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(l)     [reserved],

(m)     so long as no Event of Default has occurred and is continuing at the time such Investment is made or would result therefrom, any other Investments in an aggregate amount not to exceed the lesser of $250,000 outstanding at any time and the amounts therefor permitted in compliance with the Approved Budget,

(n)     Investments (i) by Borrower or any Subsidiary that is a Loan Party in Borrower or any Subsidiary that is a Loan Party, (ii) by any non-Loan Party in any other non-Loan Party that is a Subsidiary and (iii) by any non-Loan Party in Borrower or any Subsidiary that is a Loan Party,

(o)     Investments consisting of obligations under Hedge Agreements permitted by Section 6.1,

(p)     advances in connection with purchases of goods or services in the ordinary course of business and consistent with past practice solely to the extent set forth in Approved Budget, and

(q)     Advances of payroll payments to employees in the ordinary course of business to the extent set forth in the Approved Budget.

"Permitted Liens" means

(a)     Liens granted to, or for the benefit of, Agent to secure any of the DIP Facility Obligations,

(b)     Liens for unpaid Taxes, assessments, or other governmental charges or levies, and other statutory inchoate Liens, in each case that either (i) are not more than thirty days past due or (ii) the underlying Taxes, assessments, charges, levies or other obligations are the subject of Permitted Protests,

(c)      judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under <u>Section 8.3</u> of the Agreement so long as such judgments are stayed during the pendency of the Chapter 11 Cases,

(d)      the interests of lessors and sublessors under operating leases and subleases and non-exclusive licensors and sublicensors under license agreements and sublicense agreements, in each case, incurred in the ordinary course of business,

(e)      Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, contractor, or suppliers, construction liens and other like liens, in each case incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not more than thirty days past due, or (ii) are the subject of Permitted Protests,

(f)      Liens on amounts deposited to secure Parent's and its Subsidiaries obligations in connection with worker's compensation or other unemployment insurance and other social security legislation or other insurance related obligations (including obligations in respect of letters of credit, bank guarantees or similar instruments) securing the same,

(g)      Liens on amounts or Cash Equivalents deposited to secure Parent's and its Subsidiaries obligations in connection with the making or entering into of bids, tenders, contracts, or leases in the ordinary course of business, or statutory obligations and, in each case not in connection with the borrowing of money,

(h)      Liens on amounts deposited to secure Parent's and its Subsidiaries reimbursement obligations with respect to surety, performance, bid, or appeal bonds, completion guarantees and similar obligations, or letters of credit, bank guarantees or similar instruments obtained in the ordinary course of business,

(i)      with respect to any Real Property, (i) easements, covenants, conditions, reservations, declarations, rights of way, and zoning restrictions (including deed restrictions utilized in connection with any Remedial Actions required under Environmental Laws) and other similar matters of record affecting title to such Real Property, (ii) any state of facts that a current accurate survey and visual inspection would disclose, in either case, that do not materially interfere with or impair the use or operation thereof and (iii) all Liens and other matters disclosed in any Mortgage title insurance policy,

(j)      licenses and sublicenses of Intellectual Property rights in existence as of the Effective Date or thereafter in the ordinary course of business,

(k)      Liens granted or authorized by the DIP Orders, including, without limitation, replacement Liens granted to Senior ABL Facility Agent and Liens granted by US Borrowers (as defined in the ABL DIP Facility Agreement) to the Canadian Borrower (as defined in the ABL DIP Facility Agreement) to secure Permitted Intercompany Advances,

(l)      (i) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of Deposit Accounts in the ordinary course of business, (ii) Liens of a collection bank arising under

Section 4-208 of the Uniform Commercial Code on the items in the course of collection, and (iii) Liens attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes,

(m)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties not yet delinquent in connection with the importation of goods,

(n)    Liens on amounts deposited to secure amounts incurred in the ordinary course of business owing to public utilities or to any municipalities or Governmental Authorities or other public authority when required by the utility, municipality or Governmental Authorities or other public authority in connection with the supply of services or utilities to any Loan Party,

(o)    Liens on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business,

(p)    Liens securing the (x) Senior ABL Facility Obligations, (y) ABL DIP Facility Obligation, and (z) the Pre-Petition Term Facility Obligations,

(q)    contractual rights of set-off relating to purchase orders and other agreements entered into in the ordinary course of business,

(r)    inchoate Liens in respect of Canadian Priority Payables and Liens for which a "Canadian Priority Payables Reserve" (as defined therein) for the amount of such Lien has been established under the ABL DIP Facility Agreement,

(s)    Liens set forth on Schedule 1.1A to the Agreement; provided, that to qualify as a Permitted Lien, any such Lien described on Schedule 1.1A to the Agreement shall only secure the Indebtedness that it secures on the Effective Date,

(t)    Liens on assets securing the Senior ABL Facility Obligations subject to the Intercreditor Agreement,

(u)    Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under Section 6.1,

(v)    Liens granted to, or for the benefit of, Pre-Petition Term Agent to secure the Pre-Petition Term Facility Obligations,

(w)    Liens in the nature of precautionary UCC or PPSA filings (or similar filings) by lessors under operating leases,

(x)    any interest of a lessee or sublessee or licensee under any lease or license of excess office, warehouse or other space by a Loan Party in the ordinary course of business consistent with past practices, and

(y)    the Administration Charge (as defined in the ABL Facility Documents).

"Permitted Priority Lien" means Permitted Liens that, under applicable law, are senior to, and have not been subordinated to, the liens of the Agents under the DIP Loan Documents, but only to the extent that such liens are valid, enforceable and non-avoidable liens as of the Petition Date (or as may be permitted to be perfected on the Petition Date pursuant to Section 546 of the Bankruptcy Code).

"Permitted Protest" means the right of Parent or any of its Subsidiaries to protest any Lien (other than any Lien that secures the DIP Facility Obligations), Taxes, or rental or other lease payment, provided that (a) a reserve with respect to such obligation is established on Parent's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted in accordance with applicable law diligently by Parent or its Subsidiary, as applicable, in good faith, and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens.

"Permitted Tax Distributions" means, except as otherwise noted in this definition below, for the calendar year (or portion thereof) ending December 31, 2019 and each calendar year (or portion thereof) ending December 31 thereafter, distributions in the aggregate amount (1) if (A) Parent is not a Flow Through Entity and (B) Borrower is not a Flow Through Entity and Parent is a member (other than the parent) of a consolidated, combined or other similar group for tax purposes, an amount necessary to permit the parent of the aforementioned group to pay estimated or final federal income tax attributable to the taxable income of Borrower and its Subsidiaries for U.S. federal income tax purposes, provided that such payments shall not exceed the amount Borrower and its Subsidiaries would be required to pay if they filed as part of a consolidated, combined, or other similar group for tax purposes separately from the common parent with Borrower as the parent of such hypothetical group, or (2) if Borrower, Holdings and Parent are all Flow Through Entities, an amount equal to the sum of the aggregate net taxable income of Borrower for U.S. federal income tax purposes for the taxable year multiplied by the Effective Tax Rate; provided that such aggregate net taxable income shall be computed (i) as if all excess taxable losses and excess taxable credits of the company were carried forward (taking into account the character of any such loss carryforward as capital or ordinary) and (ii) taking into account any special basis adjustment resulting from an election under IRC Section 754.  Borrower shall be permitted to make estimated tax distributions based on good faith estimates of the taxable income of Borrower and its Subsidiaries.  Within ten (10) days of the filing of the federal income tax return of Parent it shall provide Agent with a signed declaration of the accountant that prepared such return of the amount of taxable income or loss from Borrower and its Subsidiaries that was reflected on such tax return. To the extent estimated Permitted Tax Distributions exceed final Permitted Tax Distributions for any calendar year, such excess, if already distributed, shall be returned to the Borrower.  For purposes of this definition, "taxable income" of Borrower and its Subsidiaries shall include the taxable income of Borrower and its Subsidiaries (included pursuant to Section 951 and Section 951A of the IRC) only to the extent Borrower and its Subsidiaries receive from such Excluded Subsidiary an amount sufficient to pay all income taxes attributable to such taxable income.

"Permitted Variances" means, with respect to determining compliance with Section 6.19 relating to the Borrower's cash receipts, cash disbursements and net cash flow, (i) all variances favorable to the Borrowers and their Subsidiaries; (ii) with respect to determining compliance with Section 6.19(e) or 6.19(f) as of the end of any Testing Period, an unfavorable cumulative variance of 10.0% (in each case compared to the relevant amounts forecast for the same period in the Approved Budget); and (iii) with respect to determining compliance with Section 6.19(g) as of the end of any Testing Period, an unfavorable cumulative variance of 15.0% (in each case compared to the amount forecast for the same period in the Approved Budget).

"Persons" means natural persons, corporations, limited liability companies, limited partnerships, unlimited liability companies, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning specified therefor in the recitals.

"Plan Effective Date" means the date in which all conditions precedent to the effectiveness of a Proposed Plan has been satisfied or waived in accordance with the Proposed Plan.

"Post-Carve Out Trigger Notice Cap" has the meaning specified therefor in Section 2.14(d) of the Agreement.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness, trade payables or other pre-petition claims against any Loan Party.

"Pre-Petition Term Agent" means Barings Finance LLC in its capacity as agent for the Pre-Petition Term Lenders under the Pre-Petition Term Facility Documents, or any successor agent under the Pre-Petition Term Facility Documents.

"Pre-Petition Term Facility Agreement" means that certain Term Loan Credit Agreement, dated as of June 9, 2017, by and among the Borrower, the Parent Guarantors, the Pre-Petition Term Agent, the Pre-Petition Term Lenders, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Pre-Petition Term Facility" means the Pre-Petition Term Facility Agreement, any Pre-Petition Term Facility Documents, any notes issued pursuant thereto and any guarantee and collateral agreement, patent and trademark security agreement, mortgages, and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Pre-Petition Term Facility Documents" means the "Loan Documents" as defined in the Pre-Petition Term Facility Agreement, as the same may be amended, supplemented, waived, or otherwise modified from time to time.

"Pre-Petition Term Lenders" means the lenders from time to time party to the Pre-Petition Term Facility Agreement.

"Pre-Petition Term Liens" means the Liens securing the Pre-Petition Term Obligations.

"Pre-Petition Term Obligations" means the "Obligations" under and as defined in the Pre-Petition Term Facility Agreement.

"Prepayment Date" has the meaning specified therefor in Section 2.4(f) of the Agreement.

"Proposed Plan" has the meaning specified therefor in Section 8.9(m)(iv) of this Agreement.

"Pro Rata Share" means, as of any date of determination:

(a)    with respect to a Lender's obligation to make all or a portion of the DIP Loans of any tranche, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the DIP Loans of such tranche, and with respect to all other computations and other matters related to the DIP Loans of such tranche, the percentage obtained by dividing (i) the DIP Loan Commitments (or, if such DIP Loan Commitments are terminated, the outstanding DIP Loans) of such tranche owed to such Lender by (ii) the aggregate DIP Loan Commitments (or, if such DIP Loan Commitments are terminated, the aggregate outstanding DIP Loans) of such tranche owed to all Lenders, and

(b)    with respect to all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.7 of the Agreement), the percentage obtained by dividing (i) the DIP Loan Commitments (or, if such DIP Loan Commitments are terminated, the outstanding DIP Loans) of the relevant tranche owed to such Lender by (ii) the aggregate DIP Loan Commitments (or, if such DIP Loan Commitments are terminated, the aggregate outstanding DIP Loans) of the relevant tranche owed to all Lenders, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 13.1; provided, that if all of the DIP Loans of the relevant tranche have been repaid in full, and all DIP Loan Commitments of the relevant tranche have been terminated, Pro Rata Share under this clause shall be determined as if the DIP Loans of the relevant tranche had not been repaid and shall be based upon the DIP Loans of the relevant tranche as they existed immediately prior to their repayment.

"Qualified Equity Interests" means and refers to any Equity Interests issued by Parent (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by Parent or one of its Subsidiaries and the improvements thereto, including without limitation the Real Property Collateral.

"Real Property Collateral" means the Real Property identified on Schedule R-1 to the Agreement and any Real Property hereafter acquired by any Loan Party in fee simple with a fair market value greater than $1,000,000.

"Recipient" means (a) Agent and (b) any Lender, as applicable.

"Recognition Proceedings" means the recognition proceeding commenced under Part IV of the Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice (Commercial List ) to recognize the Chapter 11 Cases as "foreign main proceedings".

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Loan Party giving rise to Net Cash Proceeds to such Loan Party, as the case may be, to the extent that such settlement or payment does not constitute reimbursement or compensation for amounts previously paid by the Borrower or any other Loan Party in respect of such casualty or condemnation.

"Register" has the meaning set forth in Section 13.1(h) of the Agreement.

"Registered Loan" has the meaning set forth in Section 13.1(h) of the Agreement.

"Related Agreements" means the DIP Loan Documents, the RSA and all other agreements or instruments executed in connection with the Related Transactions.

"Related Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Related Transactions" means (i) the execution, delivery and performance by the Loan Parties of this Agreement and each other DIP Loan Document to which they are a party, the initial borrowing under of the DIP Loan and the use of the proceeds thereof, and the grant of DIP Liens by the Borrower on the DIP Collateral pursuant to this Agreement, the DIP Orders and the Guaranty and Security Agreement, (ii) the commencement and filing of the Chapter 11 Cases and (iii) the payment of all fees, costs and expenses associated with all of the foregoing.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Replacement Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Required Lenders" means, at any time, Lenders having or holding more than 50% of the sum of the aggregate outstanding DIP Loans of all Lenders; provided, that the outstanding DIP Loans of any Defaulting Lender shall be disregarded in the determination of the Required Lenders; provided, further, that if at any time there are two (2) or more Lenders, then at least two (2) Lenders shall be necessary to constitute Required Lenders (for purposes of this proviso, a Lender and any other Lenders that are Affiliates or Related Funds of such Lender shall be counted as a single Lender).

"Responsible Officer" of any Person means the chief executive officer, the president, executive vice president, any senior vice president, any vice president, the chief operating officer, the legal representative, the general manager or any Financial Officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of the Agreement.  Agent and each Lender shall be entitled to conclusively presume that (i) any document delivered hereunder that is signed by a Responsible Officer of a Loan Party has been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and (ii) such Responsible Officer has acted on behalf of such Loan Party.

"Restricted Asset Sale Proceeds" means, in respect of a Foreign Asset Sale, an amount equal to the Net Cash Proceeds attributable thereto if and solely to the extent that the repatriation of such Net Cash Proceeds to Borrower (a) would result in material (relative to the amount of the Foreign Asset Sale) adverse Tax consequences to Parent or any of its Subsidiaries (taking into account any foreign tax credit that would be realized in connection with such repatriation) or (b) would be prohibited (but only for so long as such prohibition is in effect) or restricted (but only to the extent of such restriction and, then, only for so long as such restriction is in effect) by applicable law, rule or regulation, organizational document of the applicable Foreign Subsidiary, or pre-existing contract (so long as (i) such contractual obligation or restriction or organizational document was not entered into or imposed in contemplation of such repatriation and (ii) unless such prohibition or restriction is required to be included under applicable law, rule, or regulation, if there are commercially reasonable measures available to remove such prohibition or restriction from its organizational documents, such Foreign Subsidiary has taken such commercially reasonable measures).  For purposes of this definition, if an officer's certificate setting forth a calculation in reasonable detail of the amount of Restricted Asset Sale Proceeds in respect of any Foreign Asset Sale is delivered to Agent, such certificate shall be prima facie evidence of such amount unless Agent or any Lender notifies Borrower within 10 Business Days after such certificate is received by Agent that it (i) disagrees with such determination (including a description of the basis upon which it disagrees) or (ii) reasonably requires additional information in order to determine whether it agrees or disagrees with such determination.

"Restricted Payment" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by Parent (including any such payment in connection with any merger, amalgamation or consolidation involving Parent) or to the direct or indirect holders of Equity Interests issued by Parent in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by Parent), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger, amalgamation or consolidation involving Parent) any Equity Interests issued by Parent, and (c) make any payment

to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of Parent now or hereafter outstanding.

"RSA" means a Restructuring Support Agreement, dated as of the date hereof, entered into by the Loan Parties, the Agent, and certain of the Pre-Petition Term Lenders, and the other parties thereto.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a comprehensive country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Documents" means the Guaranty and Security Agreement, each Mortgage related to any mortgaged real property, and all other similar security documents hereafter delivered to the Agent granting or perfecting a DIP Lien on any asset or assets of any Person to secure the obligations and liabilities of the Loan Parties hereunder and/or under any of the other DIP Loan Documents or to secure any guarantee of any such obligations and liabilities, in each case, as amended, supplemented, waived or otherwise modified from time to time.  For the avoidance of doubt, the DIP Orders shall constitute "Security Documents" for all purposes hereunder.

"Selling Lender" has the meaning specified therefor in Section 13.1(l) of the Agreement.

"Senior ABL Agreement" means the Third Amended and Restated Credit Agreement, dated as of June 9, 2017, by and among the Parent Guarantors, Borrower, Hollander Sleep Products Canada Limited, certain subsidiaries of Parent, the Senior ABL Facility Agent, the lenders party thereto and the other parties thereto.

"Senior ABL Facility Agent" means Wells Fargo Bank, National Association, in its capacity as administrative agent under the Senior ABL Facility Documents, together with its successors and assigns.

"Senior ABL Facility" means the Senior ABL Agreement, any Senior ABL Facility Documents, any notes and letters of credit issued pursuant thereto and any guarantee and

collateral agreement, patent and trademark security agreement, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Senior ABL Facility Documents" means the "Loan Documents" as defined in the Senior ABL Agreement, as the same may be amended, supplemented, waived, otherwise modified, extended, renewed, refinanced or replaced from time to time.

"Senior ABL Facility Lenders" means the lenders under the Senior ABL Agreement.

"Senior ABL Facility Obligations" means the "Obligations", as defined in the Senior ABL Agreement.

"Sponsor" means Sentinel Capital Partners, L.L.C.

"Sponsor Affiliated Entity" means Sponsor or any of its Affiliates (other than Loan Parties or their Subsidiaries and other than operating portfolio companies of Sponsor and its Affiliates).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, unlimited liability company or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, unlimited liability company, or other entity.

"Taxes" or "taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Term Loan Priority Collateral" has the meaning specified therefor in the Intercreditor Agreement.

"Termination Event" has the meaning specified therefor in Section 8.9 of the Agreement.

"Testing Period" means (x) as of end of the week that is the third Friday after the Petition Date, the period commencing with the first day of the first calendar week covered by the Approved Budget and ending with the last day of such week; and (y) as of the end of each consecutive two-week period ending thereafter (ending with the last such full two-week period ending during the Life of the Case), the period commencing with the first day of the first calendar week covered by the Approved Budget and ending with the last day of the applicable week referenced in this clause (y).

"TL Deposit Account" means a non-interest bearing cash collateral account established and maintained by the Borrower at an office of the Collateral Account Bank in the name, and, subject to the DIP Orders, under the "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) of the Agent for the benefit of the Secured Parties; provided that until such time as such account subject to a lien or control agreement securing the Obligations is established, TL Deposit Account shall mean arrangements of substantially similar effect reasonably satisfactory to the Agent (and set forth in the DIP Orders) for such funds to be deposited with and maintained in the Debtors' account(s) at Wells Fargo). For the avoidance of doubt, any requirement to enter into a control agreement with respect to the TL Deposit Account shall be satisfied by entering into such agreement with the Agent, with control to be exercised in accordance with the DIP Orders.

"Trademark Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Unasserted Contingent Indemnification Obligations" means contingent indemnification obligations to the extent no demand or claim has been made with respect thereto and no claim giving rise thereto has been asserted.

"United States" means the United States of America.

"US Foreign Holdco" means any Subsidiary of Parent organized under the laws of a State of the United States or the District of Columbia substantially all of whose assets consist of stock or other equity (or instruments treated as equity for U.S. federal income tax purposes) of one or more CFCs and other assets of *de minimis* value (including, without limitation, any Canadian Subsidiary).

"US Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the IRC.

"Variance Report" has the meaning specified therefor in Section 5.2(a) of the Agreement.

"Voidable Transfer" has the meaning specified therefor in Section 17.8 of the Agreement.

"Weekly Cash Flow Forecast" has the meaning specified therefor in Section 5.2(a) of the Agreement.

"Withdrawal Liability" means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule

## Schedule 1.1A

## Permitted Liens

| Name of Debtor | Secured Party | Jurisdiction/Office | File Number/ Date Filed | Type of Lien | Description of Collateral |
|---|---|---|---|---|---|
| HOLLANDER SLEEP PRODUCTS, LLC | TOYOTA INDUSTRIES COMMERCIAL FINANCE, INC. <br><br> NATIONWIDE LIFT TRUCKS INC. | Delaware - Secretary of State | 2017 0983046 02/13/2017 | UCC-1 | Leased equipment |
| HOLLANDER SLEEP PRODUCTS, LLC | IBM CREDIT LLC | Delaware - Secretary of State | 2017 7995188 12/04/2017 | UCC-1 | Leased equipment |
| HOLLANDER SLEEP PRODUCTS, LLC | CANNON FINANCIAL SERVICES, INC. | Delaware - Secretary of State | 2018 3435233 05/21/2018 | UCC-1 | Leased equipment |
| HOLLANDER SLEEP PRODUCTS, LLC | HYG FINANCIAL SERVICES, INC. | Delaware - Secretary of State | 2018 7480524 10/29/2018 | UCC-1 | Leased equipment |
| Hollander Sleep Products, LLC | MAC CROSSING, L.L.C. | Texas - Dallas County, Clerk | 201800098247 04/16/2018 | UCC-1 | All of Debtor's property situated in or upon, or used in connection with, the Premises or the Project located at 2615 Gifford Street, Grand Prairie, Texas 75050 |
| PACIFIC COAST FEATHER COMPANY | NMHG FINANCIAL SERVICES, INC. | Washington - Department of Licensing | 2012-156-8434-8 06/04/2012 | UCC-1 | Leased equipment |
| PACIFIC COAST FEATHER COMPANY | DE LANDEN FINANCIAL SERVICES, INC. | Washington - Department of Licensing | 2013-259-9054-4 09/16/2013 | UCC-1 | Leased equipment |

## **Schedule 4.1(b)**

## **Subscriptions, Options, Warrants, Calls of Parent**

There are a total of 11,428,571 options issued with respect to all classes of the outstanding units in Dream II Holdings, LLC that include time and exit options as well as two classes of performance options.

**Schedule 4.1(c)**

**Capitalization of Parent's Subsidiaries**

| Issuer | Holder | Class of Equity Interest | Number of Authorized Shares | Number of Shares Issued and Outstanding | Percentage Owned by Holder |
|---|---|---|---|---|---|
| Hollander Home Fashions Holdings, LLC | Dream II Holdings, LLC | Membership interests | 1,358,214 Common Units | N/A | 100% |
| Hollander Sleep Products, LLC | Hollander Home Fashions Holdings, LLC | Membership interests | 1,000 units | N/A | 100% |
| Hollander Sleep Products Kentucky, LLC | Hollander Sleep Products, LLC | Membership interests | 1,000 units | N/A | 100% |
| Hollander Home Fashions Trading (Shanghai) Co., Ltd. | Hollander Sleep Products, LLC | Membership interests | N/A | N/A | 100% |
| Hollander Sleep Products Canada Limited | Dream II Holdings, LLC | Common shares | 1 common share | 1 | 100% |
| Pacific Coast Feather, LLC | Hollander Sleep Products, LLC | Membership interests | N/A | N/A | 100% |
| Pacific Coast Feather Cushion, LLC | Pacific Coast Feather, LLC | Membership interests | N/A | N/A | 100% |
| PCF (Shanghai) Quality Management Consulting Co., Ltd. | Pacific Coast Feather, LLC | Equity interest | N/A | N/A | 100% |

## **Schedule 4.1(d)**

## **Subscriptions, Options, Warrants, Calls of Parent's Subsidiaries**

None.

## **Schedule 4.6(a)**

### **Litigation**

1. The Bankruptcy Cases, the Recognition Proceedings and any litigation resulting therefrom

**Schedule 4.10**

**Benefit Plans**

None.

## **Schedule 4.11**

### **Environmental Matters**

None.

## **Schedule 4.14**

## **Permitted Indebtedness**

1. To the extent constituting Indebtedness, Capitalized Lease Obligations secured by the Liens set forth on Schedule P-2

**Schedule 4.25**

**Immaterial Subsidiaries**

None.

**Schedule 4.26**

**Intellectual Property**

Schedules 2, 4 and 6 to the Guaranty and Security Agreement are herein incorporated by reference.

**Schedule 4.27**

**Insurance**

| COVERAGE | INSURER | POLICY NUMBER | POLICY TERM |
|---|---|---|---|
| Workers Compensation/Employers Liability | Safety First Insurance Co. | FCL 4059909 | 1/1/19-1/1/20 |
| Automobile Liability & Physical Damage | Safety National Casualty Corp | CAF 4059905 | 1/1/19-1/1/20 |
| General Liability | Safety National Casualty Corp | GLF 4059904 | 1/1/19-1/1/20 |
| Umbrella Liability Excess Umbrella | Continental Insurance Co. The Ohio Casualty Insurance Co. | TBD TBD | 1/1/19-1/1/20 |
| Foreign Package | Insurance Co. of the State of PA (AIG) | WS11001075 | 1/1/19-1/1/20 |
| Property Terrorism | Lexington Insurance Co. (Primary) James River Ins. Co. ($25MM xs $25MM) Landmark American ($50MM xs $50MM) Lloyds of London (Hiscox) | 061818976 000812520 LHD903070 UTS2555987.19 | 2/1/18-2/1/19 2/1/18-2/1/19 2/1/18-2/1/19 1/1/19-2/1/20 |
| Stock Throughput/Cargo | Lloyds of London | B0509MARCW1900022 | 1/1/19-1/1/20 |
| Commercial Crime | Travelers | 106205672 | 1/1/19-1/1/20 |
| Cyber (Privacy & Network Liability) | ACE American Insurance Co. | G25666707004 | 1/1/19-1/1/20 |
| Special Crime (K&R) | National Union Fire Ins Co (AIG) | 82867529 | 1/1/18-11/1/19 |
| Employment Practices Liability | Travelers Casualty and Surety Company of America | 106876796 | 1/1/19-1/1/20 |

**<u>Schedule 6.10</u>**

**<u>Affiliate Transactions</u>**

1.  Last Out DIP Obligations

## Exhibit D

**DIP ABL Fee Letter**

**Filed Under Seal**

KE 61190851

## <u>Exhibit E</u>

**DIP Term Loan Fee Letter**

**Filed Under Seal**