Hearing Date:  August 1, 2019, at 11:00 a.m. (prevailing Eastern Time)
Objection Deadline:  July 25, 2019, at 4:00 p.m. (prevailing Eastern Time)

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | Case No. 19-11608 (MEW) |
| Debtors. | (Jointly Administered) |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE PLANT CLOSURE AGREEMENT BETWEEN THE DEBTORS AND THE SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED, SEIU ON BEHALF OF LOCAL 2420 AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order (I) Approving the Plant Closure Agreement Between the Debtors and the Southern Regional Joint Board of Workers United, SEIU on Behalf of Local 2420 and (II) Granting Related Relief* (the "Motion") will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York (the "Court"), One Bowling Green, Courtroom No. 617, New York, New York 10004-1408, on **August 1, 2019, at 11:00 a.m.**, prevailing Eastern Time.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York, and the *Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief* [Docket No. 184] approved by the Court; (c) be filed electronically with the Court on the docket of *In re Hollander Sleep Products, LLC*, Case 19-11608 (MEW) by registered users of the Court's electronic filing system and in accordance with the General Order M-399 (which is available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **July 25, 2019, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the master service list (available on the Debtors' case website at https://omnimgt.com/hollander) and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed, served, and received will be considered at the hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 62147412

New York, New York
Dated:  July 3, 2019

/s/ Joshua A. Sussberg, P.C.
Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

KE 62147412

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE PLANT CLOSURE AGREEMENT BETWEEN THE DEBTORS AND THE SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED, SEIU ON BEHALF OF LOCAL 2420 AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

**Relief Requested**

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A**, (a) approving the Memorandum of Agreement (the "Union Agreement") dated

June 14, 2019, by and between Hollander Sleep Products LLC and the Southern Regional Joint

Board of Workers United, SEIU on behalf of Local 2420 (the "Union"), a copy of which is attached

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

hereto as **Exhibit B**, which will allow the Debtors to close their manufacturing plant based in

Thomson, Georgia (the "Thomson Plant"), and (b) granting related relief.  In further support of

the relief requested herein, the Debtors respectfully submit the declaration of Marc Pfefferle

(the "Pfefferle Declaration"), a copy of which is attached hereto as **Exhibit C** and which is

incorporated herein by reference.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and

the *Amended Standing Order of Reference from the United States District Court for the Southern

District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to rule

7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a

final order by the Court in connection with this motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are section 105(a) and 363(b) of title 11 of

the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Bankruptcy

Rule 9019.

### Background[2]

5.      Hollander Sleep Products is the largest pillow and mattress pad manufacturer in

North America.  The Debtors also manufacture comforters and other basic bedding products.

---

[2]    A description of the Debtors' business and the events precipitating these chapter 11 cases is set forth in
the *Declaration of Marc Pfefferle, Chief Executive Officer of Hollander Sleep Products, LLC, in Support of*

KE 62147412

The Debtors have their own brands, including Great Sleep®, I AM®, LC®, PCF®, and Restful Nights®, and also manufacture and sell licensed brands, including Simmons®, Ralph Lauren®, CHAPS®, Calvin Klein®, Therapedic®, Nautica®, 37.5®, and Dr. Maas®. The Debtors are headquartered in Boca Raton, Florida, operate a main showroom in New York City, and have thirteen manufacturing facilities throughout the United States and Canada. The Debtors generated approximately $527 million in net revenue in fiscal year 2018 and currently employ more than 2,300 people across the United States and Canada. As of May 19, 2019 (the "Petition Date"), the Debtors had approximately $233 million in funded debt.

6.       On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no party has requested the appointment of a trustee or an examiner in these chapter 11 cases. On May 30, 2019, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "UCC") pursuant to section 1102 of the Bankruptcy Code.

**The Thomson Plant**

7.       The Debtors are pursuing a path to right size their business operations to make them more efficient and restore them to profitability. To that end, and due to changing customer demands, the Debtors have excess manufacturing capacity and are reviewing their operations and analyzing potential consolidations of their manufacturing locations. One such location is the Thomson Plant, which is the Debtors' smallest East Coast manufacturing facility in terms of

---

*Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 3]. Terms capitalized but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

square footage and production. The Thomson Plant has been operating at full capacity and needs capital upgrades, and it is most efficient to transfer its production functions to other manufacturing plants. Accordingly, the Debtors have decided to close the Thomson Plant, a course of action that the Debtors anticipate will generate significant annual savings.

8.          Closure of the Thomson Plant will also require the continued support and efforts of the Debtors' Thomson Plant employees. The Thomson Plant has 173 employees, 141 of which are members of the Union, which is party to a collective bargaining agreement with the Debtors. As a result, it is critical that the Debtors have the support of the Union through the Thomson Plant's wind-down process. To encourage the continued cooperation of the Thomson Plant's Union employees through the wind down and cessation of operations, the Debtors negotiated a comprehensive settlement of all outstanding matters with the Union, which is incorporated into the Union Agreement. Although the loss of jobs associated with the Thomson Plant closure is an unfortunate consequence of the Debtors' need to streamline their operations, the Debtors believe that the Union Agreement provides a mutually beneficial resolution of the outstanding issues between the Debtors and the Union. Among other points, the Union Agreement provides for the following key terms:[3]

| Summary of Union Agreement Key Terms | |
| --- | --- |
| Collective Bargaining Agreement | The existing collective bargaining agreement will remain in effect until the last Union employee is permanently laid off and terminated. The outside date for termination of the existing collective bargaining agreement is October 31, 2019, subject to extension. |

---

[3]    The summary of the terms of the Union Agreement contained in this motion is provided for convenience purposes only. In the event of any inconsistency between the summary set forth herein and the Union Agreement, the Union Agreement shall control. Capitalized terms used in this table but not otherwise defined herein have the meanings set forth in the Union Agreement.

4

| Summary of Union Agreement Key Terms | |
|---|---|
| Resumption of Operations | If the Debtors resume similar manufacturing operations in or within twenty-five miles of Thomson, Georgia on or before January 31, 2020, the Union will be the exclusive bargaining representative for the same employees it currently represents, and certain enumerated Union employees will have preferential hiring rights. |
| Release of Claims | All Union grievances (both belonging to the Union and to the individual employees it represents) filed before the date of the Union Agreement are settled, resolved, and released. |
| Continued Services | Union employees working on or after June 3, 2019, will continue their normal work and cooperate in facilitating the Thomson Plant's shutdown. The target date for the Thomson Plant's closure is August 16, 2019. |
| Severance and Compensation Benefits[4] | The Debtors will continue to honor vacation pay policies, continue to insure Union employees through the end of the month in which they are permanently laid off and pay for one month of COBRA continued health insurance thereafter, and continue matching contributions to the Union's non-contributory 401(k) until the beneficiary is permanently laid off.<br><br>The Debtors will also pay eligible employees a seniority buyback payment in an amount calculated based upon the employee's length of service. |
| Relocation | The Debtors may offer certain employees the opportunity to relocate to the Henderson, North Carolina manufacturing plant. Union employees who are offered the opportunity will be eligible to receive an advance from the Debtors to assist with relocation expenses. |
| Work-Through Bonus | Union employees who work through their designated permanent layoff date at the Thomson Plant with perfect attendance and no more than 2 hours of No-Fault absence time between the date of Court approval of the Union Agreement and the date of the employee's permanent layoff will be eligible for a work-through bonus ranging from $1.50–$2.00 for each straight time hour of work between June 3, 2019, and the date of the employee's permanent layoff. |

## **Basis for Relief**

9.      Section 363(b)(1) of the Bankruptcy Code authorizes a court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

---

[4]      The Union Agreement does not contemplate any severance, bonuses, or other payments for the benefit of any "insider" as the term is defined in section 101(31) of the Bankruptcy Code.

5

property of the estate." 11 U.S.C. § 363(b)(1). To approve a use, sale, or lease of property other than in the ordinary course of business, a court must find "some articulated business justification" that demonstrates "a good business reason" for the requested relief. *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983). Once a debtor articulates a business justification, "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).

10.     Bankruptcy Rule 9019(a) further provides that, "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In determining whether to approve a settlement as fair and equitable under Bankruptcy Rule 9019, courts in the Second Circuit consider the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay; (c) the paramount interest of the creditors; (d) whether other parties in interest affirmatively support the proposed settlement; (e) the nature and breadth of releases to be obtained by officers and directors; (f) the competency and experience of the counsel supporting the settlement; and (g) the extent to which the settlement is the product of arm's-length bargaining. *See In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *see also Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 428 (S.D.N.Y. 1993) *aff'd*, 17 F.3d 600 (2d Cir. 1994).

11.     A settlement under Bankruptcy Rule 9019 need not result in the best possible outcome for the Debtors, but must not "fall[] below the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 595 (Bankr. S.D.N.Y. 1991) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). In determining the range of reasonableness, the bankruptcy court need not decide the numerous issues of law and fact raised

6

by the settlement. *See W.T. Grant Co.*, 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In other words, the court does not need to conduct a "mini-trial" of the underlying facts and merits; it needs only to evaluate those facts that are necessary to allow it to assess the settlement and to make an independent judgment about the settlement. *See In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) ("The standard does not require that the settlement be the best the debtor could have obtained nor does it require the court to conduct a mini-trial of the questions of law and fact."); *In re Mrs. Wienberg's Kosher Foods, Inc.*, 278 B.R. 358, 362 (Bankr. S.D.N.Y. 2002) ("In reviewing the settlement, the court is not required to conduct a mini-trial of the compromised issues or claims."); *Drexel Burnham*, 134 B.R. at 496 ("[A] trial or 'mini trial' on the merits is not required for Court approval of a settlement.").

12.      Ultimately, the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim."); *Drexel Burnham*, 134 B.R. at 505; *see also In re Infotechnology*, 1995 U.S. App. LEXIS 39883, at *4–5 (2d Cir. Nov. 9, 1995) (noting that in determining whether to approve a debtor's motion to settle a controversy, a court does not substitute its judgment for that of the debtor).

13.      A court should exercise its discretion in favor of a settlement wherever possible, as settlements are generally favored in bankruptcy. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged."); *see also In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) ("The decision to grant or deny a settlement or compromise lies squarely within the discretion of the bankruptcy court [and such] discretion should be exercised in light of

7

the general public policy favoring settlements.") (citing *Nellis v. Shugrue*, 165 B.R. 115, 121 (S.D.N.Y. 1994); *In re Michael Milken & Assocs. Secs. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (noting the paramount public policy for settlements)).[5]

14.    The Debtors respectfully submit that the Union Agreement represents a fair and reasonable compromise that is in the best interest of the Debtors' estates and within the Debtors' sound business judgment.    The Union Agreement favorably resolves all outstanding Union grievances, which could otherwise result in contentious and protracted litigation.    The Union Agreement also allows the Debtors to amicably terminate their relationship with the Union without engaging in section 1113 litigation with the Union.    Moreover, the Union Agreement ensures stability for the Debtors' business operations as they wind down the Thomson Plant's operations. In exchange for these benefits, the Debtors have committed to providing certain benefits to the Union's employees, such as the provision of one month of COBRA continuing insurance coverage and payment of work-through bonuses.

15.    The Debtors have determined in their reasonable business judgment that the benefits of the Union Agreement outweigh the associated costs.    Thus, the terms embodied in the Union Agreement satisfy the Bankruptcy Rule 9019 factors applied in this jurisdiction and meet the business judgment test as required under section 363(b) of the Bankruptcy Code.    Accordingly, the Debtors respectfully request that the Court authorize the Debtors to enter into and perform under the Union Agreement as such action is a reasonable exercise of the Debtors' business judgment and in the best interest of their estates.

---

[5]    Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Authorizing the Debtors to proceed with the Union Agreement falls squarely within the spirit of Bankruptcy Rule 9019 as well as the Bankruptcy Code's predilection for compromise.    Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

KE 62147412

**Notice**

16.     The Debtors have provided notice of this motion to the entities on the Master Service List (as defined in the case management order in these chapter 11 cases [Docket No. 184] and available on the Debtors' case website at https://omnimgt.com/hollander) and the Union. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**Waiver of Bankruptcy Rule 6004(h)**

17.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that the Debtors have established cause to exclude the relief requested herein from the 14-day stay period provided under Bankruptcy Rule 6004(h).

**Motion Practice**

18.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013 1(a).

**No Prior Request**

19.     No prior request for the relief sought in this Motion has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

9

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form

attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as

is just and proper.

New York, New York
Dated:  July 3, 2019

/s/ *Joshua A. Sussberg, P.C.*
Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

KE 62147412

**<u>Exhibit A</u>**

**Proposed Order**

KE 62147412

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE PLANT CLOSURE AGREEMENT BETWEEN THE
DEBTORS AND THE SOUTHERN REGIONAL JOINT BOARD OF WORKERS
UNITED, SEIU ON BEHALF OF LOCAL 2420 AND (II) GRANTING RELATED
RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) approving the Union Agreement and (b) granting related relief, all as more fully set forth in the Motion; and upon the Pfefferle Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

KE 62147412

the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.       The Motion is granted as set forth herein.

2.       The Union Agreement is hereby approved, and the Debtors are authorized to enter into and perform under the Union Agreement and perform, execute, and deliver all documents, and take all actions, necessary to immediately continue and fully implement the Union Agreement in accordance with the terms, conditions, and agreements set forth or provided for therein.

3.       Nothing herein shall be deemed to authorize the payment of any amounts that violate or implicate section 503(c) of the Bankruptcy Code, except upon further order of this Court.

4.       Notwithstanding the relief granted in this Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and any budget in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith.

5.       Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

6.       The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

KE 62147412

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of the Union Agreement and this

Order.

New York, New York
Dated: _____, 2019

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

KE 62147412

## Exhibit B

**Union Agreement**

KE 62147412

# HOLLANDER SLEEP PRODUCTS, LLC

## AND

## SOUTHERN REGIONAL JOINT BOARD

## OF WORKERS UNITED, SEIU ON BEHALF OF LOCAL 2420

## THOMSON, GEORGIA PLANT SHUTDOWN

## <u>MEMORANDUM OF AGREEMENT</u>

This Thomson, Georgia Plant Shutdown Memorandum of Agreement, made and entered into this *14th* day of June 2019, by and between Hollander Sleep Products, LLC (hereinafter referred to as the "Company") and the Southern Regional Joint Board of Workers United, SEIU on behalf of Local 2420, (hereinafter referred to as the "Union"), for and on behalf of all employees in the bargaining unit represented by the Union as described in Article 1.01 of the Collective Bargaining Agreement (hereinafter sometimes referred to as the "Labor Agreement") between the Company and the Union effective February 1, 2017, through January 31, 2020.

### WITNESSETH:

**WHEREAS**, the Company has decided to permanently close the Thomson, Georgia plant ("Thomson plant") and there will be a permanent shutdown of the manufacturing operations at the Thomson plant;

**WHEREAS**, the Company and the Union are parties to a Labor Agreement covering rates of pay, wages, hours, benefits and other conditions of employment for manufacturing operations and distribution operations in the Thomson plant;

**WHEREAS**, the Company has informed the Union of the decision to permanently close the Thomson plant, and the Union has no basis at this time for challenging the finality of the Company's decision; and

**WHEREAS**, the Company and the Union have negotiated concerning the effects of the decision to close the Thomson plant, and have had full opportunity to make proposals and negotiate with respect to the permanent shutdown of the Thomson plant and its effects on employees, and have negotiated and agreed regarding the benefits to be granted employees in connection with such permanent shutdown of the Thomson plant and the release of all claims of the Union and employees against the Company related to the closing of the Thomson plant, and desire to set forth in this Memorandum of Agreement, their entire agreement with respect to such matters:

**NOW THEREFORE**, in consideration of the promises and mutual agreements hereinafter stated it is agreed as follows:

1.  The Labor Agreement currently in effect between the Company and the Union shall remain in effect in its entirety until the day the last employee working in the manufacturing operations in the bargaining unit represented by the Union is permanently laid off and terminated. But in no event shall such termination of the Labor Agreement and the permanent layoff and termination of the last employee working in the manufacturing operations in the bargaining unit represented by the Union occur later than October 31, 2019. This October 31, 2019, date may be extended to a later date based on the customer requirements, run-out production results, and extension of the plant lease issues.

2.  In the event that the Company resumes similar manufacturing operations in Thomson, Georgia or within a twenty-five (25) mile radius from the Thomson plant location, on or before January 31, 2020, the Company shall recognize the Union as the exclusive bargaining representative for the same bargaining unit that exists in the current Labor Agreement, including all production, maintenance and shipping and receiving employees, excluding supervisors as defined in the National Labor Relations Act, inventory clerks, Quality Inspector, industrial engineers, guards, and mechanics at said re-established plant, and bargain with the Union for a new collective bargaining agreement. All employees whose names appear in Exhibit A of this Agreement shall be afforded preferential hire rights to jobs at such re-established new plant which they are qualified to perform. Qualifications will be measured at the sole discretion of the Company, but in no event shall an employee be unreasonably denied a job.

3.  If any provision of the Labor Agreement is inconsistent with the terms and provisions of this Thomson, Georgia Plant Shutdown Memorandum of Agreement, then the terms and provisions of this Thomson, Georgia Plant Shutdown Memorandum of Agreement shall control.

4.  The Union agrees that all grievances previously filed before the date of this Thomson, Georgia Plant Shutdown Memorandum of Agreement are settled and considered resolved on the basis of the agreed settlement between the Company and Union or the Company's answer in the most recent step of the grievance procedure in the Labor Agreement and that there are no pending grievances between the Company and the Union as of the date of this Thomson, Georgia Plant Shutdown Memorandum of Agreement. However, the Company and Union agree that any grievance under the Labor Agreement arising from actions taken by the Company after the effective date of this Memorandum of Agreement and any claimed violation of this

Memorandum of Agreement by the Company shall be subject to the grievance and arbitration procedure provided for in the Labor Agreement. The Company and the Union also agrees that any such grievance under the Labor Agreement and any such claimed violation of this Memorandum of Agreement shall be entered at Step #3 of the grievance procedure and that the grievance procedure under the Labor Agreement is the mutually agreed method for resolution of any such disputes.

5.   **Work During Plant Shutdown Process.**

   A.   Employees in the bargaining unit working on or after June 3, 2019, will continue to perform work regularly done by the Union at the Thomson plant.

   B.   The Union agrees on behalf of the employees it represents that the employees will cooperate in facilitating the permanent shutdown and orderly closing of manufacturing operations at the Thomson plant.

   C.   The Company and the Union agree that neither party supports, nor will it sanction, the sabotage of any operation, equipment or property located in the Thomson plant's operations or on Company property.

6.   **Manufacturing Plant Shutdown and Closing Process.**

   Although the projected starting shutdown date for the Thomson plant is August 16, 2019, but no later than October 31, 2019, the Company and the Union understand that the final date for manufacturing-related activities may be extended depending on several factors including but not limited to customer requirements, run-out production results for various departments, and plant lease extension issues. Therefore, the Company and the Union agree that the Thomson plant manufacturing operations will be considered permanently shut down the day after normal bargaining unit work ceases related to the manufacturing-related activities at the Thomson plant. The Company will notify the Union in writing of this date.

7.   **Payment for Vacation.**

   The Company will pay an eligible employee (defined as employees on the seniority list [EXHIBIT A] who remain on the seniority list until permanently laid off) vested and unpaid vacation pay. This payment will be made in a separate lump sum check on the regularly scheduled pay date after the individual is permanently laid off.

8.   **401(k) Plan.**

   Participants' contributions and Company's matching contributions to the Union's non-contributory National Plus 401(k) Plan under Article 27.01 of the Labor Agreement will cease

for an employee when they are permanently laid off by the Company due to the permanent shutdown of the Thomson, Georgia manufacturing operations. Benefits payable from the Union's non-contributory National Plus 401(k) Plan shall be computed and paid in accordance with the applicable provisions of that 401(k) Plan and the applicable provisions of the Employee Retirement Income Security Act ("ERISA").

9.    **Insurance Coverage.**

An employee who is working at the time they are notified of their permanent layoff due to the closing of the Thomson, Georgia operations will be entitled to continuation of Company supported health insurance to the end of the month of the date of the permanent layoff. In addition, for an employee eligible for Company supported health insurance, the Company will pay for one (1) month of COBRA continued health insurance if the employee enrolls in COBRA continued health insurance coverage as of the date the employee is permanently laid off. After the end of that one (1) month, an employee's continuation of health insurance coverage is subject to the COBRA continuation period provided to an employee under federal law and subject to the requirements for such coverage under federal law. After the end of that one (1) month, an employee's continuation of health insurance coverage is subject to the required employee payment for the appropriate coverages.

10.    **Seniority Buyback Payment.**

A.    For an employee who did not receive a seniority buyback payment under the 2018 Thomson, Georgia Plant Shutdown Memorandum of Agreement, the Company will pay an eligible employee a seniority buyback payment of:

- two (2) days for an employee with up to one (1) full year of seniority based upon the employee's seniority date under the Labor Agreement;
- five (5) days for an employee with more than one (1) full year and up to three (3) full years of seniority based upon the employee's seniority under the Labor agreement;
- four (4) weeks for an employee with more than four (4) full years and up to six (6) full years of seniority based upon the employee's seniority under the Labor Agreement;
- six (6) weeks for an employee with more than six (6) full years and up to ten (10) full years of seniority based upon the employee's seniority under the Labor Agreement;

- eight (8) weeks for an employee with more than ten (10) full years and up to twenty (20) full years of seniority based upon the employee's seniority under the Labor Agreement.
- twelve (12) weeks for an employee with more than twenty (20) full years of seniority based upon the employee's seniority under the Labor Agreement.

B.    For an employee who did receive a seniority buyback payment under the 2018 Thomson, Georgia Plant Shutdown Memorandum of Agreement, the Company will pay an eligible employee a seniority buyback payment of two (2) days, except an eligible employee with more than ten (10) years of seniority will receive a seniority buyback payment of five (5) days.

C.    An eligible employee's seniority will be calculated as if the eligible employee had worked through the later of August 16, 2019, or the date of the employee's permanent layoff. A week of seniority buyback payment will be forty (40) hours straight time pay at the employee's regular rate of pay. To be eligible for such seniority buyback payment under this paragraph 10(A), the employee must have been on the seniority list as of June 3, 2019, and must have remained on the seniority list (as provided in EXHIBIT A) until permanently laid off by the Company due to the shutdown of the Thomson plant, and must also have signed the "Individual Waiver and General Release" authorized in this Thomson plant Shutdown Memorandum of Agreement. This seniority buyback payment will be made to such an eligible employee in a separate lump sum check on the first regularly scheduled pay date after the Individual Waiver and General Release is effective and can no longer be revoked. This payment is to be considered deferred compensation and in consideration for a seniority buyback.

11.    **Employee Verification Letter.**

Upon written request, the Company will provide an employee at the time of their permanent layoff from the Company with a letter (see EXHIBIT B) of employment verification to assist the employee in their outplacement efforts to find another job to include name, dates of employment and position held.

12.    **Relocation and Work-Through Bonus.**

A.    Relocation. There may be opportunities to relocate to the Henderson, North Carolina, Hollander Sleep Products plant ("Henderson plant") to specific jobs that the Company determines are available for relocation, depending on your skill, abilities, and experience.

Any employee interested in relocating to the Henderson plant in lieu of the seniority buyback payment under this Agreement, must advise the Company in writing on or before July 31, 2019, of their interest and provide that writing to the human resources office at the Thomson plant. In order to be considered for relocation to one of the specific jobs at the Henderson plant, an employee must complete an employment application on the applicant tracking system for a position at the Henderson plant. Any employee who relocates to the Henderson plant must relocate within thirty (30) calendar days from their permanent layoff date at the Thomson plant and will retain their company seniority date under the Labor Agreement for benefit purposes at the new plant. If the employee is offered relocation to the Henderson plant and signs a Thomson Plant Relocation Agreement (see EXHIBIT C), such an employee will be eligible to receive a Twenty-Five Hundred Dollar ($2,500.00) Relocation Advance and a thirty (30)-day temporary living allowance for lodging at a hotel approved in writing by the human resources office at the Henderson plant. This Thomson Plant Relocation Agreement provides that the employee will be responsible to repay the Company a pro-rata portion of the total financial amount of the $2,500 Relocation Advance and the thirty (30)-day temporary living allowance if the employee works less than one (1) year, for any reason, at the Henderson plant. The employee will also be eligible to receive the seniority buyback payment provided for in this Agreement after working for six (6) months at the Henderson plant.

B.    Work-Through Bonus. An employee will be eligible for a work-through bonus if the employee works through their designated permanent layoff date at the Thomson plant. The employee must have perfect attendance with no absences or no more than 2.0 hours of No-Fault absence time between the date the bankruptcy court approves this Agreement, and the date of the employee's permanent layoff. Approved vacation days do not impact an employee's perfect attendance and vacation days already approved before this Agreement shall be honored. Provided the employee meets these eligibility requirements, for each straight time hour of work between June 3, 2019, and the date of the employee's permanent layoff, a work-through bonus will be paid in an amount of Two Dollars ($2.00) per hour for every straight time hour of work for skilled employees (Sewer, Operator, Forklift Driver, and Yard Driver), and an amount of One Dollar and 50/100 Cents ($1.50) for each straight time hour of work for unskilled employees (all job

classifications other than the four [4] identified skilled job classifications). The amount of an employee's work-through bonus will be paid to such an eligible employee in a separate lump sum check on the first regularly scheduled pay date after the Individual Waiver and General Release is effective and can no longer be revoked.

13. **Union and Individual Employee Releases.**

A. In consideration of the benefits and other agreements and provisions contained in this Thomson, Georgia Plant Shutdown Memorandum of Agreement, the Union on behalf of itself and on behalf of all persons in the bargaining unit it represents at the Thomson plant hereby releases and forever discharges the Company, its parent, subsidiaries and affiliates, and their current and former directors, officers, shareholders, agents and employees of each of their predecessors, successors and assigns from any and all obligations, duties, liabilities, responsibilities, causes of actions, including withdrawal of any and all unfair labor practice charges, grievances, rights to arbitrate or any claims or demands of any kind which the Union have had, may now have, or may in the future have under the Labor Agreement or previous collective bargaining agreements for the Thomson, Georgia manufacturing plant in effect between the Company and Union, or any rights, claims or demands which the Union have had, may now have, or may in the future have regarding any matter which is a proper subject for collective bargaining between the parties, including all claims of breach, of implied or expressed contracts, breach of promises, misrepresentation, fraud, estoppel, or wrongful discharge (except for the benefits and exceptions set forth in this Memorandum of Agreement which describes the entire agreement of the parties on the Thomson plant closing). This release by the Union, on behalf of itself, includes a release and agreement not to file any charges of discrimination or pursue any claims or demands of any kind for race, color, national origin, religious, marital, sex, pregnancy, handicap, mental condition, age or any other unlawful discrimination against the Company under any federal, state or local laws prohibiting discrimination.

B. The Union understands and agrees that the Company will require an employee to sign an "Individual Waiver and General Release" in order for the employee to receive any of the seniority buyback payment and benefits provided for in this Memorandum of Agreement. This Individual Waiver and General Release is attached to this Memorandum of Agreement as EXHIBIT D. The Company and the Union understand

and agree that this Individual Waiver and General Release will not have any effect on any claim an employee may have for unemployment compensation, workers' compensation or any vested rights or benefits an employee may have under the 401(k) plan and group insurance benefits under the Labor Agreement.

14.    **Miscellaneous Provisions.**

    A.    For purposes of this Memorandum of Agreement, an employee will become permanently laid off and terminated on the later of the last day worked or the date specified in a notice from the Company in connection with the Thomson plant shutdown and such permanent layoff and termination will constitute a termination of seniority under Article 9.04 of the Labor Agreement.

    B.    All manufacturing operations at the Thomson plant will cease no later than October 31, 2019, which may be extended as set forth in this Agreement.

    C.    The Company agrees not to contest unemployment insurance claims by permanently laid-off employees.

    D.    The Company has provided appropriate WARN Act notices to the Union in accordance with the requirements of the federal and state law.

15.    **Outplacement, Counseling and Training.**

The Company and Union will work in conjunction with Federal and State agencies including but not limited to the Georgia Department of Economic Development Dislocated Workforce Division to coordinate outplacement counseling, transitional assistance and training for affected employees.    The Georgia Department of Economic Development Dislocated Workforce Division shall be onsite conducting their initial, overview presentation as soon as possible after June 14, 2019.    The Company will communicate the in-house events and available services. Additionally, the Company shall make available the following resources to each affected employee as follows:

    i.    Training from the Georgia Department of Economic Development Dislocated Workforce Division during plant meetings;

    ii.    Onsite workshops related to job searches and employee preparedness;

    iii.    Onsite distribution of applications for the Georgia Department of Economic Development Dislocated Workforce Division shall be provided to employees;

    iv.    The Human Resources Department will seek to identify job opportunities from

maintain on the internet the information available to the affected employees. Local job fairs will be held exclusively for Hollander Sleep Products' Thomson plant employees, in coordination with the Georgia Department of Economic Development Dislocated Workforce Division.

16.  **Savings Clause Provision.**

Should any term or terms of this Memorandum of Agreement become wholly or partially in conflict with the laws existing during the term of this Memorandum of Agreement, the validity of the balance of this Memorandum of Agreement shall in no way be affected, and this Memorandum of Agreement shall be deemed modified to conform to the provisions of said existing laws.

**IN WITNESS WHEREOF,** the parties hereto have set their respective names this _14th_ day of June 2019.

**HOLLANDER SLEEP PRODUCTS, LLC:**

Todd Helander
Vice President of Manufacturing

Rose Ruiz
Vice President of Human Resources/Payroll

**SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED, SEIU ON BEHALF OF LOCAL 2420:**

Chris Baumann
Southern Region Director

Arcine Rasberry
Georgia/Florida District Director

331157.0721067  4827-9111-3880v6

9

# EXHIBIT A

**Seniority List**

SEE ATTACHED LIST.

# EXHIBIT B

To Whom It May Concern:

(Employee Name) has worked for Hollander Sleep Products (Thomson, Georgia) since (Start Date) and (Employee Name)'s last position held was ( ).

(Employee Name)'s employment with the Company was terminated as a result of the permanent shutdown of the Company's Thomson, Georgia facility.

If you have any questions, please feel free to contact me at (706) 410-5570.

Very truly yours,


Tina Dodgen
Director of HR Operations

# EXHIBIT C

## THOMSON PLANT RELOCATION AGREEMENT

This Agreement is made this ___ day of _____, 2019, by and between Hollander Sleep Products, LLC ("Company") and _____, an employee of Company ("Employee").

That for and in consideration of the mutual promises and covenants contained herein, Company and the Employee agree as follows:

1.  Company and Employee mutually desire that Employee's residence be relocated from the Thomson, Georgia area to Henderson, North Carolina area in order that the residence be near the location of Employee's continued future employment at the Company's Henderson, North Carolina plant.

2.  Company and Employee agree that Employee's continued employment with Company will be governed and controlled by the collective bargaining agreement and/or policies at the Company's Henderson, North Carolina plant ("Henderson plant").

3.  Company agrees to provide Employee with a Twenty-Five Hundred Dollar ($2,500.00) Relocation Advance to assist Employee with the relocation of Employee's residence. This advance will be paid to Employee in a lump sum, less applicable withholdings, in a separate check on the first regular pay date after Employee begins work at the Company's Henderson plant.

4.  Company agrees to provide Employee with up to thirty (30) days temporary living allowance for lodging costs at a hotel in the area of the Company's Henderson plant. The only extended stay hotels approved and eligible for this temporary living allowance for lodging benefit are the hotels identified on Exhibit A to this Agreement. The Company will reimburse the Employee every week (up to the thirty [30]-day minimum period) for the lodging costs only for the Employee's stay at an approved and eligible hotel. The Employee must submit the paid invoice to the human resources office at the Company's Henderson plant, which will then be reimbursed in a separate check.

5.  Company and Employee agree that the Relocation Advance and temporary living allowance for lodging costs are conditioned upon Employee remaining an employee in good standing at the Company's Henderson plant. Should Employee fail to remain employed in good standing for at least one (1) year, Employee will be responsible for repaying a pro rata portion of the relocation advance and temporary lodging costs paid on Employee's behalf by Company. The total amount to be repaid shall be prorated on a monthly basis such that for each full month during which the Employee remained in the employ of Company, the amount to be repaid shall be reduced by one-twelfth (1/12) of the gross reimbursement. In addition to these direct expenses expended on Employees' behalf by Company related to the relocation, included in the gross amount will be all

taxes, fees, and withholdings paid on Employee's behalf by the Company related to Employee's relocation.

6.      Company and Employee agree that in the event of a termination of employment for reasons not within the control of Employee, Company may, in its reasonable and sole discretion, waive the repayment provision of this Agreement.  Said Waiver shall not be effective unless it is incorporated into a writing signed and approved by the Vice President of Human Resources/Payroll of Company.

7.      Employee authorizes Company to deduct from Employee's final payroll check the full amount of any outstanding amount due to Company under this Agreement to the extent the amount does not reduce Employee's wage below an amount equivalent to the minimum wage (and/or applicable overtime wage) as established by federal and state law, if applicable.  If the amount deducted from Employee's final payroll check is not sufficient to repay the full amount of the repayment obligation to Company, Employee knowingly and voluntarily agrees to repay the remaining full amount still owing within thirty (30) calendar days after Employee's last day of Company employment.

8.      If Employee does not repay the above-referenced full amount owed within thirty (30) calendar days after Employee's last day of employment with Company (by payroll deduction or otherwise), Employee agrees this Agreement is enforceable against Employee as an acknowledgement of a valid debt owed to Company.  This Agreement can be enforced in a court proceeding pursuant to applicable Florida law.  If, for any reason, any part(s) or language within any part(s) of this Agreement shall be deemed invalid or unenforceable, all remaining parts shall remain binding and in full force.

9.      Employee agrees this Agreement is not a contract for employment, hours of work, or the providing of benefits.  Company does not promise Employee's employment will be continued for any period of time to enable Employee to obtain all or any specified portion of the benefits under Company's policies and procedures.

10.     Employee voluntarily has entered this Agreement and understands its terms.

        **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first above written.

**HOLLANDER SLEEP PRODUCTS, LLC**          **[EMPLOYEE NAME]**

By: _____             By: _____
Printed: _____             Printed: _____
Title: _____             Title: _____

13

## Exhibit A

**APPROVED HOTELS
NEAR HENDERSON, NORTH CAROLINA PLANT**

## EXHIBIT D

[Date]

Dear Employee:

In connection with your permanent layoff, the Company and Southern Regional Joint Board of Workers United, SEIU on Behalf of Local 2420 (the "Union") have negotiated the Thomson, Georgia Plant Shutdown Memorandum of Agreement (the "Agreement"). A copy of the Agreement is attached for your review and use. Pursuant to the Agreement, various benefits are being offered to employees in the bargaining unit under certain conditions. In order to receive certain seniority buyback payment and benefits provided under the Agreement, you must, among other things, sign and return the attached Individual Waiver and General Release ("Release").

You are advised to consult with an attorney before executing the attached Release and have forty-five (45) days in which to do so. You should understand that you will not begin to receive specific seniority buyback payment and benefits until you have returned the signed Release, and your right to revoke the Release has expired.

All job classifications listed in the collective bargaining agreement are eligible for certain seniority buyback payment and benefits under the Agreement. Additionally, a list containing the job titles and ages of all eligible employees is attached.

If you have any questions, please contact me at (706) 410-5570.

Very truly yours,

Tina Dodgen
Director of HR Operations

# INDIVIDUAL WAIVER AND GENERAL RELEASE

Hollander Sleep Products, LLC, (hereinafter, the "Company") and _____
(hereinafter, the "Employee") desire to resolve issues relating to the Employee's employment with and termination from the Company by entering into this Individual Waiver and General Release (the "Agreement"). Accordingly, intending to be legally bound, the Company and the Employee hereby agree as follows:

1.    Termination Date. The Employee agrees that his/her employment with the Company will end with his/her permanent layoff effective _____, with no seniority accrual after that termination date. In order to be eligible for the seniority buyback payment and benefits provided by the Thomson, Georgia Plant Shutdown Memorandum of Agreement between the Company and the Employee's Union, the Employee must work through the permanent layoff and termination date assigned by the Company.

2.    Return of Property. All Company property in the Employee's possession or which has been issued to the Employee must be returned to the Company as soon as practicable, but in no event later than the date that this Agreement is duly executed and returned to the Company. Such property includes all Company documents, software, access keys, desk keys, ID badges, and such other property of the Company as the Company may reasonably request.

3.    Employer's Payment. Following the Employee's permanent layoff and termination, the Company agrees to provide the seniority buyback payment and benefits to the Employee in accordance with the provisions set forth in the Thomson, Georgia Plant Shutdown Memorandum of Agreement between the Company and the Employee's union.

4.    Release and Waiver.

   A.    In consideration for the Company's payment to the Employee of seniority buyback payment and benefits in accordance with the Thomson, Georgia Plant Shutdown Memorandum of Agreement and as a full and final mutual settlement, the Employee hereby releases and discharges the Company, its parents, divisions, subsidiaries, predecessors, successors, assigns and affiliates and the current and former directors, officers, shareholders, agents and employees of each (herein the "Hollander Entities"), from any and all claims and causes of action arising out of the Employee's employment with and/or separation from employment with the Company. This Agreement includes, but is not limited to, any claims for seniority buyback payment, vacation pay, holiday pay, back pay, bonuses or other compensation. This Agreement also includes, but is not limited to, claims of discrimination on the basis of, among other things, race, color, national origin, ancestry, religion, marital status, sex, pregnancy, disability, age, sexual orientation or other protected category as provided by state, federal and/or local law. Such discrimination claims include, but are not limited to, claims under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990; Title VII of the Civil Rights Act, as amended; the Americans with Disabilities Act, as amended; the Georgia Human Rights Act, as amended, and any other federal, state or local law prohibiting employment discrimination. This Agreement also includes claims under the federal and Georgia Worker Adjustment and Retraining Notification Act, and for breach of implied or express contract, breach of promise, misrepresentation, fraud, promissory estoppel, outrage, negligent or

intentional infliction of emotional distress, personal injury, defamation, loss of consortium, humiliation, loss of standing and prestige, public policy, wrongful discharge, or any other tort that could arise under federal, state and/or local law. This Agreement includes, without limitation, any and all claims for any damages, whether they be equitable, compensatory, liquidated, punitive, or in the form of expenses, attorney fees, expenses or costs.

B.     This Agreement is binding on all claims described above that arose on or before the date that the Employee signs this Agreement, whether or not the Employee knew of the claims on that date. This Agreement is binding on the Employee, his or her heirs, executors, administrators, successors, and assigns.

C.     The Employee also agrees to dismiss with prejudice any actions the Employee might have brought against the Company before the signing of this Agreement. It is further agreed that the Employee will not institute any complaint, lawsuit or action at law or otherwise against the Hollander Entities for any claims arising up through the date of the signing of this Agreement, and shall hold the Hollander Entities harmless against such actions (except, of course, for the right to the various seniority buyback payments and benefits specified in the Thomason, Georgia Plant Shutdown Memorandum of Agreement). This Agreement does not have any effect on any claim the Employee may have for unemployment compensation, for workers' compensation, or for any vested benefits the Employee may have under the 401(k) plan and group insurance plan or on the Employee's right to file a Charge with the Equal Employment Opportunity Commission, provided that the Employee agrees that he or she will not be entitled to, and agrees to renounce, any benefit from any claim, investigation or proceeding filed on his or her behalf by any person, agency or entity with any agency or court, including, but not limited to, the Equal Employment Opportunity Commission, Department of Workforce Development, and/or the federal or state Department of Labor.

D.     The Employee agrees to this Agreement because it is his or her intent in executing this Agreement to forever release the Company from any and all causes of action, foreseen or unforeseen, that may have existed on or prior to the date of his or her termination, except for: (1) obligations of the Company under the Thomson, Georgia Plant Shutdown Memorandum of Agreement; and (2) obligations of the Company under the Company's employee benefit plans providing benefits other than seniority buyback payments.

5.     No Admission. It is expressly understood and agreed that this Agreement does not constitute an admission by any party that the Company has acted unlawfully or is otherwise liable to the Employee. It is further agreed that evidence of this Agreement, its terms, or the circumstances surrounding the parties' entering into this Agreement, shall be inadmissible in any action or lawsuit of any kind, except an action for alleged breach of this Agreement or as permitted under the Age Discrimination in Employment Act.

6.     Confidentiality. The Employee agrees that he or she will take no action which is intended to, or would reasonably be expected to cause harm to the Hollander Entities, impair the Hollander Entities' reputation, or lead to unwanted or unfavorable publicity to the Hollander Entities, nor will the Employee disclose any confidential or proprietary information provided to or obtained by the Employee during the course of his or her employment.

7.    <u>Miscellaneous</u>. This Agreement shall be interpreted and enforced in accordance with the laws of the state of Georgia. Any dispute between the parties concerning this Agreement must be brought in the state or federal courts of that state.

The Employee agrees that, in executing this Agreement, that the Employee has not relied on any representation or statement not set forth in this document or the Thomson Georgia Plant Shutdown Agreement, and further agrees that neither this Agreement nor the Thomson, Georgia Plant Shutdown Memorandum of Agreement may be modified orally.

This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof and fully supersedes any and all prior agreements or understandings between them concerning such subject matter.

If any section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any section of this Agreement is restrained by such tribunal, the Company shall be entitled to elect to enforce the remainder of the Agreement, or to cancel it as permitted by the Age Discrimination in Employment Act.

8.    <u>Informed, Voluntary Signature</u>. The Employee agrees that he or she has signed this Agreement knowingly, voluntarily, and after consulting with whomever the Employee thought appropriate.

9.    <u>Opportunity to Review</u>. The Employee represents that he or she was given a copy of this Agreement on _____, 2019. The Employee agrees that he or she has been encouraged to consult with an attorney before signing this Agreement and that he or she was given a period of up to forty-five (45) days to consider it.

10.    <u>Right to Revoke</u>. Following execution of this Agreement, the Employee has seven (7) days to revoke this Agreement. Within that 7-day period, the Employee may revoke this Agreement by delivering to the Company written notification of such revocation. If the Employee does not so revoke this Agreement, the Agreement will become binding and irrevocable by the Employee on the eighth (8th) day after he or she signs it.

11.    Notices under this Agreement shall be delivered by certified mail, return receipt requested, at the following addresses:

To the Company:        HOLLANDER SLEEP PRODUCTS, LLC
                       c/o Rose Ruiz
                       901 Yamato Road, Suite 250
                       Boca Raton FL 33431

And

To the Employee: _____

_____

_____

### EMPLOYEE ACKNOWLEDGEMENT — PLEASE READ CAREFULLY

**I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS ENTIRE AGREEMENT AND UNDERSTAND ALL OF ITS TERMS, INCLUDING THE FULL AND FINAL RELEASE AND WAIVER OF ALL KNOWN AND UNKNOWN CLAIMS AS SET FORTH ABOVE. I FURTHER ACKNOWLEDGE THAT I HAVE VOLUNTARILY ENTERED INTO THIS AGREEMENT, THAT I HAVE NOT RELIED UPON ANY REPRESENTATION OR STATEMENT, WRITTEN OR ORAL, NOT SET FORTH IN THIS AGREEMENT AND THAT I HAVE BEEN GIVEN THE OPPORTUNITY AND ENCOURAGED TO HAVE THIS AGREEMENT REVIEWED BY MY ATTORNEY. I ALSO ACKNOWLEDGE THAT I HAVE BEEN AFFORDED UP TO FORTY-FIVE (45) DAYS TO CONSIDER THIS AGREEMENT AND THAT I HAVE SEVEN (7) DAYS AFTER SIGNING THIS AGREEMENT TO REVOKE IT BY NOTIFYING THE COMPANY, IN WRITING, OF SUCH REVOCATION BEFORE THE END OF BUSINESS ON THE SEVENTH DAY. IF I DO NOT REVOKE THIS AGREEMENT, THE AGREEMENT WILL BECOME EFFECTIVE ON THE EIGHTH (8TH) DAY AFTER I HAVE SIGNED IT.**

**DATE GIVEN TO EMPLOYEE:** _____

IN WITNESS WHEREOF, the parties thereto have executed this Agreement as of the date shown below.

**ACCEPTED AND AGREED TO:**

EMPLOYEE:                                  HOLLANDER SLEEP PRODUCTS, LLC:

_____                _____
                                           Rose Ruiz
                                           Vice President of Human Resources/Payroll

_____                _____
Witness                                    Witness

_____                _____
Date                                       Date

## Exhibit C

## Pfefferle Declaration

KE 62147412

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DECLARATION OF MARC PFEFFERLE, CHIEF EXECUTIVE OFFICER OF
HOLLANDER SLEEP PRODUCTS, LLC, IN SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I) APPROVING THE PLANT CLOSURE AGREEMENT
BETWEEN THE DEBTORS AND THE SOUTHERN REGIONAL JOINT BOARD OF
WORKERS UNITED, SEIU ON BEHALF OF LOCAL 2420 AND
(II) GRANTING RELATED RELIEF**

I, Marc Pfefferle, Chief Executive Officer of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), hereby declare under penalty of perjury:

1.    I am a Partner at Carl Marks Advisors.  Carl Marks was retained by the Debtors on

March 28, 2019, and I was appointed CEO on the same day.  I have over thirty years of experience

providing restructuring and reorganization services for companies, creditors, and other

stakeholders across a variety of industries, including consumer products, retail, manufacturing,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep
Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119);
Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location
of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

and distribution related businesses. I submit this declaration in support of the *Debtors' Motion for Entry of an Order (I) Approving the Plant Closure Agreement Between the Debtors and the Southern Regional Joint Board of Workers United, SEIU on Behalf of Local 2420 and (II) Granting Related Relief* (the "Motion").[2]   Through my role as Chief Executive Officer, I oversee the Debtors' day-to-day operations and am familiar with their business, finances, books, and records. I was involved in the decision to close the Thomson Plant and enter into the Union Agreement.

2.      The Debtors are pursuing a path to right size their business operations to increase efficiency and return to profitability. To that end, and due to changing customer demands, my team and I are reviewing the Debtors' operations and analyzing potential consolidations of the Debtors' manufacturing locations.

3.      One such location is the Thomson Plant, which is the Debtors' smallest East Coast manufacturing facility in terms of square footage and production. The Thomson Plant has been operating at full capacity and needs capital upgrades, and it is most efficient to transfer its production functions to other manufacturing plants. Accordingly, the Debtors have decided to close the Thomson Plant, a course of action that I anticipate will generate significant annual savings.

4.      The Thomson Plant has 173 employees, 141 of which are members of the Union, and the Union is party to a collective bargaining agreement with the Debtors. As a result, it is critical that the Debtors have the support of the Union through the Thomson Plant's wind-down process. To encourage the continued cooperation of the Thomson Plant's Union employees through the wind down and cessation of operations, the Debtors negotiated a comprehensive

---

[2]    Terms capitalized but not defined herein shall have the meanings ascribed to them in the Motion.

KE 62147412

settlement of all outstanding matters with the Union, which is incorporated into the Union Agreement.

5.      Critically, the Union Agreement provides for the Union employees' continued support during the wind down of operations at the Thomson Plant, which will provide stability to the consolidation process.   The Union Agreement favorably resolves all outstanding Union grievances, which could otherwise result in contentious and protracted litigation.   The Union Agreement also allows the Debtors to amicably terminate their relationship with the Union without engaging in section 1113 litigation with the Union.   Such litigation would distract from the administration of these chapter 11 cases, and I do not believe that the end result of such litigation would be better for the Debtors than the compromise embodied in the Union Agreement. In exchange for these benefits, the Debtors have committed to providing certain benefits to the Union's employees, such as the provision of one month of COBRA continuing insurance coverage, payment of work-through bonuses, and assistance with relocation expenses to allow certain employees to transfer to the Debtors' Henderson, North Carolina plant.

6.      Accordingly, I believe it is in the best interest of the Debtors' estates to enter into the Union Agreement.

Dated:  July 3, 2019
New York, New York

*/s/ Marc Pfefferle*
Name: Marc Pfefferle
Title:   Chief Executive Officer
          Hollander Sleep Products, LLC

KE 62147412