Hearing Date and Time:  **August 1, 2019, at 11:00 a.m. (prevailing Eastern Time)**
Objection Deadline:  **July 25, 2019, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLANS AND (B) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order (A) Approving the Debtors' Key Employee Retention Plans and (B) Granting Related Relief* (the "Motion") will be held before the Michael E. Wiles, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York (the "Court"), One Bowling Green, Courtroom No. 617, New York, New York 10004-1408, on **August 1, 2019, at 11:00 a.m., prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

Procedure, the Local Bankruptcy Rules for the Southern District of New York, all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York, and the *Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief* [Docket No. 184] (the "<u>Case Management Order</u>") approved by the Court; (c) be filed electronically with the Court on the docket of *In re Hollander Sleep Products, LLC*, Case 19-11608 (MEW) by registered users of the Court's electronic filing system and in accordance with the General Order M-399 (which is available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **July 25, 2019, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://omnimgt.com/hollander) and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed, served, and received will be considered at the hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

KE 61919146

New York, New York
Dated: July 3, 2019

/s/ Joshua A. Sussberg, P.C.
Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE DEBTORS'
KEY EMPLOYEE RETENTION PLANS AND (B) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

**Relief Requested**

1.        By this motion, the Debtors seek entry of an order, substantially in the form

attached hereto as **Exhibit A**, (a) approving the Debtors' key employee retention plan

(the "Hollander Retention Plan"), (b) approving retention payments related to the closure of the

Debtors' Thomson, Georgia plant (the "Georgia Retention Plan," and together with the Hollander

Retention Plan, the "Retention Plans"), and (c) granting related relief.  In support of this motion,

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep
Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119);
Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location
of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

the Debtors submit the declaration of Marc Pfefferle (the "Pfefferle Declaration"), Chief Executive

Officer of Hollander Sleep Products, LLC, a copy of which is attached hereto as **Exhibit B**.

## Introduction

2.      The Debtors are undergoing a complex operational restructuring requiring

significant increased workloads and stresses on the part of key employees.  These employees

perform critical oversight of the Debtors' manufacturing operations and plant management

services as well as provide critical accounting, asset management, business administration and

development, human resources, information technology, marketing and sales, and sourcing and

logistics work.  Certain of this personnel has also undertaken additional tasks beyond the scope of

their usual job functions necessary to administer these chapter 11 cases, such as preparing various

reports required to administer these chapter 11 cases and provide updates to the Official Committee

of Unsecured Creditors (the "UCC") under the Debtors' various first day relief.  The key

employees are meeting these obligations while the Debtors are running a marketing process for

their assets, which invariably has led to additional concerns about job security for the key

employees.  Moreover, as part of these chapter 11 cases, the Debtors are also commencing a

process to right-size their operating model to improve financial performance and maintain value

for all stakeholders.  As part of these efforts, the Debtors have announced the closing of their

Thomson, Georgia plant and the Debtors will need key employees to remain with the Debtors to

ensure a smooth and efficient closure of the facility.

3.      Maintaining the morale, support, and focus of the Debtors' employees is absolutely

essential to fostering an environment where the Debtors' operations can succeed in a safe, efficient,

and reliable manner while the Debtors work to reorganize their business to maximize the value of

their estates.  Absent the relief requested, the Debtors face the real risk of losing key employees at

KE 61919146

a critical time in their restructuring efforts.  Indeed, since the Petition Date, two key employees have resigned in the Debtors' various management and operational departments.

4.      By this motion, the Debtors seek approval of the Retention Plans to retain key personnel as well as operational employees of the Thomson, Georgia plant.  The Retention Plans are necessary for the Debtors to maintain stability in their operations and maintain enterprise value and is consistent with retention plans in similarly sized chapter 11 cases.  The Retention Plans provide for payment of awards to 74 of the Debtors' non-insider employees (each a "Participant," and, collectively, the "Participants"), including 47 Participants under the Hollander Retention Plan (the "Hollander Participants") and 28 Participants[2] under the Georgia Retention Plan (the "Georgia Participants").  No Participant is an officer or director (as such terms are normally understood), but instead play vital rank-and-file functions for the Debtors' business.[3]  The departure of any of the Participants during these chapter 11 cases would disrupt ongoing operations at an important phase in the Debtors' restructuring process, including their process to wind down operations at their Georgia plant.  As a result, the Debtors believe implementation of the Retention Plans is necessary and appropriate in an attempt to avoid costly disruptions.

5.      As described in detail herein, the Debtors' sized the awards to each Participant conservatively.  The Retention Plans contemplate retention payments made in one installment to each of the Participants with a total approximate cost of $559,000, with an average award of approximately $7,600 per Participant.  No single Hollander Participant is eligible for an award totaling more than $20,000, with $10,000 as the most common award under the Hollander

---

[2]      One Participant is included in both the Hollander Retention Plan and the Georgia Retention Plan.  If the Georgia Retention Plan is approved, such Participant would be removed from the Hollander Retention Plan.

[3]      As discussed more fully herein, the Debtors respectfully submit that no Participant is an "insider," as that term is defined in section 101(31) of the Bankruptcy Code.

KE 61919146

Retention Plan. The awards under the Georgia Retention Plan are less substantial in both total amount and individual awards by comparison.

6. Before filing this motion, the Debtors and their advisors have distributed information regarding the cost and scope of the proposed Retention Plans with their key economic stakeholder groups and the office of the United States Trustee for Region 2 (the "U.S. Trustee") and solicited feedback. The Debtors will continue to engage with parties in interest, including the U.S. Trustee, in advance of the hearing on the Retention Plans. The Debtors are hopeful that they will be able to build further consensus around the Retention Plans as cost-effective plans that will improve recoveries for all stakeholders by ensuring that the Debtors will be able to maintain their business operations in the ordinary course during the pendency of these cases and the wind down of the Thomson, Georgia plant efficiently.

7. The Debtors respectfully submit that the Retention Plans comply with the applicable provisions of the Bankruptcy Code, are justified by the facts and circumstances of these cases, and are within the Debtors' sound and reasonable business judgment. For these reasons and the reasons set forth below, the Debtors respectfully request the Court enter an order authorizing the Debtors to implement the Retention Plans.

## Jurisdiction and Venue

8. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 105(a), 363(b), and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Bankruptcy Rule 6004.

## The Key Employee Retention Plans

### I.      The Participants.

11.     Of the Debtors' approximately 2,370 current employees, the Debtors have designated 74 key employees whose work is critical to support the Debtors' day-to-day operations and will be needed to ensure a successful and timely reorganization.[4]  As set forth in the Pfefferle Declaration, certain of the Participants may be motivated to leave the Debtors during the pendency of these chapter 11 cases due to, among other things, the uncertainty created by the Debtors' ongoing reorganization efforts and expected employee reductions within the next months. The Retention Plans are necessary to encourage the Debtors' key non-insider employees to remain with the Debtors through the closure of the Thomson, Georgia plant and the pendency of these chapter 11 cases.

12.     The Hollander Participants perform a variety of important business functions for the Debtors—including accounting, cash management, information technology, human resources, merchandising, sales, sourcing and logistics, plant management, and other critical activities—that are vital to the Debtors' ability to preserve and enhance stakeholder value.  The Debtors selected

---

[4]     The Debtors have provided the list of proposed Participants, together with their job title, base salary, and proposed payments, to their key stakeholders, including counsel to the UCC and the U.S. Trustee, before the filing of this motion.  The Debtors will provide the list to the Court upon request.

the 47 Hollander Participants based on their status as critical, hard-to-replace employees.  Many of the Hollander Participants have developed valuable institutional and technical knowledge regarding the Debtors' business operations that would be difficult and expensive to replace on an expedited basis, and could very well slow the Debtors' ability to restructure on a timely basis. Moreover, some of the Hollander Participants have provided indispensable support to the Debtors' advisors in meeting the additional operational demands imposed by chapter 11.  Preserving this institutional and technical knowledge is crucial to the successful completion and efficient administration of the Debtors' chapter 11 cases.

13.    The Georgia Participants perform critical operational tasks at the Debtors' Thomson, Georgia plant ranging from maintenance and inventory supervision to production management and supervision, as well as other critical operational activities that are vital to maintain stability in the Debtors' operations at their Georgia plant through the efficient wind down of the facility.  Similar to the Hollander Participants, the Debtors selected the 28 Georgia Participants based on their status as critical, hard-to-replace employees.  The Georgia Participants have developed technical knowledge and skills necessary to the operations of the Georgia facility that would be extremely difficult and expensive to replace at this critical juncture considering the short, several month period of the plant wind down.  The Georgia Participants are vital to maintaining efficient operations at the Georgia plant through the closing of the facility. Accordingly, the Debtors believe that the Georgia Retention Plan is necessary to incentivize the Georgia Participants to remain with the Debtors to ensure a smooth and efficient closure of the facility and to maximize value for all stakeholders.

14.    Given the extraordinary demands placed upon the Participants during these chapter 11 cases, the Debtors believe that it is appropriate to pay a retention bonus.

6

The importance of the Participants to the Debtors' business cannot be understated. Unless the Debtors provide compensation designed to motivate employees to remain with the Debtors throughout the chapter 11 process, employee attrition could result in costly disruptions to the Debtors' operations. The Debtors respectfully submit that the Retention Plans will increase the likelihood that these key employees are properly incentivized to remain with the Debtors during the restructuring process and the closure of the Georgia plant, thereby preserving value for the Debtors, their estates, their creditors, and other parties in interest.

15.    Although certain of the Participants have titles incorporating the word "director," no Participant is an "insider" of the Debtors. Specifically, the Participants do not include any employee that (a) reports directly to the Debtors' Board of Directors, (b) is appointed directly by the Debtors' Board of Directors, (c) exercises managerial control over the Debtors' operations as a whole, (d) controls the Debtors' company policy, or (e) directs the Debtors' overall corporate governance. In addition, each of the Participants that has a director title reports to officers and executives below the chief executive officer of the Debtors.

## II.    The Retention Plans.

16.    Due to the importance of the Participants to the success of the Debtors' go-forward business, including the smooth and efficient closure of the Georgia facility, the Debtors, together with their advisors, worked to develop retention plans designed to offer fair compensation that would motivate the Participants to remain with the Debtors through the duration of their reorganization and the wind down of their Georgia plant. As noted above, the proposed Retention Plans will not exceed $559,000 in the aggregate, and the potential payments range from approximately 2.40 to 14.87 percent of base salary for each of the Participants.

7

17.    The key terms of the Hollander Retention Plan are as follow:[5]

(a)    <u>Hollander Participants</u>:  Limited to 47 non-insider key employees who will remain with the go-forward business, or approximately 1.98 percent of the Debtors' current workforce.  By the Hollander Retention Plan, the Debtors reserve the right, in their reasonable business judgment, to add replacement participants should a current Hollander Participant resign or be fired for cause upon notice to the U.S. Trustee and counsel to the UCC. The Hollander Participants represent critical employees performing, among other things, accounting, cash management, information technology, human resources, merchandising, sales, sourcing and logistics, plant management, and other critical functions for the Debtors.

(b)    <u>Payment Prerequisites</u>:  Hollander Participants will receive and keep, subject to any applicable tax or other withholding obligations, 100% of the payout under the Hollander Retention Plan if they remain employed with the Debtors at least three months after either (i) the effective date of a chapter 11 plan or (ii) the closing of a sale of all or substantially all of the Debtors' assets, as applicable.

(c)    <u>Payout Frequency</u>:  The Hollander Retention Plan will be paid in one installment upon (i) the effective date of a chapter 11 plan or (ii) the closing of a sale of all or substantially all of the Debtors' assets, as applicable.

18.    The Key Terms of the Georgia Retention Plan are as follows:

(a)    <u>Georgia Participants</u>:  Limited to 28 non-insider key employees who will remain with Debtors through the closing of the Georgia plant, or approximately 1.18 percent of the Debtors' current workforce.  By the Georgia Retention Plan, the Debtors reserve the right, in their reasonable business judgment, to add replacement participants should a current Georgia Participant resign or be terminated for cause upon notice to the U.S. Trustee and counsel to the UCC.  The Georgia Participants represent critical employees performing operational activities including, among other things, maintenance, inventory supervision, and production and shipping management.

(b)    <u>Payment Prerequisites</u>:  Georgia Participants will receive and keep, subject to any applicable tax or other withholding obligations, 100% of the payout under the Georgia Retention Plan if they remain with the Debtors through their termination by the Debtors, *provided* that the Georgia Participants

---

[5]    The summaries of the Retention Plans contained in this motion are provided for purposes of convenience only. In the event of any inconsistency between the summary contained herein and the terms and provisions of the Retention Plans, the terms of the Retention Plans shall control unless otherwise set forth herein, *provided* that the terms relating to the total amount of the Retention Plans and the timing of payments provided in this motion shall control.

8

shall not receive such payout if they voluntarily leave or are terminated for cause.

(c)    <u>Payout Frequency</u>:    The Georgia Retention Plan will be paid in one installment upon their termination by the Debtors, *provided* that such termination is not for cause.

## III.    Reasonableness of the Retention Plans.

19.    As set forth in the Pfefferle Declaration, the Debtors and their advisors reviewed the Debtors' current needs, their employees' current compensation compared to market rates, and common features of retention plans.  The Debtors then designed the Retention plans keeping in mind their goals of maximizing the value of their estates for the benefit of all interested parties and ensuring that their operations are conducted in an effective and stable manner through emergence from chapter 11.  In particular, the Debtors worked closely with their advisors to ensure that the incentives for the Participants were appropriate and within the Debtors' postpetition financing budget.  The Debtors believe that both the average award and total cost of the proposed Retention Plans fall well below the average market comparable.

20.    Accordingly, the Debtors submit that the award opportunities in the Retention Plans are more than justified under the circumstances of these chapter 11 cases.  Further, the total aggregate cost of $559,000 under the Retention Plans is reasonable in absolute terms when compared to the aggregate costs of key employee plans approved in other chapter 11 cases.

## Basis for Relief

21.    As discussed more fully herein, the Debtors submit that the Retention Plans are a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors, pursuant to both sections 503(c)(3) and 363(b) of the Bankruptcy Code.  Further, the Debtors respectfully submit that section 503(c)(1) of the Bankruptcy Code is inapplicable here because no

"insiders" (as that term is defined by section 101(31) of the Bankruptcy Code) will participate in the proposed Retention Plans.

## I.       The Retention Plans Are a Sound Exercise of the Debtors' Business Judgment.

22.    The Debtors' implementation of the Retention Plans is a sound exercise of their business judgment.  Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, a debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment.  *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to grant such application); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business); *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment."); *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (noting that the standard for determining a section 363(b) motion is "a good business reason"); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same).

23.    Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986)

(noting that "a presumption of reasonableness attaches to a debtor's management decisions" and that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct"). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

24.     The implementation of the Retention Plans is a proper exercise of the Debtors' business judgment and is in the best interests of their estates and of all stakeholders in these chapter 11 cases. The Participants—along with their skills, knowledge, and hard work—are critical to ensuring that the Debtors continue to maximize stakeholder value in the current economic environment, including through the smooth and efficient closure of the Thomson, Georgia facility. The Hollander Participants are familiar with the Debtors' business and have the experience and knowledge necessary to ensure the Debtors' continued operations during the chapter 11 cases. Indeed, the Hollander Participants have already played a vital role in the Debtors' soft landing into chapter 11. The Debtors cannot easily replace the Hollander Participants without adversely affecting the Debtors' operating efficiency and distracting management from the Debtors' restructuring efforts. Similarly, the Georgia Participants have developed technical knowledge regarding the business operations of the Georgia facility and are therefore vital to the efficient operations of such facility through its wind down. Accordingly, hiring and training replacements for the Georgia Participants within the several month wind down period would be difficult and costly at best and impossible at worst thereby impacting customer service levels and harming value for all stakeholders. For these reasons, the Debtors' decision to implement the Retention Plans is a valid exercise of business judgment and in the best interest of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

KE 61919146

## II. The Retention Plans Are Justified by the Facts and Circumstances of these Chapter 11 Cases.

25.    Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Importantly, section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different that the business judgment standard under section 363(b) of the Bankruptcy Code." *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); *see also In re Borders Grp. Inc.*, 453 B.R. at 473–74 (evaluating the debtors' KERP under the business judgment rule under both section 363(b) and section 503(c)(3) of the Bankruptcy Code); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). Accordingly, whether a retention plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment are the same.

26.    In the context of approving compensation plans, courts in the Second Circuit have considered the following factors identified in *In re Dana Corp.* when determining if a compensation proposal and the process for developing it meet the "sound business judgment" test:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

- Is the scope of the plan fair and reasonable, does it apply to all employees, or does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576–77; *see also In re Residential Capital, LLC,* 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment); *In re Borders Grp. Inc.*, 453 B.R. at 473–77 (same). No single factor is dispositive, and the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it. *See, e.g.*, *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013) ("Section 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention of or in the nature of severance."). Even the total absence of a factor may be permissible, so long as the interests of the Debtors are sufficiently protected. *See In re Borders Grp., Inc.*, 453 B.R. at 477 (finding that the lack of independent counsel was "not fatal" where the presence of other factors ensured "that the [d]ebtors' interests were sufficiently protected"); *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 154 (Bankr. E.D.N.Y. 2012) (noting that "the relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient"). The Debtors respectfully submit that the proposed Retention Plans satisfy the standard set forth above, each as discussed more fully below.

27.    First, there is a reasonable relationship between the proposed Retention Plans and Debtors' need to retain important employees. The Debtors, in consultation with their advisors, designed the Hollander Retention Plan to motivate and reward the Hollander Participants for their significant efforts given the significantly increased demands placed upon them in connection with the chapter 11 process and the uncertainty and stresses presented by an ongoing reorganization

process.  The Hollander Retention Plan will ensure that the Debtors have the appropriate staff on hand to facilitate a timely exit from these chapter 11 cases, thereby maximizing value for the Debtors' estates.    Additionally, the Georgia Retention Plan is designed to encourage Georgia Participants to remain with the Debtors through the efficient wind down of the Georgia plant.  A failure to retain the Participants would cause significant customer service issues as it would be impractical for the Debtors to hire and train replacement employees within the short several month plant wind down period, which would, in turn, hinder their operations and reorganization to the detriment of all parties in interest.

28.    Second, the cost of the proposed Retention Plans is reasonable given the Debtors' assets and liabilities.  The Debtors believe that the costs associated with the Retention Plans are below the range of market practice as compared to plans proposed and approved at similarly situated companies.  Accordingly, the costs are reasonable and well-justified given the size of the Debtors' business and the value that the participants bring to the estate.

29.    Third, the scope of the Retention Plans is fair and reasonable.  As noted herein, the Debtors undertook a careful selection process and received input from their advisors in determining the specific employees that should be eligible.  In fact, the 74 Participants represent a small portion of the Debtors' total employee base of approximately 2,370 people.  Retaining employees who serve key managerial or operational functions allows the Debtors to leverage employees who are essential to the Debtors' chapter 11 efforts and continued efficient operations.  As set forth in the Pfefferle Declaration, the Debtors took an objective view and did not discriminate on any basis in deciding which employees needed to be incentivized to remain with the Debtors for the duration of the chapter 11 cases.

KE 61919146

30.     Fourth, the Debtors submit that the Retention Plans are consistent with industry practice.  As outlined in the Pfefferle Declaration, the Retention Plans are more cost-effective than retention plans in other, similar cases, both in terms of total costs and cost per participant.

31.     Fifth, the Debtors performed their due diligence in determining the need for the Retention Plans and in determining which employees would be eligible to ensure that the plan was consistent with, if not more cost-effective than, similar plans in their industry.  In developing the Retention Plans, the Debtors consulted with department heads to determine who was most critical and most at risk to leave or even actively searching for new work.  The Debtors then considered the work performed by those employees to determine if that employee could be easily replaced given the employee's experience and expertise with the Debtors' business operations.

32.     Sixth, the Debtors relied in part on the independent review of Carl Marks in developing the Retention Plans.  The Debtors' decision to rely on their current advisors to develop and evaluate the Retention Plans, and to not separately retain an outside consultant, was appropriate.  Given the conservative size of the proposed payouts, engaging additional advisors would have made the Retention Plans economically inefficient.  Moreover, the Debtors have actively shared information regarding each of the Participants and the proposed awards with their key creditor constituencies and the office of the U.S. Trustee.  Because of this open engagement, the Debtors believe that the interests of their estates have been adequately protected and that the Retention Plans are justified by the facts and circumstances of these chapter 11 cases.

33.     Accordingly, the Debtors respectfully submit that the Retention Plans satisfy the "business judgment standard" identified in *In re Dana Corp*.  And, indeed, courts in this district have routinely granted relief well in excess of that requested herein.  *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 15, 2019) (approving a KERP with

approximate payout of $5.0 million); *In re Nine West Holdings, Inc.*, No. 18-40947 (SCC) (Bankr. S.D.N.Y. Sept. 14, 2018) (approving a KERP for 51 of the debtors' non-insider employees with a total approximate cost of $655,000); *In re Westinghouse Electric Co. LLC*, No. 17-10751 (MEW) (Bankr. S.D.N.Y. Sept. 12, 2017) (approving a KERP for 210 of the debtors' non-insider employees with total cost of $13,831,879); *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. July 1, 2016) (approving a KERP for 38 employees with approximate payout of $1.4 million); *In re SunEdison Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 29, 2016) (approving a KERP for 126 employees with an estimated payout of $7.0 million).

### III.    Section 503(c)(1) of the Bankruptcy Code Is Inapplicable to the Retention Plans.

34.    Because none of the Participants are "insiders" as that term is defined by the Bankruptcy Code, section 503(c)(1) is inapplicable. Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—i.e., those insider plans that are essentially "pay to stay" plans. 11 U.S.C. § 503(c)(1). By its terms, section 503(c)(1) of the Bankruptcy Code does not apply where—as is the case here—participants in a retention-based plan are not insiders.

35.    Section 101(31) of the Bankruptcy Code provides that where a debtor is a corporation, insiders include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . . or (iv) relative of a . . . director, officer or person in control of the debtor." 11 U.S.C. § 101(31)(B). Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Velo Holdings, Inc.*, 472 B.R. at 208. It is well-established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code. *See In re Borders Grp. Inc.*, 453 B.R. at 469 (noting that "[c]ompanies often

16

give employees the title 'director' or 'director- level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

36.     Although certain Participants hold titles including the term "director," as set forth in the Pfefferle Declaration, none of the Participants are "insiders," as such term is defined by section 101(31) of the Bankruptcy Code.  None of the Participants have discretionary control over substantial budgetary amounts or significant control with respect to the Debtors' corporate policies.  Furthermore, none of the Participants are an executive of the Debtors, a member of the Debtors' board of directors, or an active participant in the Debtors' corporate governance mechanisms.  Finally, none of the Participants had any input in the development of the Retention Plans.  Therefore, the Debtors respectfully submit that none of the Participants constitute "insiders" of the Debtors, and the restrictions of section 503(c)(1) of the Bankruptcy Code is inapplicable to the Retention Plans.

### Waiver of Bankruptcy Rule 6004(h)

37.     To implement the foregoing immediately, the Debtors seek a waiver, to the extent required, of the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Motion Practice

38.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

### Notice

39.     The Debtors have provided notice of this motion to the entities on the Master Service List (as defined in the case management order in these chapter 11 cases [Docket No. 184]

17

and available on the Debtors' case website at https://omnimgt.com/hollander).  The Debtors submit

that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

40.    No prior request for the relief sought in this motion has been made to this or any

other court.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 61919146

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form

attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as

is just and proper.

New York, New York                          /s/ Joshua A. Sussberg, P.C.
Dated:  July 3, 2019                         Joshua A. Sussberg, P.C.
                                            Christopher T. Greco, P.C.
                                            **KIRKLAND & ELLIS LLP**
                                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                            601 Lexington Avenue
                                            New York, New York 10022
                                            Telephone:     (212) 446-4800
                                            Facsimile:     (212) 446-4900

                                            - and -

                                            Joseph M. Graham (admitted *pro hac vice*)
                                            **KIRKLAND & ELLIS LLP**
                                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                            300 North LaSalle Street
                                            Chicago, Illinois 60654
                                            Telephone:     (312) 862-2000
                                            Facsimile:     (312) 862-2200

                                            *Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

KE 61919146

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC., *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  Docket No. __** |

**ORDER (A) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLANS
AND (B) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) approving the Debtors' key employee retention plan (the "Hollander Retention Plan"), (b) approving retention payments related to the closure of the Thomson, Georgia plant (the "Georgia Retention Plan," and together with the Hollander Retention Plan, the "Retention Plans"), and (c) granting related relief, all as more fully set forth in the Motion; and upon the Pfefferle Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

[2]    Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

KE 61919146

the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.        The Motion is granted as set forth herein.

2.        Pursuant to sections 503(c) and 363(b)(1) of the Bankruptcy Code, the Retention Plans are approved.

3.        The Debtors are authorized, but not directed, to implement the Retention Plans and make the payments contemplated thereunder at the times specified in the Motion.

4.        The Debtors may add a replacement participant(s) to the Retention Plans upon the resignation or the termination for cause of any Participant, *provided* that the Debtors must provide advance notice of such replacement participant to counsel for the U.S. Trustee and counsel to the UCC.

5.        Notwithstanding the relief granted in this Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor in possession financing facility and any budget in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith.

6.        Notwithstanding Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

2

7.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

8.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2019

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Pfefferle Declaration**

KE 61919146

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF MARC PFEFFERLE IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE DEBTORS'**
**KEY EMPLOYEE RETENTION PLANS AND (B) GRANTING RELATED RELIEF**

I, Marc Pfefferle, Chief Executive Officer of Hollander Sleep Products, LLC and certain of its affiliates and subsidiaries (the "Debtors"), hereby declare under penalty of perjury:

1.    I am a Partner at Carl Marks Advisory Group LLC ("Carl Marks") and have served as the Chief Executive Officer of Hollander Sleep Products, LLC, since March 28, 2019.  I submit this declaration in support of the Debtors' motion (the "Motion") seeking entry of an order approving the Debtors' proposed key employee retention plans (the "Retention Plans").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

2.      Before joining Carl Marks, I was a Partner with Marigold Associates, a strategic management consulting firm serving Fortune 100 companies, and before that I worked for Price Waterhouse LLP.  I have over thirty years of experience providing restructuring and reorganization services for companies, creditors, and other stakeholders across a variety of industries, including consumer products, retail, manufacturing, and distribution related businesses.

3.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors (including the Carl Marks team working under my supervision), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## Necessity and Development of the Retention Plans

4.      The Debtors are undergoing a complex operational restructuring requiring significant increased workloads and stresses on the part of key employees.  These employees perform critical oversight of the Debtors' manufacturing operations and plant management services as well as provide critical accounting, asset management, business administration and development, human resources, information technology, marketing and sales, and sourcing and logistics work.  Certain of this personnel has also undertaken additional tasks beyond the scope of their usual job functions necessary to administer these chapter 11 cases, such as preparing various reports required to administer these chapter 11 cases and provide updates to the Official Committee of Unsecured Creditors (the "UCC") under the Debtors' various first day relief.  The key employees are meeting these obligations while the Debtors are running a marketing process for

2

their assets, which invariably has led to additional concerns about job security for the key employees.  Moreover, as part of these chapter 11 cases, the Debtors are also commencing a process to right-size their operating model to improve financial performance and maintain value for all stakeholders.  As part of these efforts, the Debtors have announced the closing of their Thomson, Georgia plant and the Debtors will need key employees to remain with the Debtors to ensure a smooth and efficient closure of the facility.

5.       Maintaining the morale, support, and focus of the Debtors' employees is absolutely essential to fostering an environment where the Debtors' operations can succeed in a safe, efficient, and reliable manner while the Debtors work to reorganize their business to maximize the value of their estates.  Absent the relief requested, the Debtors face the real risk of losing key employees at a critical time in their restructuring efforts.  Indeed, since the Petition Date, two key employees have resigned in the Debtors' various management and operational departments.

6.       By the Motion, the Debtors seek approval of the Debtors' Retention Plans to retain key personnel as well as operational employees of the Thomson, Georgia plant.  The Retention Plans are necessary for the Debtors to maintain stability in their operations and maintain enterprise value and is consistent with retention plans in similarly sized chapter 11 cases.  The Retention Plans provide for payment of awards to 74 of the Debtors' non-insider employees (each, a "Participant," and, collectively, the "Participants"), including 47 Participants (the "Hollander Participants") under the Debtors' key employee retention plan (the "Hollander Retention Plan") and 28 Participants[2] (the "Georgia Participants") under their retention plan related to the closure of the Debtors' Thomson, Georgia plant (the "Georgia Retention Plan")  No Participant is an

---

[2]    One Participant is included in both the Hollander Retention Plan and the Georgia Retention Plan.  If the Georgia Retention Plan is approved, such Participant would be removed from the Hollander Retention Plan.

KE 61919146

officer or director (as such terms are normally understood), but instead play vital rank-and-file functions for the Debtors' business.[3]   The departure of any of the Participants during these chapter 11 cases would disrupt ongoing operations at an important phase in the Debtors' restructuring process, including their process to wind down operations at their Georgia plant.  As a result, I believe implementation of the Retention Plans is necessary and appropriate in an attempt to avoid costly disruptions.

7.    I believe that the Participants must be motivated to remain with the Debtors during their reorganization and the closure of their Georgia plant.  By increasing motivation among the Participants and providing them with an incentive to continue performing important functions, the Retention Plans align the interests of the Debtors, their employees, and creditors.   Moreover, should any of the Participants resign before the conclusion of the Debtors' chapter 11 cases or winding down of the Georgia facility, the Debtors leadership, including myself, will have to devote significant time and resources to find suitable replacements.

8.    The Debtors and their advisors reviewed the Debtors' needs during the chapter 11 cases and the necessary features of a retention plan.  In concert with their advisors, the Debtors designed Retention Plans keeping in mind their goals of maximizing the value of their estates for the benefit of all interested parties and ensuring that their operations are maintained in an effective and stable manner through the consummation of a chapter 11 plan and the closure of the Georgia facility.  I submit that the Retention Plans have been designed in a reasonable, cost-effective way to ensure the commitment of those key personnel that will be essential to the Debtors achieving these goals.

---

[3]    As discussed more fully herein, the Debtors respectfully submit that no Participant is an "insider," as that term is defined in section 101(31) of the Bankruptcy Code.

KE 61919146

9.      In developing the plan, the Debtors and Carl Marks consulted with department heads to determine who was most critical and most likely to leave or even actively searching for new work.  Further, the Debtors took an objective view and did not discriminate on any basis in deciding which employees needed to be incentivized to remain with the Debtors through emergence from chapter 11.  In particular, the Debtors worked closely with their advisors to ensure that the incentives for the Participants were appropriate and within the Debtors' postpetition financing budget.  I believe that both the average award and total cost of the proposed Retention Plans fall well below the average market comparables.

## Terms of the Retention Plans

10.      The aggregate cost of the Retention Plans will be no greater than $559,000. Approximately 74 key employees may be eligible to receive a retention payment under the Retention Plans.  The Participants are the individuals who have the relevant expertise and knowledge of the Debtors' operations that make it essential that they remain incentivized while the chapter 11 cases are pending.  Retaining this specific group of employees will allow the Debtors to leverage the Participant's skills across the Debtors' enterprise and operations. The Hollander Participants are familiar with the Debtors' business and have the experience and knowledge necessary to ensure the Debtors' continued operations during the chapter 11 cases. The Debtors cannot easily replace the Hollander Participants without adversely affecting the Debtors' operating efficiency and distracting management from the Debtors' restructuring efforts. Similarly, the Georgia Participants have developed technical knowledge regarding the business operations of the Georgia facility and are therefore vital to the efficient operations of such facility through its wind down.  Accordingly, hiring and training replacements for the Georgia Participants within the several month wind down period would be difficult and costly at best and impossible at worst, thereby impacting customer service levels and harming value for all stakeholders.

5

11.     The Hollander Retention Plan will be paid in one installment upon (i) the effective date of a chapter 11 plan or (ii) the closing of a sale of all or substantially all of the Debtors' assets, as applicable.  The Georgia Retention Plan will be paid in one installment upon termination of the Georgia Participants by the Debtors; *provided* that such termination is not for cause.

12.     Without the payments under the proposed Retention Plans, I believe that the Participants will not be appropriately incentivized during the remainder of the chapter 11 cases and through the wind down of the Georgia facility, harming the value of the estates and affecting the efficiency of the Debtors' efforts and operations.

**The Participants Are Not Insiders**

13.     While a few Participants have titles that include the word "director" suggesting insider status, none of the Participants are in reality insiders.  Although the Participants are important to the Debtors' business, they do not have the ability to influence corporate policy or the direction of the Debtors' business operations or sit on, or directly report to, the board of directors.  Many of the Participants' duties are limited to an individual division, and the Participants' scope of authority is accordingly limited.  Merely holding a title of director conveys no special privileges within the Debtors' corporate hierarchy.  Rather, each of the Participants that has a director title reports to officers and executives below my position as Chief Executive Officer of the Debtors.  As a result, the Debtors do not believe that these individuals are insiders vis-a-vis the Debtor implementing the Retention Plans.

14.     In light of the foregoing, I believe that the Retention Plans are a reasonable, market-based approach to retaining employees essential to the Debtors' reorganization and operations.  The relief sought in the Motion should be granted by the Court, as it represents a key element of the Debtors' efforts in the chapter 11 cases.

KE 61919146

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  July 3, 2019                    */s/ Marc Pfefferle*
New York, New York                  Name:  Marc Pfefferle
                                       Title:    Chief Executive Officer
                                                Hollander Sleep Products, LLC